**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF WILLIAM KOCOVSKI
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, William Kocovski, declare under penalty of perjury as follows:

1.      I am a Partner at AlixPartners LLP ("***AlixPartners***"), a limited liability partnership, which has served as financial advisor to 2U, Inc., a Delaware corporation, and its debtor affiliates (collectively, the "***Debtors***" and, together with their non-debtor affiliates, the "***Company***" or "***2U***") since approximately November 2023.  Since that time, AlixPartners has assisted the Debtors with their business plan, liquidity assessment and ongoing liquidity management and forecasting, as well as identification and implementation of operational improvements.  I am over the age of 18

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

and authorized to submit this declaration (this "***Declaration***") on behalf of the Debtors.  I submit this Declaration in accordance with rule 1007- 2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") in support of the Debtors' (a) voluntary petitions for relief and (b) certain "first-day" pleadings described herein (collectively, the "***First Day Pleadings***"), including the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief* (the "***DIP Motion***"), each of which has been filed contemporaneously herewith.  If called, I would testify competently to all facts in this Declaration.

2.      AlixPartners was engaged by the Debtors to, among other things, assist the Debtors in their contingency planning efforts, including a potential chapter 11 filing.  I have led the AlixPartners team since the inception of the engagement.  In this capacity, I have familiarized myself with a range of matters concerning the Debtors' finances and capital structure, the Debtors' projected financial performance, the Debtors' liquidity, and the Debtors' motions and other matters described herein.  Since AlixPartners' engagement in this matter, AlixPartners has been working closely with the Debtors' management and other professionals to assist the Debtors in considering and planning for various restructuring scenarios.

3.      Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or opinion based on my experience; (b) information that I have received from the Debtors, my colleagues at AlixPartners working directly with me or under my supervision, direction, or control, or other advisors of the Debtors; and/or (c) my review of relevant documents.  As to matters regarding state and federal law, including bankruptcy law, I have relied upon the advice of the Debtors' proposed bankruptcy counsel, Latham & Watkins LLP

2

("**Bankruptcy Counsel**").    Additionally, the opinions asserted herein are based upon my experience and knowledge of the Debtors' operations, financial condition, and liquidity.  I am not being specifically compensated for this testimony other than through the compensation to AlixPartners as a professional retained by the Debtors.

4.    This Declaration is divided into four parts.  **Part A** provides background information regarding AlixPartners' and my qualifications.  **Part B** provides background information regarding these Chapter 11 Cases (as defined below).  **Part C** discusses the Debtors' need for postpetition financing during these Chapter 11 Cases.  **Part D** summarizes the First Day Pleadings and explains why the relief requested therein is appropriate and necessary.  Finally, **Part E** provides certain information required by Local Rule 1007-2.

A.    **QUALIFICATIONS**

5.    AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing operational and financial advisory services and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous Chapter 11 cases of similar size and complexity to these Chapter 11 Cases.  Since its inception in 1981, AlixPartners has provided restructuring or crisis management services in numerous large cases.  AlixPartners also has a wealth of experience advising institutions and other companies in and adjacent to the education industry, including Skillsoft, McGraw Hill, General Assembly and SCAD.   AlixPartners has extensive experience in providing financial and restructuring advisory services to debtors and financially distressed companies, which will be described more fully in the Debtors' application to retain AlixPartners pursuant to section 327(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), once filed with this Court (as defined below).

US-DOCS\152002016.16

6. I have over 20 years of restructuring, reorganization and strategic advisory expertise at AlixPartners. I have advised U.S. and international debtors and creditors in high-profile restructurings, including Gol Linhas Aereas Inteligentes S.A., Grupo Aeromexico, S.A.B. de C.V., Westinghouse Electric Company, General Motors, Akorn Inc., Metaldyne Corp., Mirant Corp., and Federal Mogul Corp. My experience also includes business plan development, cash flow and other financial forecasting, contingency planning, analysis of major contracts, liquidation analysis, analysis and implementation of cost reductions, and analysis of restructuring alternatives and financial transactions.

**B.    THESE CHAPTER 11 CASES**

7. The Debtors comprise a leading online education technology company providing over eighty million people worldwide with access to high-quality education, including graduate, undergraduate, and non-degree programs. Through a comprehensive platform, the Debtors enable non-profit universities and colleges (the "***Partner Institutions***") to offer a wide range of online courses and programs. These span diverse fields such as artificial intelligence, data science, business, healthcare, and education, with over 4,600 programs accessible on their platform, edX.org, which provides learners with essential information on admissions, enrollment requirements, application processes, curriculum, tuition, and completion times. By consolidating a vast array of educational offerings on a single platform, the Debtors offer flexible and affordable pathways for achieving professional and educational goals. Although operations are predominantly remote, the majority of the Debtors' revenue flows into New York, where the Debtors hold their primary bank accounts, and where they collaborate with prestigious institutions of higher education (many of which are located here in New York City, including New York University, Columbia University and Fordham University), enhancing their reach and impact within the city and state.

4

8.      On the date of filing this Declaration (the "**Petition Date**"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (this "**Court**") commencing voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.

9.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Matthew Norden, Chief Legal Officer and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions* (the "**Norden Declaration**"),[2] filed contemporaneously with this Declaration.

10.     These Chapter 11 Cases are "prepackaged" cases commenced for the purpose of implementing an agreed restructuring of the Debtors' debt. Prior to the Petition Date, the Debtors entered into the Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended, modified or supplemented, the "**Restructuring Support Agreement**") with certain creditors including (a) an ad hoc group of certain holders (the "**Ad Hoc Noteholder Group**") of 2.25% convertible senior notes due May 1, 2025, issued under that certain Indenture, dated as of April 23, 2020 (the "**2025 Notes**") and 4.50% senior unsecured convertible notes due February 1, 2030, issued under that certain Indenture, dated as of January 11, 2023 (the "**2030 Notes**" and, together with the 2025 Notes, the "**Notes**") represented by Weil, Gotshal & Manges LLP, (b) Greenvale Capital LLP ("**Greenvale**" and, together with the Ad Hoc Noteholder Group, the "**Consenting Noteholders**") as holder of the Notes represented by Schulte Roth & Zabel LLP, and (c) an ad hoc group of certain First Lien Lenders (the "**First Lien Ad Hoc Group**" and, together with the Consenting Noteholders, the "**Consenting Stakeholders**") represented by Milbank LLP. As of

---

[2]     Unless otherwise defined herein, all capitalized terms in this Part B shall have the meanings ascribed to them in the Norden Declaration.

July 24, 2024, the Consenting Stakeholders held approximately 82% of the Debtors' first lien funded debt, 86.9% of the 2025 Notes, and 95.2% of the 2030 Notes.

11.     On the Petition Date, the Debtors filed a plan of reorganization reflecting the terms of the Restructuring Support Agreement (as may be amended, modified or supplemented, the "***Plan***") in addition to a disclosure statement with respect to the Plan (as may be amended, modified or supplemented, the "***Disclosure Statement***").  The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.

12.     Before the Petition Date, the Debtors commenced solicitation of votes on the Plan from holders of Class 3 First Lien Claims and Class 4 Unsecured Notes Claims (each as defined in the Plan), the only classes entitled to vote under the Plan.  Subject to this Court's approval, votes with respect to the Plan are due on August 21, 2024.  On the Petition Date, the Debtors filed a motion seeking, among other things, (a) conditional approval of the Disclosure Statement, and (b) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan.  The Debtors seek to obtain confirmation of the Plan as quickly as this Court's schedule and requisite notice periods will permit.

## C.     The Debtors' Need for Postpetition Financing

### I.     The DIP Facility and Use of Cash Collateral

13.     To fund these Chapter 11 Cases, the Debtors are seeking authorization for use of cash collateral (as defined in the Bankruptcy Code, "***Cash Collateral***") and to obtain $64 million in postpetition new-money financing on a superpriority junior secured basis (the "***DIP Facility***"), pursuant to the DIP Motion,[3] filed contemporaneously with this Declaration.  Certain holders of

---

[3]     Unless otherwise defined herein, all capitalized terms in this Part B shall have the meanings ascribed to them in the DIP Motion.

US-DOCS\152002016.16

Unsecured Notes (as defined in the Plan) will be the initial lenders under the DIP Facility (in such capacity, the "**DIP Lenders**").  By the DIP Motion, the Debtors seek authority to make an initial draw of $60 million under the DIP Facility on an interim basis (the "**Initial Funding**"), with the remainder of the DIP Facility available upon entry of a final order.

14.     The terms of the DIP Facility are the result of arm's-length, good-faith negotiations conducted by the Debtors and their advisors with the Consenting Noteholders and the Ad Hoc First Lien Group (as defined in the Plan), and each of their respective advisors.  These discussions began in April 2024 and lasted until shortly before the Petition Date.  Ultimately, the Debtors, in consultation with their advisors, determined that the DIP Facility represented the best post-petition debtor in possession financing option available to the Debtors.  In addition to demonstrating the confidence of the DIP Lenders in the Debtors' restructuring strategy, the DIP Facility is essential to the continued support of the Debtors' stakeholders, including their workforce, Partner Institutions, students, and vendors and avoidance of an interruption of their businesses during these Chapter 11 Cases.

**II.     The Debtors Liquidity Needs**

15.     Before the Petition Date, the Debtors worked with AlixPartners to analyze and quantify the Debtors' potential liquidity needs for these Chapter 11 Cases.  As part of the Debtors' evaluation of their liquidity position, AlixPartners worked closely with the Debtors' management to review, analyze, and assist in the Debtors' 13-week cash flow forecast, which takes into consideration a number of factors, including the effect of these Chapter 11 Cases on the operations of the business, fees and interest expenses associated with postpetition financing, adequate protection payments, professional fees and expenses, and customer and vendor obligations.  The Debtors' 13-week cash flow forecast as of the Petition Date indicates that the Debtors are unable

7

to generate enough operating cash flow to cover their anticipated operating expenses and working capital needs in addition to the projected costs of these Chapter 11 Cases.

16.    Specifically, the Debtors' liquidity has already fallen below the minimum level required to comfortably operate.  The Debtors believe that the Company needs to maintain a minimum liquidity level of no less than $30 million to satisfy their commitments to Partner Institutions, students, employees, and vendors in the ordinary course and be in a position to address unforeseen expenditures that arise that exceed typical disbursements.  In addition, the Debtors have, and will continue to incur substantial costs during these Chapter 11 Cases in pursuit of restructuring transactions that position them to continue offering high-quality education and support during this process and beyond.  As of the Petition Date, the Debtors' total cash balance is approximately $21.4 million, substantially all of which I understand to be encumbered by the liens securing the Debtors' obligations under the First Lien Credit Agreement and an agreement governing the Debtors' certificate of deposit account held at AMEX National Bank, or otherwise posted as cash collateral to secure the Debtors' outstanding letters of credit.  Of the Debtors' total cash balance, $8.3 represents available liquidity.  Accordingly, the Debtors require postpetition financing and access to Cash Collateral to continue satisfying their commitments in the ordinary course and to fund these Chapter 11 Cases.

17.    The Debtors, with the assistance of their advisors, sized the DIP Facility, including the Initial Funding, taking into account the Debtors' actual cash needs to, among other things: (a) provide sufficient minimum liquidity to continue to conduct their businesses in the ordinary course and generate revenue during these Chapter 11 Cases; (b) fund payments to their workforce; (c) fund the payments authorized by this Court pursuant to the First Day Pleadings; (d) fund adequate protection payments to First Lien Lenders; and (e) satisfy administrative costs and

8

expenses of the Debtors incurred in these Chapter 11 Cases. This analysis is reflected in the Approved Budget (as defined below) attached as Exhibit B to the Interim DIP Order (as defined in the DIP Motion), which the Debtors prepared with the assistance of AlixPartners.

18.    As described above, the Debtors have a critical need to use the proceeds of the DIP Facility and Cash Collateral to operate their businesses and fund these Chapter 11 Cases. And importantly, the Approved Budget assumes that uninterrupted operations will be made possible through approval of the DIP Motion, including the occurrence of the Initial Funding and immediate use of Cash Collateral. If the Debtors' operations are interrupted, then their cash flow position would be meaningfully lower than is reflected in the Approved Budget, as vendors and Partner Institutions may be unwilling to do business with the Debtors and employees could leave the Debtors, jeopardizing their operations.

**III.    Interim Relief is Warranted**

19.    I believe that approval of the interim relief requested in the DIP Motion, including the Initial Funding, is necessary to avoid immediate and irreparable harm to the Debtors' estates. The Debtors have expended considerable efforts and resources to reach a constructive and comprehensive restructuring solution that allows them to both (a) continue their mission to expand access to high-quality education and deliver best-in class student outcomes, and (b) restructure and strengthen their balance sheet. These efforts and expenditures will have been for naught if the Company were to face a potential liquidation, rather than restructuring, without the use of Cash Collateral and the infusion of new money from the DIP Facility to fund its ongoing operations and obligations during these Chapter 11 Cases.

20.    The Initial Funding will increase the Company's liquidity above the $30 million level that the Debtors believe is necessary to run their businesses in the ordinary course, as well as

remain in a position to address unforeseen expenditures that may arise in excess of typical disbursements. The $60 million provided in Initial Funding under the DIP Facility is intended to keep the Company's liquidity at or above the minimum level deemed necessary to comfortably operate. And access to the DIP Facility and use of Cash Collateral will allow the Debtors to avoid value degradation and reduced recoveries for their stakeholders. Absent immediate access to the DIP Facility and Cash Collateral at this pivotal stage, the Debtors could (a) face a detrimental interruption of their business; (b) lose the support of key constituencies, including the Debtors' workforce, Partner Institutions, and vendors, on which the success of these Chapter 11 Cases depend; and (c) be forced to make adverse modifications to their operations, all of which could detrimentally affect the Debtors' ability to maximize the value of the estates.

21.    Among other things, the Debtors require the Initial Funding to send a strong message to their employees that the Debtors are financially stable and have the liquidity necessary to meet ongoing obligations to their workforce and to successfully navigate and emerge from these Chapter 11 Cases. The Debtors' employees' skills, knowledge, and understanding of the Debtors' businesses, operations, and relationships are essential to the continuation of the Debtors' operations during these Chapter 11 Cases. Absent the confidence and support from their employees that the Debtors will be able to meet their obligations in the ordinary course, the Debtors may face employee attrition which would have an adverse impact on the Debtors' business operations.

22.    Likewise, the Debtors rely on a network of vendors to provide the services and technology needed to maintain their platform. The Debtors would incur significant delay and costs if their vendors refused to continue to do business with them as a result of uncertainty regarding the Debtors' financial position. In the past few weeks, the Debtors delayed payments to certain of

10

their vendors to preserve cash.  Absent the use of Cash Collateral and the additional liquidity from

the Initial Funding, the Debtors vendors may stop providing goods and/or services.  Further,

without immediate access to the DIP Facility, vendors may demand onerous trade terms, such as

cash on delivery, as a condition to continuing to do business with the Debtors, which would strain

the Debtors' liquidity.

23.     Further, maintaining relationships with Partner Institutions and providing the

services that students and learners need to continue their education is essential to the Debtors'

mission to provide universal access to the world's best education, and is critical to the success of

the Debtors' business and preservation of the value of their estates.  The Debtors approach their

responsibilities to their Partner Institutions, students, and learners in this regard with the utmost

seriousness.  As described in detail above, the Debtors' ability to successfully operate their

platform to provide the high-quality education at the core of their business would be irreparably

harmed without continued access to liquidity.  Accordingly, the Debtors require immediate use of

Cash Collateral and access to the DIP Facility to ensure the seamless execution of its

responsibilities to Partner Institutions, students and learners on an ongoing basis.

24.     The Debtors immediate need for access to the DIP Facility and use of Cash

Collateral is compounded by the fact that, as the month of August approaches, the Debtors are

entering a period during which their cash flow is typically below average due to the seasonality of

their business.  2U's Degree Program Segment, which represents more than 50% of its revenue, is

seasonal with respect to payments from Partner Institutions.  Specifically, cash collections are

concentrated around academic terms, with invoicing typically occurring approximately thirty (30)

days after the start of each term—many of which begin in mid-to-late August.  Accordingly, the

month of August is typically a trough period for the Company's cash flow profile due to the

seasonality of the academic calendar.   And given the Company's other liquidity needs in connection with these Chapter 11 Cases and its ongoing operations, the Company requires immediate access to both the DIP Facility and use of Cash Collateral.

25.    The Debtors' ability to generate revenue would also be impacted without the immediate access to the DIP Facility and use of Cash Collateral.   Specifically, the Alternative Credential Segment has a short marketing and revenue generation cycle that relies heavily on significant up-front spending on marketing leading up to a course start date.   Absent access to the DIP Facility and use of Cash Collateral, the Debtors may need to reduce or pause spending on marketing, which would likely cause the Debtors to experience reduced near-term collections and revenue to the detriment of the Debtors' businesses and estates.

26.    Finally, the Debtors require access to the DIP Facility and use of Cash Collateral to make adequate protection payments in accordance with the Restructuring Support Agreement, which requires the Debtors to pay approximately $11.3 million to the lenders under the First Lien Credit Agreement by July 31, 2024.   The Debtors will be unable to meet these obligations without access to the DIP Facility and use of Cash Collateral.   Failure to comply with the Restructuring Support Agreement would imperil the Debtors' ability to restructure in an orderly manner and, among other things, cause the Debtors to incur significant additional costs in these Chapter 11 Cases, which would diminish the value of their estates.

27.    Accordingly, the preservation of the estates and the continuing viability of the Debtors' businesses depends heavily upon the expeditious approval of the relief requested in the DIP Motion.   Accordingly, based on the foregoing, I believe that approval of the DIP Motion on an interim and final basis is in the best of the Debtors and their estates.

US-DOCS\152002016.16

**D.      Facts Supporting Relief Sought in First Day Pleadings[4]**

28.      In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "***Proposed Orders***"), and respectfully request that this Court consider entering the Proposed Orders granting the First Day Pleadings.   For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in those of the First Day Pleadings for which such authority is sought.   A description of the relief requested in as well as an overview of the facts supporting each of the following First Day Pleadings is set forth in **Exhibit A** hereto and incorporated herein by reference:

> (a)      **Administrative and Procedural Pleadings**
>
>> (i)      *Motion of Debtors for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases; and (B) Granting Related Relief* (the "**Joint Administration Motion**");
>>
>> (ii)      *Motion of Debtors for Entry of an Order (A) Scheduling a Combined Hearing to Consider Approval of the Disclosure Statement and Confirmation of the Plan; (B) Establishing the Voting Record Date, Voting Deadline, and Other Dates; (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Disclosure Statement or the Plan; (D) Approving the Manner and Forms of Notice and Other Related Documents; (E) Approving Equity Rights Offering Documents; (F) Conditionally Waiving Requirement of Filing Schedules and Statements and of Convening Section 341 Meeting of Creditors; and (G) Granting Related Relief* (the "**Solicitation Procedures Motion**");
>>
>> (iii)      *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to File (I) a Consolidated Creditor Matrix and Consolidated List of the Top Thirty Unsecured Creditors and (II) Redact Certain Personally Identifiable Information; (B) Waiving Requirement to File List of Equity Security Holders; and (C) Granting Related Relief* (the "**Creditor Matrix Motion**");

---

[4]      Unless otherwise defined herein, all capitalized terms in this Part D shall have the meanings ascribed to them in the applicable First Day Pleadings.

