**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING THE DEBTORS TO (I) OBTAIN JUNIOR LIEN POSTPETITION**
**FINANCING AND (II) USE CASH COLLATERAL; (B) GRANTING LIENS**
**AND SUPERPRIORITY CLAIMS; (C) GRANTING ADEQUATE**
**PROTECTION TO CERTAIN PARTIES; AND (D) GRANTING RELATED RELIEF**

The debtors in possession (collectively, the "***Debtors***") in the above-captioned cases (the

"***Chapter 11 Cases***") hereby file this motion (this "***Motion***") and respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

## RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "***Interim Order***"), and a final order (the "***Final Order***" and, together with the Interim Order, the "***DIP Orders***"):[2]

a)    authorizing the Debtors to obtain *junior* secured postpetition financing in the form of a term loan facility in the aggregate principal amount of up to $64 million (the "***DIP Facility***", and the loans made, advanced or deemed advanced thereunder, the "***DIP Loans***"), of which up to $60 million will be available immediately upon entry of the Interim Order, with the remaining up to $4 million to be available upon entry of, and subject to, the Final Order (the "***Final Borrowing***"), in accordance with and subject to the terms and conditions set forth in (i) that certain *Debtor-in-Possession Credit and Guaranty Agreement*, by and among Debtor 2U, Inc., as borrower (the "***Borrower***"), certain subsidiaries of the Borrower party thereto, as guarantors (together with any subsidiaries of the Borrower that become guarantors subsequent to the Closing Date (as defined in the DIP Credit Agreement), the "***DIP Guarantors***" and, together with the Borrower, the "***DIP Credit Parties***"), Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent (collectively, in such capacities, the "***DIP Agent***"), and the lenders from time to time party thereto (the "***DIP Lenders***" and, together with the DIP Agent, the "***DIP Secured Parties***"), substantially in the form attached as **Exhibit A** to the Interim Order (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***" and, together with the other Credit Documents (as defined in the DIP Credit Agreement), the "***DIP Credit Documents***"),[3] (ii) the Interim Order, (iii) the Final Order (as it relates to any Final Borrowing), and (iv) the term sheet attached to the Restructuring Support Agreement (the "***DIP Facility Term Sheet***");

b)    authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral (as defined below), including Cash Collateral (as defined in the Interim Order), solely in accordance with the terms and conditions set forth in the Interim Order and the DIP Credit Documents, including the Approved Budget (as defined in the Interim Order), subject to any variances expressly permitted in the Interim Order and under the DIP Credit Agreement;

c)    granting to the DIP Lenders the DIP Liens (as defined below) on all DIP

---

[2]    To the extent of any conflict between the descriptions and definitions in this Motion and the DIP Orders or DIP Credit Documents, then the DIP Orders or DIP Credit Documents, as applicable, will control.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim Order, the DIP Credit Agreement, or the other DIP Credit Documents, as applicable.

Collateral, as set forth in the Interim Order, subject to the Carve-Out (as defined below);

d)    granting to the DIP Lenders DIP Superpriority Claims (as defined below);

e)    granting adequate protection to be provided to the Prepetition Secured Parties (as defined below); and

f)    granting related relief.

2.    In support of this Motion, the Debtors rely on the Declaration of Cullen Murphy in Support of Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief (the "**Murphy Declaration**") and the Declaration of William Kocovski in Support of Chapter 11 Petitions and First Day Motions (the "**Kocovski Declaration**"), both of which have been filed contemporaneously herewith and are fully incorporated herein by reference.

3.    In addition, the Debtors request that this Court (as defined herein) schedule a final hearing (the "***Final Hearing***") within approximately thirty (30) days from the Petition Date (as defined herein) to consider approval of this Motion on a final basis.

## JURISDICTION AND VENUE

4.    The United States Bankruptcy Court for the Southern District of New York (this "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.    The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Bankruptcy Rules 2002, 4001, 9013, and 9014, and rule 9014 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

## **<u>BACKGROUND</u>**

7.      The Debtors comprise a leading online education technology company providing over eighty million people worldwide with access to high-quality education, including graduate, undergraduate, and non-degree programs.  Through a comprehensive platform, the Debtors enable non-profit universities and colleges to offer a wide range of online courses and programs.  These span diverse fields such as artificial intelligence, data science, business, healthcare, and education, with over 4,600 programs accessible on the Debtors' platform, edX.org, which provides learners with essential information on admissions, enrollment requirements, application processes, curriculum, tuition, and completion times.  By consolidating a vast array of educational offerings on a single platform, the Debtors offer flexible and affordable pathways for achieving professional and educational goals.  Although operations are predominantly remote, the majority of the Debtors' revenue flows into New York, where the Debtors hold their primary bank accounts, and where they collaborate with prestigious institutions of higher education (many of which are located here in New York City, including New York University, Columbia University, and Fordham University), enhancing their reach and impact within the city and state.

8.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing these Chapter 11 Cases.  The Debtors continue to manage and operate their

businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No

trustee or examiner has been requested, and no committee has been appointed in these Chapter 11

Cases.

9.      The factual background regarding the Debtors, including their business operations,

their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is

set forth in detail in the *Declaration of Matthew Norden, Chief Legal Officer and Chief Financial

Officer of the Debtors, in Support of Chapter 11 Petitions* (the "***Norden Declaration***") and the

Kocovski Declaration (together with the Norden Declaration, the "***First Day Declarations***") filed

contemporaneously herewith, which are fully incorporated herein by reference.

10.     These Chapter 11 Cases are "prepackaged" cases commenced for the purpose of

implementing an agreed restructuring of the Debtors' debt.  Prior to the Petition Date, the Debtors

entered into the Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended,

modified or supplemented, the "***Restructuring Support Agreement***") with certain creditors

including (a) an ad hoc group of certain holders (the "***Ad Hoc Noteholder Group***") of 2.25%

convertible senior notes due May 1, 2025, issued under that certain Indenture, dated as of

April 23, 2020 (the "***2025 Notes***") and 4.50% senior unsecured convertible notes due

February 1, 2030, issued under that certain Indenture, dated as of January 11, 2023 (the "***2030***

***Notes***" and, together with the 2025 Notes, the "***Notes***") represented by Weil, Gotshal & Manges

LLP, (b) Greenvale Capital LLP ("***Greenvale***" and, together with the Ad Hoc Noteholder Group,

the "***Consenting Noteholders***") as holder of the Notes represented by Schulte Roth & Zabel LLP,

and (c) an ad hoc group of certain Prepetition Lenders (the "***First Lien Ad Hoc Group***" and,

together with the Consenting Noteholders, the "***Consenting Stakeholders***") represented by

Milbank LLP.  As of July 24, 2024, the Consenting Stakeholders held approximately 82% of the Debtors' first lien funded debt, 86.9% of the 2025 Notes, and 95.2% of the 2030 Notes.

11.     On the Petition Date, the Debtors filed a plan of reorganization reflecting the terms of the Restructuring Support Agreement (as may be amended, modified or supplemented, the "***Plan***") in addition to a disclosure statement with respect to the Plan (as may be amended, modified or supplemented, the "***Disclosure Statement***").  The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.[4]

12.     Prior to the Petition Date, the Debtors commenced solicitation of votes on the Plan from holders of Class 3 First Lien Claims and Class 4 Unsecured Notes Claims (each as defined in the Plan), the only classes entitled to vote under the Plan.  Subject to this Court's approval, votes with respect to the Plan are due on August 21, 2024.  On the Petition Date, the Debtors filed a motion seeking, among other things, (a) conditional approval of the Disclosure Statement, and (b) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan.  The Debtors seek to obtain confirmation of the Plan as quickly as this Court's schedule and requisite notice periods will permit.

