**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF CULLEN MURPHY IN SUPPORT OF
MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO (I) OBTAIN JUNIOR LIEN
POSTPETITION FINANCING AND (II) USE CASH COLLATERAL; (B) GRANTING
LIENS AND SUPERPRIORITY CLAIMS; (C) GRANTING ADEQUATE
PROTECTION TO CERTAIN PARTIES; AND (D) GRANTING RELATED RELIEF**

I, Cullen Murphy, make this declaration pursuant to 28 U.S.C. § 1746:

1. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims;*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

*(C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief* (the "**DIP Motion**").[2]

2. The statements in this Declaration are, except where specifically noted otherwise, based on my personal knowledge or opinion, on information that I have obtained from the Debtors' advisors, the Debtors' management, and employees of Moelis & Company LLC ("**Moelis**") working directly with me or under my supervision, direction, or control. Specifically, I have been a leader of a Moelis team that, since December 2023, has been actively engaged advising the Debtors in the period of time leading up to the Debtors' Chapter 11 Cases. I am not being specifically compensated for this testimony other than through payments to be received by Moelis as a professional of the Debtors. The Debtors will file an application seeking this Court's approval of the Debtors' retention of Moelis at a subsequent date. I am over eighteen (18) years of age and authorized to submit this declaration. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

3. I am an Executive Director at Moelis, a global investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring transactions. Moelis is the proposed financial advisor, capital markets advisor and investment banker to the Debtors. As an Executive Director, I am one of the Moelis bankers responsible for the day-to-day activities of the Moelis deal team.

4. I personally have ten (10) years of experience as an investment banker and investor specializing in recapitalization and restructuring transactions. Throughout my career, I have

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion and First Day Declarations (as defined below), as applicable.

2

advised debtors, creditors, equity holders, and other constituents on a wide variety of restructuring transactions across a broad range of industries, including constituents in the education industry (such as the lenders in the chapter 11 cases of *In re Skillsoft Corp.*, Case No. 20-11532 (MEW) (Bankr. D. Del. 2020)).  I have extensive experience in arranging debtor-in-possession financing, having been involved in numerous such projects.

5.      I received a B.S.B.A. in Economics from the University of Denver, an M.S. in Mathematics from Fairfield University, and an MBA from Cornell University.  Since the start of my career, I have been involved in the following chapter 11 cases (among others):  Hertz, Akumin, Sears, Party City, GWG Holdings, Alpha Media, RentPath, David's Bridal, Bristow Group, CHC Group, C&J Energy, Core Scientific, Voyager Digital, BlockFi, Express, Internap Technology Solutions, MD Helicopters, SFX Entertainment, and Sungard Availability Services.

6.      Moelis provides a broad range of financial advisory and investment banking services to its clients, including: (a) corporate restructurings; (b) general corporate finance; (c) mergers, acquisitions, and divestitures; (d) special committee assignments; and (e) capital raising.  Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases.  Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including:  *In re Express*, *Inc.*, Case No. 24-10831(KBO) (Bankr. D. Del. May 16, 2024); *In re WeWork*, *Inc.*, Case No. 23-19865(JKS) (Bankr. D.N.J. Dec. 22, 2023); *In re Proterra*, Case No. 23-11120 (BLS) (Bankr. D. Del. Aug. 25, 2023); *In re Genesis Global Holdco, LLC,* Case No. 23-10063 (SHL) (Bankr. S.D.N.Y. Feb. 8, 2023); *In re Voyager Digit. Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Aug. 16, 2022); *In re TPC Grp. Inc.*, Case No. 22-10493 (CTG) (Bankr. D. Del. June 30, 2022); *In re MD Helicopters*, Inc., Case No. 22-

