**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO (I) SATISFY
PREPETITION WORKFORCE OBLIGATIONS AND (II)
CONTINUE WORKFORCE PROGRAMS ON A POSTPETITION BASIS;
(B) GRANTING RELIEF FROM AUTOMATIC STAY WITH RESPECT TO
WORKERS' COMPENSATION CLAIMS; AND (C) GRANTING RELATED RELIEF**

The debtors in possession (collectively, the "***Debtors***") in the above-captioned cases (the

"***Chapter 11 Cases***") hereby file this motion (this "***Motion***") and respectfully state as follows:

**RELIEF REQUESTED**

1.        By this Motion, the Debtors seek entry of interim and final orders, substantially in

the forms attached hereto as, respectively, **Exhibit A** (the "***Proposed Interim Order***") and

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

**Exhibit B** (the "***Proposed Final Order***" and, together with the Proposed Interim Order, the "***Proposed Orders***"):

    (a)    authorizing, but not directing, the Debtors, in their discretion, to (i) satisfy or otherwise honor various prepetition Workforce Obligations (as defined below) to or for the benefit of their current or former employees (the "***Employees***")[2] and contract workers (the "***Contract Workers***" and, together with the Employees, the "***Workforce***") for compensation, expense reimbursements, and benefits under all plans, programs, policies, and agreements maintained by, or for the benefit of, or contributed to or entered into by, the Debtors prior to the Petition Date (collectively, the "***Workforce Programs***"), and (ii) continue the Workforce Programs related to such obligations postpetition, in the ordinary course of business, as in effect immediate prior to the filing of these Chapter 11 Cases; each in accordance with the Approved Budget (as defined in the DIP Order[3]);

    (b)    granting a limited waiver of the automatic stay under section 362 of the Bankruptcy Code to allow Workers' Compensation Claims (as defined below) to proceed under the applicable Workers' Compensation Policy (as defined below), and to allow the Debtors, their affiliates, their insurance providers, and/or their third-party administrators to negotiate, settle, and/or litigate Workers' Compensation Claims, and pay resulting amounts, whether such claims arose pre- or postpetition in accordance with the DIP Order; and

    (c)    granting related relief.

## JURISDICTION AND VENUE

    2.    The United States Bankruptcy Court for the Southern District of New York (this "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[2] Unless specifically noted otherwise, the relief requested in this Motion applies solely to the Employees (as defined and described herein).

[3] "**DIP Order**" refers to that interim or final order, as applicable, approving the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief* (as may be amended, restated, or otherwise modified from time to time).

3.     The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of

Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by this Court in

connection with this Motion to the extent that it is later determined that this Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.  Venue of these cases and this Motion in this district is proper

under 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and legal predicates for the relief requested herein are sections 105(a),

362(d), 363(b), 503(c)(3), 507(a), 541, 1107(a), and 1108 of title 11 of the United States Code,

11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Bankruptcy Rules 6003 and 6004, and rule

9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "***Local***

***Rules***").

## **BACKGROUND**

5.     The Debtors comprise a leading online education technology company providing

over eighty million people worldwide with access to high-quality education, including graduate,

undergraduate, and non-degree programs.  Through a comprehensive platform, the Debtors enable

non-profit universities and colleges to offer a wide range of online courses and programs.  These

span diverse fields such as artificial intelligence, data science, business, healthcare, and education,

with over 4,600 programs accessible on the Debtors' platform, edX.org, which provides learners

with essential information on admissions, enrollment requirements, application processes,

curriculum, tuition, and completion times.  By consolidating a vast array of educational offerings

on a single platform, the Debtors offer flexible and affordable pathways for achieving professional

and educational goals.  Although operations are predominantly remote, the majority of the

Debtors' revenue flows into New York, where the Debtors hold their primary bank accounts, and

where they collaborate with prestigious institutions of higher education (many of which are located

here in New York City, including New York University, Columbia University, and Fordham University), enhancing their reach and impact within the city and state.

6.    On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing these Chapter 11 Cases.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested, and no committee has been appointed in these Chapter 11 Cases.

7.    The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Matthew Norden, Chief Legal Officer and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions* (the "***Norden Declaration***") and the *Declaration of William Kocovski in Support of Chapter 11 Petitions and First Day Motions* (the "***Kocovski Declaration***" and, together with the Norden Declaration, the "***First Day Declarations***") filed contemporaneously herewith, which are fully incorporated herein by reference.[4]

8.    These Chapter 11 Cases are "prepackaged" cases commenced for the purpose of implementing an agreed restructuring of the Debtors' debt.  Prior to the Petition Date, the Debtors entered into the Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended, modified or supplemented, the "***Restructuring Support Agreement***") with certain creditors including (a) an ad hoc group of certain holders (the "***Ad Hoc Noteholder Group***") of 2.25% convertible senior notes due May 1, 2025, issued under that certain Indenture, dated as of April 23, 2020 (the "***2025 Notes***") and 4.50% senior unsecured convertible notes due February 1, 2030,

---

[4]    Capitalized terms used, but not defined in this Motion have the meanings ascribed to them in the First Day Declarations.

issued under that certain Indenture, dated as of January 11, 2023 (the "**2030 Notes**" and, together with the 2025 Notes, the "**Notes**") represented by Weil, Gotshal & Manges LLP, (b) Greenvale Capital LLP ("**Greenvale**" and, together with the Ad Hoc Noteholder Group, the "**Consenting Noteholders**") as holder of the Notes represented by Schulte Roth & Zabel LLP, and (c) an ad hoc group of certain First Lien Lenders (the "**First Lien Ad Hoc Group**" and, together with the Consenting Noteholders, the "**Consenting Stakeholders**") represented by Milbank LLP.  As of July 24, 2024, the Consenting Stakeholders held approximately 82% of the Debtors' first lien funded debt, 86.9% of the 2025 Notes, and 95.2% of the 2030 Notes.

9.      On the Petition Date, the Debtors filed a plan of reorganization reflecting the terms of the Restructuring Support Agreement (as may be amended, modified or supplemented, the "**Plan**") in addition to a disclosure statement with respect to the Plan (as may be amended, modified or supplemented, the "**Disclosure Statement**").  The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.[5]

10.      Prior to the Petition Date, the Debtors commenced solicitation of votes on the Plan from holders of Class 3 First Lien Claims and Class 4 Unsecured Notes Claims (each as defined in the Plan), the only classes entitled to vote under the Plan.  Subject to this Court's approval, votes with respect to the Plan are due on August 21, 2024.  On the Petition Date, the Debtors filed a motion seeking, among other things, (a) conditional approval of the Disclosure Statement, and (b) to schedule a combined hearing to consider approval of the Disclosure Statement on a final

---

[5]      Contemporaneously with filing this Motion, the Debtors are filing a motion to seek this Court's authorization to reject certain unexpired commercial real property leases.

basis and confirmation of the Plan.  The Debtors seek to obtain confirmation of the Plan as quickly as this Court's schedule and requisite notice periods will permit.

**THE DEBTORS' WORKFORCE**

11.    To operate their businesses, the Debtors and their non-debtor affiliates (the "***Non-Debtor Affiliates***" and, together with the Debtors, "***2U***" or the "***Company***") rely on the Workforce to perform a variety of critical functions, including, but not limited to, developing the edX.org platform, developing technology to launch and support its clients' educational offerings, providing services to clients and students (including student engagement services, curriculum and learning services, marketing services, and university and student support services), supporting the Company's other information technology systems and infrastructure, and providing necessary administrative, managerial, and financial support services.

12.    As of the Petition Date, 2U's Workforce consists of approximately 4,820 individuals.  Specifically, the Debtors' Workforce consists of approximately 3,130 Employees in the United States and 270 Contract Workers in the United States and abroad.  In addition, due to the global nature of 2U's businesses, the Non-Debtor Affiliates employ approximately 1,420 individuals in various locations outside of the United States.

13.    The Debtors' Workforce is comprised of several categories of Employees and Contract Workers.  *First*, there are regular full-time Employees (the "***Regular Full-Time Employees***") who are regularly scheduled to work at least thirty (30) hours per week and are eligible for employee benefits.  As of the Petition Date, the majority of the Debtors' Workforce in the United States (approximately 1,820 individuals) are Regular Full-time Employees.

14.    *Second*, there are regular part-time Employees (the "***Regular Part-Time Employees***") who are regularly scheduled to work fewer than thirty (30) hours per week.  Such

Employees include, among others, instructors for certain of 2U's educational offerings. As of the Petition Date, the Debtors employ approximately 1,310 Regular Part-Time Employees.

15.     *Third,* the Debtors also use the services of approximately 270 Contract Workers. The Contract Workers are both located in the United States and abroad and do not only include individuals who are hired (and paid) directly by the Company to complete a specific project, but also individuals who are hired (and paid) via a third-party agency rather than the Company. For instance, Debtor edX LLC works with certain third-party payroll administrators to engage certain Contract Workers in India to provide sales-related and external software-development services in connection with the edX online learning platform. Generally, Debtor edX LLC pays such third-party payroll administrators on a monthly basis for the supply of such Contract Workers.

16.     The Debtors believe that eight (8) of the Employees (each, an "***Insider***" and, collectively, the "***Insiders***") constitute "insiders" as such term is defined in section 101(31) of the Bankruptcy Code. Certain of the Employees have the title of "Senior Vice President" or above (such Employees, the "***Senior Employees***"). The Debtors submit that not all of the Senior Employees are Insiders.

17.     The Workforce enables the Debtors to operate productively for the benefit of the Debtors' stakeholders. Due to the disruption and uncertainty inherent in a chapter 11 filing, the Debtors believe that the continuity and performance of the Workforce would be jeopardized without the relief requested herein. The continued and uninterrupted service of the Workforce is thus essential to the Debtors' ongoing operations and the success of these Chapter 11 Cases.

