**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR
INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO
(I) CONTINUE USE OF EXISTING CASH MANAGEMENT SYSTEM, INCLUDING
MAINTENANCE OF EXISTING BANK ACCOUNTS, CHECKS, AND BUSINESS
FORMS, (II) CONTINUE EXISTING DEPOSIT PRACTICES, (III) WAIVE CERTAIN
U.S. TRUSTEE GUIDELINES, AND (IV) CONTINUE INTERCOMPANY
TRANSACTIONS; (B) GRANTING SUPERPRIORITY STATUS TO POSTPETITION
INTERCOMPANY CLAIMS; AND (C) GRANTING RELATED RELIEF**

The debtors in possession (collectively, the "***Debtors***") in the above-captioned cases (the

"***Chapter 11 Cases***") hereby file this motion (this "***Motion***") and respectfully state as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in

the forms attached hereto as, respectively, **Exhibit A** (the "***Proposed Interim Order***") and

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

**Exhibit B** (the "***Proposed Final Order***" and, together with the Proposed Interim Order, the "***Proposed Orders***"): (a) authorizing, but not directing, the Debtors, to (i) continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms, (ii) continue their existing deposit practices, (iii) waive certain bank account and related guidelines of the Office of the United States Trustee for the Southern District of New York (the "***U.S. Trustee***," and such guidelines, the "***U.S. Trustee Guidelines***") and the requirements of section 345(b) of title 11 of the United States Code, 11 U.S.C. §§ 101– 1532 (the "***Bankruptcy Code***"), to the extent inconsistent with the Debtors' practices under their existing cash management system or other actions described herein, (iv) continue certain ordinary course intercompany transactions, including honoring and paying prepetition intercompany claims among Debtors and Non-Debtor Affiliates (as defined below), and (v) open and close bank accounts; (b) granting superpriority status to postpetition intercompany claims arising from certain intercompany transactions; and (c) granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of New York (this "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a), 345, 363, 503(b), 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

## BACKGROUND

5.      The Debtors comprise a leading online education technology company providing over eighty million people worldwide with access to high-quality education, including graduate, undergraduate, and non-degree programs.  Through a comprehensive platform, the Debtors enable non-profit universities and colleges to offer a wide range of online courses and programs.  These span diverse fields such as artificial intelligence, data science, business, healthcare, and education, with over 4,600 programs accessible on the Debtors' platform, edX.org, which provides learners with essential information on admissions, enrollment requirements, application processes, curriculum, tuition, and completion times.  By consolidating a vast array of educational offerings on a single platform, the Debtors offer flexible and affordable pathways for achieving professional and educational goals.  Although operations are predominantly remote, the majority of the Debtors' revenue flows into New York, where the Debtors hold their primary bank accounts, and where they collaborate with prestigious institutions of higher education (many of which are located here in New York City, including New York University, Columbia University, and Fordham University), enhancing their reach and impact within the city and state.

6.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing these Chapter 11 Cases.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No

trustee or examiner has been requested, and no committee has been appointed in these Chapter 11
Cases.

7.        The factual background regarding the Debtors, including their business operations,
their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is
set forth in detail in the *Declaration of Matthew Norden, Chief Legal Officer and Chief Financial
Officer of the Debtors, in Support of Chapter 11 Petitions* (the "**Norden Declaration**") and the
*Declaration of William Kocovski in Support of Chapter 11 Petitions and First Day Motions* (the
"**Kocovski Declaration**" and, together with the Norden Declaration, the "**First Day Declarations**")
filed contemporaneously herewith, which are fully incorporated herein by reference.[2]

8.        These Chapter 11 Cases are "prepackaged" cases commenced for the purpose of
implementing an agreed restructuring of the Debtors' debt.  Prior to the Petition Date, the Debtors
entered into the Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended,
modified or supplemented, the "**Restructuring Support Agreement**") with certain creditors
including (a) an ad hoc group of certain holders (the "**Ad Hoc Noteholder Group**") of 2.25%
convertible senior notes due May 1, 2025, issued under that certain Indenture, dated as of April
23, 2020 (the "**2025 Notes**") and 4.50% senior unsecured convertible notes due February 1, 2030,
issued under that certain Indenture, dated as of January 11, 2023 (the "**2030 Notes**" and, together
with the 2025 Notes, the "**Notes**") represented by Weil, Gotshal & Manges LLP, (b) Greenvale
Capital LLP ("**Greenvale**" and, together with the Ad Hoc Noteholder Group, the "**Consenting
Noteholders**") as holder of the Notes represented by Schulte Roth & Zabel LLP, and (c) an ad hoc
group of certain First Lien Lenders (the "**First Lien Ad Hoc Group**" and, together with the

---

[2]    Capitalized terms used, but not defined in this Motion have the meanings ascribed to them in the First Day
Declarations.

Consenting Noteholders, the "**Consenting Stakeholders**") represented by Milbank LLP. As of July 24, 2024, the Consenting Stakeholders held approximately 82% of the Debtors' first lien funded debt, 86.9% of the 2025 Notes, and 95.2% of the 2030 Notes.

9.      On the Petition Date, the Debtors filed a plan of reorganization reflecting the terms of the Restructuring Support Agreement (as may be amended, modified or supplemented, the "**Plan**") in addition to a disclosure statement with respect to the Plan (as may be amended, modified or supplemented, the "**Disclosure Statement**"). The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.[3]

10.     Prior to the Petition Date, the Debtors commenced solicitation of votes on the Plan from holders of Class 3 First Lien Claims and Class 4 Unsecured Notes Claims (each as defined in the Plan), the only classes entitled to vote under the Plan. Subject to this Court's approval, votes with respect to the Plan are due on August 21, 2024. On the Petition Date, the Debtors filed a motion seeking, among other things, (a) conditional approval of the Disclosure Statement, and (b) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan. The Debtors seek to obtain confirmation of the Plan as quickly as this Court's schedule and requisite notice periods will permit.

## THE DEBTORS' BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

### A.      OVERVIEW OF THE CASH MANAGEMENT SYSTEM

11.     In the ordinary course of their businesses, the Debtors maintain a cash management system (the "**Cash Management System**") that includes (a) operating accounts; (b) payroll accounts; (c) collection accounts; (d) money market accounts (one of which will be used to hold

---

[3]      Contemporaneously with filing this Motion, the Debtors are filing a motion to seek this Court's authorization to reject certain unexpired commercial real property leases.

adequate assurance deposits for the Debtors' utility providers); (e) an account for receiving the proceeds of the DIP Facility (as defined in the DIP Motion);[4] (f) an account established for receiving proceeds from the Equity Rights Offering; (g) a professional fee escrow account; (h) a certificate of deposit account; (i) a restricted cash account; and (j) certain bank accounts held by the Debtors' non-Debtor affiliates (the "**Non-Debtor Affiliates**" and, together with the Debtors, the "**Company**").  The Cash Management system is integral to the operation and administration of the Debtors' businesses.   Specifically, the Cash Management System allows the Debtors to: (a) monitor and control all of their cash receipts and disbursements to and from the Bank Accounts (as defined below); (b) identify their cash requirements; (c) transfer cash as needed in light of those cash requirements; and (d) track intercompany cash transfers between Debtors, as well as between Debtors and Non-Debtor Affiliates.   The Debtors believe that the Cash Management System is similar to those used by other companies of similar size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.  The Cash Management System is managed by finance personnel who work remotely in either the United States or South Africa and oversee the administration of the various bank accounts, including the collection, disbursement, and transfer of cash within the United States and abroad, as well as among and between the Debtors and their Non-Debtor Affiliates.  Because of the nature of the Debtors' businesses, any disruption of the Cash Management System would be materially detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.

---

[4]    "**DIP Motion**" means the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief*, filed contemporaneously herewith.

## B.     THE BANK ACCOUNTS AND FLOW OF FUNDS

12.     As of the Petition Date, the Debtors maintain twenty-three (23) accounts (the "***Bank Accounts***"), including (a) operating accounts; (b) payroll accounts; (c) collection accounts; (d) money market accounts (one of which will be used to hold adequate assurance deposits for the Debtors' utility providers); (e) an account for receiving the proceeds of the DIP Facility; (f) an account established for receiving proceeds from the Equity Rights Offering; (g) a professional fee escrow account; (h) a certificate of deposit account; and (i) a restricted cash account.  All of the Bank Accounts are held at either JPMorgan Chase Bank, National Association ("***JPM***"), Bank of America, N.A. ("***Bank of America***"), Comerica Bank ("***Comerica***"), Flagstar Bank, N.A. ("***Flagstar***"), Citizens Bank, N.A. ("***Citizens***"), or American Express National Bank ("***AmEx***") (collectively, the "***Cash Management Banks***").  As of the Petition Date, the aggregate balance of funds held in the Bank Accounts was approximately $21.4 million.  JPM, Bank of America, Comerica, Flagstar, Citizens, and AmEx are financially stable institutions that are insured in the United States by the Federal Deposit Insurance Corporation ("***FDIC***") (up to an applicable limit per Debtor per institution), and all Cash Management Banks except AmEx are party to a Uniform Depository Agreement with the U.S. Trustee.[5]  The Debtors hold two (2) foreign Bank Accounts at JPM, a global financial institution widely regarded as well-capitalized and financially stable, in the United Kingdom and South Africa, both of which are jurisdictions with depository insurance or guarantee schemes.[6]

---

[5]     As set forth on the list of Authorized Depositories for Region 2, published by the U.S. Trustee on November 16, 2023, JPM, Bank of America, Flagstar, and Citizens are "Authorized Depositories" for all U.S. Trustee offices in Region 2, and Comerica is an "Authorized Depository" for the Southern District of New York.

[6]     The Bank of England's Financial Services Compensation Scheme provides protection for deposits and insurance policies, and South Africa's Corporation for Deposit Insurance is South Africa's insurance deposit scheme. *See* Bank of England, Financial Services Compensation Scheme, https://www.bankofengland.co.uk/prudential-regulation/authorisations/financial-services-compensation-scheme; South African Reserve Bank, Corporation for Deposit Insurance, https://www.resbank.co.za/en/home/what-we-do/Deposit-insurance.

13.     Certain Non-Debtor Affiliates also maintain accounts with the Cash Management Banks: (a) GetSmarter Online Ltd., edX Boot Camps (Canada) ULC, 2U GetSmarter (UK) Limited, edX Boot Camps (Australia) Pty Limited, edX Boot Camps (UK) Limited, and 2U Group (UK) Limited maintain accounts with JPM; and (b) edX Boot Camps (Canada) ULC, edX Boot Camps (Australia) Pty Limited, and edX Boot Camps (UK) Limited maintain accounts with Bank of America.

