**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR**
**INTERIM AND FINAL ORDERS (A) AUTHORIZING**
**THE DEBTORS TO (I) HONOR PREPETITION CUSTOMER OBLIGATIONS AND**
**(II) CONTINUE CUSTOMER PROGRAMS; AND (B) GRANTING RELATED RELIEF**

The debtors in possession (collectively, the "***Debtors***") in the above-captioned cases (the

"***Chapter 11 Cases***") hereby file this motion (this "***Motion***") and respectfully state as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in

the forms attached hereto as, respectively, **Exhibit A** (the "***Proposed Interim Order***") and

**Exhibit B** (the "***Proposed Final Order***" and, together with the Proposed Interim Order, the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC
(N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter
(US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

"***Proposed Orders***"): (a) authorizing, but not directing, the Debtors, in their discretion, to (i) fulfill

and honor (through payment, credit, setoff, or otherwise) their Customer Obligations (as defined

below) and (ii) continue, renew, replace, terminate, and/or implement new Customer Programs (as

defined below) and any other customer practices in the ordinary course postpetition without further

application to this Court; and (b) granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of New York (this

"***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern

District of New York*, dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).

3.      The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of

Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by this Court in

connection with this Motion to the extent that it is later determined that this Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

III of the United States Constitution. Venue of these cases and this Motion in this district is proper

under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a)

and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"),

Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the

Southern District of New York (the "***Local Rules***").

## BACKGROUND

5.      The Debtors comprise a leading online education technology company providing

over eighty million people worldwide with access to high-quality education, including graduate,

undergraduate, and non-degree programs.  Through a comprehensive platform, the Debtors enable non-profit universities and colleges to offer a wide range of online courses and programs.  These span diverse fields such as artificial intelligence, data science, business, healthcare, and education, with over 4,600 programs accessible on the Debtors' platform, edX.org, which provides learners with essential information on admissions, enrollment requirements, application processes, curriculum, tuition, and completion times.  By consolidating a vast array of educational offerings on a single platform, the Debtors offer flexible and affordable pathways for achieving professional and educational goals.  Although operations are predominantly remote, the majority of the Debtors' revenue flows into New York, where the Debtors hold their primary bank accounts, and where they collaborate with prestigious institutions of higher education (many of which are located here in New York City, including New York University, Columbia University, and Fordham University), enhancing their reach and impact within the city and state.

6.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing these Chapter 11 Cases.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested, and no committee has been appointed in these Chapter 11 Cases.

7.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Matthew Norden, Chief Legal Officer and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions* (the "***Norden Declaration***") and the *Declaration of William Kocovski in Support of Chapter 11 Petitions and First Day Motions* (the

"*Kocovski Declaration*" and, together with the Norden Declaration, the "*First Day Declarations*")

filed contemporaneously herewith, which are fully incorporated herein by reference.[2]

8.      These Chapter 11 Cases are "prepackaged" cases commenced for the purpose of

implementing an agreed restructuring of the Debtors' debt.  Prior to the Petition Date, the Debtors

entered into the Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended,

modified or supplemented, the "*Restructuring Support Agreement*") with certain creditors

including (a) an ad hoc group of certain holders (the "*Ad Hoc Noteholder Group*") of 2.25%

convertible senior notes due May 1, 2025, issued under that certain Indenture, dated as of April

23, 2020 (the "*2025 Notes*") and 4.50% senior unsecured convertible notes due February 1, 2030,

issued under that certain Indenture, dated as of January 11, 2023 (the "*2030 Notes*" and, together

with the 2025 Notes, the "*Notes*") represented by Weil, Gotshal & Manges LLP, (b) Greenvale

Capital LLP ("*Greenvale*" and, together with the Ad Hoc Noteholder Group, the "*Consenting

Noteholders*") as holder of the Notes represented by Schulte Roth & Zabel LLP, and (c) an ad hoc

group of certain First Lien Lenders (the "*First Lien Ad Hoc Group*" and, together with the

Consenting Noteholders, the "*Consenting Stakeholders*") represented by Milbank LLP.  As of

July 24, 2024, the Consenting Stakeholders held approximately 82% of the Debtors' first lien

funded debt, 86.9% of the 2025 Notes, and 95.2% of the 2030 Notes.

9.      On the Petition Date, the Debtors filed a plan of reorganization reflecting the terms

of the Restructuring Support Agreement (as may be amended, modified or supplemented, the

"*Plan*") in addition to a disclosure statement with respect to the Plan (as may be amended,

modified or supplemented, the "*Disclosure Statement*").  The Plan contemplates that all Allowed

---

[2]     Capitalized terms used, but not defined in this Motion have the meanings ascribed to them in the First Day
Declarations.

General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.[3]

10.    Prior to the Petition Date, the Debtors commenced solicitation of votes on the Plan from holders of Class 3 First Lien Claims and Class 4 Unsecured Notes Claims (each as defined in the Plan), the only classes entitled to vote under the Plan.  Subject to this Court's approval, votes with respect to the Plan are due on August 21, 2024. On the Petition Date, the Debtors filed a motion seeking, among other things, (a) conditional approval of the Disclosure Statement, and (b) to schedule a combined hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan.  The Debtors seek to obtain confirmation of the Plan as quickly as this Court's schedule and requisite notice periods will permit.