(iv) *Motion of Debtors for an Order (A) Enforcing and Restating Sections 362, 365, 525, and 541 of the Bankruptcy Code; (B) Approving Form and Manner of Notice to Foreign Parties in Interest of the Debtors; (C) Approving Form and Manner of Notice to Foreign Parties in Interest of The Non Debtor Affiliates; and (D) Granting Related Relief* (the "**Global Stay Motion**");

(v) *Motion of Debtors for Interim and Final Orders (A) Establishing Notification and Hearing Procedures on Certain Transfers of Interests in, and Claims Against, the Debtors, and Claims of Certain Worthless Stock Deductions; and (B) Granting Related Relief* (the "**NOL and Claims Trading Motion**"); and

(vi) *Application of Debtors for Entry of an Order (A) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent to the Debtors; and (B) Granting Related Relief* (the "**Epiq Claims Agent Application**").

**(b)** **Business and Operational Motions**

(i) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief* (*i.e.*, the DIP Motion);

(ii) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, And Business Forms, (II) Continue Existing Deposit Practices, (III) Waive Certain U.S. Trustee Guidelines, and (IV) Continue Intercompany Transactions; (B) Granting Superpriority Status to Postpetition Intercompany Claims; and (C) Granting Related Relief* (the "**Cash Management Motion**");

(iii) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Honor Prepetition Customer Obligations and (II) Continue Customer Programs; and (B) Granting Related Relief* (the "**Customer Programs Motion**");

(iv) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Satisfy Prepetition Workforce Obligations and (II) Continue Workforce Programs on a Postpetition Basis; (B) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (C) Granting Related Relief* (the "**Wages Motion**");

(v) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees; and (B) Granting Related Relief* (the "**Taxes Motion**");

(vi) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Insurance Programs Obligations and (II) Maintain Their Insurance Programs Postpetition; and (B) Granting Related Relief* (the "**Insurance Motion**");

(vii) *Motion of Debtors for an Order (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (B) Approving the Debtors' Proposed Form of Adequate Assurance of Payment for Utility Services; (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance; and (D) Granting Related Relief* (the "**Utilities Motion**"); and

(viii) *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business; and (B) Granting Related Relief* (the "**All Trade Motion**").

29.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruptions and disruptions to their businesses or loss of productivity or value; (b) is necessary preserve valuable relationships with customers, trade vendors and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

## E.    Information Required by Local Rule 1007-2

30.     Local Rule 1007-2 requires that certain information regarding the Debtors be provided.  Such information is appended in **Exhibit B** through **Exhibit M** hereto.  Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[5]

---

[5]    The information contained in **Exhibit B** through **Exhibit M** attached to this Declaration does not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein or therein is a disputed claim or debt and to challenge the priority, nature, amount, or status of any such claim or debt.

(a)     Pursuant to Local Rule 1007-2(a)(3), **Exhibit B** provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these Chapter 11 Cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

(b)     Pursuant to Local Rule 1007-2(a)(4), **Exhibit C** provides the following information with respect to each of the holders of the Debtors' thirty (30)[6] largest unsecured claims, excluding claims of insiders:  the creditor's name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

(c)     Pursuant to Local Rule 1007-2(a)(5), **Exhibit D** provides the following information with respect to each of the holders of the five largest secured claims against the Debtors:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

(d)     Pursuant to Local Rule 1007-2(a)(6), **Exhibit E** provides a summary of the Debtors' assets and liabilities.

(e)     Pursuant to Local Rule 1007-2(a)(7), **Exhibit F** provides a summary of the publicly held securities of the Debtors.

(f)     Pursuant to Local Rule 1007-2(a)(8), **Exhibit G** provides the following information with respect to any property of the Debtors in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

(g)     Pursuant to Local Rule 1007-2(a)(9), **Exhibit H** provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

(h)     Pursuant to Local Rule 1007-2(a)(10), **Exhibit I** sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

---

[6]     While Local Rule 1007-2(a)(4) requires that the Debtors the twenty (20) largest unsecured claims, the Debtors have elected to provide the top thirty (30) unsecured claims.

US-DOCS\152002016.16

(i)     Pursuant to Local Rule 1007-2(a)(11), **Exhibit J** provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

(j)     Pursuant to Local Rule 1007-2(a)(12), **Exhibit K** sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, each such individual's tenure with the Debtors, and a brief summary of each such individual's relevant responsibilities and experience.

(k)     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Exhibit L** provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equity holders) and the estimated amounts to be paid to officers, equity holders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

(l)     Pursuant to Local Rule 1007-2(b)(3), **Exhibit M** provides a schedule of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the Petition Date, and any other information relevant to an understanding of the foregoing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 25, 2024

*/s/ William Kocovski*
William Kocovski
Partner
AlixPartners LLP

**<u>Exhibit A</u>**

**Relief Sought by and Factual Overview of First Day Pleadings[1]**

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Pleadings in connection with which they are herein referenced.

A.    **Administrative and Procedural Pleadings**

I.    *Joint Administration Motion*

1.    By the Joint Administration Motion, the Debtors seek entry of an order: (a) directing the joint administration of these Chapter 11 Cases for procedural purposes only; and (b) granting related relief.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these Chapter 11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

II.    *Solicitation Procedures Motion*

2.    By the Solicitation Procedures Motion, the Debtors seek entry of an order: (a) scheduling a combined hearing the ("***Combined Hearing***") for September 6, 2024 (or as soon thereafter as the Court has availability), at which the Court will consider approval of the Disclosure Statement and confirmation of the Plan; (b) establishing the voting record date, voting deadline and other related dates; (c) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Disclosure Statement or the Plan; (d) approving the manner and forms of notice and other related documents; (e) approving the equity rights offering documents; (f) conditionally, if the Plan is confirmed within 75 days of the Petition Date, waiving the requirements to (i) hold the Creditors' Meeting and (ii) file schedules of assets and liabilities, statements of financial affairs and 2015.3 Reports; and (g) granting related relief.

3.    In connection with the foregoing, the Debtors request that the Court approve (subject to the availability of the Court's calendar) the following Proposed Confirmation Schedule, which dates I understand comply with the milestones contained in the Debtors' Restructuring Support Agreement:

**Proposed Confirmation Schedule**

| Event | Date/Deadline | Notes |
|---|---|---|
| Voting Record Date | July 22, 2024 | N/A |
| Commencement of Prepetition Solicitation | July 24, 2024 | N/A |
| Petition Date | July 25, 2024 | N/A |
| Commencement of Equity Rights Offering | July 26, 2024 | N/A |
| Deadline to Publish Notice of Combined Hearing | July 31, 2024 (or as soon as reasonably practicable after entry of the Proposed Order) | Combined Hearing *less* 37 days. |
| Initial Plan Supplement Deadline | August 16, 2024 | 5 days prior to Voting Deadline and 7 days prior to the Objection Deadline. |
| Voting Deadline | August 21, 2024 | Commencement of Prepetition Solicitation *plus* 28 days. |
| Objection Deadline for Combined Hearing | August 23, 2024 | At least 28 days after commencement of Prepetition Solicitation. |
| Equity Rights Offering Termination | August 27, 2024 | N/A |
| Confirmation Brief and Reply Deadline | September 3, 2024 | N/A |
| Combined Hearing | September 6, 2024 | Petition Date *plus* 43 days. |

4.      I have been informed that a debtor is typically required to provide notice of a hearing to consider the adequacy of the disclosure statement and a hearing to consider confirmation of a plan to all creditors and equity holders.  I have also been advised that, beginning on July 24, 2024, the Debtors caused their claims and noticing agent, Epiq Corporate Restructuring, LLC (the "**Claims and Noticing Agent**"), to distribute Solicitation Packages to the Voting Classes.

5.      I was also advised that, on or around the Petition Date, the Debtors, through the Claims and Noticing Agent, mailed or will mail the Combined Notice, which gives (a) notice of the commencement of these Chapter 11 Cases; (b) instructions regarding the Combined Hearing and how to obtain a copy of the Solicitation Package (other than a Ballot) free of charge; and (c) detailed directions for filing objections to approval of the Disclosure Statement or confirmation of the Plan

6.      I believe that the relief requested in the Solicitation Procedures Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Solicitation Procedures Motion.

### III.    *Creditor Matrix Motion*

7.      By the Creditor Matrix Motion, the Debtors seek entry of an order:  (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) file and maintain a consolidated creditor list and mailing matrix (the "***Creditor Matrix***"), in lieu of a separate creditor list and mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' top thirty (30) unsecured creditors, in lieu of filing a separate list of the top twenty (20) unsecured creditors for each Debtor, and (iii) redact certain personally identifiable information; (b) waiving the requirement for Debtor 2U, Inc. to file a list of its equity security holders; and (c)  granting related relief.

8.      I am informed by Bankruptcy Counsel that section 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(a)(1), and Local Rule 1007-1(a) require a debtor in a voluntary chapter 11 case to file a list containing the name and complete address of each creditor.  In addition, I am informed by Bankruptcy Counsel that Bankruptcy Rule 1007(d) requires a debtor to file a list

containing the name, address, and claim of the creditors holding the twenty largest unsecured claims against the debtor.

9.      In this case, I believe that authorizing the Debtors to file a consolidated Creditor Matrix, in lieu of a separate creditor list and mailing matrix for each Debtor, is warranted.  The Debtors operate as an integrated business and share cash management and operational systems. Because the Debtors have thousands of creditors and other parties-in-interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an unnecessarily burdensome and time-consuming task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors and their agents.  Moreover, with respect to the top unsecured creditor lists, I believe that filing separate top twenty (20) creditor lists for each Debtor—instead of one consolidated list of the Debtors' top thirty (30) unsecured creditors—would be of limited utility and potentially duplicative to an extent, especially in comparison to the time and expense it would cost to compile separate lists when the Debtors' management are trying to facilitate a smooth transition into chapter 11.

10.     Instead, the Debtors, in consultation with Epiq Corporate Restructuring, LLC ("**Epiq**"), their proposed claims and noticing agent, have prepared a single, consolidated list of the Debtors' creditors in electronic format.[2]  The Debtors are prepared to make the Creditor Matrix available in electronic form to any party-in-interest who requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of this

---

[2]    I am informed by Bankruptcy Counsel that pursuant to Local Rule 5075-1, a debtor filing a petition with more than 250 creditors and equity interest holders in the aggregate, as is the case here, is required to retain an approved claims and noticing agent pursuant to an order of this Court.  Contemporaneously herewith, the Debtors have filed an application seeking the appointment of Epiq as their claims and noticing agent pursuant to 28 U.S.C. § 156(c).

Bankruptcy Court.  I am informed by Bankruptcy Counsel that the proposed maintenance of the Creditor Matrix with Epiq is consistent with applicable Local Rules.

11.      I believe that 2U, Inc.'s requirement to file a list of all equity security holders should be waived in these Chapter 11 Cases.  As an initial matter, 2U, Inc. is a public reporting company with the Securities and Exchange Commission (the "*SEC*") and 2U, Inc.'s common stock (the "*2U Common Stock*") currently is registered with the SEC under Section 12(g) of the Securities Exchange Act of 1934, as amended.  2U Common Stock is listed under the ticker symbol "TWOU" on the Nasdaq Global Select Market.  As of the Petition Date, I am informed that there were approximately 2,805,321 shares of 2U Common Stock outstanding with average daily trading volume of approximately 74,130 shares.

12.      Although the Debtors maintain a list of registered holders of 2U Common Stock, the Debtors do not maintain a separate list of the beneficial holders of 2U Common Stock.  As a result, I do not believe that it is feasible for the Debtors to prepare a complete list of all the names and addresses of the current beneficial holders of 2U Common Stock.[3]  Accordingly, I believe that the requirement under Bankruptcy Rule 1007(a)(3) to file a list of all holders of 2U Common Stock be waived.  As an alternative to preparing a complete list of holders of 2U Common Stock, the Debtors will include all registered holders of 2U Common Stock on the Creditor Matrix.

13.      I am informed by Bankruptcy Counsel that the Debtors may be subject to privacy and data protections, including the CCPA, the UK GDPR, and the EU GDPR.  Accordingly, I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Creditor Matrix, the following personally identifiable information of the Debtors' current and former employees, independent contractors,

---

[3]      2U, Inc. filed with its petition a list of significant holders of 2U Common Stock.

customers, creditors, equity security holders (solely to the extent they are natural persons), and any other natural persons: (a) names, (b) home and email addresses, and (c) any other personally identifiable information. I believe that the publication of such information could be used to perpetrate identify theft or phishing scams or to harass or stalk such individuals, exposing the Debtors to potential civil liability and significant financial penalties. Absent the relief requested in the Creditor Matrix Motion, I believe that the Debtors could jeopardize the privacy and safety of individual parties in interest in these Chapter 11 Cases by publishing their names and home addresses without any advance notice or opportunity to opt out or take protective measures.

**IV.    *Global Stay Motion***

14.    By the Global Stay Motion, the Debtors seek entry of an order: (a) enforcing and restating the automatic stay provisions of section 362 the Bankruptcy Code, the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, the anti-discrimination provisions of section 525 of the Bankruptcy Code, and the anti-*ipso facto* provision of section 541(c) of the Bankruptcy Code; (b) approving the form and manner of notice, to foreign parties in interest of the Debtors, confirming that the Debtors are subject to the supervision of the Bankruptcy Court and the protections of the Bankruptcy Code, including the aforementioned provisions in the preceding clause (a); (c) approving the form and manner of notice (the "***Proposed Non-Debtor Notice***"), to foreign parties in interest of the Debtors' non-Debtor affiliates (the "***Non-Debtor Affiliates***"), confirming that the Non-Debtor Affiliates are not included in these Chapter 11 Cases and, thus, are not subject to the supervision of the Bankruptcy Court nor the provisions of the Bankruptcy Code that are the subject of the Global Stay Motion; and (d) granting related relief.

15.    To facilitate world-wide access to education, the Company relies on partnerships with colleges and universities (collectively, the "***University Customers***"), in addition to service

providers, from across the world.  Accordingly, I understand the Company has material assets abroad, and many of the parties with whom the Company conducts business are located outside of the United States.  The Company's businesses are internationally integrated, and I believe that its ability to maintain its international operations and operate as a unified global company throughout these Chapter 11 Cases is imperative.

16.    I believe that many of the Debtors' foreign University Customers, other customers, vendors, and other contract counterparties operating in various jurisdictions may be unfamiliar with chapter 11, including the scope of a debtor in possession's authority to operate its business and the import of the automatic stay.  Accordingly, it is my understanding that certain of the Debtors' foreign creditors could attempt to assert liens against the Debtors' assets.  These creditors, and others, may attempt to seize assets located outside of the United States or take other actions violating the automatic stay to the detriment of the Debtors, their estates, and other parties in interest.  Furthermore, the Debtors provide technology and services to customers located outside of the United States.  I am informed that the Debtors owe certain of these customers prepetition and ongoing obligations, and such parties may attempt to obtain payment in violation of the automatic stay.  Additionally, upon the commencement of these Chapter 11 Cases, I am informed that foreign counterparties to certain executory contracts could attempt to terminate such contracts, including pursuant to *ipso facto* provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside of the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants held by a Debtor and required for the Debtors' ongoing business operations, in violation of section 525 of the Bankruptcy Code.

17.     The Non-Debtor Affiliates similarly have a substantial body of foreign University Customers, other customers, vendors, and other contract counterparties that are vital to their international operations, many of whom may be unsure of the impact of these Chapter 11 Cases on the Non-Debtor Affiliates.  I believe that certain of these foreign parties in interest may be hesitant or, worse yet, refuse to conduct business with the Non-Debtor Affiliates under the mistaken assumption that the Non-Debtor Affiliates are part of these Chapter 11 Cases and subject to the protective provisions of the Bankruptcy Code.  This would substantially impair and impede the operations of the Non-Debtor Affiliates, which would have a corresponding detrimental impact on the Debtors given the Company's substantial reliance on intercompany relationships to operate its global businesses.  Accordingly, I believe it is equally important to notify these foreign parties in interest pursuant to the Proposed Non-Debtor Notice, that the Non-Debtor Affiliates are not part of these Chapter 11 Cases, and thus not subject to the supervision of this Court nor the protections of the Bankruptcy Code.

### V.     *NOL and Claims Trading Motion*

18.     By the NOL and Claims Trading Motion, the Debtors seek entry of interim and final orders (a) establishing notification and hearing procedures that must be complied with before certain transfers of interests in, and claims against, the Debtors are deemed effective, and certain worthless stock deductions with respect to equity securities of the Debtors can be taken, in order to protect the potential value of the Debtors' federal consolidated net operating losses (the "***NOLs***"), carryforwards of disallowed business interest expense under section 163(j) of title 26 of the United States Code (the "***Tax Code***"), and other tax benefits (collectively, the "***Tax Attributes***"); and (b) granting related relief.

19.     I understand that the Debtors possess certain Tax Attributes, including, as of December 31, 2023, (a) NOL carryforwards of approximately $830 million, and (b) carryforwards

of disallowed business interest expense of approximately $175 million.  I am informed that the Debtors expect to generate additional amounts of Tax Attributes prior to the Effective Date (as defined in the Plan) in the 2024 taxable year.  I believe that the Tax Attributes are valuable assets of the Debtors' estates.  I am informed by counsel that the Tax Code generally permits a corporation to carry forward its NOLs and disallowed business interest expense to reduce taxable income, thereby reducing the corporation's tax liability in future periods.  Accordingly, absent any existing or intervening limitations and depending on future operating results, I am informed that the Tax Attributes could significantly reduce the Debtors' U.S. federal income tax liability for current and future periods, including by offsetting any taxable income that may result from transactions completed in connection with the Debtors' Plan.  I am informed that the Tax Attributes could therefore translate into future tax savings over time, which savings could substantially enhance the Debtors' value and contribute to the Debtors' restructuring efforts.