## CONCISE STATEMENT PURSUANT TO
## BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2

13.     The below chart contains a summary of the material terms of the proposed DIP Facility and proposed Interim Order, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

---

[4]     Contemporaneously with filing this Motion, the Debtors are filing a motion to seek this Court's authorization to reject certain unexpired commercial real property leases.

| Material Terms[5] | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | 2U, Inc.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each subsidiary of the Borrower that is a signatory, or executed a joinder, to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, § 1.1. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain holders of Unsecured Notes (as defined below) participating in the DIP Facility.<br><br>*See* DIP Facility Term Sheet 2. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Loans shall mature on January 24, 2025.<br><br>*See* DIP Credit Agreement, § 1.1. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(1), (a)(7) | Junior secured postpetition financing in the form of a term loan facility in the aggregate principal amount of up to $64 million, of which up to $60 million will be available immediately upon entry of the Interim Order, with the remaining up to $4 million to be available following entry of, and subject to, the Final Order, and, in each case, subject to the conditions precedent set forth in the DIP Credit Documents.<br><br>*See* Interim Order, Preamble; DIP Credit Agreement, § 1.1. |
| **Backstop Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(2) | <u>Conditions Precedent to the Closing of the DIP Facility</u>.  The DIP Credit Agreement includes conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>    a. *Credit Agreement and Collateral Documents*.  The DIP Agent shall have received fully executed copies of (i) the DIP Credit Agreement (together with the schedules and exhibits thereto) and (ii) the other Collateral Documents, including the Collateral Agreement (together with the schedules and exhibits thereto). |

---

[5]    Except where stated otherwise, the sources of the material terms selected for inclusion herein are Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.

| Material Terms[5] | Summary of Material Terms |
|---|---|
| | b. *Funding Notice*.  The DIP Agent shall have received a fully-executed and delivered Funding Notice, no later than 10:00 a.m. (New York City time) at least one (1) Business Day in advance of the Closing Date (or such later time as the DIP Agent may agree), together with a flow of funds memorandum attached thereto with respect to the initial funding of DIP Loans on the Funding Date.<br><br>c. *Interim DIP Order*.  The Interim Order (i) shall have been entered within five (5) days of the Petition Date (or such longer period as the Required Lenders (as defined in the DIP Credit Agreement) may agree) and shall be in full force and effect and (ii) shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified, without the prior written consent of the Required Lenders.<br><br>d. *First Day Orders*.  The "first day" orders (including a cash management order), which shall be in form and substance satisfactory to the Required Lenders, shall have been entered upon an application or motion of the DIP Credit Parties in form and substance satisfactory to the Required Lenders.<br><br>e. *Approved Budget*.  The Required Lenders shall have received and approved, in their sole discretion, the Initial Approved Budget.<br><br>f. *Restructuring Support Agreement*.  The Support Effective Date (as defined in the Restructuring Support Agreement) shall have occurred.<br><br>g. *Fees*.  The Borrower shall have paid to the DIP Agent the fees payable to each such Person on the Closing Date referred to in Section 2.8(a) of the DIP Credit Agreement, in each case, to the extent due and payable on the Closing Date.<br><br>h. *Secretary's Certificate and Attachments*.  The DIP Agent shall have received an executed officer's certificate of each DIP Credit Party, together with all applicable attachments, certifying as to the following:<br><br>    i. *Organizational Documents*.  Attached to the DIP Credit Agreement is a copy of each Organizational Document of such DIP Credit Party, to the extent applicable and customary in the relevant jurisdiction of such DIP Credit Party, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto.<br><br>    ii. *Signature and Incumbency*.  Set forth therein are the signature and incumbency of the officers or other authorized representatives of such DIP Credit Party executing the DIP Credit Documents to which it is a party.<br><br>    iii. *Resolutions*.  Attached thereto are copies of resolutions of the Board of Directors of such DIP Credit Party approving and authorizing the execution, delivery and performance of the DIP Credit Agreement and the other DIP Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment. |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| | iv. *Good Standing Certificates*.  Attached thereto is a good standing certificate (if applicable) from the applicable Governmental Authority of such DIP Credit Party's jurisdiction of incorporation, organization or formation dated as of a recent date prior to the Closing Date. |
| | i. *"Know-Your-Customer", Etc*.  The DIP Agent and each applicable DIP Lender shall have received all documentation and other information required under Anti-Terrorism Laws and applicable "know-your-customer" and anti-money laundering Laws, including certificates required under the Beneficial Ownership Regulation, including, without limitation, a duly executed W-9 (or such other applicable tax form) of the Borrower. |
| | j. *Promissory Notes*.  Delivery of each Note requested by a DIP Lender in accordance with Section 2.4(b) of the DIP Credit Agreement, if any. |
| | k. *Expenses*.  The DIP Agent and each DIP Lender shall have received, or substantially simultaneously with the initial funding of the DIP Loans on the Funding Date shall receive, (i) to the extent invoiced at least two (2) Business Days prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment in full, in cash, of all reasonable and documented out-of-pocket expenses (including fees, charges and disbursements of Schulte Roth & Zabel LLP, Weil, Gotshal & Manges LLP, Seward & Kissel LLP and Houlihan Lokey Capital, Inc.) required to be reimbursed or paid by any DIP Credit Party under any DIP Credit Document and (ii) reimbursement or payment in full, in cash, of all reasonable and documented out-of-pocket fees and expenses of the Consenting Noteholder Advisors (as defined in the Restructuring Support Agreement); *provided*, that, in each case, each of Schulte Roth & Zabel LLP, Weil, Gotshal & Manges LLP, Seward & Kissel LLP and Houlihan Lokey Capital, Inc. may provide summary copies of its invoices (which shall not be required to contain time entries, if any, and which may be redacted or modified to delete any privileged information or any other confidential information but shall include a general brief description of the nature of the matters for which services were performed), and it is understood and agreed that such summary copies shall constitute sufficient documentation in accordance with paragraph (k) of the DIP Credit Agreement. |
| | *See* DIP Credit Agreement, § 3.1. |
| | <u>Conditions to Each Extension of Credit</u>.  The DIP Credit Agreement also includes conditions to the extension of credit requested to be made by it on any funding date. |
| | a. *Representations and Warranties*.  Each of the representations and warranties made by any DIP Credit Party in or pursuant to the DIP Credit Documents shall be true and correct in all material respects (unless qualified by materiality, in which case they shall be true and correct in all respects) on and as of such date as if made on and as of such date (except to the extent made as of a specific date, in which case such representation and warranty shall be true and correct in all material respects (unless qualified by materiality, in which case they shall be true and correct in all respects) on and as of such specific date). |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| | b. *No Default*. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.<br><br>c. *Notices*. The Borrower shall have delivered to the DIP Agent the notice of borrowing or Application, as the case may be, for such extension of credit in accordance with the DIP Credit Agreement.<br><br>d. *MAE*. Since the Petition Date, no Material Adverse Effect shall have occurred.<br><br>e. *Second Draw Funding*. Solely in respect of the Second Draw, (x) the Bankruptcy Court shall have entered the Final Order within forty-five (45) days following the Petition Date (or such later date as the Required Lenders may agree) (and, in any event, prior to the Second Draw Funding Date) and (y) the Required Lenders shall have consented (in their sole discretion) to funding such Second Draw.<br><br>f. *DIP Order*. The DIP Order (or, in the case of the First Draw, only the Interim DIP Order) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay without the prior written consent of the Required Lenders.<br><br>*See* DIP Credit Agreement, § 3.2. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(3) | Each DIP Loan shall bear interest on the unpaid principal amount thereof from the date made to repayment thereof (whether by acceleration or otherwise) at an interest rate equal to the Base Rate or Term SOFR, as applicable, plus (i) for DIP Loans that are Base Rate Loans, 7.50% *per annum* and (ii) for DIP Loans that are Term SOFR Loans, 8.50% *per annum*. Interest on each DIP Loan shall accrue on a daily basis and be payable in arrears in kind.<br><br>*See* DIP Credit Agreement, § 2.5(a).<br><br><u>Default Interest</u>. Upon the occurrence and during the continuance of an Event of Default, the overdue portion of any principal amount of all DIP Loans and, to the extent permitted by applicable Law, any overdue interest payments on the DIP Loans or any overdue premium, fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall bear interest (including post-petition interest in any proceeding under any Debtor Relief Law) from the date of such Event of Default, payable in kind and capitalized at a rate that is 2.00% *per annum* in excess of the interest rate otherwise payable hereunder with respect to the applicable DIP Loans (or, in the case of any such overdue interest, overdue premium, fees and other amounts, at a rate which is 2.00% *per annum* in excess of the interest rate otherwise payable hereunder for DIP Loans outstanding as Base Rate Loans). Payment or acceptance of the increased rates of interest provided for in Section 2.7 of the DIP Credit Agreement is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Agent or any Lender.<br><br>*See* DIP Credit Agreement, § 2.7. |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The following parties have an interest in Cash Collateral: the Prepetition Secured Parties and the DIP Secured Parties. *See* Interim Order ¶ F. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) Local Rule 4001-2(a)(2), 2(a)(3), 2(a)(15) | The proceeds of the DIP Loans shall be used in accordance with the terms of the DIP Orders, the DIP Credit Documents and the Approved Budget, including, without limitation: (i) to pay amounts due to the DIP Lenders and the DIP Agent and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lenders and the DIP Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (ii) to provide working capital and for other general corporate purposes of the DIP Credit Parties, in each case, in accordance with the DIP Orders and the Approved Budget, and (iii) to honor Adequate Protection Obligations. *See* DIP Credit Agreement, § 4.19; Interim Order ¶ 6. No portion of proceeds of the DIP Loans shall be used, directly or indirectly, (i) to object to, seek subordination of, prevent, hinder, delay or contest the validity, extent, perfection, priority or enforceability of any of the Secured Parties' rights, remedies, claims, liens, security interests, defenses, or encumbrances upon any of the DIP Collateral or enforcement or assertion of any of their respective rights thereto; (ii) for any purpose that is prohibited under the DIP Orders, the DIP Credit Documents or the Bankruptcy Code; (iii) to initiate, assert, prosecute or finance in any way any claim, defense, demand, cause of action, adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of any or all of the Secured Parties, any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, partners, managers, employees, agents, representatives, subsidiaries, security-holders or equity-holders, or their respective rights and remedies under the DIP Credit Documents or the DIP Orders, or under or relating to any other loan or extensions of credit or other agreement provided to any of the Borrower or its predecessors or affiliates, in each case, including, without limitation, any action, suit or other proceeding for breach of contract, tort, recharacterization, any actions under section 105 or chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or any other applicable law (state, federal, or foreign) or otherwise; (iv) except as permitted by the Approved Budget (including Permitted Variances), to make any payment in settlement of any claim, action, or proceeding in excess of $200,000 in the aggregate without the prior written consent of the Required Lenders; (v) to incur Indebtedness, except to the extent permitted hereunder; (vi) to seek to amend or modify any of the rights granted to the Secured Parties under the DIP Orders or the DIP Credit Documents; (vii) to seek to subordinate, recharacterize, disallow, or avoid the DIP Obligations (as defined in the Interim Order); (viii) to object to or challenge in any way the claims, liens, or interests held by or on behalf of the Secured Parties; (ix) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of, or seek equitable relief from, any of the DIP Obligations, the DIP Liens of the DIP Agent or any other rights or interests of the Secured Parties; or (x) to file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the DIP Credit Parties without the prior written consent of the Required Lenders. *See* DIP Credit Agreement, § 6.16(d). |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| **Adequate Protection** Bankruptcy Rules 4001(b)(1)(B)(iv) 4001(c)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(3) 4001-2(a)(4) | As adequate protection of their interests in the Prepetition Collateral (including Cash Collateral that constitutes Prepetition Collateral (as defined below)) for any diminution in value of their interests in the Prepetition Collateral (including Cash Collateral that constitutes Prepetition Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "***Diminution in Value***"), and as an inducement to the Prepetition Secured Parties to consent to the use of their Cash Collateral that constitutes Prepetition Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "***Adequate Protection Obligations***"): |