3

10263 (KBO) (Bankr. D. Del. May 6, 2022); *In re Knotel, Inc.*, Case No. 21-10146 (MFW) (Bankr. D. Del. Jan. 31, 2021); *In re Party City Holdco Inc.*, Case No. 23-90005 (DRJ) (Bankr. S.D. Tex. Feb. 21, 2023); *In re Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. July 26, 2022); *In re Brazos Elec. Power*, Case No. 21-30725 (DRJ) (Bankr. S.D. Tex. Mar. 1, 2021); *In re Internap Technology Solutions Inc.*, Case No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); *In re Rentpath Holdings, Inc.*, Case No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Sanchez Energy Corp.* Case No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); *In re Monitronics Int'l, Inc.*, Case No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 2, 2019); *In re Aegerion Pharmaceuticals, Inc.*, Case No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); *In re iHeartMedia, Inc.*, Case No. 18-31274 (MI) (Bankr. S.D. Tex. May 1, 2019); *In re Global A&T Electronics Ltd*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC) (Bankr. S.D.N.Y. Dec. 21, 2017); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (Bankr. S.D.N.Y. July 20, 2016); *In re AOG Entm't, Inc.*, Case No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. Sept. 11, 2015); *In re Allied Nevada Gold Corp.* Case No. 15-10503 (MFW) (Bankr. D. Del. April 15, 2015); I*n re Eagle Bulk Shipping Inc.*, Case No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 19, 2014); *In re GSE Envt'l., Inc.*, Case No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014); *In re MACH Gen, LLC*, Case No. 14 10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); *In re Sbarro LLC*, Case No. 14-10557 (MG) (Bankr. S.D.N.Y. Apr. 7, 2014); *In re Sorenson Commc'ns, Inc.*, Case No. 14 10454 (BLS) (Bankr. D. Del. Mar. 25, 2014).

## MOELIS' ENGAGEMENT

7. On December 15, 2023, the Debtors engaged Moelis to serve as their investment banker in connection with advising the Debtors with respect to various strategic alternatives, including a potential restructuring transaction, liability management transaction, capital transaction, and/or sale of all or substantially all the Debtors' assets.[3] Since then, Moelis, at the direction of the Debtors' board of the directors (the "***Board***"), has engaged in a comprehensive process to market the Debtors and explore such various strategic alternatives.

8. From December 2023 until the Petition Date, Moelis assisted the Debtors in evaluating and pursuing strategic alternatives, including an out-of-court restructuring, discrete asset sales and a sale of the Debtors' businesses as a going concern. When these alternatives proved infeasible, incomplete, or unattractive, the Debtors evaluated an in-court restructuring transaction with its key stakeholders. Moelis, at the direction of the Board, began to engage in negotiations regarding such a restructuring transaction with the Debtors' Prepetition Lenders and Noteholders (the "***Restructuring***"), the terms of which are memorialized in the Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended, modified or supplemented, the "***Restructuring Support Agreement***").

9. Throughout its engagement, Moelis has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations, all of which are more fully set forth in the *Declaration of Matthew Norden, Chief Legal Officer and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions* (the "**Norden Declaration**") and the *Declaration*

---

3   Moelis reached out to twenty-six (26) parties to gauge interest in a sale. Fourteen (14) of those parties executed an NDA and conducted diligence. Only one (1) party submitted a bid, which the Debtors determined was not actionable.

*of William Kocovski in Support of Chapter 11 Petitions and First Day Motions* (together with the Norden Declaration, the "*First Day Declarations*").

## THE TERMS OF THE DIP FINANCING

10. The DIP Facility, which is being provided by certain Noteholders, includes (a) a junior lien, multi-draw term loan facility, providing an initial draw of up to $60 million following entry of the Interim Order and a subsequent draw of up to $4 million following entry of the Final Order; (b) an interest rate of Base Rate or Term SOFR, as applicable, plus (i) for DIP Loans that are Base Rate Loans, 7.50% per annum and (ii) for DIP Loans that are Term SOFR Loans, 8.50% per annum, payable in kind; and (c) a maturity date of January 24, 2025. Significantly, there are no fees associated with the DIP Facility.

11. The DIP Facility also provides the Debtors the continued use of Cash Collateral. Under the Plan, each holder of a claim arising under the DIP Facility will receive either (a) its *pro rata* share of Exit Loans under the Exit Credit Agreement, or (b) such other treatment as to which the Debtors and the holder of such claim will have agreed upon in writing, with the consent of the Required Consenting Noteholders and the Debtors.

## THE NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL

12. As more fully described in the Norden Declaration, a number of factors have destabilized the Debtors' businesses and threaten to further deteriorate the Debtors' liquidity. The Debtors, with the assistance of their financial advisor, AlixPartners LLP, analyzed and quantified the Debtors' potential liquidity needs for a chapter 11 process. As set forth in further detail in the First Day Declarations, without access to the DIP Facility and Cash Collateral, I understand that the Debtors' liquidity would be significantly strained, and the Debtors would not be forecasted to

generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected administrative costs of these Chapter 11 Cases.