18.     Moreover, if the Debtors fail to satisfy the Workforce Obligations in the ordinary course of business, the members of the Workforce could suffer extreme personal hardship and, in some cases, could be unable to pay their basic living expenses. This would have a catastrophic

impact on the Workforce's morale and productivity, while causing immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, the Debtors have determined that both paying those obligations and continuing all of the compensation and benefits programs described in this Motion, and in accordance with the Approved Budget, are vital to preventing the loss of key members of the Workforce during the pendency of these Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

## A.    WORKFORCE OBLIGATIONS

19.    In the ordinary course, the Debtors incur a number of obligations to, or for the benefit of, their Workforce (the "***Workforce Obligations***"), which include:[6]

(a)    Workforce compensation obligations, including the Payroll Obligations, the Contracted Labor Obligations, the Payroll Deduction Obligations, and the Payroll Taxes (each as defined and described in <u>Section B.</u>);

(b)    the other compensation programs described in <u>Section C</u>, including the Employee Incentive Programs, the Retention Programs, the PTO Obligations, Independent Director Compensation, and the Severance Program (each as defined below);

(c)    the Expense Reimbursements (as defined and described in <u>Section D</u>);

(d)    the Employee Benefits Obligations (as defined and described in <u>Section E</u>), including obligations incurred in connection with the Medical and Dental Benefits, the Vision Plans, health savings accounts, Life and Disability Insurance, the Employee Assistance Programs, the Voluntary Benefits Program, and the Employee Wellness Programs (each as defined below);

(e)    the obligations incurred in connection with the savings and other retirement programs described in <u>Section F</u>;

(f)    the workers' compensation obligations described in <u>Section G</u>; and

(g)    the payments to administrators described in <u>Section H</u>.

20.    As set forth in the below chart, the Debtors estimate that, as of the Petition Date, there are approximately $12,701,000 (the "***Interim Amount***") of accrued but unpaid Workforce

---

[6]    Capitalized but undefined terms in this paragraph have the meanings ascribed to them elsewhere in this Motion.

Obligations, all of which will become due and owing before the final hearing on this Motion (the "***Final Hearing***").

| Workforce Obligations | Requested Interim Order Amount | Requested Final Order Amount |
|---|---|---|
| Workforce Compensation Obligations | $8,360,000 | $8,360,000 |
| *Payroll Obligations* | $1,740,000 | $1,740,000 |
| *Contracted Labor Obligations* | $6,200,000 | $6,200,000 |
| *Payroll Deduction Obligations (inclusive of Garnishments)* | $240,000 | $240,000 |
| *Payroll Taxes* | $130,000 | $130,000 |
| *Payroll Processing Services* | $50,000 | $50,000 |
| Other Compensation Programs | $1,100,000 | $5,550,000 |
| *Employee Incentive Programs* | $100,000 | $1,580,000 |
| *Retention Programs* | $0 | $0 |
| *PTO Obligations* | $0 | $0 |
| *Independent Director Compensation* | $0 | $0 |
| *Severance* | $1,000,000 | $3,970,000 |
| Expense Reimbursements | $550,000 | $550,000 |
| *Company Credit Card Expenses* | $300,000 | $300,000 |
| *Miscellaneous Expenses* | $250,000 | $250,000 |
| Employee Benefits Obligations | $2,271,000 | $2,271,000 |
| *Medical and Dental Benefits* | $2,000,000 | $2,000,000 |
| *Vision Plans* | $7,000 | $7,000 |
| *Health Savings Accounts* | $39,000 | $39,000 |
| *Life and Disability Insurance* | $160,000 | $160,000 |
| *Employee Assistance Programs* | $10,000 | $10,000 |
| *Voluntary Benefits Program* | $25,000 | $25,000 |
| *Employee Wellness Program* | $30,000 | $30,000 |
| Savings and Other Retirement Obligations | $340,000 | $340,000 |
| Payments to Administrators | $80,000 | $80,000 |
| ***Total*** | **$12,701,000** | **$17,151,000** |

21.     To fulfill these imminent commitments, the Debtors request entry of (a) the Proposed Interim Order authorizing the Debtors to pay such prepetition Workforce Obligations up to the Interim Amount of $12,701,000 and (b) the Proposed Final Order authorizing the Debtors to pay all additional Workforce Obligations, each in accordance with the Approved Budget.

**B.     EMPLOYEE PAYROLL AND WITHHOLDING OBLIGATIONS**

**I.     Employee Payroll**

22.     The Debtors pay all Employees' wages and salaries (collectively, the "***Payroll Obligations***") bi-weekly, with pay periods starting on Monday and ending on the second Sunday, with an aggregate average payroll of approximately $8.6 million for each pay period.  The next payroll date for Employees is July 26, 2024.  In addition, the Debtors pay Contract Workers fees and expenses (collectively, the "***Contracted Labor Obligations***") in accordance with the terms of their respective contracts.  As a result, at any given point in time, the Employees often have a significant amount of unpaid wages and other compensation that has accrued but is unpaid, and the Contract Workers often have a significant amount of unpaid fees and expenses that has accrued but is unpaid.

23.     The Debtors' payroll processing (the "***Payroll Processing Services***") is administered by third-party fee-based service providers, OneSource Virtual ("***OneSource***") or ADP, Inc. (together with OneSource, the "***Payroll Administrators***").  The ongoing services of the Payroll Administrators are imperative to the smooth functioning of the Debtors' operations and payroll processing.  In the aggregate, on an annual basis, the Debtors pay annual fees of

approximately $530,000 for the Payroll Processing Services, which amounts are paid out of the Debtors' accounts payable.

24.     As of the Petition Date, the Debtors estimate that they owe approximately $50,000 accrued but unpaid obligations on account of the Payroll Processing Services and $1.74 million in accrued but unpaid Payroll Obligations (inclusive of certain Withholding Obligations (as defined below)) to the Employees, all of which will become due and owing before the Final Hearing.  In addition, as of the Petition Date, the Debtors estimate that they owe approximately $6.2 million in accrued but unpaid Contracted Labor Obligations to the Contract Workers, all of which will become due and owing before the Final Hearing.  The Debtors request authority, but not direction, to pay all of the foregoing amounts and to continue honoring such obligations in the ordinary course of business and in accordance with the Approved Budget.

**II.     Withholding Obligations**

25.     In the ordinary course of business, the Debtors withhold deductions from Employees' paychecks (collectively, the "***Payroll Deductions***").  Such Payroll Deductions include (a) garnishments (such as tax levies, child support, and other court-ordered obligations); and (b) other deductions that are payable to employee benefit plans (such as an Employee's share of healthcare benefits and insurance premiums, and 401(k) contributions).

26.     The Debtors have obligations (collectively, the "***Payroll Deduction Obligations***") to remit, on a weekly, bi-weekly or monthly basis, as applicable, the withheld amounts from such Payroll Deductions either to the appropriate governmental authorities, the applicable benefits providers, or to Payroll Administrators (who then forward such amounts to applicable benefits providers).

27.     In addition to the Payroll Deduction Obligations, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal,

state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "***Payroll Taxes***" and, together with the Payroll Deduction Obligations, the "***Withholding Obligations***") for remittance to the appropriate federal, state, or local taxing authorities. The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed. The Debtors' aggregate average bi-weekly Withholding Obligations for Employees total approximately \$3.1 million.

28.    As noted above, as of the Petition Date, certain of the Employees are owed prepetition amounts related to their compensation. Where Employees are owed such amounts, the applicable Withholding Obligations have not yet been met. Additionally, the Debtors, as of the Petition Date, may not yet have forwarded or paid to the various third parties noted above the amounts that are attributable to various prepetition Withholding Obligations that have been withheld from Employees' paychecks. The Debtors estimate that, as of the Petition Date, accrued but unpaid Withholding Obligations total approximately \$680,000. The Debtors request authority, but not direction, (a) to honor and process any Withholding Obligations that were unpaid or unremitted as of the Petition Date on an interim and final basis and (b) to continue to honor and process Withholding Obligations on a postpetition basis, in the ordinary course and consistent with their prepetition practices and in accordance with the Approved Budget.

**C.     OTHER COMPENSATION PROGRAMS**

    **I.     Employee Incentive Programs**[7]

    29.     In the ordinary course of business, in order to encourage and reward outstanding performance, eligible Employees may earn commission and bonuses under various bonus and incentive programs (the "***Employee Incentive Programs***") based on individual and business targets.  The following Employee Incentive Programs are applicable to Employees of the Debtors:

    (a)    *Sales Commission*.  The Debtors offer a sales incentive program, in which eligible Employees in certain departments are eligible for commissions from sales to enterprise clients or for entering into new deals with university partners (the "***Sales Commissions***").  As of the Petition Date, approximately eighteen (18) Employees are eligible to receive Sales Commissions, and the amount of aggregate, unpaid accrued Sales Commissions totals approximately $50,000.

    (b)    *Spot Bonuses*.  The Debtors occasionally provide certain non-Insider Employees discretionary spot bonuses based on performance ("***Spot Bonuses***").  The Debtors estimate that they have no outstanding obligations owed on account of Spot Bonuses.

    (c)    *Lending Hands Bonuses*.  The Debtors provide bonuses to certain Employees for taking over the job duties of other Employees on leaves of absence ("***Lending Hands Bonuses***").  As of the Petition date, almost all non-Insider Full-Time Employees (other than those who provide student recruiting services) are eligible to receive Lending Hand Bonuses, and the amount of aggregate, outstanding Lending Hands Bonuses totals approximately $20,000.

    (d)    *Commitment Bonuses*.  The Debtors occasionally provide discretionary commitment bonuses as needed to retain non-Insider employees ("***Commitment Bonuses***").  As of the Petition Date, almost all non-Insider Employees (other than those who provide student recruiting services) are eligible to receive Commitment Bonuses, and the amount of aggregate, outstanding Commitment Bonuses totals approximately $1.5 million.