14.     A schematic setting forth the Bank Accounts and the movement of cash through the Cash Management System is attached hereto as **Exhibit D**.  As shown in this schematic, the Cash Management System aligns with the Debtors' two (2) business segments that are described in the Norden Declaration:  (a) the Degree Program Segment (Bank Accounts held by Debtor 2U, Inc.); and (b) the Alternative Credential Segment, which is comprised of Open Courses (as defined below) (Bank Accounts held by edX LLC), Exec Ed Programs (Bank Accounts held by Debtor 2U GetSmarter (US), LLC), and Boot Camps (Bank Accounts held by Debtor edX Boot Camps LLC). The Bank Account with the highest level of activity is the Primary 2U Operating Account (as defined below) which, among other things, transfers cash to and from other operating accounts held by the Debtors and Non-Debtor Affiliates to ensure that each Debtor and Non-Debtor Affiliate has sufficient liquidity to meet its current obligations.  A schedule of the Bank Accounts is attached hereto as **Exhibit C**, and the following table sets forth a summary of the Bank Accounts:

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| **Operating Accounts** | | |
| JPM - 6686 | 2U, Inc. | 2U, Inc. maintains an operating account (the "***Primary 2U Operating Account***") at JPM for purposes of (a) collecting receipts from certain Partner Institutions in connection with the Degree Program Segment; (b) making disbursements on account of payments to certain vendors and Partner Institutions; and (c) making transfers to, and receiving transfers from, other Bank Accounts held by 2U, Inc. and other Debtors as well as certain bank accounts held by Non-Debtor Affiliates.  The Primary 2U Operating Account is funded from third-party receipts, as well as cash swept manually from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. |
| Comerica - 1849 | 2U, Inc. | 2U, Inc. maintains an operating account (the "***Secondary 2U Operating Account***") at Comerica for purposes of (a) collecting receipts from certain Partner Institutions in connection with the Degree Program Segment; and (b) receiving transfers from other Bank Accounts held by 2U, Inc.  The Secondary 2U Operating Account is funded from third-party receipts and cash swept manually from the 2U Collections Account. Cash is manually swept from the Secondary 2U Operating Account to the Primary 2U Operating Account on an approximately weekly basis.  Although the majority of 2U Inc.'s disbursements are made from the Primary 2U Operating Account, disbursements may occasionally be made from the Secondary 2U Operating Account. |

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| BOA - 1970 | edX Boot Camps LLC | edX Boot Camps LLC maintains an operating account (the "***Primary Boot Camps Operating Account***") at BOA for purposes of (a) collecting receipts from individual learners (via either check or credit card (or similar) transactions) processed by Stripe (as defined below), enterprise customers, and third-party financing sources in connection with the Boot Camps business; (b) making transfers to other Bank Accounts held by edX Boot Camps LLC; and (c) making transfers to, and receiving transfers from, other Debtors as well as certain bank accounts held by Non-Debtor Affiliates.    The Primary Boot Camps Operating Account is funded from third-party receipts, as well as intercompany transfers from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. |
| JPM - 2922 | edX Boot Camps LLC | edX Boot Camps LLC maintains an operating account (the "***Secondary Boot Camps Operating Account***") at JPM for purposes of (a) making disbursements on account of payments to certain vendors and Partner Institutions in connection with the Boot Camps business; and (b) making transfers to, and receiving transfers from, other Bank Accounts held by edX Boot Camps LLC and other Debtors.    The Secondary Boot Camps Operating Account is funded from the Primary 2U Operating Account and the Primary Boot Camps Operating Account. |

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| JPM - 8116 | edX LLC | edX LLC maintains an operating account (the "***edX Operating Account***") at JPM for purposes of (a) collecting receipts from individual learners (via either check or credit card (or similar) transactions processed by Stripe) and enterprise customers in connection with the Open Courses business; (b) making disbursements on account of payments to certain vendors and Partner Institutions; and (c) making transfers to, and receiving transfers from, other Bank Accounts held by other Debtors as well as certain bank accounts held by Non-Debtor Affiliates. The edX Operating Account is funded from third-party receipts, as well as intercompany transfers from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. |
| JPM - 2032 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains an operating account (the "***Primary GetSmarter Operating Account***") at JPM for purposes of (a) making disbursements on account of payments to certain vendors and Partner Institutions; (b) receiving transfers from other Bank Accounts held by 2U GetSmarter (US), LLC; and (c) making transfers to, and receiving transfers from, certain bank accounts held by Non-Debtor Affiliates. The Primary GetSmarter Operating Account is funded from intercompany transfers from other Bank Accounts held by 2U GetSmarter (US), LLC and bank accounts held by Non-Debtor Affiliates. |

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| Comerica - 0697 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains an operating account (the "***Secondary GetSmarter Operating Account***") at Comerica for purposes of (a) collecting receipts from individual learners (via either check or credit card (or similar) transactions processed by Stripe) and enterprise customers in connection with the Executive Education Programs (as defined below) business; (b) making transfers to other Bank Accounts held by 2U GetSmarter (US), LLC; and (c) making transfers to, and receiving transfers from, other Debtors as well as certain bank accounts held by Non-Debtor Affiliates.    The Secondary GetSmarter Operating Account is funded from third-party receipts, as well as intercompany transfers from other Bank Accounts and bank accounts held by Non-Debtor Affiliates. Although the majority of 2U GetSmarter (US), LLC's disbursements are made from the Primary GetSmarter Operating Account, disbursements may occasionally be made from the Secondary GetSmarter Operating Account. |
| **Collections Accounts** | | |
| Comerica - 1422 | 2U, Inc. | 2U, Inc. maintains a collections account (the "***2U Collections Account***") at Comerica for the purpose of collecting receipts from certain Partner Institutions in connection with the Degree Program Segment, which are automatically swept daily to the Secondary 2U Operating Account.  The 2U Collections Account is funded from third-party receipts. |

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| JPM - 0185 and JPM - 8169 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains two collections accounts (collectively, the "**GetSmarter Collections Accounts**") at JPM for the purpose of (a) collecting receipts from enterprise customers and individual learners in connection with the Executive Education Programs; and (b) making transfers to the Secondary GetSmarter Operating Account. The GetSmarter Collections Accounts are funded from third-party receipts. The account ending in 0185 is held in South Africa and the account ending in 8169 is held in the United Kingdom. |
| **Payroll Accounts** | | |
| JPM - 6779 | 2U, Inc. | 2U, Inc. maintains a payroll account (the "**2U Payroll Account**") at JPM for the purpose of making disbursements on account of payroll obligations to the majority of the Debtors' U.S.-based employees. The 2U Payroll Account is manually funded from the Primary 2U Operating Account on an approximately weekly basis. |
| Bank of America - 2144 | edX Boot Camps LLC | edX Boot Camps LLC maintains a payroll account (the "**Boot Camps Payroll Account**") at Bank of America for the purpose of making disbursements on account of payroll obligations to certain of the Debtors' U.S.-based part-time employees of the Boot Camps business. The Boot Camps Payroll Account is automatically funded from the Primary Boot Camps Operating Account approximately every two weeks. |

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| Comerica - 9216 | 2U GetSmarter (US), LLC | 2U GetSmarter (US), LLC maintains a payroll account (the "***GetSmarter Payroll Account***") at Comerica for the purpose of making disbursements on account of payroll obligations to certain of the U.S. and foreign-based part-time employees in the Executive Education Programs business employed either directly by the Debtors or indirectly through a professional services organization. The GetSmarter Payroll Account is manually funded from the Primary GetSmarter Operating Account approximately every two weeks. |
| **Money Market Account**<br>JPM - 5286 | 2U, Inc. | 2U, Inc. maintains a money market account (the "***Money Market Account***") at JPM for the purpose of obtaining a higher interest rate on excess cash. The Money Market Account is manually funded from the Primary 2U Operating Account when the amount of cash in the Primary 2U Operating Account exceeds the Debtors' forecasted cash needs for the following two-to-three weeks. |
| **Money Market Account - Adequate Assurance**<br>Comerica - 1864 | 2U, Inc. | 2U, Inc. maintains a money market account (the "***Adequate Assurance Account***") at Comerica which will hold $4,216 adequate assurance for utility providers as further described in the Utilities Motion.[7] |

---

[7]    Contemporaneously herewith, the Debtors filed the *Motion of Debtors for an Order (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (B) Approving the Debtors Proposed Form of Adequate Assurance of Payment for Utility Services; (C) Establishing Procedures for Resolving Requests for Additional Assurance; and (D) Granting Related Relief* (the "**Utilities Motion**"). The Adequate Assurance Account will be funded in accordance with the procedures set forth in the Utilities Motion.

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| **DIP Funding Account**<br><br>Flagstar - 1233 | 2U, Inc. | 2U, Inc. maintains a DIP funding account (the "***DIP Funding Account***") at Flagstar for the purpose of (a) receiving the proceeds of the DIP Facility; and (b) transferring the proceeds of the DIP Facility to the Primary 2U Operating Account to be used to fund the Debtors' operations during these Chapter 11 Cases, and for other purposes permitted by the DIP Order (as defined below). |
| **Subscription Account**<br><br>Citizens - 8154 | 2U, Inc. | 2U, Inc. maintains a subscription account (the "***Subscription Account***") at Citizens for the purpose of (a) receiving subscription proceeds from the Equity Rights Offering; and (b) transferring the proceeds of the Equity Rights Offering to the Primary 2U Operating Account in accordance with the documents and agreements governing the Equity Rights Offering. |
| **Certificate of Deposit Account**<br><br>AmEx - 8586 | 2U, Inc. | 2U, Inc. maintains a certificate of deposit account (the "***CD Account***") at AmEx for the purpose of holding cash collateral to secure the 2U, Inc's obligations under its corporate credit card program (the "***Corporate Credit Card Program***").[8] Pursuant and subject to a corporate services commercial account agreement with AmEx, the Debtors are required to hold a minimum balance in the CD Account equal to approximately $880,000 for periods of at least three (3) months, and the Debtors earn interest on cash held in the CD Account. |

---

[8]     The Corporate Credit Card Program is described in greater detail in the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Satisfy Prepetition Workforce Obligations and (II) Continue Workforce*

| Bank Account | Debtor Account Holder | Account Description |
|---|---|---|
| **Restricted Cash Account**<br><br>JPM - 3391 | 2U, Inc. | 2U, Inc. maintains a restricted cash account (the "***Restricted Cash Account***") at JPM for the purpose of holding cash collateral to secure 2U, Inc's obligations under its letters of credit. [9]  Pursuant and subject to the relevant agreements, the Debtors may transfer excess cash collateral to the Primary 2U Operating Account. |
| **Professional Fee Escrow Account**<br><br>Citizens - 8162 | 2U, Inc. | 2U, Inc. maintains a professional fee escrow account (the "**Professional Fee Escrow Account**") at Citizens for the purpose of escrowing and disbursing certain fees pursuant to the DIP Order. |
| **Inactive Accounts**<br><br>Comerica – 0063 (2U, Inc.)<br>Comerica – 1856 (2U, Inc.)<br>JPM – 6951 (edX LLC) | 2U, Inc.<br>edX LLC | The Debtors have 3 Bank Accounts (collectively, the "***Inactive Accounts***") that are relatively dormant with little to no activity prior to the Petition Date.  Any proceeds received in the Inactive Accounts (related to legacy operations or otherwise) are transferred to the Primary 2U Operating Account. |

## I.    Cash Collection

15.    As described in the First Day Declarations, the Debtors are a leading online education platform and service provider.  Through the Debtors' Degree Program Segment, they

---

*Programs on a Postpetition Basis; (B) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (C) Granting Related Relief*, filed concurrently herewith.