## THE DEBTORS' BUSINESS SEGMENTS AND CUSTOMERS

11.    As described in the Norden Declaration, the Debtors provide learners around the world with access to high-quality education on a global scale through a leading online platform. The Debtors have two business segments:   (a) the Degree Program Segment; and (b) the Alternative Credential Segment (each as defined below).  Through the Degree Program Segment, the Debtors provide technology and services to nonprofit colleges and universities to enable the online delivery of undergraduate and graduate degree programs through the Debtor's platform. Through the Alternative Credential Segment, the Debtors provide premium online open courses, executive education offerings, technical, skills-based boot camps to individual consumers through relationships with nonprofit colleges and universities and other leading organizations.  For the fiscal year ending on December 31, 2023, the Debtors generated revenue of approximately

---

[3]    Contemporaneously with filing this Motion, the Debtors are filing a motion to seek this Court's authorization to reject certain unexpired commercial real property leases.

(a) $561 million from the Degree Program Segment and (b) $385 million from the Alternative Credential Segment.

12.     The Debtors partner with approximately forty-three (43) nonprofit colleges and universities (collectively, the "***University Customers***") to provide technology and services to support the University Customers' online degree programs (the "***Degree Programs***" and, the business segment associated therewith, the "***Degree Program Segment***").    The University Customers collect tuition and fees from the students enrolled in the Degree Programs.    Pursuant to the terms of the applicable contracts between each University Customer and the applicable Debtor (the "***University Customer Agreements***"), the University Customers pay the Debtors a portion of the revenue collected from the Degree Programs as consideration for the Debtors' provision of technology and services (the "***Degree Program Revenue Share***").    Typically, each University Customer reports and pays the applicable Degree Program Revenue Share to the Debtors each academic term after the last possible date a student can withdraw from a course and receive a refund, which is typically one to three weeks after the first day of the course and is set by each University Customer (the "***Degree Program Add/Drop Deadline***").    As further described below, the University Customers have the right to offset certain amounts owed by the Debtors to the University Partners by subtracting such amount from the next Degree Program Revenue Share payment.

13.     The Debtors also offer premium, non-degree online open courses (the "***Open Courses***"), executive education programs (the "***Executive Education Programs***"), and skills-based boot camps (the "***Boot Camps***" and, together with the Open Courses and the Executive Education Programs, the "***Alternative Credential Programs***" and, the business segment associated therewith, the "***Alternative Credential Segment***").    The content for Alternative Credential

6

Programs is developed or approved by certain colleges, universities, or other commercial or non-profit institutions (the "*Alternative Credential Partners*"), and the Alternative Credential Programs are delivered under the applicable Debtor's and Alternative Credential Partner's brand. In consideration for the Alternative Credential Partners' provision of content or related services, the Debtors pay an agreed-upon portion of the revenue generated from the Alternative Credential Programs to the Alternative Credential Partners (the "*Alternative Credential Revenue Share*"). The Alternative Credential Revenue Share generally accrues after the date set as the last possible date a learner can withdraw from an Alternative Credential Program and receive a refund, which is typically one to three weeks after the first day of the course (the "*Alternative Credential Add/Drop Deadline*"). The Alternative Credential Revenue Share is generally paid quarterly to the applicable Alternative Credential Partner.

14.     The Debtors market the Alternative Credential Programs directly to individual consumers (the "*Learner Customers*"). Learner Customers pay the Debtors directly to access these Alternative Credential Programs. The Debtors also market the Alternative Credential Programs to organizations, corporations, non-profits, and governments (the "*Enterprise Customers*" and, together with the University Customers and Learner Customers, the "*Customers*"). The Enterprise Customers pay the Debtors directly to provide their employees with access to the Alternative Credential Programs. The Enterprise Customers' employees can then take courses in the Alternative Credential Programs at no cost and have an opportunity to upskill or reskill while remaining employed full-time.

15.     Each Enterprise Customer can structure its purchase of the Alternative Credential Programs in one of two ways. *First*, an Enterprise Customer can purchase a set number of credits, which typically need to be used by the Enterprise Customer's employees within twelve (12)

months from the purchase date (the "***Enterprise Learner Credit Programs***").  *Second*, an Enterprise Customer can purchase credits through a subscription program, in which the Enterprise Customer pays a flat fee per employee to access the Alternative Credential Programs (the "***Enterprise Subscription Programs***" and, together with the Enterprise Learner Credit Programs, the "***Enterprise Programs***").  Pursuant to an Enterprise Subscription Program, the Enterprise Customer's employees can take an unlimited number of Alternative Credential Programs during the subscription period.  Enterprise Customers typically pay the Debtors shortly after signing an agreement for an Enterprise Program.

## THE DEBTORS' CUSTOMER PROGRAMS

16.     To preserve the Debtors' critical relationships with their Customers, the Debtors provide various types of programs to their Customers, including making various types of contractually required payments to their Customers in the ordinary course of business (collectively, the "***Customer Programs***" and, the obligations incurred thereunder, the "***Customer Obligations***"). The Debtors offer two categories of Customer Programs (each as defined and further described below):  (a) the Degree Customer Programs and (b) the Alternative Credential Customer Programs.

17.     The Debtors' goodwill and ongoing business relationships may erode if their Customers perceive that the Debtors are unable or unwilling to fulfill the prepetition Customer Obligations.  If the Debtors are unable to preserve the loyalty of their Customers, the Debtors' businesses would likely suffer material harm.  It is essential, therefore, that the Debtors fulfill their Customer Obligations and continue the Customer Programs to ensure customer satisfaction and maintain Customer goodwill, which is critical to the Debtors' ongoing operations and to preserving and maximizing stakeholder value.  Indeed, without the ability to continue the Customer Programs and to satisfy Customer Obligations, the Debtors risk losing market share, harming their future business and revenue growth, and reducing the recoveries of the Debtors' stakeholders.