20.    I am informed and believe that the Debtors believe that they have significant Tax Attributes that would be adversely affected by the occurrence of an Ownership Change during these Chapter 11 Cases.  I am informed that an Ownership Change occurs, the availability and value the Tax Attributes would be severely limited or eliminated.  Therefore, I believe that it is in the best interests of the Debtors and their stakeholders to restrict both the trading of 2U Stock and any claim of a Worthless Stock Deduction that could result in an Ownership Change *before* the effective date of a chapter 11 plan.  I am informed that such a restriction would protect the Debtors' ability to use the Tax Attributes during these Chapter 11 Cases, in connection with a reorganization transaction, and in taxable years following emergence.

21.    In addition, the Plan involves the issuance of new common stock in 2U, Inc. (or any successor to 2U, Inc.) and the distribution of such stock to certain creditors in satisfaction, in

whole or in part, of their respective claims (each, as defined in section 101(5) of the Bankruptcy Code, a "***Claim***") against the Debtors.  I am informed that this issuance and distribution is expected to result in an Ownership Change.  I am informed and believe that it is in the best interests of the Debtors and their stakeholders to restrict the trading of certain Claims against the Debtors that could impair the Debtors' ability to qualify for the relief afforded by section 382(l)(5) of the Tax Code.

22.    In light of the foregoing paragraphs, I believe that the relief requested in the NOL and Claims Trading Motion, including the restrictions and procedures requested therein, are in the best interest of the Debtors' estates.

### VI.    *Epiq Claims Agent Application*

23.    By the Epiq Claims Agent Application, the Debtors seek entry of an order: (a) appointing Epiq[4] as claims and noticing agent for the Debtors in these Chapter 11 Cases effective as of the Petition Date; and (b) granting relief.  I am informed that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

24.    The Debtors anticipate that there will be thousands of entities to be noticed.  I am informed by Bankruptcy Counsel that Local Rule 5075-1(b) provides that "[i]n a case in which the number of creditors and equity security holders, in the aggregate, is 250 or more, the estate shall retain, subject to approval of this Court, a claims and noticing agent in accordance with the [Claims Agent Protocol]."  In view of the number of anticipated claimants, the amount of noticing likely to be required in these Chapter 11 Cases, and the complexity of the Debtors' businesses, I am informed by Bankruptcy Counsel that the appointment of a claims and noticing agent is required by Local Rule 5075-1(b) I believe that such appointment is otherwise in the best interests of both

---

[4]    Epiq is the trade name of Epiq Corporate Restructuring, LLC.

the Debtors' estates and their creditors.  I am also informed that appointment of Epiq as claims and noticing agent will relieve the Clerk's Office of the administrative burden of processing what may be an overwhelming number of claims.

25.     At the Debtors' request, Epiq has been serving in a Claims and Noticing Agent capacity since prior to the Petition Date with assurances that the Debtors would seek approval of its employment and retention effective as of the Petition Date so that Epiq may be compensated for its pre-application services in these Chapter 11 Cases.  I believe that no party in interest will be prejudiced by the granting of the *nunc pro tunc* employment, as provided in the Epiq Claims Agent Application, because Epiq has provided and continues to provide valuable services to the Debtors' estates in the interim period.

## B.    Business and Operational Motions

### I.    *DIP Motion*

26.     By the DIP Motion, the Debtors seek entry of interim and final orders:

(a)     authorizing the Debtors to obtain *junior* secured postpetition financing in the form of a term loan facility in the aggregate principal amount of up to $64 million (the "***DIP Facility***" and, the loans made, advanced or deemed advanced thereunder, the "***DIP Loans***"), of which up to $60 million will be available immediately upon entry of the Interim Order, with the remaining up to $4 million to be available upon entry of, and subject to, the Final Order (the "***Final Borrowing***"), in accordance with and subject to the terms and conditions set forth in (i) that certain *Debtor-in-Possession Credit and Guaranty Agreement*, by and among Debtor 2U, Inc., as borrower (the "***Borrower***"), certain subsidiaries of the Borrower party thereto, as guarantors (together with any subsidiaries of the Borrower that become guarantors subsequent to the Closing Date (as defined in the DIP Credit Agreement), the "***DIP Guarantors***" and, together with the Borrower, the "***DIP Credit Parties***"), Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent (collectively, in such capacities, the "***DIP Agent***"), and the lenders from time to time party thereto (the "***DIP Lenders***" and, together with the DIP Agent, the "***DIP Secured Parties***") (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***" and, together with the other Credit Documents (as defined in the DIP Credit Agreement), the "***DIP Credit Documents***"), (ii) the Interim Order, (iii) the Final Order (as it relates to any Final

Borrowing), and (iv) the term sheet attached to the Restructuring Support Agreement (the "***DIP Facility Term Sheet***");

(b)        authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, including Cash Collateral (as defined in the Interim Order), solely in accordance with the terms and conditions set forth in the Interim Order and the DIP Credit Documents, including the Approved Budget (as defined in the Interim Order), subject to any variances expressly permitted in the Interim Order and under the DIP Credit Agreement;

(c)        granting to the DIP Lenders the DIP Liens on all DIP Collateral, as set forth in the Interim Order, subject to the Carve-Out;

(d)        granting to the DIP Lenders DIP Superpriority Claims;

(e)        granting adequate protection to be provided to the Prepetition Secured Parties; and

(f)        granting related relief.

27.        The DIP Facility, which is being provided by certain Noteholders, includes:  (a) a junior lien, multi-draw term loan facility, providing an initial draw of up to $60 million following entry of the Interim Order and a subsequent draw of up to $4 million following entry of the Final Order, and in each case, subject to the conditions precedent set forth in the DIP Credit Agreement; (b) an interest rate of Base Rate or Term SOFR, as applicable, plus (i) for DIP Loans that are Base Rate Loans, 7.50% *per annum* and (ii) for DIP Loans that are Term SOFR Loans, 8.50% *per annum*, payable in kind; and (c) a maturity date of January 24, 2025.  Significantly, there are ***no fees*** associated with the DIP Facility..

28.        The DIP Facility also provides the Debtors the continued use of Cash Collateral. Under the Plan, each holder of a claim arising under the DIP Facility will receive either (a) its *pro rata* share of Exit Loans under the Exit Facility Credit Agreement (each as defined in the Plan), or (b) such other treatment as to which the Debtors and the holder of such claim will have agreed upon in writing, with the consent of the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) and the Debtors.

29.     As described in this Declaration, access to the proposed DIP Facility will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis.  Given the Debtors' circumstances, the Debtors believe that the terms of the proposed DIP Facility are fair, reasonable, and adequate, and thus the relief sought by the DIP Motion is unquestionably in the best interests of the Debtors, their estate, and their stakeholders. Accordingly, I respectfully submit that the Court should approve the DIP Motion.

## II.     *Cash Management Motion*

30.     By the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors, to (i) continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms, (ii) continue their existing deposit practices, (iii) waive certain bank account and related guidelines of the Office of the United States Trustee for the Southern District of New York (the "***U.S. Trustee***," and such guidelines, the "***U.S. Trustee Guidelines***") and the requirements of section 345(b) of the Bankruptcy Code, to the extent inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Cash Management Motion, (iv) continue certain ordinary course intercompany transactions, including honoring and paying prepetition intercompany claims among Debtors and Non-Debtor Affiliates (as defined below), and (v) open and close bank accounts; (b) granting superpriority status to postpetition intercompany claims arising from certain intercompany transactions; and (c) granting related relief.

31.     In the ordinary course of their businesses, the Debtors maintain a cash management system (the "***Cash Management System***") that includes (a) operating accounts; (b) payroll accounts; (c) collection accounts; (d) money market accounts (one of which will be used to hold adequate assurance deposits for the Debtors' utility providers); (e) an account for receiving the

proceeds of the DIP Facility; (f) an account established for receiving proceeds from the Equity Rights Offering; (g) a professional fee escrow account; (h) a certificate of deposit account; (i) a restricted cash account; and (j) certain bank accounts held by the Debtors' non-Debtor affiliates. I believe that the Cash Management system is integral to the operation and administration of the Debtors' businesses.  Specifically, the Cash Management System allows the Debtors to: (a) monitor and control all of their cash receipts and disbursements to and from the Bank Accounts (as defined below); (b) identify their cash requirements; (c) transfer cash as needed in light of those cash requirements; and (d) track intercompany cash transfers between Debtors, as well as between Debtors and Non-Debtor Affiliates.  I believe that the Cash Management System is similar to those used by other companies of similar size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.  The Cash Management System is managed by finance personnel who work remotely in either the United States or South Africa and oversee the administration of the various bank accounts, including the collection, disbursement, and transfer of cash within the United States and abroad, as well as among and between the Debtors and their Non-Debtor Affiliates.  Because of the nature of the Debtors' businesses, I believe that any disruption of the Cash Management System would be materially detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.

32.    **The Bank Accounts and Flow of Funds**.  As of the Petition Date, the Debtors maintain twenty-three (23) accounts (the "***Bank Accounts***"), including (a) operating accounts; (b) payroll accounts; (c) collection accounts; (d) money market accounts (one of which will be used to hold adequate assurance deposits for the Debtors' utility providers); (e) an account for receiving the proceeds of the DIP Facility; (f) an account established for receiving proceeds from the Equity Rights Offering; (g) a professional fee escrow account; (h) a certificate of deposit

account; and (i) a restricted cash account. All of the Bank Accounts are held at either JPMorgan Chase Bank, National Association ("**JPM**"), Bank of America, N.A. ("**Bank of America**"), Comerica Bank ("**Comerica**"), Flagstar Bank, N.A. ("**Flagstar**"), Citizens Bank, N.A. ("**Citizens**"), or American Express National Bank ("**AmEx**") (collectively, the "**Cash Management Banks**"). As of the Petition Date, the aggregate balance of funds held in the Bank Accounts was approximately $21.4 million. JPM, Bank of America, Comerica, Flagstar, Citizens, and AmEx are financially stable institutions that are insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**") (up to an applicable limit per Debtor per institution), and all Cash Management Banks except AmEx are party to a Uniform Depository Agreement with the U.S. Trustee.[5] The Debtors hold two (2) foreign Bank Accounts at JPM, a global financial institution widely regarded as well-capitalized and financially stable, in the United Kingdom and South Africa, and I am informed that both of these jurisdictions with depository insurance or guarantee schemes.[6]

33. Certain Non-Debtor Affiliates also maintain accounts with the Cash Management Banks: (a) GetSmarter Online Ltd., edX Boot Camps (Canada) ULC, 2U GetSmarter (UK) Limited, edX Boot Camps (Australia) Pty Limited, edX Boot Camps (UK) Limited, and 2U Group (UK) Limited maintain accounts with JPM; and (b) edX Boot Camps (Canada) ULC, edX Boot

---

[5]   I am informed by Bankruptcy Counsel that as set forth on the list of Authorized Depositories for Region 2, published by the U.S. Trustee on November 16, 2023, JPM, Bank of America, Flagstar, and Citizens are "Authorized Depositories" for all U.S. Trustee offices in Region 2, and Comerica is an "Authorized Depository" for the Southern District of New York.

[6]   I am informed that the Bank of England's Financial Services Compensation Scheme provides protection for deposits and insurance policies, and South Africa's Corporation for Deposit Insurance is South Africa's insurance deposit scheme. *See* Bank of England, Financial Services Compensation Scheme, https://www.bankofengland.co.uk/prudential-regulation/authorisations/financial-services-compensation-scheme; South African Reserve Bank, Corporation for Deposit Insurance, https://www.resbank.co.za/en/home/what-we-do/Deposit-insurance.

Camps (Australia) Pty Limited, and edX Boot Camps (UK) Limited maintain accounts with Bank of America.

34.     A schematic setting forth the Bank Accounts and the movement of cash through the Cash Management System is attached to the Cash Management Motion as Exhibit D.  As shown in this schematic, the Cash Management System aligns with the Debtors' two (2) business segments that are described in the Norden Declaration:  (a) the Degree Program Segment (Bank Accounts held by Debtor 2U, Inc.); and (b) the Alternative Credential Segment, which is comprised of Open Courses (as defined below) (Bank Accounts held by edX LLC), Exec Ed Programs (Bank Accounts held by Debtor 2U GetSmarter (US), LLC), and Boot Camps (Bank Accounts held by Debtor edX Boot Camps LLC).  The Bank Account with the highest level of activity is the Primary 2U Operating Account (as defined below) which, among other things, transfers cash to and from other operating accounts held by the Debtors and Non-Debtor Affiliates to ensure that each Debtor and Non-Debtor Affiliate has sufficient liquidity to meet its current obligations.  A schedule of the Bank Accounts is attached to the Cash Management Motion as Exhibit C, and the following table sets forth a summary of the Bank Accounts:

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| **Operating Accounts**<br><br>JPM - 6686 | 2U, Inc. | 2U, Inc. maintains an operating account (the "*Primary 2U Operating Account*") at JPM for purposes of (a) collecting receipts from certain Partner Institutions in connection with the Degree Program Segment; (b) making disbursements on account of payments to certain vendors and Partner Institutions; and (c) making transfers to, and receiving transfers from, other Bank Accounts held by 2U, Inc. and other Debtors as well as certain bank accounts held by Non-Debtor Affiliates.  The Primary 2U Operating Account is funded from third-party receipts, as well as cash swept manually from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. |
| Comerica - 1849 | 2U, Inc. | 2U, Inc. maintains an operating account (the "*Secondary 2U Operating Account*") at Comerica for purposes of (a) collecting receipts from certain Partner Institutions in connection with the Degree Program Segment; and (b) receiving transfers from other Bank Accounts held by 2U, Inc.  The Secondary 2U Operating Account is funded from third-party receipts and cash swept manually from the 2U Collections Account. Cash is manually swept from the Secondary 2U Operating Account to the Primary 2U Operating Account on an approximately weekly basis.  Although the majority of 2U Inc.'s disbursements are made from the Primary 2U Operating Account, disbursements may occasionally be made from the Secondary 2U Operating Account. |

| | | |
|---|---|---|
| BOA - 1970 | edX Boot Camps LLC | edX Boot Camps LLC maintains an operating account (the "***Primary Boot Camps Operating Account***") at BOA for purposes of (a) collecting receipts from individual learners (via either check or credit card (or similar) transactions) processed by Stripe (as defined below), enterprise customers, and third-party financing sources in connection with the Boot Camps business; (b) making transfers to other Bank Accounts held by edX Boot Camps LLC; and (c) making transfers to, and receiving transfers from, other Debtors as well as certain bank accounts held by Non-Debtor Affiliates. The Primary Boot Camps Operating Account is funded from third-party receipts, as well as intercompany transfers from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. |
| JPM - 2922 | edX Boot Camps LLC | edX Boot Camps LLC maintains an operating account (the "***Secondary Boot Camps Operating Account***") at JPM for purposes of (a) making disbursements on account of payments to certain vendors and Partner Institutions in connection with the Boot Camps business; and (b) making transfers to, and receiving transfers from, other Bank Accounts held by edX Boot Camps LLC and other Debtors. The Secondary Boot Camps Operating Account is funded from the Primary 2U Operating Account and the Primary Boot Camps Operating Account. |

| JPM - 8116 | edX LLC | edX LLC maintains an operating account (the "***edX Operating Account***") at JPM for purposes of (a) collecting receipts from individual learners (via either check or credit card (or similar) transactions processed by Stripe) and enterprise customers in connection with the Open Courses business; (b) making disbursements on account of payments to certain vendors and Partner Institutions; and (c) making transfers to, and receiving transfers from, other Bank Accounts held by other Debtors as well as certain bank accounts held by Non-Debtor Affiliates. The edX Operating Account is funded from third-party receipts, as well as intercompany transfers from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. |
| JPM - 2032 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains an operating account (the "***Primary GetSmarter Operating Account***") at JPM for purposes of (a) making disbursements on account of payments to certain vendors and Partner Institutions; (b) receiving transfers from other Bank Accounts held by 2U GetSmarter (US), LLC; and (c) making transfers to, and receiving transfers from, certain bank accounts held by Non-Debtor Affiliates. The Primary GetSmarter Operating Account is funded from intercompany transfers from other Bank Accounts held by 2U GetSmarter (US), LLC and bank accounts held by Non-Debtor Affiliates. |

| Comerica - 0697 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains an operating account (the "***Secondary GetSmarter Operating Account***") at Comerica for purposes of (a) collecting receipts from individual learners (via either check or credit card (or similar) transactions processed by Stripe) and enterprise customers in connection with the Executive Education Programs (as defined below) business; (b) making transfers to other Bank Accounts held by 2U GetSmarter (US), LLC; and (c) making transfers to, and receiving transfers from, other Debtors as well as certain bank accounts held by Non-Debtor Affiliates. The Secondary GetSmarter Operating Account is funded from third-party receipts, as well as intercompany transfers from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. Although the majority of 2U GetSmarter (US), LLC's disbursements are made from the Primary GetSmarter Operating Account, disbursements may occasionally be made from the Secondary GetSmarter Operating Account. |
| **Collections Accounts**<br>Comerica - 1422 | 2U, Inc. | 2U, Inc. maintains a collections account (the "***2U Collections Account***") at Comerica for the purpose of collecting receipts from certain Partner Institutions in connection with the Degree Program Segment, which are automatically swept daily to the Secondary 2U Operating Account. The 2U Collections Account is funded from third-party receipts. |

| | | |
|---|---|---|
| JPM - 0185 and JPM - 8169 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains two collections accounts (collectively, the "***GetSmarter Collections Accounts***") at JPM for the purpose of (a) collecting receipts from enterprise customers and individual learners in connection with the Executive Education Programs; and (b) making transfers to the Secondary GetSmarter Operating Account. The GetSmarter Collections Accounts are funded from third-party receipts. The account ending in 0185 is held in South Africa and the account ending in 8169 is held in the United Kingdom. |
| **Payroll Accounts**<br>JPM - 6779 | 2U, Inc. | 2U, Inc. maintains a payroll account (the "***2U Payroll Account***") at JPM for the purpose of making disbursements on account of payroll obligations to the majority of the Debtors' U.S.-based employees. The 2U Payroll Account is manually funded from the Primary 2U Operating Account on an approximately weekly basis. |
| Bank of America - 2144 | edX Boot Camps LLC | edX Boot Camps LLC maintains a payroll account (the "***Boot Camps Payroll Account***") at Bank of America for the purpose of making disbursements on account of payroll obligations to certain of the Debtors' U.S.-based part-time employees of the Boot Camps business. The Boot Camps Payroll Account is automatically funded from the Primary Boot Camps Operating Account approximately every two weeks. |