<br>

a. *Adequate Protection Liens*. A valid and perfected replacement security interest in and lien on all of the DIP Collateral (other than the DIP Account (and all amounts from time to time therein) and any proceeds of the DIP Facility) on account of the Diminution in Value (the "***Adequate Protection Liens***"), subject only to the Carve-Out;

b. *Adequate Protection Claims*. Allowed superpriority administrative expense claim against the DIP Credit Parties on a joint and several basis (without the need to file any proof of claim) on account of the Diminution in Value under section 507(b) of the Bankruptcy Code (the "***Adequate Protection Claims***"), which Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time therein), subject only to the Carve-Out;

c. *Fees and Expenses*. The payment in cash by the Debtors of all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (i) the advisors to the *ad hoc* group of Prepetition Lenders represented by Milbank LLP (in such capacity, the "***First Lien Ad Hoc Group Counsel***", and the Prepetition Lenders in the ad hoc group represented by such First Lien Ad Hoc Group Counsel, the "***First Lien Ad Hoc Group Members***"), including, without limitation, those of the First Lien Ad Hoc Group Counsel and FTI Consulting, Inc., (ii) the Prepetition Agent, (iii) Holland & Knight LLP, as counsel to the Prepetition Agent, and (iv) Allen Overy Shearman Sterling US LLP ("***AOS***"), as counsel to the Revolving Credit Lenders (as defined in the Prepetition Credit Agreement but subject to Section 13(c) of the Interim Order, which expressly prohibits the payment or reimbursement of any fees and expenses for litigation relating to the DIP Facility the Restructuring Support Agreement incurred by the Revolving Credit Lenders (including any fees and expenses of AOS));

d. *Cash Interest*. Payment by the Debtors to the Prepetition Secured Parties of current interest in respect of the Prepetition Secured Obligations at the rates and times and in the form provided for in the Prepetition Credit Agreement;

e. *Maintenance of Collateral*. Maintenance and insurance of the Prepetition Collateral (including Cash Collateral) and DIP Collateral (including, in each case, Cash Collateral) in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents and the DIP Credit Documents, as applicable;

f. *Perfection of Adequate Protection Liens*. The Interim Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of the Adequate Protection Liens granted and created under the Interim Order, and, such security interests and liens shall constitute valid,

| Material Terms[5] | Summary of Material Terms |
|---|---|
| | automatically perfected and unavoidable security interests and liens, with the priorities set forth herein, effective as of the date of the Interim Order, without the necessity of executing deposit account control agreements or creating, filing, recording, or serving any financing statements, mortgages or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens granted to the applicable Prepetition Secured Parties under the Interim Order; and<br><br>g. *Reporting*.  The Debtors shall provide to (i) the Prepetition Agent at the same time as such reporting (including any reporting with respect to the Approved Budget and the Permitted Variances (as defined in the DIP Credit Agreement) in connection therewith) is provided to any DIP Secured Party, all reporting required to be provided to the DIP Secured Parties under the DIP Credit Documents and (ii) the Prepetition Secured Parties the reports, documents, and other information required to be delivered to the Prepetition Secured Parties under the Prepetition Credit Agreement in accordance with the relevant timelines and requirements set forth therein, which reports, documents, and other information shall also be provided to the DIP Secured Parties at the same time.<br><br>*See* Interim Order ¶ 13. |
| **DIP Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(2) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget.  The Debtors will provide an updated Budget every other Thursday, commencing on August 8, 2024, which shall become the Approved Budget upon the date on which the Required Lenders shall have approved such Budget.[6]<br><br>*See* DIP Credit Agreement, § 5.1(j). |
| **Reporting Information / Variance Covenants**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(2) | The Debtors are required to provide the DIP Agent and the DIP Lender advisors certain financial statements and other reports and notices set forth in Section 5.1 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, § 5.1.<br><br>Every other Thursday, commencing on August 8, 2024, the Permitted Variances (as defined below) shall be tested on a bi-weekly basis for the prior cumulative two-weekly period for Total Disbursements (the "***Bi-Weekly Disbursement Period***") against the Approved Budget, and Total Disbursements shall not be more than 120% of the Total Disbursements in the Approved Budget for such Bi-Weekly Disbursement Period (the "***Permitted Variances***").<br><br>*See* DIP Credit Agreement, § 6.15. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A |

---

[6] The agreed upon Initial Approved Budget is attached to the Interim Order as **Exhibit B**.