13. Based on my understanding of the Debtors' liquidity position and based on my experience, without immediate access to funds from the DIP Facility and the Cash Collateral, I understand that the Debtors will soon be unable to pay their vendors and employees, resulting in (a) a value-destructive interruption to their businesses; and (b) the loss of support from parties upon whom the Debtors' businesses depend, including university partners, students, customers, vendors, and employees, thereby hindering the Debtors' ability to successfully effectuate the Restructuring. I further believe that, if the Debtors do not have access to the DIP Facility and Cash Collateral and are forced to liquidate their assets rather than effectuate the Restructuring, the Debtors and their stakeholders would be irreparably harmed.

14. As such, the Debtors require immediate access to the DIP Facility and Cash Collateral in an effort to ensure that they have sufficient liquidity to operate their businesses in the ordinary course and administer these Chapter 11 Cases in a manner that will provide the Debtors an opportunity to effectively restructure their outstanding obligations pursuant to the terms of the Restructuring Support Agreement.

## THE DEBTORS' EFFORTS TO SECURE DIP FINANCING

15. The Debtors recognized from the outset that their choices with respect to postpetition financing were limited under the circumstances. I understand that substantially all of the Debtors' assets, other than certain excluded assets as set forth in the Prepetition Credit Agreement, are pledged as collateral to the Prepetition Lenders. Because the Debtors' unpledged assets that could be used to support a financing are limited, the Debtors, together with Moelis, determined that any postpetition financing would require pledging as collateral assets already

7

included in the Prepetition Collateral. Thus, the Debtors faced limited options to raise postpetition financing and to locate a lender willing to: (a) provide postpetition financing either on an unsecured basis or secured by liens junior in priority to the liens securing the Prepetition Lenders' interests; (b) provide postpetition financing on terms acceptable to the majority of the Prepetition Lenders such that the Debtors could obtain their consent to prime their liens (including incurring the cost of any required adequate protection necessary to obtain such consent); or (c) attempt to prime the liens held by the Prepetition Lenders on a non-consensual basis, thereby initiating a contested priming fight at the outset of these Chapter 11 Cases with the Prepetition Lenders.

16. Against this backdrop, the Debtors, with the assistance of Moelis and their other advisors, engaged in negotiations with the Ad Hoc Noteholder Group, Greenvale, the First Lien Ad Hoc Group, and certain other Noteholders regarding postpetition financing. After weeks of negotiations amongst the parties and the completion of the marketing process described herein, it became clear that certain Noteholders (including the Ad Hoc Noteholder Group and Greenvale) were the best sources of postpetition financing to fund a chapter 11 process. These Noteholders have a vested interest in supporting the Debtors' efforts to successfully effectuate the Restructuring to protect their prepetition investment, and the Restructuring Support Agreement further contemplates that the Noteholders will receive the reorganized equity of the Debtors (subject to dilution).

17. Accordingly, the Debtors and their advisors engaged in negotiations with the DIP Lenders with respect to postpetition financing. The negotiations spanned several weeks and lasted until shortly before the Petition Date. Throughout this process, the Debtors and their advisors actively negotiated a number of the material terms proposed by the DIP Lenders—including the amount of financing available, economics, covenants, and case milestones. As a result of these

negotiations, the DIP Lenders have agreed to fund the $64 million DIP Facility on a second lien basis to provide the Debtors with liquidity to attempt to successfully emerge from chapter 11 while avoiding a priming fight with the Prepetition Lenders. Given the expected short duration of these Chapter 11 Cases and the fact that most of the funds are needed on an interim basis, the DIP Facility is being provided solely by certain Noteholders, who have agreed to participate and fund the DIP Facility.

18. The Debtors also engaged the Prepetition Lenders regarding the terms and conditions on which they would be willing to consent to the use of Cash Collateral. The negotiations lasted until shortly before the Petition Date and the Debtors were ultimately able to obtain the consent of the Prepetition Lenders, who hold 82% of the obligations outstanding under the Prepetition Credit Agreement, to the DIP Facility and use of Cash Collateral.

19. The Debtors, together with Moelis, also ran a marketing process in search of postpetition financing to ensure that no alternative source of available postpetition financing offered better terms under the circumstances. Moelis, drawing on its experience in DIP financing transactions, identified and solicited sources that in its professional judgment it felt had the ability to complete diligence quickly, had experience or possible interest in providing postpetition financing, and had the ability to commit to financing on the timeline required.

20. Moelis assisted the Debtors in identifying potential financial institutions, including credit funds, alternative investment managers, and a commercial bank, which in its professional judgement were well suited to potentially provide postpetition financing to the Debtors. More specifically, Moelis initially solicited proposals for priming, junior lien or unsecured postpetition financing from ten (10) potential lenders. Of the ten (10) potential lenders that were contacted, all ten (10) parties declined to sign a non-disclosure agreement or submit a proposal.