    (e)    *Signing Bonuses*.  The Debtors provide bonuses to certain new hires upon joining the Debtors' Workforce ("***Signing Bonuses***").  The structure of the Signing Bonuses varies, but typically consists of either (a) a one-time cash payment that is paid to the recipient after such recipient commences employment or (b) an upfront

---

[7]   Any description of the Employee Incentive Programs is for illustration purposes only, is not intended to be a comprehensive recitation of all of the applicable terms and conditions, and is qualified in its entirety by the governing agreements.

cash payment.  As of the Petition Date, the Debtors estimate unpaid accrued Signing Bonuses total approximately $10,000.

30.     During the twelve (12)-month period prior to the Petition Date, the Debtors paid approximately $4.1 million on account of the Employee Incentive Programs.  As of the Petition Date, the Debtors estimate that there is approximately $1.58 million outstanding in connection with the Employee Incentive Programs, of which $100,000 will come due during the period beginning on the Petition Date and ending on the date that is thirty (30) calendar days after the Petition Date.

31.     By this Motion, the Debtors seek authority to pay accrued and unpaid amounts owed to non-Insiders under the Employee Incentive Programs and to continue the Employee Incentive Programs for non-Insider Employees on a postpetition basis in the ordinary course of business and in accordance with the Approved Budget.[8]

## II.    Retention Programs

32.     In the ordinary course of business, the Debtors offer various retention programs (the "***Retention Programs***"), all of which were instituted prepetition, to certain eligible Employees.  The Retention Programs are summarized as follows:

(a)     *General Non-Insider Retention Program*.  For the year 2024, almost all non-Insider Regular Full-Time Employees received a one-time cash retention award equal to forty percent (40%) of their annual bonus target opportunity for 2024 (the "***General Non-Insider Retention Program***").  The Debtors pay out such awards under the General Non-Insider Retention Program in four (4) quarterly installments, subject to continued employment on each payment date.  Eligible Employees forfeit any unpaid amounts under this Retention Program if their employment is terminated for any reason.  As of the Petition Date, the Debtors estimate that there is approximately $2.1 million in connection with the General Non-Insider Retention Program that will come due on September 20, 2024.

---

[8]     For the avoidance of doubt, the Debtors do not seek via this Motion authority to pay any amounts to Insiders under the Employee Incentive Programs.  The Debtors, however, reserve the right to seek such authority during these Chapter 11 Cases by separate motion.

(b)     *Key Executive Retention Program.*    For the year 2024, fifteen (15) Senior Employees received a one-time cash retention award equal to forty percent (40%) of their annual bonus target opportunity for 2024 plus twenty percent (20%) of their long-term incentive plan[9] target opportunity for 2024 in lieu of any awards under such incentive plans for 2024 (the "***Key Employee Retention Program***").    The Debtors pay out such awards under the Key Employee Retention Program in four (4) quarterly installments.    If a participant voluntarily terminates employment without good reason or is terminated for cause prior to June 30, 2025, he or she will be required to repay the pre-tax amount of any previously paid retention bonus installments he or she has received, and forfeit any unpaid retention bonus installments.    If, however, an eligible Employee voluntarily terminates with good reason or is involuntarily terminated without cause, or dies or becomes disabled, he or she does not need to repay any previously paid retention bonus installments, and the next quarterly retention bonus installment will be accelerated and paid.    As of the Petition Date, the Debtors estimate that, solely with respect to non-Insiders, there is approximately $550,000 in connection with the Key Employee Retention Program that will come due on October 11, 2024.

33.    Any interruption in payments pursuant to the General Non-Insider Retention Program or the Key Employee Retention Program (solely with respect to non-Insiders) could upset Employee morale or cause attrition, which could lead to severe disruptions to the Debtors' operations.    This is particularly true given that a large percentage of the Employees are covered by the General Non-Insider Retention Program and six percent (6%) of the Employees' total compensation is comprised of payments under the General Non-Insider Retention Program. Further, the Key Employee Retention Program is an important part of the overall compensation packages for certain of the Senior Employees who are non-Insiders and contributes to non-Insider Senior Employees' motivation to perform for the benefit of the Debtors' estates.    For those reasons, by this Motion, the Debtors seek authority to pay accrued and unpaid amounts owed to non-Insiders under the Retention Programs and to continue the Retention Programs for non-Insider

---

[9]     The long-term incentive plan is an equity award plan offered to certain Senior Employees.

Employees on a postpetition basis in the ordinary course of business and in accordance with the Approved Budget.[10]

### III.    PTO Obligations

34.    As part of their overall compensation, Regular Full-Time Employees are eligible, in certain circumstances, to receive unlimited paid time off for, among other things, (a) vacation, personal days, and holidays (collectively, "***UPTO***"), and (b) other paid sick and safe leave, such as sick leave, parental leave, and caregiver leave (collectively, "***PSSL***").   While the Regular Part-Time Employees are not eligible for UPTO, the Debtors provide up to seventy-two (72) hours of PSSL benefits to such Employees.  Such paid time off is, in certain cases, required by applicable law and usual, customary, and necessary if the Debtors are to retain qualified Employees for business operations.  Thus, failure to provide these benefits could contravene applicable law, harm Employee morale, and precipitate the departure of Employees.

35.    The aggregate amount of any accrued but unpaid obligations related to the UPTO or PSSL (collectively, the "***PTO Obligations***") does not represent a true "cash" liability for the Debtors.  Given that UPTO and PSSL are unlimited for Regular Full-Time Employees, such Employees do not actually accrue or earn any leave time or paid time off and, accordingly, are not eligible to receive cash payments on account of accrued but unused UPTO.  Moreover, the Debtors anticipate that the Regular Part-Time Employees will use most of their PSSL in the ordinary course of business, and eligible Employees will receive cash payments on account of unused earned time off only upon termination or resignation, as required by law, Company policy, or contract. Although the Debtors are not aware of any PTO Obligations as of the Petition Date, it is possible

---

[10]    For the avoidance of doubt, the Debtors do not seek via this Motion authority to pay any amounts to Insiders under the Key Employee Retention Program.  The Debtors, however, reserve the right to seek such authority during these Chapter 11 Cases by separate motion.

that accrued but unpaid PTO Obligations will arise in the ordinary course of business.  Therefore,

out of an abundance of caution, the Debtors request authority to (a) pay any prepetition amounts

that are later determined to be owed on account of any PTO Obligations and (b) continue to honor

their PTO Obligations in the ordinary course of business during these Chapter 11 Cases, each in

accordance with the Approved Budget.

### IV.    Independent Director Compensation

36.    Debtor 2U's Board of Directors is comprised of eight (8) members (the "***Board***"),

including one Employee, the Chief Executive Officer, and seven (7) non-Employee directors

(each, an "***Independent Director***" and, collectively, the "***Independent Directors***").  For the year

2024, six (6) of the Independent Directors are each eligible to receive a cash award of $183,000,

in lieu of receiving any equity awards, paid out in quarterly installments (collectively, the "***Legacy

Cash Awards***").  The remaining Independent Director, who was appointed to the Board in May

2024, is receiving a cash award of $30,000 each month, paid at the beginning of each month

(together with the Legacy Cash Awards, the "***Annual Cash Awards***").

37.    The chair of the Board, Audit Committee, Compensation Committee, and

Nominating and Corporate Governance Committee each receive a supplemental cash award in the

amount of, respectively, $69,000, $25,000, $15,000, and $11,000 (collectively, the "***Chair

Supplemental Cash Awards***").  Non-chair members of the Audit Committee, Compensation

Committee, and Nominating and Corporate Governance Committee each receive a supplemental

cash award in the amount of, respectively, $12,500, $10,000, and $5,000 ("***Non-Chair

Supplemental Cash Awards***").  In addition, Board Members also receive a cash award of $1,500

for each meeting outside of the scheduled quarterly meetings, and such payments are not to exceed

$10,000 (collectively with the Annual Cash Awards and Chair Supplement Cash Awards, the

"***Independent Director Compensation***").  The Independent Director Compensation is paid in

quarterly installments at the beginning of each quarter to six (6) of the Independent Directors. The Independent Director Compensation is paid each month to the remaining Independent Director, who was appointed to the Board in May 2024, at the beginning of each month.

38.     While the Debtors believe that there are no accrued and unpaid prepetition amounts owed on account of the Independent Director Compensation as of the Petition Date, the Debtors request, out of an abundance of caution, (a) authority to pay any prepetition amounts that are later determined to be owed on account of any obligations related to Independent Director Compensation and (b) authority to pay the Independent Director Compensation as it comes due in the ordinary course of business, each in accordance with the Approved Budget.

### V.    Severance Program

39.     Certain Employees, including non-Insider Senior Employees, are eligible for severance benefits in the United States pursuant to certain severance plans and contractual agreements (collectively, the "*Severance Plans*") and non-contractual Company practices (the "*Severance Practices*" and, together with the Severance Plans, the "*Severance Program*"). The Severance Program applies to eligible Employees upon a qualifying termination of employment, and are summarized as follows:

(a)     *Severance Pay and Change in Control Plan.* The Debtors offer eligible Senior Employees the opportunity to participate in a severance pay and change in control plan that provides assurances of specified benefits to such eligible Employees (the "*Severance Pay and Change in Control Plan*"). Under the Severance Pay and Change in Control Plan, eligible Employees receive salary continuance, COBRA coverage and a pro-rated amount of their actual bonus for the year in which they are terminated. The terms provided under the Severance Pay and Change in Control Plan differ based on the eligible Employee's position and whether the qualifying termination of employment occurs in connection with a change in control.