[9]    The Debtors' outstanding letters of credit are described in greater detail in the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Insurance Programs Obligations and (II) Maintain Their Insurance Programs Postpetition; and (B) Granting Related Relief*, filed concurrently herewith.

provide technology and services to nonprofit college and universities to enable the online delivery of degree programs through the Debtors' platform. Through the Debtors' Alternative Credential Segment, they provide premium online open courses (the "**Open Courses**"), executive education offerings (the "**Executive Education Programs**"), technical, skills-based boot camps (the "**Boot Camps**") to individual consumers through relationships with nonprofit colleges and universities and other leading organizations. In connection with the Degree Program Segment and the Alternative Credential Segment, the Debtors receive payments either directly, via electronic funds transfer or check, or, in the case of credit card (or similar) transactions, indirectly through their payment processing service provider, Stripe, Inc. ("**Stripe**"). In addition, Debtor edX Boot Camps LLC receives payments into the Primary Boot Camps Operating Account from third-party financing sources on behalf of learner customers.[10]

## II.    Disbursements

16.    The Debtors, through the applicable operating and payroll accounts, make disbursements for, among other things: (a) payroll; (b) payroll taxes; (c) payments made to vendors; and (d) payments made to Partner Institutions. Disbursements to vendors and Partner Institutions are made on an approximately weekly basis.[11] In addition, the Primary 2U Operating Account is used to issue direct payments related to, among other things: (a) the payment of certain taxes in the ordinary course of business; (b) the Debtors' prepetition debt obligations; (c) lease expenses; and (d) credit card payments. Disbursements are processed on a periodic or as needed basis, depending on the payable.

---

[10]    These third-party financing sources include Climb Credit, Inc., EdAid Ltd., Nimble Australia Pty Ltd, D/B/A Zeefi, and Meritize Lending, LLC.

[11]    While each Partner Institution is generally paid once-per-quarter, the Partner Institutions are on different payment schedules. Therefore, in a given week, the Debtors typically make payments to various Partner Institutions, and the amounts the Debtors pay to Partner Institutions fluctuates from week-to-week.

### III.   Bank Fees and Payment Processing Fees

17.   The Debtors pay the Cash Management Banks ordinary course fees and expenses in connection with maintaining and operating the Bank Accounts (the "***Bank Fees and Expenses***") typically by authorizing the Cash Management Banks to deduct the amount of the applicable Bank Fees and Expenses from the relevant Bank Accounts in accordance with the applicable bank agreements.   As of the Petition Date, the Debtors estimate that approximately $15,000 in Bank Fees and Expenses is accrued and unpaid, all of which will become due within twenty-one (21) days following the Petition Date.   The Debtors believe that honoring the Bank Fees and Expenses is essential to the ordinary course maintenance of the Cash Management System without disruption.   The Debtors hold all of their cash in the Bank Accounts and maintain no other accounts holding cash.

18.   The Debtors also incur ordinary course service charges and other fees in connection with the payment processing services provided by Stripe.   To the extent the Debtors receive payments made by credit card (or similar payment methods), such payments are processed by Stripe before being deposited into the applicable collections or operating account.   In exchange for such services, Stripe charges fees (the "***Payment Processing Fees***"), which equal approximately 3% of each credit card (or similar payment method) transaction amount, and deducts the Payment Processing Fees before depositing cash in the Debtors' Bank Accounts.   Historically, the Debtors have incurred Payment Processing Fees of 3% on every transaction processed through Stripe.

### IV.   Certificate of Deposit Account

19.   The Debtors have posted cash collateral in favor of, and as required by, AmEx (the "***Collateral Obligations***") pursuant to the Corporate Credit Card Program.   As of the Petition Date, the Debtors have posted approximately $880,000 in the CD Account to comply with the Collateral Obligations of the Corporate Credit Card Program.

20.     Under the Corporate Credit Card Program, the Debtors are required to maintain a minimum balance of $880,000 in the CD Account to secure their obligations under the Corporate Credit Card Program, which amount represents approximately 98% of the aggregate credit limit under the Corporate Credit Card Program.  The Debtors' failure to maintain their Collateral Obligations could disrupt the Debtors' payment of certain ordinary course business expenses.  The Debtors request authority to maintain the CD Account and their Collateral Obligations, including to renew, replace, modify, extend, or add to the posted collateral as needed in the ordinary course of business.

## C.     THE DEBTORS' INTERCOMPANY TRANSACTIONS

21.     In the ordinary course of business, the Debtors engage in routine business relationships with each other[12] and with certain Non-Debtor Affiliates (the "***Intercompany Transactions***"), which may result in intercompany receivables and payables (the "***Intercompany Claims***") that the Debtors track and record in their books and records.[13]  These Intercompany Transactions, which relate primarily to payments for services and of certain expenses, occur as part of the routine operation of the Cash Management System and the Debtors' businesses, and at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or to a Non-Debtor Affiliate.  The Intercompany Transactions are subject to both formal and informal

---

[12]    The majority of the Debtors' collections are received by the Primary 2U Operating Account and the Secondary 2U Operating Account.  Accordingly, transfers from Debtor 2U, Inc.'s operating accounts to Bank Accounts held by other Debtors primarily serve to ensure that each the other Debtors have sufficient cash on hand to pay their obligations as they come due, including with respect to payroll.

[13]    The overwhelming majority of Intercompany Transactions are between Debtor 2U GetSmarter (US), LLC and its foreign Non-Debtor Affiliates in connection with the Executive Education Programs.  As discussed in footnote 14 below, 2U GetSmarter (US), LLC collects customer receipts for the Executive Education Programs, while the operations for those customer receipts are primarily conducted by the foreign Non-Debtor Affiliates.  These transfers have averaged approximately $8.2 million per month in 2024.  Outside of these regularly occurring receipts transfers, other transfers between Debtors and Non-Debtor Affiliates have netted to approximately $5 million in total from Non-Debtor Affiliates to Debtors in 2024.

agreements, including general accounting mechanisms used among the Debtors and the Non-Debtor Affiliates, as well as arrangements based on administrative convenience. For the avoidance of doubt, all Intercompany Transactions are tracked by the Debtors and recorded in their books and records.[14]

22.    Before the commencement of these Chapter 11 Cases, the Debtors, among themselves and their Non-Debtor Affiliates, engaged in many types of Intercompany Transactions in the ordinary course of business. These included, without limitation, (a) cash transfers between the Bank Accounts, as well as between the Bank Accounts and bank accounts held by Non-Debtor Affiliates, for operational purposes and administrative efficiency; and (b) transfers and setoffs related to (i) Intercompany Services (as defined below), (ii) general corporate services, (iii) operational expenses, including the payment of wages and benefits, and (iv) intercompany foreign exchange transactions.

23.    The Intercompany Transactions and the related Intercompany Claims, as well as the resulting cash flows and set offs through the Cash Management System, are integral to the smooth operation of the Debtors' and Non-Debtor Affiliates' collective businesses and are administratively beneficial to the Debtors' operations. Importantly, the benefits of these Intercompany Transactions ultimately inure to the Debtors' estates, and the failure to honor prepetition Intercompany Claims among Debtors and to continue Intercompany Transactions in the ordinary course postpetition among Debtors and Non-Debtor Affiliates alike would negatively impact the Debtors' ability to continue operating their businesses in the ordinary course.

---

[14]    While the Debtors do not settle Intercompany Claims in cash, such balances are tracked by the Debtors in the ordinary course. In the case of transfers between Debtors and Non-Debtor Affiliates, the majority of collections from the Company's non-domestic customers, which are driven by the Non-Debtor Affiliates that participate in Intercompany Transactions, are received in the Secondary GetSmarter Operating Account, the GetSmarter Collections Accounts, and the edX Operating Account.

### I.      Intercompany Services Agreements

24.     Certain Debtors and Non-Debtor Affiliates are party to intercompany services agreements (collectively, the "***Intercompany Services Agreements***" and, the Debtors and Non-Debtor Affiliates party thereto, the "***Intercompany Services Participants***").   Certain Debtors provide services (the "***Intercompany Services***") to certain Non-Debtor Affiliates in exchange for fees, resulting in efficiencies across the broader corporate group, as well as reduced costs.   The Intercompany Services are of vital importance to the Debtors as, without the Intercompany Services, the Non-Debtor Affiliates party to the Intercompany Services Agreements, all of whom are direct or indirect subsidiaries of the Debtors, would be unable to perform basic functions necessary to run their businesses.   The Intercompany Services include, among other things, services associated with Non-Debtors Affiliates':  (a) performance under third-party contracts; (b) educational, strategic, marketing, and related services; (c) access to the Debtors' personnel and their expertise; and (d) other administrative services.

25.     The Debtors incur certain expenses arising from their participation in the Intercompany Services.   The Intercompany Services Participants who benefit from such Intercompany Services are then responsible for their portion of such expenses as fees to the applicable Debtor service providers that incurred the expenses.   These fees are tracked and recorded as intercompany balances on the applicable Debtors' books and records.

26.     The Intercompany Services ensure the smooth functioning and operation of the Non-Debtor Affiliates' businesses, generate revenue for the Debtors, and are administratively beneficial to the Debtors' broader corporate group.