18.    As further described below, the Debtors estimate that the aggregate value of accrued Customer Obligations as of the Petition Date is approximately $23.9 million.  This sum is comprised of:  (a) $20.8[4] million in Degree Customer Program Obligations (as defined below), of which $5.2 million will come due during the period beginning on the Petition Date and ending on the date that is thirty (30) calendar days after the Petition Date (the "***Interim Period***"); and (b) $3.05 million in Alternative Credential Customer Program Obligations (as defined below), of which $2.97 million will come due during the Interim Period.

## A.    DEGREE CUSTOMER PROGRAMS

19.    The Debtors provide the following Customer Programs to the University Customers in connection with the Degree Program Segment (the "***Degree Customer Programs***") (each as defined and further described below):  (a) the Royalty Program; (b) Student Bad Debt Obligations; (c) Immersion Experience Obligations; (d) Degree Program Commitments; and (e) Other University Customer Obligations.  The Debtors estimate that the following amounts are accrued and owed as of the Petition Date on account of the Degree Customer Programs (collectively, the "***Degree Customer Program Obligations***"):

| Degree Customer Program | Estimated Amount Owed on Interim Basis | Total Estimated Amount Outstanding |
|---|---|---|
| Royalty Program | $1,000,000 | $1,000,000 |
| Student Bad Debt Obligations | $3,700,000 | $3,700,000 |
| Immersion Experience Obligations | $400,000 | $400,000 |

---

[4]    The amount of Degree Customer Program Obligations which the Debtors request authority to pay includes amounts of prepetition Degree Customer Program Obligations that University Customers may be entitled to, but for which they have not yet requested payment.  The Debtors have, in good faith and in an abundance of caution, included these amounts they would be obligated to pay in the event payment is requested for them.

| | | |
|---|---|---|
| Degree Program Commitments | $0 | $15,600,000[5] |
| Other University Customer Obligations | $100,000 | $100,000 |
| **Total** | $5,200,000 | $20,800,000 |

20.     The Debtors request authority to pay and honor, including through implementing or agreeing to setoffs, the Degree Customer Program Obligations owed to certain University Customers as they come due in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget (as defined in the DIP Order).[6]  Failure to pay and honor the Degree Customer Program Obligations would constitute a breach of certain University Customer Agreements.  Further, failure to satisfy the Degree Customer Program Obligations would likely result in serious and irreparable harm to the Debtors, including loss of certain business and market share, and erosion of University Customer satisfaction and goodwill.  If the Debtors are unable to fulfil their Degree Customer Program Obligations, University Customers may seek remedies against the Debtors and pursue competitive alternatives to the Debtors' technology and services to deliver their online education.

21.     Additionally, the Debtors request authority to continue to perform, including through implementing or agreeing to setoffs, their Degree Customer Program Obligations on a postpetition basis in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget.

---

[5]     As discussed in section IV, many of the Degree Program Commitments are agreed upon in the applicable University Customer Agreement and paid in periodic installments subject to the terms of the applicable University Customer Agreement.  As of the Petition Date, the Debtors have accrued approximately $15.6 million in prepetition Degree Program Commitments; however, given the prepackaged nature of these cases, the Debtors do not anticipate that any such obligations will come due prior to emergence from these Chapter 11 Cases.

[6]     "***DIP Order***" refers to that interim or final order, as applicable, approving the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief* (as may be amended, restated or otherwise modified from time to time).

## I.      Royalty Program

22.      The Debtors are obligated to pay certain University Customers (the "*Original University Customers*") a percentage of net revenue (the "*Royalties*") that the Debtors generate from substantially similar Degree Programs provided by other University Customers (the "*Subsequent University Customers*," and the program, the "*Royalty Program*").[7]  The Debtors agreed to pay such Royalties to the Original University Customers as consideration for permitting the Debtors to market Subsequent University Customers' programs to leads initially generated for the Original University Customers.

23.      The Debtors pay such Royalties to the Original University Customers typically on a quarterly basis after the Debtors calculate the Royalties owed to each University Customer.  On average, the Debtors pay approximately $1,000,000 in Royalties each quarter.  The Debtors estimate that the aggregate amount of Royalties accrued and owing as of the Petition Date under the Royalty Program is $1,000,000.

## II.      Student Bad Debt Obligations

24.      Typically, students must pay University Customers tuition and fees for Degree Programs by the first day of class.  The University Customers typically pay the Debtors the Degree Program Revenue Share after the Degree Program Add/Drop Deadline.  The Degree Program Revenue Share is paid following this deadline because students receive a full refund of their tuition payments if they drop the course prior to the deadline.

25.      In some instances, however, certain University Customers may allow certain students to enroll and complete programs without collecting payment in full at the outset of the

---

[7]    An example of this arrangement applies to Master of Business Administration ("*MBA*") degrees.  Certain University Customers are entitled to Royalties if the Debtors have partnered with other University Customers to offer a competitive MBA Degree Program.

Degree Program or a specific course. These students complete the Degree Program on credit and undertake an obligation to pay such tuition and fees in future installments. Inevitably, some students may not fulfill their obligations and make all required payments. The University Customers offering such arrangements will periodically evaluate the aging of these tuition accounts receivable and, after a failed collection process, determine such outstanding obligations amount to bad debt. Once declared bad debt, University Customers write off the revenue associated with such student's obligation and then invoice the Debtors for their respective share of such obligations (the "**Student Bad Debt Obligations**"), which the Debtors are required to then pay pursuant to the relevant University Customer Agreements.