| Comerica - 9216 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains a payroll account (the "*GetSmarter Payroll Account*") at Comerica for the purpose of making disbursements on account of payroll obligations to certain of the U.S. and foreign-based part-time employees in the Executive Education Programs business employed either directly by the Debtors or indirectly through a professional services organization. The GetSmarter Payroll Account is manually funded from the Primary GetSmarter Operating Account approximately every two weeks. |
|---|---|---|
| **Money Market Account**<br>JPM - 5286 | 2U, Inc. | 2U, Inc. maintains a money market account (the "*Money Market Account*") at JPM for the purpose of obtaining a higher interest rate on excess cash. The Money Market Account is manually funded from the Primary 2U Operating Account when the amount of cash in the Primary 2U Operating Account exceeds the Debtors' forecasted cash needs for the following two-to-three weeks. |
| **Money Market Account - Adequate Assurance**<br>Comerica - 1864 | 2U, Inc. | 2U, Inc. maintains a money market account (the "*Adequate Assurance Account*") at Comerica which will hold $4,216 adequate assurance for utility providers as further described in the Utilities Motion. |
| **DIP Funding Account**<br>Flagstar - 1233 | 2U, Inc. | 2U, Inc. maintains a DIP funding account (the "*DIP Funding Account*") at Flagstar for the purpose of (a) receiving the proceeds of the DIP Facility; and (b) transferring the proceeds of the DIP Facility to the Primary 2U Operating Account to be used to fund the Debtors' operations during these Chapter 11 Cases, and for other purposes permitted by the DIP Order (as defined below). |

| **Subscription Account** | | |
| --- | --- | --- |
| Citizens - 8154 | 2U, Inc. | 2U, Inc. maintains a subscription account (the "***Subscription Account***") at Citizens for the purpose of (a) receiving subscription proceeds from the Equity Rights Offering; and (b) transferring the proceeds of the Equity Rights Offering to the Primary 2U Operating Account in accordance with the documents and agreements governing the Equity Rights Offering. |
| **Certificate of Deposit Account** | | |
| AmEx - 8586 | 2U, Inc. | 2U, Inc. maintains a certificate of deposit account (the "***CD Account***") at AmEx for the purpose of holding cash collateral to secure the 2U, Inc's obligations under its corporate credit card program (the "***Corporate Credit Card Program***"). Pursuant and subject to a corporate services commercial account agreement with AmEx, the Debtors are required to hold a minimum balance in the CD Account equal to approximately $880,000 for periods of at least three (3) months, and the Debtors earn interest on cash held in the CD Account. |
| **Restricted Cash Account** JPM - 3391 | 2U, Inc. | 2U, Inc. maintains a restricted cash account (the "***Restricted Cash Account***") at JPM for the purpose of holding cash collateral to secure 2U, Inc's obligations under its letters of credit. Pursuant and subject to the relevant agreements, the Debtors may transfer excess cash collateral to the Primary 2U Operating Account. |
| **Professional Fee Escrow Account** | | |
| Citizens - 8162 | 2U, Inc. | 2U, Inc. maintains a professional fee escrow account (the "**Professional Fee Escrow Account**") at Citizens for the purpose of escrowing and disbursing certain fees pursuant to the DIP Order. |

| **Inactive Accounts**<br>Comerica – 0063 (2U, Inc.)<br>Comerica – 1856 (2U, Inc.)<br>JPM – 6951 (edX LLC) | 2U, Inc.<br>edX LLC | The Debtors have 3 Bank Accounts (collectively, the "***Inactive Accounts***") that are relatively dormant with little to no activity prior to the Petition Date. Any proceeds received in the Inactive Accounts (related to legacy operations or otherwise) are transferred to the Primary 2U Operating Account. |
|---|---|---|

35.    **Cash Collection.**  The Debtors are a leading online education platform and service provider.  Through the Debtors' Degree Program Segment, they provide technology and services to nonprofit college and universities to enable the online delivery of degree programs through the Debtors' platform.  Through the Debtors' Alternative Credential Segment, they provide premium online open courses (the "***Open Courses***"), executive education offerings (the "***Executive Education Programs***"), technical, skills-based boot camps (the "***Boot Camps***") to individual consumers through relationships with nonprofit colleges and universities and other leading organizations.  In connection with the Degree Program Segment and the Alternative Credential Segment, the Debtors receive payments either directly, via electronic funds transfer or check, or, in the case of credit card (or similar) transactions, indirectly through their payment processing service provider, Stripe, Inc. ("***Stripe***").  In addition, Debtor edX Boot Camps LLC receives payments into the Primary Boot Camps Operating Account from third-party financing sources on behalf of learner customers.[7]

36.    **Disbursements.**  The Debtors, through the applicable operating and payroll accounts, make disbursements for, among other things:  (a) payroll; (b) payroll taxes; (c) payments made to vendors; and (d) payments made to Partner Institutions.  Disbursements to vendors and

---

[7]    These third-party financing sources include Climb Credit, Inc., EdAid Ltd., Nimble Australia Pty Ltd, D/B/A Zeefi, and Meritize Lending, LLC.

Partner Institutions are made on an approximately weekly basis.[8]  In addition, the Primary 2U

Operating Account is used to issue direct payments related to, among other things:  (a) the payment

of certain taxes in the ordinary course of business; (b) the Debtors' prepetition debt obligations;

(c) lease expenses; and (d) credit card payments.  Disbursements are processed on a periodic or as

needed basis, depending on the payable.

37.    **Bank Fees and Payment Processing Fees.**    The Debtors pay the Cash

Management Banks ordinary course fees and expenses in connection with maintaining and

operating the Bank Accounts (the "***Bank Fees and Expenses***") typically by authorizing the Cash

Management Banks to deduct the amount of the applicable Bank Fees and Expenses from the

relevant Bank Accounts in accordance with the applicable bank agreements.  As of the Petition

Date, the Debtors estimate that approximately $15,000 in Bank Fees and Expenses is accrued and

unpaid, all of which will become due within twenty-one (21) days following the Petition Date.  I

believe that honoring the Bank Fees and Expenses is essential to the ordinary course maintenance

of the Cash Management System without disruption.  The Debtors hold all of their cash in the

Bank Accounts and maintain no other accounts holding cash.

38.    The Debtors also incur ordinary course service charges and other fees in connection

with the payment processing services provided by Stripe.  To the extent the Debtors receive

payments made by credit card (or similar payment methods), such payments are processed by

Stripe before being deposited into the applicable collections or operating account.  In exchange for

such services, Stripe charges fees (the "***Payment Processing Fees***"), which equal approximately

3% of each credit card (or similar payment method) transaction amount, and deducts the Payment

---

[8]    While each Partner Institution is generally paid once-per-quarter, the Partner Institutions are on different payment
schedules.  Therefore, in a given week, the Debtors typically make payments to various Partner Institutions, and
the amounts the Debtors pay to Partner Institutions fluctuates from week-to-week.

Processing Fees before depositing cash in the Debtors' Bank Accounts. Historically, the Debtors have incurred Payment Processing Fees of 3% on every transaction processed through Stripe.

39.     **Certificate of Deposit Account.**  The Debtors have posted cash collateral in favor of, and as required by, AmEx (the "***Collateral Obligations***") pursuant to the Corporate Credit Card Program.  As of the Petition Date, the Debtors have posted approximately $880,000 in the CD Account to comply with the Collateral Obligations of the Corporate Credit Card Program.

40.     Under the Corporate Credit Card Program, the Debtors are required to maintain a minimum balance of $880,000 in the CD Account to secure their obligations under the Corporate Credit Card Program, which amount represents approximately 98% of the aggregate credit limit under the Corporate Credit Card Program.  I believe that the Debtors' failure to maintain their Collateral Obligations could disrupt the Debtors' payment of certain ordinary course business expenses.

41.     **The Debtors' Intercompany Transactions.**  In the ordinary course of business, the Debtors engage in routine business relationships with each other[9] and with certain Non-Debtor Affiliates (the "***Intercompany Transactions***"), which may result in intercompany receivables and payables (the "***Intercompany Claims***") that the Debtors track and record in their books and records.[10]  These Intercompany Transactions, which relate primarily to payments for services and

---

[9]     The majority of the Debtors' collections are received by the Primary 2U Operating Account and the Secondary 2U Operating Account.  Accordingly, transfers from Debtor 2U, Inc.'s operating accounts to Bank Accounts held by other Debtors primarily serve to ensure that each the other Debtors have sufficient cash on hand to pay their obligations as they come due, including with respect to payroll.

[10]    The overwhelming majority of Intercompany Transactions are between Debtor 2U GetSmarter (US), LLC and its foreign Non-Debtor Affiliates in connection with the Executive Education Programs.  As discussed in the footnote below, 2U GetSmarter (US), LLC collects customer receipts for the Executive Education Programs, while the operations for those customer receipts are primarily conducted by the foreign Non-Debtor Affiliates.  These transfers have averaged approximately $8.2 million per month in 2024.  Outside of these regularly occurring receipts transfers, other transfers between Debtors and Non-Debtor Affiliates have netted to approximately $5 million in total from Non-Debtor Affiliates to Debtors in 2024.

of certain expenses, occur as part of the routine operation of the Cash Management System and the Debtors' businesses, and at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or to a Non-Debtor Affiliate.  The Intercompany Transactions are subject to both formal and informal agreements, including general accounting mechanisms used among the Debtors and the Non-Debtor Affiliates, as well as arrangements based on administrative convenience.  For the avoidance of doubt, all Intercompany Transactions are tracked by the Debtors and recorded in their books and records.[11]

42.    Before the commencement of these Chapter 11 Cases, the Debtors, among themselves and their Non-Debtor Affiliates, engaged in many types of Intercompany Transactions in the ordinary course of business.  These included, without limitation, (a) cash transfers between the Bank Accounts, as well as between the Bank Accounts and bank accounts held by Non-Debtor Affiliates, for operational purposes and administrative efficiency; and (b) transfers and setoffs related to (i) Intercompany Services (as defined below), (ii) general corporate services, (iii) operational expenses, including the payment of wages and benefits, and (iv) intercompany foreign exchange transactions.

43.    I believe that the Intercompany Transactions and the related Intercompany Claims, as well as the resulting cash flows and set offs through the Cash Management System, are integral to the smooth operation of the Debtors' and Non-Debtor Affiliates' collective businesses and are administratively beneficial to the Debtors' operations.  Importantly, the benefits of these Intercompany Transactions ultimately inure to the Debtors' estates, and I believe that the failure

---

[11]    While the Debtors do not settle Intercompany Claims in cash, such balances are tracked by the Debtors in the ordinary course.  In the case of transfers between Debtors and Non-Debtor Affiliates, the majority of collections from the Company's non-domestic customers, which are driven by the Non-Debtor Affiliates that participate in Intercompany Transactions, are received in the Secondary GetSmarter Operating Account, the GetSmarter Collections Accounts, and the edX Operating Account.

to honor prepetition Intercompany Claims among Debtors and to continue Intercompany Transactions in the ordinary course postpetition among Debtors and Non-Debtor Affiliates alike would negatively impact the Debtors' ability to continue operating their businesses in the ordinary course.

44.    **Intercompany Services Agreements.**  Certain Debtors and Non-Debtor Affiliates are party to intercompany services agreements (collectively, the "***Intercompany Services Agreements***" and, the Debtors and Non-Debtor Affiliates party thereto, the "***Intercompany Services Participants***").  Certain Debtors provide services (the "***Intercompany Services***") to certain Non-Debtor Affiliates in exchange for fees, resulting in efficiencies across the broader corporate group, as well as reduced costs.  The Intercompany Services are of vital importance to the Debtors as, without the Intercompany Services, the Non-Debtor Affiliates party to the Intercompany Services Agreements, all of whom are direct or indirect subsidiaries of the Debtors, would be unable to perform basic functions necessary to run their businesses.  The Intercompany Services include, among other things, services associated with Non-Debtors Affiliates': (a) performance under third-party contracts; (b) educational, strategic, marketing, and related services; (c) access to the Debtors' personnel and their expertise; and (d) other administrative services.

45.    The Debtors incur certain expenses arising from their participation in the Intercompany Services.  The Intercompany Services Participants who benefit from such Intercompany Services are then responsible for their portion of such expenses as fees to the applicable Debtor service providers that incurred the expenses.  These fees are tracked and recorded as intercompany balances on the applicable Debtors' books and records.

46.     I believe that the Intercompany Services ensure the smooth functioning and operation of the Non-Debtor Affiliates' businesses, generate revenue for the Debtors, and are administratively beneficial to the Debtors' broader corporate group.

47.     **Intercompany Loan Agreements.**  Certain Debtors are lenders under a number of intercompany loan agreements (collectively, the "***Intercompany Loan Agreement***s") with certain Non-Debtor Affiliates as borrowers.  The Intercompany Loan Agreements serve to facilitate the smooth transfer of funds between the Debtors and their Non-Debtor Affiliates.  The Intercompany Loan Agreements are formalized loan agreements.[12]  I believe that the Debtors' continued performance under the Intercompany Loan Agreements is critical to the Debtors' operations and performance as they facilitate the flow of funds necessary to ensure that the Non-Debtor Affiliates, together with the Debtors, can continue operating in the ordinary course of business as a single, unified, global company.

48.     The Debtors' ongoing operations are inextricably tied to the Debtors' ability to continue engaging in Intercompany Transactions in the ordinary course of business, and I believe that the Debtors receive significant benefits from the Intercompany Transactions.  The Debtors further rely upon the structure of the Intercompany Services Agreements and the Intercompany Loan Agreements to ensure that the Debtors' and the Non-Debtor Affiliates' operations can continue on an unimpeded basis.

49.     **The Debtors' Business Forms**.  In the ordinary course, the Debtors use checks, invoices, letterhead, purchase orders, and other forms and correspondence (the "***Business***

---

[12]     The Intercompany Loan Agreements allow the Non-Debtor Affiliate borrowers thereunder to draw advances from the Debtor lender up to a specified commitment amount.  In each case, the commitment amount is the maximum amount of advances that can be drawn by the borrower, regardless of any prepayments or repayments to the Debtor lender.  Under each Intercompany Loan Agreement, the borrower must repay the Debtor lender in full on the maturity date, with interest.

*Forms*").  The Debtors' existing Business Forms are not marked with any designation referencing their status as debtors in possession.  To minimize expense and avoid potential operational issues with their employees, customers, vendors, and other parties during this critical time, I believe that the Debtors should be authorized to continue to use the existing Business Forms, notwithstanding any applicable U.S. Trustee Guidelines.

### III.    *Customer Programs Motion*

50.    By the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their discretion, to (i) fulfill and honor (through payment, credit, setoff, or otherwise) their Customer Obligations (as defined below) and (ii) continue, renew, replace, terminate, and/or implement new Customer Programs (as defined below) and any other customer practices in the ordinary course postpetition without further application to this Court; and (b) granting related relief.

51.    The Debtors provide learners around the world with access to high-quality education on a global scale through a leading online platform.  The Debtors have two business segments:  (a) the Degree Program Segment; and (b) the Alternative Credential Segment (each as defined below).  Through the Degree Program Segment, the Debtors provide technology and services to nonprofit colleges and universities to enable the online delivery of undergraduate and graduate degree programs through the Debtor's platform.  Through the Alternative Credential Segment, the Debtors provide premium online open courses, executive education offerings, technical, skills-based boot camps to individual consumers through relationships with nonprofit colleges and universities and other leading organizations.  For the fiscal year ending on December 31, 2023, the Debtors generated revenue of approximately (a) $561 million from the Degree Program Segment and (b) $385 million from the Alternative Credential Segment.

52.    The Debtors partner with approximately forty-three (43) nonprofit colleges and universities to provide technology and services to support the University Customers' online degree programs (the "***Degree Programs***" and, the business segment associated therewith, the "***Degree Program Segment***").  The University Customers collect tuition and fees from the students enrolled in the Degree Programs.  Pursuant to the terms of the applicable contracts between each University Customer and the applicable Debtor (the "***University Customer Agreements***"), the University Customers pay the Debtors a portion of the revenue collected from the Degree Programs as consideration for the Debtors' provision of technology and services (the "***Degree Program Revenue Share***").  Typically, each University Customer reports and pays the applicable Degree Program Revenue Share to the Debtors each academic term after the last possible date a student can withdraw from a course and receive a refund, which is typically one to three weeks after the first day of the course and is set by each University Customer (the "***Degree Program Add/Drop Deadline***").  As further described below, the University Customers have the right to offset certain amounts owed by the Debtors to the University Customers by subtracting such amount from the next Degree Program Revenue Share payment.

53.    The Debtors also offer the Open Courses, the Executive Education Programs, and the Boot Camps (together with the Open Courses and the Executive Education Programs, the "***Alternative Credential Programs***" and, the business segment associated therewith, the "***Alternative Credential Segment***").  The content for Alternative Credential Programs is developed or approved by certain colleges, universities, or other commercial or non-profit institutions (the "***Alternative Credential Partners***"), and the Alternative Credential Programs are delivered under the applicable Debtor's and Alternative Credential Partner's brand.  In consideration for the Alternative Credential Partners' provision of content or related services, the Debtors pay an

agreed-upon portion of the revenue generated from the Alternative Credential Programs to the Alternative Credential Partners (the "***Alternative Credential Revenue Share***").  The Alternative Credential Revenue Share generally accrues after the date set as the last possible date a learner can withdraw from an Alternative Credential Program and receive a refund, which is typically one to three weeks after the first day of the course (the "***Alternative Credential Add/Drop Deadline***").  The Alternative Credential Revenue Share is generally paid quarterly to the applicable Alternative Credential Partner.

54.    The Debtors market the Alternative Credential Programs directly to individual consumers (the "***Learner Customers***").  Learner Customers pay the Debtors directly to access these Alternative Credential Programs.  The Debtors also market the Alternative Credential Programs to organizations, corporations, non-profits, and governments (the "***Enterprise Customers***" and, together with the University Customers and Learner Customers, the "***Customers***").  The Enterprise Customers pay the Debtors directly to provide their employees with access to the Alternative Credential Programs.  The Enterprise Customers' employees can then take courses in the Alternative Credential Programs at no cost and have an opportunity to upskill or reskill while remaining employed full-time.