| Material Terms[5] | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(3) | |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(10) | The DIP Credit Agreement contains events of default customarily found in loan agreements for similar debtor-in-possession financings. The events of default include, without limitation, the occurrence and continuance of any one or more of the following conditions or events: a. *Termination of the DIP Orders*. The DIP Orders (i) at any time cease to be in full force and effect or (ii) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the DIP Agent and the Required Lenders; b. *Breach of the DIP Credit Agreement*. The entry of an order of the Bankruptcy Court in any of the Chapter 11 Cases finding that the Debtors have breached or failed to satisfy any requirement under the DIP Orders or the DIP Credit Documents (including the satisfaction of milestones set forth in the DIP Credit Agreement); c. *Dismissal or Conversion*. The dismissal of any of the Chapter 11 Cases or conversion of any Chapter 11 Case to a Chapter 7 case or any Debtor shall have filed (or failed to object to) a motion or other pleading seeking such dismissal without the prior written consent of the Required Lenders; d. *Appointment of a Trustee*. The appointment or election of a chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Chapter 11 Cases; e. *Additional Financing*. The entry of an order in any of the Chapter 11 Cases authorizing the Debtors (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full, in cash, of all DIP Obligations under the DIP Credit Documents or (ii) to grant any DIP Lien, other than DIP Liens expressly permitted under the DIP Credit Agreement and the DIP Orders, upon or affecting any DIP Collateral; f. *Approval of an Unacceptable Plan*. The entry of an order approving a disclosure statement with respect to a plan of reorganization or the entry of an order confirming a plan of reorganization, in each case, unless such plan of reorganization is acceptable to the DIP Agent and the Required Lenders; and g. *Allowance of Claims under Section 506(c)*. The entry of any order in any of the Chapter 11 Cases charging any of the DIP Collateral with respect to the DIP Secured Parties, whether under section 506(c) of the Bankruptcy Code or otherwise. *See* DIP Credit Agreement, § 8.1; Interim Order ¶ 16. |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement will be subject to the following milestones (the "***DIP Milestones***"): |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(10), (a)(12) | a. *Solicitation.* On or prior to 11:59 p.m. prevailing Eastern Time on July 24, 2024, the Debtors shall have commenced Solicitation (as defined in the Restructuring Support Agreement);<br><br>b. *Commencement of Chapter 11 Cases.* On or prior to 11:59 p.m. prevailing Eastern Time on July 25, 2024, the Debtors shall have commenced the Chapter 11 Cases;<br><br>c. *Filing of Lease Rejection Motion.* On or prior to 11:59 p.m. prevailing Eastern Time on July 25, 2024, the Debtors shall have filed the Lease Rejection Motion;<br><br>d. *Filing of the Plan and Disclosure Statement.* On or prior to 11:59 p.m. prevailing Eastern Time on July 26, 2024, the Debtors shall have filed the Approved Chapter 11 Plan, Disclosure Statement, and a motion for approval of the Disclosure Statement and Solicitation Materials (as defined in the Restructuring Support Agreement);<br><br>e. *Entry of Interim Order.* On or prior to 11:59 p.m. prevailing Eastern Time on July 30, 2024, the Bankruptcy Court shall have entered the Interim Order;<br><br>f. *Entry of Solicitation Procedures Order.* On or prior to 11:59 p.m. prevailing Eastern Time on July 30, 2024, the Bankruptcy Court shall have entered the Solicitation Procedures Order;<br><br>g. *Entry of Interim Notification Procedures and Restrictions on Transfers Order.* On or prior to 11:59 p.m. prevailing Eastern Time on July 30, 2024, the Bankruptcy Court shall have entered an interim order (in form and substance acceptable to the Required Lenders) (the "Interim NOL Order"), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors;<br><br>h. *Entry of Final Notification Procedures and Restrictions on Transfers Order.* On or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered a final order (in form and substance acceptable the Required Lenders) (the "Final NOL Order"), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors;<br><br>i. *Entry of Final Order.* On or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Final Order;<br><br>j. *Entry of Equity Rights Offering Backstop* Order. On or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order (as defined in the Restructuring Support Agreement);<br><br>k. *Entry of Lease Rejection Order.* On or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Lease Rejection Order; |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| | l. *Entry of Combined Order.* On or prior to 11:59 p.m. prevailing Eastern Time on September 8, 2024, the Bankruptcy Court shall have entered the Combined Order; and<br><br>m. *Occurrence of the Effective Date.* On or prior to 11:59 p.m. prevailing Eastern Time on September 13, 2024, the effective date of the Approved Chapter 11 Plan shall have occurred.<br><br>*See* DIP Credit Agreement, § 5.12. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(4) | As security for the DIP Obligations, effective as of the date of entry of the Interim Order, in each case subject to the Carve-Out and the priority set forth in Section 3 of the Interim Order), the DIP Agent, for the benefit of the DIP Secured Parties and to secure the DIP Obligations, is granted—without the necessity of the execution or recordation of filings by the DIP Credit Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents or instruments, or the possession or control by the DIP Agent or any DIP Lender of, or over, any collateral—security interests and liens as set forth in the Interim Order.<br><br>*See* Interim Order ¶ 3. |
| **Carve Out**<br>Bankruptcy Rule 4001<br><br>Local Rule 4001-2(a)(5), (a)(9) | The Interim Order provides a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtors, including a Post-Trigger-Notice Carve-Out Fee Cap, all as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 11. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br>Bankruptcy Rule 4001(c)(1)(B)(viii)<br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(4) | No costs or expenses of administration which have been or may be incurred by any Debtor or its estate in these Chapter 11 Cases at any time (excluding, for the avoidance of doubt, the Carve-Out) shall be charged against the DIP Secured Parties or the DIP Collateral or the Prepetition Secured Parties or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise. Nothing contained in the Interim Order shall be deemed a consent by the DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment, or claim against, or in respect of, the DIP Collateral or Prepetition Collateral, under sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise.<br><br>*See* Interim Order ¶ 20.<br><br>Subject to the entry of the Final Order, the DIP Secured Parties and Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties in any respect.<br><br>*See* Interim Order ¶ 21. |
| **Marshaling** | The DIP Secured Parties and Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of the Interim Order, the other DIP Credit Documents, and the Prepetition Loan Documents, as applicable, and, subject to entry of the Final Order, none of the DIP Secured Parties or |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| | Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.<br><br>*See* Interim Order ¶ 18(g). |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to and upon entry of the Interim DIP Order, the DIP Liens shall attach to all causes of actions, including the proceeds of any causes of action arising under chapter 5 of the Bankruptcy Code or non-bankruptcy law.<br><br>*See* Interim Order ¶ 3(a)(i). |
| **Superpriority Claims Under the DIP Facility**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i-11)<br><br>Local Rule 4001-2(a)(5) | Effective as of the date of entry of the Interim Order, in each case subject to the Carve-Out and subject and junior to the Adequate Protection Claims, in accordance with the DIP Credit Documents, the DIP Agent, for the benefit of the DIP Secured Parties, is granted, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, allowed superpriority administrative expense claims (the "***DIP Superpriority Claims***").<br><br>*See* Interim Order ¶ 4. |
| **"Roll Up" Provisions**<br>Local Rule 4001-2(a)(7) | N/A |
| **Loan Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(7) | The DIP Credit Documents contain covenants customary and appropriate for debtor-in-possession financings of this type, including, but not limited to, (i) provision of and compliance with the Approved Budget, (ii) reporting of financial information, (iii) maintenance of applicable insurance and (iv) restrictions, subject to certain exceptions, on indebtedness, liens, restricted payments, burdensome agreements, investments, asset sales and affiliate transactions.<br><br>*See* DIP Credit Agreement, Arts. V &VI. |
| **Provisions Limiting Court's Power or Discretion to Enter Future Orders**<br><br>Local Rule 4001-2(a)(8) | No provision of the DIP Credit Documents or the Interim Order specifically limits this Court's power or discretion to enter future orders in these Chapter 11 Cases. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(10) | N/A |
| **Waiver / Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the DIP Secured Parties to perform any act authorized or permitted under or by virtue of the Interim Order, the DIP Credit Agreement, or the other DIP Credit Documents, as applicable, including, without limitation, to (i) implement the postpetition financing |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(10) | arrangements authorized by the Interim Order, (ii) permit the DIP Secured Parties to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iii) permit the DIP Secured Parties to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations (or any portion thereof) including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Credit Documents and apply such payments to the DIP Obligations, and (iv) subject to the DIP Remedies Notice Period, permit the DIP Secured Parties to take any action and exercise all rights and remedies provided to it by the Interim Order, the DIP Credit Documents, or applicable law.  Notwithstanding anything to the contrary in the Interim Order or the DIP Credit Documents, so long as there are any Prepetition Secured Obligations outstanding and except with respect to the proceeds of the DIP Facility, the DIP Account, and/or any amounts from time to time therein, the DIP Secured Parties shall have no right and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the DIP Credit Documents or the Interim Order on the DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time therein), or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time therein). <br><br>*See* Interim Order ¶ 16(c). |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, the DIP Lenders, the First Lien Ad Hoc Group Members, the Revolving Credit Lenders, and the Prepetition Agent and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in accordance with the DIP Credit Documents and the Prepetition Credit Documents, which indemnification is hereby authorized and approved; *provided*, that no such parties will be indemnified for any costs, expense, or liability to the extent determined in a final, non-appealable judgment of a court of a competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. <br><br>*See* Interim Order ¶ 14. |
| **Prepayment Penalties** <br><br> Local Rule 4001-2(a)(13) | No provision of the DIP Credit Documents or the Interim Order provides for a prepayment penalty.  The Borrower shall have the right at any time and from time to time to prepay any DIP Loan in whole or in part, without premium or penalty. <br><br>*See* DIP Credit Agreement, § 2.10. |
| **Provisions Governing Joint Liability** <br><br> Local Rule 4001-2(a)(14) | The DIP Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the DIP Agent for the ratable benefit of the DIP Secured Parties the due and punctual payment in full of all DIP Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under section 362(a) of the Bankruptcy Code following an event of default). <br><br>*See* DIP Credit Agreement, § 7.1. |

| Material Terms[5] | Summary of Material Terms |
|---|---|
| **Provisions Providing for Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(15) | *See* **Use of DIP Facility and Cash Collateral** above.<br><br>Restrictions on the Use of DIP Collateral with Respect to Foreign and Non-Debtor Affiliates. The Debtors shall not transfer or use any DIP Collateral or Prepetition Collateral, including any Cash Collateral, to or for the benefit of any direct or indirect foreign or non-debtor affiliate or subsidiary of the Debtors that is not a DIP Credit Party; *provided*, that the Debtors shall be permitted to make payments for the benefit of its foreign and non-debtor affiliates or subsidiaries that are not DIP Credit Parties (i) in compliance in all respects with the Approved Budget (subject to Permitted Variances) or (ii) with the prior written consent of the Required DIP Lenders and the Prepetition Required Lenders ("***Permitted Non-Debtor Affiliate Payments***"). All intercompany investments in the form of a loan or advance owed to a DIP Credit Party shall be evidenced by a subordinated intercompany note, which shall be pledged to the Prepetition Secured Parties and the DIP Secured Parties, subject to the priorities set forth in the Interim Order.<br><br>*See* Interim Order ¶ 22; DIP Credit Agreement, § 6.6. |
| **Provisions Requiring Debtors to Pay Agent or Lenders' Expenses and Attorneys Fee Without Notice or Review**<br><br>Local Rule 4001-2(16) | N/A |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(18) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity, perfection, and priority of the Prepetition Secured Parties' liens and obligations and the validity of the Unsecured Notes Obligations (as defined below). |