21. Ultimately, the Debtors have not received any alternative financing proposals as of the Petition Date. The contacted lenders declined to extend DIP proposals for a number of reasons, including that: (a) they were not interested in providing DIP financing on a *junior* basis; and (b) they were unlikely to provide better terms than the market terms in the DIP Facility. Equally as important, the Debtors have not received any proposals from third parties that would provide an achievable, transactable, and holistic restructuring solution. The DIP Facility, on the other hand, not only provides postpetition financing on a junior basis, but also is an integral part of a holistic restructuring path to exit these Chapter 11 Cases.

22. I believe, based on the specific circumstances of these cases and my experience advising clients with respect to debtor-in-possession financing transactions, that lenders would most likely be unwilling to extend financing to the Debtors on a non-priming basis. Further, I believe, based on negotiations with the Prepetition Lenders, that any other debtor-in-possession financing facility other than the DIP Facility would, at a minimum, most likely require the Debtors to provide a substantially more costly adequate protection package to the Prepetition Lenders and likely involve a priming fight with the Prepetition Lenders. Specifically, although the Prepetition Lenders, which hold approximately 82% of the outstanding obligations under the Prepetition Credit Agreement, are consenting to the junior liens granted under the DIP Facility, they were not willing to commit in advance to being primed by the liens under any alternative DIP financing facility.

23. Based on my experience with debtor-in-possession financing transactions as well as my involvement in the Debtors' prepetition marketing process, I believe that the DIP Facility is reasonable under current market conditions and provides the Debtors with access to an amount of capital that is anticipated to be sufficient to administer these Chapter 11 Cases on terms better

under the circumstances than any other alternative source of postpetition financing currently available to the Debtors (of which there are none). I believe the proposed DIP Facility will provide the Debtors with immediate and critical access to liquidity anticipated to be sufficient to stabilize the Debtors' businesses, adequately fund the ongoing costs of these Chapter 11 Cases and facilitate the Debtors' efforts to preserve and enhance the value of their assets during the course of these Chapter 11 Cases.

### ARM'S-LENGTH AND GOOD-FAITH NEGOTIATIONS

24.     I believe that the terms of the DIP Facility are the product of extensive and good-faith negotiations between the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Lenders, which constitute the Required Lenders under the Prepetition Credit Agreement. I believe the parties' negotiations regarding the terms of the DIP Facility were conducted at arm's-length. No consideration is being provided to the DIP Agent, the DIP Lenders, or any other party to the DIP Credit Documents other than as described in the DIP Motion.

25.     Through the negotiations, the Debtors, with the help of their advisors, were able to obtain more favorable terms of the DIP Facility. Specifically, the Debtors were able to: (a) increase the total amount of the DIP Facility from $45 million to $64 million; (b) obtain the DIP Facility without granting the DIP Lenders senior liens on currently unencumbered assets; and (c) reduce fees associated with the DIP from a 5.0% backstop fee payable to no fees payable on the DIP financing.

### THE TERMS AND CONDITIONS OF
### THE DIP FACILITY ARE REASONABLE AND SHOULD BE APPROVED

26.     Based on my experience in and observation of similar chapter 11 cases, the terms and conditions of the DIP Facility are reasonable given current market conditions, the Debtors' circumstances, and the Debtors' prepetition secured indebtedness. Further, since this DIP Facility

is being provided on a junior basis, I believe the economic terms, including the applicable interest rate, reflect current market conditions, are within the range of other court-approved DIP facilities for debtors of similar size and industry in recent years, and are reasonable considering the Debtors' financial condition and the costs, risk, and complexity of administering these Chapter 11 Cases. Based on my experience and involvement in the DIP Facility negotiations, I believe that the DIP Facility loans are offered as a protective measure by the DIP Lenders to provide enough liquidity to achieve and complete a chapter 11 reorganization process and would not be offered but for the economic terms as part of the DIP Facility. Indeed, the agreement on the economic terms was to induce the DIP Lenders to make the DIP Loans to the Debtors.

27. I believe the covenants and milestones included in the DIP Facility likewise are reasonable under the circumstances, should allow the Debtors the opportunity to expeditiously consummate the Restructuring.

28. In sum, I believe that, given the circumstances, the process to obtain debtor-in-possession financing produced the best available option of the proposed financing alternatives currently available to the Debtors and the terms of the DIP Facility are reasonable and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on July 25, 2024.

<i>/s/ Cullen Murphy</i>
Cullen Murphy