(b)     *Contractual Severance Agreements.* Additionally, Employees with the title of "Senior Vice President" who do not participate in the 2U, Inc. Severance Pay and Change in Control Plan have contractual severance arrangements, which provide that those Employees who have worked at the Company for five (5) or more years are eligible for severance of twelve (12) months of salary continuance and those

Employees who have worked at the Company for less than five (5) years are eligible for severance of six (6) months of salary continuance.

(c)     *Severance Practices.*  In the ordinary course of business, the Debtors also offer eligible non-Senior Employees certain severance benefits under the Severance Program.  Specifically, Employees with the title of "Vice President" are eligible for severance of one (1) month of salary continuance for their first year of service and two (2) weeks of salary continuance for every year/partial year thereafter, and six (6) months of outplacement services designed to help Employees successfully navigate the job market (the "***Outplacement Services***").  Additionally, Employees with the title of "Senior Director" and lower are eligible for two (2) weeks of salary continuance for every year/partial year thereafter and two (2) months of Outplacement Services.

40.     In addition, under the Severance Program, Employees may be eligible for payments on account of COBRA coverage for any Employee who had elected into medical, vision, or dental coverage as of their termination date.  Participating Employees may also be eligible for certain bonus-related payments and other payments related to the Company's internet stipend and PSSL policies, or the Employee's previously accrued vacation from the Debtors' legacy vacation plan.

41.     As of the Petition Date, the Debtors estimate that they have $3.97 million outstanding severance obligations owed to former Employees, of which approximately $1.0 million will come due and owing before the Final Hearing.

**D.     EXPENSE REIMBURSEMENTS**

42.     The Debtors, in the ordinary course of business, pay for a variety of ordinary, necessary, and reasonable business-related expenses (or pay for reimbursement of such expenses) that the Employees incur on behalf of the Debtors in the scope of their employment (all such obligations described in this section, the "***Expense Reimbursements***").  Expense Reimbursements may include expenses for business travel (including lodging, automobile rentals, meals, fitness center usage, and internet charges), business-related transportation and mileage costs, and other general business-related expenses.  Employees are expected to use sound judgment and good business sense when incurring such expenses.

### I. Company Credit Card Expenses

43.     In certain instances, Employees may be issued corporate credit cards to pay for Expense Reimbursements.  Such Employees are issued a Company credit card through American Express Company ("*American Express*") to be utilized for travel and other business-related expenses (the "*Credit Card Programs*").  Employees are responsible for making the payments on their corporate credit cards directly and then submitting for reimbursement from the Debtors. Approximately 170 Employees have a Company credit card, and the average aggregate monthly reimbursable amount incurred on the Company credit cards is approximately $850,000.  As of the Petition Date, the Debtors estimate that they owe approximately $300,000 in accrued but unpaid obligations on account of the Expense Reimbursements under the Credit Card Programs, all of which will become due and owing before the Final Hearing.

### II. Miscellaneous Expenses

44.     Employees may also receive reimbursement for certain other miscellaneous programs and benefits (the "*Miscellaneous Reimbursement Programs*").  Generally, the Debtors, at the discretion of the eligible Employee's applicable business unit, may reimburse, pay directly for, or provide a monthly stipend for items such as broadband internet services, professional license fees or dues, subscriptions, and other miscellaneous business expenses.  Certain eligible Employees receive a monthly stipend of $30 or $75 for cell phone data allowance.  As of the Petition Date, the Debtors estimate that they owe approximately $250,000 in accrued but unpaid obligations on account of the Miscellaneous Reimbursement Programs, all of which will become due and owing before the Final Hearing.

### E. EMPLOYEE BENEFITS

45.     Regular Full-Time Employees may elect to enroll in a portfolio of benefits, including medical and prescription drug coverage, dental coverage, vision coverage, health savings

accounts, flexible spending accounts, life insurance, disability insurance and other benefit programs provided to Employees in the ordinary course of business (the health and welfare benefits obligations described in this section, the "***Employee Benefits***").  As of the Petition Date, the Debtors estimate that approximately 1,900 Employees enroll in at least some of the Employee Benefits, and the Debtors owe approximately $2.27 million in accrued but unpaid obligations on account of the Employee Benefits (the "***Employee Benefits Obligations***"), of which approximately $2.27 million will become due and owing before the Final Hearing.

46.     By this Motion, the Debtors request authority to make all payments and remittances for amounts attributable to the prepetition period and related to the Employee Benefits Obligations, in the ordinary course of business and in accordance with the Approved Budget.  The Debtors also request authority to continue the Employee Benefits postpetition in the ordinary course of business and in accordance with the Approved Budget.

### I.    Medical and Dental Plans

47.     The Debtors offer Regular Full-Time Employees and their eligible family members the opportunity to obtain basic medical, prescription drug, dental coverage, and related benefits (the "***Medical and Dental Benefits***").  The Regular Full-Time Employees can participate in any of the following fully-insured healthcare plans (collectively, the "***Medical Plans***") provided by Cigna Healthcare ("***Cigna***"):  (a) an enhanced high-deductible health plan combined with a health-savings account (the "***Enhanced HDHP***"); (b) a basic high-deductible health plan combined with a health-savings account (together with the Enhanced HDHP, the "***HDHPs***"); (c) a traditional preferred provider organization plan ("***PPO Plan***"); and (d) an essential exclusive provider organization plan ("***EPO Plan***").  All Regular Full-Time Employees may also select from Cigna's two dental plan options (the "***Dental Plans***" and, together with the Medical Plans the "***Medical***

*and Dental Plans*"):  (a) an enhanced dental preferred provider organization plan; or (b) a basic dental preferred provider organization plan.

48.    Coverage under the Medical and Dental Plans becomes available the first day of the month after the Employee is hired.  In the ordinary course of business, the Debtors pay to Cigna, on a monthly basis, the premiums for any Medical and Dental Benefits purchased by Employees.  In the twelve (12) months prior to the Petition Date, the Debtors remit, on average, approximately $2.0 million and $100,000 per month in employee and employer contributions under, respectively, the Medical Plans and the Dental Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $2.0 million in accrued but unpaid obligations on account of the Medical and Dental Benefits, all of which will become due and owing before the Final Hearing.

**II.    Vision Plans**

49.    The Debtors offer Regular Full-Time Employees and their eligible family members the opportunity to enroll in vision benefits under fully-insured plans (the "*Vision Plans*") provided by Vision Service Plan Insurance Company ("*VSP*").  Under the Vision Plans, participating Employees may select from two coverage options:  (a) the basic plan or (b) the enhanced plan. The Vision Plans generally cover Employees' routine eye exams, eyeglass frames and lenses, and contact lenses, to varying degrees depending on the service and whether the provider is within VSP's network or is outside the network (the latter option being subject to higher costs to the Employee).

50.    Coverage under the Vision Plans becomes available the first day of the month after the Employee is hired.  In the ordinary course of business, the Debtors pay to VSP, on a monthly basis, the premiums for any Vision Plans purchased by Employees.  In the twelve (12) months prior to the Petition Date, the Debtors paid, on average, approximately $3,000 per month in

premiums in connection with the Vision Plans. As of the Petition Date, the Debtors estimate that

they owe approximately $7,000 in accrued but unpaid obligations on account of the Vision Plans,

all of which will become due and owing before the Final Hearing.

### III.    Pre-Tax Contribution Health Savings Accounts and Flexible Spending Accounts

51.    Participants in the HDHPs have the opportunity to contribute, through pre-tax

compensation deductions, to health savings accounts ("**HSAs**") to be used for healthcare-related

expenses[11] and limited-purpose flexible spending accounts for dental and vision-related expenses

(the "**Dental and Vision FSAs**"). For Employees participating in the HSAs, the Debtors contribute

either $150 or $300 quarterly to the HSA for each employee enrolled in the Enhanced HDHP.

Each participating Employee may also contribute a portion of his or her eligible earnings each year

on a pre-tax basis to his or her HSA, subject to limits imposed by federal law. A participating

Employee may only use his or her HSA for eligible medical expenses. The HSAs are administered

by Fidelity Investments ("**Fidelity**"), which receives from the Debtors an administrative fee of

approximately $3,000 per month.

52.    Eligible Employees have the opportunity to contribute, through pre-tax

compensation deductions, to full-purpose health-care flexible spending accounts (together with the

Dental and Vision FSAs, the "**FSAs**"). Contributions to the FSAs are one hundred percent (100%)

Employee-funded, and participating Employees may only use their FSAs for healthcare-related

expenses, commuter expenses, and dependent care expenses, subject to limits imposed by

applicable federal law. FSA deductions are taken from Employees' paychecks. To be reimbursed

---

[11]    In order to contribute to an HSA, eligible Employees also must not be covered under any non-HDHP health coverage, not have received any medical benefits during the previous three (3) months from the Indian Health Service or the US Department of Veterans affairs except for treatment for a service-connected disability, and not be claimed as a dependent on someone else's tax returns.

for these expenses, claims are adjudicated automatically, or Employees may submit eligible claims to Flores247 ("*Flores*").    Flores administers such claims under the FSAs and remits reimbursements to the relevant provider and/or Employee(s), as applicable.    Flores receives from the Debtors an administrative fee of approximately $5,000 per month.

53.    As of the Petition Date, the Debtors estimate that they owe approximately $39,000 in accrued but unpaid obligations on account of obligations arising under the FSAs and the HSAs. By this Motion, the Debtors are requesting the authority, but not direction, to (a) remit Employee HSA and FSA deductions withheld from Employees' prepetition paychecks but not yet forwarded to Fidelity or Flores, as applicable, (b) pay any prepetition administrative fees owed to Fidelity or Flores, as applicable, in connection with the HSAs and FSAs, and (c) continue honoring their obligations under the HSA and FSA programs postpetition in the ordinary course and consistent with their prepetition practices, each in accordance with the Approved Budget.