### II.      Intercompany Loans

27.     Certain Debtors are lenders under a number of intercompany loan agreements (collectively, the "***Intercompany Loan Agreements***") with certain Non-Debtor Affiliates as

borrowers.  The Intercompany Loan Agreements serve to facilitate the smooth transfer of funds between the Debtors and their Non-Debtor Affiliates.  The Intercompany Loan Agreements are formalized loan agreements.[15]  The Debtors' continued performance under the Intercompany Loan Agreements is critical to the Debtors' operations and performance as they facilitate the flow of funds necessary to ensure that the Non-Debtor Affiliates, together with the Debtors, can continue operating in the ordinary course of business as a single, unified, global company.

28.    The Debtors' ongoing operations are inextricably tied to the Debtors' ability to continue engaging in Intercompany Transactions in the ordinary course of business, and the Debtors receive significant benefits from the Intercompany Transactions.  The Debtors further rely upon the structure of the Intercompany Services Agreements and the Intercompany Loan Agreements to ensure that the Debtors' and the Non-Debtor Affiliates' operations can continue on an unimpeded basis.    Accordingly, the Debtors request Court authority to continue the Intercompany Transactions in the ordinary course.[16]

**D.    THE DEBTORS' BUSINESS FORMS**

29.    In the ordinary course, the Debtors use checks, invoices, letterhead, purchase orders, and other forms and correspondence (the "***Business Forms***").  The Debtors' existing Business Forms are not marked with any designation referencing their status as debtors in possession.  To minimize expense and avoid potential operational issues with their employees, customers, vendors, and other parties during this critical time, the Debtors seek authority to

---

[15]    The Intercompany Loan Agreements allow the Non-Debtor Affiliate borrowers thereunder to draw advances from the Debtor lender up to a specified commitment amount.  In each case, the commitment amount is the maximum amount of advances that can be drawn by the borrower, regardless of any prepayments or repayments to the Debtor lender.  Under each Intercompany Loan Agreement, the borrower must repay the Debtor lender in full on the maturity date, with interest.

[16]    This motion provides an overview of the Debtors' typical Intercompany Transactions.  In an abundance of caution, the Debtors request authority to honor all prepetition Intercompany Transactions, including any Intercompany Transactions that have not been described herein, and to continue all Intercompany Transactions in the ordinary course postpetition.

continue to use the existing Business Forms, notwithstanding any applicable U.S. Trustee Guidelines.

## BASIS FOR RELIEF

**A.    THE BANKRUPTCY CODE PERMITS THE DEBTORS TO CONTINUE THE USE OF THE CASH MANAGEMENT SYSTEM AND THE BANK ACCOUNTS**

30.     The Debtors' continued use of the Cash Management System is permitted under the Bankruptcy Code.  Specifically, section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *See In re Enron Corp.*, No. 01-16034, 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).  Courts have recognized that a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system is within the purview of Bankruptcy Code section 363(c)(1).  *See e.g.*, *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

31.     Further, section 105(a) of the Bankruptcy Code also authorizes this Court to permit the Debtors to continue to use the Cash Management System, including maintenance of their existing Bank Accounts.  Section 105(a) vests in this Court the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  The continuation of the Cash Management System, including the continued use of the Bank Accounts, is essential to the efficient administration of these Chapter 11 Cases and

to the Debtors' efforts to maximize estate value for all parties in interest.  Courts have noted that a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part, rev'd in part sub nom.*, *Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, Nos. 91-803, 91-804, 1992 U.S. Dist. LEXIS 9460 (D. Del. July 6, 1992), *aff'd in part, rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  As a result, courts have concluded that segregating and maintaining numerous accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

32.    Bankruptcy courts thus treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  In *Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtor and 43 of its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, *including operating entities that are not debtors herein*." *Id*. at 620 (emphasis added).  Thereafter, the United States Court of Appeals for the Eleventh Circuit affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code.  *Id*. at 621.

33.    Here, the Debtors have utilized the Cash Management System in its current form as part of their ordinary and usual business practices for a significant amount of time.  Therefore, the Debtors believe their continued use of the Cash Management System that is consistent with past practices is an ordinary course, customary, and essential business practice authorized by section 363(c)(1) of the Bankruptcy Code.  The Cash Management System also reduces the administrative burden on the Debtors by facilitating the movement of funds among and across all the Debtors and their Non-Debtor Affiliates.  To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value for the benefit of the Debtors' creditors and other parties in interest.  Thus, maintaining the existing Cash Management System without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates, and all interested parties.  Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Bank Accounts consistent with past practices.

**B.    THIS COURT SHOULD WAIVE THE U.S. TRUSTEE GUIDELINES TO PERMIT THE DEBTORS TO CONTINUE TO USE THE CASH MANAGEMENT SYSTEM**

34.    The Debtors further request, pursuant to sections 105(a) and 363 of the Bankruptcy Code, that this Court grant a waiver of certain bank account and related U.S. Trustee Guidelines to the extent that they are inconsistent with (a) the Debtors' existing practices under the Cash Management System; or (b) any action taken by the Debtors in accordance with any order granting this Motion or any other order entered in these Chapter 11 Cases, including any orders governing the use of cash collateral or debtor-in-possession financing.

35.     In particular, the U.S. Trustee Guidelines would require the Debtors to close the Bank Accounts and open new "debtor in possession" accounts and establish segregated accounts for tax payments and cash collateral.  The U.S. Trustee Guidelines are designed to demarcate prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims.

36.     The Debtors submit that they can, and will, coordinate with the Cash Management Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed within the Debtors' existing Cash Management System.  Each of the Debtors' Cash Management Banks—except AmEx—is designated as an authorized depository by the U.S. Trustee.[17]  And AmEx is a global financial institution that is widely recognized as trustworthy, well-capitalized, and financially stable.  For the avoidance of doubt, all of the Debtors' U.S. Bank Accounts, including the CD Account held at AmEx, are FDIC-insured.

37.     The Cash Management System spans three (3) countries and holds funds in three (3) different currencies.  All but two of the Bank Accounts are located in the United States and each of such Bank Accounts is party to a Uniform Depository Agreement with the U.S. Trustee.  Both of the Debtors' foreign Bank Accounts in the United Kingdom and South Africa are held at JPM, a global financial institution widely recognized as well-capitalized and financially stable.  Additionally, both the United Kingdom and South Africa are jurisdictions with depository insurance or guarantee schemes.

38.     The Debtors believe that these Cash Management Banks are well positioned to continue to perform the depository and cash management functions during these Chapter 11 Cases

---

[17]   As set forth on the list of Authorized Depositories for Region 2, published by the U.S. Trustee on November 16, 2023, JPM and Bank of America are "Authorized Depositories" for all U.S. Trustee offices in Region 2, and Comerica is an "Authorized Depository" for the Southern District of New York.

and, accordingly, respectfully submit that cause exists to allow the Debtors to continue utilizing the existing Bank Accounts consistent with historical practices.

39.     The Debtors further submit that enforcement of certain of the U.S. Trustee Guidelines would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.  In light of the scope and complexity of the Cash Management System, it would be onerous for the Debtors to strictly comply with the U.S. Trustee Guidelines requiring them to close all existing bank accounts and open new debtor in possession accounts.  And doing so would also risk material operational disruption, as the Debtors' business partners and personnel transition to a wholly-new system.  Furthermore, the Debtors submit that it would be burdensome, costly, and detrimental to their estates to move the CD Account to a financial institution party to Uniform Depository Agreements with the U.S. Trustee, due to the disruptions that would result to the Debtors' Corporate Credit Card Program and ability to pay certain business expenses necessary to their ongoing operations.  In addition, no parties in interest will be jeopardized by the Debtors' continued maintenance of the CD Account, as the funds held therein are secure.

40.     Further, it would be unnecessary and inefficient to require the Debtors to abide by the U.S. Trustee Guidelines to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to the accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  The Debtors can pay their tax obligations most efficiently in accordance with their existing practices, and the U.S. Trustee will have the ability to monitor the flow of funds into and out of the accounts through the Debtors' periodic reporting.  The creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

41.     In addition, it is unnecessary to require the Debtors to abide by the U.S. Trustee Guidelines requiring specific debtor in possession accounts for cash collateral.  As set forth in the DIP Motion, filed contemporaneously herewith, the Debtors have provided safeguards to ensure that parties with liens on and security interests in the Debtors' cash are adequately protected and that those parties have been provided with notice of the proposed use of the cash collateral. Further, through the Cash Management System and the efforts of the Debtors' treasury personnel, the Debtors can track and account for each Intercompany Transaction and the resulting Intercompany Claims.  All Intercompany Transactions and Intercompany Claims, including deposits, withdrawals, borrowed amounts, and interest accrued or owing on account thereof, are appropriately recorded in each applicable Debtor's books and records.

42.     Thus, the Debtors submit that cause exists to waive certain bank account and related U.S. Trustee Guidelines to the extent that they are inconsistent with the Debtors' historical practices, and to allow the Debtors to continue to utilize the existing Bank Accounts consistent with past practice and any orders of this Court.

## C.     THE DEBTORS SHOULD BE AUTHORIZED TO CONTINUE USING THEIR EXISTING BUSINESS FORMS

43.     To minimize expenses to their estates, the Debtors request that this Court waive their compliance with any U.S. Trustee Guidelines that would require them to replace their checks and Business Forms immediately, and seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession.  In the event the Debtors generate new checks during the pendency of these Chapter 11 Cases other than from their existing stock of checks, those checks will include a legend referring to the Debtors as "Debtors in Possession."  The Debtors also seek authority to

use all other Business Forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.[18]

44.    Changing the Debtors' existing checks, correspondence, and other Business Forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  These changes would disrupt the Debtors' business operations, may create friction with their customers and vendors, and would not confer any benefit upon parties that transact with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, correspondence, and other Business Forms without being required to place the label "Debtor in Possession" on any of the foregoing.

45.    For the reasons mentioned herein, the Debtors submit that the aforementioned waivers of related U.S. Trustee Guidelines are appropriate.

**D.    THIS COURT SHOULD PERMIT THE DEBTORS TO CONTINUE THEIR DEPOSIT PRACTICES**

46.    The Debtors should be authorized to continue to deposit and maintain their funds in the Bank Accounts in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System; and the deposit requirements of section 345(b) of the Bankruptcy Code, to the extent that the requirements are inconsistent with these practices, should be waived.  For the avoidance of doubt, to the extent any Bank Account may be classified as an investment account, or to the extent any of the Debtors' routine deposits into such Bank Account may be regarded as investment activity, the Debtors hereby seek authorization to continue to deposit funds into such Bank Accounts in

---

[18]    The Debtors also seek explicit authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

accordance with existing practices, notwithstanding the requirements of Section 345(b) of the Bankruptcy Code.