26. On average, the Debtors accrue approximately $150,000 to $600,000 in Student Bad Debt Obligations each quarter. The Debtors estimate that the aggregate amount of Student Bad Debt Obligations accrued and owing as of the Petition Date is $3.7 million.

### III. Immersion Experience Obligations

27. As part of a Degree Program, a University Customer may plan, organize, and execute in-person on- and off-campus events for students and faculty (the "**Immersion Experiences**"). For example, an MBA Degree Program may incorporate an Immersion Experience where the students travel with faculty to the New York Stock Exchange. In certain circumstances, the University Customer will pay for the Immersion Experiences and then seek reimbursement from the Debtors when the Debtors are obligated to pay a portion of the costs and expenses, including transportation and lodging, incurred in connection with such Immersion Experiences (the "**Immersion Experience Obligations**").

28. On average, the Debtors accrue approximately $250,000 in Immersion Experience Obligations each quarter. The Debtors estimate that the aggregate amount of Immersion Experience Obligations accrued as of the Petition Date is $400,000.

### IV.    Degree Program Commitments

29.    As part of their business, the Debtors have committed to make various types of payments to the University Customers to offset some of the upfront costs University Customers may incur to develop and launch Degree Programs (the "***Degree Program Commitments***").  These payments may be upfront, one-time payments or periodic payments over time.

30.    The Degree Program Commitment payments are typically conditioned on the University Customers satisfying defined milestones, such as launching a Degree Program within a certain time period.  Depending on the terms of the underlying University Customer Agreement, the payments are made (a) before such milestones are satisfied, in which case University Customers are required to return the Degree Program Commitment in the event of non-satisfaction of the milestones, or (b) after the University Customer has satisfied the condition.  The Debtors' ability to honor the Degree Program Commitments is crucial to maintaining their Customer relationships and preserving the value of the Degree Program Segment.

31.    The amount of Degree Program Commitments paid by the Debtors each quarter varies depending on the terms of University Customer Agreements recently entered by the Debtors.  The Debtors estimate that the aggregate amount of the Degree Program Commitments accrued and owing as of the Petition Date is $15.6 million.

### V.    Other University Customer Obligations

32.    The Debtors also have additional payment obligations to University Customers for miscellaneous categories of expenses, including Extraordinary Refund Offsets, Compliance Payments, Scholarship Reconciliation Payments, and Marketing Rights Obligations (each as defined below, and collectively, the "***Other University Customer Obligations***").

33.    The Debtors will occasionally issue refunds to University Customers if a student drops a class after the Degree Program Add/Drop Deadline has passed due to extraordinary

circumstances (the "***Extraordinary Refunds***").  In these situations, the University Customer offsets the accrued amount of Extraordinary Refunds against the next Degree Program Revenue Share payment made to the Debtors (the "***Extraordinary Refund Offsets***").  Accordingly, the Extraordinary Refund Offsets do not require payment by the Debtors, but in an abundance of caution, the Debtors request authority to honor any prepetition Extraordinary Refund Offsets and to continue honoring Extraordinary Refund Offsets in the ordinary course postpetition.

34.     Periodically, the Debtors make certain one-time and recurring payments to governmental authorities and authorization boards on behalf of the University Customers to ensure compliance with regulations applicable to their offering of online degree programs (the "***Compliance Payments***").  The Debtors make the Compliance Payments directly to the relevant governmental entities and invoice the University Customers for reimbursement.[8]

35.     On rare occasion, the Debtors receive Degree Program Revenue Share on account of tuition or fees that are later discovered to be covered by a scholarship.  Upon discovery of such a circumstance, the University Customer invoices the Debtors for repayment of the Degree Program Revenue Share in an amount proportionate to the size of the scholarship (the "***Scholarship Reconciliation Payments***").

36.     The Debtors have also committed to pay certain University Customers a fixed amount of the University Customer's marketing and promotional spend for Degree Program (the "***Marketing Rights Obligations***").  Relatedly, the Debtors are also obligated to pay certain University Customers in the event that a Degree Program has not met defined metrics, which are measured on an annual basis.  Payment of these Other University Customer Programs is necessary

---

[8]     For example, certain states require providers of distance education services, including the Debtors, to make Compliance Payments in order to offer such programs to students in those jurisdictions.  If the Debtors were to stop making the Compliance Payments, the Debtors would be prevented from offering Degree Programs to students in those states.

to maintain their valuable relationships with University Customers, and in the case of the Compliance Payments, ensure the Degree Programs comply with applicable regulations.

37.    On average, the Debtors accrue approximately $150,000 to $200,000 in Other University Customer Obligations each quarter.  The Debtors estimate that the aggregate amount of Other University Customer Obligations accrued and owing as of the Petition Date is $100,000.