55.    Each Enterprise Customer can structure its purchase of the Alternative Credential Programs in one of two ways.  *First*, an Enterprise Customer can purchase a set number of credits, which typically need to be used by the Enterprise Customer's employees within twelve (12) months from the purchase date (the "***Enterprise Learner Credit Programs***").  *Second*, an Enterprise Customer can purchase credits through a subscription program, in which the Enterprise Customer pays a flat fee per employee to access the Alternative Credential Programs (the "***Enterprise Subscription Programs***" and, together with the Enterprise Learner Credit Programs,

the "***Enterprise Programs***").  Pursuant to an Enterprise Subscription Program, the Enterprise

Customer's employees can take an unlimited number of Alternative Credential Programs during

the subscription period.  Enterprise Customers typically pay the Debtors shortly after signing an

agreement for an Enterprise Program.

56.    **The Debtors' Customer Programs**.    To preserve the Debtors' critical

relationships with their Customers, the Debtors provide various types of programs to their

Customers, including making various types of contractually required payments to their Customers

in the ordinary course of business (collectively, the "***Customer Programs***" and, the obligations

incurred thereunder, the "***Customer Obligations***").  The Debtors offer two categories of Customer

Programs (each as defined and further described below):  (a) the Degree Customer Programs and

(b) the Alternative Credential Customer Programs.

57.    I believe that he Debtors' goodwill and ongoing business relationships may erode

if their Customers perceive that the Debtors are unable or unwilling to fulfill the prepetition

Customer Obligations.  If the Debtors are unable to preserve the loyalty of their Customers, I

believe that the Debtors' businesses would likely suffer material harm.  I believe that it is essential,

therefore, that the Debtors fulfill their Customer Obligations and continue the Customer Programs

to ensure customer satisfaction and maintain Customer goodwill, which is critical to the Debtors'

ongoing operations and to preserving and maximizing stakeholder value.  Indeed, without the

ability to continue the Customer Programs and to satisfy Customer Obligations, I believe that the

Debtors risk losing market share, harming their future business and revenue growth, and reducing

the recoveries of the Debtors' stakeholders.

58.    As further described below, the Debtors estimate that the aggregate value of

accrued Customer Obligations as of the Petition Date is approximately $23.9 million.  This sum is

comprised of: (a) $20.8[13] million in Degree Customer Program Obligations (as defined below), of which $5.2 million will come due during the period beginning on the Petition Date and ending on the date that is thirty (30) calendar days after the Petition Date (the "***Interim Period***"); and (b) $3.05 million in Alternative Credential Customer Program Obligations (as defined below), of which $2.97 million will come due during the Interim Period.

59.     **Degree Customer Programs**.     The Debtors provide the following Customer Programs to the University Customers in connection with the Degree Program Segment (the "***Degree Customer Programs***") (each as defined and further described below): (a) the Royalty Program; (b) Student Bad Debt Obligations; (c) Immersion Experience Obligations; (d) Degree Program Commitments; and (e) Other University Customer Obligations. The Debtors estimate that the following amounts are accrued and owed as of the Petition Date on account of the Degree Customer Programs (collectively, the "***Degree Customer Program Obligations***"):

| Degree Customer Program | Estimated Amount Owed on Interim Basis | Total Estimated Amount Outstanding |
|---|---|---|
| Royalty Program | $1,000,000 | $1,000,000 |
| Student Bad Debt Obligations | $3,700,000 | $3,700,000 |
| Immersion Experience Obligations | $400,000 | $400,000 |
| Degree Program Commitments | $0 | $15,600,000[14] |
| Other University Customer Obligations | $100,000 | $100,000 |
| **Total** | $5,200,000 | $20,800,000 |

---

[13]   The amount of Degree Customer Program Obligations which the Debtors request authority to pay includes amounts of prepetition Degree Customer Program Obligations that University Customers may be entitled to, but for which they have not yet requested payment. The Debtors have, in good faith and in an abundance of caution, included these amounts they would be obligated to pay in the event payment is requested for them.

[14]   As discussed in the Customer Programs Motion, many of the Degree Program Commitments are agreed upon in the applicable University Customer Agreement and paid in periodic installments subject to the terms of the

60.     I believe that the Debtors should be authorized to pay and honor, including through implementing or agreeing to setoffs, the Degree Customer Program Obligations owed to certain University Customers as they come due in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget (as defined in the DIP Order).  It is my understanding that failure to pay and honor the Degree Customer Program Obligations would constitute a breach of certain University Customer Agreements.  Further, I believe that failure to satisfy the Degree Customer Program Obligations would likely result in serious and irreparable harm to the Debtors, including loss of certain business and market share, and erosion of University Customer satisfaction and goodwill.  I believe that if the Debtors are unable to fulfil their Degree Customer Program Obligations, University Customers may seek remedies against the Debtors and pursue competitive alternatives to the Debtors' technology and services to deliver their online education.

61.     I also believe that the Debtors should be authorized to continue to perform, including through implementing or agreeing to setoffs, their Degree Customer Program Obligations on a postpetition basis in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget.  I submit that this relief is in the best interest of the Debtors' estates.

62.     **Royalty Program.**  The Debtors are obligated to pay certain University Customers (the "***Original University Customers***") a percentage of net revenue (the "***Royalties***") that the Debtors generate from substantially similar Degree Programs provided by other University

---

applicable University Customer Agreement.  As of the Petition Date, the Debtors have accrued approximately $15.6 million in prepetition Degree Program Commitments; however, given the prepackaged nature of these cases, the Debtors do not anticipate that any such obligations will come due prior to emergence from these Chapter 11 Cases.

Customers (the "**Subsequent University Customers**," and the program, the "**Royalty Program**").[15] I understand that he Debtors agreed to pay such Royalties to the Original University Customers as consideration for permitting the Debtors to market Subsequent University Customers' programs to leads initially generated for the Original University Customers.

63.     The Debtors pay such Royalties to the Original University Customers typically on a quarterly basis after the Debtors calculate the Royalties owed to each University Customer.  On average, the Debtors pay approximately $1,000,000 in Royalties each quarter.  The Debtors estimate that the aggregate amount of Royalties accrued and owing as of the Petition Date under the Royalty Program is $1,000,000.

64.     **Student Bad Debt Obligations**.  Typically, students must pay University Customers tuition and fees for Degree Programs by the first day of class.  The University Customers typically pay the Debtors the Degree Program Revenue Share after the Degree Program Add/Drop Deadline.  The Degree Program Revenue Share is paid following this deadline because students receive a full refund of their tuition payments if they drop the course prior to the deadline.

65.     In some instances, however, certain University Customers may allow certain students to enroll and complete programs without collecting payment in full at the outset of the Degree Program or a specific course.  These students complete the Degree Program on credit and undertake an obligation to pay such tuition and fees in future installments.  Inevitably, some students may not fulfill their obligations and make all required payments.  The University Customers offering such arrangements will periodically evaluate the aging of these tuition accounts receivable and, after a failed collection process, determine such outstanding obligations

---

[15]   An example of this arrangement applies to Master of Business Administration ("**MBA**") degrees.  Certain University Customers are entitled to Royalties if the Debtors have partnered with other University Customers to offer a competitive MBA Degree Program.

amount to bad debt.  Once declared bad debt, University Customers write off the revenue associated with such student's obligation and then invoice the Debtors for their respective share of such obligations (the "**Student Bad Debt Obligations**"), which I am informed that the Debtors are required to then pay pursuant to the relevant University Customer Agreements.

66.     On average, the Debtors accrue approximately $150,000 to $600,000 in Student Bad Debt Obligations each quarter.  The Debtors estimate that the aggregate amount of Student Bad Debt Obligations accrued and owing as of the Petition Date is $3.7 million.

67.     **Immersion Experience Obligations.**  As part of a Degree Program, a University Customer may plan, organize, and execute in-person on- and off-campus events for students and faculty (the "**Immersion Experiences**").  For example, an MBA Degree Program may incorporate an Immersion Experience where the students travel with faculty to the New York Stock Exchange. In certain circumstances, the University Customer will pay for the Immersion Experiences and then seek reimbursement from the Debtors when the Debtors are obligated to pay a portion of the costs and expenses, including transportation and lodging, incurred in connection with such Immersion Experiences (the "**Immersion Experience Obligations**").

68.     On average, the Debtors accrue approximately $250,000 in Immersion Experience Obligations each quarter.  The Debtors estimate that the aggregate amount of Immersion Experience Obligations accrued as of the Petition Date is $400,000.

69.     **Degree Program Commitments.**  As part of their business, the Debtors have committed to make various types of payments to the University Customers to offset some of the upfront costs University Customers may incur to develop and launch Degree Programs (the "**Degree Program Commitments**").  These payments may be upfront, one-time payments or periodic payments over time.

70.     The Degree Program Commitment payments are typically conditioned on the University Customers satisfying defined milestones, such as launching a Degree Program within a certain time period.  Depending on the terms of the underlying University Customer Agreement, the payments are made (a) before such milestones are satisfied, in which case University Customers are required to return the Degree Program Commitment in the event of non-satisfaction of the milestones, or (b) after the University Customer has satisfied the condition.  I believe that the Debtors' ability to honor the Degree Program Commitments is crucial to maintaining their Customer relationships and preserving the value of the Degree Program Segment.

71.     The amount of Degree Program Commitments paid by the Debtors each quarter varies depending on the terms of University Customer Agreements recently entered by the Debtors.  The Debtors estimate that the aggregate amount of the Degree Program Commitments accrued and unpaid as of the Petition Date is $15.6 million.

72.     **Other University Customer Obligations.**  The Debtors also have additional payment obligations to University Customers for miscellaneous categories of expenses, including Extraordinary Refund Offsets, Compliance Payments, Scholarship Reconciliation Payments, and Marketing Rights Obligations (each as defined below, and collectively, the "***Other University Customer Obligations***").

73.     The Debtors will occasionally issue refunds to University Customers if a student drops a class after the Degree Program Add/Drop Deadline has passed due to extraordinary circumstances (the "***Extraordinary Refunds***").  In these situations, the University Customer offsets the accrued amount of Extraordinary Refunds against the next Degree Program Revenue Share payment made to the Debtors (the "***Extraordinary Refund Offsets***").  I believe that it is in

the best interest of the Debtors' estates to continue to honor any prepetition Extraordinary Refund

Offsets and to continue honoring Extraordinary Refund Offsets in the ordinary course postpetition.

74.     Periodically, the Debtors make certain one-time and recurring payments to

governmental authorities and authorization boards on behalf of the University Customers to ensure

compliance with regulations applicable to their offering of online degree programs (the

"***Compliance Payments***").  The Debtors make the Compliance Payments directly to the relevant

governmental entities and invoice the University Customers for reimbursement.[16]

75.     On rare occasion, the Debtors receive Degree Program Revenue Share on account

of tuition or fees that are later discovered to be covered by a scholarship.  Upon discovery of such

a circumstance, the University Customer invoices the Debtors for repayment of the Degree

Program Revenue Share in an amount proportionate to the size of the scholarship (the

"***Scholarship Reconciliation Payments***").

76.     The Debtors have also committed to pay certain University Customers a fixed

amount of the University Customer's marketing and promotional spend for Degree Program (the

"***Marketing Rights Obligations***").  Relatedly, the Debtors are also obligated to pay certain

University Customers in the event that a Degree Program has not met defined metrics, which are

measured on an annual basis.  Payment of these Other University Customer Programs is necessary

to maintain their valuable relationships with University Customers, and in the case of the

Compliance Payments, ensure the Degree Programs comply with applicable regulations.

---

[16]   For example, certain states require providers of distance education services, including the Debtors, to make
Compliance Payments in order to offer such programs to students in those jurisdictions.  If the Debtors were to
stop making the Compliance Payments, I believe that the Debtors would be prevented from offering Degree
Programs to students in those states.

77.     On average, the Debtors accrue approximately $150,000 to $200,000 in Other University Customer Obligations each quarter. The Debtors estimate that the aggregate amount of Other University Customer Obligations accrued and owing as of the Petition Date is $100,000.

78.     **Alternative Credential Customer Programs.** The Debtors provide the following Customer Programs to their Learner Customers and Enterprise Customers in connection with the Alternative Credential Segment (the "***Alternative Credential Customer Programs***") (each as defined and further described below): (a) Learner Refunds; (b) Financing Provider Payments; and (c) Enterprise Customer Payments. The Debtors estimate that the following amounts are accrued and owed as of the Petition Date on account of the Alternative Credential Customer Programs (the "***Alternative Credential Customer Program Obligations***"):

| Alternative Credential Customer Program | Estimated Amount Owed on Interim Basis | Total Estimated Amount Outstanding |
|---|---|---|
| Learner Refunds | $2,800,000 | $2,800,000 |
| Financing Provider Payments | $150,000 | $200,000 |
| Enterprise Customer Payments | $20,000 | $50,000 |
| **Total** | $2,970,000 | $3,050,000 |

79.     I believe that the Debtors it is in the best interest of the Debtors' estates for the Debtors to pay and honor, including through implementing or agreeing to setoffs, the Alternative Credential Customer Program Obligations owed to certain Learner Customers and Enterprise Customers as they come due in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget. I believe that failure to pay and honor the Alternative Credential Customer Program Obligations may constitute a breach of agreements with Learner Customers and Enterprise Customers. Further, I believe that failure to satisfy the Alternative

Credential Customer Program Obligations would likely result in serious and irreparable harm to the Debtors, including loss of certain business, market share, erosion of Learner Customer and Enterprise Customer satisfaction and goodwill.  I believe that if the Debtors are unable to fulfil their obligation to pay Alternative Credential Customer Program Obligations, Learner Customers and Enterprise Customers may seek remedies and pursue competitive alternatives to the Debtors' online educational platform to meet their demand.

80.    I further believe that it is in the best interest of the Debtors' estates for them to be authorized to continue to perform, including through implementing or agreeing to setoffs, under the Alternative Credential Customer Program Obligations on a postpetition basis in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget.

81.    **Learner Refunds.**  The Learner Customers pay the Debtors directly to participate in the Alternative Credential Programs.  The Learner Customers may elect to pay in full at the time of registration, in which case the Learners' entire balance for the Alternative Credential Program must be paid before the program begins.  The Learner Customers may also elect to utilize a monthly payment plan with the Debtors, in which case the first monthly payment is due before the program begins and subsequent payments are due on a monthly basis.  Under both payment options, if a Learner Customer drops the course prior to the Alternative Credential Add/Drop Deadline, the Debtors refund any tuition payments already made to the Learner Customer in the ordinary course of business (the "***Ordinary Learner Refunds***").

82.    The Debtors provide certain discounts on Learner Programs for certain Learner Customers.  The discounts are generally applied at the point of sale, but the Debtors will sometimes, as a courtesy and in their sole discretion, honor a discount after a Learner Customer has already paid full price for an Alternative Credential Program if the Learner Customer was

unaware the discount could be applied.  In such instances, the Debtors will issue a refund for the amount of the discount to the Learner Customer (the "**_Promotional Refunds_**" and, together with the Ordinary Learner Refunds, the "**_Learner Refunds_**").

83.     On average, the Debtors accrue approximately $5.3 million in Learner Refunds each quarter.  The Debtors estimate that the aggregate amount of Learner Refunds accrued and owing as of the Petition Date is $2.8 million.

84.     **Financing Provider Payments.**  The Debtors partner with third-party financing sources (the "**_Financing Providers_**") to provide Learner Customers financing options to fund their participation in Boot Camps.  The terms of each financing arrangement are determined by the Financing Provider based on its underwriting criteria.  Each financing arrangement must also be approved by the Alternative Credential Partner that developed the Boot Camp's content.[17] Pursuant to the terms of the underlying financing arrangement, the Financing Provider pays tuition, on behalf of the Learner Customer, to the Debtors either by paying a lump sum within the first month of the Boot Camp or by remitting monthly payments for the duration of the financing arrangement.  As a result, there are circumstances where Learner Customers become eligible for a Learner Refund after the Debtors have received payment from Financing Providers on behalf of the Learner Customers.  In such circumstances, in order to deliver the learner Refund to the Learner Customers, the Financing Providers will invoice the Debtors to recoup the previous payment (the "**_Financing Provider Payments_**").

---

[17]    Certain universities may have their own relationships with Financing Providers, and Learner Customers are also able to secure financing directly from these universities.

85.    On average, the Debtors accrue approximately $470,000 in Financing Provider Payments each quarter.  The Debtors estimate that the aggregate amount of Financing Provider Payments accrued and owing as of the Petition Date is $200,000.

86.    **Enterprise Customer Payments.**  In connection with the delivery of Enterprise Programs, the Debtors make occasional payments to Enterprise Customers, including refunds of amounts previously paid by Enterprise Customers (the "*Enterprise Customer Payments*").  I believe that the Enterprise Customer Payments are necessary for the Debtors to maintain strong relationships with Enterprise Customers.

87.    The amount of Enterprise Customer Payments paid by the Debtors each quarter varies depending on the terms of Enterprise Customer agreements recently entered by the Debtors. The Debtors estimate that the aggregate amount of Enterprise Customer Payments accrued and owing as of the Petition Date is $50,000.

### IV.    *Wages Motion*

88.    By the Wages Motion, the Debtors request entry of interim and final orders:

(a)    authorizing, but not directing, the Debtors, in their discretion, to (i) satisfy or otherwise honor various prepetition Workforce Obligations (as defined below) to or for the benefit of their current or former employees (the "*Employees*") and contract workers (the "*Contract Workers*" and, together with the Employees, the "*Workforce*") for compensation, expense reimbursements, and benefits under all plans, programs, policies, and agreements maintained by, or for the benefit of, or contributed to or entered into by, the Debtors prior to the Petition Date (collectively, the "*Workforce Programs*"), and (ii) continue the Workforce Programs related to such obligations postpetition, in the ordinary course of business, as in effect immediate prior to the filing of these Chapter 11 Cases; each in accordance with the Approved Budget (as defined in the DIP Order);

(b)    granting a limited waiver of the automatic stay under section 362 of the Bankruptcy Code to allow Workers' Compensation Claims to proceed under the applicable Workers' Compensation Policy (as defined below), and to allow the Debtors, their affiliates, their insurance providers, and/or their third-party administrators to negotiate, settle, and/or litigate Workers' Compensation Claims, and pay resulting amounts, whether such claims arose pre- or postpetition in accordance with the DIP Order; and

(c)    granting related relief.

89.    To operate their businesses, the Debtors and their Non-Debtor Affiliates rely on the Workforce to perform a variety of critical functions, including, but not limited to, developing the edX.org platform, developing technology to launch and support its clients' educational offerings, providing services to clients and students (including student engagement services, curriculum and learning services, marketing services, and university and student support services), supporting the Company's other information technology systems and infrastructure, and providing necessary administrative, managerial, and financial support services.