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

14.     As of the Petition Date, and as described more fully in the Norden Declaration, the Debtors were liable for long-term debt obligations in the principal amount of approximately $944.8 million, including first lien secured loans in the principal amount of approximately $414.3 million and unsecured notes in the principal amount of approximately $527 million. The following table summarizes the principal amounts outstanding of the Debtors' long-term debt as of the Petition Date:

| Long-Term Debt | | (millions) |
|---|---|---|
| Prepetition Credit Agreement | | |
|     1L revolving loans ............................................................ | $ | 40 |
|     1L term loan .................................................................... | $ | 374.3 |
| **Total 1L debt**................................................................. | **$** | **414.3** |
|     2025 Notes ...................................................................... | $ | 380 |
|     2030 Notes ...................................................................... | $ | 147 |
| **Total Notes** ..................................................................... | **$** | **527** |
| **Total other long-term debt** ............................................. | **$** | **3.5** |
| **Total long-term debt** ....................................................... | **$** | **944.8** |

### 1. The Prepetition Credit Facilities

15. Pursuant to that certain Credit and Guaranty Agreement, dated as of June 28, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "***Prepetition Credit Agreement***" and, together with the other Collateral Documents (as defined in the Prepetition Credit Agreement, the "***Prepetition Credit Documents***"), by and among the Borrower (in such capacity, the "***Prepetition Borrower***"), certain subsidiaries of the Prepetition Borrower party thereto, as guarantors (the "***Prepetition Guarantors***" and, together with the Prepetition Borrower, the "***Prepetition Credit Parties***"), Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "***Prepetition Agent***"), and the lenders from time to time party thereto (the "***Prepetition Lenders***" and, together with the Prepetition Agent, the "***Prepetition Secured Parties***"), the Prepetition Lenders provided the Company with a term loan facility in the original principal amount of $380 million (the "***First Lien Term Loan Facility***") and a revolving credit facility in the principal amount of $40 million (the "***First Lien Revolving Facility***").

16. As of the Petition Date, not less than $384.8 million of the loans under the First Lien Term Loan Facility (the "***First Lien Term Loans***") remain outstanding, including outstanding

principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, charges, indemnities, and all other unpaid Obligations (as defined in the Prepetition Credit Agreement) incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Prepetition Credit Agreement (collectively, the "***Prepetition First Lien Term Loan Obligations***").  In addition, as of the Petition Date, not less than $40.1 million of the loans under the First Lien Revolving Facility (the "***First Lien Revolving Loans***" and, together with the First Lien Term Loans, the "***First Lien Loans***") remain outstanding, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, charges, indemnities, and all other unpaid Obligations (as defined in the Prepetition Credit Agreement) incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Prepetition Credit Agreement (together with the Prepetition First Lien Term Loan Obligations, the "***Prepetition Secured Obligations***").

17.    While the First Lien Revolving Loans are scheduled to mature on June 28, 2026, the maturity date will be accelerated to January 1, 2025, if more than $50 million in the aggregate principal amount of the 2025 Notes (as defined below) remains outstanding on January 1, 2025. The First Lien Revolving Facility provides that base rate and swingline First Lien Revolving Loans accrue interest at a rate of the base rate plus 4.50% per annum and SOFR-based First Lien Revolving Loans accrue interest at a rate of the term SOFR rate plus 5.50% per annum, in each case, subject to adjustment under the terms of the Prepetition Credit Agreement.  Interest on the First Lien Revolving Loans accrues on a daily basis and is payable in cash quarterly in arrears, on January 31, April 30, July 31, and October 31 of each year.

18.    While the First Lien Term Loans are scheduled to mature on December 28, 2026, the maturity date will be accelerated to January 30, 2025, if more than $40 million of the aggregate

principal amount of the 2025 Notes (as defined below) remains outstanding on January 30, 2025. The First Lien Term Loan Facility provides that base rate First Lien Term Loans accrue interest at a rate of the base rate plus 5.50% per annum and the SOFR-based First Lien Term Loans accrue interest at a rate of the term SOFR rate plus 6.50% per annum, in each case, subject to adjustment as provided in the Prepetition Credit Agreement.  Interest on the First Lien Term Loans accrues on a daily basis and is payable in cash in arrears.

19.     The DIP Guarantors guarantee jointly and severally Debtor 2U, Inc.'s obligations under the Prepetition Credit Agreement.  The Prepetition Secured Obligations are secured on a first-priority basis by (subject to certain exclusions) a lien (the "***Prepetition Liens***") on substantially all of the Debtors' assets and a pledge of sixty-five percent (65%) or one-hundred percent (100%), as applicable, of certain of Debtor 2U, Inc.'s subsidiaries as indicated on Exhibit A of the Norden Declaration.

### 2.     Unsecured Notes

20.     On April 23, 2020, Debtor 2U, Inc. issued the 2025 Notes pursuant to that certain Indenture, dated as of April 23, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***2025 Indenture***"), by and between Debtor 2U, Inc., as issuer, and Wilmington Trust, National Association, as trustee (the "***2025 Indenture Trustee***"). While the 2025 Notes mature on May 1, 2025, the 2025 Indenture Trustee or the holders of at least twenty-five percent (25%) of the aggregate principal amount of the 2025 Notes may accelerate all of the 2025 Notes (including all accrued and unpaid interest) then outstanding to become due and payable immediately if certain events of default under the 2025 Indenture occur.  Interest on the 2025 Notes accrues at the rate of 2.25% per annum and is payable semi-annually in arrears on May 1 and November 1 of each year.

21.    On January 11, 2023, Debtor 2U, Inc. issued the 2030 Notes (together with the 2025 Notes, the "*Unsecured Notes*")[7] pursuant to that certain Indenture, dated as of January 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "*2030 Indenture*" and, together with the 2025 Indenture, the "*Indentures*"), by and between Debtor 2U, Inc., as issuer, and Wilmington Trust, National Association, as trustee (the "*2030 Indenture Trustee*").    While the 2030 Notes mature on February 1, 2030, the 2030 Indenture Trustee or the holders of at least twenty-five percent (25%) of the aggregate principal amount of the 2030 Notes may accelerate all the 2030 Notes (including all accrued and unpaid interest) then outstanding to become due and payable immediately if certain events of default under the 2030 Indenture occur.    Interest on the 2030 Notes accrues at the rate of 4.50% per annum and is payable semi-annually in arrears on February 1 and August 1 of each year.

22.    As of the Petition Date, no less than $382.0 million in aggregate principal and accrued interest under the 2025 Notes and no less than $150.2 million in aggregate principal and accrued interest under the 2030 Notes remain outstanding (collectively with any fees and all other amounts outstanding under the Indentures, the "*Unsecured Notes Obligations*" and, together with the Prepetition Secured Obligations, the "*Funded Debt Obligations*").    The Unsecured Notes Obligations are neither secured nor guaranteed.

### 3.    Deferred Governmental Grants

23.    The Company has two outstanding conditional loan agreements with Prince George's County, Maryland and the State of Maryland for an aggregate amount of $3.5 million, each bearing an interest rate of 3% per annum (the "*Deferred Governmental Grants*").    These agreements are conditional loan obligations that may be forgiven if the Company attains certain

---

[7]    The holders of the Unsecured Notes are referred to herein as the "*Noteholders*."

conditions related to employment levels at 2U's office in Lanham, Maryland. The conditional loan with Prince George's County has a maturity date of June 22, 2027, and the conditional loan agreement with the State of Maryland has a maturity date of June 30, 2028. To ensure the timely repayment when due under the Deferred Governmental Grants, 2U, Inc. issued standby letters of credit to both Prince George's County and the State of Maryland in the full principal amount of the loans.

## THE PROPOSED DIP FACILITY

### A.    THE TERMS OF THE DIP FINANCING

24.    The DIP Facility, which is being provided by certain Noteholders, includes: (a) a junior lien, multi-draw term loan facility, providing an initial draw of up to $60 million following entry of the Interim Order and a subsequent draw of up to $4 million following entry of the Final Order, and in each case, subject to the conditions precedent set forth in the DIP Credit Agreement; (b) an interest rate of Base Rate or Term SOFR, as applicable, plus (i) for DIP Loans that are Base Rate Loans, 7.50% *per annum* and (ii) for DIP Loans that are Term SOFR Loans, 8.50% *per annum*, payable in kind; and (c) a maturity date of January 24, 2025. Significantly, there are ***no fees*** associated with the DIP Facility.