**IV.    Life and Disability Insurance**

54.    Regular Full-Time Employees receive, at the Debtors' cost, short-term disability coverage, long-term disability insurance, basic accidental death and dismemberment insurance, and life insurance (collectively, the "*Basic Insurance*").    Certain eligible Regular Full-Time Employees hired prior to January 1, 2019, receive, at the Debtors' cost, short-term disability coverage, long-term disability insurance, basic accidental death and dismemberment insurance, and life insurance (the "*Executive Life Insurance Plan*").    As of the Petition Date, thirty-three (33) Employees participate in the Executive Life Insurance Plan.    In addition, Regular Full-Time Employees may also choose to purchase supplemental life insurance and supplemental accidental death and dismemberment insurance (together with the Basic Insurance and the Executive Life Insurance Plan, the "*Life and Disability Insurance*") for themselves, their spouse and/or

dependent children.  All of the Life and Disability Insurance programs are administered through The Hartford Financial Services Group, Inc. (the "*Hartford*").

55.    The premiums for any Life and Disability Insurance purchased by eligible Employees are deducted from the applicable Employee's paychecks and reimbursed to the Debtors.  As of the Petition Date, the Debtors estimate that they owe approximately $160,000 in accrued but unpaid obligations on account of Life and Disability Insurance.

### V.    Employee Assistance Programs

56.    The Debtors provide eligible Employees with counseling services, wellness and other coaching and lifestyle management services, meditation lessons and classes, on demand workouts and audiobooks, health assessments, biometric screening, and team challenges through employee assistance programs provided by third parties.

57.    Regular Full-Time Employees receive, at the Debtors' cost, access to employee assistance programs (the "*Employee Assistance Programs*") provided through Health Advocate, Inc.  The Employee Assistance Programs include consultative services featuring unlimited 24/7 telephonic in-the-moment emotional well-being support and other online resources.  They also include access to legal and financial assistance and a personal health advocate that helps Employees navigate a wide variety of healthcare and insurance-related issues.  Additionally, the Debtors provide eligible Employees with wellness challenges and incentive programs to encourage healthy activities.

58.    As of the Petition Date, the Debtors estimate that they owe approximately $10,000 in accrued but unpaid obligations on account the Employee Assistance Programs.

VI.     **Voluntary Benefits Program & Employee Wellness Program**

59.     The Debtors offer a voluntary benefits program (the "***Voluntary Benefits Program***") to eligible Employees administered by certain third-party administrators including, MetLife, Inc. and Allstate Corporation.  The Voluntary Benefits Program allows participating Employees to participate in a variety of discounted or free benefits, such as home and automobile insurance, pet insurance, identity theft protection services, continuing education subscriptions, and legal services, certain of which may be deducted from the Employee's pay.

60.     The Debtors also offer to eligible Employees wellness challenges and incentive programs (the "***Employee Wellness Programs***") that are administered by WorkTango Inc. ("***WorkTango***") and Cigna.  Through the Employee Wellness Programs, Eligible Employees can receive cash awards and reward points ("***WorkTango Points***").  In the twelve (12) months prior to the Petition Date, the Debtors paid WorkTango, on average, approximately $25,000 per month in connection with the Employee Wellness Program.  In addition, eligible Employees enrolled in the Cigna Medical Plans can earn gift cards for completing certain health and wellness related goals (the "***MotivateMe Program***").  The Debtors pay the amount owed for gift cards redeemed by Employees under the MotivateMe Program and Cigna reimburses the Debtors directly, on a quarterly basis.

61.     As of the Petition Date, the Debtors estimate that they owe approximately $25,000 in accrued but unpaid obligations on account the Voluntary Benefits Program and $30,000 in accrued but unpaid obligations on account the Employee Wellness Programs.

F.     **SAVINGS AND OTHER RETIREMENT OBLIGATIONS**

62.     Regular Full-Time Employees automatically participate in the 2U 401(k) Plan, a qualified defined contribution plan administered by Fidelity (the "***401(k) Plan***"), for retirement savings for eligible Employees pursuant to section 401 of the Internal Revenue Code.  Under the

401(k) Plan, Employees may contribute up to seventy-five percent (75%) of their eligible earnings each year, subject to limits imposed by applicable law.  In addition, under the 401(k) Plan, the Debtors will match one hundred percent (100%) of the first two percent (2%) of the eligible Employee's contribution and fifty percent (50%) of the next four percent (4%) of the Employee's contribution (collectively, the "***401(k) Contributions***").  The Debtors make such matching contribution on a bi-weekly basis in accordance with their payroll schedule.  Matching contributions made on behalf of the Employees during the twelve (12) months prior to the Petition Date to the 401(k) Plan totaled approximately $7.3 million.

63.     As of the Petition Date, the Debtors estimate that they owe approximately $340,000 in accrued but unpaid obligations on account of prepetition matching contributions related to the 401(k) Plan.  Nonetheless, out of an abundance of caution, the Debtors request via this Motion authority, but not direction, to honor prepetition obligations arising out of the 401(k) Plan and continue their employee contribution matching program under the 401(k) Plan in the ordinary course and in accordance with the Approved Budget.

## G.     WORKERS' COMPENSATION

64.     Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and programs, or participate in workers' compensation programs administered by state governments, to provide their Employees with workers' compensation coverage for certain claims arising from or related to their employment with the Debtors.  The Employees are covered under a workers' compensation policy issued and administered by the Hartford (such policy, the "***Workers' Compensation Policy***").  On an annual basis, the Debtors pay premiums in the amount of approximately $300,000 per annum under the Workers' Compensation Policy.  Under the Workers' Compensation Policy, upon the filing of a

verified claim ("***Workers' Compensation Claim***") by an eligible Employee, the insurer pays the Workers' Compensation Claim amount directly to the Employee.

65.     It is critical that the Debtors be permitted to continue their workers' compensation program and to make payments in connection with outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business, because alternative arrangements for workers' compensation coverage would most certainly be more costly, and because the failure to provide coverage may subject the Debtors and/or their officers to severe penalties.  To facilitate the ordinary course handling of Workers' Compensation Claims, the Debtors further request authority, in their discretion, to lift the automatic stay of section 362 of the Bankruptcy Code to allow Workers' Compensation Claims to proceed under the Workers' Compensation Policy and to allow the Debtors, their affiliates, their insurance providers, and/or their third-party administrators to negotiate, settle, and/or litigate Workers' Compensation Claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

66.     As of the Petition Date, the Debtors believe that there are not any accrued and unpaid amounts owing on account of administrative costs for the Workers' Compensation Policy. Out of an abundance of caution, the Debtors request the authority, but not direction, to continue to honor their obligations related to the Workers' Compensation Claims in the ordinary course and consistent with their prepetition practices and in accordance with the Approved Budget, whether such obligations arose before or after the Petition Date.

## H.    PAYMENTS TO ADMINISTRATORS

67.    In addition to payroll processing services described above, the Debtors rely on certain third-party providers or administrators to administer and deliver other payments and benefits to the Employees (collectively, the "***Administrators***"),[12] all as described herein.

68.    In conjunction with the Debtors' payment of their prepetition Workforce Obligations and continued performance under Workforce programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary, to ensure uninterrupted delivery of certain benefits to the Workforce.   The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.   If the Debtors were required to replace the Administrators postpetition, it likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, the Debtors submit that paying claims owed to the Administrators is in the best interest of the Debtors' estates.   As of the Petition Date, the Debtors estimate that they owe approximately $80,000 in accrued but unpaid obligations on account of payments to Administrators, all of which is expected to become due and owing before the Final Hearing.

### BASIS FOR RELIEF

## A.    THE PROPOSED PAYMENTS OF THE WORKFORCE OBLIGATIONS ARE APPROPRIATE UNDER SECTION 363(b) OF THE BANKRUPTCY CODE

69.    To the extent that use of the property of the Debtors' estates is implicated here, the relief requested is appropriate under section 363(b) of the Bankruptcy Code.   Under section 363

---

[12]    For the avoidance of doubt, the term "***Administrators***" includes any Payroll Administrators.

of the Bankruptcy Code, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. *See* 11 U.S.C. § 363(b); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. *See In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)) (finding disposal of an asset of the estate under section 363(b) to be "permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application'"); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"). To the extent the payment of prepetition wages, expenses, and benefits is deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees, and the maintenance of positive employee morale provide a sufficient business justification for such payment. *See In re Iridium Operating LLC*, 478 F.3d at 466; *In re Montgomery Ward Holding Corp.*, 242 B.R. at 155.

70.     The relief requested in this Motion represents a sound exercise of the Debtors' business judgment as it is directed at preserving the resources and value of their estates. Continued payment, without interruption, of the Workforce Obligations, and the continued funding, without interruption, of the compensation and benefits plans, policies, programs, and practices attendant to such obligations, as described in this Motion, are vital to the Debtors' businesses and will ensure

a smooth transition into chapter 11 and enhance the success of these cases.  If the relief requested in this Motion is not granted, the Debtors' business operations will suffer to the detriment of the Debtors' estates, creditors, and other stakeholders.

71.     Any delay or failure to pay wages, salaries, benefits, retention programs, incentive programs, and other similar items would irreparably impair Workforce morale, dedication, confidence, and cooperation.  Also, any such delay or failure would adversely impact the Debtors' relationships with their Workforce, at a time when the support of their Workforce is critical to the success of the Chapter 11 Cases.  The Debtors simply cannot risk the substantial damage to their businesses that would result from any decline in Workforce morale.

72.     Without the relief requested in this Motion, the Workforce could also suffer undue hardship and, in many instances, serious financial difficulties, as some of the Workforce will likely need the amounts in question to meet their own personal financial obligations.  Failure to reimburse business-related expenses will cause Employees to worry about personal liability for business-related charges, a concern that would discourage Employees from devoting their full attention to the Debtors' businesses and restructuring efforts.  Accordingly, this Court should grant the requested relief under section 363(b) of the Bankruptcy Code.