47.    Section 345(a) of the Bankruptcy Code authorizes a debtor in possession to make deposits or investments of estate money in a manner "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  If a deposit or investment is not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the debtor must require that the entity with which the deposit is made obtain a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.  *See* 11 U.S.C. § 345(b).[19]

48.    This Court has discretion to waive the requirements imposed by section 345(b) of the Bankruptcy Code "for cause."  11 U.S.C. § 345(b)(2).  In In re Service Merchandise Co., Inc., the court indicated that the existence of "cause" should be determined based upon the totality of the circumstances taking account of factors such as: (a) the sophistication of the debtor's business; (b) the size of the debtor's business; (c) the amount of investments involved; (d) the ratings of the financial institutions at which the debtor's funds are held; (e) the complexity of the case; (f) the safeguards in place within the debtor's own business to ensure the safety of funds; (g) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (h) the benefit to the debtor; (i) the harm, if any, to the estate; and (j) the reasonableness of the debtor's request for relief from the section 345(b) of the Bankruptcy Code requirements in light of the

---

[19]    Strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in a case such as this, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H. 10,767 (Oct. 4, 1994), 1994 WL 54773.

overall circumstances of the case.  240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999); see also H.R. Rep. 103-835, at 47 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3355 (noting that section 345(b) investment guidelines may be "wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, [but] can work to needlessly handcuff larger, more sophisticated debtors").

49.     The Debtors submit that cause exists to waive the requirements of section 345(b) of the Bankruptcy Code because the Debtors are sophisticated entities with a complex Cash Management System that relies on the Bank Accounts on a daily basis.  As noted above, all of the Debtors' U.S. Bank Accounts are held at stable financial institutions that are FDIC-insured and, thus, the Debtors' funds in such accounts are safe (up to applicable FDIC limits).  In addition, the Debtors' two (2) foreign Bank Accounts are held at JPM, a well-capitalized, stable financial institution, in jurisdictions with depository insurance or guarantee schemes.  In light of the regular deposits to, and disbursements from, the various Bank Accounts within the United States, it would be especially disruptive, unnecessary, and wasteful to require the posting of a bond to the extent that the balance of the Bank Accounts exceed the applicable FDIC insurance limits at a given time.

50.     The Debtors also submit that incurring administrative expense complying with section 345(b) for their Bank Accounts outside of the United States would unnecessarily drain their resources.  The Debtors conduct business in several countries, and the foreign Bank Accounts facilitate collections on products and services sold in foreign jurisdictions, while providing the Debtors' treasury personnel with complete oversight of the Bank Accounts and the means to protect the cash therein.

51.     Thus, the Debtors submit that their investment and deposit practices satisfy the requirements of section 345(b) of the Bankruptcy Code, or, in the alternative, that cause exists for

this Court to waive the deposit requirements of section 345(b) of the Bankruptcy Code to the extent that the requirements are inconsistent with the Cash Management System.

52.    For the foregoing reasons, this Court should authorize the Debtors to continue to deposit funds in the Bank Accounts and grant a waiver of the requirements of section 345(b) of the Bankruptcy Code, to the extent that the requirements are inconsistent with the Cash Management System.

**E.    HONORING CERTAIN OF THE DEBTORS' OBLIGATIONS RELATED TO THE CASH MANAGEMENT SYSTEM IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES AND ALL PARTIES IN INTEREST**

53.    As described above, the Debtors incur ordinary course Bank Fees and Expenses and Payment Processing Fees in connection with the Cash Management System.  While the Debtors do not believe that they have any outstanding amounts on account of the Bank Fees and Expenses or the Payment Processing Fees that are due and owing as of the Petition Date, the Debtors request authority, out of an abundance of caution, to continue paying the Bank Fees and Expenses and the Payment Processing Fees in the ordinary course of business and consistent with historical practices and the Approved Budget (as defined in the DIP Order).[20]

54.    Several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code support the payment of prepetition claims as requested herein.  Under Bankruptcy Code section 363(b), a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so.  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on Bankruptcy Code section 363 to allow contractor to

---

[20]    "***DIP Order***" refers to that interim or final order, as applicable, approving the DIP Motion (as may be amended, restated, or otherwise modified from time to time).

pay prepetition claims of suppliers).   In addition, Bankruptcy Code section 105(a) empowers bankruptcy courts to issue orders necessary or appropriate to carry out other provisions of the Bankruptcy Code, including Bankruptcy Code section 1107(a), which contains an implied duty of the debtor in possession to protect and preserve the estate, including an operating business's going-concern value, on behalf of a debtor's creditors and other parties in interest.  *See In re Sillerman*, 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019) ("While the Bankruptcy Code permits a debtor to operate its business and exercise control over its estate, the debtor-in-possession acts as a fiduciary of the estate and its creditors.") (citation omitted); *Taub v. Taub (In re Taub)*, 427 B.R. 208, 224 (Bankr. E.D.N.Y. 2010), *aff'd*, No. 10-cv-5717, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.*), 227 B.R. 229, 233 (Bankr. S.D.N.Y. 1998) ("upon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee").

55.    Additionally, the Cash Management Banks may have secured interests in the funds in those Bank Accounts, which the Debtors are not seeking to prime.  Under certain circumstances, those Cash Management Banks may be entitled to setoff or recoup fees related to the Bank Accounts based on their account agreements with the Debtors or applicable law.   Thus, by authorizing the Debtors to pay or honor such prepetition obligations, this Court will ensure that the Debtors normalize operations and avoid the disruption that would otherwise occur if the Bank Accounts were frozen pending payment or resolution of disputes regarding the priority of claims or rights of recoupment.

**F.    DEBTORS SHOULD BE AUTHORIZED TO CONTINUE USING DEBIT, WIRE AND ELECTRONIC TRANSFERS**

56.    The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds be by check and include a notation representing the reason for the disbursement.  Given the Debtors' current operations, it is necessary for the Debtors to conduct transactions by debit, wire, ACH, and other similar methods of electronic transfers.  Denying the Debtors the opportunity to conduct transactions by electronic methods would likely interfere with the Debtors' performance under their contracts and obligations, and unnecessarily distract the Debtors and their management from the Debtors' business operations, as well as create additional costs to be borne by the Debtors and their creditors.  Accordingly, the Debtors believe it is imperative that the Cash Management Banks be authorized and directed to continue to pay, honor, and execute any and all debit instructions, wires, ACH payments and other forms of electronic transfers issued and drawn on the Bank Accounts on and after the Petition Date.

**G.    THE BANKRUPTCY CODE PERMITS THE DEBTORS TO CONTINUE TO ENGAGE IN THE INTERCOMPANY TRANSACTIONS**

57.    The relief requested herein related to the continuation of Intercompany Transactions, including making postpetition intercompany transfers, payments, or contributions to, on behalf of, or for the benefit of Non-Debtor Affiliates (the "***Non-Debtor Intercompany Transactions***"), is appropriate under section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing," 11 U.S.C. § 363(c)(1), and is an appropriate exercise of this Court's equitable powers under section 105(a) of the Bankruptcy Code.  *See, e.g.*, *In re Gen. Growth Props.*, 412 B.R. 609, 610-11 (Bankr. S.D.N.Y. 2009) (authorizing debtors to continue prepetition cash management practices, including intercompany transactions, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code); *In re Charter Co.*, 778 F.2d at 621 (indicating that order

34

authorizing continued use of cash management system that involved fund transfers to non-debtor affiliates was "entirely consistent" with section 363(c)(1) because the practice was "usual and customary in the past").

58.     The Debtors submit that continuing to engage in Intercompany Transactions with Debtors and Non-Debtor Affiliates (consistent with historical practices and in accordance with the Approved Budget), are all undertakings that occur in the ordinary course of their businesses.  As noted above, it is typical for corporate groups like the Debtors to engage in Intercompany Transactions, Intercompany Services, and cash movements, in particular, among the entities that compose them, as the Debtors have done historically.

59.     If Intercompany Transactions are not considered ordinary course, however, the Debtors respectfully submit that they should be authorized to engage in such transactions as a sound exercise of their business judgment pursuant to section 363(b) of the Bankruptcy Code. Under section 363(b)(1) of the Bankruptcy Code, a debtor may, in the exercise of its sound business judgment and after notice and a hearing, "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under Bankruptcy Code section 363(b), a court may authorize a debtor to pay certain prepetition claims where a sound business purpose exists for doing so.  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397-98 (S.D.N.Y. 1983) (relying on Bankruptcy Code section 363 to allow contractor to pay prepetition claims of suppliers).  This standard prohibits other parties from second guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

60.     The Debtors believe that their business judgment to pay or settle prepetition Intercompany Claims among Debtors and between Debtors and Non-Debtor Affiliates, including those related to Intercompany Services, is sound because the Intercompany Transactions are integral to their daily operations as an integrated global company.  The Intercompany Transactions are used precisely because they are administratively beneficial to the Debtors' operations, and facilitate the operations of the Non-Debtor Affiliates, the benefits of which inure ultimately to the Debtors' estates and their creditors.  These benefits accrue through both increased value of the equity of the Non-Debtor Affiliates, each of which is ultimately owned entirely by the Debtors, as well as the efficient operation of the Non-Debtor Affiliates' businesses, including through their global online education platforms.

61.     Failing to honor prepetition Intercompany Claims among Debtors and between Debtors and Non-Debtor Affiliates, including on account of the Intercompany Services, may result in disruptions to certain Debtors' operations and, as a result, deteriorating business and partner relationships and estate value.  Thus, the Debtors submit that continuation of the Intercompany Transactions and honoring and paying prepetition Intercompany Claims in the ordinary course and consistent with historical practices and the Approved Budget is in the best interests of the Debtors' estates and their creditors and is a sound exercise of the Debtors' business judgment supported by the standards applicable to Section 363(b) of the Bankruptcy Code.

62.     Further, the Debtors request that postpetition Intercompany Claims be accorded superpriority[21] administrative claim status pursuant to section 503(b) of the Bankruptcy Code.  If postpetition Intercompany Claims are accorded superpriority administrative claim status, then each individual Debtor upon whose behalf another Debtor has utilized funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors.  Accordingly, the Debtors submit that this Court should grant superpriority administrative claim status to postpetition Intercompany Claims pursuant to section 503(b) of the Bankruptcy Code.