**B.    ALTERNATIVE CREDENTIAL CUSTOMER PROGRAMS**

38.    The Debtors provide the following Customer Programs to their Learner Customers and Enterprise Customers in connection with the Alternative Credential Segment (the "***Alternative Credential Customer Programs***") (each as defined and further described below):  (a) Learner Refunds; (b) Financing Provider Payments; and (c) Enterprise Customer Payments.  The Debtors estimate that the following amounts are accrued and owed as of the Petition Date on account of the Alternative Credential Customer Programs (the "***Alternative Credential Customer Program Obligations***"):

| Alternative Credential Customer Program | Estimated Amount Owed on Interim Basis | Total Estimated Amount Outstanding |
|---|---|---|
| Learner Refunds | $2,800,000 | $2,800,000 |
| Financing Provider Payments | $150,000 | $200,000 |
| Enterprise Customer Payments | $20,000 | $50,000 |
| **Total** | $2,970,000 | $3,050,000 |

39.    The Debtors request authority to pay and honor, including through implementing or agreeing to setoffs, the Alternative Credential Customer Program Obligations owed to certain Learner Customers and Enterprise Customers as they come due in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget.  Failure to pay and

honor the Alternative Credential Customer Program Obligations may constitute a breach of agreements with Learner Customers and Enterprise Customers. Further, failure to satisfy the Alternative Credential Customer Program Obligations would likely result in serious and irreparable harm to the Debtors, including loss of certain business, market share, erosion of Learner Customer and Enterprise Customer satisfaction and goodwill. If the Debtors are unable to fulfil their obligation to pay Alternative Credential Customer Program Obligations, Learner Customers and Enterprise Customers may seek remedies and pursue competitive alternatives to the Debtors' online educational platform to meet their demand.

40.    Additionally, the Debtors request authority to continue to perform, including through implementing or agreeing to setoffs, under the Alternative Credential Customer Program Obligations on a postpetition basis in the ordinary course of business, consistent with past practice, and in accordance with the Approved Budget.

## I.    Learner Refunds

41.    The Learner Customers pay the Debtors directly to participate in the Alternative Credential Programs. The Learner Customers may elect to pay in full at the time of registration, in which case the Learners' entire balance for the Alternative Credential Program must be paid before the program begins. The Learner Customers may also elect to utilize a monthly payment plan with the Debtors, in which case the first monthly payment is due before the program begins and subsequent payments are due on a monthly basis. Under both payment options, if a Learner Customer drops the course prior to the Alternative Credential Add/Drop Deadline, the Debtors refund any tuition payments already made to the Learner Customer in the ordinary course of business (the "*Ordinary Learner Refunds*").

42.    The Debtors provide certain discounts on Learner Programs for certain Learner Customers. The discounts are generally applied at the point of sale, but the Debtors will

sometimes, as a courtesy and in their sole discretion, honor a discount after a Learner Customer has already paid full price for an Alternative Credential Program if the Learner Customer was unaware the discount could be applied.  In such instances, the Debtors will issue a refund for the amount of the discount to the Learner Customer (the "***Promotional Refunds***" and, together with the Ordinary Learner Refunds, the "***Learner Refunds***").

43.    On average, the Debtors accrue approximately $5.3 million in Learner Refunds each quarter.  The Debtors estimate that the aggregate amount of Learner Refunds accrued and owing as of the Petition Date is $2.8 million.

## II.    Financing Provider Payments

44.    The Debtors partner with third-party financing sources (the "***Financing Providers***") to provide Learner Customers financing options to fund their participation in Boot Camps.  The terms of each financing arrangement are determined by the Financing Provider based on its underwriting criteria.  Each financing arrangement must also be approved by the Alternative Credential Partner that developed the Boot Camp's content.[9]  Pursuant to the terms of the underlying financing arrangement, the Financing Provider pays tuition, on behalf of the Learner Customer, to the Debtors either by paying a lump sum within the first month of the Boot Camp or by remitting monthly payments for the duration of the financing arrangement.  As a result, there are circumstances where Learner Customers become eligible for a Learner Refund after the Debtors have received payment from Financing Providers on behalf of the Learner Customers.  In such circumstances, in order to deliver the Learner Refund to the Learner Customers, the Financing

---

[9]    Certain universities may have their own relationships with Financing Providers, and Learner Customers are also able to secure financing directly from these universities.

Providers will invoice the Debtors to recoup the previous payment (the "***Financing Provider Payments***").

45.    On average, the Debtors accrue approximately $470,000 in Financing Provider Payments each quarter.  The Debtors estimate that the aggregate amount of Financing Provider Payments accrued and owing as of the Petition Date is $200,000.

### III.    Enterprise Customer Payments

46.    In connection with the delivery of Enterprise Programs, the Debtors make occasional payments to Enterprise Customers, including refunds of amounts previously paid by Enterprise Customers (the "***Enterprise Customer Payments***").    The Enterprise Customer Payments are necessary for the Debtors to maintain strong relationships with Enterprise Customers.

47.    The amount of Enterprise Customer Payments paid by the Debtors each quarter varies depending on the terms of Enterprise Customer agreements recently entered by the Debtors. The Debtors estimate that the aggregate amount of Enterprise Customer Payments accrued and owing as of the Petition Date is $50,000.

## BASIS FOR RELIEF

### A.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO MAINTAIN THE CUSTOMER PROGRAMS AS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

48.    Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so.    *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge deciding a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining

a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted).

49.     Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Id.* (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).

50.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under section 363(b) of the Bankruptcy Code.  If the Debtors are prohibited from honoring the Customer Obligations and maintaining their Customer Programs consistent with their past business practices, their Customers may lose confidence in the Debtors' ability to provide their products and services on competitive terms, and will likely cause some of the Customers to seek alternative services from competitors to meet their business needs.  In addition, the damage from refusing to honor these obligations far exceeds the cost associated with honoring prepetition obligations and continuing these practices.  The relief requested herein will protect the Debtors' goodwill with their Customers during this critical time and enhance the Debtors' ability to generate revenue.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

51.     Accordingly, the Debtors request that they, in accordance with the Approved Budget, be authorized to (a) fulfill and honor (through payment, setoff, credit, or otherwise) such of their Customer Obligations, whether arising prepetition or postpetition, and (b) continue, renew, replace, implement new, and/or terminate the Customer Programs and any other customer practices, without further application to this Court.