90.    As of the Petition Date, 2U's Workforce consists of approximately 4,820 individuals.  Specifically, the Debtors' Workforce consists of approximately 3,130 Employees in the United States and 270 Contract Workers in the United States and abroad.  In addition, due to the global nature of 2U's businesses, the Non-Debtor Affiliates employ approximately 1,420 individuals in various locations outside of the United States.

91.    The Debtors' Workforce is comprised of several categories of Employees and Contract Workers.  *First*, there are regular full-time Employees (the "***Regular Full-Time Employees***") who are regularly scheduled to work at least thirty (30) hours per week and are eligible for employee benefits.  As of the Petition Date, the majority of the Debtors' Workforce in the United States (approximately 1,820 individuals) are Regular Full-time Employees.

92.    *Second*, there are regular part-time Employees (the "***Regular Part-Time Employees***") who are regularly scheduled to work fewer than thirty (30) hours per week.  Such Employees include, among others, instructors for certain of 2U's educational offerings.  As of the Petition Date, the Debtors employ approximately 1,310 Regular Part-Time Employees.

93.    *Third,* the Debtors also use the services of approximately 270 Contract Workers. The Contract Workers are both located in the United States and abroad and do not only include

individuals who are hired (and paid) directly by the Company to complete a specific project, but also individuals who are hired (and paid) via a third-party agency rather than the Company. For instance, Debtor edX LLC works with certain third-party payroll administrators to engage certain Contract Workers in India to provide sales-related and external software-development services in connection with the edX online learning platform. Generally, Debtor edX LLC pays such third-party payroll administrators on a monthly basis for the supply of such Contract Workers.

94.    I understand by Bankruptcy Counsel that eight (8) of the Employees (each, an "***Insider***" and, collectively, the "***Insiders***") constitute "insiders" as such term is defined in section 101(31) of the Bankruptcy Code. Certain of the Employees have the title of "Senior Vice President" or above (such Employees, the "***Senior Employees***"). I am informed by Bankruptcy Counsel that not all of the Senior Employees are Insiders.

95.    I believe that the Workforce enables the Debtors to operate productively for the benefit of the Debtors' stakeholders. Due to the disruption and uncertainty inherent in a chapter 11 filing, I believe that the continuity and performance of the Workforce would be jeopardized without the relief requested in the Wages Motion. Therefore I believe that the continued and uninterrupted service of the Workforce is thus essential to the Debtors' ongoing operations and the success of these Chapter 11 Cases.

96.    Moreover, I believe that if the Debtors fail to satisfy the Workforce Obligations in the ordinary course of business, the members of the Workforce could suffer extreme personal hardship and, in some cases, could be unable to pay their basic living expenses. I believe that this would have a catastrophic impact on the Workforce's morale and productivity, while causing immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, I believe that that both paying those obligations and continuing all of the

compensation and benefits programs described in the Wages Motion, and in accordance with the

Approved Budget, are vital to preventing the loss of key members of the Workforce during the

pendency of these Chapter 11 Cases and to maintaining the continuity and stability of the Debtors'

operations.

97.     In the ordinary course, the Debtors incur a number of obligations to, or for the

benefit of, their Workforce (the "***Workforce Obligations***"), which include:

(a)     Workforce compensation obligations, including the Payroll Obligations, the Contracted Labor Obligations, the Payroll Deduction Obligations, and the Payroll Taxes;

(b)     the other compensation programs, including the Employee Incentive Programs, the Retention Programs, the PTO Obligations, Independent Director Compensation, and the Severance Program;

(c)     the Expense Reimbursements;

(d)     the Employee Benefits Obligations, including obligations incurred in connection with the Medical and Dental Benefits, the Vision Plans, health savings accounts, Life and Disability Insurance, the Employee Assistance Programs, the Voluntary Benefits Program, and the Employee Wellness Programs (each as defined below);

(e)     the obligations incurred in connection with the savings and other retirement programs;

(f)     the workers' compensation obligations; and

(g)     the payments to administrators.

98.     As set forth in the below chart, the Debtors estimate that, as of the Petition Date,

there are approximately $12,701,000 (the "***Interim Amount***") of accrued but unpaid Workforce

Obligations, all of which will become due and owing before the final hearing on the Wages Motion.

| Workforce Obligations | Requested Interim Order Amount | Requested Final Order Amount |
|---|---|---|
| Workforce Compensation Obligations | $8,360,000 | $8,360,000 |
| *Payroll Obligations* | $1,740,000 | $1,740,000 |
| *Contracted Labor Obligations* | $6,200,000 | $6,200,000 |
| *Payroll Deduction Obligations (inclusive of Garnishments)* | $240,000 | $240,000 |
| *Payroll Taxes* | $130,000 | $130,000 |
| *Payroll Processing Services* | $50,000 | $50,000 |
| Other Compensation Programs | $1,100,000 | $5,550,000 |
| *Employee Incentive Programs* | $100,000 | $1,580,000 |
| *Retention Programs* | $0 | $0 |
| *PTO Obligations* | $0 | $0 |
| *Independent Director Compensation* | $0 | $0 |
| *Severance* | $1,000,000 | $3,970,000 |
| Expense Reimbursements | $1550,000 | $550,000 |
| *Company Credit Card Expenses* | $300,000 | $300,000 |
| *Miscellaneous Expenses* | $250,000 | $250,000 |
| Employee Benefits Obligations | $2,271,000 | $2,271,000 |
| *Medical and Dental Benefits* | $2,000,000 | $2,000,000 |
| *Vision Plans* | $7,000 | $7,000 |
| *Health Savings Accounts* | $39,000 | $39,000 |
| *Life and Disability Insurance* | $160,000 | $160,000 |
| *Employee Assistance Programs* | $10,000 | $10,000 |
| *Voluntary Benefits Program* | $25,000 | $25,000 |
| *Employee Wellness Program* | $30,000 | $30,000 |
| Savings and Other Retirement Obligations | $340,000 | $340,000 |
| Payments to Administrators | $80,000 | $80,000 |
| *Total* | **$12,701,000** | **$17,151,000** |

99.    I believe that it is in the best interest of the Debtors' estates to continue to honor the Workforce Obligations in the ordinary course.  Furthermore, I submit that the Debtors' continued performance under the Workforce Obligations is in the best interest of all stakeholders in these Chapter 11 Cases.

**V.    *Taxes Motion***

100.    By the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) pay amounts owed on account of any prepetition tax and fee obligations to certain international, federal, state, and local governmental entities, and quasi-governmental entities, and (ii) make payments to, and set off amounts owed from, certain non-Debtor affiliates or other Debtors on account of prepetition taxes and fees to certain international, federal, state, and local governmental entities, and quasi-governmental entities; and (b) granting related relief.

101.    In the ordinary course of their businesses, the Debtors incur various tax liabilities and fees—including administrator fees, sales, use and value-added taxes, franchise taxes, and personal property taxes (together with any other taxes, fees, assessments, or similar charges and any penalties, interest, or similar charges in respect of such taxes and fees, collectively, the "***Taxes and Fees***")—owed to the international, federal, state, and local governmental entities listed on Exhibit C attached to the Taxes Motion (the "***Authorities***").

102.    As of the Petition Date, the Debtors estimate that they have accrued liabilities, which are not yet due and outstanding, in the approximate amount of $7,518,000 on account of Taxes and Fees.  Specifically, the Debtors estimate that they owe the following accrued amounts on account of the following categories of Taxes and Fees:

| Category | Estimated Interim Amount | Estimated Final Amount |
|---|---|---|
| Administrator Fees | $50,000 | $75,000 |
| Sales, Use, and Value-Added Taxes | $105,000 | $6,935,000 |
| Franchise Taxes | $60,000 | $268,000 |
| Personal Property Taxes | $240,000 | $240,000 |
| **Total** | $455,000 | $7,518,000 |

103.    The manner in which the Debtors' Taxes and Fees are paid varies.  With respect to certain Taxes and Fees, the Debtors pay the applicable Authority directly; with respect to other Taxes and Fees, the Debtors directly or indirectly (on behalf of themselves and other applicable Debtors and/or non-Debtor affiliates) contract with third-party administrator Vertex, Inc. (the "***Administrator***") to administer and deliver payments to the applicable Authorities.  In connection with its services, the Debtors pay the Administrator certain fees (the "***Administrator Fees***") in the ordinary course of business.  As of the Petition Date, the Debtors estimate that they owe the Administrator an aggregate amount of approximately $75,000 on account of accrued and unpaid prepetition Administrator Fees.

104.    I believe that it is in the best interests of the Debtors' estates for the Debtors to be authorized to (a) make payments directly to the Authorities, and/or make payments to, or set off amounts owed from, certain non-Debtor affiliates or other Debtors on account of the Taxes and Fees, and (b) pay all accrued and unpaid prepetition Administrator Fees to avoid disruption of the Administrator's services at this critical juncture in these Chapter 11 Cases, each in accordance with the Approved Budget (as defined in the DIP Order).  Following the Petition Date, the Debtors intend to satisfy postpetition obligations on account of Taxes and Fees and Administrator Fees as they come due.

## VI.    *Insurance Motion*

105.    By the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their sole discretion, to (i) pay prepetition claims arising under their ordinary course Insurance Programs (as defined below), and (ii) maintain their Insurance Programs in the ordinary course postpetition; and (b) granting related relief.

106.    In the ordinary course of business, the Debtors maintain certain insurance policies that are administered by various insurers (the "***Insurers***"), which provide coverage to the Debtors for, among other things, worker's compensation, directors' and officers' ("***D&O***") liability,[18] casualty and property loss, automotive liability, cyber errors and omissions ("***E&O***"), commercial crimes, social engineering, fraud, and general umbrella liability (collectively, the "***Insurance Policies***").  All of the Insurance Policies are held in the name of Debtor 2U, Inc. and cover all subsidiaries of 2U, Inc. (including the other Debtors and their non-Debtor affiliates).  A detailed list of the Insurance Policies is attached to the Insurance Motion as Exhibit C.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, the coverage may be required by law or regulation, or obligated by contract.  I believe that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

107.    The Debtors and their non-Debtor affiliates obtain the Insurance Policies through Lockton Companies, LLC (the "***Broker***"), pursuant to that certain Engagement Letter between the Broker and 2U, Inc., dated as of July 19, 2022, which automatically renews annually, subject to negotiation or modification, unless properly terminated (the "***Broker Contract***").  The Broker assists in obtaining comprehensive insurance coverage and provides related services, including

---

[18]    Prior to the Petition Date, the Debtors purchased six (6) years of runoff or "tail" coverage for the D&O policies, incepting on the date of emergence.

risk engineering and procuring and negotiating the Insurance Policies on advantageous terms and at competitive rates. In exchange for the receipt of these services, the Debtors are obligated to pay certain fees to the Broker (the "**Broker Fees**"), which are included in the Debtors' payment of Insurance Premiums (as defined below). The Debtors have already paid all Broker Fees owed to Lockton for the current calendar year. Accordingly, as of the Petition Date, the Debtors estimate that they owe approximately $0 in prepetition Broker Fees.

108.    Typically, 2U, Inc. pays the Broker (which in turn pays the applicable Insurer) on account of the collective insurance-related obligations of the Debtors and their non-Debtor affiliates. The other Debtors and non-Debtor affiliates are thereafter obligated to reimburse Debtor 2U, Inc. (either directly or indirectly) for their allocated share of such amounts on a monthly basis.

109.    The total amount paid in annual premiums and other costs associated with the Insurance Policies (collectively, the "**Insurance Premiums**" and, together with the Broker Fees, the "**Prepetition Insurance Obligations**") is approximately $3.45 million.[19]  The Insurance Policies renew around March of each year. The Debtors pay all of the Insurance Premiums due for each Insurance Policy at the beginning of its respective policy period. The Insurance Premiums for all Insurance Policies have been paid for their current policy periods. Accordingly, as of the Petition Date, the Debtors estimate that they owe approximately $0 in prepetition Insurance Premiums.

110.    In the event the Debtors learn that additional amounts attributable to the period before the Petition Date are due and outstanding on account of the Insurance Policies and related services, I believe that is in the best interests of the Debtors' estates for the Debtors to be authorized

---

[19]    For the avoidance of doubt, this amount of annual premiums and other costs associated with the Insurance Policies does not include the annual premiums for the Debtors' workers compensation insurance coverage, which is addressed in further detail in the Wages Motion, or the premiums for the runoff or "tail" coverage for the D&O policies.

to make payments to the Broker and Insurers, as applicable, on account of any such Prepetition Insurance Obligations in accordance with the Approved Budget (as defined in the DIP Order).  I also believe that the Debtors should be authorized to renew, replace,[20] modify, extend, or add to the existing Insurance Policies, including by paying any premiums that may be triggered during these Chapter 11 Cases with respect to "runoff" options contained in the Insurance Policies, or obtaining new insurance policies postpetition in accordance with the Approved Budget.

111.    **Letters of Credit.**  The Debtors have approximately $11.3 million[21] of outstanding letters of credit (the "***Letters of Credit***" and, together with the Insurance Policies the "***Insurance Programs***").[22]  The Letters of Credit cover a range of obligations, including real estate obligations and deferred government grant obligations.  A detailed list of the Letters of Credit that are currently maintained by the Debtors, as well as their expiration dates and issuing banks (the "***Issuing Banks***"), is attached to the Insurance Motion as Exhibit D.

112.    In the ordinary course of business, the Debtors pay the Issuing Banks approximately $24,000 on a quarterly basis for fees relating to the Letters of Credit.  As of the Petition Date, the Debtors do not believe there are any payments due and owing on account of the Letters of Credit and the Debtors are not aware of any pending requests for payment on the Letters of Credit (the "***Prepetition Letters of Credit Obligations***" and, together with the Prepetition Insurance

---

[20]    In the context of the Insurance Programs, "***replace***", means to purchase an equivalent new insurance policy, letter of credit, or contract upon expiration of the term or period of the existing policy, letter of credit, or contract.

[21]    The Debtors hold a Letter of Credit denominated in South African rand (ZAR).  The Debtors converted the value of this Letter of Credit from ZAR to USD on July 24, 2024 using an exchange rate calculator available at https://www.xe.com/currencyconverter.

[22]    Like an insurance policy, the issuance of a letter of credit shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to the applicable issuing bank.  Unlike an insurance policy, under the terms of a written letter of credit agreement with the applicable issuing bank, if a beneficiary draws on a letter of credit, then the issuing bank is typically entitled to recover from the applicable Debtor.  I believe that failing to provide, maintain, or timely replace their Letters of Credit may prevent the Debtors from undertaking essential functions related to their operations.

Obligations, the "***Prepetition Insurance Programs Obligations***").   Out of an abundance of

caution, in the event that the Debtors learn that additional amounts attributable to the period before

the Petition Date are due and outstanding on account of the Letters of Credit and related services,

I believe they should be authorized to make payments to the Issuing Banks on account of any such

Prepetition Letters of Credit Obligations in accordance with the Approved Budget.  I also believe

the Debtors should be authorized to honor the current Letters of Credit and renew, replace, modify,

extend, cancel, or add to the Letters of Credit as needed in the Debtors sole discretion postpetition,

including through the issuance of new Letters of Credit in accordance with the Approved Budget.

113.    To secure the Prepetition Letters of Credit Obligations, the Debtors have posted

collateral, or may need to post new collateral, in favor of and as required by the relevant Issuing

Banks.   As of the Petition Date, the Debtors have posted in the aggregate approximately

$11.9 million in collateral in a segregated collateral account to secure the Prepetition Letters of

Credit Obligations.  I believe it is in the best interest of the Debtors' estates for them to be

authorized to pay the Issuing Banks in the ordinary course of business and honor the collateral

posted prepetition and renew, replace, modify, extend, or add to the posted collateral as needed

and in accordance with the Approved Budget in the Debtors' discretion postpetition, including

through the posting of additional collateral.

### VII.    *Utilities Motion*

114.    By the Utilities Motion, the Debtors seek entry of interim and final orders

(a) prohibiting the Debtors' utility service providers (the "***Utility Companies***") from altering,

refusing, or discontinuing service to, or discriminating against, the Debtors; (b) approving an

adequate assurance deposit as adequate assurance of postpetition payment to the Utility Companies

in accordance with the Approved Budget (as defined in the DIP Order); (c) establishing procedures

for resolving any subsequent requests by the Utility Companies for additional adequate assurance of payment; and (d) granting related relief.

115.     The Debtors rely on electricity, gas, water, sewer, waste, telephone and internet services, and/or other similar services (collectively, the "*Utility Services*") from the Utility Companies to operate their businesses.  As of the Petition Date, at least four (4) Utility Companies provide Utility Services to the Debtors in the United States.

116.     I believe that it is best for the Debtors' estates that Utility Services go uninterrupted. Should any Utility Company refuse or discontinue service, even for a brief period, I believe that the Debtors' business operations could be disrupted, and such disruption could negatively impact recoveries for the Debtors' creditors.

117.     Over the past twelve (12) months, the Debtors have incurred obligations totaling an average of approximately $8,432 per month for Utility Services.  Based on the timing of the filings of these Chapter 11 Cases in relation to the Utility Companies' billing cycles, however, there may be outstanding invoices reflecting prepetition utility costs that have been incurred by the Debtors but for which payment is not yet due, as well as prepetition utility costs for services provided to the Debtors since the end of the last billing cycle that have not yet been invoiced.

118.     The Debtors also indirectly remit payment to certain of these Utility Companies through the Debtors' landlords (collectively the "*Landlords*"), who pay certain Utility Companies directly for 'non-technical' Utility Services such as water, sewer, trash, electric, and gas.  These Utility Services are paid directly by the Landlords and therefore the Proposed Adequate Assurance does not allocate any amounts toward these Utility Companies because they do not directly rely on the Debtors for payment for such Utility Services.

119.    To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to invoices for prepetition Utility Services as of the Petition Date.  The Debtors intend to pay, or direct the payment of, any postpetition obligations to the Utility Companies in the ordinary course and in a timely fashion.  Concurrently with the filing of the Utilities Motion, the Debtors have filed the DIP Motion, which, in addition to the cash generated by the Debtors' businesses, will provide the necessary additional liquidity for the Debtors to continue operations in the ordinary course of business.  As set forth in the Approved Budget, the Debtors' proposed expenditures set forth in the Approved Budget include payment of obligations to the Utility Companies in the ordinary course on a postpetition basis.

120.    **Adequate Assurance.**  I believe that the Debtors will have sufficient cash on hand to timely pay in full, in cash, all undisputed postpetition obligations owed to Utility Companies during these Chapter 11 Cases.