25.    The DIP Facility also provides the Debtors the continued use of Cash Collateral. Under the Plan, each holder of a claim arising under the DIP Facility will receive either (a) its *pro rata* share of Exit Loans under the Exit Facility Credit Agreement (each as defined in the Plan), or (b) such other treatment as to which the Debtors and the holder of such claim will have agreed upon in writing, with the consent of the Required Consenting Noteholders (as defined in the Restructuring Support Agreement) and the Debtors.

B.    **NEED FOR DEBTOR-IN-POSSESSION FINANCING AND ACCESS TO CASH COLLATERAL**

26.    The Debtors require immediate access to liquidity to ensure they are able to continue operating during these Chapter 11 Cases and preserve the value of their estates for the benefit of all parties in interest.  Kocovski Decl. ¶ 14.  Indeed, the Debtors' liquidity has already fallen below the minimum levels they believe are required to comfortably operate.  *Id.* at ¶ 16.

27.    Without immediate postpetition financing and access to Cash Collateral, the Debtors lack the necessary liquidity to meet working capital, satisfy business obligations, and administer these Chapter 11 Cases.  *Id.* at ¶ 15.  Further, lack of immediate financing would cause immediate and irreparable harm and degradation to the value of the Debtors' estates to the detriment of all stakeholders.  *Id.* at ¶ 20.  Moreover, sufficient post-petition financing is necessary to send a strong signal to the market, the Debtors' employees, vendors, and Partner Institutions (as defined in the Kocovski Declaration) that these Chapter 11 Cases are well-funded.  *Id.* at ¶¶ 21-23.  Specifically, commencing these Chapter 11 Cases with adequate financing, in the form of the DIP Facility and the consensual use of Cash Collateral, should communicate to such stakeholders that the Debtors will be able to continue meeting the needs of their customers and managing their businesses in a manner as close to the ordinary course as possible.  *Id.* at ¶ 23.

28.    If the Debtors are unable to demonstrate that they have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, their customers may seek alternative providers of educational services, and the Debtors' vendors may refuse to do business with them.  *Id.* at 22-23.  The Debtors, along with the help of their advisors, undertook an analysis of how much postpetition financing would be required to operate the Debtors' businesses and pay administrative costs during these Chapter 11 Cases.  *Id.* at ¶ 15.  Based on this analysis, the Debtors determined that they would require incremental new

25

money liquidity of approximately $64 million to operate smoothly postpetition, and to continue satisfying costs and expenses.  *Id.* at ¶ 13.  The Debtors believe the DIP Facility in the amount requested is essential to preserve of the estates and the continuing viability of the Debtors' business, and responsibly administer these Chapter 11 Cases.  *Id.* at ¶ 27.

## C.  THE DEBTORS' MARKETING EFFORTS

29.    The Debtors and their advisors recognized from the outset that, under the circumstances, their choices with respect to postpetition financing were limited.  Murphy Decl. ¶ 15.  Substantially all of the Debtors' assets, other than certain excluded assets as set forth in the Prepetition Credit Documents, are pledged as collateral to the Prepetition Lenders (the "***Prepetition Collateral***").  *Id.*  Given that the Debtors' unpledged assets available to support a financing are limited, the Debtors, together with Moelis & Company LLC ("***Moelis***") determined that any postpetition financing would require pledging as collateral assets already included in the Prepetition Collateral.  *Id.*  Thus, the Debtors faced limited options to raise postpetition financing and to locate a lender willing to:  (a) provide postpetition financing either on an unsecured basis or secured by liens junior in priority to the liens securing the Prepetition Lenders' interests; (b)  provide postpetition financing on terms acceptable to the majority of the Prepetition Lenders such that the Debtors could obtain their consent to prime their liens (including incurring the cost of any required adequate protection necessary to obtain such consent); or (c) attempt to prime the liens held by the Prepetition Lenders on a non-consensual basis, thereby initiating a contested priming fight at the outset of these Chapter 11 Cases with the Prepetition Lenders.  *Id.*

30.    The Debtors, with the assistance of Moelis and their other advisors, engaged in negotiations with the Ad Hoc Noteholder Group, Greenvale, the First Lien Ad Hoc Group, and certain Noteholders regarding postpetition financing.  Murphy Decl. ¶ 16.  After weeks of negotiations amongst the parties and the completion of the marketing process described herein, it

became clear that certain Noteholders (including the Ad Hoc Noteholder Group and Greenvale) were the best sources of postpetition financing to fund a chapter 11 process. *Id.* These Noteholders have a vested interest in supporting the Debtors' efforts to successfully effectuate the restructuring to protect their prepetition investment, and the Restructuring Support Agreement further contemplates that the Noteholders will receive the reorganized equity of the Debtors (subject to dilution). *Id.* In addition, the DIP Facility is an integral part of the holistic Restructuring, which contemplates the injection of new money in the form an Equity Rights Offering (as described in the Restructuring Support Agreement) that is open to all Noteholders. *Id.* at 21.

31.    Accordingly, the Debtors and their advisors engaged in negotiations with the DIP Lenders with respect to postpetition financing. Murphy Decl. ¶ 17. The negotiations spanned several weeks and lasted until shortly before the Petition Date. *Id.* Throughout this process, the Debtors and their advisors actively negotiated a number of the material terms proposed by the DIP Lenders—including the amount of financing available, economics, covenants, and case milestones. *Id.* As a result of these negotiations, the DIP Lenders, have agreed to fund the $64 million DIP Facility on a second lien basis to provide the Debtors with liquidity to successfully emerge from chapter 11 while avoiding a priming fight with the Prepetition Lenders. *Id.*

32.    The Debtors also engaged the Prepetition Lenders regarding the terms and conditions on which they would be willing to consent to the use of Cash Collateral. Murphy Decl. ¶ 18. The negotiations lasted until shortly before the Petition Date and the Debtors were ultimately able to obtain the consent of the Prepetition Lenders, which hold 82% of the obligations outstanding under the Prepetition Credit Agreement to the DIP Facility and use of Cash Collateral. *Id.*

27

33. The Debtors, together with Moelis, also ran a marketing process in search of third-party postpetition financing to ensure that no alternative source of available postpetition financing offered better terms under the circumstances. Murphy Decl. ¶ 19. Moelis, drawing on its experience in DIP financing transactions, identified and solicited sources that in its professional judgment it felt had the ability to complete diligence quickly, had experience or possible interest in providing postpetition financing, and had the ability to commit to financing on the timeline required. *Id.*

34. Moelis assisted the Debtors in identifying potential financial institutions, including credit funds, alternative investment managers, and a commercial bank, which in its professional judgement were well suited to potentially provide postpetition financing to the Debtors. Murphy Decl. ¶ 20. More specifically, Moelis initially solicited proposals for priming, junior, and non-priming postpetition financing from ten (10) potential lenders. *Id.* Of the ten (10) potential lenders that were contacted, all ten (10) parties declined to sign a non-disclosure agreement or submit a proposal. *Id.*

35. The Debtors have not received any alternative financing proposals as of the Petition Date. Murphy Decl. ¶ 21. The contacted lenders declined to extend DIP proposals for a number of reasons, including that: (a) they were not interested in providing DIP financing on a *junior* basis; and (b) they were unlikely to provide better terms than the market terms in the DIP Facility. *Id.* Equally as important, the Debtors have not received any proposals from alternative third parties that would provide an achievable, transactable, and holistic restructuring solution. *Id.* The DIP Facility, on the other hand, not only provides postpetition financing on a junior basis, but also is an integral part of a holistic restructuring path to exit these Chapter 11 Cases. *Id.*

36.     In light of the above, and as set forth more fully in the Murphy Declaration, the Debtors, in consultation with their advisors, determined that the DIP Facility is reasonable under current market conditions and no alternative sources of postpetition financing were readily available to the Debtors (whether unsecured or secured). *Id.* at ¶¶ 22-23. The DIP Facility is the product of extensive arm's-length, good-faith negotiations, and will provide the Debtors with immediate and critical access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized, adequately fund the ongoing costs of these Chapter 11 Cases, and facilitate the Debtors' efforts to preserve and enhance the value of their assets during the course of these Chapter 11 Cases.

## BASIS FOR RELIEF

**A.     THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING UNDER SECTION 364(C) OF THE BANKRUPTCY CODE ON A JUNIOR SECURED AND SUPERPRIORITY BASIS**

37.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Credit Documents and the Interim Order pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lenders with security interests and liens (the "***DIP Liens***") on all property of each Debtor (the "***DIP Collateral***"). For such property that is not already encumbered, the DIP Liens are only junior to any Permitted Liens (as defined in the Interim Order) and the Adequate Protection Liens; for such property that is already encumbered, the DIP Liens are junior to the Prepetition Liens.