**B.     MAINTAINING   AND   PAYING   THE   PREPETITION   WORKFORCE OBLIGATIONS IS AUTHORIZED UNDER SECTIONS 1107 AND 1108 OF THE BANKRUPTCY CODE**

73.     Authority for the maintenance and payment of the Workforce Obligations is found in sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr.  N.D. Tex. 2002).  Courts have recognized that implicit in the duties of a chapter 11 debtor in possession

is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

74.    The *CoServ* court held that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id*. That court specifically held that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id*. at 497-98. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*.

75.    Payment of prepetition Workforce Obligations meets each *CoServ* element. *First*, any failure by the Debtors to pay prepetition Workforce Obligations would have a severe negative impact on the morale of the Debtors' Workforce at a critical time for the Debtors and their businesses. Moreover, as described above, the Employees likely maintain priority claims against the Debtors in relation to many of the prepetition Workforce Obligations.

76.    *Second*, the potential harm and economic disadvantage that would stem from the Debtors inability to pay prepetition Workforce Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid. Absent payment of prepetition Workforce Obligations, Workforce morale would decrease dramatically, likely leading to the loss of key

personnel and other severe business disruptions costing far in excess of the amount of such obligations.

77.     *Third*, the Debtors have examined other options in place of payment of prepetition Workforce Obligations and have determined that, to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of the Workforce Obligations.  Therefore, the Debtors respectfully submit that they can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the prepetition Workforce Obligations.

## C.     PAYING THE PREPETITION WORKFORCE OBLIGATIONS IS NECESSARY TO THE DEBTORS' REORGANIZATION AND SHOULD BE APPROVED

78.     The Debtors should also be authorized to pay the Workforce Obligations under section 105(a) of the Bankruptcy Code and the "doctrine of necessity."  Section 105(a) of the Bankruptcy Code empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Under section 105(a), courts may authorize preplan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr.  S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization.").  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their business in order to effect a successful reorganization through, among other things, preservation of the Debtors' Workforce and its morale and productivity, payment of the Workforce Obligations as requested herein is proper in accordance with section 105(a) of the Bankruptcy Code.  Payment of prepetition Workforce Obligations is

further supported by the doctrine of necessity, which this Court is empowered to invoke (under appropriate circumstances) under section 105(a).[13]   The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (Bankr.  D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); *see also In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr.  E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor."); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr.  E.D. Va. 1992) ("the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor").

79.     The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence.  *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546-47 (Bankr.  W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); *see also In re Columbia Gas Sys., Inc.*, 171

---

[13]   This Court's power to utilize the doctrine of necessity in Chapter 11 Cases derives from this Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport C & Sw. Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See id.* at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*.  *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("in order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious, jeopardy").

B.R. 189, 191-92 (Bankr. D. Del. 1994); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175-76 (Bankr. S.D.N.Y. 1989).

80.    Further, the importance of a debtor's employees to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Jul. 22, 2022) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a final basis); *In re GTT Commc'ns., Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021) (same); *In re Jason Indus. Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Jul. 27, 2020) (same); *In re Frontier Commc'ns. Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. May 26, 2020) (same); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019) (same). Absent payment of the Workforce Obligations, the Debtors' businesses and operations will be detrimentally impacted through the reduction in Workforce morale and the potential loss of key personnel during a critical time for the Debtors and their businesses.

81.    Because of the adverse consequences that could follow if the Workforce Obligations are not paid, doing so is necessary to the Debtors' reorganization. The potential disruption and distraction that would occur if the Debtors failed to honor these obligations could thwart the Debtors' efforts to maximize value and reorganize successfully. Accordingly, the Debtors respectfully request that this Court authorize the Debtors to pay the Workforce Obligations under section 105(a) of the Bankruptcy Code and the necessity of payment doctrine.

## D.    THE PREPETITION WORKFORCE OBLIGATIONS CONSTITUTE PRIORITY CLAIMS

82.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, severance and vacation pay be accorded priority in payment in an

amount not to exceed $15,150 for each individual.  In chapter 11, priority claims must be paid in full.  Accordingly, granting the relief requested with respect to the priority portion of prepetition Workforce Obligations will not adversely affect the Debtors' other unsecured creditors.

83.     The Debtors believe that, as of the Petition Date, most of the Employees are not owed wages in excess of the $15,150 statutory cap pursuant to section 507(a)(4) of the Bankruptcy Code.  However, certain of the prepetition obligations owed under the Severance Program and a few of the Employees' wages (when factoring in commissions and/or bonuses) will likely exceed the $15,150 statutory cap.  Additionally, the amounts of certain prepetition Workforce Obligations, such as Employee Benefits Obligations, are unknown pending submission of claims and, therefore, the Debtors do not know the exact amount due on account of each Employee for the prepetition period.  To the extent that Employees are owed aggregate amounts in excess of the priority cap, or amounts that are otherwise not entitled to priority status, the Debtors submit that payment of the prepetition Workforce Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified under the authority discussed below.

**E.    CONTINUING TO MAKE SEVERANCE PAYMENTS TO EMPLOYEES IS REASONABLE AND REPRESENTS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT**

84.     Moreover, the Debtors submit that their ability to continue to make severance payments and honor any obligations under the Severance Program, and specifically the Severance Plans, are authorized under sections 363(b) and 503(c) of the Bankruptcy Code.  Importantly, because the Debtors do not propose to make any severance payments to any Insiders, the pre-existing severance obligations are not subject to the heightened standards of sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code.  *See* 11 U.S.C. § 503(c)(1) and (2) (applying only to insiders).

85.     Instead, pursuant to section 503(c)(3) of the Bankruptcy Code, continuing to honor severance obligations and make severance payments to non-Insider Employees only requires a

36

showing that it is "justified by the facts and circumstances of" the Debtors' chapter 11 cases. *See* 11 U.S.C. § 503(c)(3). This standard, in turn, is essentially the same as the business judgment standard that is applied under section 363(b) of the Bankruptcy Code. *See In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Global Home Prods. LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363").

86.     The Debtors submit that continuing to make severance payments to non-Insiders is a sound exercise of their business judgment and in the best interests of their estates. Importantly, the severance obligations are intended to incentivize compliance with applicable restrictive covenants, are given as consideration for a release of claims by non-Insider Employees, and protect the non-Insider Employees in the ordinary operations of the Debtors' business operations. The Debtors therefore believe that it is necessary to continue honoring severance obligations to non-Insiders on a postpetition basis, especially in light of the damage to morale that would result if any severance obligations to non-Insiders are not honored on a postpetition basis. Accordingly, the Debtors request that this Court authorize the Debtors to continue making severance payments, only upon entry of the Proposed Final Order, to non-Insiders in the ordinary course of business and in accordance with the Approved Budget, including payment of prepetition obligations related thereto, if any.

## F.    FUNDS RELATED TO THE PAYROLL TAXES AND PAYROLL DEDUCTION OBLIGATIONS MAY BE HELD IN TRUST AND ARE NOT PROPERTY OF THE ESTATES

87.     Payroll Taxes withheld from an Employee's wages and any other Payroll Deduction Obligations are collected or withheld by the Debtors and may be held in trust for the benefit of the

applicable taxing authority.  As a result, Payroll Taxes and other Payroll Deduction Obligations

are not property of the Debtors' estates under section 541 of the Bankruptcy Code, and those funds,

therefore, are not available for the satisfaction of creditors' claims.  *See, e.g.*, *Begier v. IRS*, 496

U.S. 53 (1990) (stating that withheld taxes are property held by the debtor in trust for another and,

as such, not property of the debtor's estate); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92,

95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income

tax from its employees' wages created a trust relationship between the debtor and the city for

payment of withheld income taxes); *see generally In re Columbia Gas Sys. Inc.*, 997 F.2d 1039,

1060 (3d Cir. 1993) (indicating that even if a statute does not establish an express trust, a

constructive trust may be found).  Instead, the Debtors may be obligated to remit these funds to

the applicable taxing authority.

88.     Many federal, state, and local statutes also impose personal liability on officers and

directors of companies for certain Payroll Taxes and other Payroll Deduction Obligations.  To the

extent that the relevant Payroll Taxes and other Payroll Deduction Obligations remain unpaid by

the Debtors, the Debtors' managers, directors, officers, and executives may be subject to lawsuits

or criminal prosecution during the pendency of the Chapter 11 Cases.  Any such lawsuit or criminal

prosecution (and the ensuing potential liability) would distract the Debtors and their managers,

directors, officers, and executives from devoting their full attention to the Debtors' businesses and

the orderly administration of the Chapter 11 Cases.  The Debtors believe that these distractions

would materially undermine their ability to operate in the ordinary course of business and to

administer the Chapter 11 Cases, with resulting detriment to any parties in interest.

## G.     PRECEDENT CASES SUPPORT GRANT OF THE REQUESTED RELIEF

89.     The relief requested in this Motion is similar to relief granted by numerous courts,

including this Court in other chapter 11 cases in this district.  *See, e.g.*, *In re Credivalores -*

*Crediservicios S.A.*, Case No. 24-10837 (DSJ) (Bankr. S.D.N.Y. June 12, 2024) [Docket No. 72]

(authorizing Debtors to pay prepetition employee obligations and continue employee benefit

programs, and granting related relief); *In re Acorda Therapeutics, Inc.*, Case No. 24-22284 (DSJ)

(Bankr. S.D.N.Y. Apr. 26, 2024) [Docket No. 102] (same); *In re GOL Linhas Aèreas Inteligentes*

*S.A.*, Case No. 24-10118 (MG) (Bankr. S.D.N.Y. Feb. 27, 2024) [Docket No. 198] (same); *In re*

*Troika Media Grp., Inc.*, Case No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Jan. 2, 2024) [Docket No.

67] (same); *In re Mercon Coffee Corp.*, Case No. 23-11945 (MEW) (Bankr. S.D.N.Y. Jan. 10,

2024) [Docket No. 102] (same); *In re Benitago Inc.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y.