63.     For the foregoing reasons, the Debtors respectfully submit that (a) they should be authorized to continue their prepetition intercompany practices on a postpetition basis; (b) they should be authorized to honor and set off or pay prepetition Intercompany Claims among Debtors; and (c) postpetition Intercompany Claims among Debtors and Non-Debtor Affiliates, as applicable, should be granted superpriority status.

## H.     MAINTENANCE OF THE CASH MANAGEMENT SYSTEM IS A VALID EXERCISE OF THE DEBTORS' FIDUCIARY DUTIES

64.     Authority for maintenance of the Cash Management System is found in sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Courts have recognized that implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

---

[21]     Nothing herein constitutes a request to validate the nature or amount of any Intercompany Transaction or Intercompany Claim, if any, whether arising prepetition or postpetition.

65.     The CoServ court held that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* That court specifically held that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 497-98. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

66.     Payment of prepetition claims arising under the existing Cash Management System, including payment of the Bank Fees and Expenses and the Payment Processing Fees, engaging in Intercompany Transactions and honoring Intercompany Claims meets each CoServ element. As described above, each element of the Debtors' Cash Management System is crucial to the efficient operation of the Debtors' businesses. The Debtors' failure to pay prepetition claims arising under the Cash Management System would result in significant disruption to the Debtor's day-to-day business functions. The potential harm and economic disadvantage that would stem from the Debtors inability to conduct business in the ordinary course is grossly disproportionate to the amount of the prepetition claims that may be paid. Finally, the Debtors have examined other options short of honoring the prepetition claims under the Cash Management System and have determined that, in order to avoid significant disruption to the Debtors' business operations, there exists no practical or legal alternative to payment of such obligations.

67.     Accordingly, to meet their fiduciary duties as debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors must not only be authorized to continue the Cash Management System, but also be authorized to pay all prepetition claims arising under the Cash Management System consistent with historical practices to avoid significant disruption to their businesses.

## I.    PRECEDENT CASES SUPPORT GRANT OF THE REQUESTED RELIEF

68.     The relief requested in this Motion is similar to relief granted by numerous courts, including this Court in other chapter 11 cases in this district.  See, e.g., *In re Credivalores - Crediservicios S.A.*, Case No. 24-10837 (DSJ) (Bankr. S.D.N.Y. June 12, 2024) [Docket No. 70] (granting authority to continue use of existing cash management system); *In re Acorda Therapeutics, Inc.*, Case No. 24-22284 (DSJ) (Bankr. S.D.N.Y. Apr. 26, 2024) [Docket No. 100] (same); *In re Mercon Coffee Corp.*, Case No. 23-11945 (MEW) (Bankr. S.D.N.Y. Feb. 29, 2024) [Docket No. 215] (same); *In re GOL Linhas Aèreas Inteligentes S.A.*, Case No. 24-10118 (MG) (Bankr. S.D.N.Y. Feb. 27, 2024) [Docket No. 190] (same); *In re Benitago Inc.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y. Jan. 19, 2024) [Docket No. 374] (same); *In re Troika Media Grp., Inc.*, Case No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Jan. 2, 2024) [Docket No. 70] (same); *In re Voyager Aviation Holdings*, LLC, Case No. 23-11177 (JPM) (Bankr. S.D.N.Y. Oct. 11, 2023) [Docket No. 359] (same); *In re PacificCo Inc.*, Case No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023) [Docket No. 149] (same); *In re SVB Fin. Grp.*, Case No. 23-10367 (MG) (Bankr. S.D.N.Y. Apr. 27, 2023) [Docket No. 132] (same); *In re Genesis Glob. Holdco, LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 21, 2023) [Docket No. 150] (same); *In re Rockley Photonics Holdings Ltd.*, Case No. 23-10081 (LGB) (Bankr. S.D.N.Y. Feb. 27, 2023) [Docket No. 76] (same); *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Feb. 3, 2023) [Docket No. 879] (same); *In re*

*Lumileds Holding B.V.*, Case No. 22-11155 (LGB) (Bankr. S.D.N.Y. Sept. 22, 2022) [Docket No. 137] (same).

## J.    BANKRUPTCY RULE 6003 HAS BEEN SATISFIED, AND BANKRUPTCY RULE 6004 SHOULD BE WAIVED

69.    Certain aspects of the relief requested herein may, if granted, be subject to Bankruptcy Rule 6003.  Under Bankruptcy Rule 6003, this Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors believe an immediate and orderly transition into Chapter 11 is critical to the viability of their operations and the success of these Chapter 11 Cases.  As discussed in detail above and in the Kocovski Declaration, immediate and irreparable harm would result if the relief herein is not granted.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that this Court approve the relief requested in this Motion on an emergency basis.

70.    Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

## RESERVATION OF RIGHTS

71.     Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If this Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## MOTION PRACTICE

72.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## NOTICE

73.     Notice of this Motion will be given to:  (a) the United States Trustee for Region 2; (b) Milbank LLP as counsel to the First Lien Ad Hoc Group; (c) the administrative agent and

collateral agent under the first lien credit agreement; (d) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Noteholder Group; (e) Schulte Roth & Zabel LLP as counsel to Greenvale; (f) the indenture trustees for the Notes; (g) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (h) the United States Attorney's Office for the Southern District of New York; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Cash Management Banks; (l) Stripe; and (m) all parties entitled to notice pursuant to Local Rule 9013-1(b). The Debtors submit that, under the circumstances, no other or further notice is required.

74.    A copy of this Motion is available from (a) this Court's website, www.nysb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/2U.

## NO PRIOR MOTION

75.    The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other court.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that this Court enter the Proposed Interim Order and, following a noticed hearing on the relief sought, the Proposed Final Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

<div align="center">

**LATHAM & WATKINS LLP**

</div>

Dated:    July 25, 2024
          New York, New York

By:    */s/ George A. Davis*
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  george.davis@lw.com
       george.klidonas@lw.com
       anu.yerramalli@lw.com
       randall.weber-levine@lw.com
       scott.yousey@lw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

### Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO**
**(I) CONTINUE USE OF EXISTING CASH MANAGEMENT SYSTEM, INCLUDING**
**MAINTENANCE OF EXISTING BANK ACCOUNTS, CHECKS, AND BUSINESS**
**FORMS, (II) CONTINUE EXISTING DEPOSIT PRACTICES, (III) WAIVE CERTAIN**
**U.S. TRUSTEE GUIDELINES, AND (IV) CONTINUE INTERCOMPANY**
**TRANSACTIONS; (B) GRANTING SUPERPRIORITY STATUS TO POSTPETITION**
**INTERCOMPANY CLAIMS; AND (C) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of the Debtors for an interim order (this "***Interim Order***"): (a) authorizing, but not directing, the Debtors, to (i) continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms, (ii) continue their existing deposit practices, (iii) waive the U.S. Trustee Guidelines and the requirements of section 345(b) of the Bankruptcy Code, to the extent inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Motion, (iv) continue certain ordinary course intercompany transactions, including honoring and paying prepetition intercompany claims among Debtors, and (v) open and close bank accounts; (b) granting superpriority status to postpetition intercompany claims arising from certain intercompany transactions; and (c) granting related relief; and this Court having

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

reviewed the Motion and the First Day Declarations; and this Court having determined that the

relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors,

and other parties in interest; and this Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order*

*of Reference from the United States District Court for the Southern District of New York*, dated

January 31, 2012; and consideration of the Motion and the relief requested therein being a core

proceeding under 28 U.S.C. § 157(b)(2); and this Court having authority to enter a final order

consistent with Article III of the United States Constitution; and venue being proper before this

Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the

Motion has been given and that no other or further notice is necessary; and a hearing having been

held to consider the relief requested in the Motion (the "***Hearing***"); and upon the First Day

Declarations and the record of the Hearing and all the proceedings before this Court; and after due

deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

### ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED on an interim basis, as set forth herein.

2.      All objections to the entry of this Interim Order, to the extent not withdrawn or

settled, are overruled.

3.      The Debtors are authorized and empowered to maintain and continue to use their

existing Cash Management System in accordance with this Interim Order and the DIP Order (as

applicable).  In connection with the ongoing utilization of the Cash Management System, the

Debtors shall continue to maintain records with respect to all transfers of cash so that all

transactions may be readily ascertained, traced, and recorded properly to the same extent

maintained by the Debtors before the Petition Date.

4.      Any existing deposit agreements between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all of the provisions of those agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect unless otherwise ordered by this Court, and the Debtors and the Cash Management Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and cash management procedures in the ordinary course of business and consistent with historical practices, the DIP Order, and the DIP Credit Documents (as defined in the DIP Order), including, without limitation, the opening and closing of Bank Accounts, subject to the terms and conditions of this Interim Order.

5.      The Debtors are authorized, but not directed, to the extent consistent with the DIP Order and the DIP Credit Documents (as defined in the DIP Order), to continue to comply with the Collateral Obligations posted prepetition and to renew, replace, modify, extend, or add to the posted collateral as needed in the ordinary course postpetition.

6.      The Debtors are authorized, but not directed, to the extent consistent with the DIP Order and the DIP Credit Documents, to (a) continue to use any and all of the Bank Accounts in existence as of the Petition Date, including, but not limited to, the Bank Accounts identified in the Motion, in the same manner and with the same account numbers, styles, and document forms as are currently employed; (b) deposit funds in and withdraw funds from the Bank Accounts in the ordinary course by all usual means, including checks, wire transfers, drafts, ACH transfers, and electronic fund transfers or other items presented, issued, or drawn on the Bank Accounts; (c) pay ordinary course Bank Fees and Expenses and any other service charges in connection with the Bank Accounts, including any Bank Fees and Expenses arising prior to the Petition Date;

(d) continue to pay Payment Processing Fees; (e) perform their obligations under the documents and agreements governing the Bank Accounts; and (f) for all purposes, treat the Bank Accounts as accounts of the Debtors in their capacities as debtors in possession.

7.      The Cash Management Banks and the Debtors' financial institutions shall be, and hereby are, authorized, when requested by the Debtors in their discretion, to process, honor, pay, and, if necessary, reissue any and all checks, including prepetition checks that the Debtors reissue postpetition, and electronic fund transfers drawn on the Debtors' bank accounts relating to payments permitted by an order of this Court, whether the checks were presented or funds transfer requests were submitted prior to or subsequent to the Petition Date, *provided*, that sufficient funds are available in the applicable accounts to make the payments.

8.      The Debtors are authorized, but not directed, to continue to use their existing checks, correspondence, and other Business Forms without alteration or change and without the designation "Debtor in Possession" or a bankruptcy case number imprinted upon them.