## B.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE MOTION PURSUANT TO THE DOCTRINE OF NECESSITY

52.     Section 105(a) of the Bankruptcy Code codifies the Bankruptcy Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See In re C.A.F. Bindery, Inc.,* 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.,* 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization."); *Ionosphere Clubs,* 98 B.R. at 176 (holding that a court may authorize payments of prepetition obligations under section 105(a) of the Bankruptcy Code pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity")).

53.     Failing to obtain the relief sought herein—indeed, even being forced to advise Customers that further judicial relief is necessary—could result in the Debtors losing a portion of their customer base and severe harm to the estates.  Such disruption and value degradation could undermine the Debtors' reorganization efforts, and, accordingly, this Motion should be granted under section 105(a) of the Bankruptcy Code.

C.    **MAINTENANCE OF THE CUSTOMER PROGRAMS AND PAYMENT OF THE PREPETITION CUSTOMER OBLIGATIONS ARE AUTHORIZED UNDER SECTIONS 1107(A) AND 1108 OF THE BANKRUPTCY CODE**

54.    Authority for the maintenance and payment of the Customer Programs is found in sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Courts have recognized that implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

55.    The *CoServ* court held that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  *Id*.  That court specifically held that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate."  *Id*. at 497-98.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*.

56.    Payment of the prepetition Customer Obligations meets each *CoServ* element.  As described above, non-payment of the prepetition Customer Obligations could result in the Debtors

being in violation of certain University Customer Contracts and their business obligations, in which case the Debtors would suffer a loss of a portion of their customer base and a deterioration of goodwill.  Nonpayment of the prepetition Customer Obligations also could render the Debtors unable to maintain their invaluable customer relationships or develop new ones.  The potential harm and economic disadvantage that would stem from the failure to honor the prepetition Customer Obligations are grossly disproportionate to the amount of the prepetition Customer Obligations.  Therefore, the Debtors respectfully submit that they can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the prepetition Customer Obligations.

### D.    PRECEDENT CASES SUPPORT GRANT OF THE REQUESTED RELIEF

57.    The relief requested in this Motion is similar to relief granted by numerous courts, including this Court in other chapter 11 cases in this district.  *See, e.g.*, *In re Acorda Therapeutics, Inc.*, Case No. 24-22284 (DSJ) (Bankr. S.D.N.Y. Apr. 26, 2024) [Docket No. 101] (granting final relief to maintain and administer customer programs and to honor related prepetition obligations); *In re GOL Linhas Aèreas Inteligentes S.A.*, Case No. 24-10118 (MG) (Bankr. S.D.N.Y. Feb. 22, 2024) [Docket No. 173] (same); *In re PacificCo Inc.*, Case No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023) [Docket No. 154] (same); *In re Times Square JV LLC*, Case No. 22-11715 (JPM) (Bankr. S.D.N.Y. Jan. 19, 2023) [Docket No. 117] (same); *In re Endo Int'l plc*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y. Sept. 30, 2022) [Docket No. 316] (same); *In re Lumileds Holding B.V.*, Case No. 22-10760 (LGB) (Bankr. S.D.N.Y. Sept. 21, 2022) [Docket No. 123]; *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Aug. 4, 2022) [Docket No. 173] (same); *In re Revlon, Inc.*, Case No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Jul. 21, 2022) [Docket No. 260] (same); *In re GTT Commc'ns, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021) [Docket No. 142] (same); *In re A.B.C. Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1,

2021) [Docket No. 113] (same); *In re GBG USA Inc.,* Case No. 21-11369 (MEW) (Bankr.

S.D.N.Y. Sept. 1, 2021) [Docket No. 147] (same); *In re Lakeland Tours, LLC*, Case No. 20-11647

(JLG) (Bankr. S.D.N.Y. Aug. 6, 2020) [Docket No. 91] (same).

**E.    THIS COURT SHOULD AUTHORIZE BANKS TO HONOR AND PAY CHECKS ISSUED AND ELECTRONIC FUNDS TRANSFERRED TO PAY THE PREPETITION CUSTOMER OBLIGATIONS**

58.    The Debtors further request that this Court authorize, but not direct, their banking

institutions and all other applicable banks and other financial institutions to receive, process,

honor, and pay any and all checks drawn or electronic funds relating to the prepetition Customer

Obligations, regardless of whether such checks were presented before or after the Petition Date.

The Debtors expect to have sufficient liquidity to pay such amounts as they become due in the

ordinary course of business, and under the Debtors' existing cash management system, checks or

wire transfer requests can be readily identified as relating to an authorized payment of the

Customer Obligations.  As such, the Debtors believe that checks or wire transfer requests, other

than those relating to authorized payments, will not be honored inadvertently.  The Debtors also

seek authority to issue new postpetition checks or effect new electronic fund transfers on account

of the Customer Obligations to replace any prepetition checks or electronic fund transfer requests

that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases.

**F.    NO PARTY WILL BE PREJUDICED BY THE RELIEF REQUESTED IN THIS MOTION**

59.    No party in interest will be prejudiced by the relief requested by this Motion

because the Customer Obligations are unimpaired under the Plan and will be paid in full.  Thus,

the relief requested herein seeks to alter only the timing, not the amount or priority, of such

payments.  Moreover, as described more fully herein authority to pay the Customer Obligations in

the ordinary course of business is necessary to avoid the risk of disruption to the Debtors' business

from Customers reducing or discontinuing their dealing with the Debtors.