121.    Nevertheless, the Debtors propose to provide additional assurance of payment to each Utility Company listed on the Utility Services List for postpetition Utility Services in accordance with the Approved Budget.  The Debtors propose to place a cash deposit equal to one-half of the Debtors' approximate average monthly cost for all Utility Services (the "***Utility Deposit***"), based on the Debtors' payments over the past twelve (12) months, into a segregated, interest-bearing account for the benefit of the Utility Companies (the "***Adequate Assurance Account***").  The Adequate Assurance Account will be maintained pending further order of this Court, and the Debtors' creditors will have no interest in, or lien on, any Utility Deposit or the Adequate Assurance Account.

122.    I believe that continued and uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Chapter 11 Cases.  Should

any Utility Provider refuse or discontinue service, even for a brief period, I believe that the Debtors' ability to operate their businesses in the ordinary course would be severely disrupted, jeopardizing the Debtors' ability to successfully restructure. Accordingly, I submit that the Court should grant the relief sought by the Utilities Motion, including the Proposed Adequate Assurance and the Adequate Assurance Procedures.

### VIII.  *All Trade Motion*

123.    By the All Trade Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their discretion and both in the ordinary course of business and consistent with the DIP Order, to pay the allowed prepetition claims (collectively, the "***Trade Claims***") of creditors that provide goods or services related to the Debtors' operations (the "***Trade Creditors***") and (b) granting related relief. The Debtors estimate the aggregate total amount of the Trade Claims is approximately $48.3 million. The Debtors also seek administrative priority status of all undisputed obligations of the Debtors owing to vendors and suppliers arising from the postpetition delivery of goods or provision of services ordered before the Petition Date under the Prepetition Purchase Orders (as defined below) and authorization to pay such obligations in the ordinary course of business pursuant to the Approved Budget (as defined in the DIP Order).

124.    The Debtors rely upon numerous Trade Creditors, who are located around the world, to provide goods and services that are critical to the maintenance of the Debtors' highly-sophisticated, global-learning platform.

125.    The Trade Creditors include (but are not limited to):

(a)    third-party providers of curriculum design and development services, such as videography, editing, and other services associated with creating digital content;

(b)       third-party advertising platforms and providers of advertising and marketing services, including search-engine optimization, search-engine marketing, social-media optimization, and other digital-marketing services;

providers of certain software services, such cybersecurity and customer relationship management systems and applications, that are critical to the Debtors' upkeep of their business infrastructure;

(c)       data centers and cloud storage facilities;

(d)       the Alternative Credential Partners who create and provide educational content for use in the Debtors' Alternative Credential Programs (as defined below); and

(e)       business-services vendors and certain other operational partners and providers of services (the "***Other Operational Partners***") that are necessary for the Debtors' day-to-day operations and are not addressed in other first day motions.

126.     Without the services of such Trade Creditors, I believe that the Debtors would be unable to obtain the goods and services needed to provide online educational opportunities or operate their businesses.  In addition, the nature of the Debtors' businesses requires them to rely on data centers, cloud storage facilities, software, and technology services that are often available from single (or a limited pool of) suppliers, which I believe makes it difficult (and, in some cases, impossible) for the Debtors to replace any of these Trade Creditors in a timely manner.  Accordingly, to avoid disruption to customers and unnecessary harm to the Debtors' businesses if obligations are not paid when due or as expected, I submit that the Debtors should be authorized to pay and honor the Trade Claims in the ordinary course of business and consistent with customary past practice.

127.     Critically, I believe that the relief requested in the All Trade Motion is focused on the timing of payment to the Trade Creditors rather than the extent to which such payments will ultimately be made to such creditors under the Plan.  As set forth above and more fully in the Norden Declaration, prior to the Petition Date, the Debtors and the Consenting Stakeholders entered into the Restructuring Support Agreement, the terms of which are reflected in the Plan.

The Plan contemplates the payment in full of all General Unsecured Claims in the ordinary course. Therefore, the requested relief would, if granted, simply allow the Debtors to pay the Trade Claims now in the ordinary course of business (and, for the avoidance of doubt, consistent with their customary past practice) instead of upon consummation of the Plan. I believe that this relief is essential because it will minimize any disruption to the Debtors' businesses that would otherwise occur as a result of delay in payment to the Trade Creditors, and thereby allows for a smooth and expeditious reorganization in these Chapter 11 Cases.

128.    **The Debtors' Trade Claims.**  The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business. The Trade Claims are comprised of (a) non-priority, prepetition claims held by vendors that are critical to the Debtors' business operations ("***Critical Vendors***" and, such claims, the "***Critical Vendor Claims***") totaling approximately $30.9 million, (b) non-priority prepetition claims held by suppliers, service providers, and distributors based outside the United States ("***Foreign Vendors***" and, the claims of Foreign Vendors, the "***Foreign Vendor Claims***") totaling approximately $5.0 million, and (c) non-priority prepetition claims held by Other Operational Partners and all other trade claimants (the "***Non-Priority Trade Claims***") totaling approximately $12.4 million.

129.    The Critical Vendors provide services that are critical to the maintenance of the Debtors' complex, global-learning platform. As described above, I believe that numerous Critical Vendors are simply impossible to replace because they are significant Alternative Credential Partners or they act as the sole provider of certain services such as data centers, cloud storage facilities, and software, advertising, and technology services. I believe that this makes it extremely difficult (and, in some cases, impossible) for the Debtors to replace any of these Critical Vendors in a timely manner.

130.    The Foreign Vendors include, among others, foreign technology development service providers and certain foreign Alternative Credential Partners.  I believe that the Foreign Vendors are critical to the Debtors' ability to provide educational offerings across the world and navigate and operate in foreign jurisdictions.

131.    While it may be possible to replace certain of the Critical Vendors or Foreign Vendors, I believe that doing so would impose significant financial and temporal burdens on the Debtors that could delay their ability to provide their products to customers for years.  For instance, I believe that any disruption to the Alternative Credential Programs would be detrimental (perhaps even life threatening) to the Debtors' businesses.  I believe that any pause in the supply of content that is provided by the Alternative Credential Partners could delay or completely jeopardize the Debtors' ability to offer Alternative Credential Programs, which would, in turn, force students to seek out alternative educational opportunities or abandon their educational goals on a potentially permanent basis.

132.    The Debtors also rely on the Other Operational Partners, including landlords, utility providers and providers of professional services (such as accountants and other ordinary course professionals retained in matters unrelated to these Chapter 11 Cases and that are, therefore, not separately retained by the Debtors pursuant to applications under section 327 of the Bankruptcy Code).  I believe that the ordinary course payment of the Non-Priority Trade Claims is both crucial to the Debtors' ability to reorganize successfully with minimal business disruptions and consistent with the unimpaired treatment of these claims under the Plan.  Accordingly, I believe that such payment is warranted under the facts and circumstances of these Chapter 11 Cases.

133.    In addition, although the Debtors are not currently aware of any of the following outstanding Trade Claims, there is a possibility that they may come due in the ordinary course of

business:  (a) prepetition claims entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code (the "***503(b)(9) Claims***" and, the claimants asserting 503(b)(9) Claims, the "***503(b)(9) Claimants***"), and (b) prepetition claims held by common carriers, warehousemen, toll processors, mechanics, and freight forwarders, in each case that may have or may be capable of asserting liens against the Debtors' property (collectively, the "***Lienholders***" and, the claims of Lienholders, the "***Lienholder Claims***") totaling approximately $20,000.  During the twelve (12) months prior to the Petition Date, the Debtors' average monthly payment to Trade Creditors was approximately $25.2 million.  The Debtors estimate that they owe a total of approximately $48.3 million on account of accrued and unpaid Trade Claims as of the Petition Date, and that approximately $34.0 million of that amount will become due within the interim period before a final hearing on the All Trade Motion (the "***Interim Period***").  The following table summarizes the types of Trade Claims held by the Trade Creditors, and provides the Debtors' estimate of the total amount of each type of Trade Claim outstanding as of the Petition Date, including estimates for the portion of such total coming due within the Interim period:

| Category | Description of Claims | Estimated Amount Due Within Interim Period | Estimated Total Amount Outstanding as of Petition Date |
|---|---|---|---|
| Critical Vendor Claims | Claims of certain Trade Creditors that are essential to maintaining the going concern value of the Debtors' enterprise. | $23,000,000 | $30,900,000 |
| Foreign Vendor Claims | Claims held by suppliers, service providers, and distributors based outside the United States. | $3,500,000 | $5,000,000 |
| Non-Priority Trade Claims | Claims of Other Operational Partners and all other Trade Claims incurred in the ordinary course of business. | $7,500,000 | $12,400,000 |
| **Total Trade Claims:** | | **$34,000,000** | **$48,300,000** |

134.    The Debtors are not seeking to pay these amounts immediately or in one lump sum; rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' businesses and in accordance with the Approved Budget.  Concurrently with the filing of the All Trade Motion, the Debtors have filed the DIP Motion, which, in addition to the cash generated by the Debtors' businesses, I believe will provide the necessary additional liquidity for the Debtors to continue operations in the ordinary course of business.  As set forth in the Approved Budget, the Debtors' proposed expenditures set forth in the Approved Budget include payment of the Trade Claims the Debtors are seeking authority to pay pursuant to the All Trade Motion.  Accordingly, I believe that the Debtors will have ample liquidity to pay the Trade Claims in the ordinary course during the administration of these Chapter 11 Cases subject to the Approved Budget.

135.    I believe that the following terms and conditions, subject to the Approved Budget, upon which the Debtors request authority to pay all Trade Claims, are reasonable and should be approve:  (a) the Debtors, in their discretion and subject to the limitations set forth below, shall determine which Trade Claims, if any, will be paid pursuant to the Proposed Orders; and (b) before making a payment to a creditor under the Proposed Orders, the Debtors may, in their discretion, settle all or some of the prepetition claims of such creditor for less than their face amount without further notice or hearing.

136.    **<u>Outstanding Purchase Orders.</u>**  As of the Petition Date, the Debtors have certain prepetition purchase orders (the "***Prepetition Purchase Orders***") outstanding with various third party vendors and suppliers for goods or services ordered by the Debtors that have not yet been delivered or provided to the Debtors.  I understand that these vendors may be concerned that payment owed on account of such Prepetition Purchase Orders will either be delayed or never

honored at all.  Accordingly, and notwithstanding the Plan's treatment of General Unsecured Claims, I believe that certain vendors may refuse to provide goods or services to the Debtors purchased pursuant to the Prepetition Purchase Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of this Court (a) confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods or services subject to Prepetition Purchase Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

137.    I believe that any delay in the shipment or delivery of goods or services could bring the Debtors' operations to a halt, harming the Debtors' businesses.  Although it is difficult to estimate the total amount due and owing under the Prepetition Purchase Orders for goods or services that are not scheduled to be delivered or provided until after the Petition Date, I believe that the total amount to be paid in connection therewith, if the relief requested in the All Trade Motion is granted, is *de minimis* compared to the importance and necessity of the goods or services provided.

**Exhibit B**

**Committees Organized Prepetition**

| Prepetition Committee | Counsel | Members |
|---|---|---|
| Ad Hoc First Lien Group | Milbank LLP<br>55 Hudson Yards<br>New York, New York 10001<br>Attn: Albert A. Pisa (apisa@milbank.com), Tyson Lomazow (tlomazow@milbank.com), and Abigail Debold (adebold@milbank.com) | Secured lenders under the First Lien Credit Agreement holding approximately 82% of outstanding obligations thereunder. |
| Ad Hoc Noteholder Group and Greenvale | Weil, Gotshal & Manges LLP<br>767 5th Ave<br>New York, New York 10153<br>Attn: David Griffiths (david.griffiths@weil.com) and Matt Barr (matt.barr@weil.com)<br>- and -<br>Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn:  Kristine Manoukian (kristine.manoukian@srz.com), Kelly Knight (kelly.knight@srz.com), and Reuben E. Dizengoff (reuben.dizengoff@srz.com) | Unsecured convertible noteholders under the Indentures holding approximately 86.9% of the 2025 Notes and 95.2% of the 2030 Notes. |

## Exhibit C

**Consolidated List of the Holders of the Debtors' Thirty (30) Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the thirty (30)[1] largest unsecured claims (the "***Consolidated Creditor List***") based on the Debtors' unaudited books and records as of the Petition Date.  The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the twenty largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

---

[1]    While Local Rule 1007-2(a)(4) requires that the Debtors the twenty (20) largest unsecured claims, the Debtors have elected to provide the top thirty (30) unsecured claims.

| Fill in this information to Identify the case: |
| --- |
| Debtor Name:    2U, Inc., *et al.* |
| United States Bankruptcy Court for the:    Southern District of New York |
| Case Number (If known): |

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1    WILMINGTON TRUST, NATIONAL ASSOCIATION 50 SOUTH SIXTH STREET SUITE 1290 MINNEAPOLIS, MN  55402 | CONTACT: EMILIA GAZZUOLO & IRIS MUNOZ PHONE: 612-217-5640 EGAZZUOLO@WILMINGTONTRUST.COM; IMUNOZ@WILMINGTONTRUST.COM | SENIOR UNSECURED CONVERTIBLE NOTES DUE 2025 | | | | $380,000,000.00 |
| 2    WILMINGTON TRUST, NATIONAL ASSOCIATION 50 SOUTH SIXTH STREET SUITE 1290 MINNEAPOLIS, MN  55402 | CONTACT: EMILIA GAZZUOLO & IRIS MUNOZ PHONE: 612-217-5640 EGAZZUOLO@WILMINGTONTRUST.COM; IMUNOZ@WILMINGTONTRUST.COM | SENIOR UNSECURED CONVERTIBLE NOTES DUE 2030 | | | | $147,000,000.00 |
| 3    MARYLAND DEPARTMENT OF COMMERCE 401 EAST PRATT STREET 17TH FLOOR BALTIMORE, MD  21202 | CONTACT: MARY DIFERNDINANDO PHONE: 401-767-6300 MARY.DIFERNDINANDO@MARYLAND.GOV | LOAN | | | | $2,000,000.00 |
| 4    HARVARDX 125 MT. AUBURN STREET CAMBRIDGE, MA  02138 | CONTACT: BURMAA NERGUI PHONE: 617-384-0435 MKAN.HSPH@HARVARD.EDU; BURMAA_NERGUI@HARVARD.EDU | UNIVERSITY PARTNER | | | | $1,938,602.75 |
| 5    CIGNA HEALTH AND LIFE 900 COTTAGE GROVE ROAD BLOOMFIELD, CT  06002 | CONTACT: ASHLEY ELLIS PHONE: 804-688-3411 ASHLEY.ELLIS@CIGNAHEALTHCARE.COM | TRADE PAYABLE | | | | $1,710,361.76 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 6  PRINCE GEORGES COUNTY WAYNE K. CURREY ADMINISTRATION BUILDING 1301 MCCORMICK DRIVE SUITE 4000 LARGO, MD  20774 | CONTACT: DAWN MEDLEY PHONE: 301-883-6904 DRMEDLEY@FSCFIRST.COM | LOAN | | | | $1,500,000.00 |
| 7  AMAZON WEB SERVICES P.O. BOX 84023 SEATTLE, WA  98124-8423 | CONTACT: GREG DEVINE PHONE: 206-266-1000 AWS-RECEIVABLES-SUPPORT@AMAZON.COM; DEVINEG@AMAZON.COM | TRADE PAYABLE | | | | $1,091,007.09 |
| 8  MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT) 77 MASSACHUSETTS AVENUE CAMBRIDGE, MA  02139 | CONTACT: BRYAN ADKISON PHONE: 617-258-6723 WIRE-TRANSFERS@MIT.EDU; BADKISON@MIT.EDU | UNIVERSITY PARTNER | | | | $976,741.57 |
| 9  RED VENTURES EDUCATION 1423 RED VENTURES DRIVE FORT MILL, SC  29707 | CONTACT: BEN BRAUN PHONE: 704-971-2300 HIGHEREDINVOICES@REDVENTURES.COM | TRADE PAYABLE | | | | $966,231.50 |
| 10  COLUMBIA UNIVERSITY 540 MUDD MC 4719 500 WEST 120TH STREET NEW YORK, NY  10027 | CONTACT: SEAN WIGGINS PHONE: 212-854-6447 ST2840@COLUMBIA.EDU; SEAN.WIGGINS@COLUMBIA.EDU | UNIVERSITY PARTNER | | | | $950,803.73 |
| 11  SPI GLOBAL CONTENT HOLDING 77 ROBINSON ROAD 13-00 ROBINSON SINGAPORE  068896 SINGAPORE | CONTACT: SWAPNI RAUT PHONE: 609-512-4050 SWAPNIL.RAUT@LEARNINGMATE.COM | TRADE PAYABLE | | | | $889,346.26 |
| 12  GUILD EDUCATION INC 370 17TH STREET SUITE 300 DENVER, CO  80202 | CONTACT: BRITTANY MITCHELL PHONE: 720-378-5452 AR@GUILDEDUCATION.COM | TRADE PAYABLE | | | | $797,585.36 |
| 13  THE FRIDAY CONFERENCE CENTER (UNC-CHAPEL HILL) 100 FRIDAY CENTER DRIVE CHAPEL HILL, NC  27599 | CONTACT: JOHN ALBRECHTSEN PHONE: 919-962-3000 JOHN.ALBRECHTSEN@UNC.EDU | UNIVERSITY PARTNER | | | | $705,747.80 |
| 14  MCCOMBS SCHOOL OF BUSINESS FOUNDATION 2110 SPEEDWAY STOP, B6000 AUSTIN, TX  78712-1750 | CONTACT: ERIN STEPPE & PATRICIA MARTINEZ PHONE: 732-939-6688 ERIN.STEPPE@AUSTIN.UTEXAS.EDU; PATRICIA.MARTINEZ@MCCOMBS.UTEXAS.EDU | UNIVERSITY PARTNER | | | | $636,877.60 |
| 15  BOARD OF REGENTS, UNIVERSITY OF CALIFORNIA 2195 HEARST AVE., RM  159 BERKELEY, CA  94720-1101 | CONTACT: ANGELA CHANG PHONE: 510-642-1466 ANGELACHANG@ISCHOOL.BERKELEY.EDU | UNIVERSITY PARTNER | | | | $623,100.84 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 16   RUTGERS UNIVERSITY LIFELONG LEARNING CENTER 3 RUTGERS PLAZA 3RD FLOOR NEW BRUNSWICK, NJ  08901 | CONTACT: HYUN-JA LEEANDRE LEPINE PHONE: 848-932-6554 HYUNJA@DOCS.RUTGERS.EDU; ANDRE.LEPINE@RUTGERS.EDU | UNIVERSITY PARTNER | | | | $605,396.62 |
| 17   BANNER EDGE MEDIA 14350 NORTH 87TH STREET SUITE 110 SCOTTSDALE, AZ  85260 | CONTACT: JENAY HENNING PHONE: 480-254-8741 JENAY@BANNEREDGEMEDIA.COM | TRADE PAYABLE | | | | $527,860.00 |
| 18   UNIVERSITY OF CENTRAL FLORIDA 12424 RESEARCH PARKWAY SUITE 300 ORLANDO, FL  32826 | CONTACT: JANA BREBURDOVA PHONE: 407-882-0247 JANA.BREBURDOVA@UCF.EDU | UNIVERSITY PARTNER | | | | $478,178.27 |
| 19   YALE UNIVERSITY TREASURY SERVICES P.O. BOX. 208087 NEW HAVEN, CT  06520-8087 | CONTACT: ELIZABETH ROESSLER PHONE: 203-785-7207 CONTROLLERS.OFFICE@YALE.EDU; ELIZABETH.ROESSLER@YALE.EDU | UNIVERSITY PARTNER | | | | $477,609.90 |
| 20   RFR/K 55 PROSPECT OWNER LLC P.O. BOX 780887 SUITE 204 PHILADELPHIA, PA  19177-0887 | CONTACT: MEISHA PARIS PHONE: 917-647-5309 MPARRIS@RFR.COM | RENT | | | | $457,567.20 |
| 21   EPWERY JOSE P. VARELA 532 70000 COLONIA DEL SACRAMENTO COLONIA URUGUAY | CONTACT: GUSTAVO SANTUCHO PHONE: +598-4522-0505 GUSTAVOSANTUCHO@GMAIL.COM | TRADE PAYABLE | | | | $457,563.84 |
| 22   MICHIGAN STATE UNIVERSITY HANNAH ADMINISTRATION BLDG 426 AUDITORIUM RD, RM 110 EAST LANSING, MI  48824 | CONTACT: STACEY NYEKEN BEER PHONE: 517-353-3530 NYESL@MSU.EDU; BEERK@MSU.EDU | UNIVERSITY PARTNER | | | | $421,236.05 |
| 23   NORTHWESTERN UNIVERSITY 339 EAST CHICAGO AVE WIEBOLDT HALL 6TH FLOOR CHICAGO, IL  60611-3008 | CONTACT: JEANNINE PUCHTEL & ERICA WILKE BOVA PHONE: 847-467-1908 JPUCHTEL@NORTHWESTERN.EDU; ERICA.BOVA@NORTHWESTERN.EDU | UNIVERSITY PARTNER | | | | $339,392.06 |
| 24   KFORCE INC P.O. BOX 277997 ATLANTA, GA  30384-7997 | CONTACT: JEFFREY HACKMAN PHONE: 877-453-6723 REMITS@KFORCE.COM | TRADE PAYABLE | | | | $325,720.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 25 | THE UNIVERSITY OF TEXAS AT AUSTIN P.O. BOX 7518 AUSTIN, TX  78713-7518 | CONTACT: HEATHER VAN LIGTEN & JOSH CLEMENTS PHONE: 512-471-4141 HEATHER.VANLIGTEN@AUSTIN.UTEXAS.EDU; J.CLEMENTS@AUSTIN.UTEXAS.EDU | UNIVERSITY PARTNER | | | | $321,051.24 |
| 26 | UNIVERSITY OF NORTH CAROLINA AT CHARLOTTE 9201 UNIVERSITY CITY BOULEVARD CHARLOTTE, NC  28223 | CONTACT: KATIE ADDISON & JEFF ANDERSON PHONE: 704-687-8900 GENERALACCOUNTING@UNCC.EDU; JANDERSON@CHARLOTTE.EDU | UNIVERSITY PARTNER | | | | $314,479.59 |
| 27 | GEORGE WASHINGTON UNIVERSITY COLLEGE OF PROFESSIONAL STUDIES 802 21ST ST NW, STE 301 WASHINGTON, DC  20052 | CONTACT: KREDA BOCI PHONE: 202-994-2083 KBOCI@GWU.EDU | UNIVERSITY PARTNER | | | | $313,840.44 |
| 28 | BRIGHT LABS SERVICES LLC 485 LEXINGTON AVENUE 10TH FLOOR NEW YORK, NY  10017 | CONTACT: ROBERT BIRD PHONE: 718-916-7021 ROBERT.BIRD@ANKURA.COM | TRADE PAYABLE | | | | $298,029.33 |
| 29 | THE UNIVERSITY OF UTAH 1901 E S CAMPUS DR,  2175 SALT LAKE CITY, UT  84112 | CONTACT: STERLING MOORE & JONLEE ALVARO PHONE: 801-587-4619 STERLING.MOORE@UTAH.EDU; U6039172@UTAH.EDU; IRIS.MOULTON@UTAH.EDU | UNIVERSITY PARTNER | | | | $286,817.20 |
| 30 | MARKETPLACE OPERATIONS INC C/O FUNARO & CO., P.C. 350 5TH AVENUE 41ST FLOOR NEW YORK, NY  10118 | CONTACT: SONNY ANAND PHONE: 610-209-8657 FINREPORTS@FORBESADVISOR.COM; SONNY.ANAND@FUNARO.COM | TRADE PAYABLE | | | | $265,170.00 |