38.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor under section 364(c) to obtain credit or to

incur debt, the repayment of which is entitled to superpriority administrative expense status, or is

secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a

combination of the foregoing.

39.    In the event that a debtor demonstrates that it is unable to obtain unsecured credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code,

section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

40.    Courts have articulated a three-part test to determine whether a debtor is entitled to

financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(1)    the debtor is unable to obtain unsecured credit under section 364(b) of the
Bankruptcy Code (*i.e.*, by allowing a lender only an administrative claim);

(2)    the credit transaction is necessary to preserve the assets of the estate; and

(3)    the terms of the transaction are fair, reasonable, and adequate, given the
circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990).

**I.     THE DEBTORS ARE UNABLE TO OBTAIN UNSECURED FINANCING
AND SHOULD BE AUTHORIZED TO GRANT LIENS AND
SUPERPRIORITY CLAIMS**

41.    To show that the credit required is not obtainable on an unsecured basis, a debtor

need only demonstrate "by a good faith effort that credit was not available without" the protections

of sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th

Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit

to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)) (internal citations omitted).

42.     As described above and as set forth in the Kocovski Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' existing assets are encumbered under their existing capital structure.  Kocovski Decl. ¶ 16.  Because of this, the Debtors, in consultation with their advisors, concluded that the best source of financing was likely to be provided by certain Noteholders (including the Ad Hoc Noteholder Group and Greenvale).  Murphy Decl. ¶ 16.  Further, following extensive negotiations, it became clear that these lenders would only provide DIP financing on a secured basis.  Murphy Decl. ¶¶ 17-19.

43.     In addition, the Debtors have not been able to obtain postpetition financing on better terms than those reflected in the DIP Credit Agreement, despite the pre-petition marketing process conducted by Moelis.  Murphy Decl. ¶ 21.  Moelis contacted ten (10) potential lenders, and all ten (10) parties declined to sign a non-disclosure agreement or submit a proposal. *Id.*at 20.  At this time, there are no better offers available to the Debtors or before this Court, as potential lenders were not interested in extended postpetition financing, citing a number of reasons, including that: (a) they were not interested in providing DIP financing on a *junior* basis and (b) they were unlikely to provide better terms than those in the DIP Facility, which they considered to be market. *Id.* at ¶ 21.

44.     Despite the Debtors' reasonable, good faith efforts, they were not able to obtain DIP financing on an unsecured basis or terms that were superior to those offered by the DIP

Lenders. Therefore, approving the DIP financing on a secured basis and the DIP Superpriority

Claims in favor of the DIP Lenders is reasonable and appropriate.

## II.    THE DIP FACILITY IS NECESSARY TO PRESERVE AND PROTECT THE DEBTORS' ASSETS

45.    The DIP Facility will provide the Debtors with necessary and immediate access to

the liquidity needed to avoid an immediate liquidation. The DIP Facility (including immediate

access on an interim basis) and the use of the Cash Collateral will enable the Debtors to preserve

more value as a going concern for the benefit of their estates as compared to a piecemeal

liquidation—which the Debtors believe would generate substantially less value for stakeholders

than a restructuring. *See* Murphy Decl. ¶ 13; Kocovski Decl. ¶ 19. Additionally, the DIP Facility

will signal to the Debtors' employees and vendors that operations can and will continue in the

ordinary course, which will help mitigate the uncertainty and disruptions that might otherwise

arise. *See* Kocovski Decl. ¶¶ 20-23. Thus, the DIP Facility is necessary to preserve and protect

the assets of the Debtors' estates.

## III.    THE TERMS ARE FAIR, REASONABLE, AND APPROPRIATE UNDER THE CIRCUMSTANCES

46.    In considering whether the terms of postpetition financing are fair and reasonable,

courts consider the terms in light of the relative circumstances. *See In re Farmland Indus., Inc.*,

294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also* Hr'g Tr. at 734-35:24, *In re Lyondell Chem.*

*Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now

available for DIP financing in the current economic environment aren't as desirable" as in the

past); *Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor

may have to enter into "hard bargains" to acquire funds for its reorganization). This Court may

also appropriately take into consideration non-economic benefits to the Debtors offered by a

proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy

court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms. ***Relevant features of the***
> ***financing must be evaluated, including non-economic elements***
> ***such as the timing and certainty of closing, the impact on creditor***
> ***constituencies and the likelihood of a successful reorganization.***
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

47.     As described herein, the terms of the DIP Credit Agreement and the Interim Order

were negotiated in good faith and at arm's-length between the Debtors (through their advisors)

and the DIP Lenders and their respective independent advisors. Murphy Decl. ¶¶ 24-25. The

terms, including the Interest Rate and lack of Fees, are reasonable given current market conditions

and within the range of other court-approved comparable DIP facilities. *Id.* at 26. Further, the

Debtors' marketing process did not provide an alternative source of DIP financing, making the

DIP Facility the only acceptable financing option available option to the Debtors. Murphy

Decl. ¶¶ 20-21. Thus, given the circumstances and the extension of postpetition financing on a

*junior* basis, the Debtors believe that the DIP Facility is fair, reasonable, and appropriate under the

circumstances.

## B.   ENTRY INTO THE DIP FACILITY IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT

48.     Entry into the DIP Facility is an exercise of the Debtors' sound business judgment.

Courts grant a debtor considerable deference in acting in accordance with its business judgment in

obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run

afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See In re Barbara K.*

*Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008)

(explaining that courts defer to a debtor's business judgment "so long as a request for financing

does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one

party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases

consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be

utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long

as the financing agreement does not contain terms that leverage the bankruptcy process and powers

or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also*

*In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr.

S.D.N.Y. May 4, 2016) ("In determining whether to authorize post-petition financing, bankruptcy

courts will generally defer to the debtor's business judgment.").

49.     To determine whether a debtor has met the business judgment standard, a court

need only "examine whether a reasonable business person would make a similar decision under

similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In*

*re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should

 not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under

the [Bankruptcy] Code").

50.     The Debtors' decision to move forward with the DIP Facility is a sound exercise of

their business judgment following an extensive arm's-length process and careful evaluation of

available alternatives.   Murphy Decl. ¶¶ 24-25.   The Debtors require immediate postpetition

financing, given their immediate liquidity constraints, which likely would cause the Debtors to liquidate if financing were not obtained, which the Debtors believe would materially decrease recoveries to constituents.  *See* Kocovski Decl. ¶ 20; Murphy DIP Decl. ¶ 13.  The liquidity provided by the proposed DIP financing would enable the Debtors to (a) continue to conduct their businesses and generate revenue during these Chapter 11 Cases; (b) fund payments to their workforce; (c) fund the payments authorized by this Court pursuant to the First Day Pleadings; (d) fund adequate protection payments to Prepetition Lenders and (e) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases.  *See* Kocovski DIP Decl. ¶ 17.

51.    As discussed above, the Debtors negotiated the DIP Credit Agreement with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available at this time under the circumstances. *See* Murphy Decl. ¶¶ 24-25.  Further, the Debtors believe the terms of the DIP Facility are fair and reasonable under the circumstances.  Murphy Decl. ¶¶ 28.  This Court should thus authorize the Debtors' entry into the DIP Credit Agreement as a reasonable exercise of the Debtors' business judgment.

## C.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

52.    Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral (as defined in section 363 of the Bankruptcy Code) unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

53.    The Debtors have engaged the Prepetition Lenders regarding acceptable terms and conditions on which they would be willing to consent to the use of Cash Collateral.  Murphy Decl. ¶ 18.  Following these negotiations, shortly before the Petition Date, the Prepetition Lenders consented to the use of Cash Collateral, subject to the terms of the DIP Credit Documents and

Interim Order. *Id.* In addition, the Debtors' use of cash collateral is fair, in the best interests of

the Debtors' estates, and a sound exercise of their business judgment for the reasons explained

throughout this Motion. Accordingly, the Debtors' use of Cash Collateral should be approved,

subject to the terms of the DIP Credit Documents and Interim Order.

54.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests

in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code

provides for adequate protection of interests in property due to the imposition of the automatic

stay. *See e.g., In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of

adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty*

*Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736

(Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case,

but its focus is protection of the secured creditor from diminution in the value of it collateral during

the reorganization process") (citation omitted); *In re Satcon Tech. Corp.*, No. 12-12869 (KG),

2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R.

389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed.

1993)) (explaining that adequate protection can take many forms and "must be determined based

upon equitable considerations arising from the particular facts of each proceeding" (citations

omitted)).