Sept. 28, 2023) [Docket No. 68] (same); *In re Voyager Aviation Holdings, LLC*, Case No.

23-11177 (JPM) (Bankr. S.D.N.Y. Sept. 1, 2023) [Docket No. 151] (same); *In re Vice Grp.*

*Holding Inc.*, Case No. 23-10738 (JPM) (Bankr. S.D.N.Y. July 5, 2023) [Docket No. 247] (same);

*In re PacificCo Inc.*, Case No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023) [Docket No. 150]

(same); *In re SVB Fin. Grp.*, Case No. 23-10367 (MG) (Bankr. S.D.N.Y. June 29, 2023) [Docket

No. 372] (same); *In re Rockley Photonics Holdings Ltd.*, Case No. 23-10081 (LGB) (Bankr.

S.D.N.Y. Jan. 26, 2023) [Docket No. 21] (same); *In re Genesis Glob. Holdco, LLC*, Case No.

23-10063 (SHL) (Bankr. S.D.N.Y. Feb. 24, 2023) [Docket No. 100] (same); *In re Lumileds*

*Holding B.V.*, Case No. 22-11155 (LGB) (Bankr. S.D.N.Y. Sept. 21, 2022) [Docket No. 129]

(same); *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Aug. 4, 2022) [Docket No.

174] (same).

## H.    THIS COURT SHOULD AUTHORIZE BANKS TO HONOR AND PAY CHECKS ISSUED AND ELECTRONIC FUNDS TRANSFERRED TO PAY THE PREPETITION WORKFORCE OBLIGATIONS

90.     The Debtors further request that this Court authorize, but not direct, their banking

institutions and all other applicable banks and other financial institutions to receive, process,

honor, and pay any and all checks drawn or electronic funds relating to the prepetition Workforce

Obligations, regardless of whether such checks were presented before or after the Petition Date. The Debtors expect to have sufficient liquidity to pay such amounts as they become due in the ordinary course of business, and under the Debtors' existing cash management system, checks or wire transfer requests can be readily identified as relating to an authorized payment of the prepetition Workforce Obligations. As such, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Debtors also seek authority to issue new postpetition checks or effect new electronic fund transfers, on account of the prepetition Workforce Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

## I.   THE AUTOMATIC STAY SHOULD BE MODIFIED FOR WORKERS' COMPENSATION CLAIMS

91.   Section 362(a) of the Bankruptcy Code "operates as a stay, applicable to all entities, of—the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." *See* 11 U.S.C. § 362(a)(1).

92.   Section 362(d) of the Bankruptcy Code, however, permits a debtor or other party in interest to request a modification or termination of the automatic stay "for cause." There is cause to modify the automatic stay, because staying the Workers' Compensation Claims could cause employee departures or otherwise harm Employee morale, which could severely disrupt the Debtors' businesses and prevent a successful reorganization. Accordingly, the Debtors request

this Court authorize the Debtors, in their discretion, to agree to modify the automatic stay under

section 362 of the Bankruptcy Code with respect to the Workers' Compensation Claims.

**J.      BANKRUPTCY RULE 6003 HAS BEEN SATISFIED, AND BANKRUPTCY
RULE 6004 SHOULD BE WAIVED**

93.      Certain aspects of the relief requested herein may, if granted, be subject to

Bankruptcy Rule 6003.  Under Bankruptcy Rule 6003, this Court may grant a motion to "use . . .

property of the estate, including a motion to pay all or part of a claim that arose before the filing

of the petition" within twenty-one (21) days after the chapter 11 case's commencement to the

extent "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr.  P. 6003.

The Debtors believe an immediate and orderly transition into Chapter 11 is critical to the viability

of their operations and the success of these Chapter 11 Cases.  As discussed in detail above and in

the Kocovski Declaration, immediate and irreparable harm would result if the relief herein is not

granted.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable

harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that this Court

approve the relief requested in this Motion on an emergency basis.

94.      Additionally, with respect to any aspect of the relief sought herein that constitutes

a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the fourteen-

day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in

this Motion is immediately necessary for the Debtors to be able to continue to operate their

businesses and preserve the value of their estates.  The Debtors thus submit that the requested

waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay

imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought

herein justifies immediate unstayed relief.

**RESERVATION OF RIGHTS**

95.     Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If this Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**MOTION PRACTICE**

96.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

**NOTICE**

97.     Notice of this Motion will be given to:  (a) the United States Trustee for Region 2; (b) Milbank LLP as counsel to the First Lien Ad Hoc Group; (c) the administrative agent and

collateral agent under the first lien credit agreement; (d) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Noteholder Group; (e) Schulte Roth & Zabel LLP as counsel to Greenvale; (f) the indenture trustees for the Notes; (g) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (h) the United States Attorney's Office for the Southern District of New York; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) all parties entitled to notice pursuant to Local Rule 9013-1(b).  The Debtors submit that, under the circumstances, no other or further notice is required.

98.     A copy of this Motion is available from (a) this Court's website, www.nysb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/2U.

## NO PRIOR MOTION

99.     The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other court.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that this Court enter the Proposed Interim Order and, following a noticed hearing on the relief sought, the Proposed Final Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

**LATHAM & WATKINS LLP**

Dated:    July 25, 2024              By:    _/s/ George A. Davis_
          New York, New York               George A. Davis
                                           George Klidonas
                                           Anupama Yerramalli
                                           Randall C. Weber-Levine
                                           Scott Yousey
                                           1271 Avenue of the Americas
                                           New York, NY 10020
                                           Telephone: (212) 906-1200
                                           Facsimile: (212) 751-4864
                                           Email:  george.davis@lw.com
                                                   george.klidonas@lw.com
                                                   anu.yerramalli@lw.com
                                                   randall.weber-levine@lw.com
                                                   scott.yousey@lw.com

                                           _Proposed Counsel to the Debtors and Debtors in Possession_

## EXHIBIT A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

## INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO
## (I) SATISFY PREPETITION WORKFORCE OBLIGATIONS AND
## (II) CONTINUE WORKFORCE PROGRAMS ON A POSTPETITION BASIS;
## (B) GRANTING RELIEF FROM AUTOMATIC STAY WITH RESPECT TO
## WORKERS' COMPENSATION CLAIMS; AND (C) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of the Debtors for an interim order (this "***Interim Order***"):  (a) authorizing, but not directing, the Debtors to (i) satisfy certain prepetition Workforce Obligations and (ii) maintain and continue such Workforce Programs on a postpetition basis; and (b) modify the automatic stay with respect to Workers' Compensation Claims; and this Court having reviewed the Motion and the First Day Declarations; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and this Court having authority to enter a final order

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

consistent with Article III of the United States Constitution; and venue being proper before this

Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the

Motion has been given and that no other or further notice is necessary; and a hearing having been

held to consider the relief requested in the Motion (the "*Hearing*"); and upon the First Day

Declarations and the record of the Hearing and all the proceedings before this Court; and after due

deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is GRANTED on an interim basis, as set forth herein.

2. All objections to the entry of this Interim Order, to the extent not withdrawn or
settled, are overruled.

3. The Debtors (or any applicable Administrator on behalf of, and as directed by, the
Debtors) are authorized, but not directed, to pay or otherwise honor all prepetition Workforce
Obligations (including, but not limited to, all Employee Benefits Obligations, Contracted Labor
Obligations, and Independent Director Compensation obligations) consistent with past practices,
and the Approved Budget; *provided*, that nothing in the Motion or this Interim Order shall be
deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of
the Final Hearing (as defined below) to consider the relief requested in the Motion.
Notwithstanding any other provision of this Interim Order, the Debtors are only authorized to
honor Workforce Obligations coming due prior to the date of the Final Hearing.

4. The Debtors are authorized, but not directed, to honor, continue, and renew their
Workforce Programs that were in effect as of the Petition Date, in the ordinary course of business,
and in the same manner and on the same basis as the Debtors honored and continued such
Workforce Programs before the Petition Date, and in accordance with the Approved Budget.

5.      The Debtors are authorized but not directed, in their discretion and business judgment, to withhold all foreign, federal, state, and local taxes relating to the Workforce Obligations as required by applicable law.

6.      The Debtors shall not make any bonus, incentive, or retention payments to any Insiders without further order of this Court.

7.      No payment to any Employee or other party may be made pursuant to this Interim Order to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code under a separate motion.

8.      The Debtors' banks and financial institutions are authorized to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts before the Petition Date for the prepetition Workforce Obligations (including, but not limited to, the Employee Benefits Obligations, Contracted Labor Obligations, and Independent Director Compensation obligations) that have not been honored and paid as of the Petition Date (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and are authorized to rely on the Debtors' directions or representations as to which checks, drafts, transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Interim Order; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such payments, and any such banks and financial institutions shall not have any liability to any party for relying on such directions or representations by the Debtors as provided in this Interim Order.

9.      The Debtors are authorized, but not directed, to reissue payment for the prepetition Workforce Obligations, the prepetition Contracted Labor Obligations, and the prepetition

Independent Director Compensation obligations and to replace any inadvertently dishonored or rejected payments in accordance with the Approved Budget. Further, the Debtors are authorized to reimburse any expenses that Employees or Contract Workers may incur as a result of any bank's failure to honor a prepetition check in accordance with the Approved Budget.

10.    The Debtors are authorized, but not directed, to continue their Workers' Compensation Policies and to pay or set off any outstanding prepetition claims, taxes, charges, assessments, premiums, and Administrator fees arising under the Workers' Compensation Policies and or programs in which they participate in accordance with the Approved Budget. In addition, the Debtors are authorized, in their discretion, (i) to agree to modify the automatic stay of section 362 of the Bankruptcy Code, without further order of this Court, (a) to allow Workers' Compensation Claims to proceed under the applicable Workers' Compensation Policy and (b) to allow the Debtors' insurance providers and/or third-party administrators to negotiate, settle, and/or litigate Workers' Compensation Claims, and (ii) to pay resulting amounts, whether such claims arose before or after the Petition Date consistent with past practices and the Approved Budget.