9.      The Debtors are authorized, but not directed, to continue to utilize all third-party providers consistent with historical practices necessary for the administration of their Cash Management System, including, for the avoidance of doubt, Stripe.

10.     As of the Petition Date, and subject to the terms of this Interim Order and the DIP Order (as applicable), (a) the Cash Management Banks are authorized to continue to administer, service, and maintain the Bank Accounts as the accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses, as such amounts are due and owing), and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date

by the holders or makers thereof, as the case may be, and, when requested by the Debtors in their

discretion, to receive, process, honor, and pay, to the extent of available funds, any and all checks,

drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn

on the Bank Accounts on account of a claim against the Debtors arising on or after the Petition

Date; and (b) Stripe is authorized to continue making deductions for Payment Processing Fees,

consistent with historical practice, in the ordinary course.

11.     The relief granted in this Interim Order is extended to any new bank account opened

by the Debtors at the Cash Management Banks after the date hereof, *provided*, that such new bank

account complies with the terms of this Interim Order and the DIP Order; *provided*, *further*, that

such new bank account shall only be opened at a bank that is included on the U.S. Trustee's list of

Authorized Depositories in Region 2; *provided*, *further*, that the Debtors shall provide notice to

the U.S. Trustee within five (5) business days of the opening of such new bank account.

12.     All Cash Management Banks provided with notice of this Interim Order

maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the

listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors

specifically issue stop payment orders in accordance with the documents governing the Bank

Accounts.

13.     No Cash Management Bank that honors a prepetition check or item drawn on any

account that is the subject of this Interim Order (a) at the direction of the Debtors to honor the

prepetition check or item; (b) in the good faith belief that this Court has authorized the prepetition

check or item to be honored; or (c) as a result of a good faith error made despite implementation

of customary item handling procedures, shall be deemed to be liable to the Debtors or their estates

on account of the prepetition check or item being honored postpetition or otherwise in violation of

this Interim Order.  Without limiting the foregoing, the Cash Management Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order or any other order of this Court and shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

14.    The Debtors are authorized, but not directed, to implement reasonable changes, consistent with this Interim Order and subject to the DIP Order, to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts or opening new accounts whenever the Debtors deem that those accounts are needed or appropriate, and to enter into any ancillary agreements related to the foregoing, as they may deem necessary and appropriate, subject to the terms and provisions of the Debtors' agreements with the Cash Management Banks.  The Cash Management Banks are authorized to honor the Debtors' requests to open or close (as the case may be) the Bank Account(s) or new account(s) and accept and hold the Debtors' funds in accordance with the Debtors' instructions, subject to the terms and provisions of the Debtors' agreements with the Cash Management Banks, this Interim Order, and the DIP Order.

15.    The Debtors are authorized, but not directed, to deposit funds in accordance with existing practices under the Cash Management System as in effect as of the Petition Date, subject to any reasonable changes, consistent with this Interim Order and the DIP Order, to the Cash Management System that the Debtors may implement, and, to the extent such practices are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have forty-five (45) days from entry of this Interim Order to either comply with section 345(b) of the Bankruptcy Code or obtain this Court's approval for any deviation from section 345(b)

(including pursuant to any Final Order granting the Motion); *provided*, that such extension is without prejudice to the Debtors' right to request a further extension or complete waiver of the requirements of section 345(b) of the Bankruptcy Code in these Chapter 11 Cases.

16.      The Debtors are authorized, but not directed, to the extent consistent with the DIP Order and DIP Credit Documents (a) in their discretion to make payments on account of prepetition Intercompany Transactions, including prepetition Intercompany Claims among Debtors, if the Debtors deem the payment necessary and in the best interests of the Debtors' estates; (b) to set off prepetition obligations on account of Intercompany Transactions, including prepetition Intercompany Claims among Debtors; and (c) to continue to engage in Intercompany Transactions on a postpetition basis, including Intercompany Transactions with Non-Debtor Affiliates, in the ordinary course of business and/or as necessary to execute the Cash Management System; *provided*, that nothing in this Interim Order shall modify or impair the ability of any party in interest to contest (y) how the Debtors account, including, without limitation, the validity or amount set forth in such accounting, for any Intercompany Transaction, whether arising prepetition or post-petition; and (z) the ability of the Debtors to set off prepetition and post-petition obligations on account of Intercompany Transactions.

17.      The Debtors are authorized to enter into and engage in the Non-Debtor Intercompany Transactions and to take any actions related thereto subject to the DIP Order and DIP Credit Documents.  All claims arising from Non-Debtor Intercompany Transactions among the Debtors are hereby granted superpriority administrative expense status; *provided*, that any superpriority administrative expense other than the Carve-Out (as defined in the DIP Motion) arising under this paragraph shall be junior in all regards to the First Lien Loans and DIP Facility

and DIP Liens in the event these Chapter 11 Cases are converted to a liquidation proceeding purusant to either chapter 7 of the Bankruptcy Code or any other liquidation proceeding.

18.   The Debtors shall not be required to comply with the requirement of the U.S. Trustee Guidelines to establish separate accounts for cash collateral and/or tax payments.

19.   All claims against a Debtor by another Debtor arising from postpetition Intercompany Transactions shall be accorded superpriority administrative expense status under section 503(b) of the Bankruptcy Code.

20.   Notwithstanding the relief granted in this Interim Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order and the DIP Credit Documents (as defined in the DIP Order) and any orders governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating to the foregoing).  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Credit Documents.  To the extent there is any inconsistency between the terms of the DIP Order, the DIP Credit Documents, or any orders approving the Debtors' use of cash collateral, and the terms of this Interim Order, the terms of the DIP Order, the DIP Credit Documents, and such order approving the use of cash collateral, as applicable, shall control.

21.   Nothing contained in the Motion or this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist or was not perfected as of the Petition Date; or (b) alter or impair any lien, security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

22.   The final hearing on the Motion (the "***Final Hearing***") will be held on [ ● ], at [ ● ] [ ● ].m. (Eastern Time).  Any objections or responses to entry of a final order on the Motion

8

must be filed on or before 4:00 p.m. (Eastern Time) on [ ● ], 2024, and served on the following parties: (a) United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee, 1 Bowling Green, Room 534, New York, NY 10004 (Attn: Rachael E. Siegel (rachael.e.siegel@usdoj.gov), Daniel Rudewicz (daniel.rudewicz@usdoj.gov), and Brian Masumoto (brian.masumoto@usdoj.gov)); (b) 2U, Inc., 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202 (Attn: Paul S. Lalljie (plalljie@2u.com), Matthew Norden (mnorden@2u.com), and Lillian Brownstein (lbrownstein@2u.com)); (c) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis (george.davis@lw.com), George Klidonas (george.klidonas@lw.com), Anupama Yerramalli (anu.yerramalli@lw.com), Randall C. Weber-Levine (randall.weber-levine@lw.com) and Scott Yousey (scott.yousey@lw.com)), proposed counsel for the Debtors; (d) Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Albert A. Pisa (apisa@milbank.com), Tyson Lomazow (tlomazow@milbank.com), and Abigail Debold (adebold@milbank.com)), counsel for the First Lien Ad Hoc Group; (e) Weil, Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153 (Attn: Matt Barr (matt.barr@weil.com), David Griffiths (david.griffiths@weil.com), and F. Gavin Andrews (f.gavin.andrews@weil.com)), counsel for the Ad Hoc Noteholder Group; (f) Schulte, Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Kristine Manoukian (kristine.manoukian@srz.com), Kelly Knight (kelly.knight@srz.com), and Reuben E. Dizengoff (reuben.dizengoff@srz.com)), counsel to Greenvale; and (g) counsel to any statutory committee appointed in these Chapter 11 Cases. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

23.     Nothing in the Motion or this Interim Order or the relief granted herein (including any actions taken or payments made by the Debtors), is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Interim Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

24.     The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

25.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Interim Order shall be effective and enforceable immediately upon entry hereof.

26.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

27.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Interim Order.

28.     This Court retains jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated:_____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

### FINAL ORDER (A) AUTHORIZING THE DEBTORS TO (I) CONTINUE USE OF EXISTING CASH MANAGEMENT SYSTEM, INCLUDING MAINTENANCE OF EXISTING BANK ACCOUNTS, CHECKS, AND BUSINESS FORMS, (II) CONTINUE EXISTING DEPOSIT PRACTICES, (III) WAIVE CERTAIN U.S. TRUSTEE GUIDELINES, AND (IV) CONTINUE INTERCOMPANY TRANSACTIONS; (B) GRANTING SUPERPRIORITY STATUS TO POSTPETITION INTERCOMPANY CLAIMS; AND (C) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of the Debtors for a final order (this "***Final Order***"): (a) authorizing, but not directing, the Debtors, in their discretion, to (i) continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms, (ii) continue their existing deposit practices, (iii) waive the U.S. Trustee Guidelines and the requirements of section 345(b) of the Bankruptcy Code, to the extent inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Motion, (iv) continue certain ordinary course intercompany transactions, including honoring and paying prepetition intercompany claims among Debtors, and (v) open and close bank accounts; (b) granting superpriority status to postpetition intercompany claims arising from certain intercompany transactions; and (c) granting related relief; and this

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Court having reviewed the Motion and the First Day Declarations; and this Court having

determined that the relief requested in the Motion is in the best interests of the Debtors, their

estates, their creditors, and other parties in interest; and this Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern*

*District of New York*, dated January 31, 2012; and consideration of the Motion and the relief

requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and this Court having

authority to enter a final order consistent with Article III of the United States Constitution; and

venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that

proper and adequate notice of the Motion has been given and that no other or further notice is

necessary; and a hearing having been held, if necessary, to consider the relief requested in the

Motion (the "***Hearing***"); and upon the First Day Declarations and the record of the Hearing and

all the proceedings before this Court; and after due deliberation thereon; and good and sufficient

cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis, as set forth herein.

2.      All objections to the entry of this Final Order, to the extent not withdrawn or settled,

are overruled.

3.      The Debtors are authorized and empowered to maintain and continue to use their

existing Cash Management System in accordance with this Final Order and the DIP Order (as

applicable). In connection with the ongoing utilization of the Cash Management System, the

Debtors shall continue to maintain records with respect to all transfers of cash so that all

transactions may be readily ascertained, traced, and recorded properly to the same extent maintained by the Debtors before the Petition Date.

4.      Any existing deposit agreements between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all of the provisions of those agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect unless otherwise ordered by this Court, and the Debtors and the Cash Management Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and cash management procedures in the ordinary course of business and consistent with historical practices, the DIP Order, and the DIP Credit Documents, including, without limitation, the opening and closing of Bank Accounts, subject to the terms and conditions of this Final Order.

5.      The Debtors are authorized, but not directed, to continue to comply with the Collateral Obligations posted prepetition and to renew, replace, modify, extend, or add to the posted collateral as needed in the ordinary course postpetition.

6.      The Debtors are authorized, but not directed, to the extent consistent with the DIP Order and the DIP Credit Documents, to (a) continue to use any and all of the Bank Accounts in existence as of the Petition Date, including, but not limited to, the Bank Accounts identified in the Motion, in the same manner and with the same account numbers, styles, and document forms as are currently employed; (b) deposit funds in and withdraw funds from the Bank Accounts in the ordinary course by all usual means, including checks, wire transfers, drafts, ACH transfers, and electronic fund transfers or other items presented, issued, or drawn on the Bank Accounts; (c) pay ordinary course Bank Fees and Expenses and any other service charges in connection with the Bank Accounts, including any Bank Fees and Expenses arising prior to the Petition Date;

(d) continue to pay Payment Processing Fees; (e) perform their obligations under the documents and agreements governing the Bank Accounts; and (f) for all purposes, treat the Bank Accounts as accounts of the Debtors in their capacities as debtors in possession.

7.       The Cash Management Banks and the Debtors' financial institutions shall be, and hereby are, authorized, when requested by the Debtors in their discretion, to process, honor, pay, and, if necessary, reissue any and all checks, including prepetition checks that the Debtors reissue postpetition, and electronic fund transfers drawn on the Debtors' bank accounts relating to payments permitted by an order of this Court, whether the checks were presented or funds transfer requests were submitted prior to or subsequent to the Petition Date, *provided*, that sufficient funds are available in the applicable accounts to make the payments.

8.       The Debtors are authorized, but not directed, to continue to use their existing checks, correspondence, and other Business Forms without alteration or change and without the designation "Debtor in Possession" or a bankruptcy case number imprinted upon them.

9.       The Debtors are authorized, but not directed, to continue to utilize all third-party providers consistent with historical practices necessary for the administration of their Cash Management System, including, for the avoidance of doubt, Stripe.

10.      As of the Petition Date, and subject to the terms of this Final Order and the DIP Order (as applicable), (a) the Cash Management Banks are authorized to continue to administer, service, and maintain the Bank Accounts as the accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses, as such amounts are due and owing), and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date

4

by the holders or makers thereof, as the case may be, and, when requested by the Debtors in their discretion, to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts on account of a claim against the Debtors arising on or after the Petition Date; and (b) Stripe is authorized to continue making deductions for Payment Processing Fees, consistent with historical practice, in the ordinary course.

11.    The relief granted in this Final Order is extended to any new bank account opened by the Debtors at the Cash Management Banks after the date hereof, *provided*, that such new bank account complies with the terms of this Final Order and the DIP Order; *provided*, *further*, that such new bank account shall only be opened at a bank that is included on the U.S. Trustee's list of Authorized Depositories in Region 2; *provided*, *further*, that the Debtors shall provide notice to the U.S. Trustee within five (5) business days of the opening of such new bank account.

12.    All Cash Management Banks provided with notice of this Final Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue stop payment orders in accordance with the documents governing the Bank Accounts.

13.    No Cash Management Bank that honors a prepetition check or item drawn on any account that is the subject of this Final Order (a) at the direction of the Debtors to honor the prepetition check or item; (b) in the good faith belief that this Court has authorized the prepetition check or item to be honored; or (c) as a result of a good faith error made despite implementation of customary item handling procedures, shall be deemed to be liable to the Debtors or their estates on account of the prepetition check or item being honored postpetition or otherwise in violation of this Final Order.  Without limiting the foregoing, the Cash Management Banks may rely on the

representations of the Debtors with respect to whether any check or other payment order drawn or

issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order or

any other order of this Court and shall not have any liability to any party for relying on such

representations by the Debtors as provided for herein.

14.    The Debtors are authorized, but not directed, to implement reasonable changes,

consistent with this Final Order and the DIP Order, to the Cash Management System as the Debtors

may deem necessary or appropriate, including, without limitation, closing any of the Bank

Accounts or opening new accounts whenever the Debtors deem that those accounts are needed or

appropriate, and to enter into any ancillary agreements related to the foregoing, as they may deem

necessary and appropriate, subject to the terms and provisions of the Debtors' agreements with the

Cash Management Banks.  The Cash Management Banks are authorized to honor the Debtors'

requests to open or close (as the case may be) the Bank Account(s) or new account(s) and accept

and hold the Debtors' funds in accordance with the Debtors' instructions, subject to the terms and

provisions of the Debtors' agreements with the Cash Management Banks, this Final Order, and the

DIP Order.

15.    The Debtors are authorized, but not directed, to deposit funds in accordance with

existing practices under the Cash Management System as in effect as of the Petition Date, subject

to any reasonable changes, consistent with this Final Order and the DIP Order, to the Cash

Management System that the Debtors may implement, and, to the extent such practices are

inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the requirements are

waived; *provided*, *further*, that any requirement for the Debtors' Cash Management Banks to post

collateral required under section 345(b) of the Bankruptcy Code and any related requirement under

any Uniform Depository Agreement for any amounts deposited by the Debtors with the Cash Management Banks is waived.

16.    The Debtors are authorized, but not directed, (a) in their discretion to make payments on account of prepetition Intercompany Transactions, including prepetition Intercompany Claims among Debtors, if the Debtors deem the payment necessary and in the best interests of the Debtors' estates; (b) to set off prepetition obligations on account of Intercompany Transactions, including prepetition Intercompany Claims among Debtors; and (c) to continue to engage in Intercompany Transactions on a postpetition basis, including Intercompany Transactions with Non-Debtor Affiliates, in the ordinary course of business and/or as necessary to execute the Cash Management System; *provided*, that nothing in this Final Order shall modify or impair the ability of any party in interest to contest (y) how the Debtors account, including, without limitation, the validity or amount set forth in such accounting, for any Intercompany Transaction, whether arising prepetition or post-petition; and (z) the ability of the Debtors to set off prepetition and post-petition obligations on account of Intercompany Transactions; *provided*, *further*, that any superpriority administrative expense other than the Carve-Out (as defined in the DIP Motion) arising under this paragraph shall be junior in all regards to the First Lien Loans and DIP Facility and DIP Liens in the event these Chapter 11 Cases are converted to a liquidation proceeding purusant to either chapter 7 of the Bankruptcy Code or any other liquidation proceeding.

17.    The Debtors are authorized to enter into and engage in the Non-Debtor Intercompany Transactions and to take any actions related thereto subject to the DIP Order and DIP Credit Documents.  All claims arising from Non-Debtor Intercompany Transactions among the Debtors are hereby granted superpriority administrative expense status.

18.     The Debtors shall not be required to comply with the requirement of the U.S. Trustee Guidelines to establish separate accounts for cash collateral and/or tax payments.

19.     All claims against a Debtor by another Debtor arising from postpetition Intercompany Transactions shall be accorded superpriority administrative expense status under section 503(b) of the Bankruptcy Code.

20.     Notwithstanding the relief granted in this Final Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order and the DIP Credit Documents (as defined in the DIP Order) and any orders governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating to the foregoing).  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Credit Documents.  To the extent there is any inconsistency between the terms of the DIP Order, the DIP Credit Documents, or any orders approving the Debtors' use of cash collateral, and the terms of this Final Order, the terms of the DIP Order, the DIP Credit Documents, and such order approving the use of cash collateral, as applicable, shall control.

21.     Nothing contained in the Motion, the Interim Order, or this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist or was not perfected as of the Petition Date; or (b) alter or impair any lien, security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

22.     Nothing in the Motion, the Interim Order, or this Final Order, or the relief granted herein (including any actions taken or payments made by the Debtors), is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors'

or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. Nothing contained in this Final Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

23.    The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

24.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final Order shall be effective and enforceable immediately upon entry hereof.

25.    The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Final Order.

26.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated:_____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

**Bank Accounts**

| Financial Institution | Account Number | Account Holder | Account Type |
|---|---|---|---|
| JPMorgan Chase | XXXXX6686 | 2U, Inc. | Operating |
| Comerica | XXXXXX1849 | 2U, Inc. | Operating |
| Comerica | XXXXXX1422 | 2U, Inc. | Collections |
| JPMorgan Chase | XXXXX6779 | 2U, Inc. | Payroll |
| JPMorgan Chase | XXXXXX5286 | 2U, Inc. | Money Market |
| Comerica | XXXXXX1864 | 2U, Inc. | Money Market Account - Adequate Assurance |
| Flagstar Bank, N.A. | XXXXXX1233 | 2U, Inc. | DIP Funding Account |
| Citizens Bank, N.A. | XXXXXX8154 | 2U, Inc. | Subscription Account |
| Citizens Bank, N.A. | XXXXXX8162 | 2U, Inc. | Professional Fee Escrow Account |
| AMEX | XXXXX8586 | 2U, Inc. | Certificate of Deposit |
| JPMorgan Chase | XXXXXX3391 | 2U, Inc. | Restricted Cash |
| Comerica | XXXXXX1856 | 2U, Inc. | Inactive |
| Comerica | XXXXXXXXXXX0063 | 2U, Inc. | Inactive |
| Bank of America | XXXXXXXX1970 | edX Boot Camps LLC | Operating |
| JPMorgan Chase | XXXXX2922 | edX Boot Camps LLC | Operating |
| Bank of America | XXXXXXXX2144 | edX Boot Camps LLC | Payroll |
| JPMorgan Chase | XXXXX8116 | edX LLC | Operating |
| JPMorgan Chase | XXXXX6951 | edX LLC | Inactive |
| Comerica | XXXXXX0697 | 2U GetSmarter (US), LLC | Operating |
| JPMorgan Chase | XXXXX2032 | 2U GetSmarter (US), LLC | Operating |
| JPMorgan Chase | XXXX0185 | 2U GetSmarter (US), LLC | Collections |
| JPMorgan Chase | XXXX8169 | 2U GetSmarter (US), LLC | Collections |

| Comerica | XXXXXX9216 | 2U GetSmarter (US), LLC | Payroll |

## **EXHIBIT D**

**Schematic of Cash Management System**

*Notes:*
*- The above depicts typical relationships between accounts and transfer activity. During the ordinary course of business, the Debtors periodically transfer available funds from various accounts within the cash management system, including between non-debtor accounts, on an as needed basis to fund disbursements.*
*- Collection accounts can also be used to process customer refunds*