### G.    BANKRUPTCY RULE 6003 HAS BEEN SATISFIED, AND BANKRUPTCY RULE 6004 SHOULD BE WAIVED

60.    Certain aspects of the relief requested herein may, if granted, be subject to

Bankruptcy Rule 6003.  Under Bankruptcy Rule 6003, this Court may grant a motion to "use . . .

property of the estate, including a motion to pay all or part of a claim that arose before the filing

of the petition" within twenty-one (21) days after the chapter 11 case's commencement to the

extent "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The

Debtors believe an immediate and orderly transition into Chapter 11 is critical to the viability of

their operations and the success of these Chapter 11 Cases.  As discussed in detail above and in

the Kocovski Declaration, immediate and irreparable harm would result if the relief herein is not

granted.  Continuity of the Debtors' Customer Programs is critical to the Debtors' ongoing

operations.  Any interruption to the Customer Programs could cause customers to reduce or cease

their business with the Debtors and thereby adversely impact the Debtors' ability to maximize

estate value.  Accordingly, the Debtors submit that they have satisfied the "immediate and

irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that this

Court approve the relief requested in this Motion on an emergency basis.

61.    Additionally, with respect to any aspect of the relief sought herein that constitutes

a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the fourteen-

day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in

this Motion is immediately necessary for the Debtors to be able to continue to operate their

businesses and preserve the value of their estates.  The Debtors thus submit that the requested

waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

## **RESERVATION OF RIGHTS**

62.     Nothing in this Motion shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If this Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **MOTION PRACTICE**

63.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## NOTICE

64.     Notice of this Motion will be given to:  (a) the United States Trustee for Region 2; (b) Milbank LLP as counsel to the First Lien Ad Hoc Group; (c) the administrative agent and collateral agent under the first lien credit agreement; (d) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Noteholder Group; (e) Schulte Roth & Zabel LLP as counsel to Greenvale; (f) the indenture trustees for the Notes; (g) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (h) the United States Attorney's Office for the Southern District of New York; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the University Customers; and (l) all parties entitled to notice pursuant to Local Rule 9013-1(b).  The Debtors submit that, under the circumstances, no other or further notice is required.

65.     A copy of this Motion is available from (a) this Court's website, www.nysb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/2U.

## NO PRIOR MOTION

66.     The Debtors have not made any prior motion for the relief sought in this Motion to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court enter the Proposed Interim Order and, following a noticed hearing on the relief sought, the Proposed Final Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

**LATHAM & WATKINS LLP**

Dated:    July 25, 2024
      New York, New York

By:    _/s/ George A. Davis_____
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  george.davis@lw.com
       george.klidonas@lw.com
       anu.yerramalli@lw.com
       randall.weber-levine@lw.com
       scott.yousey@lw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## <u>EXHIBIT A</u>

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO**
**(I) HONOR PREPETITION CUSTOMER OBLIGATIONS AND**
**(II) CONTINUE CUSTOMER PROGRAMS; AND (B) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of the Debtors for an interim order (this "***Interim Order***"): (a) authorizing, but not directing, the Debtors, in their discretion, to (i) fulfill and honor (through payment, credit, setoff, or otherwise) their Customer Obligations as they deem appropriate; and (ii) continue, renew, replace, terminate and/or implement new Customer Programs and any other customer practices in the ordinary course postpetition without further application to this Court; and (b) granting related relief; and this Court having reviewed the Motion and the First Day Declarations; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and this Court having authority to enter a final order consistent with

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and a hearing having been held to consider the relief requested in the Motion (the "***Hearing***"); and upon the First Day Declarations and the record of the Hearing and all the proceedings before this Court; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on an interim basis, as set forth herein.

2.      All objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

3.      The Debtors are authorized, but not directed, in accordance with the Approved Budget, to (a) fulfill and honor (through payment, credit, setoff, or otherwise) their Customer Obligations as they deem appropriate and (b) continue, renew, replace, terminate and/or implement new Customer Programs, without further order of this Court, in each case whether related to the prepetition period or the postpetition period; *provided*, that such new Customer Programs may only be implemented without prior court approval to the extent arising in the ordinary course; *provided*, *further*, that nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing (as defined below) to consider the relief requested in the Motion.  Notwithstanding any other provision of this Interim Order, such payments shall not exceed $8.2 million in the aggregate without further order of this Court.

4.      The Debtors' banks and financial institutions are authorized to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or

2

issued on the Debtors' bank accounts before the Petition Date for the Customer Obligations that have not been honored and paid as of the Petition Date (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and are authorized to rely on the Debtors' directions or representations as to which checks, drafts, transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Interim Order; *provided*, that sufficient funds are on deposit in the applicable bank accounts to cover such payments, and any such banks and financial institutions shall not have any liability to any party for relying on such directions or representations by the Debtors as provided in this Interim Order.

5.      Notwithstanding the relief granted in this Interim Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order and the DIP Credit Documents (as defined in the DIP Order) and any orders governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating to the foregoing).  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Credit Documents.  To the extent there is any inconsistency between the terms of the DIP Order, the DIP Credit Documents, or any orders approving the Debtors' use of cash collateral, and the terms of this Interim Order, the terms of the DIP Order, the DIP Credit Documents, and such order approving the use of cash collateral, as applicable, shall control.

6.      The final hearing on the Motion (the "***Final Hearing***") will be held on [ ● ], at [ ● ] [ ● ].m. (Eastern Time).  Any objections or responses to entry of a final order on the Motion must be filed on or before 4:00 p.m. (Eastern Time) on [ ● ], 2024, and served on the following parties: (a) United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee,

1 Bowling Green, Room 534, New York, NY 10004 (Attn: Rachael E. Siegel (rachael.e.siegel@usdoj.gov), Daniel Rudewicz (daniel.rudewicz@usdoj.gov), and Brian Masumoto (brian.masumoto@usdoj.gov)); (b) 2U, Inc., 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202 (Attn: Paul S. Lalljie (plalljie@2u.com), Matthew Norden (mnorden@2u.com), and Lillian Brownstein (lbrownstein@2u.com)); (c) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis (george.davis@lw.com), George Klidonas (george.klidonas@lw.com), Anupama Yerramalli (anu.yerramalli@lw.com), Randall C. Weber-Levine (randall.weber-levine@lw.com) and Scott Yousey (scott.yousey@lw.com)), proposed counsel for the Debtors; (d) Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Albert A. Pisa (apisa@milbank.com), Tyson Lomazow (tlomazow@milbank.com), and Abigail Debold (adebold@milbank.com)), counsel for the First Lien Ad Hoc Group; (e) Weil, Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153 (Attn: Matt Barr (matt.barr@weil.com), David Griffiths (david.griffiths@weil.com), and F. Gavin Andrews (f.gavin.andrews@weil.com)), counsel for the Ad Hoc Noteholder Group; (f) Schulte, Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Kristine Manoukian (kristine.manoukian@srz.com), Kelly Knight (kelly.knight@srz.com), and Reuben E. Dizengoff (reuben.dizengoff@srz.com)), counsel to Greenvale; and (g) counsel to any statutory committee appointed in these Chapter 11 Cases. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

7. Nothing in the Motion or this Interim Order or the relief granted herein (including any actions taken or payments made by the Debtors), is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the

Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Interim Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

8.     The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

9.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Interim Order shall be effective and enforceable immediately upon entry hereof.

10.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

11.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Interim Order.

12.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated:_____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 ([ ● ]) |
| Debtors.[12] | (Joint Administration Requested) |

### FINAL ORDER (A) AUTHORIZING THE DEBTORS TO
### (I) HONOR PREPETITION CUSTOMER OBLIGATIONS AND
### (II) CONTINUE CUSTOMER PROGRAMS; AND (B) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[13] of the Debtors for a final order (this "***Final Order***"): (a) authorizing, but not directing, the Debtors to (i) fulfill and honor (through payment, credit, setoff, or otherwise) their Customer Obligations as they deem appropriate; and (ii) continue, renew, replace, terminate and/or implement new Customer Programs and any other customer practices in the ordinary course postpetition without further application to this Court; and (b) granting related relief; and this Court having reviewed the Motion and the First Day Declarations; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2);

---

[12]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[13]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

and this Court having authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and a hearing having been held, if necessary, to consider the relief requested in the Motion (the "**Hearing**"); and upon the First Day Declarations and the record of the Hearing and all the proceedings before this Court; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis, as set forth herein.

2.      All objections to the entry of this Final Order, to the extent not withdrawn or settled, are overruled.

3.      The Debtors are authorized, but not directed, in accordance with the Approved Budget, to (a) fulfill and honor (through payment, credit, setoff, or otherwise) their Customer Obligations as they deem appropriate and (b) continue, renew, replace, terminate and/or implement new Customer Programs, without further order of this Court, in each case whether related to the prepetition period or the postpetition period; *provided*, that such new Customer Programs may only be implemented without prior court approval to the extent arising in the ordinary course.

4.      The Debtors' banks and financial institutions are authorized to receive, process, honor, and pay all checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts before the Petition Date for the Customer Obligations that have not been honored and paid as of the Petition Date (or to reissue checks, drafts, electronic fund transfers, or other forms of payment drawn or issued on the Debtors' bank accounts, as may be necessary), and are authorized to rely on the Debtors' directions or representations as to which

2

checks, drafts, transfers, or other forms of payment drawn or issued on the Debtors' bank accounts are subject to this Final Order; *provided*, that sufficient funds are on deposit in the applicable bank accounts to cover such payments, and any such banks and financial institutions shall not have any liability to any party for relying on such directions or representations by the Debtors as provided in this Final Order.

5.      Notwithstanding the relief granted in this Final Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with the DIP Order and the DIP Credit Documents (as defined in the DIP Order) and any orders governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating to the foregoing).  Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Credit Documents.  To the extent there is any inconsistency between the terms of the DIP Order, the DIP Credit Documents, or any orders approving the Debtors' use of cash collateral, and the terms of this Final Order, the terms of the DIP Order, the DIP Credit Documents, and such order approving the use of cash collateral, as applicable, shall control.

6.      Nothing in the Motion, the Interim Order, or this Final Order, or the relief granted herein (including any actions taken or payments made by the Debtors), is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek

3

avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt,

or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an

admission as to the validity, priority, enforceability, or perfection of any lien on, security interest

in, or other encumbrance on property of the Debtors' estates; (h) a waiver of the obligation of any

party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which

may exist against any entity under the Bankruptcy Code or any other applicable law.  Nothing

contained in this Final Order shall be deemed to increase, reclassify, elevate to an administrative

expense status, or otherwise affect any claim to the extent it is not paid.

7.      The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

8.      Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final

Order shall be effective and enforceable immediately upon entry hereof.

9.      The Debtors are authorized and empowered to take all actions necessary or

appropriate to implement the relief granted in this Final Order.

10.     This Court retains jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated:_____, 2024

_____
UNITED STATES BANKRUPTCY JUDGE