**Exhibit D**

**Consolidated List of the Holders of the Debtors' Five Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name of Creditor | Name, Telephone Number, and Email Address of Creditor Contact Familiar with Claim | Approximate Amount of Claim | Collateral Description and Value |
|---|---|---|---|
| Alter Domus (US) LLC - First Lien Term Loans | 225 W. Washington Street 9th Floor Chicago, IL 60606 United States of America ADAgencyTeam3@alterdomus.com | $384.8 million* | All assets other than Excluded Assets (as defined in the First Lien Credit Agreement) |
| Alter Domus (US) LLC - First Lien Revolving Loans | 225 W. Washington Street 9th Floor Chicago, IL 60606 United States of America ADAgencyTeam3@alterdomus.com | $40.1 million* | All assets other than Excluded Assets (as defined in the First Lien Credit Agreement) |
| ePlus Group Inc. | 13595 Dulles Technology Drive Herndon, VA 20171 United States of America mrosales@eplus.com | $1.11 million | Certain assets provided to Secured Party under that certain Lease Agreement No. MDC226 and MDC225, dated as of April 15, 2020 |
| AMEX | Juliette Bennett (623) 492-6522 juliette.r.bennett@aexp.com | $170,000 | Cash posted in AMEX National Bank CD Account |

\* Includes principal, interest, and fees. Accrued interest for the First Lien Term Loans and First Lien Revolving Loans is approximately $10.6 million in the aggregate.

## Exhibit E

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities<br>(*excluding intercompany balances to Non-Debtor Affiliates*) | Approximate Amount |
|---|---|
| Total Assets<br>(Estimated Book Value as of June 30, 2024) | $1,224,353,000 |
| Total Liabilities<br>(Estimated Book Value as of June 30, 2024) | $1,146,597,000 |

## Exhibit F

### Summary of Publicly Held Securities of the Debtors

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the approximate number of holders thereof as of the Petition Date:

| Publicly Held Security | Issued | Outstanding | Approximate Number of Record Holders |
|---|---|---|---|
| Common Stock | 2,805,321 | 2,805,321 | 44 |
| 2.25% Convertible Senior Notes due 2025 <br><br> CUSIP: 90214JAB7 | $380,000,000 | $380,000,000 | 20 |
| 4.50% Senior Unsecured Convertible Note due 2030 <br><br> CUSIP: 90214JAD3 | $147,000,000 | $147,000,000 | 4 |

Common stock held by officers and directors[1]

| Name | Number of Shares (Total Beneficial Ownership) |
|------|:---:|
| Paul S. Lalljie | 20,381 |
| Matthew J. Norden | 15,307 |
| Heather Hoffert | 1,557 |
| Andrew J. Hermalyn | 12,640 |
| Aaron M. McCullough | 20,269 |
| Ivona Smith | 0 |
| Edward S. Macias | 3,547 |
| Paul A. Maeder | 10,056 |
| Robert M. Stavis | 9,481 |
| Timothy M. Haley | 4,541 |
| Earl Lewis | 3,911 |
| Coretha M. Rushing | 2,850 |

---

[1]   Figures are as of:  (a)  July 1, 2024 with respect to Paul S. Lalljie, Matthew J. Norden, Andrew J. Hermalyn, and Aaron M. McCullough; (b) as of May 9, 2024 with respect to Ivona Smith; (c) as of April 8, 2024 with respect to Edward S. Macias, Paul A. Maeder, Robert M. Stavis, Timothy M. Haley, Earl Lewis, and Coretha M. Rushing (with holdings for the persons set forth in this clause (c) estimated to account for 2U, Inc.'s 1-for-30 reverse stock split executed on June 14, 2024).

**<u>Exhibit G</u>**

**Summary of the Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity:

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Exhibit H

**Summary of the Debtors' Property from Which the Debtors Operate Their Businesses**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | ZIP | Country |
|---|---|---|---|---|
| 2345 Crystal Drive, Suite 1100 | Arlington | VA | 22202 | USA |
| 707 17th Street, Floors: 26-28, 32, 33 & 40 | Denver | CO | 80202 | USA |
| 7900 Harkins Road, 1st -12th Floors | Lanham | MD | 20706 | USA |
| 55 Prospect Street, Floors 8-10 | Brooklyn | NY | 11201 | USA |
| 1150 S. Olive Street, Floors: 8 & 20 | Los Angeles | CA | 90015 | USA |
| 125 High Street, Floor 5 | Boston | MA | 02110 | USA |
| 123 West Franklin Street, Suite 610 | Chapel Hill | NC | 27516 | USA |
| 5201 Congress Ave, Suite 140 | Boca Raton | FL | 33487 | USA |

**Exhibit I**

**Location of the Debtors' Substantial Assets, Books and Records,
and Nature and Location of the Debtors' Assets Outside the United States**

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date:

| Property | Location |
|---|---|
| Debtors' Substantial Assets Within the United States | The Debtors hold cash in bank accounts in New York and California. <br><br> The Debtors have property and equipment at leased locations in the following states:  New York, Maryland, Virginia, Massachusetts, Colorado, North Carolina, California and Florida. |
| Books and Records | The books and records of the Debtors are primarily located at 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202. |
| Debtors' Assets Located Outside of the United States | The Debtors directly or indirectly own all of the outstanding equity interests of the following Non-Debtor Affiliates:  (a) 2U Group (UK) Limited;  (b) K2017143886 Proprietary Limited; (c) 2U GetSmarter (UK) Limited; (d) edX Boot Camps Mexico S. de R.I. de C.V.; (e) edX Boot Camps (UK) Limited; (f) edX Boot Camps (Australia) Pty Limited;  (g) edX Boot Camps (Germany) GmbH;  (h) Get Educated International Proprietary Limited; (i) edX Boot Camps (Canada) ULC; (j) Get Educated Proprietary Limited; and (k) GetSmarter Online Ltd. <br><br> In addition, at any given time, various assets belonging to the Debtors may be in transit or otherwise located throughout the world due to the international nature of the Debtors' businesses. |

## Exhibit J

### Summary of Legal Actions Against the Debtors

Pursuant to Local Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or any of their respective properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these Chapter 11 Cases.

The Debtors do not believe that there are any actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent.  However, certain of the Debtors are named as defendants in various litigation matters.  Any creditor that asserts a claim against any Debtor in respect of a pending action will be included in the Debtors' list of creditors.

**Exhibit K**

**The Debtors' Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name/Position | Position | Relevant Experience/Responsibilities |
|---|---|---|
| *Paul Lalljie* | Chief Executive Officer | Mr. Lalljie has over twenty (20) years of finance management in the high-growth technology sector and has served as 2U's Chief Executive Officer since November 2023. Mr. Lalljie previously served as 2U's Chief Financial Officer from October 2019 to November 2023. Prior to joining 2U, Mr. Lalljie served as Chief Financial Officer for Neustar, Inc and also held various leadership positions at Neustar, including Senior Vice President, Interim Chief Financial Officer and Treasurer, Vice President, Financial Planning & Analysis, and Vice President, Finance and Investor Relations. Mr. Lalljie currently serves on the board of 2U, Inc. Mr. Lalljie has extensive experience in both finance and management, including treasury, accounting, financial planning and analysis, real estate management, investor relations, and capital markets transactions. |
| *Matthew Norden* | Chief Financial Officer and Chief Legal Officer | Mr. Norden joined 2U in 2013 and has served as 2U's Chief Financial Officer since November 2023. Mr. Norden has over fifteen (15) years of experience working in global organizations at the intersection of business and law. At 2U, Mr. Norden has been instrumental in the Company's growth into a global enterprise, including by leading 2U through its successful initial public offering in 2014 and leading its acquisitions of multiple companies and several debt and equity capital markets |

| | | |
|---|---|---|
| | | transactions.  Prior to serving as Chief Financial Officer, Mr. Norden served as 2U's Chief Legal Officer and in various other senior roles in the Legal Department.  Prior to joining 2U, Mr. Norden served as Vice President and General Counsel at TOMS Shoes and worked as an associate at a major global law firm.<br><br>Mr. Norden hold a Master of Business Administration degree from the Kenan-Flagler Business School at the University of North Carolina at Chapel Hill, a Juris Doctorate degree from Georgetown University Law Center, and a Bachelor of Arts degree in Psychology from The George Washington University. |
| *Aaron McCullough* | President, Alternative Credential Segment | Mr. McCullough has served as 2U's President of 2U's Alternative Credential Segment since January 2024.  Mr. McCullough previously served as 2U's Chief Product Officer.  Prior to joining 2U, Mr. McCullough served as Vice President and General Manager of the consumer segment at Coursera.  Prior to joining Coursera, Mr. McCullough was the head of global product management at Uber Transit.  Mr. McCullough has extensive experience leveraging technology in an educational environment, as well as product management.<br><br>Mr. McCullough holds a Bachelor of Science in Business Administration with a concentration in Financial Analysis & Valuation from the University of Southern California. |
| *Andrew Hermalyn* | President, Degree Program Segment | Mr. Hermalyn has served as the President of 2U's Degree Program Segment since January 2024.  Mr. Hermalyn previously served as 2U's President of Partnerships and, previously, as its Executive Vice President of Strategic Partnerships.  Mr. |

| | | |
|---|---|---|
| | | Hermalyn has been with 2U since its founding and has deep institutional knowledge of 2U's businesses, relationships, and stakeholders. Mr. Hermalyn serves on the board of Mantra Health and on the Dean's Advisory Council for Lehigh University's College of Education.<br><br>Andrew holds a Bachelor of Arts in Sociology from Lehigh University. |
| *Michael Kurbjeweit* | Chief Marketing Officer | Mr. Kurbjeweit serves as 2U's Chief Marketing Officer. Mr. Kurbjeweit initially joined 2U in 2013 and has served in various marketing roles. He has extensive experience in global marketing functions, including performance marketing, demand generation, digital strategy, marketing analytics, and revenue generation.<br><br>Mr. Kurbjeweit holds a Bachelor of Arts in communications from Christopher Newport University and a Masters of Science in Integrated Marketing Communications from Northwestern University. He also graduated from the 2U-powered Harvard Business Analytics Program in 2020. |
| *Adam Drudge* | Chief People Officer | Mr. Drudge has served as 2U's Chief People Officer since March 2024. Prior to serving as Chief People Officer, Mr. Drudge served as 2U's Senior Vice President of People beginning in 2021. At 2U, Mr. Drudge led the employment aspects of the edX integration following the acquisition. Mr. Drudge has over twenty (20) years of human resources experience, having served in various positions at Capital One, Carrier, Ingersoll Rand, and Milliken & Company. Mr. Drudge has extensive experience leading global human resources, including talent management, |

| | | recruitment, corporate culture, and diversity, equity, and inclusion. |
| | | Mr. Drudge holds Bachelors of Arts degrees in Industrial Organizational Psychology and German from Davidson College and a Masters of Arts in Global Human Resource Development from University of Illinois Urbana-Champaign. |
| *Lillian Brownstein* | General Counsel | Ms. Brownstein has served as 2U's General Counsel since November 2023 and is responsible for overseeing 2U's corporate legal function, as well as litigation and intellectual property matters. Prior to joining 2U, Ms. Brownstein served in various legal roles at MicroStrategy Incorporated where she was responsible for overseeing the securities, corporate governance, privacy, and product-related matters. Prior to joining MicroStrategy, Ms. Brownstein worked as an associate at a major global law firm, where she represented public and private companies on governance, M&A, and securities matters. |
| | | Ms. Brownstein holds a Bachelor of Arts in Political Science and International Studies from Northwestern University and a Juris Doctorate from Columbia University Law School. |
| *Heather Hoffert* | Principal Accounting Officer | Ms. Hoffert has served as 2U's Principal Accounting Officer since November 2023. Prior to serving as Principal Accounting Officer, Ms. Hoffert served as 2U's Senior Vice President of Accounting beginning in 2021. Prior to joining 2U, Ms. Hoffert served in various roles at Neustar, Inc., including Vice President, Finance. Ms. Hoffert has extensive experience in accounting matters and financial management. |

**Exhibit L**

**The Debtors' Payroll for the 30-Day Period
Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid or proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by the Debtors.

| Payments | Estimated Payment Amount |
|---|---|
| Estimated Amount of Payroll to Employees *(exclusive of officers, directors, and stockholders)*[1, 2] | $14,838,000 |
| Estimated Amount Proposed to Be Paid to Officers, Directors, and Stockholders | $321,000 |
| Estimated Payments to Financial and Business Consultants | $6,180,000 |

---

[1]  "***Insiders***," as defined under section 503(c) of the Bankruptcy Code, are excluded from this group.  Thus, none of the individuals included in this group:  (a) participate in the management of the Debtors; (b) have decision-making authority with respect to policies of the Debtors; (c) report directly to the Debtors' board of directors; (d) were appointed by the Debtors' board of directors; (e) qualify as an Insider under Rule 16a-1(f) of the Securities Exchange Act; (f) undertake budget control over the Debtors' business operations; (g) are compensated in the form of equity of the Debtors; or (h) are relatives of any Insider of the Debtors.

[2]  Includes wages/salaries only.

**Exhibit M**

**The Debtors' Estimated Cash Receipts and Disbursements for the
30-Day Period Following the Filing of Their Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period immediately following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Estimated Cash Receipts | $42,067,000 |
| Estimated Cash Disbursements | ($86,337,000) |
| Net Cash Gain (Loss) | ($44,271,000) |
| Accrued and Unpaid Obligations | $57,876,000 |
| Accrued and Unpaid Receivables | $76,131,000 |