55.    As set forth in the Interim Order, the Debtors propose to provide the Prepetition

Secured Parties with a variety of adequate protection to protect against the postpetition diminution

in value of their collateral, including as result of the use, sale, or lease of Cash Collateral by the

Debtors and the Carve-Out and the imposition of the automatic stay (collectively, as defined in the

Interim Order, the "***Adequate Protection Obligations***"), in the form of: (a) Adequate Protection

Liens upon all of the DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time therein) on account of the Diminution in Value, subject only to the Carve-Out; (b) Adequate Protection Claims solely to the extent of the Diminution in Value, subject only to the Carve-Out; and (c) all reasonable and documented prepetition and postpetition and out-of-pocket expenses of the (i) advisors to the First Lien Ad Hoc Group Members, (ii) the Prepetition Agent, (iii) Holland & Knight LLP, as counsel to the Prepetition Agent, and (iv) AOS, as counsel to the Revolving Credit Lenders (as defined in the Prepetition Credit Agreement but subject to Section 13(c) of the Interim Order, which expressly prohibits the payment or reimbursement of any fees and expenses for litigation relating to the DIP Facility or the Restructuring Support Agreement incurred by the Revolving Credit Lenders (including any fees and expenses of AOS)); (d) the maintenance of Prepetition Collateral (including Cash Collateral); and (e) certain reporting obligations, as described in the Interim Order, each as further explained in the DIP Credit Agreement and the Interim Order, as applicable.

56.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure that the Debtors are able to avail themselves of the DIP Facility and to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order and the DIP Credit Documents, for the benefit of all parties in interest and their estates.

**D.      THE SCOPE OF THE CARVE OUT IS APPROPRIATE**

57.      The DIP Lenders' DIP Liens and the DIP Superpriority Claims will be subject and subordinate to payment of the Carve-Out.  The Carve-Out will be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the Interim Order.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of the fees of Clerk of this Court, U.S. Trustee fees, the Debtors' professional fees, and any statutory committee appointed under section 1102 of the Bankruptcy Code in these Chapter 11 Cases.

**E.      THE DIP LENDERS SHOULD BE AFFORDED GOOD-FAITH PROTECTION UNDER SECTION 364(E) OF THE BANKRUPTCY CODE**

58.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such

> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

59.    The DIP Facility is the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, (b) arm's-length, good-faith negotiations between the Debtors and the DIP Lenders, and (c) an iterative process comprising multiple proposals and counterproposals.  *See* Murphy Decl. ¶¶ 24-25.  The terms and conditions of the DIP Facility are appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code in accordance with the DIP Credit Agreement and the Interim Order.  *See* Murphy Decl. ¶¶ 26-27.  This Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and therefore the DIP Lenders are entitled to all of the protections afforded thereby.

**F.    FAILURE TO OBTAIN IMMEDIATE INTERIM ACCESS TO CASH COLLATERAL AND INCUR THE DIP FACILITY WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM.**

60.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, this Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

61.     As set forth in the Kocovski Declaration, the Debtors, with the assistance of their advisors, sized the necessary interim funding taking into account the Debtors' actual cash need to manage these Chapter 11 Cases.  Kocovski Decl. ¶¶ 14, 17.  As part of this analysis, the Debtors considered a number of inputs and their effects on liquidity, including, among other things, (a) continuing their businesses and generating revenue during these Chapter 11 Cases, (b) funding payments to their workforce, (c) funding payments authorized by this Court pursuant to the First Day Pleadings (as defined in the Kocovski Declaration), (d) funding adequate protection payments to Prepetition Lenders, and (e) satisfying administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases.  *Id.* at 17.

62.     The Debtors have an urgent and immediate need for access to the DIP Facility and Cash Collateral on an interim basis.  The Debtors require immediate access to $60 million of cash under the DIP Facility, in addition to the use of Cash Collateral, to meet their obligations and avoid irreparable harm pending a final hearing.  Kocovski Decl. ¶ 19.  Without immediate access to the DIP Facility and Cash Collateral, the Debtors would likely be forced to cease operations and enter liquidation proceedings, which would be value-destructive and irreparably harm the Debtors' estates and all parties in interest.  *Id.*

63.     Further, even if the Debtors are able to avoid liquidation in the near term, their estates would still face severe value degradation, which would impact recoveries to all stakeholders.  Kocovski Decl. ¶ 20.  Absent immediate access to the DIP Facility and Cash Collateral at this pivotal stage, the Debtors could (a) face a detrimental interruption of their businesses, (b) lose the support of key constituencies, including the Debtors' workforce, vendors, and customers, on which the success of these Chapter 11 Cases depend, and (c) be forced to modify

their operations in a significant and adverse manner, all of which could detrimentally affect the Debtors' ability to maximize the value of the estates. *Id.;* Murphy Decl. ¶ 13.

64.     Moreover, immediate access to both the DIP Facility and Cash Collateral as contemplated by the Interim Order is the stabilizing assumption upon which the Initial Approved Budget is based. Such funding would send a strong message to their employees and vendors that the Debtors are financially stable and have the liquidity necessary to meet ongoing obligations to their workforce and suppliers and to successfully navigate and emerge from these Chapter 11 Cases. Kocovski Decl. ¶ 21. Further, immediate access to both the DIP Facility and Cash Collateral is critical to the maintenance of the Debtors' relationships with Partner Institutions (as defined in the Kocovski Declaration), who are crucial to the Debtors' businesses. Kocovski Decl. ¶ 23. The Debtors' ability to meet these various obligations may be irreparably harmed without immediate access to the DIP Facility and Cash Collateral. *Id.*; Murphy Decl. ¶ 13.

65.     The Debtors' ability to preserve and maximize the value of their estates and the businesses' continuing viability depend heavily upon the interim relief sought in this Motion.

**G.     THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS.**

66.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors and the DIP Lenders to commit all acts and take all actions necessary to implement the DIP Facility and all acts, actions, and transfers contemplated therein. The Interim Order provides that the Debtors may seek an emergency hearing with respect to the DIP Lenders' right to exercise its rights and remedies under the DIP Credit Agreement during the five (5) business days immediately following the date of a DIP Termination Event (as defined in the Interim Order). Stay modifications of this kind are typical and customary features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances.

## H.    PRECEDENT CASES SUPPORT GRANT OF THE REQUESTED RELIEF.

67.    The relief requested in this Motion is similar to relief granted by numerous courts, including this Court in other chapter 11 cases in this district. *See, e.g.*, *In re Acorda Therapeutics, Inc.*, Case No. 24-22284 (DSJ) (Bankr. S.D.N.Y. May 3, 2024) [Docket No. 129] (modifying the automatic stay and authorizing the debtors to utilize cash collateral and obtain DIP financing); *In re GOL Linhas Aèreas Inteligentes S.A.*, Case No. 24-10118 (MG) (Bankr. S.D.N.Y. Feb. 28, 2024) [Docket No. 207] (same); *In re Troika Media Grp., Inc.*, Case No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Feb. 7, 2024) [Docket No. 176] (same); *In re Vice Grp. Holding, Inc.*, Case No. 23-10738 (JPM) (Bankr. S.D.N.Y. Jun. 13, 2023) [Docket No. 138] (same); *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Nov. 21, 2023) [Docket No. 331] (same); *see also In re Sears Hold. Corp.*, Case No. 18-23538 (Bankr. S.D.N.Y. Dec. 28, 2018) (modifying the automatic stay and authorizing the debtors to utilize cash collateral and obtain junior DIP financing).

## <u>RESERVATION OF RIGHTS</u>

68.    Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in

interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If this Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **MOTION PRACTICE**

69.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## **NOTICE**

70.    Notice of this Motion will be given to:  (a) the United States Trustee for Region 2; (b) Milbank LLP as counsel to the First Lien Ad Hoc Group; (c) the administrative agent and collateral agent under the first lien credit agreement; (d) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Noteholder Group; (e) Schulte Roth & Zabel LLP as counsel to Greenvale; (f) the indenture trustees for the Notes; (g) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (h) the United States Attorney's Office for the Southern District of New York; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the DIP Lenders; (l) the DIP Agent; and (m) all parties entitled to notice pursuant to Local Rule 9013-1(b).  The Debtors submit that, under the circumstances, no other or further notice is required.

71.    A copy of this Motion is available from (a) this Court's website, www.nysb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/2U.

## **<u>NO PRIOR MOTION</u>**

72.     The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order
and, following a noticed hearing on the relief sought, the Final Order, granting the relief requested
in this Motion and such other and further relief as may be just and proper.

**LATHAM & WATKINS LLP**

Dated:    July 25, 2024
          New York, New York

By:    */s/ George A. Davis*
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  george.davis@lw.com
        george.klidonas@lw.com
        anu.yerramalli@lw.com
        randall.weber-levine@lw.com
        scott.yousey@lw.com

*Proposed Counsel to the Debtors and Debtors in
Possession*