11.    The Debtors are authorized to pay amounts owed in connection with claims of the Administrators in connection with administering and delivering payments or providing other services and benefits to the Workforce for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Administrators in accordance with the Approved Budget. Any amounts owed by the Debtors to the Administrators are captured within the amounts set out for the Workforce Obligations for which the Debtors are seeking relief in the Motion.

12.    Any authorization under this Interim Order to pay, and the payment of, any amounts on account of the prepetition Workforce Obligations shall not affect the Debtors' right to contest

the amount or validity of any of the prepetition Workforce Obligations, including, without limitation, any amounts that may be due to any taxing authority.

13.    Notwithstanding anything to the contrary in the Motion or this Interim Order (subject to paragraph 13 herein), the Debtors retain their right to, in the ordinary course of business, (a) modify, change, and discontinue any Workforce Program, and (b) implement new programs, policies, and practices with respect to the Workforce Obligations during these Chapter 11 Cases without the need for further Court approval to the extent such action is authorized by applicable law.

14.    Notwithstanding the relief granted in this Interim Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order and the DIP Credit Documents (as defined in the DIP Order) and any orders governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating to the foregoing). Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Credit Documents. To the extent there is any inconsistency between the terms of the DIP Order, the DIP Credit Documents, or any orders approving the Debtors' use of cash collateral, and the terms of this Interim Order, the terms of the DIP Order, the DIP Credit Documents, and such order approving the use of cash collateral, as applicable, shall control.

15.    Notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in the Motion or this Interim Order shall create any rights in favor of, or enhance, limit or change the status of any claim held by, any member of the Workforce or other person.

16.    The final hearing on the Motion (the "*Final Hearing*") will be held on [ ● ], at [ ● ] [ ● ].m. (Eastern Time). Any objections or responses to entry of a final order on the Motion

must be filed on or before 4:00 p.m. (Eastern Time) on [ ● ], 2024, and served on the following parties: (a) United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee, 1 Bowling Green, Room 534, New York, NY 10004 (Attn: Rachael E. Siegel (rachael.e.siegel@usdoj.gov), Daniel Rudewicz (daniel.rudewicz@usdoj.gov), and Brian Masumoto (brian.masumoto@usdoj.gov)); (b) 2U, Inc., 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202 (Attn: Paul S. Lalljie (plalljie@2u.com), Matthew Norden (mnorden@2u.com), and Lillian Brownstein (lbrownstein@2u.com)); (c) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis (george.davis@lw.com), George Klidonas (george.klidonas@lw.com), Anupama Yerramalli (anu.yerramalli@lw.com), Randall C. Weber-Levine (randall.weber-levine@lw.com) and Scott Yousey (scott.yousey@lw.com)), proposed counsel for the Debtors; (d) Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Albert A. Pisa (apisa@milbank.com), Tyson Lomazow (tlomazow@milbank.com), and Abigail Debold (adebold@milbank.com)), counsel for the First Lien Ad Hoc Group; (e) Weil, Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153 (Attn: Matt Barr (matt.barr@weil.com), David Griffiths (david.griffiths@weil.com), and F. Gavin Andrews (f.gavin.andrews@weil.com)), counsel for the Ad Hoc Noteholder Group; (f) Schulte, Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Kristine Manoukian (kristine.manoukian@srz.com), Kelly Knight (kelly.knight@srz.com), and Reuben E. Dizengoff (reuben.dizengoff@srz.com)), counsel to Greenvale; and (g) counsel to any statutory committee appointed in these Chapter 11 Cases. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

17.      Nothing in the Motion or this Interim Order or the relief granted herein (including any actions taken or payments made by the Debtors), is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Interim Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

18.      The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

19.      Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Interim Order shall be effective and enforceable immediately upon entry hereof.

20.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

21.      The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Interim Order.

22.     This Court retains jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated:_____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

### FINAL ORDER (A) AUTHORIZING THE DEBTORS TO (I) SATISFY PREPETITION WORKFORCE OBLIGATIONS AND (II) CONTINUE WORKFORCE PROGRAMS ON A POSTPETITION BASIS; (B) GRANTING RELIEF FROM AUTOMATIC STAY WITH RESPECT TO WORKERS' COMPENSATION CLAIMS; AND (C) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of the Debtors for a final order (this "***Final Order***"): (a) authorizing, but not directing, the Debtors to (i) satisfy certain prepetition Workforce Obligations and (ii) maintain and continue such Workforce Programs on a postpetition basis; and (b) modify the automatic stay with respect to Workers' Compensation Claims; and this Court having reviewed the Motion and the First Day Declarations; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and this Court having authority to enter a final order

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

consistent with Article III of the United States Constitution; and venue being proper before this

Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the

Motion has been given and that no other or further notice is necessary; and a hearing having been

held, if necessary, to consider the relief requested in the Motion (the "*Hearing*"); and upon the

First Day Declarations and the record of the Hearing and all the proceedings before this Court; and

after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis, as set forth herein.

2.      All objections to the entry of this Final Order, to the extent not withdrawn or settled,
are overruled.

3.      The Debtors (or any applicable Administrator on behalf of, and as directed by, the
Debtors) are authorized, but not directed, to pay or otherwise honor all prepetition Workforce

Obligations (including, but not limited to, all Employee Benefits Obligations, Contracted Labor

Obligations, and Independent Director Compensation obligations) consistent with past practices

and the Approved Budget.

4.      The Debtors are authorized, but not directed, to honor, continue, and renew their
Workforce Programs that were in effect as of the Petition Date, in the ordinary course of business,

and in the same manner and on the same basis as the Debtors honored and continued such

Workforce Programs before the Petition Date, and in accordance with the Approved Budget.

5.      The Debtors are authorized but not directed, in their discretion and business
judgment, to withhold all foreign, federal, state, and local taxes relating to the Workforce

Obligations as required by applicable law.

6.      The Debtors shall not make any bonus, incentive, or retention payments to any Insiders without further order of this Court.

7.      The Debtors' banks and financial institutions are authorized to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts before the Petition Date for the prepetition Workforce Obligations (including, but not limited to, the Employee Benefits Obligations, Contracted Labor Obligations, and Independent Director Compensation obligations) that have not been honored and paid as of the Petition Date (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and are authorized to rely on the Debtors' directions or representations as to which checks, drafts, transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Final Order; *provided* that sufficient funds are on deposit in the applicable bank accounts to cover such payments, and any such banks and financial institutions shall not have any liability to any party for relying on such directions or representations by the Debtors as provided in this Final Order.

8.      The Debtors are authorized, but not directed, to reissue payment for the prepetition Workforce Obligations, the prepetition Contracted Labor Obligations, and the prepetition Independent Director Compensation obligations and to replace any inadvertently dishonored or rejected payments in accordance with the Approved Budget.  Further, the Debtors are authorized to reimburse any expenses that Employees or Contract Workers may incur as a result of any bank's failure to honor a prepetition check in accordance with the Approved Budget.

9.      The Debtors are authorized, but not directed, to continue their Workers' Compensation Policies and to pay or set off any outstanding prepetition claims, taxes, charges, assessments, premiums, and Administrator fees arising under the Workers' Compensation Policies

and or programs in which they participate in accordance with the Approved Budget. In addition, the Debtors are authorized, in their discretion, (i) to agree to modify the automatic stay of section 362 of the Bankruptcy Code, without further order of this Court, (a) to allow Workers' Compensation Claims to proceed under the applicable Workers' Compensation Policy and (b) to allow the Debtors' insurance providers and/or third-party administrators to negotiate, settle, and/or litigate Workers' Compensation Claims, and (ii) to pay resulting amounts, whether such claims arose before or after the Petition Date, consistent with past practices and the Approved Budget.

10.     The Debtors are authorized to pay amounts owed in connection with claims of the Administrators in connection with administering and delivering payments or providing other services and benefits to the Workforce for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Administrators in accordance with the Approved Budget. Any amounts owed by the Debtors to the Administrators are captured within the amounts set out for the Workforce Obligations for which the Debtors are seeking relief in the Motion.

11.     Any authorization under the Interim Order or this Final Order to pay, and the payment of, any amounts on account of the prepetition Workforce Obligations shall not affect the Debtors' right to contest the amount or validity of any of the prepetition Workforce Obligations, including, without limitation, any amounts that may be due to any taxing authority.

12.     Notwithstanding anything to the contrary in the Motion, the Interim Order, or this Final Order, the Debtors retain their right to, in the ordinary course of business, (a) modify, change, and discontinue any Workforce Program and (b) implement new programs, policies, and practices with respect to the Workforce Obligations during these Chapter 11 Cases without the need for further Court approval to the extent such action is authorized by applicable law.

13.     Notwithstanding the relief granted in this Final Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order and the DIP Credit Documents (as defined in the DIP Order) and any orders governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating to the foregoing).  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Credit Documents.  To the extent there is any inconsistency between the terms of the DIP Order, the DIP Credit Documents, or any orders approving the Debtors' use of cash collateral, and the terms of this Final Order, the terms of the DIP Order, the DIP Credit Documents, and such order approving the use of cash collateral, as applicable, shall control.

14.     Notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in the Motion, the Interim Order, or this Final Order shall create any rights in favor of, or enhance, limit or change the status of any claim held by, any member of the Workforce or other person.

15.     Nothing in the Motion, the Interim Order, or this Final Order, or the relief granted herein (including any actions taken or payments made by the Debtors), is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt,

or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Final Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

16.    The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

17.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final Order shall be effective and enforceable immediately upon entry hereof.

18.    The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Final Order.

19.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated:_____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE