**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-[ ● ] ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

**DISCLOSURE STATEMENT FOR THE JOINT**
**PREPACKAGED PLAN OF REORGANIZATION OF 2U, INC.**
**AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE *JOINT PREPACKAGED PLAN OF REORGANIZATION OF 2U, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE* IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE.  THE DEBTORS INTEND TO SEEK THE BANKRUPTCY COURT'S FINAL APPROVAL OF THIS DISCLOSURE STATEMENT AT THE COMBINED HEARING.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE RESTRUCTURING SUPPORT AGREEMENT AND THE RELATED TERM SHEETS REFERENCED HEREIN. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

THIS DISCLOSURE STATEMENT IS SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PREPACKAGED PLAN OF REORGANIZATION OF 2U, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE* FROM THE HOLDERS OF OUTSTANDING CLAIMS IN THE FOLLOWING CLASSES:

| VOTING CLASS | NAME OF CLASS |
|---|---|
| CLASS 3 | FIRST LIEN CLAIMS |
| CLASS 4 | UNSECURED NOTES CLAIMS |

IF YOU ARE IN CLASSES 3 OR 4, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN

DELIVERY OF BALLOTS: CLASS 3

IF YOU ARE IN CLASS 3, YOU MAY SUBMIT YOUR VOTE VIA:

1. EPIQ'S E-BALLOT PORTAL, AVAILABLE AT HTTPS://EPIQWORKFLOW.COM/CASES/2UBALLOT USING THE UNIQUE E-BALLOT ID# ON YOUR BALLOT.

2. REGULAR MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:

*2U INC. BALLOT PROCESSING*
*C/O EPIQ CORPORATE RESTRUCTURING, LLC*
*10300 SW ALLEN BLVD.*
*BEAVERTON, OR 97005*

> **3. EMAIL DELIVERY BY:**
>
> **SENDING PDF COPIES OF THE COMPLETED BALLOT(S) TO TABULATION@EPIQGLOBAL.COM, WITH A REFERENCE TO "2U BALLOTS" IN THE SUBJECT LINE**
>
> **PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT OR CONSENT FORM.**
>
> **<u>DELIVERY OF BALLOTS: CLASS 4</u>**
>
> **IF YOU ARE IN <u>CLASS 4</u>, YOU MAY SUBMIT YOUR VOTE IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE, WHICH MAY INCLUDE (I) SUBMITTING YOUR BALLOT OR (II) CONVEYING YOUR VOTE VIA E-MAIL, TELEPHONE, INTERNET APPLICATION, FACSIMILE, VOTER INFORMATION FORM, OR OTHER ACCEPTED AND CUSTOMARY MEANS OF DELIVERING SUCH INFORMATION TO YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR ALL STEPS.**
>
> **<u>THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON AUGUST 21, 2024</u>**
>
> **(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE)**
>
> **TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, YOU MUST RETURN YOUR PROPERLY COMPLETED BALLOT TO THE CLAIMS AND NOTICING AGENT OR YOUR NOMINEE, AS APPLICABLE, SO THAT YOUR BALLOT OR MASTER BALLOT, AS APPLICABLE, IS <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE PROPOSED DISCLOSURE STATEMENT ORDER.**
>
> **IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT:**
>
> **TABULATION@EPIQGLOBAL.COM WITH A REFERENCE TO "*2U*" IN THE SUBJECT LINE**
>
> **OR**
>
> **877-525-5725 (TOLL FREE U.S.) OR +1 360-803-4441 (INTERNATIONAL)**

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, this "***Disclosure Statement***") provides information regarding the *Joint Prepackaged Plan of Reorganization of 2U, INC. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy*

*Code* (as may be amended, supplemented, or otherwise modified from time to time, the "***Plan***"),[2] which 2U, Inc. and the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***" and, together with their non-Debtor Affiliates, "***2U***" or the "***Company***") intend to File in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") on the Petition Date.   A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and is incorporated herein by reference.   The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

As described in greater detail below, pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors, Holders of approximately 82% in principal amount of the First Lien Claims, and Holders of approximately 89.2% in principal amount of the Unsecured Notes Claims.

The Confirmation and Consummation of the Plan are subject to certain material conditions precedent set forth in Article VIII of the Plan.   There is no assurance that the Bankruptcy Court will confirm the Plan or that, if the Bankruptcy Court does confirm the Plan, the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors encourage you to read this Disclosure Statement (including the "Risk Factors" described in <u>Article VII</u> herein) and the Plan in their entirety before submitting your Ballot to vote on the Plan.   Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

Furthermore, the Debtors urge you to consult with your own advisors with respect to any legal, financial, Securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each transaction contemplated by the Plan.

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

**RECOMMENDATION BY THE DEBTORS:**

**EACH DEBTOR'S BOARD OF DIRECTORS, MEMBERS, OR MANAGERS, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF EACH OF THE DEBTORS' RESPECTIVE ESTATES, AND PROVIDES THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR PROPERLY COMPLETED BALLOTS TO THE CLAIMS AND NOTICING AGENT OR THEIR NOMINEE, AS APPLICABLE, SO THAT THEIR BALLOTS OR MASTER BALLOTS, AS APPLICABLE, ARE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT NO LATER THAN AUGUST 21, 2024 AT 5:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan. The New Common Interests to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "***SEC***") under the United States Securities Act of 1933 (as amended, the "***Securities Act***") or any Securities regulatory authority of any state under any state Securities law ("***Blue Sky Laws***"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority, and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 3(a)(9) and/or section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to the Holders of Unsecured Notes Claims of New Common Interests prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "***Solicitation***").

After the Petition Date, the New Common Interests and the New Common Interests issuable upon exercise of rights available to Holders of Unsecured Notes Claims under the Equity Rights Offering Documents (the "***Rights***"), each as described in this Disclosure Statement will be offered, issued, and distributed without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as may be amended from time to time, the "***Bankruptcy Code***"), section 4(a)(2) of the Securities Act, and/or other exemptions from registration under the Securities Act and Blue Sky Laws. To the extent that exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal Securities law do not

apply, the New Common Interests, the Rights, and/or the New Common Interests issuable upon exercise of such Rights may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. Neither the Solicitation nor this Disclosure Statement shall constitute an offer to sell or the solicitation of an offer to buy Securities in any state or jurisdiction in which such offer or solicitation is not authorized.

The offering of Rights to Holders of Unsecured Notes Claims under the Equity Rights Offering Documents and the sale of New Common Interests will be conducted pursuant to separate Equity Rights Offering Procedures attached hereto as **Exhibit F**. Any disclosure contained herein concerning the offering of such Rights is solely for information purposes and is not an offer to sell or a solicitation of an offer to buy any securities. Holders of Unsecured Notes Claims are advised to carefully read the terms of the Plan and this Disclosure Statement with respect to the offering of Rights in the Equity Rights Offering.

Securities offered and sold in reliance on the exemption set forth in section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Plan's Effective Date.

No offer of securities to the public is made, or will be made, in any member state of the European Economic Area or the United Kingdom that requires the publication of a prospectus within the meaning of the EU Prospectus Regulation (Regulation (EU) 2017/1129) (including as it forms part of domestic law in the UK by virtue of the European Union (Withdrawal) Act 2018).

## **DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information.  The information included in this Disclosure Statement is provided solely for the purpose of soliciting votes to accept or reject the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan.  All Holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting.  The Debtors believe that these summaries are, as of the date hereof, fair and accurate.  The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable Law, the Debtors are under no duty to update or supplement this Disclosure Statement.  The Bankruptcy Court has not yet approved this Disclosure Statement as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.  Following the commencement of the Chapter 11 Cases, the Debtors expect to promptly seek orders of the Bankruptcy Court approving this Disclosure Statement as containing "adequate information," approving the solicitation of votes as being in compliance with sections 1125 and 1126(b) of the Bankruptcy Code, and confirming the Plan.  If the Bankruptcy Court approves this Disclosure Statement, such approval does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan.  The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified.  Holders of Claims and Interests reviewing this Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement.  No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan.  This Disclosure Statement does not constitute legal, business, financial, or tax advice.  Additionally, neither the SEC nor any Securities regulatory authority of any state under Blue Sky Laws has approved or disapproved this Disclosure Statement.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Chapter 11 Cases, and certain documents related to the Plan that are attached hereto and incorporated herein by reference.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events.  In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained

in this disclosure statement has been provided by the Debtors' management.  The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise.  The Debtors' management, in consultation with the Company Advisors (as defined below), has prepared the Financial Projections (as defined below) attached hereto as **Exhibit C** and described in this Disclosure Statement.  Although the Financial Projections provide numerical specificity, they were necessarily based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management.  Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors.  The Debtors caution that no representations can be made as to the accuracy of these Financial Projections or to the Debtors' ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved.  Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the forecasted results will actually occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign Laws or rules.  As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, Securities, financial, or other effects of the Plan to Holders of Claims against, or Interests in, the Debtors or any other party in interest.  Please refer to Article VII herein, titled "Risk Factors" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular claim is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute claims and may object to claims after the Confirmation Date or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such claims or objections to claims.

Except as otherwise expressly set forth herein, the Debtors have provided all information, representations, or statements contained herein.  No Person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the Exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar terminology, or the negative thereof or other variations thereon, generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Except as required by Law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

Holders of Allowed General Unsecured Claims against any Debtors will not be Impaired by the Plan and, as a result, the right to receive payment in full on account of existing obligations in respect of such Claims is not altered by the Plan. During the Chapter 11 Cases, the Debtors intend to operate their businesses in the ordinary course.

**THE PLAN PROVIDES THAT (A) HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE WHO (I) VOTE TO ACCEPT THE PLAN, (II) DO NOT VOTE TO ACCEPT OR REJECT THE PLAN AND DO NOT ELECT TO OPT-OUT OF THE THIRD-PARTY RELEASE PROVISIONS OF THE PLAN, OR (III) VOTE TO REJECT THE PLAN BUT DO NOT OPT-OUT OF THE THIRD-PARTY RELEASE PROVISIONS OF THE PLAN; AND (B) HOLDERS OF IMPAIRED CLAIMS OR INTERESTS WHO ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT TIMELY ELECT TO OPT-OUT OF THE THIRD PARTY RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE THIRD PARTY RELEASE CONTAINED IN THE PLAN.**

No legal or tax advice is provided to you by this Disclosure Statement. The Debtors urge each Holder of a Claim against or Interest in the Debtors to consult with its own advisors with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Furthermore, the Bankruptcy Court's approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

In reviewing this Disclosure Statement and the Plan, and in determining whether to vote in favor of or against, or to object to Confirmation of, the Plan, creditors, equity interest holders and other stakeholders should be aware that the Plan preserves all Causes of Action (including avoidance actions) and that the Plan authorizes the Reorganized Debtors to prosecute the same, except as otherwise set forth in the plan.

# TABLE OF CONTENTS

**Page**

I. EXECUTIVE SUMMARY ...........................................................................................1

    A.    Purpose and Effect of the Plan..........................................................................2
    B.    Solicitation Procedures ....................................................................................3
    C.    Voting Procedures...........................................................................................13
    D.    Confirmation of the Plan.................................................................................16
    E.    Consummation of the Plan..............................................................................17
    F.    Risk Factors ....................................................................................................18

II. BACKGROUND TO THE CHAPTER 11 CASES ................................................19

    A.    Preliminary Statement.....................................................................................19
    B.    2U's History....................................................................................................21
    C.    2U's Business Operations ...............................................................................24
    D.    The Debtors' Prepetition Corporate and Capital Structure..............................29

III. NOTABLE PREPETITION EVENTS ...................................................................34

    A.    Circumstances Leading to these Chapter 11 cases .................................................34
    B.    The Path Forward............................................................................................39

IV. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES.......................42

    A.    Commencement of the Chapter 11 Cases and Filing of First Day Motions .........42
    B.    Exclusive Period for Filing a Plan and Soliciting Votes.................................47
    C.    Anticipated Post-Emergence Capital Structure & Operations.............................47

V. SUMMARY OF THE PLAN....................................................................................49

    A.    Administrative, DIP Facility, and Priority Tax Claims ........................................49
    B.    Classification and Treatment of Classified Claims and Interests ........................51
    C.    Means for Implementation of the Plan...........................................................57
    D.    Treatment of Executory Contracts and Unexpired Leases ...............................68
    E.    Provisions Governing Distributions.................................................................73
    F.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims
        or Interests.......................................................................................................78
    G.    Conditions Precedent to Confirmation and Consummation of the Plan ...............81
    B.    Release, Discharge, Injunction And Related Provisions ......................................83
    C.    Protection Against Discriminatory Treatment......................................................89
    D.    Integral Part of Plan ........................................................................................89
    E.    Financial Information and Projection ...............................................................90
    F.    Liquidation Analysis.......................................................................................90
    G.    Valuation of the Debtors.................................................................................90

VI. CONFIRMATION AND CONSUMMATION PROCEDURES ............................................92

    A.    Solicitation of Votes ............................................................92
    B.    Confirmation Procedures ......................................................92
    C.    Statutory Requirements for Confirmation of the Plan ...........................92
    D.    Consummation of the Plan .....................................................98

VII. RISK FACTORS ...........................................................................99

    A.    Certain Bankruptcy Law and Chapter 11 Case Considerations..........................99
    B.    Risks Relating to the Capital Structure of the Reorganized Debtors...................107
    C.    Risk Factors that Could Negatively Impact the Debtors' And the
           Reorganized Debtors' Business Operations and Financial Conditions ...............113
    D.    Risks Associated with Forward-Looking Statements ...........................123
    E.    Disclosure Statement Disclaimer ..........................................124

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ....................................................................................127

    A.    Liquidation Under Chapter 7 of the Bankruptcy Code .......................127
    B.    Filing of an Alternative Plan of Reorganization .................................127

IX. SECURITIES LAW MATTERS ...........................................................129

    A.    1145 Securities...............................................................129
    B.    4(A)(2) Securities...........................................................131
    C.    Listing ....................................................................133

X. CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN .............134

    A.    Introduction.................................................................134
    B.    Consequences to the Debtors ...........................................135
    C.    Consequences to Holders of Claims .................................139

RECOMMENDATION ........................................................................152

## **EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Financial Projections

EXHIBIT D    Liquidation Analysis

EXHIBIT E    Organizational Structure

EXHIBIT F    Equity Rights Offering Procedures

| THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED HERETO BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. |
| --- |

**I.**
**EXECUTIVE SUMMARY**

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code, in connection with the solicitation of votes on the Plan. The Debtors intend to commence the Chapter 11 Cases in the Bankruptcy Court on the Petition Date. At that time or soon thereafter, the Debtors will File with the Bankruptcy Court the Plan and this Disclosure Statement, and the Debtors will request that the Bankruptcy Court hold a hearing to confirm the Plan and this Disclosure Statement (the "***Combined Hearing***") on September 6, 2024 at 10:00 A.M. (prevailing Eastern Time) before the Bankruptcy Court. A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in this Disclosure Statement and the Plan, which is qualified by reference to this entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of this Disclosure Statement and/or the Plan. This Disclosure Statement includes, without limitation, information about:

- the Debtors' history and corporate structure;

- the Debtors' business operations and prepetition capital structure;

- the events leading up to the commencement of the Chapter 11 Cases;

- the implementation of the Chapter 11 Cases and the events that are anticipated to occur during the Chapter 11 Cases;

- the anticipated post-emergence capital structure and operations of the Reorganized Debtors if the Bankruptcy Court confirms the Plan and it becomes effective;

- an overview of the material terms and provisions of the Plan, including certain impacts that Confirmation of the Plan will have, the Securities to be issued under the Plan, and the manner in which distributions will be made under the Plan;

- certain risk factors related to the Chapter 11 Cases, the capital structure of the Reorganized Debtors, and the business operations and financial conditions of the Debtors and the Reorganized Debtors;

- the Plan Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted; and

1

- a summary of alternatives to the Plan, and certain tax consequences of the Plan.

## A.   PURPOSE AND EFFECT OF THE PLAN

### 1.   Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any Person acquiring property under the plan, any creditor or interest holder of the debtor, and any other entity as may be ordered by such bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### 2.   Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.  A bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim or interest in a debtor and all other entities as may be ordered by such bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

### 3.   Financial Restructurings Under the Plan

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in <u>Article V</u> herein):

- conversion of approximately $414.3 million in principal amount of First Lien Claims to an equal amount of amended and extended first lien loans, which will have an extended maturity date of 27 months from the Effective Date;

- conversion of approximately $527 million in principal amount of Unsecured Notes Claims to 100% of the New Common Interests, subject to dilution from (i) New Common Interests issued pursuant to the Equity Rights Offering, and (ii) the MIP;

- postpetition financing—in the form of a $64 million DIP Facility—to enable the Debtors to continue to operate in the ordinary course of business during the Chapter 11 Cases;

- DIP Claims will receive either (a) their Pro Rata share of exit loans under a new secured second lien exit term loan facility; or (b) such other treatment as to which the Debtors and the Holders of such Allowed DIP Claims will have agreed upon in writing;

- New Common Interests in the Reorganized Debtors will be issued under the Equity Rights Offering.

- the Reorganized Debtors will continue to pay each Allowed General Unsecured Claim in the ordinary course of business; *provided* that the Claims arising from any rejection of unexpired leases shall be capped pursuant to section 502(b)(6) of the Bankruptcy Code.

- each Holder of an Allowed Intercompany Claim or Intercompany Interest will, at the option of the Debtors, either have its Claim: (a) Reinstated; or (b) set off, settled, distributed, contributed, merged, canceled, or released;

- all Existing Equity Interests will be canceled, released, and extinguished; and

- the legal, equitable, and contractual rights of each Holder of an Allowed Other Secured Claim and an Allowed Other Priority Claim will be unaltered by the Plan.

## B.    SOLICITATION PROCEDURES

**The discussion of the procedures below is a summary of the solicitation and voting process**. Detailed voting instructions will be provided with each Ballot and are also set forth in greater detail in the proposed Disclosure Statement Order.

> PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOT AND THE PROPOSED DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

### 1.    Prepetition Solicitation

As of the date hereof, the Debtors have caused their solicitation, notice, claims, and balloting agent, Epiq Corporate Restructuring, LLC (the "***Claims and Noticing Agent***"), to distribute packages (the "***Solicitation Packages***") to Holders of Claims entitled to vote to accept or reject the Plan as of July 22, 2024. The Solicitation Packages disclose the Debtors' expectation and intention to: (a) commence the Chapter 11 Cases; and (b) request that the Bankruptcy Court approve the Solicitation procedures, as set forth in this Disclosure Statement and the proposed Disclosure Statement Order, including approval of certain key dates as outlined below.

Members of the Voting Classes (as defined below) that receive the Solicitation Package are directed to follow the instructions contained on the Ballot to complete and submit their Ballots and cast their votes. Each Holder must submit its Ballot to the Claims and Noticing Agent or their

Nominee, as applicable, so that their Ballot or Master Ballot is **actually received** by the Claims and Noticing Agent on or before August 21, 2024 (the "**_Voting Deadline_**") to be counted.

The Bankruptcy Court has not yet approved this Disclosure Statement.  On the Petition Date or soon thereafter, the Debtors will File a motion with the Bankruptcy Court seeking approval of this Disclosure Statement together with Confirmation of the Plan at the same hearing (*i.e.*, the Combined Hearing).  By sending this Disclosure Statement and soliciting votes on the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases and thus place the Debtors in a position to minimize the length of the Chapter 11 Cases.

  **2.**  **Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class) under the Plan:

**SUMMARY OF STATUS AND VOTING RIGHTS**

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 7 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 8 | Existing Equity Interests | Impaired | Deemed to Reject |
| 9 | Subordinated Claims | Impaired | Deemed to Reject |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Classes 3 and 4 (the "**_Voting Classes_**") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.  The Debtors are **not** soliciting votes from: (a) Holders of Claims in Classes 1, 2, and 5 because such parties are conclusively presumed to have accepted the Plan, (b) Holders of Claims and Interests in Classes 8 and 9 because such parties are conclusively deemed to have rejected the

Plan, and (c) Holders of Claims and Interests in Classes 6 and 7 because such parties are either Unimpaired and conclusively presumed to have accepted the Plan or Impaired and collectively deemed to have rejected the Plan (the foregoing non-Voting Classes, collectively, the "***Non-Voting Classes***").  In lieu of a Solicitation Package, Holders of Claims in Non-Voting Classes will receive the appropriate forms of notices described in Article I.B.6 below.

### 3.      Classification and Treatment of Claims and Interests Under the Plan

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and Consummation of the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN <u>ARTICLE VII</u> BELOW. THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY.**

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Secured Claims<br><br>Expected Amount: N/A | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, on the Effective Date, each Holder of such Allowed Other Secured Claim shall receive, at the Debtors' option and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld), either (i) payment in full in Cash, (ii) delivery of the collateral securing such Allowed Other Secured Claim, (iii) Reinstatement of such Allowed Other Secured Claim, or (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Priority Claims<br><br>Expected Amount: N/A | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | 100% |
| 3 | First Lien Claims<br><br>Expected Amount: $414.3 | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed First Lien Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed First Lien Claim, on the Effective Date, each Holder of such Allowed First Lien Claim shall receive its Pro Rata share of the Amended and Restated Loans. | 100% |

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 4 | Unsecured Notes Claims<br><br>Expected Amount: $527 million | Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Unsecured Notes Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Unsecured Notes Claim, on the Effective Date, each Holder of such Allowed Unsecured Notes Claim shall receive (i) the right to participate in the Equity Rights Offering in accordance with the Equity Rights Offering Procedures, and (ii) its Pro Rata share of the New Common Interests (subject to dilution on account of the New Common Interests issued pursuant to (A) the MIP, and (B) the Equity Rights Offering). | 37.7% [3] |
| 5 | General Unsecured Claims<br><br>Expected Amount: N/A | The legal, equitable, and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date, the Reorganized Debtors shall continue to pay each Allowed General Unsecured Claim in the ordinary course of business; *provided* that each Landlord Claim shall be subject to the cap set forth in section 502(b)(6) of the Bankruptcy Code. | 100% |
| 6 | Intercompany Claims<br><br>Expected Amount: N/A | On the Effective Date, Intercompany Claims shall be, at the option of the applicable Debtor and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld), either:   (i) Reinstated;  or  (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors. | N/A |

---

[3]   Plan recovery for Unsecured Notes Claims includes (a) recovery attributable to the direct distribution of New Common Equity 33.9%; plus (b) recovery attributable to the value of Rights 3.8%.

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 7 | Intercompany Interests<br><br>Expected Amount: N/A | On the Effective Date, Intercompany Interests shall be, at the option of the applicable Debtor and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld), either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld). | N/A |
| 8 | Existing Equity Interests<br><br>Expected Amount: $0 | On the Effective Date, all Existing Equity Interests will be canceled, released, and extinguished and will be of no further force and effect. No Holders of such Existing Equity Interests will receive any property or distribution under the Plan. | 0% |
| 9 | Subordinated Claims<br><br>Expected Amount: $0 | On the Effective Date, all Subordinated Claims will be canceled, released, and extinguished and will be of no further force and effect. No Holders of such Subordinated Claims will receive any property or distribution under the Plan. | 0% |

**4.     Administrative, Professional Fee, DIP, and Priority Tax Claims**

The following is a summary of the treatment of Administrative, Professional Fee, DIP, and Priority Tax Claims under the Plan. For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

(a)     General Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such

Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

(b)     Professional Fee Claims

Professional Fee Claims will be satisfied as set forth in Article II.A.2 of the Plan, as summarized herein.

(i)     *Professional Fee Applications*

All applications for final allowance of Professional Fee Claims must be Filed and served on the Reorganized Debtors and such other Entities who are designated in the Combined Order no later than thirty (30) days after the Effective Date.  The Professional Fee Claims owed to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account after such Claims are Allowed by a Final Order.  After all Allowed Professional Fee Claims have been paid in full, any excess amounts remaining in the Professional Fee Escrow Account shall be returned to the Reorganized Debtors.  To the extent that the funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Allowed Professional Fee Claims owed to the Professionals, the Reorganized Debtors shall pay such amounts within ten (10) Business Days of entry of the order approving such Professional Fee Claims.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting Professional by no later than thirty (30) days after the Filing of the applicable final application for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Escrow Account, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim. The Reorganized Debtors shall not commingle any funds contained in the Professional Fee Escrow Account and shall use such funds to pay only the Professional Fee Claims, as and when Allowed by order of the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, the failure of the Professional Fee Escrow Account to satisfy in full the Professional Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Debtors or the Reorganized Debtors.

(ii)     *Professional Fee Escrow Account*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the

benefit of the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

(iii)    <em>Professional Fee Reserve Amount</em>

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate in good faith their Professional Fee Claims (taking into account any retainers) prior to and as of the Effective Date and shall deliver such estimate to the Debtors at least three (3) calendar days prior to the Confirmation Date.  If a Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(iv)    <em>Post-Effective Date Fees and Expenses</em>

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  Each Reorganized Debtor may employ and pay any fees and expenses of any professional, including any Professional, in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court, including with respect to any transaction, reorganization, or success fees payable by virtue of the consummation of the Plan or the occurrence of the Effective Date.

(c)    <u>DIP Claims</u>

In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each Holder of such Allowed DIP Claim shall receive either (i) its Pro Rata share of Exit Loans under the Exit Facility Credit Agreement, or (ii) such other treatment as to which the Debtors and the Holder of such Allowed DIP Claim will have agreed upon in writing, with the consent of the Required Consenting Noteholders and the Debtors.

(d)    <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  Nothing in the foregoing or otherwise in the Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Priority Tax Claim.

(e)    <u>United States Trustee Statutory Fees</u>

The Debtors and the Reorganized Debtors, as applicable, will pay all fees due and owing to the United States Trustee pursuant to 28 U.S.C. § 1930(a), together with interest, if any, pursuant to 31 U.S.C. Section 3717, for each quarter until the entry of a final decree, or if the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(f)    <u>Restructuring Fees and Expenses</u>

The Restructuring Fees and Expenses, not previously paid pursuant to the DIP Orders, incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the Restructuring Support Agreement and DIP Orders, as applicable, without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

## 5.    Contents of the Solicitation Package

The following documents and materials collectively constitute the Solicitation Package:

- the Notice of (a) Commencement of Chapter 11 Cases, (b) Combined Hearing, (c) Objection and Voting Deadlines, and (d) Solicitation and Voting Procedures, in substantially the form of the notice attached as Exhibit 1 to the proposed Disclosure Statement Order (the "***Combined Notice***");

- this Disclosure Statement;

- the Plan (which may be furnished in the Solicitation Package as Exhibit A to the Disclosure Statement);

- the proposed Disclosure Statement Order (without exhibits attached);

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan;

- a Ballot appropriate for the specific Holder of a Claim or Interest, in substantially the forms attached to the proposed Disclosure Statement Order (as may be modified for particular classes and with instructions attached thereto);

## 6.    Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims

As set forth above, certain Holders of Claims and Interests are **not** entitled to vote on the Plan.  As a result, such parties will **not** receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- <u>Unimpaired Claims – Deemed to Accept</u>.  Administrative Claims, Priority Tax Claims, and DIP Claims are unclassified, non-voting Claims.  Holders of Claims in Classes 1, 2, and 5 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan.  As such,

Holders of such Claims will receive, in lieu of a Solicitation Package or Ballots, (a) the Combined Notice; and (b) the "Unimpaired Claims Notice," the form of which is attached as Exhibit 5 to the proposed Disclosure Statement Order and gives (i) notice of the filing of the Plan, (ii) notice that such party has been identified as the Holder of an Unimpaired Claim or Interest, (iii) instructions regarding the Combined Hearing and how to obtain a copy of the Solicitation Package (other than Ballots) free of charge, and (iv) detailed directions for filing objections to approval of the Disclosure Statement or confirmation of the Plan.

- <u>Impaired Claims – Deemed to Reject</u>.  Holders of Claims and Interests in Classes 8 and 9 are receiving no distribution under the Plan and, therefore, are conclusively deemed to have rejected the Plan.  As such, Holders of such Claims and Interests will receive: (a) the Combined Notice; (b) the "Notice of Non-Voting Status to Holders of Impaired Claims and Interests," the form of which is attached as Exhibit 6 to the proposed Disclosure Statement Order; and (c) an Opt-Out Form.

- <u>Claims and Interests of Affiliates of the Debtors</u>.  In addition, Claims and Interests in Classes 6 and 7 are either Unimpaired or Impaired and are presumed to have accepted the Plan if Unimpaired or presumed to have rejected the Plan if Impaired.  In either scenario, the Holders of such Claims and Interests are Affiliates of the Debtors and, therefore, the Debtors will not be obligated to deliver Solicitation Packages or Ballots to such Holders and any requirement to deliver a notice with respect to such Holders under Bankruptcy Rule 3017(d) will be waived.

- <u>Contract and Lease Counterparties</u>.  Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, counterparties to the Debtors' Executory Contracts and Unexpired Leases will receive, in lieu of a Solicitation Package, the Combined Notice, which will include information on the treatment of executory contracts and unexpired leases in the Plan.

### 7.    Additional Distribution of Solicitation Documents

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Classes, on or about the date of this Disclosure Statement, the Debtors mailed or will mail a copy of the "***Combined Notice***" attached to the proposed Disclosure Statement Order as Exhibit 1 by first class mail to all known Holders of Claims and all known Holders of Interests.  In addition, the Debtors have also served or will serve a copy of the Combined Motion (as defined below), the Combined Notice, this Disclosure Statement, and the Plan on: (a) the United States Trustee for the District of Delaware (the "***U.S. Trustee***"); (b) Milbank LLP as counsel to the First Lien Ad Hoc Group; (c) the administrative agent and collateral agent under the First Lien Credit Agreement; (d) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Noteholder Group; (e) Schulte Roth & Zabel LLP as counsel to Greenvale; (f) the indenture trustees for the Notes; (g) the United States Attorney's Office for the Southern District of New York; (h) the Internal Revenue Service; (h) the Securities and Exchange Commission; and (j) those parties that have requested notice pursuant to Bankruptcy Rule 2002.

Additionally, copies of such documents and all pleadings and orders of the Bankruptcy Court will be made publicly available, for a fee via PACER at: http://www.nysb.uscourts.gov, or free of charge from the Claims and Noticing Agent at https://dm.epiq11.com/2U.  Such documents

and pleadings may also be obtained by: (a) visiting the Debtors' restructuring website at: https://dm.epiq11.com/2U; and/or (b) calling the Claims and Noticing Agent at 877-525-5725 (Toll Free U.S.) or +1 360-803-4441 (International); or (c) email to tabulation@epiqglobal.com with a reference to "**2U**" in the subject line.

### 8.   Filing of the Plan Supplement

The Debtors will File the Plan Supplement at least seven (7) days prior to the deadline to object to approval of the Disclosure Statement and confirmation of the Plan (the "***Objection Deadline***"). The Plan Supplement will include all exhibits and schedules that were not already filed as exhibits or schedules to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

The Debtors will provide copies of the Solicitation Package (other than Ballots) and the Plan Supplement to: (a) the U.S. Trustee; (b) counsel to the Ad Hoc Noteholder Group; (c) counsel to Greenvale; (d) the Internal Revenue Service; (e) the United States Attorney for the District of Delaware; (f) the SEC; and (g) those parties that have requested notice pursuant to Bankruptcy Rule 2002, as of the date of mailing the Solicitation Package or filing the Plan Supplement (as applicable), subject to the terms of the proposed Disclosure Statement Order. Additionally, copies of the Plan Supplement and all pleadings and orders of the Bankruptcy Court will be made publicly available, for a fee via PACER at: http://www.deb.uscourts.gov, or free of charge from the Claims and Noticing Agent at https://dm.epiq11.com/2U. Such documents and pleadings may also be obtained by: (a) visiting the Debtors' restructuring website at: https://dm.epiq11.com/2U; and/or (b) calling the Claims and Noticing Agent at 877-525-5725 (Toll Free U.S.) or +1 360-803-4441 (International); or (c) email to tabulation@epiqglobal.com with a reference to "**2U**" in the subject line.

## C.   VOTING PROCEDURES

Holders of Claims entitled to vote on the Plan are advised to read the proposed Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

### 1.   The Voting Deadline

Pursuant to the Combined Motion, the Debtors plan to request that the Bankruptcy Court set 5:00 p.m. (prevailing Eastern Time) on August 21, 2024 as the Voting Deadline. The Voting Deadline is the date by which all Ballots must be received by the Claims and Noticing Agent in order to be counted as votes to accept or reject the Plan.

### 2.   Ballots

The Debtors will provide to Holders of Claims in the Voting Classes (*i.e.*, Classes 3 and 4) with (a) Ballots, the forms of which are attached to the proposed Disclosure Statement Order as Exhibits 2, 3-A and 3-B; and (b) a cover letter, the form of which is attached to the proposed Disclosure Statement Order as Exhibit 4.

Each Ballot will include an option for the applicable Holder of Claims and Interests to affirmatively opt out of the Third-Party Release contained in Article IX of the Plan.  Any party that opts out of the Third-Party Release will not receive a Debtor Release or Third-Party Release from the Releasing Parties.

### 3.      Voting Instructions

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot and returning it to Claims and Noticing Agent or their Nominee, as applicable, so that their Ballot or Master Ballot is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline. Each Ballot will also allow Holders of Claims and Interests in the Voting Classes to opt out of the Third-Party Release set forth in Article IX of the Plan. Any Holder of Claims in the Voting Classes that opts out of the Third-Party Release will not receive a Debtor Release or a Third-Party Release from the Releasing Parties.

Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be: (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein); and (b) required to vote every portion of such Claim collectively to accept or reject the Plan.

---

**PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOTS FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

---

**TO BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN, ALL BALLOTS (WHICH WILL CLEARLY INDICATE THE APPROPRIATE RETURN ADDRESS) MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED BY FOLLOWING THE INSTRUCTIONS SET FORTH ON THE BALLOT, TO THE CLAIMS AND NOTICING AGENT OR THE APPLICABLE HOLDER'S NOMINEE, AS APPLICABLE, SO THAT THE BALLOTS OR MASTER BALLOTS, AS APPLICABLE, ARE _ACTUALLY_ _RECEIVED_ BY THE CLAIMS AND NOTICING AGENT NO LATER THAN THE VOTING DEADLINE BY THE CLAIMS AND NOTICING AGENT.  IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE EMAIL THE CLAIMS AND NOTICING AGENT AT: TABULATION@EPIQGLOBAL.COM WITH A REFERENCE TO "_2U_" IN THE SUBJECT LINE.**

### 4.      Voting Procedures

The proposed Disclosure Statement Order is accompanied by forms of Ballots to be used for voting to accept or reject the Plan for those Holders of Claims entitled to vote to accept or reject the Plan.

If you are a Holder of a Claim in Class 3 or 4 – First Lien Claims or Unsecured Notes Claims – you may vote to accept or reject the Plan by completing the Ballot sent to you and returning it in accordance with the instructions on your respective Ballot.

**5.    Tabulation of Votes**

> **THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED TO THE CLAIMS AND NOTICING AGENT OR TO YOUR NOMINEE, AS APPLICABLE SUCH THAT YOUR BALLOT OR MASTER BALLOT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE CLAIMS AND NOTICING AGENT.

- A HOLDER OF A CLAIM OR INTEREST MAY CAST ONLY ONE VOTE PER EACH CLAIM OR INTEREST SO HELD.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM OR INTEREST, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- **THE FOLLOWING BALLOTS WILL <u>NOT</u> BE COUNTED:**

    o ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT;

    o ANY BALLOT THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT;

    o ANY BALLOT CAST BY A PERSON OR ENTITY THAT DOES NOT HOLD A CLAIM IN THE VOTING CLASSES;

    o ANY BALLOT THAT IS PROPERLY COMPLETED, EXECUTED AND TIMELY FILED, BUT (A) DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, (B) INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR (C) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN;

    o ANY BALLOT SUBMITTED BY FACSIMILE, TELECOPY OR ANY OTHER ELECTRONIC MEANS OTHER THAN BY EMAIL IF THE INSTRUCTIONS IN YOUR BALLOT PERMIT RETURNING YOUR BALLOT BY EMAIL;

o   ANY UNSIGNED BALLOT, PROVIDED THAT ANY BALLOT SUBMITTED THROUGH E-BALLOT WILL BE DEEMED TO CONTAIN A VALID SIGNATURE;

o   ANY BALLOT SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE CLAIMS AND NOTICING AGENT), ANY AGENT UNDER THE FIRST LIEN CREDIT AGREEMENT, INDENTURE TRUSTEE FOR THE UNSECURED NOTES OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS; OR

o   ANY BALLOT NOT CAST IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE PROPOSED DISCLOSURE STATEMENT ORDER.

## D.    CONFIRMATION OF THE PLAN

### 1.    The Combined Hearing

Subject to Bankruptcy Court approval, the Combined Hearing will take place on September 6, 2024 at 10:00 a.m. (prevailing Eastern Time). The Combined Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment Filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

### 2.    The Deadline for Objecting to Confirmation of the Plan

Subject to Bankruptcy Court approval, the Objection Deadline will be August 23, 2024 at 4:00 p.m. prevailing Eastern Time. Any objection to approval of the Disclosure Statement or confirmation of the Plan (each a "*Confirmation Objection*") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the name of the objector and the nature and amount of any Claim or Interest asserted by the objector against or in the Debtors; (d) state with particularity the legal and factual bases for the Confirmation Objection and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so as to be **actually received** by each of the following parties (the "*Notice Parties*") on or before the Objection Deadline:

i.    The Debtors, 2U, INC., 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202 (Attn: Paul S. Lalljie (plalljie@2u.com), Matthew Norden (mnorden@2u.com), and Lillian Brownstein (lbrownstein@2u.com));

ii.    Proposed Counsel for the Debtors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis (george.davis@lw.com), George Klidonas (george.klidonas@lw.com), Anupama Yerramalli (anu.yerramalli@lw.com), Randall C. Weber-Levine (randall.weber-levine@lw.com) and Scott Yousey (scott.yousey@lw.com));

iii.   <u>Counsel to the First Lien Ad Hoc Group</u>, Milbank LLP, 55 Hudson Yards, New York, New York 10001 Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Albert A. Pisa (apisa@milbank.com), Tyson Lomazow (tlomazow@milbank.com), and Abigail Debold (adebold@milbank.com));

iv.   <u>Counsel to the Ad Hoc Noteholder Group</u>, Weil, Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153, (Attn: Matt Barr (matt.barr@weil.com), David Griffiths (david.griffiths@weil.com), and F. Gavin Andrews (f.gavin.andrews@weil.com));

v.   <u>Counsel to Greenvale</u>, Schulte, Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Kristine Manoukian (kristine.manoukian@srz.com), Kelly Knight (Kelly.knight@srz.com); and Reuben E. Dizengoff (reuben.dizengoff@srz.com));

vi.   <u>United States Trustee, U.S. Department of Justice</u>, Office of the U.S. Trustee, 201 Varick Street, Room 534, New York, NY 10014, (Attn: Rachael E. Siegel (rachael.e.siegel@usdoj.gov), Daniel Rudewicz (daniel.rudewicz@usdoj.gov), and Brian Masumoto (brian.masumoto@usdoj.gov )); and

vii.   counsel to any statutory committee, if appointed.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

**3.**     **Effect of Confirmation of the Plan**

Article IX of the Plan contains certain provisions relating to: (a) the compromise and settlement of Claims and Interests; (b) the release of the Released Parties by the Debtors and certain Holders of Claims and Interests, and each of their respective Related Parties or related Persons; and (c) the exculpation of certain parties. **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim or Interest such that you may cast your vote accordingly**.

> THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

**E.     CONSUMMATION OF THE PLAN**

It will be a condition to Confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant

to the provisions of Article VIII of the Plan.  Following Confirmation, the Plan will be consummated on the Effective Date.

**F.    RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN THE VOTING CLASSES SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VII</u> HEREIN TITLED "RISK FACTORS."**

## II.
## BACKGROUND TO THE CHAPTER 11 CASES

### A.    PRELIMINARY STATEMENT

The Debtors and their Non-Debtor Affiliates (collectively, "**2U**" or the "**Company**") were founded in 2008 on the belief that expanding access to high-quality education can transform lives and help solve critical societal needs.  For more than fifteen (15) years, 2U has partnered with nonprofit institutions of higher education (collectively, "***Partner Institutions***") to build and support thousands of online programs, giving millions of people access to high-quality education without having to quit their jobs or uproot their lives.  Today, in the face of an acute shortage of skilled labor in the United States and the advent of artificial intelligence and automation disrupting the work force worldwide, 2U plays a vital role in helping its Partner Institutions meet the growing need for career-relevant education at scale.  2U currently provides over 86 million learners around the world with access to over 4,700 educational programs, ranging from free courses to full degrees, in partnership with more than 260 institutions and corporations.

To date, 2U has supported its Partner Institutions in developing over 180 state-of-the-art online degree programs across twenty-five (25) career-relevant fields, including nursing, education, social work, artificial intelligence, business, and data science.  Over twenty (20) of these degree programs cost less than $26,000 to meet the needs of learners for flexible and affordable options.  More than forty percent (40%) of the graduate degree programs supported by 2U are in licensure-based disciplines, such as nursing, midwifery, social work, teaching, physician assistant, and speech pathology.  These fields are all experiencing significant staffing shortages and require students to gain hands-on experience by working in real-world settings—such as hospitals, clinics, or community centers—in order to obtain a professional license.  2U provides placement services across the country to ensure that the thousands of students who are pursuing online degrees in these critical fields can find local placement sites to complete their clinical requirements— resources and expertise that Partner Institutions do not have.  This is especially vital for students in rural areas who want to stay in their local communities where the need for workers with these licensure-based skills are especially high.  To date, 2U's clinical placement team has matched over 100,000 students with over 32 million hours of virtual and in-person field placements across all fifty (50) states.

For learners who are looking for upskilling and reskilling opportunities but are not seeking a full degree, 2U has supported its Partner Institutions in developing and offering over 200 boot camps, 250 executive education programs and over 4,000 open courses.  These alternative credentials are often more affordable and accessible than full degree programs providing a viable pathway for lifelong learners and career changers who need to balance education with other responsibilities.

Institutions of higher education choose to partner with 2U because of its dedicated focus on quality and student outcomes, as well as the unique bundle of support services, technology, and upfront investment capital it provides to launch programs.  From large public universities to small private colleges, hundreds of Partner Institutions rely on 2U's bundle of technology, data, and services to help them develop and deliver online education that meets the same high standards as their on-campus programs.

19

2U-enabled programs boast strong retention, graduation, and completion rates. For example, in 2023, 2U-powered programs had graduation or completion rates of seventy-two percent (72%) for degree programs, seventy-seven percent (77%) for boot camps, and eighty-nine percent (89%) for executive education offerings. Since inception, over 60,000 students have graduated from degree programs, over 85,000 have graduated from boot camps, and over 300,000 have completed executive education courses supported by 2U. But the best way to convey 2U's impact isn't through data points, it's through the personal success of learners. Today, many of these students are teaching in classrooms, providing pivotal healthcare to their communities, bringing technology skills to local employers, and providing leadership and insights to organizations worldwide. Here are just a few examples:

- Gina, a Graduate of Vanderbilt University's EdD in Leadership and Learning in Organizations: "If the only choice I had was to learn in-person, I would not be a doctor of education today. The online degree gave me access to a way of thinking and learning that would help me do more of what I truly love to do."

- Akibo, a Graduate of Columbia Engineering's Data Analytics Boot Camp: "The Columbia Boot Camp brought me to the cutting-edge at PepsiCo. Two years ago I was sitting at home, unemployed. Now, I'm working on implementing some of the most innovative technology."

- Alice, a Graduate of "Human Rights, Human Wrongs," a course offered with SDG Academy, an initiative of the UN Sustainable Development Solutions Network on sustainable development goals (SDG): "The course gave me direct access to global experts. The edX platform is a great tool for exposing yourself to new ideas and expanding your potential."

To further its mission of expanding access to high-quality education and given the growing demand for non-degree alternative credentials, 2U began executing a series of strategic acquisitions to enter the alternative credential space starting in 2017. Then, in late 2021, just after 2U completed the strategic acquisition of edX Inc. ("*edX*"), the tapering of the COVID-19 pandemic led to a decline in demand for online learning worldwide, as potential students sought to return to campus, in-person work, and in-person social activities. As a result, enrollments in many of 2U-powered offerings began to decline significantly. At the same time, demand for entry-level technology jobs unexpectedly declined as technology companies began shedding employees following a boom in hiring during the pandemic. Coupled with rapid and unanticipated adoption of artificial intelligence during the same period, demand for 2U's coding Boot Camp offerings declined.

2U adapted to the unforeseen challenges by, among other things, (a) launching programs in new high-demand fields (such as artificial intelligence), (b) launching more affordable offerings to stimulate enrollment, (c) winding down certain non-performing programs in its portfolio, (d) optimizing its cost structure across the business, (e) reducing its real estate footprint, and (f) strategically outsourcing certain services. However, the efforts taken by the Company's management and employees could not overcome the industry headwinds, particularly in light of its approaching debt maturity (as described below).

Recognizing that its financial situation required a holistic solution, in late 2023 the Company engaged professionals from Moelis & Company LLC ("**Moelis**"), AlixPartners, LLP ("**AlixPartners**"), and Latham & Watkins LLP ("**Latham**") to assist 2U in charting a path that would support the Company's overall mission and business plan while preserving and maximizing value. As the Company and its advisors implemented performance improvement exercises and evaluated potential paths forward, they engaged and began to negotiate a comprehensive restructuring transaction with (a) an ad hoc group of holders of unsecured notes (the "**Ad Hoc Noteholder Group**"), (b) Greenvale Capital LLP ("**Greenvale**"), as a holder of unsecured notes, and (c) an ad hoc group of holders of first lien loans (the "**First Lien Ad Hoc Group**"). These good-faith, arm's-length negotiations culminated in the restructuring support agreement attached hereto as Exhibit B (the "**Restructuring Support Agreement**").

The Restructuring Support Agreement is strategically designed to ensure the uninterrupted delivery of 2U's technology and services to its Partner Institutions and students worldwide while achieving (a) the reduction of 2U's Funded Debt Obligations by more than fifty percent (50%); (b) a liquidity infusion in the form of a $64 million debtor-in-possession credit facility; and (c) a post-emergence capital infusion of $46.5 million from the Equity Rights Offering (as defined below). The restructuring contemplated by the Restructuring Support Agreement will position 2U to continue both investing in innovative learning solutions to meet the changing needs of today's learners and providing the technology and services that power its partners' online programs.

## B.    2U'S HISTORY

2U was founded with the mission of expanding access to high-quality education by enabling nonprofit colleges and universities to offer comprehensive degree programs online, at a time when few of these institutions offered fully online programs. In 2009, 2U launched its first online program, a Masters in Teaching with a large private university in California. From 2009 through 2013, 2U launched eight (8) graduate degree programs, including a Masters in Nursing, a Masters in Social Work and a Masters of Business Administration. To facilitate its continued growth and meet the rapidly growing market for online postsecondary education, on March 28, 2014, 2U went public (the "**IPO**") and listed its shares on the Nasdaq Global Select Market ("**Nasdaq**").

In the three years following the IPO, 2U launched fifteen (15) graduate degree programs with Partner Institutions including masters degrees in the following disciplines (among others): communications, counseling, physical therapy, and cybersecurity. The following timeline shows the number of programs launched from 2008-2016, along with the applicable Partner Institutions.



In 2017, demand for 2U's products continued to increase and 2U launched thirty-seven (37) degree programs over the next three years, including two (2) programs with universities located outside of the United States (as shown below).



The overall market for technology solutions that enable higher education institutions to deliver education online is highly fragmented, rapidly evolving, and subject to changing

technology, shifting needs of students, faculty, and clients, and frequent introductions of new delivery methods. For example, the rise of alternative credentials—such as certificates, micro-credentials, and boot camps—has become an increasingly popular option for students seeking flexible and targeted education. Unlike traditional full degree programs, these credentials often focus on in-demand, career-relevant skills and can be completed in a shorter time frame, making them appealing for those looking to quickly enter or advance in the workforce. The growing demand for such programs is driven by the fast-paced evolution of industries like technology and business, where new skills are continuously required. Additionally, alternative credentials are often more affordable and accessible, providing a viable pathway for lifelong learners and career changers who need to balance education with other responsibilities. This trend reflects a broader shift towards skills-based hiring and the recognition that practical, up-to-date expertise can be as valuable as traditional academic achievements in certain industries.

Given this dynamic, 2U executed a series of strategic acquisitions to provide a more diverse array of educational offerings beyond full degree programs and thus better meet the needs of lifelong learners looking to upskill and reskill to advance in their careers. In 2017 and 2019, respectively, 2U acquired an executive education provider, Get Educated International Proprietary Limited (GetSmarter), and a boot camp provider, Trilogy Education Services, Inc. These acquisitions broadened 2U's product portfolio to include premium online executive education offerings and intensive, technical training programs.

In 2021, 2U acquired edX, a nonprofit organization founded in 2012 by Harvard and MIT. edX and 2U shared a very similar mission—universal access to the world's best education. While 2U had sought to meet this goal through supporting Partner Institutions' degree and alternative credential offerings, edX's focus had been building a platform to enable university faculty to make their courses available online to students around the world for free (known as "massive open online courses", or "**MOOCs**"). At the time of the transaction, edX had approximately 40 million registered learners on its platform (edX.org), 165 university partners, and over 3,000 offerings in addition to a robust consumer-facing brand. The acquisition of edX enabled 2U to further its mission to enable learners around the world to access high-quality education by (a) expanding its product offerings to include open courses, and (b) providing all of its educational programs worldwide in a single marketplace. In addition, 2U expected the edX platform to improve 2U's marketing efficiency by enabling platform-based marketing in a single online store-front for all 2U-supported programs rather than relying primarily on program-specific marketing as it had done in the past.

Currently, 2U's full suite of offerings—from MOOCs to degree programs—are available at edX.org, providing potential learners with the flexibility, optionality, and access they need to achieve their unique learning goals.

Throughout its history, 2U has remained steadfast in its mission to expand access to high-quality education and ensure its technology and services deliver best-in-class student outcomes. Demonstrating this commitment, 2U publishes an annual transparency and impact report that showcases is impact on learners, universities, employers, and society broadly. Two data points included in that report that illustrate the scope of its commitment are that from inception to date 2U has provided over $23 million in scholarships to degree program students and invested over $2.5 billion in its Partner Institutions' degree programs. Another component of 2U's services that

is critical to producing high-quality content outcomes is high-touch student support that is tailored to meet the unique needs of each student.  For many offerings, support teams assist prospective students prior to enrollment, guiding such students through the application process.  Once enrolled by the Partner Institution, students receive ongoing individualized non-academic support and career guidance from a dedicated advisor.  This dedication to quality and personalized support has yielded impressive results:  2U-powered degree programs had an eighty-four percent (84%) retention rate from term-1 to term-2 and a seventy-two percent (72%) graduation rate in 2023, which are comparable to Partner Institutions' in-person offerings.  These achievements underscore 2U's profound impact on transforming lives through education and making quality learning opportunities accessible to all.

## C.    2U'S BUSINESS OPERATIONS

2U's business is comprised of two segments: (a) the degree program segment (the "***Degree Program Segment***"), which enables students to obtain online graduate and undergraduate degrees from the Partner Institutions; and (b) the alternative credential segment (the "***Alternative Credential Segment***"), which consists of non-degree programs that 2U provides through its relationships with Partner Institutions directly to learners and enterprise customers seeking to upskill and reskill their workforces.

### 1.    The Degree Program Segment

In the Degree Program Segment, 2U provides approximately forty-three (43) Partner Institutions with a broad range of technology and services that enables them to deliver their degree programs online.

Importantly, Partner Institutions are responsible for creating the curricula and course content for programs in the Degree Program Segment and are responsible for all academic functions related to the program, including hiring and training the faculty, setting admissions standards, making admissions decisions, determining tuition, and conferring degrees.  Students in these programs are generally seeking an undergraduate or graduate degree of the same quality they would receive on campus without having to quit their jobs or uproot their lives by moving to, and living on, campus.

2U provides the complete workflow solution for the student journey, giving its Partner Institutions the comprehensive operating infrastructure they need to attract, enroll, educate, support, and graduate their students.  Such technology and services include, but are not limited to, the following:

- Learning Technology: providing an open-source software platform (the "***Open edX Platform***"), which allows Partner Institutions to build and customize their courses and educational programs, and then launch those courses and programs directly on edX.org, and other learning platforms that provide an integrated hub for students to access coursework, attend live classes, and review grading;

- *Integrated Learning and Business Systems*: providing technology to streamline the launch of degree programs at scale and tightly integrating 2U systems with the

Partner Institutions' systems through data connections that facilitate the secure bi-directional exchange of data between the parties;

- *Data and Analytics Support*: using data analytics to enable the Partner Institution faculty to better understand how their students are performing and when students may need additional support;

- *Student Support*: providing students with personalized support by assigning a dedicated advisor that is focused on retention and graduation;

- *Curriculum and Learning Services*: providing course design consultation services and other self-help resources to assist faculty in creating engaging course content in a digital environment;

- *Marketing Services*: creating program-specific marketing campaigns, which leverage the Partner Institutions' brands and approved messaging to generate student interest in a particular program;

- *Admissions Services*: providing technology-enabled services that streamline the admissions process by assisting prospective students in the application process and organizing and routing completed student application packages to the Partner Institution to make admissions decisions; and

- *Field Placements*: for licensure-based programs that require hands-on, in-person experiences, assisting students in securing field placements and monitoring the completion of such placements for the Partner Institutions.

The following chart highlights each of the services 2U provides along the student journey:



2U makes significant up-front investments in the technology, content development, and marketing services required to build and launch each Partner Institution's degree program. 2U recoups this investment as students enroll in and progress through their programs. Students in

degree programs pay tuition and fees for credits taken in their particular program to the Partner Institution offering such program. According to the applicable master services agreement between 2U and each Partner Institution (each, an "***MSA***"), the Partner Institutions in the Degree Program Segment generally pay 2U a portion of the revenue collected each academic term from the relevant program in consideration for 2U's technology and services.[4]

### 2.    The Alternative Credential Segment

Through the Alternative Credential Segment, in collaboration with certain of the Partner Institutions, businesses ("***Business Clients***") and governmental entities (together with Business Clients, "***Enterprise Clients***"), 2U provides premium online open courses, executive education offerings, and technical, skills-based programs to individual learners and enterprises seeking to upskill and reskill their workforces. Alternative Credential Segment offerings are shorter in duration and less expensive than traditional degree programs, and students enrolled in these offerings are generally seeking to reskill or upskill for career advancement or personal development.

The programs in the Alternative Credential Segment include:

- executive education programs ("***Exec Ed Programs***") that provide working professionals a flexible path for learning a new skill for either professional or personal development;

- technical, skills-based boot camps ("***Boot Camps***") that equip individuals with the technical knowledge and skills necessary to advance in their careers; and

- premium online open courses ("***Open Courses***" and, together with the Exec Ed Programs and Boot Camps, the "***Alternative Credential Programs***") taught by faculty from Partner Institutions, which 2U makes available on edX.org for free (except individuals may choose to pay for enhancements, such as graded assignments, access to forums, and a verified certificate of completion).

2U develops the curricula and content for the Alternative Credential Programs in collaboration with the applicable Partner Institution or Enterprise Client. Individual learners and enterprises seeking to upskill and reskill their workforces, as applicable, pay 2U directly the tuition and fees required to enroll in Alternative Credential Programs. In accordance with the applicable MSAs, 2U then remits a percentage of tuition and fees collected to the applicable Partner Institution or Enterprise Client.

### 3.    Employees

To operate its businesses, 2U relies on employees and contract workers (collectively, the "***Workforce***") to perform a variety of critical functions. The majority of employees are in roles dedicated to providing services to the Partner Institutions and students (including data and

---

[4] Alternatively, certain of the Partner Institutions instead pay a fixed fee for select packages of services that best fit their needs.

analytics support services, admissions services, curriculum and learning services, marketing services, field placement services, and university and student support services), and developing technology, including the edX platform, to launch and support the Partner Institutions' educational offerings. In addition, the 2U Workforce also supports 2U's other information technology systems and infrastructure, and provides necessary administrative, managerial, and financial support services. The Workforce's skills, knowledge, and understanding of the Debtors' businesses, operations, and relationships are essential to the continuation of the Debtors' operations during these Chapter 11 Cases.

As of the Petition Date, the Debtors' Workforce includes approximately 3,130 employees (1,820 of which are fulltime and 1,310 of which are part-time) and 270 contract workers. In addition, due to the global nature of 2U's businesses, the Non-Debtor Affiliates employ approximately 1,420 individuals in various locations outside of the United States. None of the Debtors' employees are represented by a labor union or covered by a collective bargaining agreement.

### 4.    The Company's Executives

Set forth below are, as of the date hereof, the names, positions, and biographical information of the current executive officers of 2U.

(a)    *Paul S. Lalljie*, Chief Executive Officer

Paul S. Lalljie has served as 2U's Chief Executive Officer since November 2023. Mr. Lalljie previously served as 2U's Chief Financial Officer from October 2019 to November 2023. Prior to that, he served as Chief Financial Officer for Neustar, Inc. from June 2009 to February 2018. From February 2000 until his appointment as Chief Financial Officer, Mr. Lalljie held various leadership positions at Neustar, Inc., including Senior Vice President, Interim Chief Financial Officer and Treasurer, Vice President, Financial Planning & Analysis, and Vice President, Finance and Investor Relations. Mr. Lalljie currently serves on the board of Bitdefender, a private cybersecurity solutions company.

(b)    *Matthew J. Norden*, Chief Financial Officer and Chief Legal Officer

Mr. Norden has served as 2U's Chief Financial Officer since November 2023 and as Chief Legal Officer since December 2019 and previously served as Co-General Counsel from August 2017 to December 2019, Deputy General Counsel from November 2014 to August 2017 and as Associate General Counsel from September 2013 to November 2014. From June 2010 to September 2013, Mr. Norden served as Vice President and General Counsel of TOMS Shoes. Prior to that, he was an associate at the law firm Skadden, Arps, Slate, Meagher and Flom, LLP. Mr. Norden holds a B.A. in Psychology from The George Washington University, a J.D. from Georgetown University Law Center and an M.B.A. from the Kenan-Flagler Business School of the University of North Carolina at Chapel Hill.

(c)    *Andrew J. Hermalyn*, President of the Degree Program Segment

Mr. Hermalyn has served as 2U's President of the Degree Program Segment since January 2024 and previously served as 2U's President of Partnerships from 2017 to January 2024. Since

27

joining the Company in 2008, Mr. Hermalyn served in various senior roles, including Executive Vice President of Strategic Partnerships, General Manager, and Vice President of University Relations. Mr. Hermalyn is also a board member of Mantra Health, a leading digital mental health provider for university students, and serves on the Dean's Advisory Council for Lehigh University's College of Education. Mr. Hermalyn holds a B.A. in Sociology from Lehigh University.

(d)     *Aaron M. McCullough*, President of the Alternative Credential Segment

Mr. McCullough has served as 2U's President of the Alternative Credential Segment since January 2024 and previously served as 2U's Chief Product Officer from July 2023 to January 2024. Prior to joining the Company, Mr. McCullough held various senior roles at Coursera, Inc., including Vice President and General Manager of the consumer segment from January 2023 to July 2023 and Vice President of Product Management from September 2021 to January 2023. From March 2020 to September 2021, Mr. McCullough served as the Head of Global Product Management at Uber Transit and from November 2017 to March 2020, Mr. McCullough served as Director of Product Management for Walmart Global Tech. Mr. McCullough holds a Bachelor of Science in Business Administration with a concentration in Financial Analysis & Valuation from the University of Southern California.

(e)     *Mike Kurbjeweit*, Chief Marketing Officer

Michael Kurbjeweit is 2U's Chief Marketing Officer, responsible for creating alignment and efficiencies across all global marketing functions. He has spent the last decade driving acquisition, conversion, and platform marketing strategies for the company and its partners. Since beginning his tenure in 2013, Kurbjeweit has led highly effective marketing organizations and functions, with particular focus on performance marketing. His entire career has been dedicated to creating new, bold approaches to demand generation, digital strategy, marketing analytics, and revenue generation. Kurbjeweit holds a B.A. in Communications from Christopher Newport University and a M.S. in Integrated Marketing Communications from Northwestern University. He also graduated from the 2U-powered Harvard Business Analytics Program in 2020.

(f)     *Adam Drudge*, Chief People Officer

Adam Drudge is 2U's Chief People Officer, leading global human resources, talent management, recruitment, and optimization of the growth and sustainability of 2U's resilient culture. He's responsible for championing the organization's dedication to diversity, equity, and inclusion and driving employee engagement worldwide. As CPO, Adam is a member of 2U's global executive team. Joining 2U as SVP of People in 2021, Drudge has played a critical role in guiding the Human Resource Business Partners (HRBP) and Organizational Development (OD) functions, as well as integrating the edX team into 2U. He brings more than 20 years of experience in human resources at Capital One, Carrier, Ingersoll Rand, and Milliken & Company. At Capital One, he spent more than a decade driving strategic talent initiatives and designing innovative ways to engage employees and cultivate an inclusive and lasting culture. Drudge holds BAs in Industrial/Organizational Psychology and German from Davidson College and a MA in Global Human Resource Development from University of Illinois Urbana-Champaign.

28

(g)    *Lillian Brownstein*, General Counsel

Lillian Brownstein is 2U's General Counsel, responsible for overseeing the corporate legal function as well as litigation and intellectual property matters.  Before joining 2U, Brownstein served in various senior legal roles at MicroStrategy Incorporated where she was responsible for overseeing the securities, corporate governance, privacy, and product-related matters.  Earlier in her career, Brownstein was a corporate attorney in the New York office of Latham & Watkins LLP, where she represented public and private companies on governance, M&A, and securities matters.  Brownstein graduated from Northwestern University with a B.A. in Political Science and International Studies and earned her J.D. from Columbia University Law School.

## D.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

### 1.    Prepetition Corporate Structure

As reflected in the corporate structure chart attached hereto as **Exhibit E** (the "***Corporate Structure Chart***"), Debtor 2U, Inc. is the ultimate parent of the Company and the sole borrower under the following prepetition debt instruments, each of which is governed by the laws of New York and contains forum selection clauses designating New York as the exclusive venue for disputes arising out of such instruments:

- that certain Credit and Guaranty Agreement, dated as of June 28, 2021 (as amended by that certain First Amendment to Term Loan Credit and Guaranty Agreement, dated as of November 4, 2021, and by that certain Extension Amendment and Second Amendment to Credit and Guaranty Agreement, dated as of January 9, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***First Lien Credit Agreement***"), by and among Debtor 2U, Inc., as borrower, certain subsidiaries of Debtor 2U, Inc., as guarantors (the "***Guarantors***"), the lenders party thereto (the "***First Lien Lenders***"), and Alter Domus (US) LLC, as administrative agent and collateral agent;

- that certain Indenture, dated as of April 23, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***2025 Indenture***"), by and between Debtor 2U, Inc., as issuer, and Wilmington Trust, National Association, as trustee (the "***2025 Indenture Trustee***"); and

- that certain Indenture, dated as of January 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***2030 Indenture***" and, together with the 2025 Indenture, the "***Indentures***"), by and between Debtor 2U, Inc., as issuer, and Wilmington Trust, National Association, as trustee (the "***2030 Indenture Trustee***").

As further reflected in the Corporate Structure Chart, the eight (8) remaining Debtors—2U GetSmarter, LLC, 2U GetSmarter (US), LLC, 2U Harkins Road LLC, 2U NYC, LLC, 2U KEIH Holdco, LLC, CritiqueIt, Inc., edX LLC, and edX Boot Camps LLC—are certain domestic

subsidiaries of Debtor 2U, Inc. and comprise the Guarantors under the First Lien Credit Agreement.

**2.      Prepetition Capital Structure**

As of the Petition Date, and as described more fully in the subparts below, the Debtors were liable for long-term debt obligations in the principal amount of approximately $944.8 million, including first lien secured loans in the principal amount of approximately $414.3 million and unsecured notes in the principal amount of approximately $527 million.  The following table summarizes the principal amounts outstanding of the Debtors' long-term debt as of the Petition Date, each of which is governed by the laws of New York and contains forum selection clauses designating New York as the exclusive venue for disputes arising out of such instruments:

| Long-Term Debt | | (millions) |
| --- | --- | --- |
| First Lien Credit Agreement | | |
| 1L revolving loans | $ | 40 |
| 1L term loan | $ | 374.3 |
| **Total 1L debt** | **$** | **414.3** |
| 2025 Notes | $ | 380 |
| 2030 Notes | $ | 147 |
| **Total Notes** | **$** | **527** |
| **Deferred Governmental Grants** | **$** | **3.5** |
| **Total long-term debt** | **$** | **944.8** |

(a)      The First Lien Credit Facilities

Pursuant to the First Lien Credit Agreement, the First Lien Lenders provided the Company with a term loan facility in the original principal amount of $380 million (the "*First Lien Term Loan Facility*") and a revolving credit facility in the principal amount of $40 million (the "*First Lien Revolving Facility*").  As of the Petition Date, not less than $384.8 million of the loans under the First Lien Term Loan Facility (the "*First Lien Term Loans*") remain outstanding, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, charges, indemnities, and all other unpaid Obligations (as defined in the First Lien Credit Agreement) incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the First Lien Credit Agreement (collectively, the "*First Lien Term Loan Obligations*").  In addition, as of the Petition Date, not less than $40.1 million of the loans under the First Lien Revolving Facility (the "*First Lien Revolving Loans*" and, together with the First Lien Term Loans, the "*First Lien Loans*") remain outstanding, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, charges, indemnities, and all other unpaid Obligations (as defined in the First Lien Credit Agreement) incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the First Lien Credit Agreement (collectively, the "*First Lien Revolving Loan Obligations*" and, together with the First Lien Term Loan Obligations, the "*First Lien Obligations*").

While the First Lien Revolving Loans are scheduled to mature on June 28, 2026, the maturity date will be accelerated to January 1, 2025, if more than $50 million in the aggregate principal amount of the 2025 Notes remains outstanding on January 1, 2025. The First Lien Revolving Facility provides that base rate and swingline First Lien Revolving Loans accrue interest at a rate of the base rate plus 4.50% per annum and SOFR-based First Lien Revolving Loans accrue interest at a rate of the term SOFR rate plus 5.50% per annum, in each case, subject to adjustment under the terms of the First Lien Credit Agreement. Interest on the First Lien Revolving Loans accrues on a daily basis and is payable in cash quarterly in arrears on January 31, April 30, July 31, and October 31 of each year.

While the First Lien Term Loans are scheduled to mature on December 28, 2026, the maturity date will be accelerated to January 30, 2025, if more than $40 million of the aggregate principal amount of the 2025 Notes (as defined below) remains outstanding on January 30, 2025. The First Lien Term Loan Facility provides that base rate First Lien Term Loans accrue interest at a rate of the base rate plus 5.50% per annum and the SOFR-based First Lien Term Loans accrue interest at a rate of the term SOFR rate plus 6.50% per annum, in each case, subject to adjustment as provided in the First Lien Credit Agreement. Interest on the First Lien Term Loans accrues on a daily basis and is payable in cash in arrears.

As mentioned above, the Debtor Guarantors guarantee jointly and severally Debtor 2U, Inc.'s obligations under the First Lien Credit Agreement. The First Lien Obligations are secured on a first-priority basis by (subject to certain exclusions) a lien on substantially all of the Debtors' assets and a pledge of sixty-five percent (65%) or one-hundred percent (100%), as applicable, of certain of Debtor 2U, Inc.'s subsidiaries as indicated on Exhibit E.

(b)    Unsecured Notes

On April 23, 2020, Debtor 2U, Inc. issued $380 million in principal amount of 2.25% convertible senior notes (the "***2025 Notes***") pursuant to the 2025 Indenture. While the 2025 Notes mature on May 1, 2025, the 2025 Indenture Trustee or the holders of at least 25% of the aggregate principal amount of the 2025 Notes may accelerate all of the 2025 Notes (including all accrued and unpaid interest) then outstanding to become due and payable immediately if certain events of default under the 2025 Indenture occur, which events of default include the acceleration of $30 million or more of debt for borrowed money of 2U, Inc. or its subsidiaries or the failure to pay such amounts when due (subject to a thirty (30)-day cure period). Interest on the 2025 Notes accrues at the rate of 2.25% per annum and is payable semi-annually in arrears on May 1 and November 1 of each year.

On January 11, 2023, Debtor 2U, Inc. issued $147 million of 4.50% senior unsecured convertible notes (the "***2030 Notes***" and, together with the 2025 Notes, the "***Unsecured Notes***")[5] pursuant to the 2030 Indenture. While the 2030 Notes mature on February 1, 2030, the 2030 Indenture Trustee or the holders of at least twenty-five percent (25%) of the aggregate principal amount of the 2030 Notes may accelerate all the 2030 Notes (including all accrued and unpaid interest) then outstanding to become due and payable immediately if certain events of default under the 2030 Indenture occur, which events of default include the acceleration of $30 million or more

---

[5]    The holders of the Unsecured Notes are referred to herein as the "***Noteholders***."

of debt for borrowed money of 2U, Inc. or its subsidiaries or the failure to pay such amounts when due (subject to a thirty (30)-day cure period). Interest on the 2030 Notes accrues at the rate of 4.50% per annum and is payable semi-annually in arrears on February 1 and August 1 of each year.

As of the Petition Date, no less than $382.0 million of the 2025 Notes and $150.2 million of the 2030 Notes remain outstanding, including outstanding principal and accrued and unpaid interest, fees (including any attorneys' and financial advisors' fees), costs, expenses, and all other amounts incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Indentures (collectively, the "**Unsecured Notes Obligations**" and, together with the First Lien Obligations, the "**Funded Debt Obligations**"). The Unsecured Notes Obligations are neither secured nor guaranteed.

(c)    Deferred Governmental Grants

The Company has two outstanding conditional loan agreements with Prince George's County, Maryland and the State of Maryland for an aggregate amount of $3.5 million, each bearing an interest rate of 3% per annum (the "**Deferred Governmental Grants**"). These agreements are conditional loan obligations that may be forgiven if the Company attains certain conditions related to employment levels at 2U's office in Lanham, Maryland. The conditional loan with Prince George's County has a maturity date of June 22, 2027, and the conditional loan agreement with the State of Maryland has a maturity date of June 30, 2028. To ensure the timely repayment when due under the Deferred Governmental Grants, 2U, Inc. issued standby letters of credit to both Prince George's County and the State of Maryland in the full principal amount of the loans.

(d)    Intercompany Obligations

In addition to the Funded Debt Obligations, the Debtors engage in routine business relationships with each other and certain Non-Debtor Affiliates, which may result in intercompany receivables and payables that the Debtors track and record in their books and records. As more fully described in the Cash Management Motion (as defined below), filed contemporaneously herewith, these intercompany transactions are subject to both formal and informal agreements, including general accounting mechanisms used among the Debtors and the Non-Debtor Affiliates, as well as arrangements based on administrative convenience.

(e)    General Unsecured Debt

In the ordinary course, the Debtors incur trade debt with certain third-party contractors, vendors, and the Partner Institutions in connection with the operation of their businesses, some of which are outside of the United States. The Debtors estimate that they have approximately $65 million in general unsecured claims outstanding as of the Petition Date.

Pursuant to the All Trade Motion (as defined below), which the Debtors intend to file on the Petition Date, the Debtors will seek to continue paying undisputed prepetition claims of certain creditors (including contractors, vendors, and the Partner Institutions) holding general unsecured claims in the ordinary course of business. In addition, the Plan contemplates the payment in full of all General Unsecured Claims in the ordinary course.

(f)     2U's Common Stock

Shares of 2U's common stock have historically traded on the Nasdaq under the symbol "TWOU."  On March 14, 2024, the Company received a written notification from Nasdaq that it had failed to comply with Nasdaq's minimum bid price requirement.  In accordance with Nasdaq rules, the Company had a period of 180 calendar days, or until September 10, 2024 (the "**Compliance Period**") to regain compliance with the minimum bid price requirement (the "**Minimum Bid Price Requirement**").

On June 14, 2024, 2U executed a 1-for-30 reverse stock split, consolidating every thirty (30) shares into one (1) and adjusting equity awards, warrants, and shares issuable under equity incentive plans.  The goal of the reverse stock split was to boost share price to meet Nasdaq's minimum bid price requirement and thereby avoid delisting.

On July 1, 2024, the Company received a written notification from Nasdaq that for the prior ten (10) consecutive business days, the closing bid price of the Company's common stock has been at $1.00 per share or greater.  Accordingly, the Company has regained compliance with the Minimum Bid Price Requirement.

III.
NOTABLE PREPETITION EVENTS

A.    CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

At the end of 2021, 2U had several reasons to be optimistic about its future. *First*, the COVID-19 pandemic accelerated the shift to online learning, as many individuals worldwide enrolled in online education programs when they were unable to attend in-person classes, work, or engage in social events. In fact, enrollment in 2U's degree programs increased by over 13,000 students from the start of the pandemic in March 2020 until 2U acquired edX in November 2021.

*Second*, 2U had just closed on its acquisition of edX, giving it a much broader reach and a single integrated platform to make its Partner Institutions' offerings available to learners around the world. Indeed, the acquisition allowed 2U the opportunity to reach an additional 39 million potential learners across the world, as well as over 1,000 Enterprise Clients and over 165 additional Partner Institutions.

The above factors continue to induce optimism in 2U's long-term outlook today. However, the Company's current capital structure is not sustainable in light of its existing business plan and lack of sufficient liquidity to address the upcoming maturity wall in January 2025, all of which is described below.

1.    The edX Acquisition and Industry-Specific Challenges

The edX acquisition, which closed in November 2021 for $800 million of cash, was financed in part with the proceeds from the First Lien Term Loan Facility. The edX acquisition provided 2U a strong, trusted, consumer-facing brand, as well as access to millions of learners worldwide. At the time, 2U believed that the acquisition would further its mission of providing access to world-class education for millions of learners, while increasing revenue and improving marketing efficiency across its product lines.

Unfortunately, unforeseen industry-specific challenges prevented 2U from realizing the expected benefits from the acquisition as quickly as initially hoped. In early 2020, the onset of the pandemic brought in-person learning at universities worldwide to a halt. While the corresponding shift to remote learning initially boosted enrollment in online programs and therefore 2U's business performance, the subsequent tapering of the pandemic in late 2021 drove a decline in online program enrollment, as many students sought to return to campus, work, and other in person activities. Today, even though there are more students taking online classes than pre-pandemic in 2019, fewer students are currently learning online than during the height of the pandemic. As a result of these factors, there has been, a general decrease in enrollment for the programs in 2U's Degree Program Segment since 2022 when the students that enrolled during the pandemic began graduating, with enrollments falling from approximately 62,609 in the first quarter of 2022 to approximately 44,693 in the first quarter of 2024.

Making matters worse, beginning in 2023, the demand for entry-level technology jobs unexpectedly declined as technology companies began shedding employees following a boom in hiring during the pandemic. The unforeseen adoption of artificial intelligence during the same

34

period also began to impact demand for entry-level coding positions and, eventually, led to a decline in demand for 2U's coding Boot Camp offerings.



**Newly listed U.S. jobs, change from a year earlier**

New listings of AI-related jobs are rising, year-over-year, while tech job listings are falling

Source: UMD-LinkUp AI Maps

Furthermore, the challenging capital markets environment in this time period made it difficult for the Company to refinance its debt.

More recently, in part due to the uncertainty around the Company's financial situation, certain of the Partner Institutions have elected not to renew their agreements with the Company, otherwise delayed signing new agreements with the Company, or delayed planned new program launches, negatively impacting the Company's expected business performance in the near-term.

2.     **Cost-Optimization Measures**

In response to these market conditions, the Company has undertaken various initiatives to adapt, optimize costs, and drive efficiencies across its business.  The Company launched programs in new high-demand fields (such as artificial intelligence), began offering even-more affordable programs to improve enrollment, and wound down certain non-performing programs from its portfolio.  In the third quarter of 2022, the Company downsized its workforce and consolidated its real estate footprint to its offices in Lanham, Maryland, and Cape Town, South Africa.  In late 2023, the Company announced leadership changes and commenced a comprehensive performance improvement exercise (which included additional cost optimization actions) aimed at, among other things, improving profitability and optimizing the Company's operating model and balance sheet.

3.     **The Maturity Wall and Related Funded Debt Issues**

Despite the success of these cost-optimization measures, the enrollment declines in Degree Programs and Boot Camps have negatively impacted the Company's profitability and cash flow.

In a vacuum, these enrollment declines would not present an immediate threat to the Company's balance sheet. However, the reality is that the Funded Debt Obligations total over $940 million and, absent a chapter 11 filing, may all come due by January 1, 2025, as described below.

Pursuant to the First Lien Credit Agreement, the $40 million of outstanding First Lien Revolving Loan Obligations will mature early and become due and payable on January 1, 2025, if more than $50 million of the 2025 Notes remain outstanding as of such date. As described above, such acceleration under the First Lien Credit Agreement constitutes an event of default under the Indentures, which allows the holders of the Unsecured Notes to accelerate the maturity of the Unsecured Notes such that they become immediately due and payable. The acceleration of the Unsecured Notes and the First Lien Revolving Loan Obligations, each constitute an event of default under the First Lien Credit Agreement, which could result in the acceleration of approximately $384.8 million of outstanding First Lien Term Loan Obligations.

In addition, pursuant to the First Lien Credit Agreement, the approximately $384.8 million of outstanding First Lien Term Loan Obligations will mature early and become due and payable on January 30, 2025, if more than $40 million of the 2025 Notes remain outstanding as of such date. This acceleration under the First Lien Credit Agreement likewise constitutes an event of default under the Indentures, which allows the holders of the Unsecured Notes to accelerate the maturity of the Unsecured Notes such that they become immediately due and payable.

The First Lien Credit Agreement also contains a minimum recurring revenue covenant requiring that Debtor 2U, Inc. maintain Recurring Revenues (as defined in the First Lien Credit Agreement) of at least $900,000,000 as of the last day of any period of four (4) consecutive fiscal quarters (the "***Recurring Revenue Covenant***"), subject to a cure mechanic set forth in the First Lien Credit Agreement (the "***Cure Right***"). Although the financial statements for the fiscal quarter ended June 30, 2024, are not yet finalized, they may demonstrate a breach of the Recurring Revenue Covenant as of the last day of such fiscal quarter. If there is such a breach and the Debtors are unable to exercise the Cure Right due to liquidity constraints or otherwise, the breach could result in an immediate event of default under the First Lien Credit Agreement, which could, in turn, lead to the First Lien Lenders exercising remedies (including, but not limited to, acceleration of the First Lien Term Loan Obligations). In addition, any such event of default or subsequent exercise of remedies could constitute a cross-default under the Notes and, if so, permit the Noteholders to exercise remedies (including, but not limited to, acceleration of their indebtedness).

In light of the Company's liquidity position, it is not possible for the Company to reduce the outstanding amount of the 2025 Notes to $50 million by January 1, 2025, or $40 million by January 31, 2025. Thus, absent a restructuring, all of the First Lien Revolving Loan Obligations would accelerate and become due and payable on January 1, 2025, which causes the acceleration of the Unsecured Notes Obligations and the First Lien Term Loan Obligations.

### 4.    Restructuring Negotiations with Stakeholders

Against that backdrop, the Company retained Moelis, AlixPartners, and Latham (collectively, the "***Company Advisors***") to assist in analyzing the Company's financial position and to explore options to deleverage the Company's balance sheet, including (but not limited to) potential refinancing, sale, and exchange transactions.

In November of 2023, the Company received an initial term sheet from (a) the Ad Hoc Noteholder Group, represented by Weil, Gotshal & Manges LLP and Houlihan Lokey Capital, Inc., and (b) Greenvale, represented by Schulte Roth & Zabel LLP.  The term sheet proposed, among other terms, that the applicable Noteholders would swap their Unsecured Notes for new second lien debt and new third lien debt with extended maturities.  Although the Company explored the possibility of such an uptier transaction or another liability management transaction for several months, the Company ultimately decided, in its business judgment, not to pursue such a transaction because a more comprehensive restructuring was required to address the First Lien Obligations and reduce the quantum of its debt to bring its capital structure in line with its long-term business strategy.

Over the course of the following months, the Company explored a potential sale.  The Company ultimately reached out to twenty-six (26) potential purchasers, only one of whom put forth an indication of interest.  That indication of interest valued the Company at less than fifty percent (50%) of par of the Unsecured Notes and was not executable without the consent of the Company's Unsecured Noteholders. A summary of the marketing process is displayed in the following chart:



**Illlustration of the Marketing Process**

Meanwhile, as the Company explored a potential sale, it continued to engage in arm's-length and good-faith negotiations on the terms of a potential out-of-court or in-court restructuring with the Ad Hoc Noteholder Group and Greenvale.  By late-April 2024, the Company determined, in its business judgment and based on advice received from the Company Advisors, that its ability to refinance was limited for several reasons, including that the Company determined, in its business judgment and based on advice received from the Company Advisors, that its ability to refinance was limited for several reasons, including (a) the overhang of the Company's leverage on the broader capital structure; (b) the Company's inability to raise incremental junior lien debt due to the restrictive covenant requirements under the First Lien

Credit Agreement and the 2030 Indenture; and (c) the lack of market interest in providing unsecured debt or equity capital, among other factors.

Accordingly, on May 9, 2024, the Company added a new independent director with substantial restructuring experience—Ivona Smith—to the board of directors of Debtor 2U, Inc. (the "***Board***").  And, on May 22, 2024, the Board established a Transaction Committee (the "***Transaction Committee***"), comprised of four (4) independent directors:  Ivona Smith (as Committee Chair), Paul Maeder, Timothy Haley, and Robert Stavis.

The Transaction Committee is responsible for reviewing, considering and, if appropriate, recommending to the full Board potential in-court or out-of-court strategic alternatives available to the Company, including (without limitation) seeking financing or refinancing or undertaking a restructuring, reorganization, recapitalization, business combination, sale of equity or assets or change of control of the Company, whether by sale, merger, consolidation or otherwise.

As the Company's negotiations progressed with the Ad Hoc Noteholder Group and Greenvale, the Company began, in late May of 2024, arm's- length and good-faith negotiations with the First Lien Ad Hoc Group, represented by Milbank LLP and FTI Consulting, Inc.

Around mid-June of 2024, the Company, the Ad Hoc Noteholder Group, and Greenvale determined that an out-of-court restructuring was likely not feasible and, even if it were, would not maximize value like a prepackaged chapter 11 plan would.  In the following weeks, the Company provided significant diligence to the Ad Hoc Noteholder Group, Greenvale, and the First Lien Ad Hoc Group, as the parties worked diligently towards structuring a value-maximizing restructuring.

These efforts culminated in the Debtors, certain of the First Lien Lenders holding more than 66.67% of outstanding First Lien Obligations, and certain of the Noteholders holding more than 66.67% of outstanding Unsecured Notes Obligations agreeing to the terms of the Restructuring Support Agreement.  Following the Transaction Committee's review, consideration, and recommendation, the Board unanimously approved the Debtors' entry into the Restructuring Support Agreement.

### 5.    Independent Investigation

In her capacity as independent director of the Board and member of the Transaction Committee, Ms. Ivona Smith commenced an independent investigation (the "***Independent Investigation***") into whether the estates hold any viable claims and causes of action against any of the Company's equity holders, affiliates, directors, managers, officers, or other Related Parties that are worthy of pursuit in the context of the Chapter 11 Cases.  On June 14, 2024, Ms. Smith, in her capacity as independent director of the Board and member of the Transaction Committee, retained Katten Muchin Rosenman LLP ("***Katten***") as independent legal counsel to conduct the Independent Investigation.

In furtherance of the Independent Investigation, Ms. Smith has, to date, issued document and information requests to the Company seeking, among other things, board materials and minutes, corporate governance documents, transaction documents, litigation-related documents,

and certain financial information.  To date, Katten has received and reviewed over 330 documents, comprising over 7,800 pages, relevant to the Independent Investigation.  Katten has also reviewed certain of the Company's filings with the SEC.  The Independent Investigation remains ongoing as of the date hereof, and Ms. Smith is continuing to investigate matters in accordance with the authority she has been given by the Board and her fiduciary obligations.  Ms. Smith, through her independent counsel, will be prepared to report to the Bankruptcy Court on the status of the Independent Investigation at the Combined Hearing.

## B.    THE PATH FORWARD

### 1.    Overview of the Restructuring Support Agreement

The Restructuring Support Agreement contemplates that the Debtors will pursue the prepackaged Plan that would (if confirmed) reduce 2U's total principal debt obligations by approximately $486.3 million—from approximately $944.8 million to approximately $458.5 million.

In the first instance, the Plan would convert the Unsecured Notes into one hundred percent (100%) of the reorganized equity (subject to dilution) and provide the First Lien Lenders with amended and extended first lien loans in the principal amount of $414 million.  The Amended and Restated Loans would have a maturity date of 27 months from the date on which the Plan become effective (the "***Effective Date***"), and $70 million of such loans would be paid down as follows: (a) $30 million on the Effective Date; (b) $20 million on the fifteen (15) month anniversary of the Effective Date; and (c) $20 million on the twenty-one (21) month anniversary of the Effective Date.

The Restructuring Support Agreement further contemplates that these Chapter 11 Cases will be funded via a $64 million new money multi-draw financing facility (the "***DIP Facility***") and the consensual use of cash collateral.  The DIP Facility is being provided by certain Consenting Noteholders (as defined in the Restructuring Support Agreement).  The DIP Facility is described in greater detail in the DIP Motion (as defined below).  Each holder of an outstanding claim arising under the DIP Facility on the Effective Date shall receive (a) its *pro rata* share of $64 million of loans issued under the second lien exit facility, or (b) such other treatment as to which the Debtors and the holder of such claims will have agreed upon in writing, with the consent of the Required Consenting Noteholders.

Importantly, the Restructuring Support Agreement provides that other general unsecured claims will be unimpaired, and, as discussed above and in further detail in Wages Motion and the All Trade Motion (each as defined below), contemplate that certain creditors (including contractors, vendors, and the Partner Institutions) and the Debtors' Workforce will continue to be paid in full in the ordinary course of business.  Accordingly, 2U's operations will remain unaffected throughout these Chapter 11 Cases and beyond, which will enable 2U to continue to provide its Partner Institutions and students the same level of world-class support that they have come to expect.

In addition, the Restructuring Support Agreement contemplates that 2U will offer all holders of the Unsecured Notes the right to purchase common equity interests in the corporate

parent of the reorganized Debtors in an aggregate amount of not less than $46.5 million (the "***Equity Rights Offering***").  Certain Consenting Noteholders (the "***Equity Rights Offering Backstop Parties***") will backstop the portion of the Equity Rights Offering that is not subscribed for by holders of the Unsecured Notes (other than the Equity Rights Offering Backstop Parties). The proceeds of the Equity Rights Offering will be used to reduce the aggregate principal amount of the Amended and Restated Loans by $30 million on the Effective Date, fund certain obligations under the Plan and fund the Company's ongoing working capital needs.  The Equity Rights Offering will infuse the Company with liquidity and strengthen its balance sheet upon exit from chapter 11.

## 2.    Proposed Timeline for These Chapter 11 Cases

The Debtors intend to requested approval of their solicitation procedures described in the Combined Motion (as defined below), which the Debtors intend to file on the Petition Date.  Under the Restructuring Support Agreement, the Debtors have agreed to satisfy the following milestones (collectively, the "***Milestones***"):

- The Debtors shall file the Plan, the Disclosure Statement, and the Combined Motion by no later than one (1) business day following the Petition Date;

- The Debtors shall have obtained the Bankruptcy Court's entry of the interim order granting the relief requested in the NOL Motion by no later than five (5) calendar days following the Petition Date;

- The Debtors shall have obtained the Bankruptcy Court's entry of the Interim DIP Order by no later than five (5) business days following the Petition Date.

- The Debtors shall have obtained the Bankruptcy Court's entry of the Final DIP Order, the final order granting the NOL Motion, the Lease Rejection Order (as defined in the Restructuring Support Agreement), and the Equity Rights Backstop Order (as defined in the Restructuring Support Agreement) on or prior to the date of entry of the Combined Order.

- The Debtors shall have obtained the Bankruptcy Court's entry of an order approving the Disclosure Statement by no later than forty-five (45) calendar days following the Petition Date.

- The Debtors shall have obtained the Bankruptcy Court's entry of an order confirming the Plan by no later than forty-five (45) calendar days following the Petition Date.

- Consummation of the Plan and the Effective Date shall occur by no later than fifty (50) calendar days following the Petition Date.

Achieving the various Milestones under the Restructuring Support Agreement is crucial to maintaining the support of the consenting stakeholders party thereto and successfully restructuring

the Debtors.  Moreover, an expeditious emergence from chapter 11 will minimize the adverse effects of these Chapter 11 Cases on the Debtors' businesses.

### 3. The Future of 2U

The broad consensus reflected in the Restructuring Support Agreement is the product of many months of hard work by numerous stakeholders and represents a comprehensive and fair resolution of the Debtors' prepetition financial obligations.  If confirmed, the Plan will allow the Debtors to exit chapter 11 with a right-sized balance sheet and adequate liquidity to support the business going forward.

Upon emerging from chapter 11, 2U will be well-positioned to continue supporting Partner Institutions and students in the same way it has for over 15 years.  Moreover, 2U will be better equipped to capitalize on the anticipated rapid industry shifts in the coming years.  The demand for online education is projected to grow, driven by ongoing changes in the labor market, including the transformative impact of artificial intelligence on the economy and the workforce. Many workers will require online education to reskill and upskill, ensuring their competitiveness in the jobs market of the future.  With a right-sized capital structure, 2U will be well-positioned to support these learners and capitalize on this trend alongside Partner Institutions and Enterprise Clients.

In short, the proposed chapter 11 restructuring under the Restructuring Support Agreement will resolve 2U's maturity wall under the Funded Debt Obligations and the potential breach of the Recurring Revenue Covenant, with no impact or disruption to learners or Partner Institutions.  This will allow 2U to continue to pursue its mission of expanding access to great nonprofit colleges and universities through online education, in turn changing lives and meeting critical societal needs.

## IV.
## ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

**A.    COMMENCEMENT OF THE CHAPTER 11 CASES AND FILING OF FIRST DAY MOTIONS**

In accordance with the Restructuring Support Agreement, the Debtors intend to File voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date.  The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits, and become subject to the limitations, of the Bankruptcy Code.

The Debtors intend to continue to operate their businesses in the ordinary course during the pendency of the Chapter 11 Cases as they have prior to the Petition Date.  To facilitate the prompt and efficient implementation of the Plan through the Chapter 11 Cases, the Debtors intend to File, on the Petition Date or soon thereafter, a motion seeking to have the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly.  The Debtors also intend to File, on the Petition Date or soon thereafter, various motions seeking relief from the Bankruptcy Court (the "***First Day Motions***").  The relief sought in the First Day Motions will ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The following is a brief overview of the relief that the Debtors are seeking in the First Day Motions.

### 1.    Administrative and Procedural Motions

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Debtors intend to seek approval of certain "procedural" First Day Motions, including: (a) approval of the joint administration of the Chapter 11 Cases; and (b) authorization of the retention and appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent.

The Debtors intend to File several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various Professionals to assist the Debtors in the Chapter 11 Cases.

### 2.    Stabilizing Operations

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with the vendors, revenue and profits, the Debtors intend to File a number of First Day Motions to help facilitate the stabilization of its operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession.  Specifically, the Debtors intend to seek relief to, *inter alia*:

- incur postpetition financing;

- maintain the existing cash management system;

- remit and pay certain taxes and fees;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage and enter into new insurance policies if necessary;

- continue, implement new and/or terminate customer programs and any other customer practices as they deem appropriate;

- pay, in the ordinary course of business, the allowed prepetition claims of certain critical vendors, foreign vendors, certain ordinary course professionals and other trade vendors, vendors who may have Liens on the Debtors' property, and vendors who may have Claims on account of goods or materials received by the Debtors within the twenty (20) days before the Petition Date;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- enforce the automatic stay, anti-discrimination provisions, and *ipso facto* provisions of the Bankruptcy Code; and

- establish certain notice and hearing procedures and approving restrictions on certain transfers of interests in, and claims against the Debtors.

The relief sought by the Debtors pursuant to the First Day Motions is described in further detail below:

(a)    Debtor in Possession Financing.

The Debtors require immediate access to DIP financing in order to preserve and maximize the value of their assets as they seek to expeditiously confirm and consummate the Plan. The DIP financing will be provided on a junior basis and available for, among other things, operations during and for the expenses of the Chapter 11 Cases. On the Petition Date or soon thereafter, the Debtors intend to File a motion (the "***DIP Motion***") seeking authority from the Bankruptcy Court to, among other things, enter into the DIP Facility, which will have an aggregate commitment of $64 million. By the DIP Motion, the Debtors will seek authority to make an initial draw of $60 million under the DIP Facility on an interim basis, with the remainder of the DIP Facility available upon entry of a Final Order.

(b)    Cash Management System

The Debtors maintain a cash management system designed to receive, monitor, aggregate, transfer, and distribute Cash. The Debtors and their Non-Debtor Affiliates engage in intercompany transactions in the ordinary course of business. On the Petition Date or soon thereafter, the Debtors intend to file a motion (the "***Cash Management Motion***") seeking authority from the Bankruptcy Court to continue: (i) the use of their existing cash management system, bank accounts, checks, and related business forms; (ii) their existing deposit practices; and (iii) engaging in intercompany transactions and, as applicable, settling, paying, and honoring intercompany Claims to avoid a

disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases.

(c)    Taxes

To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date or soon thereafter, the Debtors intend to seek authority from the Bankruptcy Court to (i) pay amounts owed on account of any prepetition tax and fee obligations to certain international, federal, state, and local governmental entities, and quasi-governmental entities, and (ii) make payments to, and set off amounts owed from, certain non-Debtor affiliates or other Debtors on account of prepetition taxes and fees to certain international, federal, state, and local governmental entities, and quasi-governmental entities.

(d)    Utilities

In the ordinary course of business, the Debtors obtain certain utility services from utility providers. Accordingly, to enable the continuance of their businesses in the ordinary course, on the Petition Date or soon thereafter, the Debtors plan to seek an order from the Bankruptcy Court: (i) prohibiting utility providers from altering, refusing, or discontinuing utility services on account of any unpaid charges for utility services or perceived inadequacy of adequate assurance of the Debtors' performance; (ii) approving procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor their obligations in the ordinary course.

(e)    Insurance

The maintenance of certain insurance coverage is essential to the Debtors' operations and is required by various Laws and regulations, as well as certain financing agreements, and other contracts. The Debtors believe that the satisfaction of their insurance obligations whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with their insurance providers and banks issuing letters of credit, and ensure the continued availability and commercially reasonable pricing of such insurance coverage. Accordingly, on the Petition Date or soon thereafter, the Debtors intend to seek authority from the Bankruptcy Court to continue to (i) pay obligations in connection with their ordinary course insurance obligations that arose prepetition and (ii) honor their obligations under their existing policies and programs in the ordinary course postpetition.

(f)    Customer Programs

The Debtors have historically provided certain incentives, royalties, and accommodations to their diverse customer base to attract and maintain positive customer relationships. In addition, the Debtors issue credits, adjustments, refunds, setoffs, or other similar obligations to their customers from time to time. Each of these programs is designed to target a different sales channel to ensure maximization of the Debtors' customer base. These programs promote customer loyalty and goodwill to the Debtors' businesses and the value of their brand. Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in the Chapter 11 Cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders. Accordingly, on the Petition Date or soon thereafter, the Debtors intend to seek authority from the Bankruptcy

44

Court to (i) fulfill and honor these customer programs and (ii) continue, renew, replace, terminate, new customer programs and any other customer practices in the ordinary course of business.

(g)    Employee Wage and Benefits

The Debtors' businesses are labor intensive and rely upon various employees in the United States and contract workers in the United States and abroad. Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses. To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, the Debtors intend to File, on the Petition Date or soon thereafter, a motion (the "***Wages Motion***") seeking authority from the Bankruptcy Court to continue to honor their obligations to their workforce in the ordinary course of business, including: (i) the payment of prepetition wages, salaries, reimbursable employee expenses and other compensation programs, including employee incentive programs; (ii) the payment of prepetition fees and expenses of contract workers; (iii) the payment of prepetition accrued and unpaid employee benefits; and (iv) the continuation of the aforementioned programs and postpetition obligations thereunder.

(h)    Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code

The Debtors and their Non-Debtor Affiliates provide learners around the world with access to high-quality education and partner with colleges, universities, and service providers worldwide. The Debtors believe that many of these stakeholders (including trade creditors) may not be aware the application of the following four key protections provided by the Bankruptcy Code: (i) the automatic stay provisions of section 362 of the Bankruptcy Code; (ii) the *ipso facto* provisions of section 365 of the Bankruptcy Code; (iii) the anti-discrimination provisions of section 525 of the Bankruptcy Code; and (iv) the provisions of section 541 of the Bankruptcy Code protecting property of the estate. Thus, out of an abundance of caution, the Debtors plan to File, on the Petition Date or soon thereafter, a motion seeking confirmation of the above-noted provisions to international creditors and other parties in addition to approval of (i) a notice to be sent to foreign customers, suppliers, and other stakeholders confirming that the Debtors are subject to the supervision of the Bankruptcy Court and the provisions of the Bankruptcy Code and (ii) a separate notice to be sent to foreign stakeholders of the foreign Non-Debtor Affiliates confirming that the foreign Non-Debtor Affiliates are not included in the Chapter 11 cases and are not subject to the supervision of the Bankruptcy Court nor the foregoing provisions of the Bankruptcy Code.

(i)    Transfers of, or Worthlessness Deductions with Respect to, Certain Interests and Transfer of Certain Claims

The Debtors possess certain tax attributes, including net operating loss ("***NOL***") carryforwards and disallowed business interest expense, that are valuable assets of the Debtors' estates because the Tax Code (as defined below) generally permits a corporation to carry forward NOLs and other tax attributes to reduce taxable income, thereby reducing the corporation's tax liability in future periods. If 2U, Inc. experiences an "ownership change" (as defined in the Tax Code (as defined below)) during, or prior to the Debtors' emergence from, the Chapter 11 Cases, the Debtors' ability to use their tax attributes may be substantially limited, which would impair the

Debtors' or the Reorganized Debtors' ability to offset taxable income arising upon emergence from the Chapter 11 Cases or in future tax years.  In addition, transfers of certain Claims against the Debtors during the pendency of the Chapter 11 Cases may impair the Debtors' qualification for the 382(l)(5) Exception (as defined below), which would further impair the Reorganized Debtors' ability to use their tax attributes to offset taxable income after emergence.  As a result, on the Petition Date or soon thereafter, the Debtors intend to file a motion (the "**NOL Motion**") seeking authority to establish certain procedures designed to reduce the possibility of a pre-emergence ownership change to preserve the Debtors' ability to qualify for the 382(l)(5) Exception, in each case, to preserve the Debtors' ability to use their tax attributes during the Chapter 11 Cases and in future years.

(j)    Critical Vendors, Foreign Vendors, and Lien Claimants

In the ordinary course of business, the Debtors rely upon a variety of vendors, both foreign and domestic, that are critical to the Debtors' operations.  Such vendors include, among others, (i) providers of curriculum design and development services, certain software services and advertising and marketing services; (ii) certain college, university, or other commercial or non-profit institutional partners who create and provide educational content for use in certain courses offered by the Debtors; (iii) data centers and cloud storage facilities; and (iv) other lienholders.  Certain of these vendors may seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due.  Further, the goods and services provided by these critical vendors are of paramount importance to the operation of the Debtors' businesses.  The nature of the Debtors' businesses requires them to rely on data centers, cloud storage facilities, software, and technology services that are often available from single (or a limited pool of) suppliers, which makes it difficult (and, in some cases, impossible) for the Debtors to replace any of these vendors in a timely manner.  Thus, disrupting the vendors' provision of essential goods and services would cause the Debtors' operations to halt and would significantly delay the Debtors' ability to provide customers access to the Debtors' educational platform, resulting in losses to the Debtors' estates to the detriment of all of the Debtors' stakeholders.  Additionally, many of the Debtors' foreign vendors may not be (or may assert that they are not) subject to the jurisdiction of the Bankruptcy Court, may disregard the automatic stay provisions of the Bankruptcy Code, and may engage in conduct that would disrupt the Debtors' operations.

To avoid the detrimental effects of potential actions taken by the Debtors' critical vendors, and to minimize any disruption to the Debtors' operations, the Debtors intend to file on the Petition Date or soon thereafter a motion (the "**All Trade Motion**") seeking authority from the Bankruptcy Court to pay, in the ordinary course of business, the allowed prepetition claims of certain critical vendors, foreign vendors, certain ordinary course professionals and other trade vendors, vendors who may have Liens on the Debtors' property, and vendors who may have Claims on account of goods or materials received by the Debtors within the twenty (20) days before the Petition Date.

(k)    Lease Rejection

The Debtors maintain operations throughout the country and have historically leased office space throughout the United States.  However, the Debtors have exited most of their office space despite the fact that certain leases remaining ongoing.  The Debtors have determined that rejecting

46

certain of these leases will alleviate onerous lease and sublease obligations and cap damages claims pursuant to Section 502(b)(6) of the Bankruptcy Code. Accordingly, the Debtors intend to file a motion on the Petition Date or soon thereafter a motion (the "***Lease Rejection Motion***") seeking authority from the Bankruptcy Court to reject certain leases and subleases and abandon any remaining personal property left at those locations.

### 3.    Combined Hearing and Solicitation Procedures

On the Petition Date or soon thereafter, the Debtors plan to File a motion (the "***Combined Motion***") requesting that the Bankruptcy Court enter an order (the "***Disclosure Statement Order***"): (a) scheduling the Combined Hearing to approve this Disclosure Statement and confirm the Plan; (b) establishing the voting record date, Voting Deadline and other related dates; (c) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan; (d) approving the manner and forms of notice and other related documents; (e) approving the Equity Rights Offering Procedures and other Equity Rights Offering Documents and commencement of the Equity Rights Offering; and (f) if the Plan is confirmed within seventy five (75) days of the Petition Date, conditionally waiving the requirements to (i) hold a meeting of creditors pursuant to section 341(e) of the Bankruptcy Code; and (ii) File Schedules of Assets and Liabilities, Statements of Financial Affairs, and other initial reports as set forth in Bankruptcy Rule 2015.3. The Debtors anticipate that notice of the Combined Hearing will be published and mailed to all known Holders of Claims and Interests at least twenty eight (28) days before the date by which objections to Confirmation must be Filed with the Bankruptcy Court.

## B.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of one hundred twenty (120) days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for one hundred eighty (180) days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause." If necessary, the Debtors intend to seek additional extensions of the exclusive periods to File a plan and solicit acceptances of a plan.

## C.    ANTICIPATED POST-EMERGENCE CAPITAL STRUCTURE & OPERATIONS

During the course of the Chapter 11 Cases, the Debtors, in consultation with the Company Advisors and key stakeholders developed the following anticipated capital structure of the

Reorganized Debtors.  The instruments and amounts set forth in the table below are subject to change prior to the Effective Date.

| Instrument | Amount | Description |
|---|---|---|
| Amended and Restated Credit Facility | Up to $388,400,000 | An amended and restated first lien term loan facility, the terms of which will be substantially consistent with the terms attached to the Restructuring Term Sheet as Annex 2. |
| Exit Facility | Up to $66,500,000 | A secured second lien multi-draw term loan exit facility, the terms of which shall be substantially consistent with the Exit Facility Term Sheet attached to the Restructuring Term Sheet as Annex 4. |
| New Common Interests | N/A | On the Effective Date, Reorganized Parent will issue or reserve for issuance New Common Interests in accordance with the terms of the Plan, the Restructuring Support Agreement and the Equity Rights Offering Documents and subject to dilution on the terms described therein. |

**V.**
**SUMMARY OF THE PLAN**

THIS **ARTICLE V** IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE **MATERIAL TERMS** OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THIS ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD **NOT** BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS **ARTICLE V** AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.

**A.      ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS**

**1.      General Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**2.      Professional Fee Claims**

(a)      Professional Fee Applications

All applications for final allowance of Professional Fee Claims must be Filed and served on the Reorganized Debtors and such other Entities who are designated in the Combined Order no later than sixty (60) days after the Effective Date.  The Professional Fee Claims owed to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account after such Claims are Allowed by a Final Order.  After all Allowed Professional Fee Claims have been paid in full, any excess amounts remaining in the Professional Fee Escrow Account shall be returned to the Reorganized Debtors.  To the extent that the funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Allowed Professional Fee Claims owed to the Professionals, the Reorganized Debtors shall pay such amounts within ten (10) Business Days of entry of the order approving such Professional Fee Claims.

49

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting Professional by no later than thirty (30) days after the Filing of the applicable final application for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Escrow Account, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim. The Reorganized Debtors shall not commingle any funds contained in the Professional Fee Escrow Account and shall use such funds to pay only the Professional Fee Claims, as and when Allowed by order of the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, the failure of the Professional Fee Escrow Account to satisfy in full the Professional Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Debtors or the Reorganized Debtors.

(b)    Professional Fee Escrow Account

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

(c)    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate in good faith their Professional Fee Claims (taking into account any retainers) prior to and as of the Effective Date and shall deliver such estimate to the Debtors at least three (3) calendar days prior to the Confirmation Date. If a Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(d)    Post-Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. Each Reorganized Debtor may employ and pay any fees and expenses of any professional, including any Professional, in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court, including with respect to any transaction, reorganization, or success fees payable by virtue of the consummation of the Plan or the occurrence of the Effective Date.

3.    **DIP Claims**

In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each Holder of such Allowed DIP Claim shall receive either (i) its Pro Rata share of Exit Loans under the Exit Facility Credit Agreement, or (ii) such other treatment as to which the Debtors and

50

the Holder of such Allowed DIP Claim will have agreed upon in writing, with the consent of the Required Consenting Noteholders and the Debtors.

### 4.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  Nothing in the foregoing or otherwise in the Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Priority Tax Claim.

### 5.    United States Trustee Statutory Fees

The Debtors and the Reorganized Debtors, as applicable, will pay all fees due and owing to the United States Trustee pursuant to 28 U.S.C. § 1930(a), together with interest, if any, pursuant to 31 U.S.C. Section 3717, for each quarter until the entry of a final decree, or if the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

### 6.    Restructuring Fees and Expenses

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

## B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### 1.    Summary

The Plan constitutes a separate plan of reorganization for each Debtor.  Except for the Claims addressed in Article II of the Plan (or as otherwise set forth therein), all Claims and Interests are placed in Classes for each of the applicable Debtors.  For all purposes under the Plan, each Class will exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including, without limitation, for voting, confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim

or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid, released, disallowed, or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Classified Claims and Interests**

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3. | First Lien Claims | Impaired | Entitled to Vote |
| 4. | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5. | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6. | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 7. | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 8. | Existing Equity Interests | Impaired | Deemed to Reject |
| 9. | Subordinated Claims | Impaired | Deemed to Reject |

2.    **Classification and Treatment of Claims and Interests**

(a)    Class 1 – Other Secured Claims

  (i)    *Classification*: Class 1 consists of the Other Secured Claims.

  (ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, on the Effective Date, each Holder of such Allowed Other Secured Claim shall receive, at the Debtors' option and subject to the consent of the Required Consenting Noteholders (with such consent to not be unreasonably withheld), either (i) payment in full in Cash, (ii) delivery of the collateral securing such Allowed Other Secured Claim, (iii) Reinstatement of such Allowed Other Secured Claim, or (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

  (iii)    *Voting*: Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Priority Claims

  (i)    *Classification*: Class 2 consists of the Other Priority Claims.

  (ii)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

  (iii)    *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)    Class 3 – First Lien Claims

  (i)    *Classification:* Class 3 consists of the First Lien Claims.

(ii)  *Treatment:* Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed First Lien Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed First Lien Claim, on the Effective Date, each Holder of such Allowed First Lien Claim shall receive its Pro Rata share of the Amended and Restated Loans.

(iii)  *Voting:* Class 3 is Impaired, and Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

(d)  Class 4 – Unsecured Notes Claims

(i)  *Classification*: Class 4 consists of the Unsecured Notes Claims.

(ii)  *Treatment*: Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Unsecured Notes Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Unsecured Notes Claim, on the Effective Date, each Holder of such Allowed Unsecured Notes Claim shall receive (i) the right to participate in the Equity Rights Offering in accordance with the Equity Rights Offering Procedures, and (ii) its Pro Rata share of the New Common Interests (subject to dilution on account of the New Common Interests issued pursuant to (A) the MIP, and (B) the Equity Rights Offering).

(iii)  *Voting*: Class 4 is Impaired, and Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

(e)  Class 5 – General Unsecured Claims

(i)  *Classification:* Class 5 consists of the General Unsecured Claims.

(ii)  *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date, the Reorganized Debtors shall continue to pay each Holder of an Allowed General Unsecured Claim in the ordinary course of business; *provided* that each Landlord Claim shall be subject to the cap set forth in section 502(b)(6) of the Bankruptcy Code.

(iii)  *Voting:* Class 5 is Unimpaired, and Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 5 are not entitled to vote to accept or reject the Plan.

(f)    <u>Class 6 – Intercompany Claims</u>

(i)    *Classification:* Class 6 consists of all Intercompany Claims.

(ii)    *Treatment:* On the Effective Date, Intercompany Claims shall be, at the option of the applicable Debtor and subject to the consent of the Required Consenting Noteholders (with such consent to not be unreasonably withheld), either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors.

(iii)    *Voting*: Class 6 is either: (i) Unimpaired, in which case the Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (ii) Impaired and not receiving any distribution under the Plan, in which case the Holders of such Claims in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Claim in Class 6 will not be entitled to vote to accept or reject the Plan.

(g)    <u>Class 7 – Intercompany Interests</u>

(i)    *Classification*: Class 7 consists of all Intercompany Interests.

(ii)    *Treatment:* On the Effective Date, Intercompany Interests shall be, at the option of the applicable Debtor and subject to the consent of the Required Consenting Noteholders (with such consent to not be unreasonably withheld), either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors and subject to the consent of the Required Consenting Noteholders (with such consent to not be unreasonably withheld).

(iii)    *Voting*: Class 7 is either: (i) Unimpaired, in which case the Holders of Interests in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (ii) Impaired and not receiving any distribution under the Plan, in which case the Holders of such Interests in Class 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Interest in Class 7 will not be entitled to vote to accept or reject the Plan.

(h)    <u>Class 8 – Existing Equity Interests</u>

(i)    *Classification*: Class 8 consists of the Existing Equity Interests.

(ii)    *Treatment*: On the Effective Date, all Existing Equity Interests will be canceled, released, and extinguished and will be of no further force and effect.  No Holders of such Existing Equity Interests will receive any property or distribution under the Plan.

(iii)    *Voting*: Class 8 is an Impaired Class, and the Holders of Claims in Class 8 are conclusively deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 8 are not entitled to vote to accept or reject the Plan.

(i)    <u>Class 9 – Subordinated Claims</u>

(i)    *Classification*: Class 9 consists of the Subordinated Claims.

(ii)    *Treatment*: On the Effective Date, all Subordinated Claims will be canceled, released, and extinguished and will be of no further force and effect.  No Holders of such Subordinated Claims will receive any property or distribution under the Plan.

(iii)    *Voting*: Class 9 is an Impaired Class, and the Holders of Claims in Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 9 are not entitled to vote to accept or reject the Plan.

**3.**    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided therein, nothing under the Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**4.**    **Vacant and Abstaining Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 as of the commencement of the Combined Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. Moreover, any Class of Claims that is occupied as of the commencement of the Combined Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.      **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

6.      **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article XI.E to the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

7.      **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract (including the First Lien Credit Agreement), section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

8.      **Intercompany Interests and Intercompany Claims**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims, but rather only for the purposes of administrative convenience.  Due to the importance of maintaining the corporate structure for the benefit of Holders that receive New Common Interests, the Reorganized Debtors require flexibility in connection with maintaining the corporate structure.  For the avoidance of doubt, any Interest in the Non-Debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor, unless otherwise set forth in the Definitive Documents.

## C.      **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.      **Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided*, that the Reorganized Debtors may consolidate Allowed Claims on a per Class basis for voting purposes.

## 2.      General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Combined Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

## 3.      Restructuring Transactions

Without limiting any rights and remedies of the Debtors or the Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Definitive Documents and any consents or approvals required thereunder, the entry of the Combined Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors.  Such restructuring may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable law, including the execution and delivery of the New Corporate Governance Documents; (iv) the execution and delivery of the Amended and Restated Credit Documents and entry into the Amended and Restated Credit Facility; (v) the execution and delivery of the Exit Facility Documents and entry into the Exit Facility; (vi) pursuant to the Equity Rights Offering Documents, the implementation and consummation of the Equity Rights Offering, the issuance of rights to subscribe for New Common Interests pursuant to the Equity Rights Offering Procedures to the Holders of Unsecured Notes Claims, and the issuance and distribution of the New Common Interests in connection therewith; (vii) the issuance and distribution of the New Common Interests as set forth in the Plan; and (viii) all other actions that the applicable entities determine to be necessary or appropriate, in form and substance acceptable to the Required Consenting Creditors, including making filings or recordings that may be required by applicable law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan and the Definitive Documents and any consents or approvals required.

The Combined Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 4.    Continued Corporate Existence

Subject to the Restructuring Transactions permitted by Article IV.C of the Plan, after the Effective Date, the Reorganized Debtors shall continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and bylaws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and bylaws, or other applicable New Corporate Governance Documents, are amended, restated, or otherwise modified under the Plan. Notwithstanding anything to the contrary in the Plan, the Claims against a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor solely by virtue of the Plan or these Chapter 11 Cases.

### 5.    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims

Except as otherwise expressly provided in the Plan, the Combined Order, or any other Definitive Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan (other than the Professional Fee Escrow Account and any rejected Executory Contracts and/or Unexpired Leases) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, the Reorganized Debtors may (a) operate their respective businesses; (b) use, acquire, and dispose of their respective property; and (c) compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Combined Order.

### 6.    Amended and Restated Credit Documents

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Amended and Restated Credit Documents—including, for the avoidance of doubt, converting the First Lien Claims into the Amended and Restated Loans—without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Amended and Restated Credit Documents).  On the Effective Date, the Amended and Restated Credit Documents shall constitute legal, valid, binding, and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or

subject to discharge, impairment, release or avoidance under the Plan, the Combined Order or on account of the Confirmation or Consummation of the Plan. The votes of the Holders of Claims in Class 3 to accept the Plan shall be deemed to be a direction to the First Lien Agent under the First Lien Credit Agreement to effectuate the Restructuring Transactions, including, without limitation, entry in the Amended and Restated Credit Facility (and any transactions related thereto). On and as of the Effective Date, all Holders of Amended and Restated Loans shall be deemed to be parties to the Amended and Restated Credit Documents without the need for execution by such Holders.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Amended and Restated Credit Documents shall: (a) be deemed to be granted; (b) be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Amended and Restated Credit Documents; (c) be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors or the Reorganized Debtors, as applicable, the applicable agent, or any of the applicable lenders), having the priority set forth in the Amended and Restated Credit Documents and subject only to such Liens and security interests as may be permitted under the Amended and Restated Credit Documents; and (d) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors, the Reorganized Debtors, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Combined Order (it being understood that perfection shall occur automatically by virtue of the entry of the Combined Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The proceeds of the Amended and Restated Credit Facility may be used by the Reorganized Debtors to make distributions pursuant to the Plan and fund general corporate purposes.

7.    **Exit Facility Documents**

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Exit Facility Documents—including, for the avoidance of doubt, converting all or a portion of the Allowed DIP Claims into the Exit Loans—without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Exit Facility Documents). On the Effective Date, the Exit Facility Documents shall constitute legal, valid, binding, and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Combined Order or on account of the Confirmation or Consummation of the Plan.

60

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents shall: (a) be deemed to be granted; (b) be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Exit Facility Documents; (c) be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors or the Reorganized Debtors, as applicable, the applicable agent, or any of the applicable lenders), having the priority set forth in the Exit Facility Documents and subject only to such Liens and security interests as may be permitted under the Exit Facility Documents; and (d) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors, the Reorganized Debtors, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Combined Order (it being understood that perfection shall occur automatically by virtue of the entry of the Combined Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 8.    Equity Rights Offering

On the Effective Date, pursuant to the Plan and the Equity Rights Offering Documents, the Debtors shall issue New Common Interests to the Holders of Unsecured Notes Claims as set forth in the Plan and the Equity Rights Offering Documents. Each Holder of Unsecured Notes Claims may exercise either all, a portion of, or none of its rights in exchange for Cash. Such rights are not separately transferrable or detachable from the Unsecured Notes Claims.

The Reorganized Parent shall be authorized to issue the New Common Interests issuable pursuant to such exercise of rights on the Effective Date pursuant to the terms of the Plan and the Equity Rights Offering Documents.

The Equity Rights Offering is fully backstopped, severally and not jointly, by the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Letter and the Restructuring Support Agreement.

New Common Interests issued pursuant to the Equity Rights Offering shall be offered at the Plan Discount and New Common Interests issued pursuant to the Equity Rights Offering Backstop Commitment Letter will be issued at the Plan Discount less the Equity Rights Offering Backstop Commitment Premium. Entry of the Equity Rights Offering Backstop Order shall constitute Bankruptcy Court approval of the Equity Rights Offering, the Equity Rights Offering Backstop Commitment, the Equity Rights Offering Backstop Commitment Premium and the Equity Rights Offering Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Reorganized Parent in connection therewith). On the Effective Date, the rights and

obligations of the Debtors under the Equity Rights Offering Backstop Commitment Letter shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Equity Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to the Plan and fund general corporate purposes.

When the issuance of New Common Interests pursuant to the Plan and the Equity Rights Offering Documents would otherwise result in the issuance of a number of shares of New Common Interests that is not a whole number, the actual issuance of shares of New Common Interests shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Interests shall be adjusted as necessary to account for the foregoing rounding.

### 9.  New Common Interests

On the Effective Date, the Reorganized Parent shall issue or reserve for issuance all of the New Common Interests issued or issuable in accordance with the terms of the Plan, subject to dilution on the terms described in the Plan and in the Restructuring Support Agreement. The issuance of the New Common Interests for distribution pursuant to the Plan are authorized without the need for further corporate or shareholder action, and all of the shares of New Common Interests issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

### 10.  New Common Interests Documents

On the Effective Date, the Reorganized Parent and the Holders of the New Common Interests shall enter into the New Common Interests Documents in substantially the form included in the Plan Supplement. The New Common Interests Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of the New Common Interests shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Parent.

### 11.  MIP

On or around the Effective Date, the New Board shall adopt the MIP, which shall reserve for certain employees, officers and directors of the Reorganized Parent up to ten percent (10%) of New Common Interests on a fully-diluted basis issued on the Effective Date, the structure and terms of which and grants thereunder to be determined by the New Board in its sole discretion in consultation with the Debtors' current management team. The individual allocations under the MIP are to be determined based on analysis by an independent compensation consultant in consultation with the Debtors' current Chief Executive Officer.

### 12.  Exemption from Securities Laws

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and sale of Securities under the Plan. The offering and sale by the Reorganized Parent of any New Common Interests to the Holders of Unsecured Notes Claims pursuant to the Equity Rights Offering, the Equity Rights Offering Backstop Commitment

Letter or otherwise in exchange for Claims pursuant to <u>Article III</u> and the Combined Order shall be exempt from the registration requirements of Section 5 of the Securities Act and any other applicable United States, State, or local law requiring registration for the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code.  To the extent section 1145 is not applicable, the Reorganized Parent may rely upon section 4(a)(2) of the Securities Act, and/or any other exemption from registration under the Securities Act.  Any and all such New Common Interests offered and sold under the Plan in reliance on the exemption provided by section 1145(a) of the Bankruptcy Code will be freely tradable under the Securities Act by the recipients thereof, subject to:  (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with any applicable U.S. federal, state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities; (iii) the restrictions, if any, on the transferability of such Securities in the New Common Interests Documents; and (iv) any other applicable regulatory approval.  Any and all such New Common Interests (a) offered in reliance on the exemption provided by section 1145 of the Bankruptcy Code and received by recipients who are deemed to be "underwriters" (as such term is defined in section 1145(b) of the Bankruptcy Code) or (b) offered in reliance on the exemption provided by section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act, shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available and in compliance with any applicable state or foreign securities laws.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the applicable Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Interests through the facilities of DTC, the applicable Debtors shall not be required to provide any further evidence other than the Plan or Combined Order with respect to the treatment under the Plan of such applicable portion of the New Common Interests.  DTC, any transfer agent, or other similarly situated agent, trustee or other non-governmental Person or Entity shall accept and rely upon the Plan and Combined Order in lieu of a legal opinion for purposes of determining whether the initial offer and sale of the New Common Interests were exempt from registration under section 1145(a) of the Bankruptcy Code, and whether the New Common Interests were, under the Plan, validly issued, fully paid and non-assessable.

## 13.    Release of Liens and Claims

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to <u>Article VI</u> of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully and automatically released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity; *provided*, that the Liens granted to the First Lien

Agent pursuant to the First Lien Credit Documents shall remain in full force and effect solely to the extent provided for in the Plan, the Amended and Restated Credit Documents, and the other Definitive Documents. The filing of the Combined Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence. Any Person or Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

## 14.    New Corporate Governance Documents

The respective New Corporate Governance Documents and other organizational documents of each of the Debtors shall be amended and restated or replaced (as applicable) in form and substance acceptable to the Required Consenting Noteholders in their sole discretion in consultation with the Debtors and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Common Interests in an amount not less than the amount necessary to permit the distributions required or contemplated by the Plan and the issuance of New Common Interests pursuant to the Equity Right Offering; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Definitive Documents, amend and restate their respective organizational documents as permitted by applicable law.

## 15.    Directors and Officers of the Reorganized Debtors

The New Board will initially include the Debtors' current Chief Executive Officer and other members who will be designated in accordance with the terms of the Restructuring Support Agreement and the New Corporate Governance Documents. The identity of the New Board members will be disclosed in the Plan Supplement at or prior to the Combined Hearing to the extent known at such time. Except to the extent that an existing director of 2U, Inc. is designated to serve on the New Board, the existing directors of 2U, Inc., in their capacities as such, shall be deemed to have resigned or shall otherwise cease to be a director of 2U, Inc. on the Effective Date; *provided*, that each independent director of the Debtors shall retain his/her respective authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at his/her respective authority and direction in accordance with the terms of the Plan. Each independent director of the Debtors, in such capacity, shall not have any of his/her respective privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors, Reorganized Parent, or any other Entity without such director's prior written consent.

The existing directors of each of the Debtors' subsidiaries shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

The existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to their right to resign and the ordinary rights and powers of the New Board to remove or replace them in accordance with the New Corporate Governance Documents and any applicable employment agreements that are assumed pursuant to the Plan.

### 16.    Corporate Action

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, (i) the execution and delivery of the Amended and Restated Credit Documents and the Exit Facility Documents, and entry into the Amended and Restated Credit Facility and Exit Facility; (ii) pursuant to the Equity Rights Offering Documents, the implementation of the Equity Rights Offering, the issuance and distribution of the New Common Interests to the Holders of Unsecured Notes Claims in connection with or pursuant to the Equity Rights Offering Documents; and (iii) the issuance and distribution of the New Common Interests as set forth in the Plan, including the New Corporate Governance Documents, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, directors, or proxyholders of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Definitive Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, proxyholders, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, proxyholders, managers, members, or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions, or consents of any Person.

As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the New Corporate Governance Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or, other approval or authorization by the stockholders, directors, officers, proxyholders, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities,

certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person or Entity.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

### 17.    Cancellation of Existing Agreements and Interests

On the Effective Date, except to the extent otherwise provided in the Plan, the Combined Order, or any other Definitive Document, all notes, bonds, indentures, certificates, securities, purchase rights, options, warrants, collateral agreements, subordination agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of the Debtors giving rise to any rights or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; provided that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or the Combined Order, Confirmation or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of:  (a) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under the Plan as provided therein; (b) allowing and preserving the rights of the Agents/Trustees and the A&R First Lien Agent to make distributions as specified under the Plan on account of Allowed Claims, as applicable, including allowing the Agents/Trustees and the A&R First Lien Agent to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable documents; (c) to permit the Reorganized Debtors and any other Disbursing Agent, as applicable, to make distributions on account of the applicable Claims and/or Interests, as applicable; (d) preserving the Agents/Trustees' and the A&R First Lien Agent's rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of DIP Claims, First Lien Claims and Unsecured Notes Claims, as applicable, including permitting the Agents/Trustees and the A&R First Lien Agent to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the term of First Lien Credit Documents and the DIP Credit Documents, as applicable, as in effect on the Effective Date; (e) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the Agents/Trustees and the A&R First Lien Agent against any person, other than a Released Party (including the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates) and any exculpations of the Agents/Trustees and the A&R First Lien Agent, provided that the Agents/Trustees and the A&R First Lien Agent shall remain entitled to indemnification or contribution from the Holders of DIP Claims, First Lien Claims, and Unsecured Notes Claims, as applicable, each pursuant and subject to the terms of the DIP Credit Agreement or the applicable Prepetition Funded Debt Documents, as applicable, as in effect on the Effective Date; (f) permitting the Agents/Trustees and the A&R First Lien Agent, as applicable, to enforce any obligation (if any) owed to them under the Plan; (g) permitting the Agents/Trustees and the A&R First Lien Agent to appear in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; (h) permitting the Agents/Trustees and the A&R First Lien Agent to assert any rights with respect to any contingent obligations under the

Prepetition Funded Debt Documents or DIP Credit Documents, as applicable; and (i) permitting the Agents/Trustees and the A&R First Lien Agent to perform any functions that are necessary to effectuate the foregoing; provided, however, that Article IV.Q of the Plan shall not apply to any documents securing and governing the Amended and Restated Credit Facility or Exit Facility and shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Combined Order, or the Plan, or the releases of the Released Parties pursuant to Article IX of the Plan, or result in any expense or liability to the Debtors or the Reorganized Debtors, as applicable, except as expressly provided for in the Plan.

On the Effective Date, the Agents/Trustees, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, will be automatically and fully released and discharged from any further responsibility under the DIP Credit Agreement or the applicable Prepetition Funded Debt Documents, as applicable. The Agents/Trustees, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be discharged and shall have no further obligation or liability except as provided in the Plan and the Combined Order, and after the performance by the Agents/Trustees and their representatives and professionals of any obligations and duties required under or related to the Plan or the Combined Order, the Agents/Trustees, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder. The fees, expenses, and costs of the Agents/Trustees, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with DIP Credit Agreement and the applicable Prepetition Funded Debt Documents, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to the Plan, including the fees and expenses of counsel, if any, will be paid in accordance with the terms of the Plan.

## 18.    Sources of Consideration for Plan Distributions

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with Cash on hand, including Cash from the proceeds of the DIP Facility, and the proceeds from the Equity Rights Offering. The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Definitive Documents. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Corporate Governance Documents, the Amended and Restated Credit Documents, the Exit Facility Documents and the Equity Rights Offering Documents), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

### 19.    Authority of the Debtors

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of the Plan, the Combined Order, and the Restructuring Transactions.

### 20.    Continuing Effectiveness of Final Orders

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

### 21.    Transfers

Unless approved by the Required Consenting Noteholders, no Holder of Unsecured Notes Claims shall, prior to receiving its New Common Interests on the Effective Date pursuant to the Plan (including any New Common Interests received pursuant to the Equity Rights Offering), enter into any written or oral contract, understanding or arrangement to Transfer, directly or indirectly, all or part of its right, title, or interests in the New Common Interests (including issuing or granting any option thereon or right or interest therein); *provided*, *however*, that the foregoing restriction shall not apply to the establishment or settlement of any derivative or similar position or security that does not constitute tax ownership or an option to acquire tax ownership for purposes of section 382 of the Internal Revenue Code of 1986, as amended.

## D.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code except any Executory Contract or Unexpired Lease (i) identified on the Schedule of Rejected Executory Contracts and Unexpired Leases (which shall initially be Filed with the Bankruptcy Court) as an Executory Contract or Unexpired Lease to be rejected, (ii) that is the subject of a separate motion or notice to reject pending as of the Effective Date, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).  The assumption of Executory Contracts and Unexpired Leases thereunder may include the assignment of certain of such contracts to Affiliates.  The Combined Order will constitute an order of the Bankruptcy Court approving the above described assumptions and assignments, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date; provided that, on the occurrence of the Effective Date, the Restructuring Support Agreement will terminate in accordance with its terms.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective

Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith. Except as set forth in Article V.H., to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to amend or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases in their discretion prior to the Effective Date (or such later date as may be permitted by the Plan), provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds. In the event the Debtor reject any Unexpired Lease, the Debtors are authorized to abandon or dispose of any remaining property at or on the subject premises on the applicable lease rejection effective date.

## 2.      Cure of Defaults; Assumption of Executory Contracts and Unexpired Leases

Any monetary default under an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective; provided that the Debtors or the Reorganized Debtors may settle any such dispute and shall pay any agreed upon cure amount without any further notice to any party or any action, order, or approval; provided, further, that notwithstanding anything to the contrary in the

Plan, the Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease previously designated for assumption within forty five (45) days after the entry of a Final Order resolving an objection to assumption. Any payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order(s) resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this <u>Article V.B</u> of the Plan shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in these Chapter 11 Cases, including pursuant to the Combined Order, and for which any Cure Claim has been fully paid pursuant to this <u>Article V.B</u> of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

3.      **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, and except as otherwise provided in this section or otherwise in the Plan, any Person or Entity seeking to assert a Rejection Damages Claim must file a Proof of Claim for such Rejection Damages Claim with the Claims and Noticing Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease (which shall be the Effective Date unless otherwise provided in an order of the Bankruptcy Court providing for the rejection of an Executory Contract or Unexpired Lease). Any Proofs of Claim arising from Rejection Damages Claims that are not timely Filed shall be automatically disallowed without further order of the Bankruptcy Court. All Allowed Rejection Damages Claims shall constitute General Unsecured Claims and shall be treated in accordance with <u>Article III.B</u> of the Plan.

4.      **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by any Debtor, will be performed by such Debtor or Reorganized Debtor, as applicable, liable thereunder in the ordinary course of business. Accordingly, such contracts and leases (including any Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to section 365 of the Bankruptcy Code) will survive and remain unaffected by entry of the Combined Order.

5.      **Directors and Officers Insurance Policies**

Notwithstanding anything in the Plan to the contrary, each of the D&O Liability Insurance Policies in existence as of the Effective Date (including the D&O Tail Policy) shall be Reinstated and, to the extent applicable, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code

effective as of the Effective Date.  Entry of the Combined Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including the D&O Tail Policy) in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors, officers, and proxyholders of the Debtors who served in such capacity on or at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers and proxyholders remain in such positions after the Effective Date.  The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Combined Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.

### 6.    Other Insurance Contracts

On the Effective Date, each of the Debtors' Insurance Contracts in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the Insurance Contracts in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such Insurance Contracts.  The Insurance Contracts shall apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

### 7.    Indemnification Provisions and Reimbursement Obligations

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan.  None of the Reorganized Debtors shall amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect the rights of Indemnified Persons to receive indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses, to the fullest extent permitted by

Law, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors shall not be required to indemnify the Indemnified Persons for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations.

For the avoidance of doubt, each Debtor shall continue after the Effective Date, to the fullest extent permitted by applicable Law, to (a) indemnify and hold harmless (and release from any liability to the Debtors), the Indemnified Persons against all D&O Expenses (as defined below), losses, claims, damages, judgments or amounts paid in settlement (collectively, "***D&O Costs***") in respect of any threatened, pending or completed claim, action, suit or proceeding, whether criminal, civil, administrative or investigative, based on or arising out or relating to the fact that such Indemnified Person is or was a director or officer of any Debtor arising out of acts or omissions occurring on or prior to the Effective Date (a "***D&O Indemnifiable Claim***"); and (b) advance to such Indemnified Persons all D&O Expenses incurred in connection with any D&O Indemnifiable Claim (including in circumstances where the party responsible for the indemnification of such claim has assumed the defense of such claim) promptly after receipt of reasonably detailed statements therefor; provided, however, that the Indemnified Person to whom D&O Expenses are to be advanced provides an undertaking to repay such advances if it is ultimately determined that such Indemnified Person is not entitled to indemnification. Any D&O Indemnifiable Claims will continue until such D&O Indemnifiable Claim is disposed of or all judgments, orders, decrees or other rulings in connection with such D&O Indemnifiable Claim are fully satisfied. For the purposes of this paragraph, "***D&O Expenses***" will include attorneys' fees and all other costs, charges and expenses paid or incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, to be a witness in or participate in any D&O Indemnifiable Claim, but will exclude losses, claims, damages, judgments and amounts paid in settlement (which items are included in the definition of D&O Costs).

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or the Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by these Chapter 11 Cases; provided that the Reorganized Debtors shall not indemnify the Debtors' directors for any claims or causes of action for which indemnification is barred: (i) under applicable law, the Debtors' organizational documents; or (ii) applicable agreements governing the Debtors' indemnification obligations.

## 8.    Employee Compensation and Benefit Programs

Subject to the provisions of the Plan, all Employee Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, performance stock units, and other equity awards, including stock rights under any stock purchase plan) shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. All Proofs of Claim Filed for amounts due under any Employee Compensation and Benefits Program shall be considered

72

satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.  All Employee Compensation and Benefits Programs to which contributions are made will be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements.  For the avoidance of doubt, the Debtors and the Reorganized Debtors, as applicable, shall honor all their obligations under section 1114 of the Bankruptcy Code.  Notwithstanding any other provision in the Plan, the occurrence of the Effective Date shall be deemed to trigger any applicable change of control, vesting, termination, acceleration, or similar provisions contained in the Employee Compensation and Benefits Programs.

9.    **Workers' Compensation Programs**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans, in each case, for workers' compensation and workers' compensation insurance.  Any and all Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, causes of action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; provided, further, that nothing in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

10.    **Extension of Time to Assume or Reject**

Notwithstanding anything to the contrary set forth in Article V of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article V.A of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.  Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder.

E.    **PROVISIONS GOVERNING DISTRIBUTIONS**

1.    **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable

thereafter), each Holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class; provided that any Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during these Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in <u>Article VII</u> of the Plan.

## 2.    Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

## 3.    Rights and Powers of Disbursing Agent

(a)    <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

## 4.    Special Rules for Distributions to Holders of Disputed Claims and Disputed Interests

Except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Disputed Interest until all such disputes in connection with such Disputed Claim or Disputed Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Allowed Interest

and a Disputed Claim or Disputed Interest shall not receive any distribution on the Allowed Claim or Allowed Interest unless and until all objections to the Disputed Claim or Disputed Interest have been resolved by settlement or Final Order or such Claims or Interests have been Allowed or expunged.

**5.**      **Delivery of Distributions**

(a)      <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate:  (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date (or of a designee designated by a Holder of First Lien Claims or Unsecured Notes Claims, as applicable); (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in these Chapter 11 Cases on the Holder's behalf; provided that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

(b)      <u>Delivery of Distributions on Account of DIP Claims</u>

The DIP Agent shall be deemed to be the Holder of any and all DIP Claims for purposes of distributions to be made thereunder, and any distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as practicable following compliance with the requirements set forth in Article VI, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Credit Documents and the Plan.  Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

(c)      <u>Delivery of Distributions on Account of First Lien Loan Claims</u>

The First Lien Agent shall be deemed to be the Holder of all Allowed First Lien Claims for purposes of distributions to be made thereunder, and all distributions on account of such Allowed Claims shall be made to the First Lien Agent.  As soon as practicable following compliance with the requirements set forth in <u>Article VI</u> of the Plan, if applicable, the First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed First Lien Claims in accordance with the terms of the First Lien Credit Agreement and the Plan.  Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the First Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Agent.

(d)    Delivery of Distributions on Account of Unsecured Notes Claims

The Unsecured Notes Indenture Trustee shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made thereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the Unsecured Notes Indenture Trustee.  As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, if applicable, the Unsecured Notes Indenture Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Unsecured Notes Claims in accordance with the terms of the Unsecured Notes Indentures and the Plan. Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the Unsecured Notes Indenture Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the Unsecured Notes Indenture Trustee.

(e)    Minimum Distributions

No fractional shares of New Common Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  Whenever any payment or distribution of a fraction of a dollar or fractional share of New Common Interests under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Interests (up or down), with half dollars and half shares of New Common Interests or less being rounded down.  The total number of authorized shares of New Common Interests, as applicable, shall be adjusted as necessary to account for the foregoing rounding.

(f)    Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim or Allowed Interest made in accordance herewith is returned to the Reorganized Debtors (or their Disbursing Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such undelivered distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then-current address or other necessary information; provided that any such undelivered distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the initial attempted distribution.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheat, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred.

**6.    Means of Cash Payment**

Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized

Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**7.      No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Combined Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim.

**8.      Compliance with Tax Requirements**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors or other applicable Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions thereunder and all related agreements shall be subject to any such withholding and reporting requirements. The Reorganized Debtors or other applicable Disbursing Agent shall have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (a) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, and (b) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property. Notwithstanding any provision in the Plan to the contrary, all Persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes (or establish eligibility for an exclusion for the withholding of taxes), and each Holder of an Allowed Claim or an Allowed Interest will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. Any amounts withheld or reallocated pursuant to this Article VI.H of the Plan. shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Any Person or Entity entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Reorganized Debtor or other applicable Disbursing Agent, or such other Person designated by the Reorganized Debtor or the Disbursing Agent, an IRS Form W-9 or, if the payee is a foreign Person or Entity, an applicable IRS Form W-8, or any other forms or documents reasonably requested by a Reorganized Debtor or Disbursing Agent to reduce or eliminate any withholding required by any applicable Governmental Unit.

The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and encumbrances.

9.      **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law (as reasonably determined by the Reorganized Debtors), be allocated for U.S. federal income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

10.     **Setoffs**

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for thereunder on account of any Allowed Claim an amount equal to any Claims, Causes of Action and litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided, that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims or Causes of Action are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims or Causes of Action.  Neither the failure to effect such a setoff nor the allowance of any Claim thereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims or Causes of Action, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Combined Order.

F.      **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS OR INTERESTS**

1.      **Resolution of Disputed Claims**

(a)     <u>Allowance of Claims and Interests</u>

After the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim, Disputed Interest, or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if these Chapter 11 Cases had not been commenced.

(b)      Proofs of Claim

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim (except as required for Rejection Damages Claims as set forth in Article V.C of the Plan), and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if these Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure Claim pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

Any Person or Entity seeking to assert a Rejection Damages Claim must File a Proof of Claim in accordance with Article V.C of the Plan.  For the avoidance of doubt, with respect to any Claims that are not Rejection Damages Claims, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan.  **Except with respect to Proofs of Claim Filed on account of Rejection Damages Claims in accordance with Article V.C of the Plan, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

(c)      Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors shall have the sole authority to File objections to Claims or Interests and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims or Interests, regardless of whether such Claims or Interests are in an Unimpaired Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order or approval of the Bankruptcy Court.

(d)      Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, may at any time request that the Bankruptcy Court estimate any Disputed Claim, Disputed Interest, or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such

Claim or Interest, whether for allowance or to determine the maximum amount of such Claim or Interest, including during the litigation concerning any objection to any Claim or Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims and Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

### 2.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest, as applicable, pursuant to a Final Order.

### 3.    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

### 4.    Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.    Disallowance of Claims or Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## G.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to Effective Date

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived in writing pursuant to the provisions of <u>Article VIII.B</u> of the Plan:

- The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Noteholders or Required Consenting First Lien Lenders, and shall be in full force and effect;

- The Bankruptcy Court shall have entered the DIP Orders by the applicable milestones in the DIP Credit Agreement and Restructuring Support Agreement, which orders shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

- The Bankruptcy Court shall have entered the Combined Order by the applicable milestone in the DIP Credit Agreement and Restructuring Support Agreement, and such Combined Order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

- The Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order by the applicable milestone in the DIP Credit Agreement and Restructuring Support Agreement, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

- The Equity Rights Offering Backstop Commitment Letter shall provide for backstopped commitments of not less than $46,500,000 and shall remain in full force and effect and shall not have been terminated pursuant to its terms;

- The Equity Rights Offering shall have been conducted, in all material aspects, in accordance with the Equity Rights Offering Procedures, and the cash proceeds thereof (including the funding of the Equity Rights Offering Backstop Commitment) shall equal not less than $46,500,000;

- All conditions precedent to the effectiveness of the Amended and Restated Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect;

- All conditions precedent to the effectiveness of the Exit Facility Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect;

- All Restructuring Fees and Expenses shall have been paid in full in Cash;
- The Definitive Documents (a) shall be consistent with the Restructuring Term Sheet and the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring

Support Agreement, (b) shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party thereto, and (c) to the extent applicable, shall be adopted by the applicable Entity on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

- All governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Restructuring Transactions, Restructuring Term Sheet and the Restructuring Support Agreement shall have been obtained, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

- The Bankruptcy Court shall have entered the Lease Rejection Order by the applicable milestones in the DIP Credit Agreement and Restructuring Support Agreement, which order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

- No action shall have been taken by any Governmental Unit that has had a material adverse effect on the business or results of operations of any of the Debtors taken as a whole, provided that any change in law, regulation, sub-regulatory guidance or condition generally that impacts the educational industry in which any of the Debtors operate shall not in and of itself constitute a material adverse effect; and

- The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, in each case, subject to the consent rights set forth in the Restructuring Support Agreement.

## 2.  Waiver of Conditions

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in Article VIII of the Plan may be waived by the Debtors with the consent of (x) the Required Consenting Noteholders, (y) solely with respect to the conditions set forth in clauses (1), (2), (3), (7), (8) but only to the extent the terms thereof are materially inconsistent with the terms of the Amended and Restated Credit Agreement Term Sheet, (9) but only with respect to the payment of the Restructuring Fees and Expenses of the First Lien Ad Hoc Group Advisors, (10) but only with respect to those Definitive Documents over which the Required Consenting First Lien Lenders have consent rights under the Restructuring Support Agreement, (11), (12), (13) and (14), with the consent of the Required Consenting First Lien Lenders, in each case, with such consent rights being exercised in accordance with the Restructuring Support Agreement, or (z) solely with respect to the conditions set forth in clause (9) but only with respect to the payment of the Restructuring Fees and Expenses of the First Lien Revolving Lender Advisors, with the consent of the First Lien Revolving Lenders.

### 3. Effect of Non-Occurrence of Conditions to Confirmation or Consummation

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (c) constitute an Allowance of any Claim or Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

## B.    RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

### 1. Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Definitive Documents, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. The Combined Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Combined Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further

notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

**2.  Release by the Debtors**

**II.EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE COMBINED ORDER, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY, IN EACH CASE ON BEHALF OF ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CLAIM OR CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, IS AND IS DEEMED TO BE, FOREVER AND UNCONDITIONALLY RELEASED, ABSOLVED, ACQUITTED, AND DISCHARGED BY EACH DEBTOR, REORGANIZED DEBTOR, AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, (I) THE MANAGEMENT, OWNERSHIP, OR OPERATION OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES (INCLUDING ANY DIVIDENDS OR OTHER DISTRIBUTIONS); (II) THE PURCHASE, SALE, OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES; (III) THE SUBJECT MATTER OF, OR THE TRANSACTIONS, EVENTS, CIRCUMSTANCES, ACTS OR OMISSIONS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE RESTRUCTURING TRANSACTIONS, INCLUDING THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE RESTRUCTURING TRANSACTIONS; (IV) THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR OR NON-DEBTOR AFFILIATE AND ANY OTHER ENTITY; (V) THE DEBTORS' AND NON-DEBTOR AFFILIATES' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS; (VI) INTERCOMPANY TRANSACTIONS; (VII) THE RESTRUCTURING SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING TRANSACTION; (VIII) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TERM SHEET, THE DIP DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN; (IX) THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT; OR (X) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO ANY OF THE**

FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (X) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THIS PLAN, THE COMBINED ORDER, ANY OTHER DEFINITIVE DOCUMENT, ANY RESTRUCTURING TRANSACTION, ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THIS PLAN, OR ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN; (Y) ANY CAUSES OF ACTION SPECIFICALLY RETAINED BY THE DEBTORS PURSUANT TO THE SCHEDULE OF RETAINED CAUSES OF ACTION; OR (Z) ANY CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION DETERMINED BY FINAL ORDER TO CONSTITUTE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR INTENTIONAL FRAUD.

ENTRY OF THE COMBINED ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS:  (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, INCLUDING THE RELEASED PARTIES' SUBSTANTIAL CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING TRANSACTIONS AND IMPLEMENTING THE PLAN; (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

1. **Releases by Holders of Claims and Interests**

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE COMBINED ORDER, AS OF THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASING PARTY, IN EACH CASE ON BEHALF OF ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CLAIM OR CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, HAS AND IS DEEMED TO HAVE, FOREVER AND UNCONDITIONALLY, RELEASED, ABSOLVED, ACQUITTED, AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO

ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, (I) THE MANAGEMENT, OWNERSHIP, OR OPERATION OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES (INCLUDING ANY DIVIDENDS OR OTHER DISTRIBUTIONS); (II) THE PURCHASE, SALE, OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES; (III) THE SUBJECT MATTER OF, OR THE TRANSACTIONS, EVENTS, CIRCUMSTANCES, ACTS OR OMISSIONS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE RESTRUCTURING TRANSACTIONS, INCLUDING THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE RESTRUCTURING TRANSACTIONS; (IV) THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR OR NON-DEBTOR AFFILIATE AND ANY OTHER ENTITY; (V) THE DEBTORS' AND NON-DEBTOR AFFILIATES' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS; (VI) INTERCOMPANY TRANSACTIONS; (VII) THE RESTRUCTURING SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING TRANSACTION; (VIII) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TERM SHEET, THE DIP CREDIT DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN; (IX) THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT; OR (X) ANY OTHER ACT, OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATING TO ANY OF THE FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (X) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THIS PLAN, THE COMBINED ORDER, ANY OTHER DEFINITIVE DOCUMENT, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THIS PLAN, OR ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN;  (Y) ANY CAUSES OF ACTION SPECIFICALLY RETAINED BY THE DEBTORS PURSUANT TO THE SCHEDULE OF RETAINED CAUSES OF ACTION; OR (Z) ANY CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION DETERMINED BY FINAL ORDER TO CONSTITUTE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR INTENTIONAL FRAUD.

ENTRY OF THE COMBINED ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (III) GIVEN IN EXCHANGE FOR THE GOOD AND

**VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, INCLUDING THE RELEASED PARTIES' SUBSTANTIAL CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING TRANSACTIONS AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

### 2. Waiver of Statutory Limitations on Releases

Each of the Releasing Parties in each of the Releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party. The Releases are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

### 3. Exculpation

**EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE EXCULPATED PARTIES SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY PERSON OR ENTITY FOR ANY CLAIMS OR CAUSES OF ACTION ARISING PRIOR TO OR ON THE EFFECTIVE DATE FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO, FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING OR EFFECTING THE CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE DISCLOSURE STATEMENT, THE DEFINITIVE DOCUMENTS, THE DIP CREDIT DOCUMENTS, OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THIS PLAN OR ANY OTHER POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS, THE APPROVAL OF THE DISCLOSURE STATEMENT OR CONFIRMATION OR CONSUMMATION OF THIS PLAN; *PROVIDED*, THAT THE FOREGOING PROVISIONS OF THIS EXCULPATION SHALL NOT (X) OPERATE TO WAIVE OR RELEASE THE RIGHTS OF ANY PERSON OR ENTITY TO ENFORCE THIS PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, CREDIT DOCUMENTS, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR ASSUMED PURSUANT TO THIS**

**PLAN OR FINAL ORDER OF THE BANKRUPTCY COURT AND (Y) APPLY TO THE EXCULPATED PARTIES FOR ACTS OR OMISSIONS DETERMINED BY FINAL ORDER TO CONSTITUTE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR INTENTIONAL FRAUD; *PROVIDED*, *FURTHER*, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS RESPECTIVE DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE ABOVE REFERENCED DOCUMENTS, ACTIONS OR INACTIONS;**

**THE EXCULPATED PARTIES HAVE, AND UPON CONSUMMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.**

**THE FOREGOING EXCULPATION SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON OR ENTITY.**

### 4. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to this Article IX, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, including any actions specifically enumerated in the Schedule of Retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including <u>Article IX of the Plan</u>**, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of

the Confirmation or Consummation.  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

### 5.  Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE COMBINED ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE COMBINED ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THESE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

## C.    PROTECTION AGAINST DISCRIMINATORY TREATMENT

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of these Chapter 11 Cases (or during these Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in these Chapter 11 Cases.

## D.    INTEGRAL PART OF PLAN

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

E.       **FINANCIAL INFORMATION AND PROJECTION**

In connection with planning and developing the Plan, the Debtors, with the assistance of the Company Advisors, prepared projections for the calendar years 2024 through 2028, which are attached hereto as **Exhibit C** (the "***Financial Projections***"), including management's assumptions related thereto.  For purposes of the Financial Projections, the Debtors have assumed an Effective Date of September 12, 2024.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth in the Plan.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

F.       **LIQUIDATION ANALYSIS**

The Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims than would be achieved in the Debtors' liquidation under chapter 7 of the Bankruptcy Code.  The Debtors, with the assistance of their restructuring Advisor, AlixPartners, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit D** (the "***Liquidation Analysis***"), to assist Holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

G.       **VALUATION OF THE DEBTORS**

As described above, the Company has been exploring a potential sale.  As of the date of this Disclosure Statement, only one party put forth an indication of interest, which indication of interest did not exceed the aggregate amount of the Debtors' funded-debt obligations.  While the Restructuring Support Agreement prevents the Company from continuing to solicit additional proposals, it does not prevent it from considering, negotiating, or pursuing an alternative proposal if one is received.  Because the Debtors do not want to prejudice a potential higher or better proposal, either from the parties it has already engaged with or others, this Disclosure Statement does not include a valuation analysis.  See 11 U.S.C. § 1125(b) ("The court may approve a

disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets"); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. 2019) (D.I. 544) (order authorizing delayed filing of valuation, liquidation, and recovery analysis until after an auction); *In re Akumin, Inc.*, Case No. 23-90827 (CML) (Bankr. S.D. Tex. 2023) (D.I. 60) (order conditionally approving disclosure statement filed without a valuation analysis while a marketing process was ongoing); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. 2019) (D.I. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18- 36057 (MI) (Bankr. S.D. Tex. 2018) (D.I. No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

# VI.
## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    SOLICITATION OF VOTES

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Article I herein titled, "***Executive Summary***" and set forth in detail in the proposed Disclosure Statement Order.

**PLEASE REFER TO THE PROPOSED DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

### B.    CONFIRMATION PROCEDURES

#### 1.  Combined Hearing

Subject to Bankruptcy Court approval, the Combined Hearing will commence on September 6, 2024 at 10:00 a.m. prevailing Eastern Time in the Bankruptcy Court. The Combined Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment Filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Combined Hearing, without further notice to parties-in-interest.

#### 2.  Filing Objections to the Plan

Subject to Bankruptcy Court approval, the Objection Deadline will be August 23, 2024 at 4:00 p.m. prevailing Eastern Time.

Any objection to Confirmation of the Plan must: (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any Claim or interest asserted by the objector against or in the Debtors, (d) state with particularity the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan that would resolve such objection, and (e) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so as to be **actually received** by each of the Notice Parties (as defined in Article I.D.2 herein) on or before the Objection Deadline.

> CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

### C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan

satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Debtors have proposed the Plan in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors have proposed the Plan in good faith and not by any means forbidden by Law;

- the Debtors have, or will, disclose to the Bankruptcy Court any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, and any such payment: (a) made before the Confirmation of the Plan is reasonable, or (b) if it is to be fixed after Confirmation of the Plan, is subject to the approval of the Bankruptcy Court for the determination of reasonableness;

- the Debtors have disclosed or will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security Holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- the Debtors have disclosed or will disclose the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider;

- either each Holder of an Impaired Claim or Interest will have accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- each Class of Claims or Interests that is entitled to vote on the Plan will either have accepted the Plan or will be Unimpaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

- the Plan provides for the treatment of Claims and Interests in accordance with the provisions of section 507(a) of the Bankruptcy Code;

- except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that

93

Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

• at least one Impaired Class will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest in that Class;

• Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan; and

• all outstanding fees payable pursuant to section 1930 of title 28 of the United States Code will be paid when due.

## 1. Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of a bankruptcy court; and (e) holders of interests.

Accordingly, in chapter 7 cases, the Cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered Cash held by the debtors at the time of the commencement of the liquidation.  Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's businesses and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis attached hereto as **Exhibit D**, the Debtors believe that Confirmation of the Plan will provide each Holder of an Allowed Claim or Allowed Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be

94

significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.  In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors.  As set forth in the Liquidation Analysis, (a) Holders of Claims in Class 3 – First Lien Claims – would receive a recovery of between 13.5% to 25.7% of the amount of their Allowed Claims under a chapter 7 liquidation, and (b) all other Holders of Claims and Interests in Classes subordinate to Class 3, including Holders of Claims in Class 4 – Unsecured Notes Claims – would receive no recovery of the amount of their Allowed Claims under a chapter 7 liquidation.  Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

## 2.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Financial Projections of the Reorganized Debtors for calendar years 2024 through 2028 are attached hereto as **Exhibit C**.

In general, as illustrated by the Financial Projections, the Debtors believe that as a result of the transactions contemplated by the Plan, including the Amended and Restated Credit Facility, the Exit Facility, and the Equity Rights Offering, the Reorganized Debtors should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT ACCOUNTANTS. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES THAT ARE BEYOND THE CONTROL OF THE DEBTORS. INEVITABLY, SOME ASSUMPTIONS WILL NOT MATERIALIZE AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY AFFECT THE ACTUAL FINANCIAL RESULTS. THEREFORE, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PERIOD OF THE FINANCIAL PROJECTIONS MAY VARY FROM THE PROJECTED RESULTS AND THE VARIATIONS MAY BE MATERIAL. ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED IN CONNECTION WITH THEIR EVALUATION OF THE PLAN.

BASED ON THE FINANCIAL PROJECTIONS SET FORTH IN **EXHIBIT C** HERETO, THE DEBTORS BELIEVE THAT THEY WILL BE ABLE TO MAKE ALL DISTRIBUTIONS AND PAYMENTS UNDER THE PLAN AND THAT CONFIRMATION OF THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OF THE REORGANIZED DEBTORS OR THE NEED FOR FURTHER FINANCIAL REORGANIZATION OF THE REORGANIZED DEBTORS.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, upon consummation, the holder of such claim or interest receives Cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the holder of such interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of Claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Claims in Classes 1, 2, and 5 are Unimpaired under the Plan and, as a result, the Holders of such Claims are deemed to have accepted the Plan. In addition, Claims and Interests in Classes 6 and 7 are either Unimpaired or Impaired and are presumed to have accepted the Plan if

Unimpaired but presumed to have rejected the Plan if Impaired. Accordingly, the Debtors are not required to solicit the vote of the Holders of any such Claims or Interests.

Claims in the Voting Classes (*i.e.*, Classes 3 and 4) are Impaired under the Plan and, as a result, the Holders of such Claims are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As explained above, Classes 3 and 4 will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims of the Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Claims and Interests in Classes 8 and 9 are Impaired under the Plan and will not receive or retain under the Plan any property on account of such Claim and Interests and, as a result, the Holders of such Claims and Interests are deemed to have rejected the Plan. The Debtors, therefore, will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an Impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.

(a)    No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or interests in such class:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the

liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another Entity under the plan; and (ii) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- <u>Unsecured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan any property on account of such junior claim or junior interest.

- <u>Interests</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:

  - o  the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; <u>or</u>

  - o  if the class does not receive the amount required in the paragraph directly above, no class of interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 8 and 9.**  To the extent that any Voting Class votes to reject the Plan, the Debtors reserve the right to seek: (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with <u>Article XI.E</u> of the Plan.

Notwithstanding the deemed rejection by Classes 8 and 9, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for non-consensual Confirmation of the Plan.

## D.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the Consummation of the Plan and the impact of failure to meet such conditions, see <u>Article VIII</u> of the Plan.

24-11279-mew    Doc 20    Filed 07/25/24    Entered 07/25/24 04:51:59    Main Document
Pg 111 of 568

# VII.
# RISK FACTORS

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THERE ARE MANY RISK FACTORS, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN.

## A.    CERTAIN BANKRUPTCY LAW AND CHAPTER 11 CASE CONSIDERATIONS

### 1.    General

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, the Chapter 11 Cases could have a material adverse effect on the Debtors' businesses, financial condition, results of operations and liquidity.  So long as the Chapter 11 Cases continue, the Debtors' management may be required to spend a significant amount of time and effort managing the bankruptcy process instead of focusing exclusively on the Debtors' businesses operations.  Bankruptcy protection and operating as debtors-in-possession also may make it more difficult to retain management and the key personnel necessary to the success and growth of the Debtors' businesses.  In addition, during the pendency of the Chapter 11 Cases, the Debtors' customers and suppliers might lose confidence in the Debtors' ability to reorganize their businesses successfully and may seek to establish alternative commercial relationships, which may cause, among other things, their suppliers, vendors, counterparties and service providers to renegotiate the terms of their agreements, attempt to terminate their relationship with the Debtors or require financial assurances from the Debtors.  Although the Debtors remain committed to providing safe, reliable operations, and the Debtors believe that they have sufficient resources to do so, customers may lose confidence in the Debtors' ability to provide them the level of service they expect, resulting in a significant decline in the Debtors' revenues, profitability and cash flow.

### 2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with Chapter 11 Proceedings

As a consequence of the Debtors' filing for relief under chapter 11 of the Bankruptcy Code, the Debtors' operations and their ability to develop and execute their business plan, and their continuation as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:

- the Debtors' ability to continue as a going concern;

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to obtain court approval with respect to motions Filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to maintain relationships with their suppliers, service providers, customers, employees and other third parties;

- the Debtors' ability to maintain contracts that are critical to their operations;

- the Debtors' ability to develop and execute their business plan;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to operate within the restrictions and the liquidity limitations of the DIP Credit Documents and any related orders entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

- the Debtors' ability to maintain strategic control as debtors-in-possession during the pendency of the Chapter 11 Cases;

- the cancellation of the Debtors' existing equity in the Chapter 11 Cases;

- the ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors;

- the ability of third parties to seek and obtain the Bankruptcy Court's approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm the Plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to proceedings under chapter 7 of the Bankruptcy Code; and

- the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that will occur during the Chapter 11 Cases.

**3.    Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan and, even if the Voting Classes votes in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Bankruptcy Court does not confirm the Plan, it is unclear what distributions Holders of Claims

ultimately would receive with respect to their Allowed Claims in a subsequent plan of reorganization.

### 4. Risk of Failing to Satisfy the Vote Requirement

In the event that the Debtors are nevertheless unable to obtain sufficient votes from the Voting Classes, the Debtors will seek to accomplish an alternative chapter 11 plan or seek to "cram down" (*i.e.*, achieve non-consensual confirmation of) the Plan on non-accepting Classes. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to Holders of Allowed Claims as those proposed in the Plan.

### 5. The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate

The Bankruptcy Code provides that a debtor may solicit votes of a chapter 11 plan after disclosure of "adequate information," as defined in the Bankruptcy Code. Additionally, the Bankruptcy Code provides that a holder of a Claim will not be deemed to have accepted or rejected the Plan if the Bankruptcy Court finds that the Plan was not transmitted to substantially all creditors and other interest holders of that same class entitled to vote or that an unreasonably short time was prescribed for voting.

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy Law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if: (a) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy Law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (b) there is no such Law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined in section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 6. Non-Consensual Confirmation of the Plan May be Necessary

If any impaired class of claims or interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) and, as to each impaired class that has accepted the plan, such bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 7. The Effective Date May Not Occur

As more fully set forth in <u>Article VIII</u> of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place. Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 8. Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. There, however, can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 9. Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not File an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 10. The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases. If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the Restructuring Support Agreement and the Plan. If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding and/or liquidate their businesses in another forum to the detriment of all parties in interest.

**11. Contingencies Could Affect Distributions to Holders of Allowed Claims**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Voting Classes.

The estimated Claims and recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated amounts contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**12. Financial Projections**

The Debtors have prepared the Financial Projections, as set forth in **Exhibit C** hereto. The Financial Projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or the Reorganized Debtors, including the timing, Confirmation, and Consummation of the Plan, consumer demands for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. Therefore, the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

**13. The Bankruptcy Court May Not Approve Release, Injunction, or Exculpation Provisions**

The Plan provides for certain releases, injunctions, and exculpations. Parties in interest, however, may object to, and the Bankruptcy Court may not approve, such releases, injunctions,

and exculpations.  If the Bankruptcy Court does not approve such provisions, certain Released Parties may not support the Plan.

### 14. The Support of the Consenting Stakeholders is Subject to the Terms of the Restructuring Support Agreement

Pursuant to the Restructuring Support Agreement, the Consenting Stakeholders have agreed to support the Restructuring Transactions set forth in the Plan.  Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events set forth therein.  Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of creditors holding Claims in number and amount sufficient to obtain Confirmation of the Plan.

### 15. Risks of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties thereto the ability to terminate the applicable agreement upon the occurrence or non-occurrence of certain events or if certain conditions are not satisfied, including failure to achieve certain milestones in the Chapter 11 Cases.  To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of Cash Collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to obtain Confirmation and Consummation of the Plan.

### 16. The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral or Entry Into the DIP Facility

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into a postpetition financing arrangement and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the Holders of First Lien Claims in accordance with the terms of the Restructuring Support Agreement.  Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve the DIP Facility and/or such use of cash collateral on the terms requested.  Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing.  There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

### 17. The Amended and Restated Credit Facility and the Transactions Contemplated Thereby May Not Become Effective

Although the Debtors believe that the Amended and Restated Credit Facility will become effective shortly after the Confirmation Date, there can be no assurance as to such timing or as to

whether the Amended and Restated Credit Facility and the transactions contemplated thereunder will become effective.

### 18. The Exit Facility and the Transactions Contemplated Thereby May Not Become Effective

Although the Debtors believe that the Exit Facility shall become effective shortly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Exit Facility and the transactions contemplated thereunder will become effective.

### 19. Material Transactions Could be Set Aside as Fraudulent Conveyances or Preferential Transfers

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy Laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within ninety (90) days before the petition date or one year before the petition date, if the creditor was an insider at the time of such transfer. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer. Notwithstanding the above, the Debtors do not believe they have made any transactions that constitute a fraudulent conveyance, preferential transfer, or would otherwise be subject to avoidance under the Bankruptcy Code.

### 20. The Chapter 11 Cases Will Consume a Substantial Portion of the Time and Attention of the Debtors' Management, Which May Have an Adverse Effect on the Debtors' Businesses and Results of Operations, and the Debtors May Face Increased Levels of Employee Attrition

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Bankruptcy Court will confirm the Plan. The requirements of the Chapter 11 Cases have consumed and will continue to consume a substantial portion of the Debtors' management's time and attention and leave them with less time to devote to the operations of their businesses. This diversion of management's attention may have a material adverse effect on the conduct of the Debtors' businesses and, as a result, on their financial condition and results of operations, particularly if the Chapter 11 Cases are protracted.

As a result of the Chapter 11 Cases, the Debtors may experience employee attrition, and their employees may face considerable distraction and uncertainty. A loss of key personnel or material erosion of employee morale could adversely affect the Debtors' businesses and results of operations. The loss of services of members of the Debtors' management team could impair their

ability to execute their strategy and implement operational initiatives, which would likely have a material adverse effect on the Debtors' financial condition and liquidity.

### 21. Other Parties in Interest May be Permitted to Propose Alternative Plans of Reorganization that May be Less Favorable than the Plan

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of one hundred twenty (120) days from the Petition Date.  Such exclusivity period, however, can be reduced or terminated upon order of the Bankruptcy Court.  If the Bankruptcy Court were to enter such an order, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest proposed an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests and may seek to exclude such Holders from retaining any recovery under their proposed plan.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly.  Proponents of alternative plans of reorganization, however, may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive.  If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' businesses were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

### 22. Conversion into Chapter 7 Cases

If the Bankruptcy Court cannot confirm a plan of reorganization or otherwise finds that it would be in the best interest of Holders of Claims and Interests to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the Bankruptcy Court may authorize such conversion, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  *See* Article VI.C herein, titled "Statutory Requirements for Confirmation of the Plan," as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

### 23. The Debtors May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**24. The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the Restructuring Support Agreement and necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable Law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if: (a) all Classes of adversely affected Holders of Claims and Interests accept the modification in writing; or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**B.     RISKS RELATING TO THE CAPITAL STRUCTURE OF THE REORGANIZED DEBTORS**

**1. Upon Emergence from Bankruptcy, the Debtors' Historical Financial Information May Not Be Indicative of Their Future Financial Performance**

The Debtors' capital structure will be significantly altered under the Plan. Under fresh-start reporting rules that may apply to the Debtors upon the Effective Date (or any alternative plan of reorganization), the Debtors' assets and liabilities would be adjusted to fair values and their accumulated deficit would be restated to zero. Accordingly, fresh-start reporting rules apply, and the Debtors' financial condition and results of operations following their emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in their historical financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Debtors' consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

**2. Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, changes in interest rates, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the products and services the Debtors provide, and increasing expenses. *See* Article VII.C herein, titled "Risk Factors that Could Negatively Impact the Debtors' And the Reorganized Debtors' Business Operations and Financial Conditions." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or

when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

### 3. Cure Amounts and Other Contract Payment Obligations Could be More than Projected

There can be no assurance that the estimated cure amounts or other payment obligations of the Debtors or the Reorganized Debtors arising or otherwise resulting from the assumption of Executory Contracts or Unexpired Leases will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Such cure amounts or payment obligations could be significant and material and, if the Debtors are unsuccessful in challenging such amounts, confirmation or the effectiveness of the Plan may be jeopardized.

### 4. Leverage

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness.  Following the Effective Date, the Reorganized Debtors expect to have outstanding secured indebtedness of up to approximately $459 million, which includes amounts expected to be outstanding under the Amended and Restated Credit Facility and the Exit Facility.

The degree to which the Reorganized Debtors will be leveraged could have important consequences because, among other things, it could affect the Reorganized Debtors' ability to satisfy their obligations under their secured indebtedness following the Effective Date; a portion of the Reorganized Debtors' cash flow from operations will be used for debt service and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to obtain additional debt financing or equity financing in the future may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their businesses may be limited.

### 5. The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Service Their Debt

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.  The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs.  Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) taking advantage of future opportunities; (b) growing their businesses; or (c) responding to future changes in the education industry.  Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to

seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required.

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations. Following the Effective Date, the Reorganized Debtors expect to have outstanding secured indebtedness of up to approximately $459 million, which includes amounts expected to be outstanding under the Amended and Restated Credit Facility and the Exit Facility. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which itself depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient Cash from operations to meet their debt service obligations as well as fund necessary capital expenditures. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 6. Obligations Under the Amended and Restated Credit Documents and the Exit Facility Documents

The Reorganized Debtors' obligations under the Amended and Restated Credit Documents and the Exit Facility Documents will be secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth in the Amended and Restated Credit Documents and the Exit Facility Documents). If the Reorganized Debtors or their Non-Debtor Affiliates become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the Amended and Restated Credit Documents, the Exit Facility Documents, and payment on any obligation thereunder is accelerated, the lenders of the Amended and Restated Loans and/or the Exit Loans would be entitled to exercise the remedies available under the Amended and Restated Credit Documents, the Exit Facility Documents (in each case, subject to the terms of the Amended and Restated Credit Documents and the Exit Facility Documents), or to a secured lender under applicable Law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any Claim of the Holders of unsecured debt.

### 7. Restrictive Covenants

The financing agreements governing the Amended and Restated Credit Facility and the Exit Facility will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain other restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate, and/or sell or dispose of all or substantially all of their assets. In addition, it is expected that such agreements will require the Reorganized Debtors to meet certain financial covenants. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their businesses and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, whether by acceleration or otherwise, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such agreements.

### 8. The Plan Exchanges Senior Indebtedness for Junior Securities

If the Plan is confirmed and consummated, certain Holders of Unsecured Notes Claims will receive New Common Interests subject to the conditions contained in the Plan. Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity Securities, for the New Common Interests, which will be subordinate to all future creditor Claims.

### 9. The Debtors Could Modify the Equity Rights Procedures

The Debtors may modify the Equity Rights Offering Procedures to, among other things, include additional procedures, as needed, to effectuate the Equity Rights Offering.

### 10. There Will Be No Active Trading Market for the New Common Interests

It is anticipated that there will be no active trading market for the New Common Interests. The Reorganized Debtors do not plan to list the New Common Interests on any Securities exchange or for quotation with any inter-dealer quotation system. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such Securities. If an active trading market for the New Common Interests does not develop or is not maintained, the market price and the liquidity of these Securities will be adversely affected and such Holders may not be able to sell their Securities at desired times or prices, or at all. In addition, on the date of emergence, it is expected that the Reorganized Debtors will not be required under U.S. Securities Laws to file any reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

### 11. Certain Holders of New Common Interests May Be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that the offer, sale and issuance of the New Common Interests by the Reorganized Parent to the Holders of the Unsecured Notes Claims under the Plan is covered by section 1145(a)(1) of the Bankruptcy Code, such Securities may be resold by the Holders thereof without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such Securities; *provided*, *however*, that such rights or shares of such New Common Interests will not be freely tradeable if, at the time of transfer, the Holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act (an "***affiliate***") or had been such an affiliate

110

within the ninety (90) days prior to such transfer.  Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Resales by Holders of Claims who receive New Common Interests pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable Law.  Such Holders would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The offer, sale and issuance of the New Common Interests will not initially be registered under the Securities Act or any state Securities Laws, and the Debtors make no representation regarding the right of any Holder of New Common Interests to freely resell the New Common Interests.

### 12. Restricted Securities Issued Under the Plan May Not Be Resold or Otherwise Transferred Unless They are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that Securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such Securities will be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  In the case of an issuer that is not, or has not been for a period of at least 90 days immediately before the sale, subject to the reporting requirements of section 13 or 15(d) of the Exchange Act, a non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a one-year holding period.  An affiliate may resell restricted securities after a one-year holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.

Holders of New Common Interests who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those Securities.

### 13. Certain Significant Holders of Shares of New Common Interests May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Assuming that the Effective Date occurs, Holders of Unsecured Notes Claims who receive distributions representing a substantial percentage of the aggregate outstanding shares of the New Common Interests (including through exercise of their rights pursuant to the Equity Rights Offering) may be in a position to influence matters requiring approval by the Holders of shares of

New Common Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  In particular, pursuant to the (a) Restructuring Support Agreement, Holders holding approximately 89.2% of the Unsecured Notes Claims have agreed to participate in the Plan, and (b) Equity Rights Offering Backstop Commitment Letter, the Equity Rights Offering Backstop Parties have committed to purchase any shares of New Common Interests not subscribed for pursuant to the Equity Rights Offering.  These Holders will beneficially own a significant number of shares of New Common Interests of the Reorganized Parent.  These Holders may collectively have interests that differ from those of the other Holders of shares of New Common Interests and may vote in a manner adverse to the interests of other Holders of shares of New Common Interests.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Interests.  Such actions by Holders of a significant number of shares of New Common Interests may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

### 14. The New Common Interests are Subject to Dilution

In order to preserve the Debtors' tax attributes after the Effective Date, in the event the 382(l)(5) Exception (as defined below) is utilized, the organizational documents of Reorganized Parent may include trading restrictions on the New Common Interests.

### 15. Transfers of Unsecured Notes Claims During the Debtors' Chapter 11 Cases Could Impair The Debtors' Ability To Utilize Their U.S. Federal Income Tax Net Operating Loss Carryforwards and Other Tax Attributes In Future Years and May Be Subject to Trading Procedures.

Under the Plan, each Holder of an Allowed Unsecured Notes Claim will receive its Pro Rata share of the New Common Interests, as more fully described in the Plan.  As a result, the consummation of the Plan is expected to result in an "ownership change" of 2U, Inc. and all other members of the 2U Group (as defined below).  The Debtors believe that the application of the 382(l)(5) Exception (as defined below) could result in significant future cash tax savings and are seeking to protect the continued existence of the their Pre-Change Losses (each as defined below) without annual limitations on their use.  See Article X.B under the caption "Certain U.S. Federal Income Tax Consequences of the Plan—Consequences to the Debtors" for a discussion on section 382 of the Tax Code (as defined below) and the 382(l)(5) Exception.

Accordingly, the Debtors intend to file the NOL Motion on the Petition Date or soon thereafter to seek interim and final orders establishing certain procedures with respect to trading in Claims by certain holders.  Pursuant to the NOL Motion (each as more fully described in the First Day Pleading):

- Each holder of Claims who would own more than 4.75% of the New Common Interests on emergence shall be required to provide notice of its Claims, including the amount of such Claims and the date of acquisition.

- Prior to effectuating a transfer of Claims by a holder that would result in an increase in the amount of Claims beneficial owned by, or that would result in a person or

112

entity becoming, a holder of more than 4.75% of the New Common Interests on emergence shall be required to provide notice of the intended transfer.

- The Debtors or the Required Consenting Noteholders may file an objection to any intended transfer of Claims subject to the notification requirements of the procedures, in which case such transfer will not be effective unless approved by a final and non-appealable order of the Bankruptcy Court.

- Any transfer of Claims in violation of the procedures set forth in the NOL Motion shall be null and void ab initio.

The rules relating to the use of pre-bankruptcy tax attributes by a corporation emerging from a bankruptcy are inherently uncertain. Accordingly, there cannot be any assurance that the Debtors will be entitled to use such attributes following their emergence from the Chapter 11 Cases.

**16. The New Common Interests May be Subject to Trading Restrictions Following Emergence in Order to Protect the Reorganized Debtors' Tax Attributes.**

In order to preserve the Debtors' tax attributes after the Effective Date, in the event the 382(l)(5) Exception (as defined below) is utilized, the organizational documents of Reorganized Parent may include trading restrictions on the New Common Interests.

## C. RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESS OPERATIONS AND FINANCIAL CONDITIONS

### 1. The Chapter 11 Cases May Negatively Impact Future Operations

While the Debtors believe that they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtors' emergence from chapter 11. Additionally, notwithstanding the support of the Consenting Stakeholders, the Chapter 11 Cases may adversely affect the Debtors' ability to maintain relationships with existing customers and suppliers and attract new customers.

### 2. The Reorganized Debtors May Not be Able to Repay or Refinance All of Their Post-Effective Date Indebtedness

The Debtors have incurred significant net losses since their founding, and the Reorganized Debtors' ability to repay or refinance their post-Effective Date debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. For instance, the Debtors' success depends, in part, on building awareness of, and recruiting prospective students for, the Debtors' university clients' offerings. The Debtors have experienced, and may in the future experience, fluctuations in student enrollments based on a variety of factors, including, the Debtors' university clients changing admissions standards, the COVID-19 pandemic, and macroeconomic conditions. In turn, the Reorganized Debtors may be unable to maintain a level of

cash flow from operating activities sufficient to permit the Reorganized Debtors to repay or refinance their post-Effective Date indebtedness, including, without limitation, anticipated borrowings under the Amended and Restated Credit Facility upon emergence.

### 3. Financial Conditions of the Market Could Affect Supply and Demand

The Debtors' business operations have historically been, and the Reorganized Debtors' business operations may in the future be, materially affected by changes in global economic conditions. An improvement in economic conditions and, in particular, an improvement in the economic conditions in the U.S. and the U.S. unemployment rate, may reduce demand among potential students for educational services, as they may find adequate employment without additional education. Conversely, a worsening of economic and employment conditions may reduce the willingness of employers to sponsor educational opportunities for their employees or discourage existing or potential students from pursuing additional education due to a perception that there are insufficient job opportunities, increased economic uncertainty or other factors.

### 4. High Levels of Inflation in Countries in Which the Debtors and the Reorganized Debtors Operate or Sell Products Could Adversely Impact Operating Results and Cash Flows

Increases in inflation caused by or associated with currency devaluations or other economic conditions may result in reduced discretionary spending by consumers and therefore reduced demand for the Debtors' products, as well as higher input costs for their businesses, as a result of which their results of operations and financial condition may be negatively impacted.

### 5. Changes in the way Third-Party Advertising Platforms Operate Could Have an Adverse Impact on the Debtors' Businesses

The Debtors' financial and operational performance depends heavily on its ability to recruit potential students to its offerings in a cost-effective manner, which is often affected by circumstances outside of the Debtor's control. For instance, the Debtors' make substantial use of paid search, social media, search engine optimization and custom website development and deployment and they rely on advertising through a limited number of third-party advertising platforms such as Google, Meta Platforms and LinkedIn, to direct traffic to, and recruit new students for, its offerings.

Changes in the way these platforms operate - whether due to changes in law, changes in the practices of mobile operating system providers, or otherwise - or changes in their advertising prices, data use practices, or other terms have impacted the cost and efficiency of the Debtors' student acquisition efforts in the past and could in the future make marketing the Reorganized Debtors' offerings more expensive, or less effective, which could negatively impact the Reorganized Debtors' business, results of operations and financial condition. In addition, the elimination of a particular medium or platform on which we advertise, could limit the Reorganized Debtors' ability to direct traffic to our offerings and recruit new students on a cost-effective basis, any of which could have a material adverse effect on our business, results of operations and financial condition.

Additionally, the Debtors' search engine optimization capability in connection with their student acquisition efforts substantially depends on various internet search engines, such as Google, to direct a significant amount of traffic to their marketplace at edX.org and other websites related to their offerings. The Reorganized Debtors' ability to influence the number of visitors directed to these websites through search engines is not entirely within their control. For example, search engines frequently revise their algorithms in an attempt to optimize their search result listings. In this respect, algorithm changes by Google or any other search engines could cause edX.org and other websites for the Reorganized Debtors' offerings to receive less favorable placements, which could reduce the number of prospective students who visit these websites and impact their ability to effectively utilize search engine optimization as part of their student acquisition strategies in the long-term.

### 6.  The Debtors' or the Reorganized Debtors' Business May be Negatively Impacted if They are not Able to Maintain and Enhance their Brand

Maintaining and continually enhancing the reputation and recognition of the Debtors' brand is critical to the success of their businesses.  Brand value is based in large part on customer perceptions.  Success in promoting and enhancing brand value depends in large part on the Debtors' ability to provide high-quality products.  Brand value could diminish significantly due to a number of factors, including adverse publicity about the Debtors' products (whether valid or not), a failure to maintain the quality of the Debtors' products (whether perceived or real), the failure of the Debtors' products to deliver consistently positive student experiences and outcomes, the products becoming unavailable to consumers, or consumer perception that the Debtors acted in an irresponsible manner.  Damage to the Debtors' or the Reorganized Debtors' brand, reputation or loss of customer confidence in its brand or products could result in decreased demand for the Debtors' and the Reorganized Debtors' products and have a negative impact on its businesses.

### 7.  The Debtors' Global Operations Expose Them to Risks

The Debtors have revenue and operations in various countries exposing them to certain risks, including: foreign currency movements; differing levels of protection of intellectual property and trade secrets; the burden of complying with changes in both domestic and foreign regulations, and U.S. or international taxation policies; and the effects of geopolitical events.  Changes in regulatory, geopolitical, social, economic, or monetary policies and other factors could have a material adverse effect on the Debtors' and the Reorganized Debtors' business in the future, or may require it to exit a particular market or significantly modify the Debtors' current business practices.

### 8.  Increased Competition

The markets that the Debtors operate in are highly competitive, rapidly evolving, and subject to changing technology, shifting needs of students, faculty and clients and frequent introductions of new delivery methods.  The Debtors face competition from established and emerging companies, which could divert clients or students to the Debtors' competitors, in turn harming the Reorganized Debtors' future results of operations, cash flows, and financial condition.

### 9.  Implementation of the Debtors Business Plans May Not be Successful or May Have Adverse Consequences

The Debtors may not achieve their proposed and ongoing business plans, structural changes, and financial restructuring strategy.  In such event, the Reorganized Debtors may experience negative impacts on their businesses, financial condition, cash flows, and results of operations.  Additionally, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their businesses, develop, and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

Additionally, successful implementation of such initiatives is not without risk, as they may disrupt operations, create added costs and operational inefficiencies, lower employee morale, and create turnover.  They may also hinder the Debtors' strategic planning, business execution, and future performance.

### 10. The Debtors' and Reorganized Debtors' financial performance depends heavily on its ability to recruit potential students for its offerings, and its ability to do so may be affected by circumstances beyond their control.

Building awareness of the Debtors' offerings is critical to their ability to recruit prospective students for university clients' offerings and generate revenue. A substantial portion of the Debtors' expenses is attributable to marketing and sales efforts dedicated to attracting potential students. Because the Debtors generate revenue based on a portion of the tuition and fees that students pay, it is critical to the Debtors' success that they identify prospective students for their offerings in a cost-effective manner, and that enrolled students remain active in their offerings until graduation or completion.

Fluctuations in student enrollments are based on a variety of factors. The following factors, many of which are largely outside of the control of the Debtors and Reorganized Debtors, may prevent them from successfully driving and maintaining student enrollment in the Debtors' and Reorganized Debtors' offerings in a cost-effective manner or at all, which would adversely affect revenue and their ability to achieve profitability:

- **Negative perceptions about online learning programs**. Online offerings in the market generally may not be successful, operate efficiently, or perform well. Any such underperformance could create the perception that online offerings in general are not an effective way to educate students, whether or not the Debtors' and Reorganized Debtors' offerings achieve satisfactory performance. In addition, special interest groups have in the past and may in the future take actions to create negative perceptions about online learning programs through the media, litigation or other tactics.

- **Unsuccessful marketing efforts**. The Debtors invest substantial resources in developing and implementing data-driven marketing strategies that focus on identifying the right potential student at the right time. In connection with the Debtors' platform-based and product-level marketing efforts, the Debtors make substantial use of search engine optimization, paid search, social media and custom website development and deployment

116

and the Debtors rely on a small number of internet search engines and marketing partners. The effectiveness and cost of the Debtors' marketing efforts have varied over time and from offering to offering based on economic conditions, competition, advertising prices, offerings type, university client reputation and other factors, including the effectiveness of the Debtors' marketing partners to identify students and learners.

- **Damage to university client reputation**. Because the Debtors often use a university client's brand in connection with their marketing efforts for their offerings, the Debtors' university clients' reputations are critical to the ability to enroll students. Many factors affecting university clients' reputations are beyond the Debtors' control, including ranking among nonprofit educational institutions, internal university matters, changes in university leadership positions and other matters that impact the public perception of university clients.

- **Lack of interest in an offering**. The Reorganized Debtors may encounter difficulties attracting students for offerings that are not highly desired or that are relatively new within their fields. Macroeconomic conditions beyond the Debtors' and Reorganized Debtors' control may diminish interest in employment in a field, which could contribute to a lack of interest in offerings related to that field.

- **Reduced support from university clients**. The Reorganized Debtors' ability to grow their revenue from a particular offering depends on the growth of enrollment in that offering. University clients could limit enrollment in certain offerings, cease providing the offerings altogether or significantly curtail or inhibit the Reorganized Debtors' ability to promote their offerings, any of which would negatively impact revenue.

- **The Reorganized Debtors lack of control over university clients' admissions standards and admissions decisions for degree programs**. Even if the Reorganized Debtors identifies prospective students for a degree program, there is no guarantee that university clients will admit these students to that program. The Debtors' university clients retain complete discretion over setting admissions standards and making admissions decisions, and university clients may change admissions standards or inconsistently apply admissions standards.

- **The Reorganized Debtors lack of control over university clients' tuition decisions, particularly for degree programs**. The Debtors do not control tuition decisions for offerings and degree programs; university clients retain complete control over tuition decisions. If the Reorganized Debtors are not able to effectively recruit and retain students for a program because the tuition is too high, or perceived as being too high, it could negatively impact the business.

- **Inability to maintain sufficient high-quality content from clients**. The Reorganized Debtors' success depends on their ability to provide students with high-quality learning experiences. For certain offerings, including many degree programs, while the Debtors' clients are primarily responsible for curriculum development, the Debtors provide learning design and development experts that collaborate with faculty to ensure the final course content is engaging and digestible in an online format. For other offerings, including open

117

course offerings, the Debtors' clients are solely responsible for curriculum development and the Debtors provide limited self-help resources. If the course content is not high-quality and students are dissatisfied with their experience in an offering or do not find the content of the offerings appealing, they may stop accessing the Reorganized Debtors' content. In turn, if clients perceive that the platform lacks an adequate learner audience, clients may be less willing to provide content to offer on the platform, and the experience of students could be further negatively impacted.

- **Inability of students to secure funding**. Many of the students in the Debtors' university clients' offerings, in particular degree programs and boot camps, rely on the availability of third-party financing to pay for tuition and other costs of their education. This may include federal, state or private student loans, scholarships and grants, or benefits or reimbursement provided by an employer. Any developments that reduce the availability or increase the cost of financial aid for higher education generally, or for the Reorganized Debtors' university clients' offerings, such as a government shutdown as a result of failure to enact funding legislation for the government's fiscal year, could impair students' abilities to meet their financial obligations and could negatively impact future enrollment.

- **General economic conditions**. Student enrollment in offerings may be affected by changes in global economic conditions. An improvement in economic conditions and, in particular, an improvement in the economic conditions in the U.S. and the U.S. unemployment rate, may reduce demand among potential students for educational services, as they may find adequate employment without additional education. Conversely, a worsening of economic and employment conditions may reduce the willingness of employers to sponsor educational opportunities for their employees or discourage existing or potential students from pursuing additional education due to a perception that there are insufficient job opportunities, increased economic uncertainty or other factors.

## 11. A Loss of the Services of Key Personnel Could Have a Material Adverse Effect on the Debtors' and the Reorganized Debtors' Businesses

The Debtors' and the Reorganized Debtors' continued success depends to a large degree upon their ability to attract and retain key management executives, as well as upon a number of members of technology, operations and sales and marketing staffs.  However, in recent years, the senior management team has undergone material changes.  The loss of some key executives or key members of the operating staff, or an inability to attract or retain other key individuals, could materially adversely affect the Debtors and the Reorganized Debtors.

## 12. Risks Related to Intellectual Property Rights and Enforcement

The Debtors' success depends, in part, upon their ability to avoid infringing intellectual property rights owned by others and being able to resolve claims of intellectual property infringement without major financial expenditures or adverse consequences.  The technology and software fields generally are characterized by extensive intellectual property litigation and many companies that own, or claim to own, intellectual property have aggressively asserted their rights. In addition, the Debtors face potential copyright and trademark infringement from the content they produce in connection with their marketing activities, including in websites related to the Debtors'

offerings.  From time to time, the Debtors may be subject to legal proceedings and claims relating to the intellectual property rights of others, and it is expected that third parties will assert intellectual property claims against the Debtors, particularly as they expand the complexity and scope of their businesses.  In addition, the Debtors' university client agreements require them to indemnify university clients against claims that the Debtors' platform infringes the intellectual property rights of third parties.

Future litigation may be necessary to defend the Debtors or their university clients from intellectual property infringement claims or to establish their proprietary rights.  Some of the Debtors' competitors have substantially greater resources than they do and would be able to sustain the costs of complex intellectual property litigation to a greater degree and for longer periods of time than the Debtors could.  In addition, patent holding companies that focus solely on extracting royalties and settlements by enforcing patent rights may target us.  Regardless of whether claims that the Debtors are infringing patents or other intellectual property rights have any merit, these claims are time-consuming and costly to evaluate and defend and could (a) hurt the Debtors' reputation; (b) adversely affect their relationships with current or future university clients; (c) cause delays or stoppages in providing 2U's platform; (d) divert management's attention and resources; (e) require technology changes to the Debtors' software that could cause them to incur substantial cost; (f) subject the Debtors to significant liabilities; and require them to cease some or all of their activities.

In addition to liability for monetary damages against the Debtors, which may include attorneys' fees, treble damages in the event of a finding of willful infringement, or, in some circumstances, damages against the Debtors' university clients, the Debtors may be prohibited from developing, commercializing or continuing to provide some or all of their bundled technology-enabled platform unless they obtain licenses from, and pay royalties to, the holders of the patents or other intellectual property rights, which may not be available on commercially favorable terms, or at all.

## 13. The Reorganized Debtors May Be Adversely Impacted by Pending and Potential Litigation

While certain prepetition litigation Claims will be treated as Class 9 Subordinated Claims and discharged in accordance with the Plan, the Debtors are involved in certain other litigation, which so long as it remains unresolved represents a legal issue and potential Claim for monetary damages.

Additionally, there is a risk of future litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims and Interests under the Plan.  It is not possible to completely predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**14. Cyber Security Attacks and Disruptions to Information Systems Could Have an Adverse Impact on the Debtors' Business**

In the ordinary course of business, the Debtors' platform requires storage and transmission of proprietary and confidential information regarding clients and the company. In addition, the Debtors have relied, and the Reorganized Debtors will continue to rely, upon information systems, some of which are managed by third parties, to process, transmit, and store digital information, and to manage or support a variety of business processes and activities. The secure operation of the Debtor's platforms and systems, and the processing and maintenance of this information is critical to business operations and strategy. Despite actions to mitigate or eliminate risk, the Debtors' or the Reorganized Debtors' information systems may be vulnerable to damage, disruptions, or shutdowns due to the activity of hackers, employee error or malfeasance, or other disruptions. The occurrence of any of these events could compromise the information systems, disrupt the Debtors' platform and services, and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure, or other loss of information could result in legal claims or proceedings, liability or regulatory penalties under Laws protecting the privacy of personal information, disrupt operations, and damage the Reorganized Debtors' reputation which could adversely affect their business, financial condition and results of operations.

**15. Increasing Legal and Regulatory Complexity Could Impact Operations and Results in Potentially Material Ways**

The Debtors and the Reorganized Debtors operate in the highly regulated higher education industry. In the United States, for instance, the Debtors' industry is subject to extensive federal and state regulations and accreditation standards. Federal regulations include Title IV federal student financial assistance programs under the Higher Education Act ("*HEA*") and regulations by the U.S. Department of Education ("*DOE*"), among other federal authority. If Debtors' and Reorganized Debtors' university clients fail to comply with applicable laws, regulations, and accreditation standards, they could lose some or all of their access to Title IV federal program funds, lose the ability to offer certain programs, or lose the ability to operate in certain states, any of which could cause Debtors' and Reorganized Debtors' revenue to decline. Furthermore, the Debtors are required to comply with education laws, regulations and accreditation standards because they are a service provider to higher education institutions. The Debtors are also subject to regulatory schemes in the other countries in which they operate.

Increased scrutiny and accountability initiatives in the education sector, as well as ongoing policy differences in the United States Congress could lead to significant changes under the HEA or otherwise, or expanded enforcement of existing laws and regulations. These changes may result in new or additional regulatory burdens on the Reorganized Debtors' university clients, and specific initiatives may be targeted at or have an impact on companies like the Debtors that serve higher education. The adoption of any laws, regulations or accreditation standards that limit the Reorganized Debtors' ability to provide services to their university clients could compromise their ability to generate revenue or make the Reorganized Debtors' platform less attractive. Additionally, the adoptions of new laws, regulations or accreditation standards may expose the Reorganized Debtors to complex compliance, litigation and similar risks that affect their operations and increase their cost of doing business.

For instance, on February 15, 2023, the DOE published a "dear colleague" letter ("***DCL***") which updated its existing guidance to significantly expand its interpretation of the types of service providers that qualify under the definition of a "Third-Party Servicer" ("***TPS***"). Under this guidance, entities like the Debtors performing services involving generalized recruiting, marketing, software, and curricular development activities, among other things, would have been deemed "Third-Party Servicers" and would have been subject to regulation by the DOE. On April 4, 2023, the Company filed a lawsuit in federal district court against the DOE and its Secretary that challenged the DOE's revised TPS guidance. On May 16, 2023, the DOE published a separate DCL which,. among other things, delayed the implementation of the revised TPS guidance. The DOE stated that it plans to publish revised guidance with an effective date at least six months after its publication. The lawsuit remains pending but is stayed awaiting issuance of the DOE's revised TPS guidance. On July 17, 2024, the DOE announced that it intends to conduct a rulemaking process to consider new TPS regulations in areas such as the definition of a TPS and compliance requirements for TPSs that include audits, reporting, financial, and past performance. If the Reorganized Debtors were deemed to be TPSs under revised guidance or regulation, their regulatory burden would increase, they could be liable to the DOE for their university client's Title IV infractions, their ability to contract with Title IV eligible institutions could be limited or eliminated, and their business could be adversely impacted.

Additionally, a DOE rule, referred to as the "***incentive compensation rule***," generally prohibits individuals or entities from receiving incentive-based compensation payments for the recruitment, admission or enrollment of students. The Debtors' current business model relies in part on receiving a share of tuition revenue from its university clients, which has been authorized by a rule provided in an official policy guidance by the DOE in a 2011 DCL permitting tuition revenue-sharing arrangements with institutions of higher education, known as the "***bundled services rule***." Because the bundled services rule was promulgated in the form of agency guidance issued by the DOE in the form of a DCL and is not codified by statute or regulation, there is risk that the rule could be altered or removed without customary administrative procedural requirements. Although the 2011 DCL remains the longstanding policy, in March 2023, the DOE provided notice that it intends to review the bundled services rule, with the intent to improve its guidance. The DOE has not indicated if or when it will issue revised guidance on the bundled services rule, and it is not known what, if any, impact any change to the existing bundled services rule would have on the Debtors' or Reorganized Debtors' businesses. Further, while most states defer to DOE regulations, analogous but different versions of the federal incentive compensation rule exist under the laws of some states, and such statutes or rules, or their interpretation, may change at any time. On May 24, 2024, the state of Minnesota passed a law banning tuition sharing between its public state colleges and universities and companies like Debtors and Reorganized Debtors when a contract involves student recruitment and marketing services. Other states may follow. The revision, removal or invalidation of the bundled services rule or a ban on revenue share at the federal or state level could require Reorganized Debtors to change their business models and renegotiate the terms of many of their university client contracts and could compromise their ability to generate revenue or otherwise adversely impact their businesses.

**16. The Debtors' and the Reorganized Debtors' Products and Operations are Subject to Various Federal and State Regulations and May be Subject to New Federal and State Regulations in the Future**

The Debtors' and the Reorganized Debtors' products and operations are subject to certain legal requirements as part of their involvement in the education technology space. These legal requirements frequently change and vary among jurisdictions. Such requirements take myriad forms, including compliance with DOE regulations, state and federal data privacy laws, and various foreign regulatory requirements, among many others. Compliance with these requirements, or the failure to comply with these requirements, may have a material adverse effect on the Debtors' and the Reorganized Debtors' operations. If any of their products becomes subject to new regulations, or if any of their products becomes specifically regulated by additional governmental or other regulatory entities, the cost of compliance could be material.

**17. The evolving scope of the Debtors' and Reorganized Debtors' offerings and changes to the operating model make it difficult to predict future financial and operating results, and the Debtors and Reorganized Debtors may not achieve expected financial and operating results in the future.**

From 2008 to 2017, the Debtors' offerings generally only consisted of graduate degree programs. In July 2017, the Debtors expanded their offerings to include premium online executive education programs and in May 2019, they further expanded offerings to include skills-based boot camps. In 2020 they launched their first undergraduate degree program and in November 2021 they expanded their offerings to include open courses and added a consumer facing marketplace. In addition, from time to time, they have entered into and they may in the future enter into agreements to strategically exit certain of their clients' programs to better align with their evolving scope of offerings and the Debtors' business. Given the significant evolution of their current scope of offerings and changes to the Debtors' operating model, the Debtors' ability to forecast future operating results, including revenue, cash flows and profitability, is limited and subject to a number of risks and uncertainties. For example, a decline in revenue due to a mutually agreed strategic exit from a program may not be apparent in the Debtors' financial results until a few quarters later. The Debtors may also experience a temporary increase in its revenue because of certain payments the Debtor receives upon the termination of these programs. If the Debtors' assumptions regarding these risks and uncertainties are incorrect or change, or if the Reorganized Debtors do not manage these risks successfully, the Reorganized Debtors' operating and financial results may differ materially from its expectations and the business may suffer.

**18. The Debtors' businesses depend heavily on the adoption by colleges and universities of online delivery of their educational offerings. If the Reorganized Debtors fail to attract new university clients, or if new leadership at existing university clients does not have an interest in continuing or expanding online delivery of their educational offerings, the Reorganized Debtors' revenue growth and profitability, and therefore the financial performance of the Reorganized Debtors, may suffer.**

The Reorganized Debtors' success depends in large part on its ability to enter into agreements with additional nonprofit colleges and universities to provide their offerings online. In

particular, to engage new university clients, the Reorganized Debtors need to convince potential university clients, many of which have been educating students only in on-campus programs for hundreds of years, to invest significant time and resources to introduce a new teaching modality. The delivery of online education at leading nonprofit colleges and universities is evolving, but many administrators and faculty members continue to have concerns regarding the perceived loss of control over the education process that might result from offering content online, as well as skepticism regarding the ability of colleges and universities to provide high-quality education online that maintains the standards they set for their on-campus programs. It may be difficult to overcome this resistance, and certain online offerings of the kind the Reorganized Debtors develop with university clients may not achieve significant market acceptance. In addition, university clients have regular turnover in their leadership positions, and there is no guarantee that any new leader will have an interest in continuing or expanding online delivery of the university's educational offerings. If new leaders at university clients do not embrace online delivery of educational offerings, the Reorganized Debtors may not be able to add additional offerings with the university client and the university client may attempt to terminate or may not renew their relationship with the Reorganized Debtor.

## D.     RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS

### 1.     Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections, and such differences may be material.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' and the Reorganized Debtors' ability to maintain market strength and retain client relationships; and (f) future regulatory developments.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD <u>NOT</u> BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT

THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## E.    DISCLOSURE STATEMENT DISCLAIMER

### 1.   The Information Contained Herein Is for Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

### 2.   This Disclosure Statement Contains Forward-Looking Statements.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

### 3.   The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 4.   No Legal or Tax Advice is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you**.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5. No Admissions are Made by this Disclosure Statement**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Interests or any other parties in interest.

**6. No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. Further, if a particular litigation Claim or projected objection to a particular Claim or Interest is identified in this Disclosure Statement, no reliance should be placed on how it is characterized or described. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims or Causes of Action and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims, Causes of Action or objections to Claims.

**7. Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Interests or Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim or an Allowed Interest for or against the Plan does not constitute a waiver or release of any Claims, Interests, or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or Allowed Interest or recover any preferential, fraudulent, or other voidable transfer or assets, regardless of whether any Claims, Interests, or Causes of Action of the Debtors or its Estate are specifically or generally identified herein.

**8. The Information Used Herein was Provided by the Debtors and was Relied Upon by the Company Advisors**

Counsel to, and other Company Advisors retained by, the Debtors have relied upon information that the Debtors provided in connection with the preparation of this Disclosure Statement. Although counsel to, and other Company Advisors retained by, the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**9. This Disclosure Statement Has Not Been Approved by the SEC**

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

**10. The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**11. No Representations Made Outside this Disclosure Statement are Authorized**

Other than as set forth in this Disclosure Statement, no representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  You should not rely on any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement.  You should promptly report unauthorized representations or inducements to proposed counsel to the Debtors and the U.S. Trustee.

# VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Bankruptcy Court may authorize the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code and, if that were to happen, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims and Interests is set forth in Article VI.C herein, titled "*Statutory Requirements for Confirmation of the Plan.*"  The Debtors believe that liquidation under chapter 7 would result in: (i) smaller or equal distributions being made to creditors and equity holders entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other Professionals to assist such trustee; (ii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations; and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

### B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Bankruptcy Court does not confirm the Plan, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.  As discussed above, during the negotiations prior to the filing of the Chapter 11 Cases and the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan and the associated Amended and Restated Credit Facility and Exit Facility enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' vendors and service providers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for Professional

fees and other expenses associated with the proceedings.  In addition, the Debtors may no longer be permitted to use Cash Collateral on a consensual basis.  Under these circumstances, it is unlikely the Debtors could successfully reorganize without damage to their business operations and material decreases in recoveries for creditors.

# IX.
## SECURITIES LAW MATTERS

The Debtors believe that any offers of New Common Interests that may be deemed to be made prior to the Petition Date, including in connection with the solicitation of votes on the Plan or the Equity Rights Offering Backstop Agreement, are exempt from the registration requirements of the Securities Act pursuant to Section 4(a)(2), Regulation D promulgated thereunder, and/or Regulation S promulgated thereunder. Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from the registration requirements under Section 5 of the Securities Act. Regulation D and Regulation S are non-exclusive safe harbors from the registration requirements promulgated by the SEC under the Securities Act.

## A.    1145 SECURITIES

### 1.  Issuance

The Plan provides for the offer, issuance, sale or distribution of shares of New Common Interests to Holders of Unsecured Notes Claims and Rights to Holders of Unsecured Notes Claims (including the New Common Interests issuable upon exercise of such Rights). The Debtors believe that the offer, issuance, sale or distribution by the Reorganized Parent of the New Common Interests and Rights (including the New Common Interests issuable upon exercise of such Rights) other than Rights (and any New Common Interests issuable upon exercise of such rights) offered or issued to the Equity Rights Offering Backstop Parties pursuant to the Backstop Commitment Agreement (the "*1145 Securities*"), will be exempt from the registration requirements under section 5 of the Securities Act and under any state or local laws requiring registration of the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities Laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the securities must be in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for such a claim or interest, or "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that the issuance of the New Common Interests and Rights (including the New Common Interests issuable upon exercise of such Rights) satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code, other than with respect to the issuance of Rights (and any New Common Interests issuable upon exercise of such Rights) to the Equity Rights Offering Backstop Parties and the issuance of New Common Interests pursuant to the Backstop Commitment Agreement.

2.        **Subsequent Transfers of 1145 Securities**

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued in a public offering.  In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter," or a "dealer" with respect to such securities.  A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.

Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters": a Person who (i) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest ("accumulators"); (ii) offers to sell securities offered or sold under a plan for the holders of such securities ("distributors"); (iii) offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is: (a) with a view to distributing such securities; and (b) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and (iv) is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, includes Persons directly or indirectly controlling, controlled by or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Such Persons are referred to as "affiliates" of the issuer.

Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be an issuer for these purposes and therefore an underwriter. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who receives ten percent or more of a class of securities of a reorganized debtor may be presumed to be in a relationship of "control" with the reorganized debtor and, therefore, an underwriter, although the staff of the SEC has not endorsed this view.

Notwithstanding the provisions of section 1145(b) of the Bankruptcy Code regarding accumulators and distributors referred to above, the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions."  The SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

130

- (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

- the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Securities Exchange Act of 1934 (the "***Exchange Act***"); or

- the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any persons intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

To the extent that Persons who receive 1145 Securities pursuant to the Plan are deemed to be underwriters (and who do not qualify for the treatment of "ordinary trading transactions" described above), resales by such Persons of 1145 Securities would not be exempted from registration under the Securities Act or other applicable laws by reason of section 1145 of the Bankruptcy Code and section 4(a)(1) of the Securities Act. However, Persons deemed to be underwriters may be permitted to resell such 1145 Securities without registration pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act or another available exemption under the Securities Act.

## B.    4(A)(2) SECURITIES

### 1.    Issuance

The issuance of the Rights and the offer and issuance of any New Common Interests not subscribed for pursuant to the Equity Rights Offering that are issued to the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Agreement (collectively, the "***4(a)(2) Securities***") may not be exempted by Section 1145 of the Bankruptcy Code from the registration requirements under the Securities Act. The Debtors believe that, to the extent Section 1145(a) of the Bankruptcy Code is not available, the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act including, to the extent applicable, Regulation D promulgated thereunder.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in

transactions not involving any public offering is exempt from the registration requirements under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.

## 2.    Subsequent Transfers of 4(a)(2) Securities

The 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Equity Rights Offering Backstop Parties will not be permitted to offer, sell, or otherwise transfer 4(a)(2) Securities except pursuant to a registration statement or an available exemption from registration.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

In the case of an issuer that is not, or has not been for a period of at least 90 days immediately before the sale, subject to the reporting requirements of section 13 or 15(d) of the Exchange Act, a non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a one-year holding period.

An affiliate may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of one percent of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 shares or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date.  Accordingly, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144 unless a registration statement is filed or another exemption from registration under the Securities Act is available.

All 4(a)(2) Securities will be issued in certificated or book-entry form and will bear a restrictive legend. Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will reserve the right to require certification or other evidence of compliance with Rule 144 or another available exemption from registration as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144 or another available exemption under the Securities Act. Any person who receives 4(a)(2) Securities will be deemed to acknowledge and agree not to resell such securities except in accordance with Rule 144 or another available exemption under the Securities Act, and that the securities will be subject to the other restrictions described above.

Any persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(a)(2) OF THE SECURITIES ACT, REGULATION D, REGULATION S, RULE 144 AND/OR RULE 144A UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKES ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF ANY SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN OR ANY OTHER AGREEMENT.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

## C.    LISTING

Upon the Effective Date, it is expected that the New Common Interests will not be publicly traded or listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

## X.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

### A.    INTRODUCTION

The following discussion is a summary of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims or Interests.  The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired, deemed to accept or reject the Plan, or otherwise entitled to payment in full in Cash under the Plan.  In addition, this discussion does not address any consideration that is received on account of a person's capacity other than as a holder of such Claims or Interests.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), regulations promulgated by the United States Department of the Treasury under the Tax Code (the "*Treasury Regulations*"), judicial authorities, published positions of the Internal Revenue Service ("*IRS*"), and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court.  Accordingly, there can be no assurance that the IRS would not assert, or that a court would not sustain, a contrary position as to the U.S. federal income tax consequences described herein.

This summary does not address non-U.S., state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances, including the impact of the Medicare contribution tax on net investment income and the alternative minimum tax, or to a holder that may be subject to special tax rules (such as persons who are related to any Debtor within the meaning of one of various provisions of the Tax Code; broker-dealers; banks; mutual funds; insurance companies; financial institutions; small business investment companies; real estate investment trusts; regulated investment companies; tax-exempt organizations; trusts; governmental authorities or agencies; dealers and traders in securities; retirement plans; individual retirement and other tax-deferred accounts; holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes; persons whose functional currency is not the U.S. dollar; dealers in foreign currency; holders who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment; holders using a mark-to-market method of accounting; holders of Claims who are themselves in bankruptcy; and holders who are accrual method taxpayers that report income on an "applicable financial statement").  In addition, this discussion does not address U.S. federal taxes other than income taxes.

Furthermore, this discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with

their form and that, except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## B.    CONSEQUENCES TO THE DEBTORS

For U.S. federal income tax purposes, Parent is the common parent of an affiliated group of corporations that files a consolidated U.S. federal income tax return (the "*2U Group*"), of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly-owned by a member of the 2U Group.  For the taxable year ending December 31, 2023, the 2U Group reported on its consolidated federal income tax return carryforwards of federal consolidated net operating losses ("*NOLs*") of approximately $830 million and carryforwards of disallowed business interest expense of approximately $175 million (collectively, and together with certain other tax attributes, the "*Tax Attributes*").  The Debtors expect to generate additional amounts of Tax Attributes prior to the Effective Date in the 2024 taxable year.  The amount of any such Tax Attributes remains subject to further analysis of the Debtors and potential audit and adjustment by the IRS.  Certain equity trading and the claiming of certain worthless stock deductions prior to the Effective Date could result in an ownership change of 2U, Inc. independent of the Plan, which could adversely affect the ability to utilize the 2U Group's Tax Attributes.  In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors intend to obtain at the inception of the Chapter 11 Cases an interim order and, subsequently, a final order from the Bankruptcy Court authorizing protective procedures with respect to certain equity trading and worthless stock deductions.

As discussed below, in connection with the implementation of the Plan, the Debtors expect that the amount of certain of the Tax Attributes will be reduced.  In addition, the subsequent utilization of NOLs and other Tax Attributes remaining following the Effective Date may be limited.

### 1.    Cancellation of Debt

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("*COD*") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any debt issued, and (iii) the fair market value of any other consideration (including equity of a debtor or a party related to such debtor) given, in each case, in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange.  However, COD income should not arise to the extent that payment of the indebtedness would have given rise to a deduction.  The Plan provides that holders of First Lien Claims and holders of Unsecured Notes Claims will receive (i) Amended and Restated Loans and (ii) New Common Interests and Rights,

respectively, in exchange for their Claims, so the amount of COD income for the 2U Group will depend in part on the issue price of the Amended and Restated Loans and the fair market value of the New Common Interests and the Rights on the Effective Date.  Accordingly, the estimated amount of COD income is uncertain at this time.

Under section 108 of the Tax Code, a taxpayer is not required to include COD in gross income (i) if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) to the extent that the taxpayer is insolvent immediately before the discharge.  As a consequence of such an exclusion, a debtor generally must reduce its tax attributes by the amount of COD income that it excluded from gross income.  In general, such tax attributes are reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject immediately after the cancellation of indebtedness); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a taxpayer with excluded COD may elect first to reduce the basis of its depreciable assets (a "***Section 108(b)(5) Election***"), in which case the limitation described in (e) does not apply to the reduction in basis of depreciable property and, following such reduction, any remaining COD income that is excluded from gross income reduces any remaining tax attributes in the order specified in the prior sentence.  The reduction of the taxpayer's tax attributes occurs at the end of the taxable year for which the excluded COD income is realized, but only after the taxpayer's net income or loss for the taxable year of the debt discharge has been determined; in this way, the attribute reduction is generally effective as of the start of the taxable year following the discharge.  If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax.  Where a taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

In connection with the implementation of the Plan, the Debtors expect to realize a substantial amount of excluded COD income for U.S. federal income tax purposes.  The Debtors currently do not intend to make a Section 108(b)(5) Election and expect that a portion of their NOLs will be reduced as a result of the COD attribute reduction arising in connection with the Plan.

### 2.    Limitation on NOLs and Other Tax Attributes

Following the Effective Date, any NOLs, carryforwards of disallowed business interest expense and certain other Tax Attributes, if any, allocable to tax periods or portions thereof ending on or prior to the Effective Date (collectively, "***Pre-Change Losses***") may be subject to certain limitations under sections 382 and 383 of the Tax Code.  Any such limitations apply in addition to, and not in lieu of, the attribute reduction that results from the exclusion of COD income arising in connection with the Plan.

If a corporation or consolidated group undergoes an "ownership change" as defined under section 382 of the Tax Code, the amount of its "pre-change losses" that may be utilized to offset future taxable income generally is subject to an annual limitation.  In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more

136

direct or indirect "5-percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the 5-percent shareholders at any time during the applicable testing period. The testing period generally is the shorter of (a) the three (3)-year period preceding the testing date and (b) the period of time since the most recent ownership change of the corporation. The Debtors anticipate that the distribution of the New Common Interests pursuant to the Plan will result in an ownership change of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

### (a)    General Annual Limitation

In general, the amount of the annual limitation to which a corporation or consolidated group that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the corporation (or parent of the consolidated group) immediately before the ownership change (with certain adjustments) and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three (3)-calendar-month period ending with the calendar month in which the ownership change occurs, e.g., 3.62% for ownership changes occurring in August 2024). For a corporation or consolidated group in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, unless the special exception described below applies, the annual limitation is generally determined by reference to the fair market value of the stock of the corporation (or the parent of the consolidated group) immediately after (rather than before) the ownership change and after giving effect to the discharge of creditors' claims, subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the assets of the corporation. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

Under certain circumstances, the annual limitation otherwise computed may be increased if the corporation or consolidated group has an overall built-in gain in its assets at the time of the ownership change. If a loss corporation (as defined in section 382(k)(1) of the Tax Code) or consolidated group has such "net unrealized built-in gain" ("**NUBIG**") at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized (or, according to a currently effective IRS notice, treated as recognized) during the following sixty (60)-month period (up to the amount of the original NUBIG) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group would be permitted to use its pre-change losses against such built-in gain income in addition to its otherwise applicable annual limitation. Alternatively, if a loss corporation or consolidated group has a "net unrealized built-in loss" at the time of an ownership change, then any built-in losses existing at such time that are recognized (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) during the sixty (60)-month period following the ownership change (up to the amount of the original net unrealized built-in loss) will be treated as pre-change losses, the deductibility of which will be subject to the annual limitation. In general, the NUBIG or net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million or (b) fifteen percent (15%) of the fair market value of the corporation's or consolidated group's assets (with certain adjustments) before the ownership change. It is currently expected that Parent will have a net unrealized built-in loss as of the Effective Date.

137

If the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (subject to potential increase for recognized built-in gains in the manner described above if the corporation is in a NUBIG position at the time of the ownership change).  Currently, the Debtors anticipate that a portion of their NOLs generated on or prior to the Effective Date will be reduced as a result of the COD attribute reduction arising in connection with the consummation of the Plan.  In addition, section 382 of the Tax Code is expected to restrict the subsequent utilization of the remaining NOLs and other Tax Attributes, such as the carryforwards of any disallowed business interest expense allocable to the period through the Effective Date.

(b)      <u>Section 382(l)(5) Bankruptcy Exception</u>

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies when, among other requirements, so-called "qualified creditors" and shareholders of a debtor corporation in chapter 11 receive, in respect of their claims or equity interests, respectively, at least fifty percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***").  The IRS has in private letter rulings applied the 382(l)(5) Exception on a consolidated basis where the parent corporation is in bankruptcy.  Generally, qualified creditors are creditors who (a) held their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and continue to hold thereafter, (b) hold claims incurred in the ordinary course of the debtor's business continuously since they were incurred, or (c) in certain cases, do not become five percent (5%) shareholders of the reorganized corporation.

Under the 382(l)(5) Exception, a debtor's pre-change losses are not subject to the annual limitation.  However, if the 382(l)(5) Exception applies, the amount of the debtor's pre-change losses is re-determined as if no interest deductions were allowable during the three (3) taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors thereafter undergo another ownership change within two (2) years after the Effective Date, the annual limitation with respect to such later ownership change would be zero, effectively precluding the utilization of any Pre-Change Losses at the time of such later ownership change against future income of the Reorganized Debtors.  Any future ownership change after such two (2)-year period would subject the Reorganized Debtors to the general limitations under sections 382 and 383 of the Tax Code.  A debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation described above.

The Debtors believe that the application of the 382(l)(5) Exception could result in significant future cash tax savings and are seeking to protect the continued existence of their significant Tax Attributes (including NOLs and "net unrealized built-in losses") without annual limitations on their use.  The Debtors currently estimate that the utilization of the 382(l)(5) Exception could result in cash tax savings ranging from approximately $45 million to $60 million during the 2024 through 2028 taxable years, although such amounts depend on, among other

138

things, the valuation of the Reorganized Parent on the Effective Date and the results of operations of the 2U Group after the Effective Date. In order to preserve the potential to qualify for the 382(l)(5) Exception, the Debtors intend to file the NOL Motion on the Petition Date or soon thereafter seeking interim and final orders establishing certain procedures with respect to the ownership and transfers of Unsecured Notes Claims. However, it is uncertain whether the consummation of the Plan will satisfy all of the requirements of the 382(l)(5) Exception, as such determination will depend on several factors, including the extent to which holders of the Unsecured Notes Claims immediately prior to consummation of the Plan may be treated as qualified creditors of 2U, Inc. for purposes of section 382(l)(5) of the Tax Code and whether the stockholders and qualified creditors of 2U, Inc. will be treated as receiving at least 50% of the stock (by vote and value) of 2U, Inc. as a result of being creditors or direct or indirect shareholders of 2U, Inc. Furthermore, even if the Plan satisfies the requirements of section 382(l)(5) of the Tax Code, the Debtors may elect not to apply the 382(l)(5) Exception, in which case, the 2U Group's Pre-Change Losses remaining after reduction for excluded COD income arising during the recognition period may be subject to an annual limitation pursuant to the rules described above.

## C.    CONSEQUENCES TO HOLDERS OF CLAIMS

Except as otherwise discussed herein, the summary below generally assumes that holders of the applicable Claims will, each as a class, vote to accept the Plan. As used herein, the term "U.S. Holder" means a beneficial owner of First Lien Claims or Unsecured Notes Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

A "Non-U.S. Holder" is a beneficial owner of First Lien Claims or Unsecured Notes Claims that is neither a U.S. Holder nor an entity or arrangement classified as a partnership for U.S. federal income tax purposes.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds such First Lien Claims, Unsecured Notes Claims, or Existing Equity Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner-level. Each U.S. Holder that is a partnership or a partner in a partnership holding any of such instruments should consult its tax advisor.

139

**1.  U.S. Holders of First Lien Claims or Unsecured Notes Claims**

(a)  <u>U.S. Holders of First Lien Claims—Recognition of Gain or Loss</u>

Pursuant to the Plan, a holder of Allowed First Lien Claims will receive in satisfaction of its Claims its Pro Rata share of the Amended and Restated Loans, as more fully described in the Plan.

Under applicable Treasury Regulations, the modification of the terms of a debt instrument (including pursuant to an exchange of a new debt instrument for the existing debt instrument) generally is a significant modification if, based on all of the facts and circumstances and taking into account all modifications of the debt instrument, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." A modification that changes the timing of payments due under a debt instrument is a significant modification if it results in a material deferral of scheduled payments. However, a deferral of one or more scheduled payments is not a material deferral if it is within a safe-harbor period beginning on the original due date of the first scheduled payment that is deferred and extending for a period equal to the lesser of five (5) years and fifty percent (50%) of the original term of the instrument. A change in the yield of a debt instrument is a significant modification if the yield of the modified instrument (as computed under the applicable Treasury Regulations) varies from the annual yield of the unmodified instrument (determined as of the date of the modification) by more than the greater of (i) twenty-five basis points (0.25%) or (ii) five percent (5%) of the annual yield of the unmodified instrument.

The Debtors' analysis of whether the exchange of Allowed First Lien Claims pursuant to the Plan constitutes an "exchange" for U.S. federal income tax purposes is ongoing, and the Reorganized Parent's determination will be provided to holders of Allowed First Lien Claims on or before the forty-fifth (45th) day following the Effective Date. The following summary discusses certain U.S. federal income tax consequences if the exchange of Allowed First Lien Claims pursuant to the Plan constitutes an "exchange" of such Claims for the Amended and Restated Loans.

If the exchange of Allowed First Lien Claims constitutes an "exchange" for U.S. federal income tax purposes, each U.S. Holder of Allowed First Lien Claims would realize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the Amended and Restated Loans received in respect of the Claims and (ii) the sum of the U.S. Holder's adjusted tax basis in the Claims exchanged therefor. Whether a U.S. Holder of Allowed First Lien Claims would recognize any such realized gain or loss would depend on whether the receipt of the Amended and Restated Loans in exchange for such Claims constitutes a taxable exchange or a tax-deferred (or partially tax-deferred) exchange for such holder, which would in part depend on whether both the Claims surrendered and the Amended and Restated Loans received in the exchange constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the

140

most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Although not free from doubt, the Debtors currently intend to take the position that the loans under the First Lien Credit Agreement (the "*First Lien Loans*") do not constitute securities.  Each holder of a First Lien Claim is urged to consult its tax advisor regarding the appropriate status for U.S. federal income tax purposes of such a Claim and of the Amended and Restated Loans.

If the exchange of Allowed First Lien Claims constitutes an "exchange" for U.S. federal income tax purposes and such exchange is a taxable transaction to a U.S. Holder, such U.S. Holder would recognize all realized gain or loss and would have a tax basis in the Amended and Restated Loans equal to the issue price of such instruments for U.S. federal income tax purposes, and the holding period in the Amended and Restated Loans would commence on the day following the Effective Date.  If the exchange of Allowed First Lien Claims constitutes an "exchange" for U.S. federal income tax purposes and such exchange is a tax-deferred transaction to a U.S. Holder, such U.S. Holder generally would not recognize any gain or loss and would have tax basis in the Amended and Restated Loans equal to the adjusted tax basis in the Allowed First Lien Claims exchanged therefor, and the U.S. Holder's holding period in the Amended and Restated Loans received as part of the tax-deferred exchange generally would include the period the U.S. Holder held its Allowed First Lien Claims.

For a discussion as to the possible recognition of accrued interest income and original issue discount ("*OID*") in connection with an exchange of Allowed First Lien Claims and related tax basis and holding period considerations, see "—Distributions with Respect to Accrued But Unpaid Interest or OID" below.

### (b)    U.S. Holders of Unsecured Notes Claims—Recognition of Gain or Loss

Pursuant to the Plan, a holder of Allowed Unsecured Notes Claims will receive in satisfaction of its Claims (i) its Pro Rata share of the New Common Interests and (ii) the Rights, as more fully described in the Plan.

Each U.S. Holder of Allowed Unsecured Notes Claims should realize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market values of the New Common Interests and Rights received in respect of the Claim and (ii) the U.S. Holder's adjusted tax basis in the Claims exchanged therefor.  Whether a U.S. Holder of Allowed Unsecured Notes Claims will recognize any such realized gain or loss will depend on whether the receipt of the New Common Interests and Rights in exchange for such Claims constitutes a taxable exchange or a tax-deferred (or partially tax-deferred) exchange for such holder, which will depend on whether the Claims surrendered in the exchange constitutes "securities" for U.S. federal income tax purposes.  As discussed above, the term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  See "—U.S. Holders of First Lien Claims—Recognition of Gain or Loss" above.  Accordingly, although not free from doubt, the Debtors currently intend to take the position that the 2025 Notes (with a term in excess of five (5) years) and the 2030 Notes (with a term in excess of seven (7) years) constitute

141

securities.  Each holder of an Unsecured Notes Claim is urged to consult its tax advisor regarding the appropriate status for U.S. federal income tax purposes of such a Claim.

Also, unless otherwise indicated, the discussion below assumes that the Rights are treated for U.S. federal income tax purposes as options to acquire New Common Interests, but see "—Rights to Participate in the Equity Rights Offering" below for a more complete discussion.  A right to acquire stock generally can also be treated as a "security."  Accordingly, the Rights should constitute "securities" of Reorganized Parent and, unless otherwise indicated, the discussion herein assumes that the Rights are treated as "securities" for U.S. federal income tax purposes.

If the exchange of Allowed Unsecured Notes Claims constitutes a tax-deferred transaction to a U.S. Holder, such U.S. Holder generally would not recognize any gain or loss, and the U.S. Holder's holding period in the New Common Interests and Rights received as part of the tax-deferred exchange generally would include the period the U.S. Holder held its Allowed Unsecured Notes Claims.  If the exchange of Allowed Unsecured Notes Claims constitutes a taxable transaction to a U.S. Holder, such U.S. Holder should recognize all realized gain or loss and should have a tax basis in the New Common Interests and Rights equal to the fair market value of the New Common Interests and such Rights on the Effective Date, and the holding period in the New Common Interests and such Rights should commence on the day following the Effective Date.

For a discussion as to the possible recognition of accrued interest income and OID in connection with an exchange of Allowed Unsecured Notes Claims and related tax basis and holding period considerations, see "Distributions with Respect to Accrued But Unpaid Interest or OID" below.

### (c)  Ownership and Disposition of Amended and Restated Loans

The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered "traded on an established market" ("*publicly traded*").  If the Amended and Restated Loans are treated as "publicly traded" for U.S. federal income tax purposes, the "issue price" of the Amended and Restated Loans will be the fair market value of the Amended and Restated Loans as of their issue date.  If the First Lien Loans are, but the Amended and Restated Loans exchanged therefor are not, treated as publicly traded for U.S. federal income tax purposes, then the issue price of the Amended and Restated Loans received in exchange for the First Lien Loans will be the fair market value of the First Lien Loans, as determined on the issue date of the Amended and Restated Loans.  If neither the First Lien Loans nor the Amended and Restated Loans exchanged therefor are treated as publicly traded, then the issue price of the Amended and Restated Loans issued in exchange for the First Lien Loans will be the principal amount of the Amended and Restated Loans.

The Amended and Restated Loans will be considered to be publicly traded if, at any time during the thirty-one-day period ending fifteen days after their issue date, such loans are traded on an "established market."  The Amended and Restated Loans will be considered to trade on an established market if (i) there is a price for an executed purchase or sale of the Amended and Restated Loans that is reasonably available within a reasonable period of time after the sale, (ii) there is at least one price quote for the Amended and Restated Loans from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the

price for which the person receiving the quoted price could purchase or sell the Amended and Restated Loans (a "*firm quote*"), or (iii) there is at least one price quote for the Amended and Restated Loans, other than a firm quote, available from at least one such broker, dealer or pricing service.

Under the applicable Treasury Regulations, the Debtors may be required to make a determination as to whether the First Lien Loans or the Amended and Restated Loans are publicly traded and their "issue price," and to make such determinations available to U.S. Holders in a commercially reasonable fashion, including by electronic publication, within ninety days of the issue date of the Amended and Restated Loans. These Treasury Regulations provide that each of these determinations is binding on a holder unless the holder satisfies certain conditions. Because the relevant trading period for determining whether the Amended and Restated Loans are publicly traded and the issue price of the Amended and Restated Loans has not yet occurred, the Debtors are unable to determine the issue price of the Amended and Restated Loans at this time.

Payments of qualified stated interest on an Amended and Restated Loan generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes. Qualified stated interest generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate. The stated interest on the Amended and Restated Loans is expected to be treated as qualified stated interest.

The Amended and Restated Loans will be treated as issued (or deemed reissued) with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" exceeds their "issue price" by an amount equal to or more than a statutorily defined de minimis amount (generally, 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated redemption price at maturity" of the Amended and Restated Loans is the total of all payments to be made under the Amended and Restated Loans other than qualified stated interest.

If the Amended and Restated Loans were treated as having been issued (or deemed reissued) with more than *de minimis* OID, U.S. Holders would be required to include the OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes, subject to reduction in the case of any acquisition premium. A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held the Amended and Restated Loans during the taxable year. To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period. An accrual period may be of any length and the length of the accrual periods may vary over the life of the Amended and Restated Loans, provided that no accrual period may be longer than one (1) year and each scheduled payment of interest or principal on the Amended and Restated Loans must occur on either the first (1st) day or last day of an accrual period. The amount of OID allocable to an accrual period will equal (a) the product of (i) the Amended and Restated Loan's adjusted issue price at the beginning of the accrual period and (ii) the Amended and Restated Loan's yield to maturity (adjusted to reflect the length of the accrual period), less (b) any qualified stated interest allocable to the accrual period.

It is possible that the Amended and Restated Loans may be required to be treated as a contingent payment debt instrument (a "***CPDI***") that is subject to the regulations governing such instruments (the "***CPDI Regulations***").  The Debtors have not sought any rulings from the IRS or opinion of counsel with respect to the application of the CPDI Regulations to the Amended and Restated Loans and do not currently intend Reorganized Parent to treat the Amended and Restated Loans as CPDIs for tax reporting purposes, but if the Amended and Restated Loans were to be treated as CDPIs, that could significantly affect the amount, timing and character of income, gain or loss in respect of an investment in the Amended and Restated Loans.  In particular, a U.S. Holder might be required to include OID in income at a different rate, and might recognize ordinary income or loss upon a taxable disposition of the Amended and Restated Loans.  U.S. Holders should consult their tax advisors concerning the consequences of the treatment of the Amended and Restated Loans as CPDIs.  The balance of this disclosure assumes that the Amended and Restated Loans will not be treated as CPDIs.

### (d)    Ownership and Disposition of New Common Interests

If Reorganized Parent makes cash distributions with respect to the New Common Interests, the distributions generally will be includible as ordinary dividend income on the day on which the dividends are actually or constructively received by a U.S. Holder to the extent of the Reorganized Parent's current and accumulated earnings and profits, as determined under U.S. federal income tax principles.  To the extent the amount of any such distribution exceeds such current and accumulated earnings and profits, the excess will be treated as a non-taxable return of capital to the extent, and in reduction, of the U.S. Holder's adjusted tax basis in the New Common Interests, and as gain from the sale or exchange of such equity to the extent it exceeds the U.S. Holder's adjusted tax basis.  Non-corporate U.S. Holders may be eligible for reduced rates of taxation on dividends.  Dividends paid to corporate U.S. Holders that meet certain holding period and other requirements may be eligible for a dividends received deduction.

U.S. Holders generally will recognize gain or loss upon the sale or taxable disposition of the New Common Interests in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in the New Common Interests exchanged and (ii) the sum of the cash and the fair market value of any property received in such disposition.  Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Interests exceeds one (1) year at the time of the sale or exchange.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital losses is subject to limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Common Interests received in exchange for an Unsecured Notes Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

144

### (e)       Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder in an exchange of Allowed Claims pursuant to the Plan, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of such U.S. Holder, whether the Claims constitute capital assets in the hands of such U.S. Holder and how long they have been held, whether the Claims were acquired at a market discount, and whether and to what extent the holder previously claimed a worthlessness deduction with respect to the Claims.  In general, any gain or loss generally should be long-term capital gain or loss if the U.S. Holder held the Claims, as applicable, as capital assets and such U.S. Holder's holding period in the Claims is more than one (1) year at the time of the relevant exchange.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital losses is subject to limitations.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  In general, a debt instrument is considered to have been acquired with market discount if the holder's adjusted tax basis in the debt instrument is less than (i) its "stated redemption price at maturity" (which generally would be equal to the stated principal amount if all stated interest was required to be paid in cash or property at least annually) or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by more than a de minimis amount.  Under these rules, any gain recognized on the exchange of Claims (which, as discussed below, does not include amounts received in respect of accrued but unpaid interest or OID, if any) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless such U.S. Holder elected to include the market discount in income as it accrued.  If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts should become deductible at the time of the exchange.  To the extent that Claims acquired with a market discount are exchanged in a tax-deferred transaction for other property, any market discount that accrued on such Claims but was not recognized by the U.S. Holder generally is carried over to the property received therefor, and any gain recognized on the subsequent sale or other disposition of the property generally is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to such Claims.  U.S. Holders who acquired their Claims other than at original issuance should consult their tax advisors regarding the possible application of the market discount rules.

### (f)       Distributions with Respect to Accrued But Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of Allowed Claims is received in satisfaction of interest accrued or OID accrued, in each case during such U.S. Holder's holding period, such amount will be taxable to the U.S. Holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under such U.S. Holder's normal method of accounting).  Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  It is unclear whether a U.S. Holder would be required to

recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.  In addition, tax basis in the consideration received by a U.S. Holder pursuant to the Plan in satisfaction of interest accrued or OID accrued generally will be equal to the fair market value of such consideration, and such U.S. Holder's holding period in such consideration should commence on the day following the Effective Date.

Article VI.I. of the Plan provides that distributions to U.S. Holders with respect to any Allowed Claim will, to the extent permitted by applicable law, be allocated first to the principal amount of such Allowed Claims, with any excess allocated to the remaining portion of such Allowed Claim.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

### (g)      Rights to Participate in the Equity Rights Offering

The characterization of a Right and its subsequent exercise for U.S. federal income tax purposes—as the exercise of an option to acquire New Common Interests or, alternatively, as an integrated transaction pursuant to which a portion of the underlying New Common Interests are acquired directly in partial satisfaction of a holder's Claim—is uncertain.  As indicated, the discussion herein generally assumes that a Right is respected as an option to acquire New Common Interests.

Regardless of the characterization of a Right, a U.S. Holder of an Allowed Unsecured Notes Claim generally would not recognize any gain or loss upon the exercise of such Right.  A U.S. Holder's aggregate tax basis in the New Common Interests received upon exercise of a Right should be equal to the sum of (i) the amount paid for the New Common Interests and (ii) the holder's tax basis, if any, in either (a) the Right, or (b) under an integrated transaction analysis, any New Common Interests received pursuant to the exercise of a Right to the extent the New Common Interests are treated as directly acquired in partial satisfaction of the holder's Claim.  A U.S. Holder's holding period in the New Common Interests received upon exercise of a Right (that is respected as an option) generally should commence the day following the Effective Date.  Under an integrated transaction analysis, a U.S. Holder's holding period in the portion of New Common Interests received in respect of its Claim would be determined as described under "—U.S. Holders of Unsecured Notes Claims—Recognition of Gain or Loss" above, whereas the holding period for New Common Interests treated as purchased for Cash should commence the day following the Effective Date.

It is uncertain whether a U.S. Holder that receives but does not exercise a Right should be treated as receiving anything of additional value in respect of its Claim.  If the U.S. Holder is treated as having received a Right of value (despite its subsequent lapse), such that it obtains a tax basis in the Right, the U.S. Holder generally would recognize a loss upon lapse of the Right to the extent of the U.S. Holder's tax basis in the Right.  In general, such loss would be a capital loss, long-term or short-term, depending on whether the requisite holding period was satisfied (which,

146

in the case of an exchange for an Allowed Unsecured Notes Claim that qualifies for reorganization treatment, even if the right goes unexercised, should include the holding period of the Claim exchanged therefor).

### 2. Non-U.S. Holders of First Lien Claims, Unsecured Notes Claims

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders and the ownership and disposition of any consideration received pursuant to or in connection with the Plan.

### (a)   Recognition of Gain or Loss

Whether a Non-U.S. Holder of First Lien Claims or Unsecured Notes Claims recognizes gain or loss on the exchange of Claims pursuant to the Plan or upon a subsequent disposition of the consideration received under the Plan, as well as the amount of such gain or loss, is determined in the same manner as set forth above in connection with U.S. Holders of the applicable Claims. See "—U.S. Holders of First Lien Claims—Recognition of Gain or Loss" and "—U.S. Holders of Unsecured Notes Claims—Recognition of Gain or Loss" above. Any gain recognized (which, as discussed above, does not include amounts received in respect of accrued but unpaid interest or OID, if any) by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for one hundred and eighty-three (183) days or more during the taxable year in which the gain is realized and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if required by an income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) solely with respect to the sale, exchange or other disposition of the New Common Interests, such New Common Interests constitute a U.S. real property interest ("*USRPI*") by reason of Reorganized Parent's status as a "United States real property holding corporation" ("*USRPHC*") for U.S. federal income tax purposes at any time within the shorter of the five (5)-year period preceding such disposition or the period in which the Non-U.S. Holder held the New Common Interests.

If the exception in clause (i) above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of thirty percent (30%) (or such lower rate under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year. If the exception in clause (ii) above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder with respect to such gain. In addition, if such a Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to thirty percent (30%) (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

If the exception in clause (iii) above applied and certain other requirements were met, a Non-U.S. Holder generally would be subject to U.S. federal income tax on any gain recognized on the sale or disposition of all or a portion of its New Common Interests. The Debtors do not believe that 2U, Inc. is nor has been a USRPHC. Because the determination of whether 2U, Inc. or Reorganized Parent is a USRPHC depends on the fair market value of its USRPIs relative to the fair market value of its non-U.S. real property interests and its other business assets, there can be no assurance 2U, Inc. currently is not a USRPHC or that 2U, Inc. or Reorganized Parent will not become one in the future. Even if 2U, Inc. is or 2U, Inc. or Reorganized Parent were to become a USRPHC, gain arising from the sale or other taxable disposition of New Common Interests by a Non-U.S. Holder will not be subject to U.S. federal income tax if the New Common Interests are "regularly traded," as defined by applicable Treasury Regulations, on an established securities market and such Non-U.S. Holder owned, actually and constructively, five percent (5%) or less of New Common Interests throughout the shorter of the five (5)-year period ending on the date of the exchange or other taxable disposition and, in each case, the Non-U.S. Holder's holding period.

### (b)    Ownership and Disposition of Amended and Restated Loans

Generally, payments to a Non-U.S. Holder that are attributable to interest on applicable Amended and Restated Loans (including, for purposes of this discussion of Non-U.S. Holders, any OID) that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income or withholding tax, provided that:

- the Non-U.S. Holder does not actually or constructively own ten percent (10%) or more of the total combined voting power of all classes of voting stock of Reorganized Parent;

- the Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Tax Code) with respect to Reorganized Parent; and

- either (1) the Non-U.S. Holder certifies in a statement provided to the applicable withholding agent under penalties of perjury that it is not a United States person and provides its name and address; (2) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the Amended and Restated Loans on behalf of the Non-U.S. Holder certifies to the applicable withholding agent under penalties of perjury that it, or the financial institution between it and the Non-U.S. Holder, has received from the Non-U.S. Holder a statement under penalties of perjury that such holder is not a United States person and provides a copy of such statement to the applicable withholding agent; or (3) the Non-U.S. Holder holds the Amended and Restated Loans directly through a "qualified intermediary" (within the meaning of applicable Treasury Regulations) and certain conditions are satisfied.

A Non-U.S. Holder that does not qualify for the above exemption with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax on such interest at a thirty percent (30%) rate, unless such Non-U.S. Holder is entitled to a

148

reduction in or exemption from withholding on such interest as a result of an applicable income tax treaty. To claim such entitlement, the Non-U.S. Holder generally must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax on such payments of interest under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If interest paid to a Non-U.S. Holder is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such interest is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), the Non-U.S. Holder generally will not be subject to U.S. federal withholding tax but will be subject to U.S. federal income tax with respect to such interest in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in the United States. See "—Non-U.S. Holders of First Lien Claims or Unsecured Notes Claims—Recognition of Gain or Loss" above. To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that interest paid on the Amended and Restated Loans is not subject to withholding tax because it is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

### (c)    Ownership and Disposition of New Common Interests

Distributions on New Common Interests will generally constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Parent's current year earnings and profits and earnings and profits accumulated as of the end of the prior year, as determined under U.S. federal income tax principles. To the extent the amount of any such distribution exceeds such current and accumulated earnings and profits, the excess will be treated as a non-taxable return of capital to the extent, and in reduction, of the Non-U.S. Holder's adjusted tax basis in the equity and as gain from the sale or exchange of such equity to the extent such excess exceeds the U.S. Holder's adjusted tax basis. Dividends paid to a Non-U.S. Holder of New Common Interests will generally be subject to withholding of U.S. federal income tax at a thirty percent (30%) rate or such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) are not subject to withholding, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the Non-U.S. Holder were a U.S. Holder. Any such effectively connected dividends received by a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may be subject to an additional branch profits tax at a thirty percent (30%) rate or such lower rate as may be specified by an applicable income tax treaty.

A Non-U.S. Holder of New Common Interests who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends,

will be required (a) to complete the applicable IRS Form W-8BEN or Form W-8BEN-E (or other applicable documentation) and certify under penalty of perjury that such holder is not a United States person and is eligible for treaty benefits or (b) if such equity is held through certain intermediaries, to satisfy the relevant certification requirements of applicable Treasury Regulations. Special certification and other requirements apply to certain Non-U.S. Holders that are passthrough entities rather than corporations or individuals. A Non-U.S. Holder of New Common Interests eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

For a discussion of the rules applicable to the recognition of gain or loss in connection with sales, exchanges or other dispositions of New Common Interests by Non-U.S. Holders, see "—Non-U.S. Holders of First Lien Claims or Unsecured Notes Claims—Recognition of Gain or Loss" above.

### 3. Information Reporting and Backup Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding and information reporting requirements. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" (currently at a rate of twenty-four percent (24%)) if a recipient of those payments fails to furnish to the payor certain identifying information, fails properly to report interest or dividends, and, under certain circumstances, fails to provide a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as certain corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders of Claims are urged to consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Claims are urged to consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

### 4. Additional Withholding Tax on Payments Made to Foreign Accounts

Withholding taxes may be imposed under sections 1471 to 1474 of the Tax Code (such sections, commonly referred to as the Foreign Account Tax Compliance Act ("*FATCA*")) on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a thirty percent (30%) withholding tax may be imposed on dividends or

interest or (subject to the proposed Treasury Regulations discussed below) gross proceeds from the sale or other disposition of stock or debt instruments, in each case paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Tax Code), unless (a) the foreign financial institution undertakes certain diligence and reporting obligations, (b) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (c) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules.  If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (a) above, it must enter into an agreement with the United States Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold thirty percent (30%) on certain payments to non-compliant foreign financial institutions and certain other account holders.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends or interest.  While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of such instruments on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely.  Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.  Holders should consult their tax advisors regarding the potential application of withholding under FATCA.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.  NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## <u>RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in the Voting Classes to vote in favor thereof.

Respectfully submitted,

2U, INC. (on behalf of itself and its Debtor affiliates)

By:      /s/ Matthew Norden

Name:      Matthew Norden

Title:      Chief Financial Officer and Chief Legal Officer

Prepared by:

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall Weber-Levine
Scott Yousey

*Proposed Counsel for the Debtors and Debtors in Possession*

## **<u>EXHIBIT A</u>**

Plan of Reorganization

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------------------- | x | |
| In re: | : | Chapter 11 |
| | : | |
| 2U, INC., *et al.*, | : | Case No. 24-[ ● ] ([ ● ]) |
| | : | |
| Debtors.[1] | : | (Joint Administration Pending) |
| | : | |
| ----------------------------------------------------------- | x | |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF 2U, INC.**
**AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**THIS PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

**TABLE OF CONTENTS**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, CONSENT
    RIGHTS, AND DEFINED TERMS ...................................................................1
    A.    Defined Terms ...............................................................................1
    B.    Rules of Interpretation; Computation of Time.................................16
    C.    Consent Rights.................................................................................17

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS............17
    A.    Administrative Claims ....................................................................17
    B.    DIP Claims .....................................................................................18
    C.    Priority Tax Claims.........................................................................18
    D.    United States Trustee Statutory Fees ..............................................19
    E.    Restructuring Fees and Expenses....................................................19

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
    AND INTERESTS.........................................................................................19
    A.    Summary ........................................................................................19
    B.    Classification and Treatment of Claims and Interests .....................20
    C.    Special Provision Governing Unimpaired Claims ...........................23
    D.    Vacant and Abstaining Classes........................................................23
    E.    Controversy Concerning Impairment...............................................23
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
        Bankruptcy Code ............................................................................23
    G.    Subordinated Claims.......................................................................23
    H.    Intercompany Interests and Intercompany Claims ...........................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .........................................24
    A.    Substantive Consolidation ..............................................................24
    B.    General Settlement of Claims and Interests.....................................24
    C.    Restructuring Transactions ..............................................................24
    D.    Continued Corporate Existence .......................................................25
    E.    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and
        Claims ...........................................................................................25
    F.    Amended and Restated Credit Documents .......................................26
    G.    Exit Facility Documents ..................................................................26
    H.    Equity Rights Offering.....................................................................27
    I.    New Common Interests.....................................................................28
    J.    New Common Interests Documents ..................................................28
    K.    MIP ...............................................................................................28
    L.    Exemption from Securities Laws......................................................28
    M.    Release of Liens and Claims............................................................29
    N.    New Corporate Governance Documents ..........................................29
    O.    Directors and Officers of the Reorganized Debtors..........................30
    P.    Corporate Action.............................................................................30
    Q.    Cancellation of Existing Agreements and Interests ..........................31
    R.    Sources of Consideration for Plan Distributions ..............................32

S.      Authority of the Debtors ...................................................................33
T.      Continuing Effectiveness of Final Orders..........................................33
U.      Transfers .............................................................................................33

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES...........................................................................................................33
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ..........33
B.      Cure of Defaults; Assumption of Executory Contracts and Unexpired
        Leases...................................................................................................34
C.      Claims Based on Rejection of Executory Contracts and Unexpired Leases .........35
D.      Contracts and Leases Entered into After the Petition Date....................................35
E.      Directors and Officers Insurance Policies...........................................35
F.      Other Insurance Contracts...................................................................36
G.      Indemnification Provisions and Reimbursement Obligations ..............................36
H.      Employee Compensation and Benefit Programs .................................37
I.      Workers' Compensation Programs .......................................................37
J.      Extension of Time to Assume or Reject ..............................................37

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................38
A.      Timing and Calculation of Amounts to Be Distributed .......................................38
B.      Disbursing Agent. ...............................................................................38
C.      Rights and Powers of Disbursing Agent...............................................38
D.      Special Rules for Distributions to Holders of Disputed Claims and
        Disputed Interests................................................................................39
E.      Delivery of Distributions .....................................................................39
F.      Means of Cash Payment.......................................................................40
G.      No Postpetition Interest on Claims ......................................................41
H.      Compliance with Tax Requirements.....................................................41
I.      Allocation of Plan Distributions Between Principal and Interest ........................41
J.      Setoffs .................................................................................................42

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED
        AND DISPUTED CLAIMS OR INTERESTS................................................42
A.      Resolution of Disputed Claims ...........................................................42
B.      No Distributions Pending Allowance ..................................................43
C.      Distributions After Allowance .............................................................43
D.      Adjustment to Claims Without Objection.............................................44
E.      Disallowance of Claims or Interests ....................................................44

ARTICLE VIII. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ........44
A.      Conditions Precedent to the Effective Date. ........................................44
B.      Waiver of Conditions...........................................................................45
C.      Effect of Non-Occurrence of Conditions to Confirmation or
        Consummation ....................................................................................46

ARTICLE IX. RELEASE, DISCHARGE, INJUNCTION AND RELATED
PROVISIONS ...................................................................................................46
    A.    Discharge of Claims and Termination of Interests ..............................46
    B.    Release by the Debtors........................................................................47
    C.    Releases by Holders of Claims and Interests.....................................48
    D.    Waiver of Statutory Limitations on Releases .....................................49
    E.    **Exculpation**.........................................................................................50
    F.    Preservation of Causes of Action........................................................50
    G.    **Injunction**..........................................................................................51
    H.    Protection Against Discriminatory Treatment ....................................51
    I.    Integral Part of Plan ...........................................................................52

ARTICLE X. RETENTION OF JURISDICTION .......................................................52

ARTICLE XI. MISCELLANEOUS PROVISIONS.......................................................53
    A.    Immediate Binding Effect...................................................................53
    B.    Substantial Consummation .................................................................54
    C.    Payment of Statutory Fees; Post-Effective Date Fees and Expenses ...................54
    D.    Conflicts.............................................................................................54
    E.    Modification of Plan ...........................................................................54
    F.    Revocation or Withdrawal of Plan......................................................54
    G.    Successors and Assigns.......................................................................55
    H.    Reservation of Rights..........................................................................55
    I.    Further Assurances..............................................................................55
    J.    Severability ........................................................................................55
    K.    Service of Documents .........................................................................56
    L.    Exemption from Stamp or Similar Taxes Pursuant to Section 1146(a) of
the Bankruptcy Code..........................................................................57
    M.    Governing Law ...................................................................................57
    N.    Tax Reporting and Compliance ..........................................................58
    O.    Schedules ...........................................................................................58
    P.    No Strict Construction ........................................................................58
    Q.    Entire Agreement ...............................................................................58
    R.    Closing of Chapter 11 Cases...............................................................58
    S.    Votes Solicited in Good Faith.............................................................58
    T.    2002 Notice Parties ............................................................................59

## JOINT PREPACKAGED PLAN OF REORGANIZATION OF 2U, INC.
## AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

2U, Inc. and each of the other debtors and debtors-in-possession in the above-captioned cases (collectively, the "**_Debtors_**") jointly propose this Plan for the treatment and resolution of the outstanding Claims against, and Interests in, the Debtors. Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in Article I.

Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the treatment and resolution of outstanding Claims against, and Interests in each Debtor pursuant to the Bankruptcy Code. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. This Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan. There also are other agreements and documents, which shall be filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement, or the Disclosure Statement as exhibits and schedules. All such exhibits and schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan before its substantial consummation.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

# ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, CONSENT RIGHTS, AND DEFINED TERMS

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

"*2025 Notes*" means 2U, Inc.'s 2.25% Convertible Senior Notes due 2025 issued pursuant to the 2025 Notes Indenture.

"*2025 Notes Indenture*" means that certain Indenture, dated as of April 23, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between 2U, Inc., as issuer, and the Unsecured Notes Indenture Trustee, as trustee.

"*2030 Notes*" means 2U, Inc.'s 4.50% Senior Unsecured Convertible Notes due 2030 issued pursuant to the 2030 Notes Indenture.

"*2030 Notes Indenture*" means that certain Indenture, dated as of January 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between 2U, Inc., as issuer, and the Unsecured Notes Indenture Trustee, as trustee.

"*A&R First Lien Agent*" means Alter Domus (US) LLC, or its duly appointed successor, in its capacity as administrative agent and collateral agent under the Amended and Restated Credit Agreement.

"*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

"*Ad Hoc Noteholder Group*" means that certain ad hoc group of Holders of Unsecured Notes Claims represented by the Ad Hoc Noteholder Group Advisors.

"*Ad Hoc Noteholder Group Advisors*" means Weil, Gotshal & Manges LLP, Houlihan Lokey Capital, Inc., and such other professional advisors as are retained by the Ad Hoc Noteholder Group with the prior written consent of the Debtors.

"*Administrative Claim*" means a Claim (other than a DIP Claim) for costs and expenses of administration of these Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Debtors' Estates and operating businesses; (ii) Allowed Professional Fee Claims; (iii) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (iv) Independent Director Fee Claims.

"*Affiliate*" means with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") as used with respect to any Entity, shall mean the

possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"*Agents/Trustees*" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the First Lien Credit Documents, the Unsecured Notes Documents, and the DIP Documents, including any successors thereto and including, without limitation, the First Lien Agent, the Unsecured Notes Indenture Trustee, and the DIP Agent.

"*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (i) except with respect to any Claim arising from the rejection of Unexpired Leases by the Debtors, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (ii) the Debtors may affirmatively deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

"*Amended and Restated Credit Agreement*" means that certain *Amended and Restated Credit Agreement*, to be entered into as of the Effective Date, by and between the applicable Reorganized Debtors, the Holders of First Lien Claims, and the administrative agent thereunder (including all appendices, exhibits, schedules, and supplements thereto), which shall amend and restate the First Lien Credit Agreement in its entirety and shall be consistent with the terms of the Amended and Restated Credit Agreement Term Sheet.

"*Amended and Restated Credit Agreement Term Sheet*" means the term sheet setting forth the terms and conditions of the Amended and Restated Credit Agreement, attached as Annex 2 to the Restructuring Term Sheet.

"*Amended and Restated Credit Documents*" means the Amended and Restated Credit Agreement together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, amended and restated, or otherwise modified from time to time, necessary to effectuate the incurrence of the Amended and Restated Credit Facility.

"*Amended and Restated Credit Facility*" means a new financing facility consisting of the Amended and Restated Loans.

"*Amended and Restated Loans*" means $414,300,000 in new first lien term loans to be extended under the Amended and Restated Credit Facility.

"*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid or recover a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

2

"***Brooklyn Lease***" means the Agreement of Lease, dated February 13, 2017, by and between Brooklyn Lessor and 2U NYC, LLC (as amended by the First Amendment to Lease, dated June 3, 2021, and as may be further amended, supplemented, or modified from time to time).

"***Brooklyn Lessor***" means RFR/K 55 Prospect Owner LLC.

"***Business Day***" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by Law or executive order.

"***Cash***" means the legal tender of the United States of America.

"***Cash Collateral***" shall have the meaning set forth in the DIP Orders.

"***Causes of Action***" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims against, or Interests in, a Debtor; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any state law fraudulent transfer claim; and (vi) any Avoidance Actions.

"***Chapter 11 Case(s)***" means (i) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court, and (ii) when used with reference to all Debtors, the jointly administered cases for all Debtors.

"***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"***Class***" means a category of Holders of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

"***CM/ECF***" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"***Combined Hearing***" means the combined hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (i) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code and (ii) confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"***Combined Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

"***Confirmation***" means the occurrence of the Confirmation Date.

3

"***Confirmation Date***" means the date on which the Bankruptcy Court enters the Combined Order.

"***Consenting Creditor Advisors***" means, collectively the Consenting Noteholder Advisors and the First Lien Ad Hoc Group Advisors.

"***Consenting First Lien Lenders***" means the Holders of First Lien Claims that are signatories to the Restructuring Support Agreement, in their capacities as such.

"***Consenting Noteholder Advisors***" means, collectively, the Ad Hoc Noteholder Group Advisors and the Greenvale Advisors.

"***Consenting Noteholders***" means Holders of certain of the outstanding Unsecured Notes Claims that are parties to the Restructuring Support Agreement, in their capacities as such.

"***Consenting Stakeholders***" means, collectively, the Consenting First Lien Lenders and the Consenting Noteholders.

"***Consummation***" means the occurrence of the Effective Date.  "Consummated" shall have the correlative meaning.

"***Cure Claim***" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

"***D&O Liability Insurance Policies***" means all insurance policies (including, without limitation, the D&O Tail Policy, any general liability policies, any errors and omissions policies, and, in each case, any agreements, documents, or instruments related thereto) issued at any time and providing coverage for liability of any Debtor's directors, managers, officers, and proxyholders.

"***D&O Tail Policy***" means that certain directors' & officers' liability insurance policy purchased by the Debtors before the Petition Date.

"***Debtor Release***" means the releases given by the Debtors to the Released Parties in <u>Article IX.B</u>.

"***Definitive Documents***" means, collectively: (i) the Plan and the Plan Supplement; (ii) the Disclosure Statement and the Solicitation Materials, and any motion seeking approval of, and any notices related to, the foregoing; (iii) the Solicitation Procedures Order; (iv) the Combined Order; (v) the DIP Documents; (vi) the New Common Interests Documents; (vii) the Amended and Restated Credit Documents; (viii) the New Corporate Governance Documents; (ix) the First Day Orders; (x)  the Lease Rejection Order; (xi) the Exit Facility Documents; and (xii) any other agreement, document, instrument, pleading and/or order entered or entered into, or utilized, in connection with or to implement the Restructuring Transactions (together with any exhibit, amendment, modification or supplement thereto).

"***DIP Agent***" means the "Administrative Agent" and the "Collateral Agent" (each, as defined in the DIP Credit Agreement), solely in their capacities as administrative agent and collateral agent under the DIP Credit Agreement, their successors, assigns, or any replacement agents appointed pursuant to the terms of the DIP Credit Agreement.

"***DIP Claim***" means any Claim held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for

4

all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents.

"***DIP Commitments***" means the commitments in respect of the DIP Facility.

"***DIP Credit Agreement***" means that certain *Debtor-in-Possession* C*redit and Guaranty Agreement* to be entered by and among 2U, Inc., as borrower, the guarantors party thereto, the DIP Agent, and the DIP Lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms) in respect of the DIP Facility.

"*DIP Documents*" means the DIP Credit Agreement, the other "Credit Documents" as defined in the DIP Credit Agreement, the DIP Orders, and any other agreement, document and/or instrument entered or entered into in connection with any of the foregoing.

"*DIP Facility*" means a postpetition secured, multi-draw, junior lien debtor-in-possession financing facility, in an aggregate principal amount of up to $64,000,000.00 on the terms of and subject to the conditions set forth in the DIP Credit Agreement.

"***DIP Lenders***" means the lenders from time to time party to the DIP Credit Agreement.

"***DIP Loans***" means the loans made under the DIP Facility.

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***Disbursing Agent***" means the Reorganized Debtors or any party designated by the Reorganized Debtors, to serve as disbursing agent under this Plan.

"***Disclosure Statement***" means the disclosure statement in respect of the Plan, including all exhibits, schedules, supplements, modifications, amendments, annexes and attachments thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Disputed***" means any Claim or an Interest, or any portion thereof, that has not been Allowed but has not been disallowed pursuant to this Plan or a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

"***Distribution Record Date***" means, other than with respect to publicly held securities, the date for determining which Holders of Claims are eligible to receive distributions under this Plan, which date shall be the Effective Date, subject to Article VI.E of this Plan.  For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions, if any, in accordance with the applicable procedures of DTC.

"***DTC***" means The Depository Trust Company.

"***Effective Date***" means the date that is a Business Day on which (i) no stay of the Combined Order is in effect and (ii) all conditions precedent to the effectiveness or consummation of this Plan specified in Article VIII have been satisfied or waived in accordance with the terms of Article VIII of this Plan.

"***Employee Compensation and Benefit Programs***" means, collectively, all employment agreements and severance policies, and all employment, compensation and benefit plans, retention plans, and programs of the Debtors applicable to any of their respective employees or retirees, and any of the employees or retirees of their respective subsidiaries, including, without limitation, all workers'

5

compensation programs, savings plans, retirement plans, deferred compensation plans, healthcare plans, disability plans, severance plans, incentive plans, life, and accidental death and dismemberment insurance plans, health and welfare plans, 401(k) plans, and pension plans.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Equity Rights Offering***" means that certain equity rights offering to be consummated by the Reorganized Parent on the Effective Date in accordance with the Equity Rights Offering Documents, pursuant to which the Reorganized Parent shall issue rights to purchase New Common Interests for an aggregate purchase price equal to the Equity Rights Offering Amount at the Plan Discount.

"***Equity Rights Offering Amount***" means an amount equal to $46,500,000, subject to increase with the consent of the Debtors and the Required Consenting Noteholders.

"***Equity Rights Offering Backstop Commitment***" means the Equity Rights Offering Backstop Parties' commitments to purchase up to the full Equity Rights Offering Amount (less the amount to be subscribed for by the Equity Rights Offering Backstop Parties in the Equity Rights Offering in their capacity as Holders of Unsecured Notes Claims) of the New Common Interests at the Plan Discount, pursuant to the terms of the Equity Rights Offering Procedures and in accordance with the Equity Rights Offering Backstop Commitment Letter.

"***Equity Rights Offering Backstop Commitment Letter***" means that certain backstop commitment letter, dated as of July 24, 2024, entered into by 2U, Inc. and the Equity Rights Offering Backstop Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms and the terms of the Restructuring Support Agreement, and approved by the Bankruptcy Court pursuant to the Equity Rights Offering Backstop Order.

"***Equity Rights Offering Backstop Commitment Premium***" means an aggregate premium equal to $1,500,000 to be paid in cash to the Equity Rights Offering Backstop Parties in exchange for their commitment to fund the Equity Rights Offering Backstop Commitment.

"***Equity Rights Offering Backstop Order***" means that certain order entered by the Bankruptcy Court, which may be the Combined Order, approving, among other things, the Equity Rights Offering Backstop Commitment Letter and the Equity Rights Offering Backstop Commitment Premium.

"***Equity Rights Offering Backstop Parties***" means the parties signatory to the Equity Rights Offering Backstop Commitment Letter (together with their respective successors and permitted assignees), or any fronting bank or other funding agent operating on their behalf, that have agreed severally and not jointly to provide the Equity Rights Offering Backstop Commitment.

"***Equity Rights Offering Documents***" means, collectively, the Equity Rights Offering Term Sheet, the Equity Rights Offering Backstop Commitment Letter, the Equity Rights Offering Backstop Order, the Equity Rights Offering Procedures, and any other agreements or documents memorializing the Equity Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

"***Equity Rights Offering Procedures***" means those certain rights offering procedures with respect to the Equity Rights Offering as set forth in this Plan.

"***Equity Rights Offering Term Sheet***" means the term sheet attached as <u>Annex 3</u> to the Restructuring Term Sheet describing the material terms of the Equity Rights Offering.

"*Estate(s)*" means, individually, the estate of each of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

"*Exculpated Parties*" means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Consenting Stakeholders; (iv) the Agents/Trustees; (v) the DIP Lenders; and (vi) with respect to the foregoing clauses (i) through (v), each such Entity's or Person's Related Parties.

"*Exculpation*" means the exculpation provision set forth in Article IX.E.

"*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Existing Equity Interests*" means any issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, or other instrument evidencing an ownership interest in 2U, Inc., whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date.

"*Exit Agent*" means the administrative agent and collateral agent under the Exit Facility Credit Agreement.

"*Exit Facility*" means the secured second lien exit term loan facility that shall be provided on the terms and conditions consistent with the Exit Facility Term Sheet and arising pursuant to the Exit Facility Credit Agreement, proceeds of which shall be available to satisfy Allowed DIP Claims.

"*Exit Facility Credit Agreement*" means that certain Credit Agreement to be entered into in connection with the Exit Facility, to be dated as of the Effective Date, by and among Reorganized Parent, as borrower, the Exit Agent, and the Exit Lenders, which shall be in form and substance consistent with the Exit Facility Term Sheet.

"*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and all other loan documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the Exit Facility Term Sheet.

"*Exit Facility Term Sheet*" means that certain term sheet that sets forth the principal terms of the Exit Facility, as may be supplemented, amended, or otherwise modified from time to time.

"*Exit Lenders*" means the lenders party to the Exit Facility Credit Agreement.

"*Exit Loans*" means loans issued under the Exit Facility Credit Agreement.

"*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

"*Final DIP Order*" means the order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility, the DIP Commitments, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on a final basis (as may be amended, supplemented or modified from time to time).

7

"***Final Order***" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which (i) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (ii) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"***First Day Orders***" means any interim or final order of the Bankruptcy Court granting the relief requested in the First Day Pleadings (as may be amended, supplemented or modified from time to time).

"***First Day Pleadings***" means all material motions, applications, notices and/or other pleadings that the Debtors File or propose to File in connection with the commencement of the Chapter 11 Cases and all orders sought thereby (any of the foregoing as amended, supplemented or modified from time to time), including the First Day Orders.

"***First Lien Ad Hoc Group***" means that certain ad hoc group of Holders of First Lien Claims represented by the First Lien Ad Hoc Group Advisors.

"***First Lien Ad Hoc Group Advisors***" means Milbank LLP and FTI Consulting, Inc., and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors.

"***First Lien Agent***" means Alter Domus (US) LLC, as administrative agent and collateral agent under the First Lien Credit Documents, or, as applicable, any duly appointed successors, assignees, or delegees thereof.

"***First Lien Claim***" means any Claim that is a First Lien Revolving Loan Claim or a First Lien Term Loan Claim.

"***First Lien Credit Agreement***" means that certain Credit and Guaranty Agreement, dated as of June 28, 2021 (as amended by that certain First Amendment to Term Loan Credit and Guaranty Agreement, dated as of November 4, 2021, and by that certain Extension Amendment and Second Amendment to Credit and Guaranty Agreement, dated as of January 9, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among 2U, Inc., as borrower, certain subsidiaries of 2U, Inc., as guarantors, the lenders party thereto, and the First Lien Agent.

"***First Lien Credit Documents***" means the First Lien Credit Agreement together with all other related documents, instruments, and agreements, in each case, as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

8

"***First Lien Revolving Lenders***" means Morgan Stanley Senior Funding, Inc. and Goldman Sachs Lending Partners LLC, solely in their capacities as Revolving Credit Lenders (as defined in the First Lien Credit Agreement).

"***First Lien Revolving Lender Advisors***" means Allen Overy Shearman Sterling (US) LLP, solely in its capacity as counsel to the First Lien Revolving Lenders.

"***First Lien Revolving Loan Claim***" means any Claim or Cause of Action derived from, based upon, or arising under the "Revolving Credit Facility" as that term is defined in the First Lien Credit Agreement.

"***First Lien Term Loan Claim***" means any Claim or Cause of Action derived from, based upon, or arising under the "Term Loan Facility" as that term is defined in the First Lien Credit Agreement.

"***General Unsecured Claim***" means all Claims (other than Administrative Claims, Priority Tax Claims, DIP Claims, First Lien Claims, Unsecured Notes Claims, Other Secured Claims, and Other Priority Claims) against the Debtors that are non-priority and unsecured, including (for the avoidance of doubt) all Landlord Claims.

"***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"***Greenvale***" means Greenvale Capital LLP, on behalf of its funds and/or accounts in their capacities as Holders of Unsecured Notes Claims.

"***Greenvale Advisors***" means Schulte Roth & Zabel LLP and such other professional advisors as are retained by Greenvale with the prior written consent of the Debtors, in each case, in such advisor's capacity as an advisor to Greenvale.

"***Holder***" means any Entity that is the record or beneficial owner of any Claim or Interest, including any nominees, investment managers, investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, or trustees of trusts that hold, any Claim or Interest.

"***HQ Premises Lease***" means the Office Lease, dated December 23, 2015, by and between HQ Premises Lessor, 2U Harkins Road LLC (as amended by the First Amendment to Office Lease and Reaffirmation of Guaranty, dated May 27, 2016, the Second Amendment to Office Lease and Reaffirmation of Guaranty, dated October 4, 2017, and the Third Amendment to Office Lease, dated May 14, 2019, and as may be further amended, supplemented, or modified from time to time).

"***HQ Premises Lessor***" means KCP HARKINS FEE OWNER, LLC.

"***Impaired***" means, when used in reference to a Claim or Interest, a Claim or Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"***Indemnification Provisions***" means, collectively, each of the provisions in existence immediately prior to the Effective Date (whether in bylaws, certificates of formation or incorporation, board resolutions, employment contracts, or otherwise) whereby any Debtor agrees to indemnify, reimburse, provide contribution or advance fees and expenses to or for the benefit of, defend, exculpate, or limit the liability of, any Indemnified Person.

"***Indemnified Person***" means each of the Debtors' or the Reorganized Debtors' and each of their respective Affiliates' or subsidiaries' respective Related Parties.

9

"***Independent Director Fee Claims***" means, as of the Effective Date, all reasonable and documented unpaid fees and expenses due to the independent directors of the Debtors pursuant to their respective director agreements with the applicable Debtor entity.

"***Insurance Contract***" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time to, or provide coverage to, any of the Debtors and all agreements, documents, or instruments relating thereto.

"***Intercompany Claim***" means any Claim against any of the Debtors held by a Debtor or Non-Debtor Affiliate, other than an Administrative Claim.

"***Intercompany Interests***" means an Interest in a Debtor held by a Debtor or Non-Debtor Affiliate.

"***Interests***" means any equity, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date (in each case whether or not arising under or in connection with any employment agreement); *provided* that the foregoing shall not apply to any entitlement to participate in or receive any Interests of the Reorganized Debtors on or following the Effective Date.

"***Interim DIP Order***" means the order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility, the DIP Commitments, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on an interim basis (as may be amended, supplemented or modified from time to time).

"***Landlord Claims***" means the Claims of any lessor related to a lease to which the Debtors are party (including, for the avoidance doubt, any Claims stemming from the rejection of the lessor's lease pursuant to section 365 of the Bankruptcy Code) which are capped pursuant to section 502(b)(6) of the Bankruptcy Code.

"***Law***" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Unit or court of competent jurisdiction (including the Bankruptcy Court).

"***Lease Rejection Motion***" means a motion, which seeks orders providing for the rejection of certain of the Debtors' Unexpired Leases pursuant to section 365 of the Bankruptcy Code; *provided*, that the Claims arising from any rejection of Unexpired Leases shall be capped pursuant to section 502(b)(6) of the Bankruptcy Code.

"***Lease Rejection Order***" means any order of the Bankruptcy Court granting the Lease Rejection Motion and related relief.

"***Lien***" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any property or asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such property or asset.

"*MIP*" means a post-emergence equity-based management incentive plan, which plan shall reserve for certain employees, officers and directors of the Reorganized Parent up to ten percent (10%) of New Common Interests on a fully-diluted basis issued on the Effective Date, the structure and terms of which and grants thereunder to be determined in good faith by the New Board in its sole discretion in consultation with the Debtors' current management team.  The individual allocations under the MIP are to be determined based on analysis by an independent compensation consultant in consultation with the Debtors' current Chief Executive Officer.

"*New Board*" means the board of directors or managers of Reorganized Parent, which shall consist of the Debtors' current Chief Executive Officer and other members to be selected by the Required Consenting Noteholders in their sole discretion in consultation with the Debtors.

"*New Common Interests*" means a single class of new common equity interests of Reorganized Parent to be issued (i) on the Effective Date or (ii) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents.

"*New Common Interests Documents*" means any and all documents required to implement, issue, or distribute the New Common Interests, including the Equity Rights Offering Procedures, Equity Rights Offering Backstop Commitment Letter, Equity Rights Offering Backstop Order, and any other agreement, document or instrument delivered or entered into pursuant thereto or in connection therewith.

"*New Corporate Governance Documents*" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement, or other similar organizational or formation documents, as applicable, of each of the Reorganized Debtors.

"*Non-Debtor Affiliates*" means all of the Affiliates of the Debtors, other than the Debtors.

"*Notice*" has the meaning set forth in <u>Article XI.K</u>.

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, an Administrative Claim, a Professional Fee Claim, a Cure Claim, or a DIP Claim.

"*Other Secured Claim*" means any Secured Claim that is not a First Lien Claim.

"*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

"*Petition Date*" means the date on which the Debtors commence the Chapter 11 Cases by filing petitions with the Bankruptcy Court.

"*Plan*" means this *Joint Prepackaged Plan Of Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, including all appendices, exhibits, schedules, and supplements thereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan and the Restructuring Support Agreement.

"***Plan Discount***" means the 30% discount to the Stipulated Equity Value at which the New Common Interests issued through the Equity Rights Offering will be purchased.

"***Plan Schedule***" means a schedule annexed to this Plan or an appendix to the Disclosure Statement (as amended, modified, or otherwise supplemented from time to time).

"***Plan Supplement***" means any supplemental appendix to the Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended modified or supplemented from time to time in accordance with the terms of the Plan and the Restructuring Support Agreement, and the Bankruptcy Code and the Bankruptcy Rules, which shall include, but shall not be limited to: (i) the New Corporate Governance Documents; (ii) the Equity Rights Offering Procedures; (iii) the Amended and Restated Credit Documents; (iv) the Exit Facility Documents; and (v) the Restructuring Transactions Memorandum.

"***Prepetition Funded Debt Documents***" means, collectively, the First Lien Credit Documents and the Unsecured Notes Documents.

"***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"***Pro Rata***" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

"***Professional***" means any Person or Entity retained by the Debtors in these Chapter 11 Cases pursuant to section 327, 328, 363, and/or 1103 of the Bankruptcy Code (other than an ordinary course professional).

"***Professional Fee Claim***" means a Claim for Accrued Professional Compensation under sections 327, 328, 329, 330, 331, or 503 of the Bankruptcy Code.

"***Professional Fee Escrow Account***" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount established, funded, and maintained by the Reorganized Debtors from Cash on hand existing immediately prior to the Effective Date solely for the purpose of paying in full and in Cash all unpaid Professional Fee Claims as and when such Claims become Allowed.

"***Professional Fee Reserve Amount***" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Professionals in accordance with Article II.A.2(c).

"***Proof of Claim***" means a proof of Claim Filed against any Debtor in these Chapter 11 Cases.

"***Reinstatement***" or "***Reinstated***" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"***Rejection Damages Claim***" mean any Claim arising from the rejection of any Executory Contracts or Unexpired Leases.

"***Related Parties***" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such

12

interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"*Released Parties*" means, collectively, each of, and in each case in its capacity as such: (i) each Debtor; (ii) each Reorganized Debtor; (iii) each Non-Debtor Affiliate; (iv) each of the Debtors' and Non-Debtor Affiliates' current and former directors, officers and proxyholders; (v) the Agents/Trustees; (vi) the Consenting Stakeholders; (vii) the DIP Lenders; (viii) if applicable, each Consenting Stakeholder in its capacity as a Holder of Existing Equity Interests; (ix) the Equity Rights Offering Backstop Parties; (x) each of the Releasing Parties; and (xi) with respect to each of the foregoing (i) through (x), each such Entities' (a) Related Parties and (b) their current and former Affiliates' Related Parties; *provided*, that in each case, an Entity shall not be a Released Party if it: (y) elects to opt out of the Releases; or (z) timely Files with the Bankruptcy Court on the docket of these Chapter 11 Cases an objection to the Releases that is not resolved before Confirmation.

"*Releases*" means collectively the Debtor Release and the Third-Party Release as set forth in Article IX.

"*Releasing Parties*" means, collectively, each of, and in each case in its capacity as such: (i) each Debtor; (ii) each Reorganized Debtor; (iii) each Non-Debtor Affiliate; (iv) each of the Debtors' and Non-Debtor Affiliates' current and former directors, officers and proxyholders; (v) the Agents/Trustees; (vi) the Consenting Stakeholders; (vii) the DIP Lenders; (viii) if applicable, each Consenting Stakeholder in its capacity as a Holder of Existing Equity Interests; (ix) each other Holder of Claims or Interests that is entitled to vote on this Plan and either (a) votes to accept this Plan, (b) abstains from voting on this Plan and does not elect to opt out of the Releases, or (c) votes to reject this Plan and does not elect to opt out of the Releases; (x) each other Holder of Claims or Interests that is deemed to reject this Plan and does not elect to opt out of the Releases; and (xi) with respect to each of the foregoing (i) through (x), each such Entities' current and former Affiliates, and such Entities' and their current and former Affiliates' Related Parties; *provided*, that, for the avoidance of doubt, an Entity described in clauses (ix) through (xi) above shall not be a Releasing Party if it: (y) elects to opt out of the Releases; or (z) timely Files with the Bankruptcy Court on the docket of these Chapter 11 Cases an objection to the Releases that is not resolved before Confirmation; *provided further*, that, for the avoidance of doubt, any opt-out election made by a Consenting Stakeholder, or Holder of Claims or Interests that is entitled vote on this Plan and votes to accept this Plan, will be void *ab initio*.

"*Reorganized Debtors*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

"*Reorganized Parent*" means from and after the Effective Date, 2U, Inc. or such other Entity as may be determined by the Debtors and the Required Consenting Noteholders to be the Debtors' new corporate parent, as reorganized pursuant to the Plan or as otherwise agreed between the Debtors and the Required Consenting Noteholders.

13

"*Required Consenting Creditors*" means, collectively, the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

"*Required Consenting First Lien Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Restructuring Fees and Expenses*" means all documented fees, costs, and expenses of each of the Consenting Creditor Advisors and the First Lien Revolving Lender Advisors in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement, the Plan, the other Definitive Documents, the Restructuring Transactions, and the transactions contemplated hereby and thereby; *provided*, that notwithstanding anything to the contrary herein, nothing herein shall authorize the payment or reimbursement of any fees and expense of any of the First Lien Revolving Lenders incurred in connection with filing, prosecuting or pursuing any objection, or litigation related to the DIP Facility, the DIP Credit Documents, the use of DIP Collateral (including Cash Collateral), the Restructuring Support Agreement and any of the transactions contemplated under any of the foregoing, including the confirmation and consummation of the Plan.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement (including all exhibits and annexes attached thereto, including the Restructuring Term Sheet) entered into on July 24, 2024 (as amended, amended and restated, modified, or otherwise supplemented from time to time in accordance with the terms thereof), by and among the Debtors, the Consenting Stakeholders, and any subsequent Entity that becomes a party thereto pursuant to the terms thereof, as attached to the Disclosure Statement as Exhibit B.

"*Restructuring Term Sheet*" means that certain Restructuring Term Sheet (including any schedules, annexes and exhibit attached thereto, each as may be modified in accordance with the terms of the Restructuring Support Agreement) attached as Exhibit A to the Restructuring Support Agreement.

 "*Restructuring Transactions*" means the transactions described in Article IV.A.

"*Restructuring Transactions Memorandum*" mans a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions.

"*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases, if any, to be rejected by the Debtors pursuant to this Plan.

"*Schedule of Retained Causes of Action*" means the schedule of Causes of Action that shall vest in the Reorganized Debtors on the Effective Date, which will be contained in the Plan Supplement, and which shall exclude all Claims and Causes of Action released under this Plan.

"*SEC*" means the Securities and Exchange Commission.

"*Secured Claim*" means a Claim that is (i) secured by a valid, perfected and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Securities*" means any instruments that qualify under section 2(a)(1) of the Securities Act, including the New Common Interests.

"*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any rules and regulations promulgated thereby.

"*Solicitation Materials*" means any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan pursuant to the Solicitation Procedures Order, and related to the Equity Rights Offering and the Equity Rights Offering Procedures.

"*Solicitation Procedures Order*" means the order of the Bankruptcy Court approving the Solicitation procedures and scheduling the Combined Hearing, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes or fees imposed or assessed by any Governmental Unit.

"*Stipulated Equity Value*" means $245,000,000.

"*Subordinated Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.  For the avoidance of doubt, Subordinated Claims include any Claims against any Debtors asserted by the plaintiffs in the following lawsuit: *Michael Beaumont v. 2U, Inc., et al.*, 8:24-cv-01723-DLB (D. Md. Jun. 13, 2024).

"*Third-Party Release*" means the releases given by the Releasing Parties to the Released Parties in Article IX.C.

"*Transfer*" means sell, assign, loan, issue, pledge, hypothecate, transfer, participate, or otherwise dispose of.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Notes*" means, collectively, the 2025 Notes and the 2030 Notes.

"*Unsecured Notes Claim*" means any Claim or Cause of Action on account of the Unsecured Notes or arising under the Unsecured Notes Documents.

"*Unsecured Notes Documents*" means the Unsecured Notes Indentures together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

15

"***Unsecured Notes Indenture Trustee***" means Wilmington Trust, National Association, as indenture trustee under the Unsecured Notes Indentures, or, as applicable, any successors, assignees, or delegees thereof.

"***Unsecured Notes Indentures***" means, collectively, the 2025 Notes Indenture and the 2030 Notes Indenture.

"***Voting and Claims Agent***" means Epiq Corporate Restructuring, LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors.

B.    *Rules of Interpretation; Computation of Time*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided herein, any reference herein to an existing or to be Filed contract, lease, instrument, release, indenture, or other agreement or document shall mean as it may be amended, modified or supplemented from time to time; (iv) any reference to an Entity as a Holder of Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (vi) unless otherwise indicated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vii) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided in Article VIII.C, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (viii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (ix) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan; (x) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (xi) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xii) all references to docket numbers of documents Filed in these Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xiii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (xiv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to these Chapter 11 Cases, unless otherwise stated.  Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to "the Debtors" or to "the Reorganized Debtors" shall mean "the Debtors and the Reorganized Debtors", as applicable, to the extent the context requires.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

US-DOCS\150744359.29

C.      *Consent Rights.*

Notwithstanding anything herein to the contrary in this Plan, the Combined Order, or the Disclosure Statement, any and all consent, consultation, and approval rights set forth in the Restructuring Support Agreement and Restructuring Term Sheet, including rights and limitations with respect to the form and substance of any Definitive Document (including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and be fully enforceable as if stated in full herein.

# ARTICLE II.
## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

  1.   General Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

  2.   Professional Fee Claims

      (a)    *Professional Fee Applications*

All applications for final allowance of Professional Fee Claims must be Filed and served on the Reorganized Debtors and such other Entities who are designated in the Combined Order no later than thirty (30) days after the Effective Date. The Professional Fee Claims owed to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account after such Claims are Allowed by a Final Order. After all Allowed Professional Fee Claims have been paid in full, any excess amounts remaining in the Professional Fee Escrow Account shall be returned to the Reorganized Debtors. To the extent that the funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Allowed Professional Fee Claims owed to the Professionals, the Reorganized Debtors shall pay such amounts within ten (10) Business Days of entry of the order approving such Professional Fee Claims.

17

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting Professional by no later than thirty (30) days after the Filing of the applicable final application for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash by the Reorganized Debtors, including from the Professional Fee Escrow Account, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim. The Reorganized Debtors shall not commingle any funds contained in the Professional Fee Escrow Account and shall use such funds to pay only the Professional Fee Claims, as and when Allowed by order of the Bankruptcy Court. Notwithstanding anything to the contrary contained in this Plan, the failure of the Professional Fee Escrow Account to satisfy in full the Professional Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Debtors or the Reorganized Debtors.

(b)    *Professional Fee Escrow Account*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

(c)    *Professional Fee Reserve Amount*

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate in good faith their Professional Fee Claims (taking into account any retainers) prior to and as of the Effective Date and shall deliver such estimate to the Debtors at least three (3) calendar days prior to the Confirmation Date. If a Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

(d)    *Post-Effective Date Fees and Expenses*

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. Each Reorganized Debtor may employ and pay any fees and expenses of any professional, including any Professional, in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court, including with respect to any transaction, reorganization, or success fees payable by virtue of the consummation of this Plan or the occurrence of the Effective Date.

B.    *DIP Claims*

In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each Holder of such Allowed DIP Claim shall receive either (i) its Pro Rata share of Exit Loans under the Exit Facility Credit Agreement, or (ii) such other treatment as to which the Debtors and the Holder of such Allowed DIP Claim will have agreed upon in writing, with the consent of the Required Consenting Noteholders and the Debtors.

C.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance

18

with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. Nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Priority Tax Claim.

D.      *United States Trustee Statutory Fees*

The Debtors and the Reorganized Debtors, as applicable, will pay all fees due and owing to the United States Trustee pursuant to 28 U.S.C. § 1930(a), together with interest, if any, pursuant to 31 U.S.C. Section 3717, for each quarter until the entry of a final decree, or if the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

E.      *Restructuring Fees and Expenses*

The Restructuring Fees and Expenses, not previously paid pursuant to the DIP Orders, incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the Restructuring Support Agreement or the DIP Orders, as applicable, without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

A.      *Summary*

This Plan constitutes a separate plan of reorganization for each Debtor. Except for the Claims addressed in <u>Article II</u> above (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors. For all purposes under this Plan, each Class will exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with <u>Article III.D</u> below.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including, without limitation, for voting, confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid, released, disallowed, or otherwise settled prior to the Effective Date.

19

**Summary of Classification and Treatment of Classified Claims and Interests**

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2. | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3. | First Lien Claims | Impaired | Entitled to Vote |
| 4. | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5. | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6. | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 7. | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 8. | Existing Equity Interests | Impaired | Deemed to Reject |
| 9. | Subordinated Claims | Impaired | Deemed to Reject |

B.    *Classification and Treatment of Claims and Interests*

1.    Class 1 – Other Secured Claims

    (a)    *Classification*: Class 1 consists of the Other Secured Claims.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, on the Effective Date, each Holder of such Allowed Other Secured Claim shall receive, at the Debtors' option and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld), either (i) payment in full in Cash, (ii) delivery of the collateral securing such Allowed Other Secured Claim, (iii) Reinstatement of such Allowed Other Secured Claim, or (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*: Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

2.    Class 2 – Other Priority Claims

    (a)    *Classification*: Class 2 consists of the Other Priority Claims.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, on the Effective Date, each Holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

    (c)    *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of

20

the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.   <u>Class 3 – First Lien Claims</u>

    (a)    *Classification:* Class 3 consists of the First Lien Claims.

    (b)    *Treatment:*  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed First Lien Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed First Lien Claim, on the Effective Date, each Holder of such Allowed First Lien Claim shall receive its Pro Rata share of the Amended and Restated Loans.

    (c)    *Voting:* Class 3 is Impaired, and Holders of Claims in Class 3 are entitled to vote to accept or reject this Plan.

4.   <u>Class 4 –Unsecured Notes Claims</u>

    (a)    *Classification*:  Class 4 consists of the Unsecured Notes Claims.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Unsecured Notes Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Unsecured Notes Claim, on the Effective Date, each Holder of such Allowed Unsecured Notes Claim shall receive (i) the right to participate in the Equity Rights Offering in accordance with the Equity Rights Offering Procedures, and (ii) its Pro Rata share of the New Common Interests (subject to dilution on account of the New Common Interests issued pursuant to (A) the MIP and (B) the Equity Rights Offering).

    (c)    *Voting*: Class 4 is Impaired, and Holders of Claims in Class 4 are entitled to vote to accept or reject this Plan.

5.   <u>Class 5 – General Unsecured Claims</u>

    (a)    *Classification*:  Class 5 consists of the General Unsecured Claims.

    (b)    *Treatment*:  The legal, equitable, and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by this Plan.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date, the Reorganized Debtors shall continue to pay each Holder of an Allowed General Unsecured Claim in the ordinary course of business; *provided* that each Landlord Claim shall be subject to the cap set forth in section 502(b)(6) of the Bankruptcy Code.

    (c)    *Voting*: Class 5 is Unimpaired, and Holders of Claims in Class 5 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 5 are not entitled to vote to accept or reject this Plan.

US-DOCS\150744359.29

6.  <u>Class 6 - Intercompany Claims</u>

    (a)    *Classification:* Class 6 consists of all Intercompany Claims.

    (b)    *Treatment:*  On the Effective Date, Intercompany Claims shall be, at the option of the applicable Debtor and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld), either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors.

    (c)    *Voting:* Class 6 is either:  (i) Unimpaired, in which case the Holders of Claims in Class 6 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code; or (ii) Impaired and not receiving any distribution under this Plan, in which case the Holders of such Claims in Class 6 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of a Claim in Class 6 will not be entitled to vote to accept or reject this Plan.

7.  <u>Class 7 – Intercompany Interests</u>

    (a)    *Classification:* Class 7 consists of all Intercompany Interests.

    (b)    *Treatment:*  On the Effective Date, Intercompany Interests shall be, at the option of the applicable Debtor and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld), either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors and subject to the consent of the Required Consenting Creditors (with such consent to not be unreasonably withheld).

    (c)    *Voting*: Class 7 is either:  (i) Unimpaired, in which case the Holders of Interests in Class 7 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code; or (ii) Impaired and not receiving any distribution under this Plan, in which case the Holders of such Interests in Class 7 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of an Interest in Class 7 will not be entitled to vote to accept or reject this Plan.

8.  <u>Class 8 – Existing Equity Interests</u>

    (a)    *Classification*: Class 8 consists of the Existing Equity Interests.

    (b)    *Treatment:*  On the Effective Date, all Existing Equity Interests will be canceled, released, and extinguished and will be of no further force and effect.  No Holders of such Existing Equity Interests will receive any property or distribution under this Plan.

    (c)    *Voting*: Class 8 is an Impaired Class, and the Holders of Claims in Class 8 are conclusively deemed to have rejected this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 8 are not entitled to vote to accept or reject this Plan.

22

9. Class 9 – Subordinated Claims

    (a)     *Classification*: Class 9 consists of the Subordinated Claims.

    (b)     *Treatment*: On the Effective Date, all Subordinated Claims will be canceled, released, and extinguished and will be of no further force and effect. No Holders of such Subordinated Claims will receive any property or distribution under this Plan.

    (c)     *Voting*: Class 9 is an Impaired Class, and the Holders of Claims in Class 9 are conclusively deemed to have rejected this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 9 are not entitled to vote to accept or reject this Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.     *Vacant and Abstaining Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 as of the commencement of the Combined Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. Moreover, any Class of Claims that is occupied as of the commencement of the Combined Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be deemed to accept this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class. The Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126(c) of the Bankruptcy Code. The Debtors reserve the right to modify this Plan in accordance with Article XI.E to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

G.     *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan shall take into account and conform to the relative priority and

23

rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract (including the First Lien Credit Agreement), section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

H.      *Intercompany Interests and Intercompany Claims*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims, but rather only for the purposes of administrative convenience. Due to the importance of maintaining the corporate structure for the benefit of Holders that receive New Common Interests, the Reorganized Debtors require flexibility in connection with maintaining the corporate structure. For the avoidance of doubt, any Interest in the Non-Debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor, unless otherwise set forth in the Definitive Documents.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      *Substantive Consolidation*

This Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. This Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in this Plan; *provided*, that the Reorganized Debtors may consolidate Allowed Claims on a per Class basis for voting purposes.

B.      *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to this Plan. This Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Combined Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

C.      *Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or the Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Definitive Documents and any consents or approvals required thereunder, the entry of the Combined Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective

24

businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors. Such restructuring may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable law, including the execution and delivery of the New Corporate Governance Documents; (iv) the execution and delivery of the Amended and Restated Credit Documents and entry into the Amended and Restated Credit Facility; (v) the execution and delivery of the Exit Facility Documents and entry into the Exit Facility; (vi) pursuant to the Equity Rights Offering Documents, the implementation and consummation of the Equity Rights Offering, the issuance of rights to subscribe for New Common Interests pursuant to the Equity Rights Offering Procedures to the Holders of Unsecured Notes Claims, and the issuance and distribution of the New Common Interests in connection therewith; (vii) the issuance and distribution of the New Common Interests as set forth in this Plan; and (viii) all other actions that the applicable entities determine to be necessary or appropriate, in form and substance acceptable to the Required Consenting Creditors, including making filings or recordings that may be required by applicable law in connection with such transactions, but in all cases subject to the terms and conditions of this Plan and the Definitive Documents and any consents or approvals required.

The Combined Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

## D.    *Continued Corporate Existence*

Subject to the Restructuring Transactions permitted by Article IV.C, after the Effective Date, the Reorganized Debtors shall continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and bylaws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and bylaws, or other applicable New Corporate Governance Documents, are amended, restated, or otherwise modified under this Plan. Notwithstanding anything to the contrary herein, the Claims against a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor solely by virtue of this Plan or these Chapter 11 Cases.

## E.    *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Combined Order, or any other Definitive Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan (other than the Professional Fee Escrow Account and any rejected Executory Contracts and/or Unexpired Leases) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses; (ii) use, acquire, and dispose of their respective property; and (iii) compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Combined Order.

25

F.      *Amended and Restated Credit Documents*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Amended and Restated Credit Documents—including, for the avoidance of doubt, converting the First Lien Claims into the Amended and Restated Loans—without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Amended and Restated Credit Documents). On the Effective Date, the Amended and Restated Credit Documents shall constitute legal, valid, binding, and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Combined Order or on account of the Confirmation or Consummation of this Plan. The votes of the Holders of Claims in Class 3 to accept this Plan shall be deemed to be a direction to the First Lien Agent under the First Lien Credit Agreement to effectuate the Restructuring Transactions, including, without limitation, entry into the Amended and Restated Credit Facility (and any transactions related thereto). On and as of the Effective Date, all Holders of Amended and Restated Loans shall be deemed to be parties to the Amended and Restated Credit Documents without the need for execution by such Holders.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Amended and Restated Credit Documents shall: (i) be deemed to be granted; (ii) be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Amended and Restated Credit Documents; (iii) be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors or the Reorganized Debtors, as applicable, the applicable agent, or any of the applicable lenders), having the priority set forth in the Amended and Restated Credit Documents and subject only to such Liens and security interests as may be permitted under the Amended and Restated Credit Documents; and (iv) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors, the Reorganized Debtors, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Combined Order (it being understood that perfection shall occur automatically by virtue of the entry of the Combined Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The proceeds of the Amended and Restated Credit Facility may be used by the Reorganized Debtors to make distributions pursuant to this Plan and fund general corporate purposes.

G.      *Exit Facility Documents*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Exit Facility Documents—including, for the avoidance of doubt, converting all or a portion of the Allowed DIP Claims into the Exit Loans,—without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Exit Facility Documents). On the Effective Date, the Exit Facility Documents shall constitute legal, valid, binding, and authorized indebtedness and obligations of the

26

Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Combined Order or on account of the Confirmation or Consummation of this Plan.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents shall: (i) be deemed to be granted; (ii) be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Exit Facility Documents; (iii) be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors or the Reorganized Debtors, as applicable, the applicable agent, or any of the applicable lenders), having the priority set forth in the Exit Facility Documents and subject only to such Liens and security interests as may be permitted under the Exit Facility Documents; and (iv) not be subject to avoidance, recovery, turnover, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors, the Reorganized Debtors, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Combined Order (it being understood that perfection shall occur automatically by virtue of the entry of the Combined Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

H.      *Equity Rights Offering*

On the Effective Date, pursuant to the Plan and the Equity Rights Offering Documents, the Debtors shall issue New Common Interests to the Holders of Unsecured Notes Claims as set forth in this Plan and the Equity Rights Offering Documents. Each Holder of Unsecured Notes Claims may exercise either all, a portion of, or none of its rights in exchange for Cash. Such rights are not separately transferrable or detachable from the Unsecured Notes Claims.

The Reorganized Parent shall be authorized to issue the New Common Interests issuable pursuant to such exercise of rights on the Effective Date pursuant to the terms of this Plan and the Equity Rights Offering Documents.

The Equity Rights Offering is fully backstopped, severally and not jointly, by the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Letter and the Restructuring Support Agreement.

New Common Interests issued pursuant to the Equity Rights Offering shall be offered at the Plan Discount and New Common Interests issued pursuant to the Equity Rights Offering Backstop Commitment Letter will be issued at the Plan Discount less the Equity Rights Offering Backstop Commitment Premium. Entry of the Equity Rights Offering Backstop Order shall constitute Bankruptcy Court approval of the Equity Rights Offering, the Equity Rights Offering Backstop Commitment, the Equity Rights Offering Backstop Commitment Premium and the Equity Rights Offering Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Reorganized Parent in connection therewith). On the Effective Date, the rights and obligations of the Debtors under the Equity Rights Offering Backstop Commitment Letter shall vest in the Reorganized Debtors, as applicable.

27

The proceeds of the Equity Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to this Plan and fund general corporate purposes.

When the issuance of New Common Interests pursuant to this Plan and the Equity Rights Offering Documents would otherwise result in the issuance of a number of shares of New Common Interests that is not a whole number, the actual issuance of shares of New Common Interests shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Interests shall be adjusted as necessary to account for the foregoing rounding.

I.      *New Common Interests*

On the Effective Date, the Reorganized Parent shall issue or reserve for issuance all of the New Common Interests issued or issuable in accordance with the terms herein, subject to dilution on the terms described herein and in the Restructuring Support Agreement. The issuance of the New Common Interests for distribution pursuant to this Plan are authorized without the need for further corporate or shareholder action, and all of the shares of New Common Interests issued or issuable pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

J.      *New Common Interests Documents*

On the Effective Date, the Reorganized Parent and the Holders of the New Common Interests shall enter into the New Common Interests Documents in substantially the form included in the Plan Supplement. The New Common Interests Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of the New Common Interests shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Parent.

K.      *MIP*

On or around the Effective Date, the New Board shall adopt the MIP, which shall reserve for certain employees, officers and directors of the Reorganized Parent up to ten percent (10%) of New Common Interests on a fully-diluted basis issued on the Effective Date, the structure and terms of which and grants thereunder to be determined by the New Board in its sole discretion in consultation with the Debtors' current management team. The individual allocations under the MIP are to be determined based on analysis by an independent compensation consultant in consultation with the Debtors' current Chief Executive Officer.

L.      *Exemption from Securities Laws*

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and sale of Securities under this Plan. The offering and sale by the Reorganized Parent of any New Common Interests to the Holders of Unsecured Notes Claims pursuant to the Equity Rights Offering, the Equity Rights Offering Backstop Commitment Letter or otherwise in exchange for Claims pursuant to <u>Article III</u> and the Combined Order shall be exempt from the registration requirements of Section 5 of the Securities Act and any other applicable United States, State, or local law requiring registration for the offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code. To the extent section 1145 is not applicable, the Reorganized Parent may rely upon section 4(a)(2) of the Securities Act, and/or any other exemption from registration under the Securities Act. Any and all such New Common Interests offered and sold under the Plan in reliance on the exemption provided by section 1145(a) of the Bankruptcy Code will be freely tradable under the Securities Act by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with any applicable U.S. federal, state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of

28

any future transfer of such Securities; (iii) the restrictions, if any, on the transferability of such Securities in the New Common Interests Documents; and (iv) any other applicable regulatory approval. Any and all such New Common Interests (a) offered in reliance on the exemption provided by section 1145 of the Bankruptcy Code and received by recipients who are deemed to be "underwriters" (as such term is defined in section 1145(b) of the Bankruptcy Code) or (b) offered in reliance on the exemption provided by section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act, shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available and in compliance with any applicable state or foreign securities laws.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the applicable Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Interests through the facilities of DTC, the applicable Debtors shall not be required to provide any further evidence other than the Plan or Combined Order with respect to the treatment under the Plan of such applicable portion of the New Common Interests. DTC, any transfer agent, or other similarly situated agent, trustee or other non-governmental Person or Entity shall accept and rely upon the Plan and Combined Order in lieu of a legal opinion for purposes of determining whether the initial offer and sale of the New Common Interests were exempt from registration under section 1145(a) of the Bankruptcy Code, and whether the New Common Interests were, under the Plan, validly issued, fully paid and non-assessable.

M.    *Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully and automatically released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity; *provided*, that the Liens granted to the First Lien Agent pursuant to the First Lien Credit Documents shall remain in full force and effect solely to the extent provided for in this Plan, the Amended and Restated Credit Documents, and the other Definitive Documents. The filing of the Combined Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence. Any Person or Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

N.    *New Corporate Governance Documents*

The respective New Corporate Governance Documents and other organizational documents of each of the Debtors shall be amended and restated or replaced (as applicable) in form and substance acceptable to the Required Consenting Noteholders in their sole discretion in consultation with the Debtors and as necessary to satisfy the provisions of this Plan and the Bankruptcy Code. Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New Common

29

Interests in an amount not less than the amount necessary to permit the distributions required or contemplated by this Plan and the issuance of New Common Interests pursuant to the Equity Right Offering; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New Common Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Definitive Documents, amend and restate their respective organizational documents as permitted by applicable law.

O.    *Directors and Officers of the Reorganized Debtors*

The New Board will initially include the Debtors' current Chief Executive Officer and other members who will be designated in accordance with the terms of the Restructuring Support Agreement and the New Corporate Governance Documents. The identity of the New Board members will be disclosed in the Plan Supplement at or prior to the Combined Hearing to the extent known at such time. Except to the extent that an existing director of 2U, Inc. is designated to serve on the New Board, the existing directors of 2U, Inc., in their capacities as such, shall be deemed to have resigned or shall otherwise cease to be a director of 2U, Inc. on the Effective Date; *provided*, that each independent director of the Debtors shall retain his/her respective authority following the Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at his/her respective authority and direction in accordance with the terms of the Plan. Each independent director of the Debtors, in such capacity, shall not have any of his/her respective privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors, Reorganized Parent, or any other Entity without such director's prior written consent.

The existing directors of each of the Debtors' subsidiaries shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

The existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to their right to resign and the ordinary rights and powers of the New Board to remove or replace them in accordance with the New Corporate Governance Documents and any applicable employment agreements that are assumed pursuant to this Plan.

P.    *Corporate Action*

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, without limitation, (i) the execution and delivery of the Amended and Restated Credit Documents and the Exit Facility Documents, and entry into the Amended and Restated Credit Facility and Exit Facility; (ii) pursuant to the Equity Rights Offering Documents, the implementation of the Equity Rights Offering, the issuance and distribution of the New Common Interests to the Holders of Unsecured Notes Claims in connection with or pursuant to the Equity Rights Offering Documents; and (iii) the issuance and distribution of the New Common Interests as set forth in this Plan, including the New Corporate Governance Documents, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, directors, or proxyholders of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Definitive Documents).

US-DOCS\150744359.29

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, officers, proxyholders, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, proxyholders, managers, members, or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions, or consents of any Person.

As of the Effective Date, all matters provided for in this Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the New Corporate Governance Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or, other approval or authorization by the stockholders, directors, officers, proxyholders, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and the Reorganized Debtors without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person or Entity.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

Q.      *Cancellation of Existing Agreements and Interests*

On the Effective Date, except to the extent otherwise provided in this Plan, the Combined Order, or any other Definitive Document, all notes, bonds, indentures, certificates, securities, purchase rights, options, warrants, collateral agreements, subordination agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of the Debtors giving rise to any rights or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; *provided* that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in this Plan or the Combined Order, Confirmation or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of:  (i) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under this Plan as provided herein; (ii) allowing and preserving the rights of the Agents/Trustees and the A&R First Lien Agent to make distributions as specified under this Plan on account of Allowed Claims, as applicable, including allowing the Agents/Trustees and the A&R First Lien Agent to submit invoices for any amount and enforce any obligation owed to them under this Plan to the extent authorized or allowed by the applicable documents; (iii) to permit the Reorganized Debtors and any other Disbursing Agent, as applicable, to make distributions on account of the applicable Claims and/or Interests, as applicable; (iv) preserving the Agents/Trustees' and the A&R First Lien Agent's rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of DIP Claims, First Lien Claims and Unsecured Notes Claims, as applicable, including permitting the Agents/Trustees and the A&R First Lien Agent to maintain, enforce, and exercise any priority of payment or charging liens against such

31

distributions each pursuant and subject to the term of First Lien Credit Documents and the DIP Documents, as applicable, as in effect on the Effective Date; (v) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the Agents/Trustees and the A&R First Lien Agent against any person, other than a Released Party (including the Debtors, the Reorganized Debtors, and the Non-Debtor Affiliates) and any exculpations of the Agents/Trustees and the A&R First Lien Agent, *provided* that the Agents/Trustees and the A&R First Lien Agent shall remain entitled to indemnification or contribution from the Holders of DIP Claims, First Lien Claims, and Unsecured Notes Claims, as applicable, each pursuant and subject to the terms of the DIP Credit Agreement or the applicable Prepetition Funded Debt Documents, as applicable, as in effect on the Effective Date; (vi) permitting the Agents/Trustees and the A&R First Lien Agent, as applicable, to enforce any obligation (if any) owed to them under this Plan; (vii) permitting the Agents/Trustees and the A&R First Lien Agent to appear in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; (viii) permitting the Agents/Trustees and the A&R First Lien Agent to assert any rights with respect to any contingent obligations under the Prepetition Funded Debt Documents or DIP Documents, as applicable; and (ix) permitting the Agents/Trustees and the A&R First Lien Agent to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that this Article IV.Q shall not apply to any documents securing and governing the Amended and Restated Credit Facility or Exit Facility and shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Combined Order, or this Plan, or the releases of the Released Parties pursuant to Article IX, or result in any expense or liability to the Debtors or the Reorganized Debtors, as applicable, except as expressly provided for in this Plan.

On the Effective Date, the Agents/Trustees, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, will be automatically and fully released and discharged from any further responsibility under the DIP Credit Agreement or the applicable Prepetition Funded Debt Documents, as applicable. The Agents/Trustees, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be discharged and shall have no further obligation or liability except as provided in this Plan and the Combined Order, and after the performance by the Agents/Trustees and their representatives and professionals of any obligations and duties required under or related to this Plan or the Combined Order, the Agents/Trustees, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder. The fees, expenses, and costs of the Agents/Trustees, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with DIP Credit Agreement and the applicable Prepetition Funded Debt Documents, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to this Plan, including the fees and expenses of counsel, if any, will be paid in accordance with the terms of this Plan.

R.     *Sources of Consideration for Plan Distributions*

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under this Plan with Cash on hand, including Cash from the proceeds of the DIP Facility, and the proceeds from the Equity Rights Offering. The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Definitive Documents. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the New Corporate Governance Documents, the

32

Amended and Restated Credit Documents, the Exit Facility Documents and the Equity Rights Offering Documents), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing in accordance with, and subject to, applicable law.

S.      *Authority of the Debtors*

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of this Plan, the Combined Order, and the Restructuring Transactions.

T.      *Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

U.      *Transfers*

Unless approved by the Required Consenting Noteholders, no Holder of Unsecured Notes Claims shall, prior to receiving its New Common Interests on the Effective Date pursuant to the Plan (including any New Common Interests received pursuant to the Equity Rights Offering), enter into any written or oral contract, understanding or arrangement to Transfer, directly or indirectly, all or part of its right, title, or interests in the New Common Interests (including issuing or granting any option thereon or right or interest therein); *provided*, *however*, that the foregoing restriction shall not apply to the establishment or settlement of any derivative or similar position or security that does not constitute tax ownership or an option to acquire tax ownership for purposes of section 382 of the Internal Revenue Code of 1986, as amended.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code except any Executory Contract or Unexpired Lease (i) identified on the Schedule of Rejected Executory Contracts and Unexpired Leases (which shall initially be Filed with the Bankruptcy Court) as an Executory Contract or Unexpired Lease to be rejected, (ii) that is the subject of a separate motion or notice to reject pending as of the Effective Date, or (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Combined Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date; *provided* that, on the occurrence of the Effective Date, the Restructuring Support Agreement will terminate in accordance with its terms.  Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall re-

33

vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith. Except as set forth in Article V.H., to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to amend or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases in their discretion prior to the Effective Date (or such later date as may be permitted by this Plan), *provided* that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds. In the event the Debtor reject any Unexpired Lease, the Debtors are authorized to abandon or dispose of any remaining property at or on the subject premises on the applicable lease rejection effective date.

B.      *Cure of Defaults; Assumption of Executory Contracts and Unexpired Leases*

Any monetary default under an Executory Contract or Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective; *provided* that the Debtors or the Reorganized Debtors may settle any such dispute and shall pay any agreed upon cure amount without any further notice to any party or any action, order, or approval; *provided*, *further*, that notwithstanding anything to the contrary herein, the Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease previously designated for assumption within forty five (45) days after the entry of a Final Order resolving an objection to assumption. Any payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order(s) resolving the dispute and approving the assumption and shall not prevent or delay implementation of this Plan or the occurrence of the Effective Date.

34

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and full payment of any applicable Cure Claim pursuant to this Article V.B shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in these Chapter 11 Cases, including pursuant to the Combined Order, and for which any Cure Claim has been fully paid pursuant to this Article V.B, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

C.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court order, and except as otherwise provided in this section or otherwise in this Plan, any Person or Entity seeking to assert a Rejection Damages Claim must File a Proof of Claim for such Rejection Damages Claim with the Voting and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease (which shall be the Effective Date unless otherwise provided in an order of the Bankruptcy Court providing for the rejection of an Executory Contract or Unexpired Lease).  Any Proofs of Claim arising from Rejection Damages Claims that are not timely Filed shall be automatically disallowed without further order of the Bankruptcy Court.  All Allowed Rejection Damages Claims shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B.

D.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by any Debtor, will be performed by such Debtor or Reorganized Debtor, as applicable, liable thereunder in the ordinary course of business.  Accordingly, such contracts and leases (including any Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to section 365 of the Bankruptcy Code) will survive and remain unaffected by entry of the Combined Order.

E.      *Directors and Officers Insurance Policies*

Notwithstanding anything in this Plan to the contrary, each of the D&O Liability Insurance Policies in existence as of the Effective Date (including the D&O Tail Policy) shall be Reinstated and, to the extent applicable, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Combined Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including the D&O Tail Policy) in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors, officers, and proxyholders of the Debtors who served in such capacity on or at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers and proxyholders remain in such positions after the Effective Date.  The Debtors are

35

further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Combined Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.

F.    *Other Insurance Contracts*

On the Effective Date, each of the Debtors' Insurance Contracts in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V.  Nothing in this Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the Insurance Contracts in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such Insurance Contracts.  The Insurance Contracts shall apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

G.    *Indemnification Provisions and Reimbursement Obligations*

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of this Plan.  None of the Reorganized Debtors shall amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect the rights of Indemnified Persons to receive indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses, to the fullest extent permitted by Law, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  Notwithstanding anything to the contrary herein, the Reorganized Debtors shall not be required to indemnify the Indemnified Persons for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations.

For the avoidance of doubt, each Debtor shall continue after the Effective Date, to the fullest extent permitted by applicable Law, to (i) indemnify and hold harmless (and release from any liability to the Debtors), the Indemnified Persons against all D&O Expenses (as defined below), losses, claims, damages, judgments or amounts paid in settlement (collectively, "***D&O Costs***") in respect of any threatened, pending or completed claim, action, suit or proceeding, whether criminal, civil, administrative or investigative, based on or arising out or relating to the fact that such Indemnified Person is or was a director or officer of any Debtor arising out of acts or omissions occurring on or prior to the Effective Date (a "***D&O Indemnifiable Claim***"); and (ii) advance to such Indemnified Persons all D&O Expenses incurred in connection with any D&O Indemnifiable Claim (including in circumstances where the party responsible for the indemnification of such claim has assumed the defense of such claim) promptly after receipt of reasonably detailed statements therefor; *provided*, *however*, that the Indemnified Person to whom D&O Expenses are to be advanced provides an undertaking to repay such advances if it is ultimately determined that such Indemnified Person is not entitled to indemnification.  Any D&O Indemnifiable Claims will continue until such D&O Indemnifiable Claim is disposed of or all judgments, orders, decrees or other

36

rulings in connection with such D&O Indemnifiable Claim are fully satisfied. For the purposes of this paragraph, "**D&O Expenses**" will include attorneys' fees and all other costs, charges and expenses paid or incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, to be a witness in or participate in any D&O Indemnifiable Claim, but will exclude losses, claims, damages, judgments and amounts paid in settlement (which items are included in the definition of D&O Costs).

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or the Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by these Chapter 11 Cases; *provided* that the Reorganized Debtors shall not indemnify the Debtors' directors for any claims or causes of action for which indemnification is barred: (i) under applicable law, (ii) the Debtors' organizational documents; or (iii) applicable agreements governing the Debtors' indemnification obligations.

H.    *Employee Compensation and Benefit Programs*

Subject to the provisions of this Plan, all Employee Compensation and Benefits Programs (other than awards of stock options, restricted stock, restricted stock units, performance stock units, and other equity awards, including stock rights under any stock purchase plan) shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. All Proofs of Claim Filed for amounts due under any Employee Compensation and Benefits Program shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in this Plan. All Employee Compensation and Benefits Programs to which contributions are made will be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors reserve all of their rights under such agreements. For the avoidance of doubt, the Debtors and the Reorganized Debtors, as applicable, shall honor all their obligations under section 1114 of the Bankruptcy Code. Notwithstanding any other provision in this Plan, the occurrence of the Effective Date shall be deemed to trigger any applicable change of control, vesting, termination, acceleration, or similar provisions contained in the Employee Compensation and Benefits Programs.

I.    *Workers' Compensation Programs*

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans, in each case, for workers' compensation and workers' compensation insurance. Any and all Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, causes of action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, that nothing in this Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

J.    *Extension of Time to Assume or Reject*

Notwithstanding anything to the contrary set forth in <u>Article V</u>, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to

37

assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Article V.A shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired. Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in this Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class; *provided* that any Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during these Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII.

B.      *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

38

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Special Rules for Distributions to Holders of Disputed Claims and Disputed Interests.*

Except as otherwise agreed by the relevant parties: (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Disputed Interest until all such disputes in connection with such Disputed Claim or Disputed Interest have been resolved by settlement or Final Order; and (ii) any Entity that holds both an Allowed Claim or Allowed Interest and a Disputed Claim or Disputed Interest shall not receive any distribution on the Allowed Claim or Allowed Interest unless and until all objections to the Disputed Claim or Disputed Interest have been resolved by settlement or Final Order or such Claims or Interests have been Allowed or expunged.

E.    *Delivery of Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate:  (i) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date (or of a designee designated by a Holder of First Lien Claims or Unsecured Notes Claims, as applicable); (ii) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (iii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (iv) on any counsel that has appeared in these Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

2.    Delivery of Distributions on Account of DIP Claims

The DIP Agent shall be deemed to be the Holder of any and all DIP Claims for purposes of distributions to be made hereunder, and any distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as practicable following compliance with the requirements set forth in Article VI, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Documents and this Plan.  Notwithstanding anything in this Plan to the contrary and without limiting the exculpation and release provisions of this Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

3.    Delivery of Distributions on Account of First Lien Loan Claims

The First Lien Agent shall be deemed to be the Holder of all Allowed First Lien Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to the First Lien Agent.  As soon as practicable following compliance with the requirements set forth in Article VI, if applicable, the First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed First Lien Claims in accordance with the terms of

39

the First Lien Credit Agreement and this Plan. Notwithstanding anything in this Plan to the contrary and without limiting the exculpation and release provisions of this Plan, the First Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Agent.

4.    Delivery of Distributions on Account of Unsecured Notes Claims

The Unsecured Notes Indenture Trustee shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the Unsecured Notes Indenture Trustee. As soon as practicable following compliance with the requirements set forth in Article VI, if applicable, the Unsecured Notes Indenture Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Unsecured Notes Claims in accordance with the terms of the Unsecured Notes Indentures and this Plan. Notwithstanding anything in this Plan to the contrary and without limiting the exculpation and release provisions of this Plan, the Unsecured Notes Indenture Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the Unsecured Notes Indenture Trustee.

5.    Minimum Distributions

No fractional shares of New Common Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. Whenever any payment or distribution of a fraction of a dollar or fractional share of New Common Interests under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Common Interests (up or down), with half dollars and half shares of New Common Interests or less being rounded down. The total number of authorized shares of New Common Interests, as applicable, shall be adjusted as necessary to account for the foregoing rounding.

6.    Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim or Allowed Interest made in accordance herewith is returned to the Reorganized Debtors (or their Disbursing Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such undelivered distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then-current address or other necessary information; *provided* that any such undelivered distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (i) the Effective Date and (ii) the date of the initial attempted distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheat, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred.

F.    *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option of the Debtors or the Reorganized Debtors (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by the Debtors or the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Debtors or the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

US-DOCS\150744359.29

G.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Combined Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim.

H.      *Compliance with Tax Requirements*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder and all related agreements shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors or other applicable Disbursing Agent shall have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (i) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, and (ii) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property.  Notwithstanding any provision in this Plan to the contrary, all Persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes (or establish eligibility for an exclusion for the withholding of taxes), and each Holder of an Allowed Claim or an Allowed Interest will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.  Any amounts withheld or reallocated pursuant to this <u>Article VI.H</u>. shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Any Person or Entity entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the applicable Reorganized Debtor or other applicable Disbursing Agent, or such other Person designated by the Reorganized Debtor or the Disbursing Agent, an IRS Form W-9 or, if the payee is a foreign Person or Entity, an applicable IRS Form W-8, or any other forms or documents reasonably requested by a Reorganized Debtor or Disbursing Agent to reduce or eliminate any withholding required by any applicable Governmental Unit.

The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and encumbrances.

I.      *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law (as reasonably determined by the Reorganized Debtors), be allocated for U.S. federal income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

41

J.      *Setoffs*

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any Claims, Causes of Action and litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; *provided*, that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims or Causes of Action are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims or Causes of Action.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims or Causes of Action, all of which are reserved unless expressly released or compromised pursuant to this Plan or the Combined Order.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS OR INTERESTS

A.      *Resolution of Disputed Claims*

1.      Allowance of Claims and Interests

After the Effective Date, and except as otherwise provided in this Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim, Disputed Interest, or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if these Chapter 11 Cases had not been commenced.

2.      Proofs of Claim

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under this Plan and as otherwise required by this Plan, Holders of Claims need not File Proofs of Claim (except as required for Rejection Damages Claims as set forth in Article V.C), and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if these Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the

42

contrary, disputes regarding the amount of any Cure Claim pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

Any Person or Entity seeking to assert a Rejection Damages Claim must File a Proof of Claim in accordance with Article V.C of this Plan.  For the avoidance of doubt, with respect to any Claims that are not Rejection Damages Claims, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under this Plan.  **Except with respect to Proofs of Claim Filed on account of Rejection Damages Claims in accordance with Article V.C, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

3.   Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors shall have the sole authority to File objections to Claims or Interests and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims or Interests, regardless of whether such Claims or Interests are in an Unimpaired Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order or approval of the Bankruptcy Court.

4.   Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, may at any time request that the Bankruptcy Court estimate any Disputed Claim, Disputed Interest, or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim or Interest, whether for allowance or to determine the maximum amount of such Claim or Interest, including during the litigation concerning any objection to any Claim or Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims and Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

B.   *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest, as applicable, pursuant to a Final Order.

C.   *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent

43

shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (ii) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied or waived in writing pursuant to the provisions of <u>Article VIII.B</u>.

1.      The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Noteholders or Required Consenting First Lien Lenders, and shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the DIP Orders by the applicable milestones in the DIP Credit Agreement and Restructuring Support Agreement, which orders shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

3.      The Bankruptcy Court shall have entered the Combined Order by the applicable milestone in the DIP Credit Agreement and Restructuring Support Agreement, and such Combined Order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

4.      The Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order by the applicable milestone in the DIP Credit Agreement and Restructuring Support Agreement, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

5.      The Equity Rights Offering Backstop Commitment Letter shall provide for backstopped commitments of not less than $46,500,000 and shall remain in full force and effect and shall not have been terminated pursuant to its terms;

6.       The Equity Rights Offering shall have been conducted, in all material aspects, in accordance with the Equity Rights Offering Procedures, and the cash proceeds thereof (including the funding of the Equity Rights Offering Backstop Commitment) shall equal not less than $46,500,000;

7.       All conditions precedent to the effectiveness of the Amended and Restated Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect;

8.       All conditions precedent to the effectiveness of the Exit Facility Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect;

9.       All Restructuring Fees and Expenses shall have been paid in full in Cash;

10.      The Definitive Documents (a) shall be consistent with the Restructuring Term Sheet and the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party thereto, and (c) to the extent applicable, shall be adopted by the applicable Entity on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

11.      All governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Restructuring Transactions, Restructuring Term Sheet and the Restructuring Support Agreement shall have been obtained, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

12.      The Bankruptcy Court shall have entered the Lease Rejection Order by the applicable milestones in the DIP Credit Agreement and Restructuring Support Agreement, which order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

13.      No action shall have been taken by any Governmental Unit that has had a material adverse effect on the business or results of operations of any of the Debtors taken as a whole, *provided* that any change in law, regulation, sub-regulatory guidance or condition generally that impacts the educational industry in which any of the Debtors operate shall not in and of itself constitute a material adverse effect; and

14.      The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan, in each case, subject to the consent rights set forth in the Restructuring Support Agreement.

B.       *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article VIII may be waived by the Debtors with the consent of (x) the Required Consenting Noteholders, (y) solely with respect to the conditions set forth in clauses (1), (2), (3), (7), (8) but only to the extent the terms thereof are materially inconsistent with the terms of the Amended and Restated Credit Agreement Term Sheet, (9) but only with respect to the payment of the Restructuring Fees

and Expenses of the First Lien Ad Hoc Group Advisors, (10) but only with respect to those Definitive Documents over which the Required Consenting First Lien Lenders have consent rights under the Restructuring Support Agreement, (11), (12), (13) and (14), with the consent of the Required Consenting First Lien Lenders, in each case, with such consent rights being exercised in accordance with the Restructuring Support Agreement, or (z) solely with respect to the conditions set forth in clause (9) but only with respect to the payment of the Restructuring Fees and Expenses of the First Lien Revolving Lender Advisors, with the consent of the First Lien Revolving Lenders.

C.      *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan shall, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders or any other Person or Entity; (iii) constitute an Allowance of any Claim or Interest; or (iv) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Person or Entity in any respect.

## ARTICLE IX.
## RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Definitive Documents, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan.  The Combined Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Combined Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and

46

reasonable.  In accordance with the provisions of this Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

B.      *Release by the Debtors*

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE COMBINED ORDER, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY, IN EACH CASE ON BEHALF OF ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CLAIM OR CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, IS AND IS DEEMED TO BE, FOREVER AND UNCONDITIONALLY RELEASED, ABSOLVED, ACQUITTED, AND DISCHARGED BY EACH DEBTOR, REORGANIZED DEBTOR, AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, (I) THE MANAGEMENT, OWNERSHIP, OR OPERATION OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES (INCLUDING ANY DIVIDENDS OR OTHER DISTRIBUTIONS); (II) THE PURCHASE, SALE, OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES; (III) THE SUBJECT MATTER OF, OR THE TRANSACTIONS, EVENTS, CIRCUMSTANCES, ACTS OR OMISSIONS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE RESTRUCTURING TRANSACTIONS, INCLUDING THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE RESTRUCTURING TRANSACTIONS; (IV) THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR OR NON-DEBTOR AFFILIATE AND ANY OTHER ENTITY; (V) THE DEBTORS' AND NON-DEBTOR AFFILIATES' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS; (VI) INTERCOMPANY TRANSACTIONS; (VII) THE RESTRUCTURING SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING TRANSACTION; (VIII) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TERM SHEET, THE DIP DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN; (IX) THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT; OR (X) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO ANY OF THE FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (X) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THIS PLAN, THE COMBINED ORDER, ANY OTHER DEFINITIVE DOCUMENT, ANY RESTRUCTURING TRANSACTION, ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THIS PLAN, OR

47

ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN; (Y) ANY CAUSES OF ACTION SPECIFICALLY RETAINED BY THE DEBTORS PURSUANT TO THE SCHEDULE OF RETAINED CAUSES OF ACTION; OR (Z) ANY CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION DETERMINED BY FINAL ORDER TO CONSTITUTE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR INTENTIONAL FRAUD.

ENTRY OF THE COMBINED ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THIS PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, INCLUDING THE RELEASED PARTIES' SUBSTANTIAL CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING TRANSACTIONS AND IMPLEMENTING THIS PLAN; (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

C.      *Releases by Holders of Claims and Interests*

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE COMBINED ORDER, AS OF THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASING PARTY, IN EACH CASE ON BEHALF OF ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CLAIM OR CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, HAS AND IS DEEMED TO HAVE, FOREVER AND UNCONDITIONALLY, RELEASED, ABSOLVED, ACQUITTED, AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, (I) THE MANAGEMENT, OWNERSHIP, OR OPERATION OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES (INCLUDING ANY DIVIDENDS OR OTHER DISTRIBUTIONS); (II) THE PURCHASE, SALE, OR RESCISSION OF ANY SECURITY OF THE DEBTORS OR THE NON-DEBTOR AFFILIATES; (III) THE SUBJECT MATTER OF, OR THE TRANSACTIONS, EVENTS, CIRCUMSTANCES, ACTS OR OMISSIONS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE RESTRUCTURING TRANSACTIONS, INCLUDING THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE RESTRUCTURING TRANSACTIONS; (IV) THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR OR NON-DEBTOR AFFILIATE AND ANY OTHER ENTITY; (V) THE DEBTORS' AND NON-DEBTOR AFFILIATES' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS; (VI) INTERCOMPANY

48

TRANSACTIONS; (VII) THE RESTRUCTURING SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, THESE CHAPTER 11 CASES, OR ANY RESTRUCTURING TRANSACTION; (VIII) ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE RESTRUCTURING TERM SHEET, THE DIP DOCUMENTS, THE DEFINITIVE DOCUMENTS, OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN; (IX) THE DISTRIBUTION OF PROPERTY UNDER THIS PLAN OR ANY OTHER RELATED AGREEMENT; OR (X) ANY OTHER ACT, OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATING TO ANY OF THE FOREGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (X) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THIS PLAN, THE COMBINED ORDER, ANY OTHER DEFINITIVE DOCUMENT, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THIS PLAN, OR ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN; (Y) ANY CAUSES OF ACTION SPECIFICALLY RETAINED BY THE DEBTORS PURSUANT TO THE SCHEDULE OF RETAINED CAUSES OF ACTION; OR (Z) ANY CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION DETERMINED BY FINAL ORDER TO CONSTITUTE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR INTENTIONAL FRAUD.

ENTRY OF THE COMBINED ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THIS PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION OF THIS PLAN; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, INCLUDING THE RELEASED PARTIES' SUBSTANTIAL CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING TRANSACTIONS AND IMPLEMENTING THIS PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

D.      *Waiver of Statutory Limitations on Releases*

Each of the Releasing Parties in each of the Releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party.  The Releases are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

49

E.    **Exculpation**

EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE EXCULPATED PARTIES SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY PERSON OR ENTITY FOR ANY CLAIMS OR CAUSES OF ACTION ARISING PRIOR TO OR ON THE EFFECTIVE DATE FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO, FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING OR EFFECTING THE CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE DISCLOSURE STATEMENT, THE DEFINITIVE DOCUMENTS, THE DIP DOCUMENTS, OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THIS PLAN OR ANY OTHER POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS, THE APPROVAL OF THE DISCLOSURE STATEMENT OR CONFIRMATION OR CONSUMMATION OF THIS PLAN; *PROVIDED*, THAT THE FOREGOING PROVISIONS OF THIS EXCULPATION SHALL NOT (X) OPERATE TO WAIVE OR RELEASE THE RIGHTS OF ANY PERSON OR ENTITY TO ENFORCE THIS PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, CREDIT DOCUMENTS, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THIS PLAN OR ASSUMED PURSUANT TO THIS PLAN OR FINAL ORDER OF THE BANKRUPTCY COURT AND (Y) APPLY TO THE EXCULPATED PARTIES FOR ACTS OR OMISSIONS DETERMINED BY FINAL ORDER TO CONSTITUTE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR INTENTIONAL FRAUD; *PROVIDED, FURTHER*, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS RESPECTIVE DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE ABOVE REFERENCED DOCUMENTS, ACTIONS OR INACTIONS;

THE EXCULPATED PARTIES HAVE, AND UPON CONSUMMATION OF THIS PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THIS PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THIS PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THIS PLAN.

THE FOREGOING EXCULPATION SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON OR ENTITY.

F.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to this Article IX, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, including any actions specifically enumerated in the Schedule of Retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to

50

do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including this <u>Article IX</u>**, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

G.    *Injunction*

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE COMBINED ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE COMBINED ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THESE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

H.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of these Chapter 11 Cases (or during these Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in these Chapter 11 Cases.

51

I.      *Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, discharge, exculpation, injunction of, for or with respect to Claims and/or Causes of Action are an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE X.
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Combined Order and the occurrence of the Effective Date, the Bankruptcy Court shall, on and after the Effective Date, retain exclusive jurisdiction over these Chapter 11 Cases and all Entities with respect to all matters related to these Chapter 11 Cases, the Debtors, and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date, *provided* that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (as applicable);

4.    resolve any issues related to any matters adjudicated in these Chapter 11 Cases;

5.    ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of this Plan;

6.    decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided* that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

52

8.    resolve any cases, controversies, suits, or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person's or Entity's obligations incurred in connection with this Plan;

9.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.  issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

11.  enforce the terms and conditions of this Plan, the Combined Order, and the Definitive Documents;

12.  resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, and other provisions contained in Article IX and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

13.  enter and implement such orders or take such other actions as may be necessary or appropriate if the Combined Order is modified, stayed, reversed, revoked or vacated;

14.  resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Combined Order or any release or exculpation adopted in connection with this Plan; and

15.  enter an order concluding or closing these Chapter 11 Cases.

Notwithstanding the foregoing, (i) any dispute arising under or in connection with the Amended and Restated Credit Facility shall be dealt with in accordance with the provisions of the applicable document; and (ii) if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to these Chapter 11 Cases, including the matters set forth in this Article X, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and notwithstanding whether or not such Person or Entity (i) will receive or retain any property, or interest in property, under this Plan; (ii) has Filed a Proof of Claim in these Chapter 11 Cases; or (iii) failed to vote to accept or reject this Plan, affirmatively voted to reject this Plan, or is conclusively presumed to reject this Plan.

US-DOCS\150744359.29

B.      *Substantial Consummation*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

C.      *Payment of Statutory Fees; Post-Effective Date Fees and Expenses*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the Office of the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

The Reorganized Debtors shall pay the liabilities and charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees, costs and expenses incurred by Professionals relating to the preparation of interim and final fee applications and obtaining Bankruptcy Court approval thereof) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court, including, without limitation, the reasonable fees, expenses, and disbursements of the Disbursing Agents, and the fees, costs and expenses incurred by Professionals in connection with the implementation, enforcement and Consummation of this Plan and the Definitive Documents.

D.      *Conflicts*

In the event that a provision of any instrument or document created or executed pursuant to the Plan conflicts with a provision of this Plan or the Combined Order, the provision of this Plan and the Combined Order (as applicable) shall govern and control to the extent of such conflict.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or the Combined Order).  In the event that a provision of this Plan conflicts with a provision of the Combined Order, the provision of the Combined Order shall govern and control to the extent of such conflict.

E.      *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Combined Order in accordance with section 1127(a) of the Bankruptcy Code; and (ii) after the entry of the Combined Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan in accordance with section 1127(b) of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Entry of the Combined Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

F.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or

54

withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Person or Entity, (b) prejudice in any manner the rights of the applicable Debtors or any other Person or Entity, or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Person or Entity.

G.    *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims and Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

H.    *Reservation of Rights*

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Combined Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Person or Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (i) the Debtors with respect to the Holders of Claims or Interests or other Person or Entity; or (ii) any Holder of a Claim or an Interest or other Person or Entity prior to the Effective Date.

I.    *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Combined Order.

J.    *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Combined Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

K.      *Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "***Notice***") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

**If to the Debtors**:

2U, Inc.
2345 Crystal Drive, Suite 1100
Arlington, Virginia 22202
Attention:  Matthew Norden and Lillian Brownstein
E-mail:  mnorden@2u.com and lbrownstein@2u.com

*with copies to*:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attn:  George A. Davis, George Klidonas, Anupama Yerramalli, Randall C. Weber-Levine, and Scott Yousey
Email: george.davis@lw.com, george.klidonas@lw.com, anu.yerramalli@lw.com, randall.weber-levine@lw.com, and scott.yousey@lw.com

**If to the Consenting First Lien Lenders**

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Albert A. Pisa, Tyson Lomazow, and Abigail Debold
E-mail:  APisa@milbank.com, TLomazow@milbank.com, and Adebold@milbank.com

**If to the Consenting Noteholders**

Weil, Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153
Attention:  Matt Barr, David Griffiths, and F. Gavin Andrews
E-mail:  Matt.Barr@weil.com, David.Griffiths@weil.com, and F.Gavin.Andrews@weil.com

**If to Greenvale**

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention:  Kristine Manoukian, Reuben E. Dizengoff, and Kelly Knight
E-mail:  Kristine.Manoukian@srz.com, Reuben.Dizengoff@srz.com, and Kelly.Knight@srz.com,

**If to the United States Trustee for the Southern District of New York**

United States Trustee, U.S. Department of Justice

56

Office of the U.S. Trustee, 1 Bowling Green, Room 534
New York, NY 10014
Attn: Rachael E. Siegel, Daniel Rudewicz, and Brian Masumoto
E-mail: rachael.e.siegel@usdoj.gov, daniel.rudewicz@usdoj.gov, and
brian.masumoto@usdoj.gov

A Notice is deemed to be given and received (i) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (ii) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (iii) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, *provided*, that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

L.      *Exemption from Stamp or Similar Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

To the fullest extent permitted by to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange pursuant to or in connection with this Plan or the other Definitive Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Combined Order shall direct the appropriate federal, state or local (domestic or foreign) governmental officials, officers or agents, wherever located and by whomever appointed, to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Plan or the other Definitive Documents (including the Restructuring Transactions); (ii) the issuance, distribution, transfer, or exchange of any debt, securities, or other interests of the Debtors or the Reorganized Debtors, including the Amended and Restated Loans, the New Common Interests, or related instruments or documentation; (iii) the maintenance, modification, consolidation, termination, refinancing, recording or creation of any security interests, mortgage, deed or trust, or Lien; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral, security for any or all of the Amended and Restated Loans or other indebtedness; or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan (including the Restructuring Transactions).

M.      *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Definitive Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

57

N.      *Tax Reporting and Compliance*

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

O.      *Schedules*

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

P.      *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Stakeholders, and their respective professionals. Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, the Exhibits, and the Plan Schedules, and the agreements and documents ancillary or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, the Exhibits, or the Plan Schedules, or the documents ancillary and related thereto.

Q.      *Entire Agreement*

Except as otherwise provided herein or therein, this Plan and the other Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan and the other Definitive Documents.

R.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of these Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close these Chapter 11 Cases.

S.      *Votes Solicited in Good Faith*

Upon entry of the Combined Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, proxyholders, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan or the Equity Rights Offering and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan, the Equity Rights Offering, and any previous plan.

T.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Combined Hearing to receive documents pursuant to Bankruptcy Rule 2002.

[*Remainder of page intentionally left blank*]

US-DOCS\150744359.29

Respectfully submitted,
July 24, 2024

2U, INC. AND ITS DEBTOR AFFILIATES

By:   /s/ Matthew Norden
_____

Title:   Chief Financial Officer and Chief Legal Officer
_____

## **<u>EXHIBIT B</u>**

Restructuring Support Agreement

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS RESTRUCTURING SUPPORT AGREEMENT IS CONFIDENTIAL AND IS SUBJECT TO THE CONFIDENTIALITY AGREEMENTS ENTERED INTO AND BY THE RECIPIENTS OF THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DEBTORS, AND MAY NOT BE SHARED WITH ANY THIRD PARTY OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENTS. NO NON-EXECUTED DRAFT OF THIS RESTRUCTURING SUPPORT AGREEMENT WILL BE CONTAINED IN ANY CLEANSING MATERIALS IN CONNECTION WITH ANY SUCH CONFIDENTIALITY AGREEMENTS.**

<u>**RESTRUCTURING SUPPORT AGREEMENT**</u>

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated July 24, 2024, is entered into by and among:

(a)    2U, Inc. ("**Holdings**"); 2U GetSmarter, LLC; 2U Harkins Road LLC; 2U NYC, LLC; 2U KEIH Holdco, LLC; Critiquelt, Inc.; edX LLC; edX Boot Camps LLC; and 2U GetSmarter (US), LLC (collectively, the "**Debtors**" and, each, a "**Debtor**");

(b)    the undersigned holders of approximately $340 million in aggregate principal amount outstanding of first lien term loans pursuant to that certain Credit and Guaranty Agreement, dated as of June 28, 2021 (as amended by that certain First Amendment to Term Loan Credit and Guaranty Agreement, dated as of November 4, 2021, as amended by that certain Extension Amendment, Second Amendment and First Incremental Agreement to Credit and Guaranty Agreement, dated as of January 9, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**First Lien Credit Agreement**"), by and among Holdings, as borrower, certain subsidiaries of Holdings, as guarantors, the lenders party thereto (whether or not party to this Agreement, the "**First Lien Lenders**"), and Alter Domus (US) LLC, as administrative agent and collateral agent (the "**First Lien Agent**"), together with accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, and all Claims or Causes of Action relating thereto (collectively,

the "**First Lien Claims**" and, such undersigned holders of First Lien Claims, solely in their capacity as First Lien Lenders, the "**Initial Consenting First Lien Lenders**" and, together with any First Lien Lender that subsequently becomes a party to this Agreement solely in its capacity as First Lien Lender, the "**Consenting First Lien Lenders**"); and

    (c) the undersigned holders of approximately $480 million in aggregate principal amount of indebtedness outstanding consisting of approximately (i) $340 million aggregate principal amount outstanding pursuant to that certain Indenture, dated as of April 23, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**2025 Notes Indenture**"), by and between Holdings, as issuer, and Wilmington Trust, National Association, as trustee (the "**Indenture Trustee**"), governing Holdings' $380 million aggregate principal amount of 2.25% Convertible Senior Notes due 2025 (the "**2025 Notes**"), and (ii) $140 million aggregate principal amount outstanding pursuant to that certain Indenture, dated as of January 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**2030 Notes Indenture**" and, together with the 2025 Notes Indenture, the "**Indentures**"), by and between Holdings, as issuer, and the Indenture Trustee, as trustee, governing Holdings' $147 million aggregate principal amount of 4.50% Senior Unsecured Convertible Notes due 2030 (the "**2030 Notes**" and, together with the 2025 Notes, the "**Convertible Notes**" and, all the holders of the Convertible Notes, whether or not party to this Agreement, the "**Convertible Noteholders**"), together with accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, and all Claims or Causes of Action relating thereto (collectively, the "**Unsecured Notes Claims**" and, such undersigned holders of the Unsecured Notes Claims solely in their capacity as Convertible Noteholders under the applicable Convertible Notes, the "**Initial Consenting Noteholders**" and, together with any Convertible Noteholder that subsequently becomes a party to this Agreement solely in its capacity as Convertible Noteholder under the applicable Convertible Notes, the "**Consenting Noteholders**" and, the Consenting Noteholders together with the Consenting First Lien Lenders, the "**Consenting Creditors**").

    The Debtors and each of the Consenting Creditors, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "**Parties**" and each, individually, as a "**Party**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below). The Restructuring Term Sheet is hereby incorporated by reference and made part of this Agreement as if fully set forth herein.

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's-length and agreed to enter into certain restructuring transactions on the terms set forth in this Agreement, the Restructuring Term Sheet and as specified in the Definitive Documents (as defined below) (collectively, the "**Restructuring**");

**WHEREAS**, the Debtors will implement the Restructuring through commencement by the Debtors of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (each as defined below);

**WHEREAS**, as of the date hereof, the Initial Consenting First Lien Lenders, in the aggregate, hold, own, or control approximately 82% of the aggregate outstanding principal amount of First Lien Claims;

**WHEREAS**, as of the date hereof, the Initial Consenting Noteholders, in the aggregate, hold, own, or control approximately 91% of the principal amount of aggregate outstanding Unsecured Notes Claims;

**WHEREAS**, the Initial Consenting Noteholders have committed, severally but not jointly, to provide a secured, multi-draw, junior lien debtor-in-possession facility in the aggregate principal amount not to exceed $64 million (the "**DIP Facility**" and, the commitments in respect thereof, the "**DIP Commitments**" and, the loans thereunder, the "**DIP Loans**") subject to the terms and conditions of the DIP Documents (as defined below);

**WHEREAS**, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim (as defined below), on the Effective Date (as defined below), each holder of such Allowed DIP Claim shall receive (a) its *pro rata* share of Exit Loans under the Exit Facility, or (b) such other treatment as to which the Debtors and the holder of such Allowed DIP Claims will have agreed upon in writing;

**WHEREAS,** in connection with the Restructuring, it is expected that Holdings will offer to all holders of the Convertible Notes rights to purchase New Common Interests (as defined below) for an aggregate amount of $46.5 million under section 1145 of the Bankruptcy Code (the "**Equity Rights Offering**"), which will be used to fund certain obligations under the Plan (including, but not limited to, reducing the aggregate principal amount of the A&R CA Loans (as defined in the Restructuring Term Sheet) by $30 million on the Effective Date in accordance with the Amended and Restated Credit Agreement Term Sheet (as defined below), and paying administrative expenses, professional fees, and the Equity Rights Offering Backstop Commitment Premium (as defined in the Restructuring Term Sheet)) and/or Reorganized Debtors' working capital needs, in accordance with this Agreement and subject to the consent of the Required Consenting Noteholders and the Debtors set forth in this Agreement;

**WHEREAS**, the Equity Rights Offering Backstop Parties (as defined in the Restructuring Term Sheet) have agreed to, severally and not jointly, backstop a portion of the Equity Rights Offering, subject to the terms of the Equity Rights Offering Backstop Order and the Equity Rights Offering Backstop Commitment Letter (each as defined in the Restructuring Term Sheet); and

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "**2025 Notes**" has the meaning set forth in the preamble to this Agreement.

(b)    "**2025 Notes Indenture**" has the meaning set forth in the preamble to this Agreement.

(c)    "**2030 Notes**" has the meaning set forth in the preamble to this Agreement.

(d)    "**2030 Notes Indenture**" has the meaning set forth in the preamble to this Agreement.

(e)    "**Ad Hoc Noteholder Group**" means that certain ad hoc group of holders of Unsecured Notes Claims represented by the Ad Hoc Noteholder Group Counsel.

(f)    "**Ad Hoc Noteholder Group Counsel**" means Weil, Gotshal & Manges, LLP, as legal counsel to the Ad Hoc Noteholder Group.

(g)    "**Agreement**" has the meaning set forth in the preamble to this Agreement.

(h)    "**Allowed**" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (i) except with respect to any Claim arising from the rejection of unexpired leases by the Debtors, there is no requirement to file a proof of claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (ii) the Debtors may affirmatively deem unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

(i)    "**Alternative Restructuring**" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring of the Debtors, or other transaction of similar effect, other than the Restructuring; *provided* that any Alternative Restructuring that is implemented pursuant to a valid amendment of this Agreement shall not be an Alternative Restructuring.

(j)    "**Amended and Restated Credit Agreement**" means that certain *Amended and Restated Credit Agreement*, to be entered into as of the Effective Date, by and between the applicable Reorganized Debtors, the First Lien Lenders, and the administrative agent thereunder (including all appendices, exhibits, schedules, and supplements thereto), which shall amend and restate the First Lien Credit Agreement in its entirety, shall be consistent with the terms of the

Amended and Restated Credit Agreement Term Sheet and shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(k)    "**Amended and Restated Credit Agreement Term Sheet**" means the term sheet setting forth the terms and conditions of the Amended and Restated Credit Agreement, attached as <u>Annex 2</u> to the Restructuring Term Sheet, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(l)    "**Amended and Restated Credit Documents**" means, collectively, the Amended and Restated Credit Agreement and all other "Credit Documents" (as defined in the Amended and Restated Credit Agreement), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(m)    "**Avoidance Actions**" means any and all actual or potential Claims and Causes of Action to avoid or recover a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

(n)    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

(o)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

(p)    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

(q)    "**Brooklyn Lease**" means the Agreement of Lease, dated February 13, 2017, by and between Brooklyn Lessor and 2U NYC, LLC (as may be amended, supplemented, or modified from time to time).

(r)    "**Brooklyn Lessor**" means 55 Prospect Owner LLC.

(s)    "**Business Day**" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

(t)    "**Cash**" means the legal tender of the United States of America.

(u)    "**Cash Collateral**" shall have the meaning set forth in the DIP Orders.

(v)    "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding demand, right, lien, indemnity,

contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims against, or Interests in, a Debtor; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any state law fraudulent transfer claim; and (vi) any Avoidance Actions.

(w)    "**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

(x)    "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(y)    "**Combined Hearing**" means the combined hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (i) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code and (ii) confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

(z)    "**Combined Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(aa)    "**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with the Restructuring, and between any Debtor and any Consenting Creditor, Consenting Creditor Advisors, or any holder of any Claims or Interests against the Debtors.

(bb)    "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Combined Order.

(cc)    "**Consenting Claims**" means all Claims against any Debtor held by or on behalf of or in the control of Consenting Creditors from time to time.

(dd)    "**Consenting Creditor Advisors**" means, collectively the Consenting Noteholder Advisors and the First Lien Ad Hoc Group Advisors.

(ee)     "**Consenting Creditor Group Counsel**" means, collectively, the Ad Hoc Noteholder Group Counsel, Greenvale Counsel, and the First Lien Ad Hoc Group Counsel.

(ff)     "**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

(gg)     "**Consenting First Lien Lender Termination Event**" has the meaning set forth in Section 7.03.

(hh)     "**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(ii)     "**Consenting Noteholder Advisors**" means, collectively, the Consenting Noteholder Group Counsel, Consenting Noteholder Financial Advisor, Consenting Noteholder Director Search Consultant, Consenting Noteholder Regulatory Counsel, and Consenting Noteholder Communications Advisor.

(jj)     "**Consenting Noteholder Communications Advisor**" means Brian Napack, in his capacity as communications advisor to the Consenting Noteholders.

(kk)     "**Consenting Noteholder Director Search Consultant**" means Heidrick & Struggles International, Inc., in its capacity as consultant to the Initial Consenting Noteholders with respect to a search for director candidate(s) in connection with the Restructuring.

(ll)     "**Consenting Noteholder Financial Advisor**" means Houlihan Lokey, Inc., as financial advisor to the Initial Consenting Noteholders.

(mm)    "**Consenting Noteholder Group Counsel**" means, collectively, the Ad Hoc Noteholder Group Counsel and Greenvale Counsel.

(nn)    "**Consenting Noteholder Regulatory Counsel**" means Holland & Knight LLP, in its capacity as regulatory counsel to the Initial Consenting Noteholders.

(oo)    "**Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

(pp)    "**Consenting Noteholder Termination Event**" has the meaning set forth in Section 7.02.

(qq)    "**Convertible Noteholders**" has the meaning set forth in the preamble to this Agreement.

(rr)     "**Convertible Notes**" has the meaning set forth in the preamble to this Agreement.

(ss)     "**Debtor**" or "**Debtors**" has the meaning set forth in the preamble to this Agreement.

7

(tt)    "**Debtors' Advisors**" means Debtors' Counsel, Moelis & Company LLC, and AlixPartners, LLP.

(uu)    "**Debtor Termination Event**" has the meaning set forth in <u>Section 7.03</u>(a).

(vv)    "**Debtors' Counsel**" means Latham & Watkins LLP, as legal advisors to the Debtors.

(ww)    "**Definitive Documents**" means, each consistent with this Agreement: (i) the Plan and the Plan Supplement; (ii) the Disclosure Statement and the Solicitation Materials, and any motion seeking approval of, and any notices related to, the foregoing; (iii) the Solicitation Procedures Order; (iv) the Combined Order; (v) the DIP Documents; (vi) the New Common Interests Documents; (vii) the Amended and Restated Credit Documents; (viii) the New Corporate Governance Documents; (ix) the First Day Orders; (x) the Lease Rejection Order; (xi) the Exit Facility Documents; and (xii) any other agreement, document, instrument, pleading and/or order entered or entered into, or utilized, in connection with or to implement the Restructuring (together with any exhibit, amendment, modification or supplement thereto), which documents specified in this clause (xii) shall in each case, be in form and substance acceptable to the Parties that have consent rights with respect to the applicable Definitive Documents in clauses (i) through (xi) and in accordance with those consents.

(xx)    "**DIP Agent**" means the "Administrative Agent" and the "Collateral Agent" (each, as defined in the DIP Credit Agreement), solely in their capacities as administrative agent and collateral agent under the DIP Credit Agreement, their successors, assigns, or any replacement agents appointed pursuant to the terms of the DIP Credit Agreement.

(yy)    "**DIP Claims**" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents.

(zz)    "**DIP Commitments**" has the meaning set forth in the recitals to this Agreement.

(aaa)    "**DIP Credit Agreement**" means that certain *Debtor-in-Possession Credit and Guaranty Agreement* to be entered by and among Holdings, as borrower, the guarantors party thereto, the DIP Agent, and the DIP Lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms) in respect of the DIP Facility, in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

(bbb)    "**DIP Documents**" means the DIP Credit Agreement, the other "Credit Documents" as defined in the DIP Credit Agreement, the DIP Motion, the DIP Orders, and any other agreement, document and/or instrument entered or entered into in connection with any of the foregoing, each in form and substance acceptable to the Required Consenting Noteholders and the

Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

(ccc)   "**DIP Facility**" has the meaning set forth in the recitals to this Agreement.

(ddd)   "**DIP Facility Term Sheet**" means the term sheet attached as Annex 1 to the Restructuring Term Sheet describing the material terms of the DIP Facility in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

(eee)   "**DIP Lenders**" means the lenders from time to time party to the DIP Credit Agreement.

(fff)   "**DIP Loans**" has the meaning set forth in the recitals to this Agreement.

(ggg)   "**DIP Motion**" means the motion seeking approval by the Bankruptcy Court of the DIP Facility and entry of the DIP Orders, including any declarations, notices, exhibits and/or annexes thereto (as amended, modified or supplemented from time to time) in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(hhh)   "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

(iii)   "**Disclosure Statement**" means the disclosure statement in respect of the Plan, in form and substance acceptable to the Required Consenting Creditors and the Debtors, including all exhibits, schedules, supplements, modifications, amendments, annexes and attachments thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(jjj)   "**Effective Date**" means, with respect to the Plan, the date that is a Business Day selected by the Debtors, with the consent of the Required Consenting Noteholders, on which (i) no stay of the Combined Order is in effect and (ii) all conditions precedent to the effectiveness or consummation of the Plan have been satisfied or waived in accordance with the terms of the Plan and this Agreement.

(kkk)   "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(lll)   "**Equity Rights Offering**" has the meaning set forth in the recitals to this Agreement.

(mmm)   "**Equity Rights Offering Backstop Order**" means that certain order entered by the Bankruptcy Court, which may be the Combined Order, approving, among other things, the Equity Rights Offering Backstop Commitment Letter and the Equity Rights Offering Backstop Commitment Premium, which shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

(nnn)    "**Equity Rights Offering Procedures**" means those certain rights offering procedures with respect to the Equity Rights Offering as set forth in the Plan.

(ooo)    "**Exit Agent**" means the administrative agent and collateral agent under the Exit Facility Credit Agreement.

(ppp)    "**Exit Facility**" means the secured second lien exit term loan facility that shall be provided on the terms and conditions consistent with the Exit Facility Term Sheet and arising pursuant to the Exit Facility Credit Agreement, proceeds of which shall be available to satisfy Allowed DIP Claims.

(qqq)    "**Exit Facility Credit Agreement**" means that certain Credit Agreement to be entered into in connection with the Exit Facility, to be dated as of the Effective Date, by and among Reorganized Parent, as borrower, the Exit Agent, and the Exit Lenders, which shall be in form and substance consistent with the Exit Facility Term Sheet and otherwise acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

(rrr)    "**Exit Facility Documents**" means, collectively, the Exit Facility Credit Agreement and all other loan documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the Exit Facility Term Sheet and shall otherwise be acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders.

(sss)    "**Exit Facility Term Sheet**" means that certain term sheet that sets forth the principal terms of the Exit Facility, as may be supplemented, amended, or otherwise modified from time to time, in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

(ttt)    "**Exit Lenders**" means the lenders party to the Exit Facility Credit Agreement.

(uuu)    "**Exit Loans**" means loans issued under the Exit Facility Credit Agreement.

(vvv)    "**Fiduciary Action**" has the meaning set forth in <u>Section 6.01</u> of this Agreement.

(www)    "**Final DIP Order**" means the order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility, the DIP Commitments, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on a final basis (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(xxx)   "**Final Order**" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which (i) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (ii) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

(yyy)   "**First Day Orders**" means any interim or final order of the Bankruptcy Court granting the relief requested in the First Day Pleadings (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(zzz)   "**First Day Pleadings**" means all material motions, applications, notices and/or other pleadings that the Debtors file or propose to file in connection with the commencement of the Chapter 11 Cases and all orders sought thereby (any of the foregoing as amended, supplemented or modified from time to time), including the First Day Orders, each of which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(aaaa)   "**First Lien Claims**" has the meaning set forth in the preamble to this Agreement.

(bbbb)   "**First Lien Credit Agreement**" has the meaning set forth in the preamble to this Agreement.

(cccc)   "**First Lien Credit Documents**" means the First Lien Credit Agreement together with all other related documents, instruments, and agreements, in each case, as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

(dddd)   "**First Lien Ad Hoc Group**" means that certain ad hoc group of holders of First Lien Claims represented by Milbank LLP, as legal counsel.

(eeee)   "**First Lien Ad Hoc Group Advisors**" means, collectively, First Lien Ad Hoc Group Counsel and FTI Consulting, Inc., as financial advisors to the First Lien Ad Hoc Group.

(ffff)   "**First Lien Ad Hoc Group Counsel**" means Milbank LLP, as legal counsel to the First Lien Ad Hoc Group.

(gggg) "**First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(hhhh) "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

(iiii)    "**Greenvale**" means Greenvale Capital LLP, on behalf of its funds and/or accounts in their capacities as holders of Unsecured Notes Claims.

(jjjj)    "**Greenvale Counsel**" means Schulte, Roth, and Zabel LLP, as legal counsel to Greenvale.

(kkkk) "**Holdings**" has the meaning set forth in the preamble to this Agreement.

(llll)    "**HQ Premises Lease**" means the Office Lease, dated December 23, 2015, by and between HQ Premises Lessor, 2U Harkins Road LLC (as amended by the First Amendment to Office Lease and Reaffirmation of Guaranty, dated May 27, 2016, the Second Amendment to Office Lease and Reaffirmation of Guaranty, dated October 4, 2017, and the Third Amendment to Office Lease, dated May 14, 2019, and as may be further amended, supplemented, or modified from time to time).

(mmmm)    "**HQ Premises Lessor**" means Lanham Office 2015 LLC.

(nnnn) "**Indenture Trustee**" has the meaning set forth in the preamble to this Agreement.

(oooo) "**Indentures**" has the meaning set forth in the preamble to this Agreement.

(pppp) "**Initial Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(qqqq) "**Initial Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

(rrrr)    "**Interests**" means any equity, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date (in each case whether or not arising under or in connection with any employment agreement); *provided* that the foregoing shall not apply to any entitlement to participate in or receive any Interests of the Reorganized Debtors on or following the Effective Date.

(ssss)    "**Interim DIP Order**" means the order, in the form attached hereto as Exhibit D, entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit

12

Agreement and approving, among other things, the DIP Facility, the DIP Commitments, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on an interim basis (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(tttt)    "**Joinder Agreement**" has the meaning set forth in <u>Section 4.02</u>.

(uuuu) "**Lease Rejection Motion**" means a motion, which shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors, which seeks orders providing for the rejection of certain of the Debtors' unexpired leases (including the HQ Premises Lease and the Brooklyn Lease, unless such leases are to be assumed pursuant to a settlement with such landlords which is acceptable to the Required Consenting Creditors and the Debtors) pursuant to section 365 of the Bankruptcy Code; *provided*, that the Claims arising from any rejection of unexpired leases shall be capped pursuant to section 502(b)(6) of the Bankruptcy Code.

(vvvv) "**Lease Rejection Order**" means any order of the Bankruptcy Court granting the Lease Rejection Motion and related relief, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(wwww)    "**Milestones**" means the "Milestones" set forth in <u>Exhibit C</u> hereto and any other milestones set forth in the DIP Documents.

(xxxx) "**New Board**" means the board of directors or managers of Reorganized Parent.

(yyyy) "**New Common Interests**" means a single class of new common equity interests of Reorganized Parent to be issued (i) on the Effective Date or (ii) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents.

(zzzz) "**New Common Interests Documents**" means any and all documents required to implement, issue, or distribute the New Common Interests, including the Equity Rights Offering Procedures, Equity Rights Offering Backstop Commitment Letter, Equity Rights Offering Backstop Order, and any other agreement, document or instrument delivered or entered into pursuant thereto or in connection therewith, each of which shall be in form and substance acceptable to the Required Consenting Noteholders, the Debtors (which consent of the Debtors shall not be unreasonably be withheld), and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld); *provided*, that the New Corporate Governance Documents shall only be acceptable to the Required Consenting Noteholders in their sole discretion in consultation with the Debtors.

(aaaaa)"**New Corporate Governance Documents**" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement, or other similar organizational or formation documents, as applicable, of each of the Reorganized Debtors, each of which shall be in form and substance acceptable to the Required Consenting Noteholders in their sole discretion in consultation with the Debtors.

(bbbbb)        "**Party**" or "**Parties**" has the meaning set forth in the preamble to this Agreement.

(ccccc) "**Permitted Transferee**" has the meaning set forth in <u>Section 4.02(b)</u>.

(ddddd)        "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

(eeeee) "**Petition Date**" means the date on which the Debtors commence the Chapter 11 Cases by filing petitions with the Bankruptcy Court.

(fffff)  "**Plan**" means the Debtors' prepackaged joint chapter 11 plan of reorganization, in the form attached hereto as <u>Exhibit E</u>, including all appendices, exhibits, schedules, and supplements thereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan and this Agreement, which shall incorporate the terms of, and shall be consistent with, this Agreement (including the Restructuring Term Sheet) and shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(ggggg)        "**Plan Supplement**" means any supplemental appendix to the Plan, in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and, solely with respect to those documents over which the Required Consenting First Lien Lenders have consent rights, reasonably acceptable to the Required Consenting First Lien Lenders, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended modified or supplemented from time to time in accordance with the terms of the Plan and this Agreement, and the Bankruptcy Code and the Bankruptcy Rules, which shall include, but shall not be limited to: (i) the New Corporate Governance Documents (*provided*, *however*, that notwithstanding anything herein, such New Corporate Governance Documents shall be in form and substance only acceptable to the Required Consenting Noteholders in their sole discretion in consultation with the Debtors); (ii) the Equity Rights Offering Procedures; (iii) the Amended and Restated Credit Documents; (iv) the Exit Facility Documents; and (v) the Restructuring Transactions Memorandum.

(hhhhh)        "**Prepetition Funded Debt Documents**" means, collectively, the First Lien Credit Documents and the Unsecured Notes Documents.

(iiiii)   "**Public Disclosure**" has the meaning set forth in <u>Article 11.</u>

(jjjjj)   "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Consenting Claims (including debt securities or other debt), or enter with customers into long and/or short positions in Consenting Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Consenting Claims (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers.

14

(kkkkk)        "**Qualified Marketmaker Joinder Date**" has the meaning set forth in <u>Section 4.02(c)</u>.

(lllll)    "**Reorganized Debtors**" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

(mmmmm)    "**Reorganized Parent**" means from and after the Effective Date, Holdings or such other Entity as may be determined by the Debtors and the Required Consenting Noteholders to be the Debtors' new corporate parent, as reorganized pursuant to the Plan or as otherwise agreed between the Debtors and the Required Consenting Noteholders.

(nnnnn)        "**Required Consenting Creditors**" means, collectively, the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

(ooooo)        "**Required Consenting First Lien Lenders**" means, as of any date of determination, the Consenting First Lien Lenders holding at least 50.1% in aggregate principal amount outstanding of the First Lien Claims held by all of the Consenting First Lien Lenders as of such date.

(ppppp)        "**Required Consenting Noteholders**" means, as of any date of determination, the Consenting Noteholders holding at least 66.67% in aggregate principal amount outstanding of the Unsecured Notes Claims held, beneficially owned, or managed by all of the Consenting Noteholders as of such date.

(qqqqq)        "**Required Consenting Terminating First Lien Lenders**" means as of any date of determination, the Consenting First Lien Lenders holding at least 50.1% in aggregate principal amount outstanding of the First Lien Claims held by all of the Consenting First Lien Lenders as of such date.

(rrrrr)    "**Restructuring**" has the meaning set forth in the recitals to this Agreement.

(sssss)    "**Restructuring Fees and Expenses**" means all documented fees, costs, and expenses of each of the Consenting Creditor Advisors, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, the other Definitive Documents, the Restructuring, and the transactions contemplated hereby and thereby.

(ttttt)    "**Restructuring Proceeding**" means other than the Chapter 11 Cases or any other action or proceeding taken in furtherance of or in connection with the Restructuring with the consent of the Debtors and the Required Consenting Noteholders, the appointment of an administrator, liquidator, provisional liquidator, bankruptcy or proposal trustee, receiver, administrative receiver, or similar officer in respect of any Debtor or any subsidiary of any Debtor, or the winding up, liquidation, provisional liquidation, dissolution, administration, reorganization, composition, compromise, or arrangement of or with any Debtor or any subsidiary of any Debtor, or any equivalent or analogous appointment or proceedings under the law of any other jurisdiction.

US-DOCS\152166568.18

(uuuuu)        "**Restructuring Term Sheet**" means the restructuring term sheet, attached hereto as <u>Exhibit A</u> and incorporated herein as if fully set forth herein (including any schedules, annexes and exhibit attached thereto, each as may be modified in accordance with the terms of this Agreement), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(vvvvv)        "**Restructuring Transactions Memorandum**" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(wwwww)        "**Securities Act**" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any rules and regulations promulgated thereby.

(xxxxx)        "**Solicitation**" means the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(yyyyy)        "**Solicitation Materials**" means  any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan pursuant to the Solicitation Procedures Order, and related to the Equity Rights Offering and the Equity Rights Offering Procedures, each of which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(zzzzz) "**Solicitation Procedures Order**" means the order of the Bankruptcy Court approving the Solicitation procedures and scheduling the Combined Hearing, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

(aaaaaa)        "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Debtors, (ii) each of the Initial Consenting First Lien Lenders so long as they collectively hold at least 66.67% of the aggregate outstanding principal amount of First Lien Claims and comprise more than 50% in number of the holders of First Lien Claims, and (iii) each of the Initial Consenting Noteholders so long as they collectively hold at least 66.67% of the aggregate outstanding principal amount of Unsecured Notes Claims and comprise more than 50% in number of the holders of Unsecured Notes Claims.

(bbbbbb)        "**Support Period**" means the period commencing on the Support Effective Date and ending on the Termination Date, and in the case that the Termination Date is the Effective Date, the Support Period shall include the Termination Date.

(cccccc)        "**Termination Date**" means the date on which termination of this Agreement is effective as to a Party in accordance with <u>Article 7</u> of this Agreement.

(dddddd)        "**Transfer**" has the meaning set forth in <u>Section 4.02</u>.

(eeeee) "**Unsecured Notes Claims**" has the meaning set forth in the preamble to this Agreement.

(fffff) "**Unsecured Notes Documents**" means the Indentures together with all other related documents, instruments, and agreements, in each case as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

2.    **Passage of Time**

With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, such Milestone or other reference of time shall be extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure; *provided*, for the avoidance of doubt, that any Milestone with respect to a hearing date shall be subject to the Bankruptcy Court's availability.

3.    **Restructuring.**

Section 3.01    Confirmation of the Plan.  Subject to the terms of this Agreement, the Parties will use their commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date, and by no later than the applicable Milestone, in accordance with the Bankruptcy Code and on terms consistent with this Agreement. Each Party shall use its commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Debtors in connection therewith.  Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including, without limitation, to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring).

Section 3.02    Definitive Documents.  The documents related to or otherwise utilized to implement or effectuate the Restructuring shall include, among others, the Definitive Documents, each of which shall be consistent in all respects with the terms and conditions of this Agreement, including the Restructuring Term Sheet, and, in each case, shall be in form and substance acceptable to the Parties that have consent rights with respect to the applicable Definitive Documents.

4.    **Agreements of the Consenting Creditors.**

Section 4.01    Support.  Each Consenting Creditor, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

(a)    timely vote or cause to be voted, following commencement of the Solicitation and by the applicable deadline set forth in the Solicitation Materials, all of its Claims (or Claims under its control), including all Claims that are impaired under the Plan, to accept the

Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Creditor, effective immediately upon written notice to the Debtors (with email among counsel being sufficient), may withhold, change, or withdraw (or cause to be withheld, changed, or withdrawn) its vote (and, upon such withdrawal be deemed void *ab initio*) at any time following termination of this Agreement in accordance with its terms with respect to such Consenting Creditor, other than on account of a breach by such Consenting Creditor;

(b)    subject to the terms of this Agreement and the DIP Documents (i) consent, and to be deemed to have consented, to the incurrence of the DIP Facility on the terms set forth in the DIP Facility Term Sheet and the DIP Documents; (ii) consent, and, if necessary, direct any administrative agent, collateral agent, or indenture trustee (as applicable) to consent, to the Debtors' use of their cash collateral pursuant to the DIP Orders; and (iii) if necessary, give any notice, order, instruction, or direction to the applicable administrative agent, collateral agent, or indenture trustee necessary to give effect to the foregoing;

(c)    subject to the terms of this Agreement and the Definitive Documents, give any notice, order, instruction, or direction to the applicable administrative agent, collateral agent, or indenture trustee necessary to give effect to the Restructuring, provided that no Consenting Creditor shall be required hereunder to provide such administrative agent, collateral agent, or indenture trustee with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith;

(d)    except to the extent provided or expressly contemplated under this Agreement or any Definitive Documents, including, without limitation, the DIP Documents, not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, and if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor will use its reasonable efforts to direct such administrative agent, collateral agent, or indenture trustee to cease, desist, and refrain from taking any such action, and to take such action as may be necessary to effect the Restructuring;

(e)    subject to the terms of this Agreement and the applicable Definitive Documents, use commercially reasonable efforts and act in good faith to negotiate, complete, enter into, execute, effectuate, and implement the Definitive Documents (as applicable) and any other necessary filings, documents, pleadings, agreements, contracts and requests for regulatory approvals to which it is a party within the timeframes contemplated herein;

(f)    use commercially reasonable efforts and act in good faith to support, not object to, and take all reasonable actions (to the extent practicable and consistent with the terms of this Agreement and/or the Definitive Documents) reasonably necessary or reasonably requested by the Debtors to facilitate the Solicitation, approval of and entry of orders regarding the Definitive Documents, and confirmation and consummation of the Plan and the Restructuring contemplated herein;

(g)    if applicable, use commercially reasonable efforts to obtain, or assist the Debtors in obtaining, any and all required governmental, regulatory and/or third-party approvals

Pg 251 of 568

to effectuate the Restructuring on the terms contemplated by this Agreement, including the Restructuring Term Sheet, and the Plan;

(h)    subject to the terms of this Agreement and the Definitive Documents, to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate with the Debtors and the other Consenting Creditors in good faith with respect to additional or alternative provisions to address any such legal or structuring impediment to the Restructuring;

(i)    to the extent it is permitted to elect whether to opt out of (or opt in to) the releases set forth in the Plan, elect not to opt out of (or elect to opt in to) the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(j)    subject to this Agreement, the Equity Rights Offering Procedures, and the Equity Rights Offering Backstop Commitment Letter, with respect to Consenting Creditors that are Equity Rights Offering Backstop Parties, fund the Equity Rights Offering in accordance with the Equity Rights Offering Backstop Commitment Letter and the other Definitive Documents;

(k)    provide, within two (2) Business Days of the Support Effective Date, its current holdings of Claims to the Debtors' Advisors, *provided*, that such information will be held on a confidential basis by the Debtors and the Debtors' Advisors;

(l)    immediately notify each of the other Parties hereto of any breach of which such Consenting Creditor has knowledge in respect of any of its or another Consenting Creditor's obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the other Parties within two (2) Business Days of knowledge of such breach; and

(m)    subject to the terms of this Agreement and the Definitive Documents, not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)    propose, file, support, or vote for any Alternative Restructuring;

(iii)    seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Restructuring Term Sheet;

(iv)    exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its or any other Person's Claims or Interest against the Debtors other than in accordance with this Agreement and the Definitive Documents;

(v)    file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement and the Restructuring Term Sheet

US-DOCS\152166568.18

(nor directly or indirectly cause or instruct any other Person to make such a filing);

(vi)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Definitive Documents, or the Restructuring contemplated herein against the Debtors or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement (nor directly or indirectly cause or instruct any other Person to initiate such litigation or proceeding);

(vii)    object to, delay, impede, or take any other action to interfere with the Debtors' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code (nor directly or indirectly cause or instruct any other Person to take such action); or

(viii)    exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its or any other Person's Claims or Interests other than in accordance with this Agreement and the Definitive Documents (nor directly or indirectly cause or instruct any other Person to take or exercise such right or remedy).

Section 4.02    Transfers.

(a)    Each Consenting Creditor agrees that, during the Support Period, it shall not sell, assign, loan, issue, pledge, hypothecate, transfer, participate, or otherwise dispose of ("**Transfer**"), directly or indirectly, in whole or in part, any Claims against the Debtors, option thereon, or right or interest therein (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended, or by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof either:

(i)    is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Claims transferred) to Debtors' Counsel and each Consenting Creditor Group Counsel within three (3) Business Days following the consummation of such Transfer; or

(ii)    before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Claims against the Debtors it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as Exhibit B (a "**Joinder Agreement**") and delivering an executed copy of such Joinder Agreement to Debtors' Counsel and each Consenting Creditor Group Counsel at least one (1) Business Day prior to the consummation of such Transfer.  Upon compliance with the foregoing, the

transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Creditor agrees that any Transfer of any Claim against the Debtors that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(b)     Notwithstanding anything to the contrary in this Agreement, a Consenting Creditor may Transfer Claims against the Debtors to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become an entity identified in Section 4.02(a) hereof (a "**Permitted Transferee**"); *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) any transferee satisfies Section 4.02(a) of this Agreement, (iii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 4.02(b), and (iv) the Transfer documentation between such Consenting Creditor and such Qualified Marketmaker shall contain a covenant providing for the requirements of Section 4.02(b); *provided*, *further*, that if a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims that it acquires that are not Consenting Claims (*i.e.*, received by such Qualified Marketmaker from a holder that is not a Consenting Creditor) without such Transfer being subject to this Section 4.02(b).

(c)     If at the time of a proposed Transfer of any Claims against the Debtors to a Qualified Marketmaker, such Claims: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims in accordance with Section 4.01, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Plan and/or the Restructuring and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third (3rd) Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation between the applicable Consenting Creditor and such Qualified Marketmaker shall provide that such Qualified Marketmaker shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof; *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claim at such time as such Claim has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

(d)     Each Consenting Noteholder agrees, unless approved by the Required Consenting Noteholders, that it shall not (i) Transfer its Unsecured Notes Claims to a related party if the related party is acquiring the notes for a principal purpose of benefiting from the Debtors' tax losses by exchanging Unsecured Notes Claims for New Common Interests or the right to acquire New Common Interests pursuant to the Plan, or (ii) prior to receiving its New Common Interests pursuant to the Plan (including any New Common Interests received pursuant to the Equity Rights Offering) enter into any written or oral contract, understanding or arrangement to

21

Transfer on or after the Effective Date, directly or indirectly, all or part of its right, title, or interests in the New Common Interests (including issuing or granting any option thereon or right or interest therein); provided, however, that the foregoing restrictions shall not apply to the establishment or settlement of any derivative or similar position or security that does not constitute tax ownership or an option to acquire tax ownership for purposes of Section 382 of the Internal Revenue Code of 1986, as amended.

Section 4.03    Additional Claims.  This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Claims or Transferring Claims in accordance with this Article 4, and each Consenting Creditor agrees that to the extent any Consenting Creditor (i) acquires additional Claims against the Debtors entitled to vote on the Plan or (ii) Transfers any Claims against the Debtors in accordance with this Article 4, then, in each case, each such Consenting Creditor shall promptly notify Debtors' Counsel and each Consenting Creditor Group Counsel, and each such Consenting Creditor hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote.

Section 4.04    The covenants and agreements of the Consenting Creditors in this Article 4 are several and not joint.

Section 4.05    The Debtors understand that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, each Debtor acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditors that manage and/or supervise each Consenting Creditor's investment in or Claim against the Debtors and shall not apply to any other trading desk or business group of the Consenting Creditor, so long as it is not acting at the direction or for the benefit of such Consenting Creditor or unless it becomes party hereto.  It is further understood and agreed that the covenants, representations, and warranties in this Agreement by a Consenting Creditor that is the nominee, investment advisor, sub-advisor, or manager to funds and/or accounts that hold or beneficially hold Claims are made with respect to, and on behalf of, such funds and/or managed accounts and not such nominee, investment advisor, or manager in its individual capacity or any other affiliate of such nominee, investment advisor, or manager and, if applicable, are made severally (and not jointly) with respect to the funds and/or accounts managed by it.

Section 4.06    Nothing in this Agreement shall (i) prohibit any Consenting Creditor from taking any action that is consistent with this Agreement, (ii) prevent any Consenting Creditor from enforcing this Agreement or any Definitive Document or contesting whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, (iii) be construed to limit any Consenting Creditor's rights under any applicable note, other loan document, instrument, and/or applicable law, including the right to purchase, sell, or enter into any transactions regarding any Claim, subject to the terms hereof and any applicable agreements or law governing such Claim, (iv) constitute a waiver, amendment or modification of any term or provision of the Convertible Notes, (v) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Debtors that secure the obligations under the relevant Claims, (vi) affect the ability of any Consenting Creditor to consult with any

other Consenting Creditor, the Debtors, or any other party in interest in the Chapter 11 Cases (including any other official committee or the United States Trustee) so long as such consultation does not violate such Consenting Creditor's support obligations set forth herein, any applicable Confidentiality Agreement, or applicable law, including the Bankruptcy Code, (vii) impair or waive the rights of any Consenting Creditor to assert or raise any objection in any court having jurisdiction over the Debtors or the Restructuring to the extent such action is consistent with this Agreement, (viii) prohibit any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and any positions advocated in connection therewith are consistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Term Sheet, the Plan or the Restructuring contemplated thereby, (ix) prevent any Consenting Creditor from taking any action that is required by applicable law, (x) require any Consenting Creditor to take any action that is prohibited by applicable law or to waive or forego the benefit of any applicable legal privilege, or (xi) require any Consenting Creditor to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Creditor; *provided* that, in each case, any such action or inaction is not materially inconsistent with such Consenting Creditor's obligations hereunder.

Section 4.07    Forbearance.

(a)    Subject to any rights or remedies granted to the Consenting Creditors pursuant to this Agreement, the Definitive Documents, including the DIP Documents, or any order of the Bankruptcy Court, during the Support Period, the Consenting Creditors agree to forebear from exercising (and agree to direct any agent or trustee to forbear from exercising) any rights or remedies they may have under the Prepetition Funded Debt Documents (whether under U.S. or non-U.S. Law) with respect to any breaches, defaults, events of default or potential defaults by the Debtors (including any such breaches, defaults, events of default, or potential defaults resulting from any maturities occurring during the Support Period).  Each Consenting First Lien Lender specifically agrees that this Agreement constitutes a direction to the First Lien Agent to refrain, during the Support Period, from exercising any remedy available or power conferred to the First Lien Agent against the Debtors or any subsidiaries or any of their assets except as necessary to effectuate the Restructuring.

(b)    Except to the extent provided or expressly contemplated under this Agreement or any Definitive Documents, including, without limitation, the DIP Documents, each Consenting Creditor further agrees that if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with any such Consenting Creditor's obligations under this Section 4.07, such Consenting Creditor shall use commercially reasonable efforts to direct and cause such administrative agent, collateral agent, or indenture trustee (as applicable) to cease and refrain from taking such actions.  For the avoidance of doubt, the foregoing forbearance shall not be construed to impair the ability of the Consenting Creditors to take any remedial action, subject to the terms of the Prepetition Funded Debt Documents or otherwise, as applicable, at any time from and after the Termination Date (unless the Termination Date occurs solely as a result of the occurrence of the Effective Date).

23

Section 4.08   Additional Disclosures.    Upon written request (including by electronic mail) by the Debtors or Debtors' Counsel, each Party shall promptly (and, in any event, not later than three (3) Business Days thereafter) identify, in writing, to the Debtors and Debtors' Counsel the nature and amount of the "disclosable economic interest" (as that term is defined by Rule 2019 of the Federal Rules of Bankruptcy Procedure) held in relation to the Debtors by all entities represented by the Consenting Creditor in connection with the Debtors as of the date of such request.

5.    **Agreements of the Debtors.**

Section 5.01    The Debtors hereby covenant and agree during the Support Period:

(a)    subject to the terms of this Agreement and the Definitive Documents, to (i) take any and all actions reasonably necessary to implement and consummate the Restructuring in accordance with the terms and conditions set forth in this Agreement and the Restructuring Term Sheet, and (ii) pursue any necessary or appropriate federal, state, and local regulatory or governmental approvals to enable confirmation of the Plan and consummation of the Restructuring, including, without limitation, approvals from the Bankruptcy Court and/or any Governmental Unit whose approval or consent is determined by the Debtors and/or the Required Consenting Creditors to be necessary or appropriate to consummate the Restructuring;

(b)    subject to the terms of this Agreement and the Definitive Documents, to (i) prepare or cause to be prepared the Definitive Documents (including, without limitation, all relevant motions, applications, orders, agreements and other documents) each of which shall be consistent with this Agreement and shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and the Required Consenting First Lien Lenders to the extent of their consent rights contained herein with respect to the applicable Definitive Documents, (ii) provide draft copies of all material motions, orders, other pleadings, documents and/or applications relating to the Restructuring or that the Debtors intends to file with the Bankruptcy Court, including the Plan, the Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, all First Day Pleadings, all First Day Orders, the DIP Documents, any other Definitive Document, and/or any responses or oppositions that the Debtors intend to file or submit, to Consenting Creditor Group Counsel, as soon as reasonably practicable before the filing, execution, distribution or use (as applicable) of such document, and consult in good faith with Consenting Creditor Group Counsel, regarding the form and substance of any of the foregoing documents in advance of such proposed filing, execution, distribution or use (as applicable), but in no event less than two (2) Business Days prior to such filing, execution, distribution or use (as applicable); *provided* that each such document shall be consistent in all respects with this Agreement and such other terms and conditions as are acceptable to Required Consenting Creditors and the Debtors; *provided*, *further*, that the foregoing shall not apply to any retention applications, fee applications, or related declarations hired by the Debtors' Advisors;

(c)    subject to the terms of this Agreement and the Definitive Documents, if applicable, to use commercially reasonable efforts to obtain, or assist the Consenting Creditors in obtaining, any and all required governmental, regulatory and/or third-party approvals (including Bankruptcy Court approvals) to effectuate the Restructuring on the terms contemplated by this Agreement and the Plan;

24

(d)     subject to the terms of this Agreement, the Definitive Documents, and to professional responsibilities, in connection with the Chapter 11 Cases, to timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by any Entity seeking the entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) for relief that (y) is materially inconsistent with this Agreement or (z) would frustrate the purposes of this Agreement, including by preventing consummation of the Restructuring, or (v) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization (except if such relief is granted pursuant to a motion filed with the consent of the Required Consenting Creditors);

(e)     subject to the terms of this Agreement and the Definitive Documents, as requested in writing by the Required Consenting Noteholders or the Required Consenting First Lien Lenders, to cause management and advisors of the Debtors to inform and/or confer with the Consenting Noteholder Advisors and the First Lien Ad Hoc Group Counsel as to: (i) the status and progress of the Restructuring, including progress in relation to the negotiations of the Definitive Documents; (ii) the status of obtaining any necessary or desirable authorizations (including any consents) with respect to the Restructuring from each of the Consenting Creditors, any competent judicial body, Governmental Unit, banking, taxation, supervisory, or regulatory body in connection with the Restructuring; (iii) the business and financial performance of the Debtors and any of their direct and indirect subsidiaries (including liquidity); and (iv) in each of the foregoing cases (i)–(iii), provide timely responses to reasonable diligence requests with respect to the foregoing, subject to any applicable restrictions and limitations set forth in any Confidentiality Agreements then in effect;

(f)     except as otherwise provided in this Agreement or any order of the Bankruptcy Court, (i) to operate the business of the Debtors and its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement, the most current business plan provided to the Initial Consenting Noteholders and the Initial Consenting First Lien Lenders, past practices, and, except as expressly contemplated or provided in this Agreement, use commercially reasonable efforts to preserve intact the Debtors' business organization and relationship with third parties (including lessors, licensors, suppliers, distributors and customers) and employees, and (ii) subject to any applicable restrictions and limitations set forth in any Confidentiality Agreements then in effect, to provide the Consenting Creditor Advisors reasonable access (A) during normal business hours, to the Debtors' books, records and facilities and (B) to the management and advisors of the Debtors;

(g)     that regardless of whether the Restructuring is consummated, the Debtors shall promptly: (i) pay in full and in Cash all Restructuring Fees and Expenses when incurred and invoiced in accordance with the relevant engagement letters and/or fee arrangements, and shall continue to pay such amounts as they come due, and otherwise in accordance with the applicable engagement letters and/or fee arrangements of the Consenting Creditor Advisors (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases); and (ii) without limiting the Debtors' obligations pursuant to the preceding clause (i) of this Section 5.01(g), reimburse in full and in Cash each Initial Consenting Noteholder and Initial Consenting First Lien Lender, as applicable, for all documented out-of-pocket costs or expenses

25

(which out-of-pocket costs or expenses shall not include any professional or advisor fees of such Initial Consenting Noteholder or Initial Consenting First Lien Lender, as applicable) incurred by such Initial Consenting Noteholder or Initial Consenting First Lien Lender, as applicable, in connection with the Restructuring.  Unless paid prior to the Support Effective Date, within five (5) Business Days of entry of the Interim DIP Order, the Debtors shall pay or reimburse, as applicable, all outstanding Restructuring Fees and Expenses in accordance with the relevant engagement letters and/or fee arrangements, and all outstanding out-of-pocket costs and expenses of the Initial Consenting Noteholders and Initial Consenting First Lien Lenders incurred prior to the Support Effective Date as described in the preceding sentence;

(h)    subject to the terms of this Agreement and the Definitive Documents, negotiate in good faith upon request of the Required Consenting Noteholders any modifications to the Restructuring that improve the tax efficiency of the Restructuring, it being understood and agreed that the terms of the Restructuring as finalized by the Debtors and the Required Consenting Noteholders will be structured in a tax-efficient manner, taking into account (x) the tax and non-tax considerations and the associated costs of the Debtors and the Consenting Noteholders and (y) the fiduciary duties of the Debtors, their officers, and directors, as well as applicable professional responsibilities with respect thereto;

(i)    subject to the terms of this Agreement and the Definitive Documents, to promptly notify the Consenting Creditors, in writing, of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(j)    subject to the terms of this Agreement and the Definitive Documents, to timely file a formal written response in opposition to, or take all appropriate actions to oppose (if circumstances do not allow for the filing of a formal written response), any objection filed with the Bankruptcy Court by any Entity with respect to the entry of the Interim DIP Order and/or Final DIP Order, draft copies of which responses shall be provided to Consenting Creditor Group Counsel as soon as reasonably practicable, but in no event less than two (2) Business Days, and the Debtors shall consult in good faith with Consenting Creditor Group Counsel regarding the form and substance thereof, prior to the filing or submission of any such response;

(k)    subject to the terms of this Agreement and the Definitive Documents, to use reasonable best efforts to cause each of the Milestones to be satisfied; and

(l)    subject to the terms of this Agreement and the Definitive Documents, to not directly or indirectly take any action that would be inconsistent with this Agreement, the Definitive Documents, or interfere with the Restructuring (including encouraging any person to undertake any action prohibited by this Agreement or the Definitive Documents).

Section 5.02        The Debtors covenant and agree that, during the Support Period, each of the Debtors shall not directly or indirectly:

(a)    through any Entity (including any administrative agent or collateral agent), (i) subject to Section 6.01, seek or solicit any Alternative Restructuring, or (ii) object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere

with, delay, or impede the Solicitation, approval of, and entry of orders regarding the Definitive Documents, or the confirmation and consummation of the Plan and the Restructuring (including by filing any motion, pleading, or other document with the Bankruptcy Court or any other court that is inconsistent with this Agreement, the Plan or any of the other Definitive Documents)

(b)     amend or modify any of the Definitive Documents in a manner that is inconsistent with any such document, this Agreement or the Plan;

(c)     without prior written consent of the Required Consenting Creditors, consummate or enter into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pay any dividend, or incur any indebtedness for borrowed money, in each case outside the ordinary course of business and other than as contemplated by the Plan, this Agreement, and the Restructuring (including incurrence of indebtedness in connection with the DIP Facility consistent with this Agreement and the DIP Documents);

(d)     enter into (i) any new employee incentive plan or employee retention plan or any new or amended agreement regarding employee compensation, including executive compensation, or, in the case of an Insider (as defined in section 101(31) of the Bankruptcy Code), any other new or amended compensation arrangement or payment (which, in each case, for the avoidance of doubt, shall exclude any existing broad-based benefit plan providing health or welfare benefits) or (ii) any executory contract or lease with a value exceeding $100,000, in each case, except with the prior written consent of the Required Consenting Noteholders; and

(e)     except, in each case, (i) to the extent reasonably necessary to consummate the Restructuring or (ii) otherwise to achieve tax efficiency (taking into account the tax and non-tax considerations and the associated costs of the Debtors and the Consenting Noteholders), take any action or inaction that would cause a change to the tax classification, for United States federal income tax purposes, of any Debtor; *provided* that any change to the tax classification for United States federal income tax purposes of any Debtor pursuant to clause (ii) hereof shall be subject to the prior written consent of the Required Consenting Noteholders.

6.     **Additional Provisions Regarding Debtors' Commitments.**

Section 6.01    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, upon advice of outside counsel, to take any action or to refrain from taking any action with respect to the Restructuring to the extent taking or failing to take such action would violate applicable law or constitute a breach of its fiduciary obligations under applicable law (any such action, or refraining from action, being a "**Fiduciary Action**"); *provided*, *however*, that (i) to the extent that taking such action or refraining from taking such action absent this Section 6.01 could, or would be reasonably expected to, result in a breach of this Agreement, the Debtors shall give the Consenting Creditors not less than three (3) Business Days prior written notice of, in accordance with Article 22 hereof, such anticipated action or anticipated refraining from taking such action, (ii) upon the occurrence of such Fiduciary Action, the Required Consenting Noteholders or the Required Consenting First Lien Lenders may terminate this Agreement in accordance with Article 7 hereof, and (iii) specific performance shall not be available as a remedy

to the Debtors with respect to the Consenting Creditors if this Agreement is terminated in accordance with this <u>Section 6.01</u>.

Section 6.02    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 6.01</u>), if the Debtors receive a written or oral proposal or expression of interest from any Person or Entity regarding any Alternative Restructuring that their board of directors, board of managers, or similar governing body determines in good faith represents a higher or otherwise better economic recovery to its stakeholders, as compared to the Restructuring, the Debtors shall have the right to:  (i) consider, respond to, facilitate, discuss, negotiate, support, or otherwise pursue such Alternative Restructuring; (ii) provide access to non-public information concerning the Debtors to any Person or Entity and enter into any confidentiality agreement with such Person or Entity in connection therewith; and (iii) otherwise cooperate with, assist, or participate in any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring, *provided*, *however*, the Debtors shall notify the Required Consenting Creditors of any of the actions set forth in this <u>Section 6.02</u> within three (3) Business Days.

Section 6.03    Nothing in this Agreement shall:  (a) impair or waive the rights of the Debtors to assert or raise any objection permitted under this Agreement in connection with the Restructuring; or (b) prevent the Debtors from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.    **Termination of Agreement.**

Section 7.01    <u>Generally</u>.

(a)    This Agreement will automatically terminate upon the Effective Date (as to all Parties).

(b)    This Agreement will terminate, unless cured in accordance with this Agreement, three (3) Business Days following the receipt of written notice (the "**Notice Period**"), delivered in accordance with <u>Article 22</u> hereof, to the other Parties (as applicable) from (i) the Required Consenting Noteholders, who may only terminate this Agreement as to the Consenting Noteholders, at any time after the occurrence of any Consenting Noteholder Termination Event (as defined below), (ii) the Required Consenting Terminating First Lien Lenders, who may only terminate this Agreement as to the Consenting First Lien Lenders, at any time after the occurrence of any Consenting First Lien Lender Termination Event (as defined below), or (iii) the Debtors at any time after the occurrence of any Debtor Termination Event *provided*, *however*, that there shall be no cure period, Notice Period, or requirement to provide notice, with respect to the failure to meet any of the Milestones.  No Party may terminate this Agreement based on a Consenting Noteholder Termination Event, Consenting First Lien Lender Termination Event, or Debtor Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (including the failure to meet a Milestone, which has not been waived or extended) unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement (including the failure to meet a Milestone, which has not been waived or extended).

US-DOCS\152166568.18

(c)     Each of the dates and time periods referenced in: (i) Section 7.02 may be extended by notice from, and with the consent of, the Required Consenting Noteholders to the other Parties; (ii) Section 7.03 may be extended by notice from, and with the consent of, the Required Consenting First Lien Lenders to the other Parties; and (iii) Section 7.04 may be extended by notice from, and with the consent of, the Debtors to the other Parties.  Notice provided in accordance with this Section 7.01(c) may be provided to the other Parties by electronic mail from and to the respective counsel to the Parties.

Section 7.02    A "**Consenting Noteholder Termination Event**" will mean any of the following:

(a)     the Debtors withdraw or modify the Plan or Disclosure Statement or file any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the Debtors receive written notice (email among counsel being sufficient) from the Required Consenting Noteholders (with notice also provided to the Consenting First Lien Ad Hoc Group Counsel) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(b)     the breach in any material respect by the Debtors of any of the representations, warranties, covenants, or other obligations of the Debtors set forth in this Agreement, which breach has not been cured (if curable, which for the avoidance of doubt shall not apply to failure to comply with any Milestone, which is not curable) within three (3) Business Days of written notice from the Required Consenting Noteholders of such breach (with notice also provided to the Consenting First Lien Ad Hoc Group Counsel);

(c)     the breach in any material respect by the Consenting First Lien Lenders of any of the undertakings, representations, commitments, warranties, or covenants of the Consenting First Lien Lenders set forth herein that, to the extent curable, remains uncured for a period of three (3) Business Days after the receipt by the Consenting First Lien Lenders of written notice (email among counsel being sufficient) of such breach from the Required Consenting Noteholders of such breach;

(d)     if the Debtors give notice of termination of this Agreement pursuant to this Article 7 which is not cured within the required period;

(e)     if the Required Consenting First Lien Lenders give notice of termination of this Agreement pursuant to this Article 7 which is not cured within the required period;

(f)     the issuance by any Governmental Unit, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) seven (7) Business Days after such issuance;

(g)     the failure to meet a Milestone, which has not been waived or extended by the Required Consenting Noteholders;

29

(h)     the occurrence of an "Event of Default" (as defined in the DIP Credit Agreement) under the DIP Credit Agreement that has not been cured (if susceptible to cure) or waived in accordance therewith; *provided*, that notwithstanding anything to the contrary in <u>Section 7.01</u>, the Notice Period shall not apply to any "Event of Default" under the DIP Credit Agreement, which shall govern as to any applicable notices or notice periods thereunder;

(i)     the acceleration of the obligations under the DIP Credit Agreement;

(j)     the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing an examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) seven (7) Business Days after the Required Consenting Noteholders provide written notice to the other Parties that such order is inconsistent with this Agreement;

(k)     (x) any Debtor (i) files any motion seeking to avoid, disallow, subordinate, invalidate, limit or recharacterize, in any respect, any Unsecured Notes Claim or interest relating to any of the Convertible Notes or arising under any of the Indentures, or (ii) supports any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action; or (y) the entry of an order by a court of competent jurisdiction avoiding, disallowing, subordinating, invalidating, limiting or recharacterizing, in any respect, any Unsecured Notes Claim or interest relating to any of the Convertible Notes or arising under any of the Indentures.

(l)     a filing by any Debtor of any Definitive Document, motion, or pleading with the Bankruptcy Court that is inconsistent with this Agreement, and such filing is not withdrawn within three (3) Business Days following written notice thereof (email among counsel being sufficient) to the Debtors and the First Lien Ad Hoc Group Counsel by the Required Consenting Noteholders (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court, such order is not stayed, reversed, or vacated within seven (7) Business Days following the entry of such order);

(m)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Debtors having an aggregate fair market value in excess of $300,000 and such order materially and adversely affects the Debtors' ability to operate their business in the ordinary course or to consummate the Restructuring;

(n)     the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file and solicit acceptances of a chapter 11 plan; unless such relief is granted pursuant to a motion filed with the consent of the Required Consenting Noteholders;

(o)     other than the Chapter 11 Cases, if any Debtor, without the consent of the Required Consenting Noteholders, (i) voluntarily commences any Restructuring Proceeding with

respect to any Debtor or for a substantial part of any Debtor's assets, except as contemplated by this Agreement, (ii) consents to the institution of, or (subject to professional responsibilities) fails to contest in a timely manner, any involuntary proceeding or petition described in the preceding clause (i), or (iii) makes a general assignment or arrangement for the benefit of creditors;

(p)     an "Event of Default" by any Debtor under and as defined in the DIP Documents that has not been cured (if susceptible to cure) or waived in accordance therewith; *provided*, that notwithstanding anything to the contrary in <u>Section 7.01</u>, the Notice Period shall not apply to any "Event of Default" under the DIP Credit Agreement, which shall govern as to any applicable notices or notice periods thereunder;

(q)     failure to conduct the Equity Rights Offering in accordance with the Equity Rights Offering Procedures and effectuate the Equity Rights Offering consistent with the terms of this Agreement; or

(r)     the occurrence of a Fiduciary Action (whether or not notice of such action is provided), upon occurrence of which, the Required Consenting Noteholders may terminate this Agreement as it relates to the Consenting Noteholders and their obligations hereunder.

Section 7.03    A "**Consenting First Lien Lender Termination Event**" will mean any of the following:

(a)     the Debtors withdraw or modify the Plan or Disclosure Statement or file any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the Debtors receive written notice (email among counsel being sufficient) from the Required Consenting Terminating First Lien Lenders (with notice also provided to Consenting Noteholder Group Counsel) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(b)     the breach in any material respect by the Debtors of any of the representations, warranties, covenants, or other obligations of the Debtors set forth in this Agreement, which breach has not been cured (if curable, which for the avoidance of doubt shall not apply to failure to comply with any Milestone, which is not curable) within three (3) Business Days of written notice from the Required Consenting Terminating First Lien Lenders of such breach (with notice also provided to Consenting Noteholder Group Counsel);

(c)     the breach in any material respect by the Consenting Noteholders of any of the undertakings, representations, commitments, warranties, or covenants of the Consenting Noteholders set forth herein that, to the extent curable, remains uncured for a period of three (3) Business Days after the receipt by the Consenting Noteholders of written notice (email among counsel being sufficient) of such breach from the Required Consenting First Lien Lenders;

(d)     if the Debtors give notice of termination of this Agreement pursuant to this <u>Article 7</u> which is not cured within the required period;

(e)      if the Required Consenting Noteholders give notice of termination of this Agreement pursuant to this <u>Article 7</u> which is not cured within the required period;

(f)      the issuance by any Governmental Unit, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) seven (7) Business Days after such issuance;

(g)      the failure to meet a Milestone, which has not been waived or extended by the Required Consenting First Lien Lenders;

(h)      the acceleration of the obligations under the DIP Credit Agreement;

(i)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing an examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) seven (7) Business Days after the Required Consenting First Lien Lenders provide written notice to the other Parties that such order is inconsistent with this Agreement;

(j)      (x) any Debtor (i) files any motion seeking to avoid, disallow, subordinate, invalidate, limit or recharacterize, in any respect, any First Lien Claim or interest relating to any of the First Lien Loans or arising under the First Lien Credit Agreement, or (ii) supports any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action; or (y) the entry of an order by a court of competent jurisdiction avoiding, disallowing, subordinating, invalidating, limiting, or recharacterizing, in any respect, any First Lien Claim or interest relating to any of the First Lien Loans or arising under the First Lien Credit Agreement.

(k)      a filing by any Debtor of any Definitive Document, motion, or pleading with the Bankruptcy Court that is inconsistent with this Agreement, and such filing is not withdrawn within three (3) Business Days following written notice thereof (email among counsel being sufficient) to the Debtors and the Consenting Noteholder Group Counsel (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court, such order is not stayed, reversed, or vacated within seven (7) Business Days following the entry of such order);

(l)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Debtors having an aggregate fair market value in excess of $300,000 and such order materially and adversely affects the Debtors' ability to operate their business in the ordinary course or to consummate the Restructuring;

(m)    the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file and solicit acceptances of a chapter 11 plan; unless such relief is granted pursuant to a motion filed with the consent of the Required Consenting First Lien Lenders;

(n)    other than the Chapter 11 Cases, if any Debtor, without the consent of the Required Consenting First Lien Lenders, (i) voluntarily commences any Restructuring Proceeding with respect to any Debtor or for a substantial part of any Debtor's assets, except as contemplated by this Agreement, (ii) consents to the institution of, or (subject to professional responsibilities) fails to contest in a timely manner, any involuntary proceeding or petition described in the preceding clause (i), or (iii) makes a general assignment or arrangement for the benefit of creditors;

(o)    an "Event of Default" by any Debtor under and as defined in the DIP Documents that has not been cured (if susceptible to cure) or waived in accordance therewith; *provided*, that notwithstanding anything to the contrary in Section 7.01, the Notice Period shall not apply to any "Event of Default" under the DIP Credit Agreement, which shall govern as to any applicable notices or notice periods thereunder;

(p)    failure to conduct the Equity Rights Offering in accordance with the Equity Rights Offering Procedures and effectuate the Equity Rights Offering consistent with the terms of this Agreement; or

(q)    the occurrence of a Fiduciary Action (whether or not notice of such action is provided), upon occurrence of which, the Required Consenting First Lien Lenders may terminate this Agreement as it relates to the Consenting First Lien Lenders and their obligations hereunder.

Section 7.04    A "**Debtor Termination Event**" will mean any of the following:

(a)    the Consenting Creditors entitled to vote on the Plan will have failed to timely vote their Claims against the Debtors in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided* that this termination event will not apply if sufficient Consenting Creditors have timely voted (and not withdrawn) their Claims to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(b)    if, as of 11:59 p.m. prevailing Eastern Time on July 24, 2024, the Support Effective Date has not occurred;

(c)    the breach in any material respect by the Consenting Creditors of any of the representations, warranties, undertakings, commitments, or covenants of the Consenting Creditors that remains uncured for a period of five (5) Business Days after receipt by the Consenting Creditors of notice of such breach;

(d)    the board of directors, board of managers, or such similar governing body of any Debtors determines, pursuant to Section 6.01 or Section 6.02, (i) that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring;

(e)    if the Required Consenting Noteholders or the Required Consenting Terminating First Lien Lenders give notice of termination of this Agreement pursuant to this Article 7 which is not cured within the required period;

(f)    the issuance by any Governmental Unit, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) ten (10) Business Days after the Debtors provide written notice to the other Parties that such ruling, judgment, or order is materially inconsistent with this Agreement;

(g)    a filing by any Consenting Creditor of any Definitive Document, motion, or pleading with the Bankruptcy Court that is inconsistent with this Agreement, and such filing is not withdrawn within three (3) Business Days following written notice thereof (email among counsel being sufficient) to the Consenting Creditors by the Debtors (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court, such order is not stayed, reversed, or vacated within seven (7) Business Days following the entry of such order);

(h)    the failure of the Equity Rights Offering Backstop Parties in the aggregate to fund the Equity Rights Offering in full in accordance with this Restructuring Support Agreement and the Equity Rights Offering Backstop Commitment Letter; or

(i)    the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing an examiner with expanded powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) or a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) seven (7) Business Days after the Debtors provide written notice to the other Parties that such order is materially inconsistent with this Agreement.

Section 7.05    Mutual Termination.  This Agreement may be terminated by mutual written agreement of the Debtors, the Required Consenting Noteholders, and the Required Consenting Terminating First Lien Lenders.  The Debtors will deliver written notice of any such termination to all Parties in accordance with Article 22 hereof.

Section 7.06    Effect of Termination.  Upon the termination of this Agreement in accordance with this Article 7 as to a Party, this Agreement will be void and of no further force or effect and each Party subject to such termination will, except as provided in this Section 7.06 and in Article 16, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law and the Prepetition Funded Debt Documents; *provided* that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.

Section 7.07   <u>No Waiver</u>.  If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms.

8.      **Additional Documents.**

Section 8.01   Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents subject to the consent rights otherwise contained in this Agreement.  Notwithstanding anything herein to the contrary, nothing herein shall require any Initial Consenting Noteholder or Initial Consenting First Lien Lender to provide any information that it determines, in its sole discretion, to be sensitive or confidential.

9.      **Inconsistency of Terms**

In the event there is any inconsistency between the terms of the Restructuring Term Sheet and this Agreement (excluding the Restructuring Term Sheet), the terms of the Restructuring Term Sheet shall prevail.

10.     **Representations and Warranties.**

Section 10.01  Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Debtors, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)      such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)      the execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (ii) conflict with, result in a breach of or constitute a default under (with or without notice or lapse of time or both) any material contractual obligation to which it is a party or it or its assets are bound, in each case, other than any such violation, conflict, breach or default with respect to which a waiver has been obtained prior to the Support Effective Date and which waiver has not been subsequently revoked;

(c)       the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except (i) such filings that may be reasonably necessary in connection with the Chapter 11 Cases, (ii) filings that Holdings is required to make with the U.S. Securities and Exchange Commission (the "**SEC**"), and (iii) such filings as may be necessary or required for disclosure to any applicable regulatory body or Governmental Unit whose approval or consent is determined by the Debtors to be necessary to consummate the Restructuring; and

(d)       this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 10.02  Each Consenting Creditor severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)       is not a Qualified Marketmaker with respect to the First Lien Claims or Unsecured Notes Claims (as applicable) set forth below its name on its signature page to this Agreement; and

(b)       (i) is the beneficial owner of the Claims set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to such beneficial ownership of such Claims, (A) sole investment or voting discretion with respect to such Claims, (B) full power and authority to vote on and consent to matters concerning such Claims, and (C) full power and authority to bind or act on the behalf of, the beneficial owners of such Claims.

11.    **Disclosure; Publicity.**

Section 11.01  The Debtors shall submit drafts to the Consenting Creditor Group Counsel of any press releases, public filings, public announcements, other public documents (including any and all filings with the SEC) or other communications with any news media or to be filed with the SEC, in each case, to be made by the Debtors relating to this Agreement (or the transactions contemplated hereby) or that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement (each, a "**Public Disclosure**") at least forty-eight (48) hours, or as soon as reasonably practicable, before making any such disclosure or filing and shall afford them a reasonable opportunity to comment on such documents and disclosures, and shall consider any such reasonable comments in good faith.  The Debtors shall submit to Consenting Noteholder Group Counsel, Consenting Noteholder Communications Advisor and the First Lien Ad Hoc Group Counsel, in advance, all (i) material mass written communications to be issued by the Debtors (the "**Mass Communications**") with customers, vendors and employees (including representatives of the employees) relating to the transactions contemplated by this Agreement and (ii) filings to be made with the SEC during the Support Period, whether or not related to this Agreement (the "**SEC Filings**"), and shall afford them a reasonable opportunity to comment on such communications and filings, and shall consider any such reasonable comments in good faith.  The Consenting Noteholder Group Counsel and the First

36

Lien Ad Hoc Group Counsel shall be authorized to share such Public Disclosure, SEC Filings, and, upon written consent from the Debtors (email from Debtors' Counsel being sufficient), the Mass Communications, with their respective clients. Any Public Disclosure, Mass Communications, and SEC Filings shall be reasonably acceptable to the Consenting Creditor Group Counsel.

Section 11.02  Except as required by law or otherwise permitted under the terms of any other agreement between the Debtors and the applicable Consenting Creditors, no Party or its advisors will disclose to any Person, other than to Debtors' Counsel (which shall not disclose any Consenting Creditor's individual holdings absent such Consenting Creditor's express prior written consent), the principal amount or percentage of any First Lien Claims and/or Unsecured Notes Claims, or any other securities of Holdings held by any Consenting Creditor, in each case, without the Consenting Creditor's prior written consent; *provided* that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, to the extent permitted by applicable law, the disclosing Party will afford the applicable Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and will take all reasonable measures to limit such disclosure to the extent required by such law, subpoena or other legal process or regulation, and (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of the First Lien Claims and/or Convertible Notes held by all the Consenting Creditors collectively. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditor (*provided* that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

12.    **Amendments and Waivers.**

Except as otherwise expressly set forth herein, this Agreement, including the exhibits hereto, may not be waived, modified, amended or supplemented except in a writing signed by the (a) Debtors and the (b) Required Consenting Creditors. Notwithstanding anything herein to the contrary, for the avoidance of doubt, (i) no amendment, modification, waiver, or supplement of the definition of "Required Consenting Creditors" shall be effective without the consent of each Consenting Creditor; *provided*, *however*, that such Consenting Creditor is not in material breach of this Agreement; (ii) no amendment, modification, waiver, or supplement of the definition of "Required Consenting First Lien Lenders" or "Required Consenting Terminating First Lien Lenders" shall be effective without the consent of each Consenting First Lien Creditor; *provided*, *however*, such Consenting First Lien Creditor is not in material breach of this Agreement; (iii) no amendment, modification, waiver, or supplement of the definition of "Required Consenting Noteholders" shall be effective without the consent of each Consenting Noteholder; *provided*, *however*, such Consenting Noteholder is not in material breach of this Agreement; and (iv) no amendment, modification, waiver, or supplement of this Section 12 shall be effective without the consent of each Consenting Creditor.

13.    **Effectiveness.**

This Agreement will become effective and binding (i) as to the Debtors, Initial Consenting First Lien Lenders, and Initial Consenting Noteholders on the Support Effective Date,

37

(ii) as to any Consenting Creditor that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery to the Debtors and the Required Consenting Creditors of such validly completed Joinder Agreement; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement; *provided*, that signature pages executed by Consenting Creditors will be delivered to (a) the Debtors, the other Consenting Creditors, and in a redacted form that removes such Consenting Creditor's holdings of the First Lien Claims or Unsecured Notes Claims and (b) the Debtors' Advisors in an unredacted form (to be held by the Debtors' Advisors on a professionals' eyes only basis) and the Consenting Creditor Group Counsel (to be held by each such counsel on a professionals' eyes only basis).

14.     **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS ARTICLE 14 SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, WITH RESPECT TO SUCH CLAIMS, (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, AND (III) WAIVES ANY OBJECTION THAT THE BANKRUPTCY COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY HERETO.

15.     **Remedies/Specific Performance.**

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to each non-breaching Party (and for the avoidance of doubt, it is agreed by the other Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach); *provided* that in connection

US-DOCS\152166568.18

with any remedy for specific performance, injunctive or other equitable relief asserted in connection with this Agreement, each Party agrees to waive the requirement for the securing or posting of a bond in connection with any remedy and to waive the necessity of proving the inadequacy of money damages; *provided further* that specific performance shall not be available as a remedy to the Debtors with respect to the Consenting Creditors if this Agreement is terminated in accordance with Section 6.01.  All rights, powers, and remedies provided under this Agreement or otherwise available at law or in equity will be cumulative and not alternative, and the exercise of any remedy, power, or remedy by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Person.

16.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Article 7 hereof, Section 7.07, Articles 9, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and Section 25.03 (and, to the extent applicable to the interpretation of such surviving sections, Article 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

17.    **Headings.**

The headings of the Articles, Sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

18.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person except as expressly permitted herein.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

19.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other person or entity will be a third-party beneficiary hereof or have any rights hereunder.

20.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior agreements and negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any Confidentiality Agreements or agreements with respect to shared or common interest heretofore executed between the Debtors and any Consenting Creditor (or the Consenting Creditor Advisors) and any engagement letters and/or fee arrangements (including those of the Consenting Noteholder Group Counsel and First Lien Ad Hoc Group Counsel) will continue in full force and effect in accordance with the terms thereof.

21.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail or DocuSign, which will be deemed to be an original for the purposes of this Article 21.

22.    **Notices.**

All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

(1)    If to the Debtors, to:

2U, Inc.
2345 Crystal Drive, Suite 1100
Arlington, Virginia 22202
Attention:  Matthew Norden and Lillian Brownstein
E-mail:  mnorden@2u.com and lbrownstein@2u.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:    George Davis, Esq. (George.Davis@lw.com)
           Anupama Yerramalli, Esq. (Anu.Yerramalli@lw.com)
           George Klidonas, Esq. (George.Klidonas@lw.com)
           Randall Weber–Levine, Esq. (Randall.Weber-Levine@lw.com)

(2)    If to the Consenting Noteholders, to the addresses or electronic mail addresses set forth below the Consenting Creditor's signature, with a copy (which will not constitute notice) to:

US-DOCS\152166568.18

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:    Matt Barr, Esq. (Matt.Barr@weil.com)
              David Griffiths, Esq. (David.Griffiths@weil.com)
              F. Gavin Andrews, Esq. (F.Gavin.Andrews@weil.com)


and


Schulte Roth & Zabel LLP
919 Third Avenue, New York, NY 10022
Attention:    Kristine Manoukian (Kristine.Manoukian@srz.com)
              Kelly Knight (Kelly.Knight@srz.com)
              Reuben E. Dizengoff (reuben.dizengoff@srz.com)


(3)      If to the Consenting First Lien Lenders, to the addresses or electronic mail addresses set forth below the Consenting Creditor's signature, with a copy (which will not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:    Albert A. Pisa, Esq. (APisa@milbank.com)
              Tyson Lomazow, Esq. (TLomazow@milbank.com)
              Abigail Debold, Esq. (Adebold@milbank.com)


Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

23.    **Reservation of Rights; No Admission.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (i) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (ii) purchase, sell, or enter into any transactions in connection with the First Lien Claims and/or Unsecured Notes Claims, (iii) enforce any right under or with respect to the First Lien Credit Agreement and any related documents, any of the Indentures and any related documents, any of the First Lien Claims and/or any of the Unsecured Notes Claims, subject to the terms hereof, (iv) consult with other Consenting Creditors, other holders of First Lien Claims and/or Unsecured Notes Claims, or any other Party regarding the Restructuring, or (v) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents.  Without limiting the foregoing, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses and interests, subject to Articles 7, 14, and 15 in the case of any claim

for breach of this Agreement arising before termination.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

24.     **Relationship Among Parties.**

It is understood and agreed that no Consenting Creditor has any fiduciary duty, any duty of trust or confidence of any kind or form, or any other duty or responsibility, to or with any other Consenting Creditor, any of the Debtors, or any other creditor or interest holder of the Debtors, and, except as expressly provided in this Agreement, there are no commitments between them as a result of this Agreement.  In this regard, it is understood and agreed that any Consenting Creditor may acquire First Lien Claims, Unsecured Notes Claims, or other debt or equity securities of the Debtors without the consent of the Debtors or any other Consenting Creditor, subject to applicable securities laws and the terms of this Agreement; *provided* that no Consenting Creditor will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.

25.     **No Solicitation; Representation by Counsel; Adequate Information.**

Section 25.01  This Agreement and the transactions contemplated herein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

Section 25.02  Each Party acknowledges that it has had an opportunity to receive information from the Debtors and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.

Section 25.03  Each Initial Consenting Creditor (and, to the extent applicable, each other Consenting Creditor) acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (iii) understands that (a) any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and (b) that some or all of such securities will be offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

US-DOCS\152166568.18

26.    **Miscellaneous.**

When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

US-DOCS\152166568.18

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

44

**Debtors' Signature Pages to
the Restructuring Support Agreement**

**2U, INC.**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Chief Financial Officer and Chief Legal Officer

**2U GETSMARTER, LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Secretary

**2U, INC.**
    as the sole member of
    **2U HARKINS ROAD LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Chief Financial Offer and Chief Legal Officer

**2U NYC, LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Secretary

**2U KEIH HOLDCO, LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Vice President and Treasurer

**CRITIQUEIT, INC.**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Secretary

**EDX LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Vice President and Treasurer

**EDX BOOT CAMPS LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Vice President and Treasurer

**2U GETSMARTER (US), LLC**

By: _Matthew J. Norden_
Name: Matthew Norden
Title: Secretary

*[**Consenting Creditors' Signature Pages Redacted**]*

## Exhibit A

## Restructuring Term Sheet

<u>**RESTRUCTURING TERM SHEET**</u>

**July 24, 2024**

This Restructuring Term Sheet[1] sets forth the terms of the Restructuring of the Debtors.  The Restructuring shall be implemented pursuant to the Plan, which shall be consistent with this Restructuring Term Sheet and the Restructuring Support Agreement.

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW.  ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE, AS APPLICABLE.

THIS RESTRUCTURING TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ACCORDINGLY PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING, WHICH RESTRUCTURING WILL BE SUBJECT TO THE COMPLETION OF THE DEFINITIVE DOCUMENTS AND THE CLOSING OF ANY RESTRUCTURING SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

THIS RESTRUCTURING TERM SHEET IS CONFIDENTIAL AND IS SUBJECT TO THE CONFIDENTIALITY AGREEMENTS ENTERED INTO BY THE RECIPIENTS OF THIS RESTRUCTURING TERM SHEET AND THE COMPANY PARTIES, AND MAY NOT BE SHARED WITH ANY THIRD-PARTY OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENTS.

---

[1]  Capitalized terms used in this Restructuring Term Sheet shall have their respective meanings set forth herein.  To the extent any capitalized terms are used, but not otherwise defined, in this Restructuring Term Sheet, they shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| Overview |
|---|
| **Filing Entities and Implementation of the Restructuring** | The following entities shall be the debtors (collectively, the "***Debtors***" and, each, a "***Debtor***") in the Chapter 11 Cases: <br><br> 1. 2U, Inc.; <br> 2. 2U GetSmarter, LLC; <br> 3. 2U Harkins Road LLC; <br> 4. 2U NYC, LLC; <br> 5. 2U KEIH Holdco, LLC; <br> 6. Critiquelt, Inc.; <br> 7. edX LLC; <br> 8. edX Boot Camps LLC; and <br> 9. 2U GetSmarter (US), LLC. <br><br> The Debtors shall commence the Chapter 11 Cases (the date of such commencement, the "***Petition Date***") to implement the Restructuring through confirmation and consummation of a prepackaged Plan. <br><br> The Debtors will, at least one day prior to the Petition Date, commence Solicitation of the Plan from the holders of First Lien Claims and Unsecured Notes Claims.  The vote of the holders of First Lien Claims shall be deemed to be a direction to the First Lien Agent to effectuate the Restructuring.   The vote of the holders of Unsecured Notes Claims shall be deemed to be a direction to the Indenture Trustee to effectuate the Restructuring. |

| | |
|---|---|
| **Existing Capital Structure** | First Lien Credit Agreement and First Lien Claims:  That certain Credit and Guaranty Agreement, dated as of June 28, 2021 (as amended by that certain First Amendment to Term Loan Credit and Guaranty Agreement, dated as of November 4, 2021, and by that certain Extension Amendment, Second Amendment and First Incremental Agreement to Credit and Guaranty Agreement, dated as of January 9, 2023, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***First Lien Credit Agreement***" and all Claims or Causes of Action relating thereto, the "***First Lien Claims***"), by and among Holdings, as borrower, certain subsidiaries of Holdings, as guarantors, the lenders party thereto (the "***First Lien Lenders***"), and Alter Domus (US) LLC, as administrative agent and collateral agent (the "***First Lien Agent***"). <br><br> Unsecured Notes and Unsecured Notes Claims:   That certain (i) Indenture, dated as of April 23, 2020 (as amended, restated, |

2

|  | amended and restated, supplemented, or otherwise modified from time to time, the "**2025 Notes Indenture**"), by and between Holdings, as issuer, and Wilmington Trust, National Association, as trustee (the "**Indenture Trustee**"), governing Holdings' $380 million aggregate principal amount of 2.25% Convertible Senior Notes due 2025 (the "**2025 Notes**"); and (ii) Indenture, dated as of January 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between Holdings, as issuer, and the Indenture Trustee, as trustee, governing Holdings' $147 million aggregate principal amount of 4.50% Senior Unsecured Convertible Notes due 2030 (together with the 2025 Notes, the "**Unsecured Notes**", and all Claims or Causes of Action relating to the Unsecured Notes, the "**Unsecured Notes Claims**"). |
|  | General Unsecured Claims:  All claims (other than Administrative Claims, Priority Tax Claims, First Lien Claims, Unsecured Notes Claims, Other Secured Claims, and Other Priority Claims) against the Debtors that are non-priority and unsecured (the "**General Unsecured Claims**"), including (for the avoidance of doubt) all Landlord Claims. |
|  | Existing Equity Interests:  All issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, other instrument evidencing an ownership interest, and/or any other Interest, in Holdings, whether or not transferable, together with any warrants, options, equity-based awards, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date (collectively, the "**Existing Equity Interests**"). |
| **Case Financing for the Restructuring** | The Chapter 11 Cases shall be funded by:  (i) Cash Collateral on terms and conditions acceptable to the Required Consenting First Lien Lenders, Required Consenting Noteholders and the Debtors and otherwise consistent with the DIP Facility Term Sheet and the DIP Documents; (ii) a secured, multi-draw, junior lien debtor-in-possession financing facility in the aggregate principal amount of up to $64 million (the "**DIP Facility**", and the loans thereunder, the "**DIP Loans**"), that shall contain economic terms consistent with those set forth in the DIP Facility Term Sheet, subject to the terms and conditions set forth in the DIP Documents; and (iii) proceeds from the Equity Rights Offering as described in the Equity Rights Offering Term Sheet. |

3

| | |
|---|---|
| | The initial lenders under the DIP Facility will be the Initial Consenting Noteholders, severally, but not jointly, and the DIP Loans will be funded *pro rata* based on the amount of Unsecured Notes Claims held by such holders pursuant to the terms of the DIP Documents. As a condition precedent to the obligations of the Initial Consenting Noteholders to make DIP Loans under the DIP Documents, among other things, the Required Consenting First Lien Lenders shall have directed the First Lien Agent, on behalf of itself and the First Lien Lenders, to join the Restructuring Support Agreement. |
| **Amended and Restated Credit Agreement** | As of the Effective Date, the Reorganized Debtors and the First Lien Lenders will enter into the Amended and Restated Credit Agreement on the terms set forth in the Amended and Restated Credit Agreement Term Sheet. |
| **New Common Interests** | Holdings or such other entity as may be determined by the Debtors and the Required Consenting Noteholders to be the Debtors' new corporate parent (the "***Reorganized Parent***") shall, (i) on the Effective Date or (ii) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents, issue the New Common Interests in accordance with the Plan and the terms of the Restructuring Support Agreement. |
| **Equity Rights Offering** | In connection with the Restructuring and consistent with the Equity Rights Offering Term Sheet and in accordance with the Plan, Holdings will offer to all holders of the Unsecured Notes the right to purchase New Common Interests for an aggregate amount of not less than $46.5 million pursuant to applicable exemptions from registration under the Securities Act and/or section 1145 of the Bankruptcy Code (the "***Equity Rights Offering***"), the proceeds of which will be used to fund certain obligations under the Plan (including, but not limited to, reducing the aggregate principal amount of the A&R CA Loans (as defined below) by $30 million on the Effective Date in accordance with the Amended and Restated Credit Agreement Term Sheet, and paying administrative expenses, professional fees, and the Equity Rights Offering Backstop Commitment Premium) and/or the Reorganized Debtors' working capital needs, in accordance with the Restructuring Support Agreement.

The Equity Rights Offering Backstop Parties will commit, severally and not jointly, to backstop in full the amount under the Equity Rights Offering, less the amount funded by the Equity Rights Offering Backstop Parties in the Equity Rights Offering in |

4

| | |
|---|---|
| | their capacity as holders of the Unsecured Notes and not as Equity Rights Offering Backstop Parties, in accordance with the terms of the Equity Rights Offering Backstop Commitment Letter.<br><br>Each holder of an Allowed Unsecured Notes Claim that properly exercises its right to purchase New Common Interests in accordance with the Equity Rights Offering Procedures shall receive its *pro rata* share of the New Common Interests issuable in the Equity Rights Offering on the Effective Date, subject to dilution on account of the New Common Interests issued pursuant to the MIP. |
| **Summary of Restructuring Terms** | On the Effective Date:<br><br>1.  In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, each holder of such Allowed DIP Claim shall receive (a) its *pro rata* share of Exit Loans under the Exit Facility Credit Agreement, or (b) such other treatment as to which the Debtors and the holder of such Allowed DIP Claims will have agreed upon in writing, with the consent of the Required Consenting Noteholders;<br><br>2.  The First Lien Lenders shall execute the Amended and Restated Credit Agreement, and the Amended and Restated Credit Agreement shall be in full force and effect;<br><br>3.  In full and final satisfaction, settlement, release, and discharge of each Allowed First Lien Claims, except to the extent that a holder of an Allowed First Lien Claim agrees to a less favorable treatment of such claim, each holder of such Allowed First Lien Claims shall receive its *pro rata* share of the loans issued under the Amended and Restated Credit Agreement (the "***A&R CA Loans***");<br><br>4.  In full and final satisfaction, settlement, release, and discharge of each Allowed Unsecured Notes Claim, except to the extent that a holder of an Allowed Unsecured Notes Claim agrees to a less favorable treatment of such claim, each holder of an Allowed Unsecured Notes Claim shall receive (i) the right to participate in the Equity Rights Offering in accordance with the Equity Rights Offering Procedures and (ii) its *pro rata* share of the New Common Interests (subject to dilution on account of the New |

5

|  | Common Interests issued pursuant to (a) the MIP and (b) the Equity Rights Offering); |
|--|--|
|  | 5. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such claim, on and after the Effective Date, the Reorganized Debtors shall continue to pay each holder of an Allowed General Unsecured Claim in the ordinary course of business; *provided* that each Landlord Claim shall be subject to the cap set forth in section 502(b)(6) of the Bankruptcy Code; and |
|  | 6. Existing Equity Interests shall be cancelled and the holders of Existing Equity Interests shall receive no consideration or distributions in respect thereof. |
| **Material Provisions for the Restructuring** ||
| **Equity Rights Offering Backstop Premium** | In exchange for their commitment to fund the Equity Rights Offering Backstop Commitment, the Equity Rights Offering Backstop Parties shall, in accordance with the Equity Rights Offering Backstop Commitment Letter and Equity Rights Offering Procedures, receive a fee (the "***Equity Rights Offering Backstop Commitment Premium***") equal to $1.5 million. |
| **Governance** | On the Effective Date, the new board of the Reorganized Parent (the "***New Board***") shall consist of the Debtors' current Chief Executive Officer, with the remaining members to be selected by the Required Consenting Noteholders in their sole discretion in consultation with the Debtors. Corporate governance and additional governance terms shall be determined by the Required Consenting Noteholders in their sole discretion in consultation with the Debtors. |
| **Releases / Exculpation** | The Plan shall contain customary release and exculpation provisions to be agreed upon by the Debtors and the Required Consenting Creditors. |
| **Discharge & Injunction** | The Plan shall contain customary discharge and injunctive provisions. |

6

| | |
|---|---|
| **Treatment of Executory Contracts and Unexpired Leases** | The Plan shall provide that, as of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amount, all executory contracts and unexpired leases to which any Debtor is a party shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts.  The assumption or rejection of any executory contract or unexpired lease by a Debtor shall be subject to the consent of the Required Consenting Creditors.

The Debtors shall engage in good-faith negotiations with their landlords for the exit from certain unexpired leases before the Petition Date for less than the capped amount of rejection damages claims, including with the HQ Premises Lessor (with respect to the HQ Premises Lease) and the Brooklyn Lessor (with respect to the Brooklyn Lease), in each case, on terms reasonably acceptable to the Debtors and the Required Consenting Creditors.  In the event the Debtors have not negotiated exits from such leases prior to the Petition Date, the Debtors shall reject such leases at the outset of the Chapter 11 Cases and by the applicable Milestone, and any claims for rejection damages (calculated in accordance with section 502(b)(6) of the Bankruptcy Code) shall be paid in Cash on or after the Effective Date, as determined by the Required Consenting Creditors; *provided* that the amount of such payments in the aggregate shall not exceed the capped amount of such rejection damages claims. |
| **Employee Compensation and Benefit Programs** | The employment agreements and severance policies, and all employment, compensation and benefit plans, retention plans, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, healthcare plans, disability plans, severance plans, incentive plans, life and accidental and dismemberment insurance plans, and policies and programs of each of the Debtors applicable to any of its employees and retirees, in each case existing as of the Effective Date (collectively, the "***Employee Plans***"), shall be assumed (and assigned to the Reorganized Debtors, if necessary).  The Required Consenting Noteholders acknowledge that the Restructuring shall constitute a "Change in Control" solely under the Employee Plans. Notwithstanding anything to the contrary, for the installment |

7

| | |
|---|---|
| | payments due in October 2024 under the insider retention plans (other than the retention plan of the Debtors' current Chief Executive Officer), the Company Parties may pay 50% of such installment payments prior to the Petition Date. The remaining balance of the insider retention plan installment payments due in October 2024 (including the full amount owed under the retention plan of the Debtors' current Chief Executive Officer) and the full balance of the installment payments under the insider retention plans due in January 2025 shall be paid in full when due. |
| **Indemnification of Prepetition Directors, Officers, Managers, *et al*.** | All indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable. To the extent necessary, the governance documents adopted as of the Effective Date shall include provisions to give effect to the foregoing. |
| **Director, Officer, Manager, and Employee Tail Coverage** | On the Effective Date, the Debtors shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy" on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage), and the Debtors shall obtain any insurer consents required to assume such policies. Prior to the Effective Date, the Debtors shall arrange for directors and officers liability insurance coverage for each of the members of the New Board, with such coverage to take effect on the Effective Date, on terms reasonably acceptable to the Required Consenting Noteholders. |
| **Management Incentive Plan** | On or around the Effective Date, the New Board shall adopt a management incentive plan (the "***MIP***"), which plan shall reserve for certain employees, officers and directors of the Reorganized Parent up to ten percent (10%) of New Common Interests on a fully-diluted basis issued on the Effective Date, the structure and terms of which and grants thereunder to be determined in good faith by the New Board in its sole discretion in consultation with the Debtors' current management team. The individual allocations |

8

| | |
|---|---|
| | under the MIP are to be determined based on analysis by an independent compensation consultant in consultation with the Company Parties' current Chief Executive Officer. |
| **Tax Matters** | The Restructuring shall be implemented in a tax-efficient manner for the Company Parties and the holders of Unsecured Notes Claims, as agreed among the Company Parties, on the one hand, and the Required Consenting Noteholders, on the other hand. |
| **Conditions Precedent to the Effective Date** | The occurrence of the Effective Date of the Plan shall be subject to the satisfaction of conditions precedent set forth in the Plan, including, without limitation, those conditions precedent set forth below.<br><br>Each condition precedent may be waived by the Debtors with the consent of (x) the Required Consenting Noteholders and, (y) solely with respect to the conditions set forth in clauses (1), (2), (3), (7), (8) but only to the extent the terms thereof are materially inconsistent with the terms of the Amended and Restated Credit Agreement Term Sheet, (9) but only with respect to the payment of the Restructuring Expenses of the First Lien Ad Hoc Group Advisors, (10) but only with respect to those Definitive Documents over which the Required Consenting First Lien Lenders have consent rights under the Restructuring Support Agreement, (11), (12), (13) and (14), with the consent of the Required Consenting First Lien Lenders, in each case, with such consent rights being exercised in accordance with the Restructuring Support Agreement.<br><br>   1. The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Noteholders or Required Consenting First Lien Lenders, and shall be in full force and effect;<br><br>   2. The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order by the applicable Milestones, which orders shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;<br><br>   3. The Bankruptcy Court shall have entered the Combined Order by the applicable Milestone, and such Combined |

9

Order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

4. The Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order by the applicable Milestone, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

5. The Equity Rights Offering Backstop Commitment Letter shall provide for backstopped commitments of not less than $46.5 million and shall remain in full force and effect and shall not have been terminated pursuant to its terms;

6. The Equity Rights Offering shall have been conducted, in all material aspects, in accordance with the Equity Rights Offering Procedures, and the cash proceeds thereof (including the funding of the Equity Rights Offering Backstop Commitment) shall equal not less than $46.5 million;

7. All conditions precedent to the effectiveness of the Amended and Restated Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect;

8. All conditions precedent to the effectiveness of the Exit Facility Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect;

9. All Restructuring Expenses shall have been paid in full in Cash;

10. The Definitive Documents (a) shall be consistent with this Restructuring Term Sheet and the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party thereto, and (c) to the extent applicable, shall be adopted by the

10

applicable Entity on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet;

11. All governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by this Restructuring Term Sheet and the Restructuring Support Agreement shall have been obtained, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

12. If the Debtors have not successfully renegotiated the HQ Premises Lease and the Brooklyn Lease or settled with each of the HQ Premises Lessor and the Brooklyn Lessor prior to Petition Date, in each case, on terms reasonably acceptable to the Required Consenting Creditors, then at the outset of the Chapter 11 Cases and by the applicable Milestone, the Debtors shall file a motion to reject the HQ Premises Lease and the Brooklyn Lease pursuant to section 365 of the Bankruptcy Code and seek entry of the Lease Rejection Order, and the amount of the rejection damages with respect to each of the leases, calculated in accordance with section 502(b)(6) of the Bankruptcy Code, shall be acceptable to the Required Consenting Creditors and the Debtors;

13. No action shall have been taken by any Governmental Unit that has had a material adverse effect on the business or results of operations of any of the Debtors taken as a whole, provided that any change in law, regulation, sub-regulatory guidance or condition generally that impacts the educational industry in which any of the Debtors operate shall not in and of itself constitute a material adverse effect; and

14. The Debtors shall have implemented the Restructuring and all transactions contemplated by this Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement, this Restructuring Term Sheet, and

11

| | |
|---|---|
| | the Plan, in each case, subject to the consent rights set forth in the Restructuring Support Agreement. |
| **Case Milestones** | The following milestones shall apply to the Chapter 11 Cases (the "***Milestones***"), unless the applicable Milestone is extended or waived with the prior written consent of the Required Consenting Noteholders (email from the Consenting Noteholder Group Counsel being sufficient), and, with respect to the "Outside Date", with the prior written consent of the Required Consenting First Lien Lenders (email from the First Lien Ad Hoc Group Counsel being sufficient): <br><br> 1. <u>Solicitation</u>.  The Debtors shall commence Solicitation by not later than 11:59 p.m. prevailing Eastern Time on July 24, 2024. <br><br> 2. <u>Commencement of the Chapter 11 Cases</u>.  The Debtors shall commence the Chapter 11 Cases for each of the Debtors by not later than 11:59 p.m. prevailing Eastern Time on July 25, 2024. <br><br> 3. <u>Filing of Lease Rejection Motion.</u>  The Debtors shall file the Lease Rejection Motion by not later than 11:59 p.m. prevailing Eastern Time on the Petition Date. <br><br> 4. <u>Filing of the Plan and Disclosure Statement</u>.  The Debtors shall file the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and Solicitation Materials, by not later than one (1) business day following the Petition Date. <br><br> 5. <u>Entry of the Interim DIP Order</u>.  The Bankruptcy Court shall have entered the Interim DIP Order by not later than five (5) calendar days following the Petition Date. <br><br> 6. <u>Entry of the Solicitation Procedures Order</u>.  The Bankruptcy Court shall have entered the Solicitation Procedures Order by not later than five (5) calendar days following the Petition Date. <br><br> 7. <u>Interim Notification Procedures and Restrictions on Transfers Order</u>.  The Bankruptcy Court shall have entered an interim order (in form and substance reasonably acceptable    the Required Consenting Noteholders), establishing notification procedures and approving |

US-DOCS\150850134.32

<table>
<tr>
<td></td>
<td>

restrictions on certain transfers of interest in, and claims against the Debtors, not later than five (5) calendar days following the Petition Date.

8. <u>Final Notification Procedures and Restrictions on Transfers Order</u>. The Bankruptcy Court shall have entered a final order (in form and substance reasonably acceptable the Required Consenting Noteholders), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors, on or prior to the date of entry of the Combined Order.

9. <u>Lease Rejection Order.</u> The Bankruptcy Court shall have entered the Lease Rejection Order on or prior to date of entry of the Combined Order.

10. <u>Entry of Equity Rights Offering Backstop Order</u>. The Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order on or prior to date of entry of the Combined Order.

11. <u>Entry of the Final DIP Order</u>. The Bankruptcy Court shall have entered the Final DIP Order on or prior to date of entry of the Combined Order.

12. <u>Combined Order.</u> At or prior to 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Combined Order.

13. <u>Occurrence of the Effective Date.</u> At or prior to 11:59 p.m. prevailing Eastern Time on the date that is fifty (50) days after the Petition Date, the Effective Date shall have occurred (the "***Outside Date***").

</td>
</tr>
<tr>
<td>**Restructuring Expenses**</td>
<td>The Debtors shall pay in full and in Cash, as set forth in the Restructuring Support Agreement (and subject to any limitations set forth therein), as and when due, all documented fees and expenses of each of the Consenting Creditor Advisors (the "***Restructuring Expenses***").</td>
</tr>
</table>

13

| | |
|---|---|
| | The Consenting Creditor Advisors shall each provide the Debtors, on the first Business Day of each month, with a report regarding fees and documented out-of-pocket expenses incurred during the prior month. |
| **Other Provisions** | The Plan shall contain other terms and conditions as agreed to by the Debtors and the Required Consenting Creditors. |

| Treatment of Claims and Interests in the Restructuring | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment/ Voting** |
| **Unclassified Non-Voting Claims** | | | |
| **N/A** | **Administrative Claims** | On the Effective Date, each holder of an Allowed Administrative Claim shall receive treatment in a manner consistent with section 1129(a)(9)(A) of the Bankruptcy Code. | N/A |
| **N/A** | **Priority Tax Claims** | On the Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **N/A** | **DIP Claims** | In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each holder of such Allowed DIP Claim shall receive either (i) its *pro rata* share of Exit Loans under the Exit Facility Credit Agreement, or (ii) such other treatment as to which the Debtors and the holder of such Allowed DIP Claims will have agreed upon in writing, with the consent of the Required Consenting Noteholders and the Debtors. | N/A |

14

| Treatment of Claims and Interests in the Restructuring | | | |
|---|---|---|---|
| Classified Claims and Interests of the Debtors | | | |
| **Class 1** | **Other Secured Claims** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, on the Effective Date, each holder of such Allowed Other Secured Claim shall receive, at the Debtors' option and subject to the consent of the Required Consenting Creditors, either (i) payment in full in Cash, (ii) delivery of the collateral securing such Allowed Other Secured Claim, (iii) Reinstatement of such Allowed Other Secured Claim, or (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; Deemed to Accept. |
| **Class 2** | **Other Priority Claims** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, on the Effective Date, each holder of such Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired; Deemed to Accept. |
| **Class 3** | **First Lien Claims** | Except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed First Lien Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed First Lien Claim, on the Effective Date, each holder of such Allowed First Lien Claim shall receive its *pro rata* share of the A&R CA Loans. | Impaired; Entitled to Vote. |

15

| Treatment of Claims and Interests in the Restructuring | | |
|---|---|---|
| **Class 4** | **Unsecured Notes Claims** | Except to the extent that a holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Unsecured Notes Claim, in full and final satisfaction, settlement, release, and discharge of each Allowed Unsecured Notes Claim, on the Effective Date, each holder of an Allowed Unsecured Notes Claims shall receive (i) the right to participate in the Equity Rights Offering in accordance with the Equity Rights Offering Procedures and (ii) its *pro rata* share of the New Common Interests (subject to dilution on account of the New Common Interests issued pursuant to (a) the MIP and (b) the Equity Rights Offering. The Unsecured Notes Claims shall be deemed allowed in the full amount of such Claims. |
| | | Impaired; Entitled to Vote. |
| **Class 5** | **General Unsecured Claims** | The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date, the Reorganized Debtors shall continue to pay each holder of an Allowed General Unsecured Claim in the ordinary course of business; *provided* that each Landlord Claim shall be subject to the cap set forth in section 502(b)(6) of the Bankruptcy Code. | Unimpaired; Deemed to Accept |
| **Class 6** | **Intercompany Claims** | On the Effective Date, Intercompany Claims shall be, at the option of the Debtors and subject to the consent of the Required Consenting Creditors, either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |

16

| Treatment of Claims and Interests in the Restructuring | | | |
|---|---|---|---|
| **Class 7** | **Intercompany Interests** | On the Effective Date, Intercompany Interests shall be, at the option of the Debtors and subject to the consent of the Required Consenting Creditors, either: (i) Reinstated; or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors and subject to the consent of the Required Consenting Creditors. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| **Class 8** | **Existing Equity Interests** | On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and of no further force and effect.  No holders of Existing Equity Interests shall receive any property or distribution under the Plan on account thereof. | Impaired; Deemed to Reject. |
| **Class 9** | **Subordinated Claims** | On the Effective Date, all Subordinated Claims shall be canceled, released, extinguished, and of no further force and effect.  No holders of Subordinated Claims shall receive any property or distribution under the Plan on account thereof. | Impaired; Deemed to Reject. |

17

| Additional Defined Terms |
|---|

"***Ad Hoc Noteholder Group***" means that certain ad hoc group of holders of Unsecured Notes Claims represented by the Ad Hoc Noteholder Group Counsel.

"***Ad Hoc Noteholder Group Counsel***" means Weil, Gotshal & Manges, LLP, as legal counsel to the Ad Hoc Noteholder Group.

"***Administrative Claim***" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Debtors' estates and operating businesses, including fees and expenses Allowed by the Bankruptcy Court as compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; and (ii) all fees and charges assessed against the Debtors' estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"***Affiliate***" shall, with respect to an Entity, have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

"***Allowed***" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (i) except with respect to any Claim arising from the rejection of unexpired leases by the Debtors, there is no requirement to file a proof of claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (ii) the Debtors may affirmatively deem unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

"***Amended and Restated Credit Agreement***" means that certain *Amended and Restated Credit Agreement*, to be entered into as of the Effective Date, by and between the applicable Reorganized Debtors, the First Lien Lenders, and the administrative agent thereunder (including all appendices, exhibits, schedules, and supplements thereto), which shall amend and restate the First Lien Credit Agreement in its entirety, shall be consistent with the terms of the Amended and Restated Credit Agreement Term Sheet and shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Amended and Restated Credit Agreement Term Sheet***" means the term sheet setting forth the terms and conditions of the Amended and Restated Credit Agreement, attached as Annex 2 hereto, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York.

18

| Additional Defined Terms |
|---|

"**Brooklyn Lease**" means the Agreement of Lease, dated February 13, 2017, by and between Brooklyn Lessor and 2U NYC, LLC (as amended by the First Amendment to Lease, dated June 3, 2021, and as may be amended, supplemented, or modified from time to time).

"**Brooklyn Lessor**" means 55 Prospect Owner LLC.

"**Cash**" means the legal tender of the United States of America.

"**Cash Collateral**" shall have the meaning set forth in the DIP Orders.

"**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any state law fraudulent transfer claim; and (vi) any Avoidance Actions.

"**Chapter 11 Cases**" means voluntary cases of the Debtors under chapter 11 of the Bankruptcy Code.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Combined Hearing**" means the combined hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (i) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code and (ii) confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"**Combined Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"**Company Parties**" means Holdings and all of its direct and indirect subsidiaries.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Combined Order.

19

| Additional Defined Terms |
|---|

"***Consenting Creditor Advisors***" means, collectively, the Consenting Noteholder Advisors and the First Lien Ad Hoc Group Advisors.

"***Consenting First Lien Lenders***" has the meaning set forth in the preamble to the Restructuring Support Agreement.

"***Consenting Noteholder Group Counsel***" means, collectively, the Ad Hoc Noteholder Group Counsel and Greenvale Counsel.

"***Consenting Noteholders***" has the meaning set forth in the preamble to the Restructuring Support Agreement.

"***Cure***" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, which payment or distribution, including the amount thereof, is subject to the consent of the Required Consenting Creditors.

"***Definitive Documents***" means, each consistent with the Restructuring Support Agreement: (i) the Plan and the Plan Supplement; (ii) the Disclosure Statement and the Solicitation Materials, and any motion seeking approval of, and any notices related to, the foregoing; (iii) the Solicitation Procedures Order; (iv) the Combined Order; (v) the DIP Documents; (vi) the New Common Interests Documents; (vii) the Amended and Restated Credit Documents; (viii) the New Corporate Governance Documents; (ix) the First Day Orders; (x) the Lease Rejection Order; (xi) the Exit Facility Documents; and (xii) any other agreement, document, instrument, pleading and/or order entered or entered into, or utilized, in connection with or to implement the Restructuring (together with any exhibit, amendment, modification or supplement thereto), which documents specified in this clause (xii) shall in each case, be in form and substance acceptable to the Parties that have consent rights with respect to the applicable Definitive Documents in clauses (i) through (xi) and in accordance with those consents.

"***DIP Agent***" means the "Administrative Agent" and the "Collateral Agent" (each, as defined in the DIP Credit Agreement), solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"***DIP Claims***" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Order, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents.

"***DIP Commitments***" has the meaning set forth in the recitals to the Restructuring Support Agreement.

20

| Additional Defined Terms |
|---|

"**DIP Credit Agreement**" means that certain *Debtor-in-Possession* C*redit and Guaranty Agreement* to be entered into by and among Holdings, as borrower, the guarantors party thereto, the DIP Agent, and the DIP Lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms) in respect of the DIP Facility, in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

"**DIP Documents**" means the DIP Credit Agreement, the other "Credit Documents" as defined in the DIP Credit Agreement, the DIP Motion, the DIP Orders, and any other agreement, document and/or instrument entered or entered into in connection with any of the foregoing, each in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

"**DIP Facility Term Sheet**" means the term sheet attached as <u>Annex 1</u> hereto, describing the material terms of the DIP Facility in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"**DIP Lenders**" means the lenders from time to time party to the DIP Credit Agreement.

"**Disclosure Statement**" means the disclosure statement in respect of the Plan, in form and substance acceptable to the Required Consenting Creditors and the Debtors, including all exhibits, schedules, supplements, modifications, amendments, annexes and attachments thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors, with the consent of the Required Consenting Creditors, on which (i) no stay of the Combined Order is in effect and (ii) all conditions precedent to the effectiveness or consummation of the Plan have been satisfied or waived in accordance with the terms of the Plan and the Restructuring Support Agreement.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Rights Offering Backstop Commitment**" has the meaning set forth in the Equity Rights Offering Backstop Commitment Letter.

"**Equity Rights Offering Backstop Commitment Letter**" means that certain backstop commitment letter, dated as of July 24, 2024, entered into by the Debtors and the Equity Rights Offering Backstop Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms and the terms of the Restructuring Support Agreement, and approved by the Bankruptcy Court pursuant to the Equity Rights Offering Backstop Order, which shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

21

| Additional Defined Terms |
|---|
| "***Equity Rights Offering Backstop Parties***" means those parties that agree to backstop the Equity Rights Offering pursuant to the Equity Rights Offering Backstop Commitment Letter, each in its respective capacity as such. |
| "***Equity Rights Offering Backstop Order***" means that certain order entered by the Bankruptcy Court, which may be the Combined Order, approving, among other things, the Equity Rights Offering Backstop Commitment Letter and the Equity Rights Offering Backstop Commitment Premium, which shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld). |
| "***Equity Rights Offering Procedures***" means those certain rights offering procedures with respect to the Equity Rights Offering as set forth in the Plan. |
| "***Equity Rights Offering Term Sheet***" means the term sheet, attached as <u>Annex 3</u> hereto, dated as of July 24, 2024, entered into by and among the Debtors and the Equity Rights Offering Backstop Parties, which shall provide for the terms of the Equity Rights Offering and shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld). |
| "***Exit Facility***" means the secured second lien exit term loan facility that shall be provided on the terms and conditions consistent with the Exit Facility Term Sheet and arising pursuant to the Exit Facility Credit Agreement, proceeds of which shall be available to satisfy Allowed DIP Claims. |
| "***Exit Facility Credit Agreement***" means that certain credit agreement to be entered into in connection with the Exit Facility.  The Exit Facility Credit Agreement shall be dated as of the Effective Date, by and among Reorganized Parent, as borrower, the administrative agent and collateral agent thereto, and the lenders party thereto, and shall be in form and substance consistent with the Exit Facility Term Sheet and otherwise acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld). |
| "***Exit Facility Documents***" means, collectively, the Exit Facility Credit Agreement and all other loan documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the Exit Facility Term Sheet and shall otherwise be acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld) to the extent the terms thereof are materially inconsistent with the terms of the Amended and Restated Credit Agreement Term Sheet). |

22

| Additional Defined Terms |
|---|

"***Exit Facility Term Sheet***" means the term sheet attached as <u>Annex 4</u> hereto, that sets forth the principal terms of the Exit Facility, as may be supplemented, amended, or otherwise modified from time to time, in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld).

"***Exit Loans***" means the loans issued under the Exit Facility Credit Agreement.

"***Final DIP Order***" means the order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility, the DIP Commitments, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on a final basis (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Final Order***" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which (i) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (ii) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"***First Day Orders***" means any interim or final order of the Bankruptcy Court granting the relief requested in the First Day Pleadings (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting Noteholders and the Debtors.

"***First Lien Ad Hoc Group***" means that certain ad hoc group of holders of First Lien Claims represented by Milbank LLP, as legal counsel.

"***First Lien Ad Hoc Group Advisors***" means, collectively, First Lien Ad Hoc Group Counsel and FTI Consulting, Inc., as financial advisors to the First Lien Ad Hoc Group.

US-DOCS\150850134.32

| Additional Defined Terms |
|---|

"***First Lien Ad Hoc Group Counsel***" means Milbank LLP, as legal counsel to the First Lien Ad Hoc Group.

"***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"***Greenvale***" means Greenvale Capital LLP, on behalf of its funds and/or accounts in their capacities as holders of Unsecured Notes Claims.

"***Greenvale Counsel***" means Schulte Roth & Zabel LLP, as legal counsel to Greenvale.

"***Holdings***" has the meaning set forth in the preamble to the Restructuring Support Agreement.

"***HQ Premises Lease***" means the Office Lease, dated December 23, 2015, by and between HQ Premises Lessor, 2U Harkins Road LLC (as amended by the First Amendment to Office Lease and Reaffirmation of Guaranty, dated May 27, 2016, the Second Amendment to Office Lease and Reaffirmation of Guaranty, dated October 4, 2017, and the Third Amendment to Office Lease, dated May 14, 2019, and as may be further amended, supplemented, or modified from time to time).

"***HQ Premises Lessor***" means Lanham Office 2015 LLC.

"***Initial Consenting First Lien Lenders***" has the meaning set forth in the preamble to the Restructuring Support Agreement.

"***Initial Consenting Noteholders***" has the meaning set forth in the preamble to the Restructuring Support Agreement.

"***Interim DIP Order***" means the order, in the form attached to the Restructuring Support Agreement as Exhibit D, entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility, the DIP Commitments, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on an interim basis (as may be amended, supplemented or modified from time to time), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Impaired***" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"***Intercompany Claims***" means any Claim against a Debtor held by another Debtor.

"***Intercompany Interests***" means an Interest in a Debtor held by another Debtor.

"***Interest***" means any equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, including, without

24

| Additional Defined Terms |
|---|

limitation, equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date (in each case whether or not arising under or in connection with any employment agreement); *provided* that the foregoing shall not apply to any entitlement to participate in or receive any equity interests of the Reorganized Debtors on or following the Effective Date.

"*Landlord Claim*" means a Claim of any lessor related to a lease to which any Debtor is a party (including, for the avoidance doubt, any Claim stemming from the rejection of the lessor's lease pursuant to section 365 of the Bankruptcy Code) which are capped pursuant to section 502(b)(6) of the Bankruptcy Code.

"*Lease Rejection Motion*" means a motion, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors, which seeks orders providing for the rejection of certain of the Debtors' unexpired leases (including the HQ Premises Lease and the Brooklyn Lease, unless such leases are to be assumed pursuant to a settlement with such landlords which is acceptable to the Required Consenting Creditors and the Debtors) pursuant to section 365 of the Bankruptcy Code; *provided*, that the Claims arising from any rejection of unexpired leases shall be capped pursuant to section 502(b)(6) of the Bankruptcy Code.

"*Lease Rejection Order*" means any order of the Bankruptcy Court granting the Lease Rejection Motion and related relief, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"*New Common Interests*" means a single class of new common equity interests of Reorganized Parent to be issued (i) on the Effective Date or (ii) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents.

"*New Common Interests Documents*" means any and all documents required to implement, issue, or distribute the New Common Interests, including the Equity Rights Offering Procedures, Equity Rights Offering Backstop Commitment Letter, Equity Rights Offering Backstop Order, and any other agreement, document or instrument delivered or entered into pursuant thereto or in connection therewith, each of which shall be in form and substance acceptable to the Required Consenting Noteholders, the Debtors (which consent of the Debtors shall not be unreasonably withheld), and reasonably acceptable to the Required Consenting First Lien Lenders (with such consent not to be unreasonably withheld); *provided*, that the New Corporate Governance Documents shall only be acceptable to the Required Consenting Noteholders in their sole discretion in consultation with the Debtors.

"*New Corporate Governance Documents*" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement, or other similar organizational or formation documents, as applicable, of each of the Reorganized Debtors, each of which shall be in form and substance

25

| Additional Defined Terms |
| --- |

acceptable to the Required Consenting Noteholders in their sole discretion, in consultation with the Debtors.

"**Other Priority Claim**" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Other Secured Claim**" means any secured claim that is not a First Lien Claim.

"**Plan**" means the Debtors' prepackaged joint chapter 11 plan of reorganization, in the form attached to the Restructuring Support Agreement, including all appendices, exhibits, schedules, and supplements thereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan and the Restructuring Support Agreement, which shall incorporate the terms of, and shall be consistent with, the Restructuring Support Agreement (including this Restructuring Term Sheet) and shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"**Plan Supplement**" means any supplemental appendix to the Plan, in form and substance acceptable to the Required Consenting Noteholders and the Debtors, and, solely with respect to those documents over which the Required Consenting First Lien Lenders have consent rights, reasonably acceptable to the Required Consenting First Lien Lenders, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended modified or supplemented from time to time in accordance with the terms of the Plan and the Restructuring Support Agreement, and the Bankruptcy Code and the Bankruptcy Rules, which shall include, but shall not be limited to: (i) the New Corporate Governance Documents (*provided*, *however*, that notwithstanding anything herein, such New Corporate Governance Documents shall be in form and substance only acceptable to the Required Consenting Noteholders in their sole discretion, in consultation with the Debtors); (ii) the Equity Rights Offering Procedures; (iii) the Amended and Restated Credit Documents; (iv) the Exit Facility Documents; and (v) the Restructuring Transaction Memorandum.

"**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Reinstatement**" or "**Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

"**Reorganized Debtors**" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

26

| Additional Defined Terms |
|---|

"***Reorganized Parent***" means from and after the Effective Date, Holdings or such other Entity as may be determined by the Debtors and the Required Consenting Noteholders to be the Debtors' new corporate parent, as reorganized pursuant to the Plan or as otherwise agreed between the Debtors and the Required Consenting Noteholders.

"***Required Consenting Creditors***" has the meaning set forth in the Restructuring Support Agreement.

"***Required Consenting First Lien Lenders***" has the meaning set forth in the Restructuring Support Agreement.

"***Required Consenting Noteholders***" has the meaning set forth in the Restructuring Support Agreement.

"***Restructuring***" has the meaning set forth in the recitals to the Restructuring Support Agreement.

"***Restructuring Support Agreement***" means the Restructuring Support Agreement to which this Restructuring Term Sheet is annexed, in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Restructuring Term Sheet***" means this term sheet (including all exhibits, annexes, appendices, and/or schedules hereto), as may be modified in accordance with the terms of the Restructuring Support Agreement), which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Restructuring Transactions Memorandum***" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Schedule of Rejected Contracts***" means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, and to be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.

"***Securities Act***" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any rules and regulations promulgated thereby.

"***Solicitation***" means the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Solicitation Materials***" means any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement and any procedures established by the

27

| Additional Defined Terms |
|---|
| Bankruptcy Court with respect to solicitation of votes on the Plan pursuant to the Solicitation Procedures Order, and related to the Equity Rights Offering and the Equity Rights Offering Procedures, each of which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.<br><br>        "*Solicitation Procedures Order*" means the order of the Bankruptcy Court approving the Solicitation procedures and scheduling the Combined Hearing, which shall be in form and substance acceptable to the Required Consenting Creditors and the Debtors.<br><br>        "*Subordinated Claims*" means any claim subject to subordination under section 510 of the Bankruptcy Code.<br><br>        "*Unimpaired*" means, with respect to a class of Claims or Interests, a class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code. |

US-DOCS\150850134.32

## **Annex 1**

**DIP Facility Term Sheet**

## 2U, INC.

### TERM SHEET FOR JUNIOR DIP

THIS TERM SHEET SETS FORTH THE PRINCIPAL TERMS OF THE JUNIOR DIP FACILITY[1] TO BE PROVIDED TO 2U, INC. (TOGETHER WITH ITS DIRECT AND INDIRECT SUBSIDIARIES, THE "***COMPANY***").

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW.  ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE, AS APPLICABLE.

THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ACCORDINGLY PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE JUNIOR DIP FACILITY, WHICH ARE SUBJECT IN ALL RESPECTS TO THE DIP DOCUMENTS.

THIS TERM SHEET IS CONFIDENTIAL AND IS SUBJECT TO THE CONFIDENTIALITY AGREEMENTS ENTERED INTO BY THE RECIPIENTS OF THIS TERM SHEET AND THE COMPANY PARTIES, AND MAY NOT BE SHARED WITH ANY THIRD-PARTY OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENTS.

---

[1]    Capitalized terms used in this Term Sheet shall have their respective meanings set forth herein.  To the extent any capitalized terms are used, but not otherwise defined, in this Term Sheet, they shall have the meanings ascribed to such terms in, as applicable, the DIP Documents or the Restructuring Term Sheet (the "***Restructuring Term Sheet***") to which this Term Sheet is an exhibit and the Restructuring Support Agreement to which the Restructuring Term Sheet is annexed.

1

## 2U, INC. JUNIOR DIP FACILITY

## SUMMARY OF CERTAIN PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Type* | Junior lien multi-draw debtor-in-possession term loan facility (the "***Junior DIP Facility***"). |
| *Amount* | An initial draw not to exceed $60 million following entry of the Interim DIP Order (the "***Initial Draw***") and a subsequent draw not to exceed $4 million following entry of the Final DIP Order (the "***Second Draw***"), in each case, subject to the conditions precedent set forth below and in the DIP Documents (including the Withdrawal provisions contained therein). |
| *DIP Lenders* | On the Closing Date (as defined in the DIP Credit Agreement), the Initial Consenting Noteholders and any other holders of Unsecured Notes participating in the Junior DIP Facility, *pro rata* in accordance with their holdings of Unsecured Notes as of the Petition Date (the Initial Consenting Noteholders, collectively, in such capacity, the "***DIP Lenders***"). |
| *Borrower* | 2U, Inc. (the "***Borrower***"). |
| *Guarantors* | Same guarantors as set forth in the Prepetition Loan Documents (as defined in the DIP Order). <br><br> In the event additional guarantors are added with respect to the Prepetition Secured Obligations (as defined in the Interim DIP Order), including any Adequate Protection Claims (as defined in the Interim DIP Order), any such additional guarantors shall also be guarantors under the Junior DIP Facility. |
| *Security* | Subject to the Carve-Out (as defined below), second priority security interests and liens on all collateral that secures the Prepetition Secured Obligations on the Closing Date or at any time thereafter (such collateral, the "***Shared Collateral***"), which security interests and liens shall be junior only to (x) the security interests and liens securing the Prepetition Secured Obligations and (y) the security interests and liens, including Adequate Protection Liens (as defined in the Interim DIP Order) that the DIP Documents expressly permit to be senior to the security interest and liens securing the Junior DIP Facility (such liens in (x) and (y), collectively, "***Permitted Liens***"). <br><br> Notwithstanding anything to the contrary contained herein, the obligations under the Junior DIP Facility shall be secured by a first-priority security interest in and lien on the proceeds of the Junior DIP Facility, the DIP Account (as defined in the Interim DIP Order) and |

2

| | |
|---|---|
| | any proceeds therein, which proceeds and account shall not constitute Shared Collateral or be subject to the security interests, liens and/or claims of the Prepetition Secured Parties (as defined in the Interim DIP Order).<br><br>In the event security interests and/or liens are granted by additional guarantors with respect to the Prepetition Secured Obligations or Adequate Protection Claims, any such additional security interests and/or liens shall also be granted to the DIP Lenders under the Junior DIP Facility, subject to the Carve-Out and Permitted Liens. |
| *Maturity* | January 24, 2025. |
| *Coupon* | SOFR + 8.50% (75 bps floor), paid in kind. |
| *Milestones* | The failure to satisfy any of the following milestones (the "**DIP Milestones**"), unless waived or extended at the sole discretion of the Required DIP Lenders (as defined in the Interim DIP Order), shall constitute an "Event of Default" under and as defined in the DIP Credit Agreement:<br><br>1. Solicitation.  The Debtors shall have commenced Solicitation by not later than 11:59 p.m. prevailing Eastern Time on July 24, 2024;<br><br>2. Commencement of the Chapter 11 Cases. The Debtors shall commence the Chapter 11 Cases for each of the Debtors by not later than 11:59 p.m. prevailing Eastern Time on July 25, 2024;<br><br>3. Filing of Lease Rejection Motion.  The Debtors shall file the Lease Rejection Motion by not later than 11:59 p.m. prevailing Eastern Time on the Petition Date;<br><br>4. Filing of the Plan and Disclosure Statement:  The Debtors shall file the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and Solicitation Materials by not later than one (1) business day following the Petition Date;<br><br>5. Entry of Interim DIP Order:  The Bankruptcy Court shall have entered the Interim DIP Order by not later than five (5) calendar days following the Petition Date;<br><br>6. Entry of the Solicitation Procedures Order.  The Bankruptcy Court shall have entered the Solicitation Procedures Order by not later than five (5) calendar days following the Petition Date;<br><br>7. Entry of Interim Notification Procedures and Restrictions on Transfers Order:  The Bankruptcy Court shall have entered an |

3

interim order (in form and substance reasonably acceptable the Required Consenting Noteholders), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors (the "***Interim NOL Order***"), not later than five (5) calendar days following the Petition Date;

8. <u>Entry of Final Notification Procedures and Restrictions on Transfers Order</u>:  The Bankruptcy Court shall have entered a final order (in form and substance reasonably acceptable the Required Consenting Noteholders), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors (the "***Final NOL Order***"), on or prior to the date of entry of the Combined Order;

9. <u>Entry of Final DIP Order</u>:  The Bankruptcy Court shall have entered the Final DIP Order on or prior to the date of entry of the Combined Order;

10. <u>Equity Rights Offering Backstop Order</u>:  The Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order on or prior to the date of entry of the Combined Order;

11. <u>Entry of Lease Rejection Order</u>:  The Bankruptcy Court shall have entered the Lease Rejection Order on or prior to the date of entry of the Combined Order;

12. <u>Disclosure Statement Approval Order</u>:  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Approval Order;

13. <u>Combined Order</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days following the Petition Date, the Combined Order shall have been entered; and

14. <u>Occurrence of the Effective Date</u>:  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is fifty (50) days after the Petition Date, the Effective Date shall have occurred.

| | |
|---|---|
| *Conditions Precedent* | Usual and customary conditions precedent for debtor-in-possession credit facilities to be agreed but, in any event, to include (without limitation):<br><br>• the Support Effective Date shall have occurred;<br><br>• solely in respect of the Initial Draw, the Bankruptcy Court shall |

|  | have entered the Interim DIP Order and the First Day Orders; |
|---|---|
|  | • the Required DIP Lenders shall have received and approved the Initial Approved Budget (as defined in the DIP Credit Agreement); |
|  | • the Borrower shall have paid to the Administrative Agent and the Collateral Agent (each as defined under the DIP Credit Agreement), and the DIP Lenders, the fees and expenses payable to each such person on the Closing Date (which shall include, without limitation, the fees and expenses of the Consenting Noteholder Advisors); and |
|  | • solely in respect of the Second Draw, (x) the Bankruptcy Court shall have entered the Final DIP Order within 45 days following the Petition Date and (y) the Required DIP Lenders shall have consented (in their sole discretion) to funding such Second Draw. |
| *Representations and Warranties* | To be based on the First Lien Credit Agreement, subject to usual and customary modifications for debtor-in-possession credit facilities. |
| *Affirmative and Negative Covenants* | To be based on the First Lien Credit Agreement, subject to usual and customary modifications for debtor-in-possession credit facilities, but in any event to include, without limitation:<br><br>• additional financial and other reporting to be set forth in the DIP Credit Agreement; *provided* that, to the extent such financial and other reporting is not required pursuant to the First Lien Credit Agreement to be delivered to the First Lien Lenders, such financial and other reporting shall be delivered to the First Lien Lenders (subject to certain limitations in the DIP Documents) as and when required pursuant to the DIP Credit Agreement to be delivered to the DIP Lenders and permitted by the DIP Orders; and<br><br>• compliance with the Approved Budget (as defined in the DIP Credit Agreement), which shall be subject to the consent of the Required DIP Lenders and subject to Permitted Variances (as defined below). |
| *Permitted Variances* | Variance from the Approved Budget shall be tested on a bi-weekly basis for the prior cumulative two-week period for Total Disbursements (the "**Bi-Weekly Disbursement Period**") against the Approved Budget, and Total Disbursements shall not be more than 120% of the Total Disbursements in the Approved Budget for such Bi-Weekly Disbursement Period (the "**Permitted Variances**"). |
| *Events of Default* | To be based on the First Lien Credit Agreement, subject to usual and customary modifications for debtor-in-possession credit facilities, but |

5

| | |
|---|---|
| | in any event to include, without limitation: <br><br> • Debtors shall seek to withdraw or modify the Approved Chapter 11 Plan or Disclosure Statement or file any motion/pleading that is inconsistent with the DIP Documents, the Restructuring Support Agreement or the Approved Chapter 11 Plan; <br><br> • termination of the Restructuring Support Agreement; <br><br> • any of the Interim NOL Order, Final NOL Order, Disclosure Statement Approval Order, Combined Order, Equity Rights Offering Backstop Order, or Lease Rejection Order ceases to be in full force and effect; <br><br> • failure of the Borrower or any Restricted Subsidiary of the Borrower to perform or comply with any term or condition contained in the DIP Loan Documents (including satisfaction of the DIP Milestones); and <br><br> • no action shall have been taken by any Government Unit that has had a material adverse effect on the business or results of operations of any of the Debtors taken as a whole, provided that any changes in law, regulation, sub-regulatory guidance or condition generally that impacts the educational industry in which any of the Debtors operate shall not in and of itself constitute a material adverse effect. |
| *Cash Collateral* | The Prepetition Secured Parties shall consent to the use, prior to a Prepetition Secured Party Termination Event (as defined below), of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (collectively, the "***Cash Collateral***") for all purposes permitted under the DIP Credit Agreement and the DIP Order. <br><br> "***Prepetition Secured Party Termination Event***" shall mean the occurrence of any of the following: <br><br> • the breach by the Debtors or failure to satisfy any requirement under the DIP Order in any manner materially adverse to the Prepetition Secured Parties; <br><br> • an Event of Default under the DIP Credit Agreement or any other DIP Credit Document (including, without limitation, a breach of any DIP Milestone) unless waived or otherwise agreed in writing |

6

by the Required DIP Lenders;

- unless waived or extended in writing by the Required DIP Lenders, any failure to meet or satisfy any of the DIP Milestones in accordance with the DIP Credit Agreement;

- the dismissal of any of the Chapter 11 Cases or conversion of any Chapter 11 Case to a chapter 7 case;

- the appointment or election of a chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Chapter 11 Cases;

- any Debtor challenging or contesting the nature, extent, amount, enforceability, validity, priority or perfection of any of the Prepetition Secured Obligations or Prepetition Liens;

- the entry of an order in the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a lien against any assets of the Debtors that constitute Prepetition Collateral or DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, or amounts from time to time therein) without the prior written consent of the Prepetition Required Lenders if such assets have an aggregate value in excess of $2,500,000;

- subject to the Carve-Out, the entry of an order in the Chapter 11 Cases granting liens that are senior to the liens of the Prepetition Secured Parties under the Prepetition Loan Documents or the Adequate Protection Liens without the prior written consent of the Prepetition Required Lenders;

- the failure of the Debtors to make any payment required pursuant to Sections 13(c) or (d) of the Interim DIP Order when due that is not cured within two (2) business days of receipt by the Debtors of written notice (which may be by email) from the Prepetition Agent (acting at the direction of the Prepetition Required Lenders) or an advisor to the First Lien Ad Hoc Group of such default, violation or breach;

- the failure by the Debtors to deliver to the Prepetition Agent any Budget or Variance Report required to be delivered to the

7

| | |
|---|---|
| | Prepetition Agent when due pursuant to this Interim Order that is not cured within three (3) business days after the applicable delivery deadline; and/or<br><br>• the failure by the Debtors to provide the Debtors' balance sheet and monthly profits and losses statement as required by the DIP Credit Agreement, within the timeframe set forth therein, that is not cured within three (3) business days of receipt by the Debtors of written notice (which may be by email) from the Prepetition Agent (acting at the direction of the Prepetition Required Lenders) or an advisor to the First Lien Ad Hoc Group of such failure.<br><br>The Prepetition Secured Parties' exercise of termination rights with respect to Debtors' use of Cash Collateral are subject to notice, opportunity to cure and other limitations set forth in the Interim DIP Order. |
| *Adequate Protection* | The Prepetition Secured Parties shall be granted, for any diminution in value of their respective interests in the applicable Shared Collateral (including Cash Collateral), to the extent that any Prepetition Secured Obligations remain outstanding:<br><br>1. <u>Adequate Protection Liens</u>.  A valid, perfected replacement security interest in and lien on account of the diminution in value upon all of the Shared Collateral (other than the DIP Account (and all amounts from time to time therein)) and any proceeds of the DIP Facility) on account of the Diminution in Value subject to the Carve-Out;<br><br>2. <u>Adequate Protection Claims</u>.  Adequate protection claims which shall be payable from and have recourse to all DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time therein), subject only to the Carve-Out.<br><br>3. <u>Fees and Expenses</u>.  The payment in cash by the Debtors of all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (i) the advisors to the *ad hoc* group of Prepetition Lenders represented by Milbank LLP (in such capacity, the "**First Lien Ad Hoc Group Counsel**"), including, without limitation, those of the First Lien Ad Hoc Group Counsel and FTI Consulting, Inc., (ii) the Prepetition Agent (as defined in the Interim DIP Order), (iii) Holland & Knight LLP, as counsel to the Prepetition Agent, and (iv) Allen Overy Shearman Sterling US LLP ("**AOS**"), as counsel to certain revolving lenders under the First Lien Credit |

8

| | |
|---|---|
| | Agreement (other than any fees and expenses of AOS incurred in connection with any opposition or potential opposition to the Junior DIP Facility or any other transaction contemplated by the DIP Credit Documents or the Restructuring Support Agreement);<br><br>4. <u>Cash Interest</u>. Payment by the Debtors to the Prepetition Secured Parties of current interest in respect of the Prepetition Secured Obligations at the rates and times provided for in the First Lien Credit Agreement; and<br><br>5. <u>Reporting</u>. The Debtors shall provide to (i) the Prepetition Agent at the same time as such reporting (including any reporting with respect to the Approved Budget and the Permitted Variances (as defined in the DIP Credit Agreement) in connection therewith) is provided to any DIP Secured Party, all reporting required to be provided to the DIP Secured Parties under the DIP Credit Documents and (ii) the Prepetition Secured Parties the reports, documents, and other information required to be delivered to the Prepetition Secured Parties under the Prepetition Credit Agreement in accordance with the relevant timelines and requirements set forth therein, which reports, documents, and other information shall also be provided to the DIP Secured Parties at the same time. |
| *Carve-Out* | Junior DIP liens, any claims arising under the Junior DIP Facility, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims, and any claims arising under the First Lien Credit Agreement shall be subject to the following carve-out (the "***Carve-Out***"):<br><br>(i)     all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee,<br><br>(ii)    all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000,<br><br>(iii)   to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained or proposed to be retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "***Professional Persons***") (a) at any time before, on, or the first business day following, |

9

| | |
|---|---|
| | the delivery of the Carve-Out Trigger Notice (as defined below), and without regard to whether such fees and expenses are provided for in the Approved Budget then in effect and whether allowed by the Bankruptcy Court prior to or after delivery of the Carve-Out Trigger Notice, and (b) incurred after the first business day following the delivery of a Carve-Out Trigger Notice in an aggregate amount not exceeding $5 million (the amount in clause (b) the "***Post-Trigger-Notice Carve-Out Fee Cap***"). <br><br> "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (as defined in the DIP Order) at the direction of the Required DIP Lenders, on behalf of the DIP Lenders, to the Debtors, the Debtors' lead restructuring counsel (Latham & Watkins LLP), and the U.S. Trustee, which notice (i) may be delivered upon the occurrence and during the continuation of an Event of Default (subject to any applicable grace periods, waivers, or forbearances) and acceleration of the DIP Obligations under the DIP Documents, and (ii) shall state that the Carve-Out is triggered and the Post-Trigger-Notice Carve-Out Fee Cap has been invoked. |
| *Treatment* | In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each holder of such Allowed DIP Claim shall receive either (i) its *pro rata* share of Exit Loans under the Exit Facility Credit Agreement, or (ii) such other treatment as to which the Debtors and the holder of such Allowed DIP Claims will have agreed upon in writing, with the consent of the Required Consenting Noteholders and the Debtors. |

10

**<u>Annex 2</u>**

**Amended and Restated Credit Agreement Term Sheet**

July 24, 2024



Strictly Confidential. Not for Distribution.

# Statement of Limiting Conditions

- This term sheet summarizes the principal terms of a potential financial restructuring of certain indebtedness of 2U, Inc. (the "Company"). This communication is for discussion purposes only and there is no obligation on the part of any party (including any obligation to continue negotiations) unless and until mutually satisfactory legal agreements are executed by all parties. In particular, this term sheet is not legally binding unless it is annexed to a transaction support agreement or similar document.  This term sheet does not constitute (nor shall it be construed as) an offer or solicitation with respect to any securities of the Company, it being understood that such an offer or solicitation, if any, only will be made in compliance with applicable provisions of securities and/or other applicable laws.  This term sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence, and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

- This term sheet does not purport to summarize all of the terms, conditions, covenants, and other provisions that may be contained in the fully negotiated and definitive documentation necessary to implement the proposed transaction, all of which shall remain subject to internal committee approvals, further discussion and negotiation, including such changes to the structure as are necessary or appropriate to implement a mutually acceptable structure, taking regulatory, tax, accounting and legal considerations into account. The regulatory, tax, accounting and other legal and financial matters related to the proposed transaction have not been fully evaluated, and any such evaluation may affect the terms and structure of the proposed transaction.

- All valuation ranges and analysis contained herein are illustrative in nature and do not necessarily represent a view on the value of the Company or its assets. No valuation of the Company or its assets have been undertaken and as such no representation is made that the valuation ranges herein accurately reflect the underlying value of the Company. Any valuation analysis is dependent upon a multitude of highly volatile factors subject to frequent and material changes, including but not limited to industry trends, government legislation and general macroeconomic conditions.

- This term sheet and the information contained herein is strictly confidential. Distribution of this term sheet, or disclosure of any information set forth herein, to any party other than its intended recipient is expressly prohibited without the prior written authorization of the authors hereof.

- By your receipt of these materials, you agree to be bound by the above terms.



# Exit 1L Facility

| | Agreed Terms (7/24/2024) |
|---|---|
| **Amount** | • $414.3mm new 1L term loan exit facility ("**Exit 1L Facility**") (same as existing RCF and 1L term loan facility amounts, in aggregate) |
| **Paydown** | • $70mm paydown pro rata (to all lenders) to occur as follows: (i) $30mm at closing (i.e., emergence), (ii) $20mm at the 15-month anniversary of closing, and (iii) $20mm at the 21-month anniversary of closing<br><br>• Exit 1L Facility to include a junior capital (including 2L) basket permitting non-cash pay junior capital to facilitate paydown / subordination, subject to deeply silent 2L ICA satisfactory to 1L AHG, the type of junior capital (e.g., 2L, equity) funded at emergence (including the initial $30mm Exit 1L Facility paydown and any exit financing to repay the Junior DIP and fund the business post-emergence), and for any future Exit 1L Facility paydowns, will be at the option of the Convert AHG |
| **Guarantors / Security** | • Granting guarantees and/or security by foreign subsidiaries is subject to legal limitations, tax limitations, timing issues and a general cost/benefit analysis to be agreed |
| **Maturity** | • 27 months from closing (i.e., emergence) |
| **Call Protection** | • Par for 21 months / 101 thereafter |
| **Make-Whole** | • None, other than as provided above (i.e., Call Protection) |
| **Interest Rate** | • S+6.50%, subject to pricing grid starting 2 full quarters after closing, and measured quarterly thereafter:<br><br>  • S+6.50% if Secured Net Leverage > 3.5x<br>  • S+6.00% if Secured Net Leverage ≤ 3.5x<br>  • S+5.50% if Secured Net Leverage ≤ 3.0x<br><br>• 100 bps step up across all levels after 15 months<br><br>• SOFR Floor: 0.75% |
| **Fees / OID** | • 100 bps PIK upfront |
| **Amortization** | • 0.25% per quarter |

# Exit 1L Facility (cont'd)

| | Agreed Terms (7/24/2024) |
|---|---|
| **Financial Covenants** | • Minimum liquidity TBA<br>• Maximum 1L TNLR Covenant set at 30% cushion to plan (subject to agreed upon EBITDA definition) |
| **Other** | • Other covenant and documentary changes (including a revised Consolidated EBITDA definition) to be agreed and filed as part of the plan supplement<br>• DIP issues list received and will be addressed in connection with the Junior DIP negotiation<br>• 1L AHG to appoint two board observers and have the right to maintain two board observers while the Exit 1L Facility is outstanding |



CORPORATE FINANCE

FINANCIAL RESTRUCTURING

FINANCIAL AND VALUATION ADVISORY

HL.com

**<u>Annex 3</u>**

**Equity Rights Offering Term Sheet**

**Annex 3**

**Equity Rights Offering Term Sheet[1]**

*THIS EQUITY RIGHTS OFFERING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY PURSUANT TO THE EQUITY RIGHTS OFFERING PROCEDURES OR THE PLAN, RESPECTIVELY, AND IN COMPLIANCE WITH APPLICABLE LAW.*

| | |
|---|---|
| **Issuer** | The Reorganized Parent. |
| **Offering** | An aggregate offering (the "***Equity Rights Offering***") of New Common Interests at a price per New Common Interest set at the Plan Discount under the Plan (the "***Per Share Price***"), subject to dilution on account of the MIP. Each holder of Allowed Unsecured Notes Claims as of the Equity Rights Offering Termination Time (as defined below) (collectively, the "***Eligible Offerees***") will be granted rights (the "***Subscription Rights***") to participate in the Equity Rights Offering, in an amount not to exceed such Eligible Offeree's *pro rata* share of the Equity Rights Offering based upon a fraction (expressed as a percentage) the numerator of which is the Allowed Unsecured Notes Claims held by such Eligible Offeree and the denominator of which is all Allowed Unsecured Notes Claims held by all Eligible Offerees. |
| | For the avoidance of doubt, each Eligible Offeree may exercise all or a portion of its Subscription Rights, but upon exercising its Subscription Rights, such Eligible Offeree shall be committed to participate for its full amount of exercised Subscription Rights in the Equity Rights Offering, and will receive New Common Interests upon payment in cash therefor as set forth in this Equity Rights Offering Term Sheet. |
| | The Restructuring Support Agreement and subscription documents for the Equity Rights Offering will provide that all Eligible Offerees that exercise their Subscription Rights must enter into a joinder to the Restructuring Support Agreement pursuant to which, among other things, such Eligible Offerees must vote to accept the Plan and must neither object to the confirmation of the Plan nor opt out of the releases contained therein. |
| **Use of Proceeds** | Proceeds of the Equity Rights Offering shall be used to fund certain obligations under the Plan (including, but not limited to, reducing the aggregate principal amount of the A&R CA Loans by $30 million on the Effective Date in accordance with the Amended and Restated Credit Agreement Term Sheet, and paying administrative expenses, professional fees, and the Equity Rights Offering Backstop Commitment Premium (as defined below)) and/or the Reorganized |

---

[1] Capitalized terms used in this Equity Rights Offering Term Sheet shall have their respective meanings set forth herein. To the extent any capitalized terms are used, but not otherwise defined, in this Equity Rights Offering Term Sheet, they shall have the meanings ascribed to such terms in the Restructuring Term Sheet to which this Equity Rights Offering Term Sheet is attached, or the Restructuring Support Agreement to which the Restructuring Term Sheet is attached.

| | |
|---|---|
| | Debtors' working capital needs, in accordance with the Restructuring Support Agreement. |
| **Exercise of Subscription Rights** | The Subscription Rights received with respect to an Allowed Unsecured Notes Claim may only be exercised by the person that holds such Claim both (i) at the time the Subscription Rights are exercised and (ii) on the Equity Rights Offering Termination Time, and may only be exercised prior to 5:00 p.m. prevailing Eastern Time on the termination date of the Equity Rights Offering (the "***Equity Rights Offering Termination Time***"). In addition, after a Subscription Right has been exercised by submitting an election form, the Allowed Unsecured Notes Claim will not be transferable. |
| **Oversubscription Privilege** | The Subscription Rights shall not have an oversubscription right. |
| **Backstop Commitment** | Each Equity Rights Offering Backstop Party shall, pursuant to the Equity Rights Offering Backstop Commitment Letter, provide for commitments (the "***Equity Rights Offering Backstop Commitments***") to purchase from the Reorganized Parent in the Equity Rights Offering its Equity Rights Offering Backstop Commitment Percentage (as defined below) of the New Common Interests that are not purchased by the Eligible Offerees (other than the Equity Rights Offering Backstop Parties in their capacities as Eligible Offerees) in the Equity Rights Offering. The Equity Rights Offering Backstop Parties will also be obligated to fully exercise all Subscription Rights issued to the Equity Rights Offering Backstop Parties in their capacities as Eligible Offerees in the Equity Rights Offering, and the Equity Rights Offering Backstop Commitments shall not include amounts attributable to Subscription Rights issued to the Equity Rights Offering Backstop Parties in their capacities as Eligible Offerees in the Equity Rights Offering. |
| | In exchange for their Equity Rights Offering Backstop Commitment, the Equity Rights Offering Backstop Parties shall, in accordance with the Equity Rights Offering Backstop Commitment Letter, receive in cash an aggregate amount equal to $1.5 million (the "***Equity Rights Offering Backstop Commitment Premium***"). |
| | The Equity Rights Offering Backstop Commitments under the Equity Rights Offering Backstop Commitment Letter shall be transferable from (i) one Equity Rights Offering Backstop Party to another Equity Rights Offering Backstop Party, (ii) from any Equity Rights Offering Backstop Party to any of its Affiliates (so long as such Equity Rights Offering Backstop Party remains liable for such transferred Equity Rights Offering Backstop Commitment), and (iii) to any other person approved in advance in writing by the Reorganized Parent and the Required Consenting Noteholders, in each case, as long as such transferees are or become signatories to the Restructuring Support Agreement and the Equity Rights Offering Backstop Commitment Letter. |
| | If an Equity Rights Offering Backstop Party fails to satisfy all or any part of its Equity Rights Offering Backstop Commitments (such failure, a "***Funding Default***"), the Reorganized Parent shall, as promptly as practicable following the occurrence of such Funding Default, provide written notice to all Equity Rights Offering Backstop Parties of such Funding Default (the "***Funding Default Notice***") and (i) if the amount of the Funding Default does not exceed 10% of the aggregate Equity Rights Offering Backstop Commitments, the non-defaulting Equity Rights Offering Backstop Parties shall, within five Business Days after receipt of the Funding Default Notice (such five Business Day period, the "***Replacement*** |

US-DOCS\152205514.4

|  | *Period*"), purchase their *pro rata* portion of the New Common Interests attributable to such defaulting Equity Rights Offering Backstop Party's Equity Rights Offering Backstop Commitment on the terms and subject to the conditions set forth in the Equity Rights Offering Backstop Commitment Letter, and (ii) if the amount of the Funding Default exceeds 10% of the aggregate Equity Rights Offering Backstop Commitments, the non-defaulting Equity Rights Offering Backstop Parties shall have the right, but not the obligation, during the Replacement Period, to elect, by written notice to the Reorganized Parent, to purchase all or any portion of the New Common Interests attributable to such defaulting Equity Rights Offering Backstop Party's Equity Rights Offering Backstop Commitment. |
|---|---|
|  | The Equity Rights Offering Backstop Commitment Letter shall contain the terms and conditions set forth in this Equity Rights Offering Term Sheet and other customary terms and conditions, including representations, warranties, conditions, covenants, and indemnification, for transactions of this type. |
|  | "*Equity Rights Offering Backstop Commitment Percentage*" means the percentage of the aggregate Equity Rights Offering Backstop Commitments that each Equity Rights Offering Backstop Party has committed to, as set forth in the Equity Rights Offering Backstop Commitment Letter. |
| **Securities Law Matters** | The issuance of the New Common Interests in the Equity Rights Offering (except for any New Common Interests issued to the Equity Rights Offering Backstop Parties) shall be exempt from the registration requirements of the Securities Act as a result of section 1145 of the Bankruptcy Code to the maximum extent available by law or, if section 1145 is not available, then otherwise exempt from registration under the Securities Act and any other applicable securities laws. |
|  | Any New Common Interests issued to the Equity Rights Offering Backstop Parties shall be exempt from the registration requirements of the Securities Act pursuant to Section 4(a)(2) thereof, and/or the safe harbor of Regulation D, or such other exemption as may be available from any applicable registration requirements. |

3

<u>**Annex 4**</u>

**Exit Facility Term Sheet**

## 2U, INC.

### TERM SHEET FOR SECOND LIEN EXIT TERM LOAN FACILITY

THIS TERM SHEET SUMMARIZES THE PRINCIPAL TERMS OF A POTENTIAL SECOND LIEN EXIT FINANCING FOR 2U, INC. AND ITS DIRECT AND INDIRECT SUBSIDIARIES (COLLECTIVELY, THE "*COMPANY*"). THIS COMMUNICATION IS FOR DISCUSSION PURPOSES ONLY AND THERE IS NO OBLIGATION ON THE PART OF ANY PARTY (INCLUDING ANY OBLIGATION TO CONTINUE NEGOTIATIONS) UNLESS AND UNTIL MUTUALLY SATISFACTORY LEGAL AGREEMENTS ARE EXECUTED BY ALL PARTIES. IN PARTICULAR, THIS TERM SHEET IS NOT LEGALLY BINDING UNLESS IT IS ANNEXED TO A TRANSACTION SUPPORT AGREEMENT OR SIMILAR DOCUMENT. THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER OR SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES AND/OR OTHER APPLICABLE LAWS.  THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PARTY OR PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, COVENANTS, AND OTHER PROVISIONS THAT MAY BE CONTAINED IN THE FULLY NEGOTIATED AND DEFINITIVE DOCUMENTATION NECESSARY TO IMPLEMENT THE PROPOSED TRANSACTION, ALL OF WHICH SHALL REMAIN SUBJECT TO INTERNAL COMMITTEE APPROVALS, FURTHER DISCUSSION AND NEGOTIATION, INCLUDING SUCH CHANGES TO THE STRUCTURE AS ARE NECESSARY OR APPROPRIATE TO IMPLEMENT A MUTUALLY ACCEPTABLE STRUCTURE, TAKING REGULATORY, TAX, ACCOUNTING AND LEGAL CONSIDERATIONS INTO ACCOUNT.  THE REGULATORY, TAX, ACCOUNTING AND OTHER LEGAL AND FINANCIAL MATTERS RELATED TO THE PROPOSED TRANSACTION HAVE NOT BEEN FULLY EVALUATED, AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF THE PROPOSED TRANSACTION.

ALL VALUATION RANGES AND ANALYSES CONTAINED HEREIN ARE ILLUSTRATIVE IN NATURE AND DO NOT NECESSARILY REPRESENT A VIEW ON THE VALUE OF THE COMPANY OR ITS ASSETS.  NO VALUATION OF THE COMPANY OR ITS ASSETS HAVE BEEN UNDERTAKEN AND AS SUCH NO REPRESENTATION IS MADE THAT THE VALUATION RANGES HEREIN ACCURATELY REFLECT THE UNDERLYING VALUE OF THE COMPANY.  ANY VALUATION ANALYSIS IS DEPENDENT UPON A MULTITUDE OF HIGHLY VOLATILE FACTORS SUBJECT TO FREQUENT AND MATERIAL CHANGES, INCLUDING BUT NOT LIMITED TO INDUSTRY TRENDS, GOVERNMENT LEGISLATION AND GENERAL

1

MACROECONOMIC CONDITIONS.

THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL. DISTRIBUTION OF THIS TERM SHEET, OR DISCLOSURE OF ANY INFORMATION SET FORTH HEREIN, TO ANY PARTY OTHER THAN ITS INTENDED RECIPIENT IS EXPRESSLY PROHIBITED WITHOUT THE PRIOR WRITTEN AUTHORIZATION OF THE AUTHORS HEREOF.

## 2U, INC. SECOND LIEN EXIT TERM LOAN FACILITY

## SUMMARY OF CERTAIN PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Type* | Secured second lien exit term loan facility (the "***Second Lien Exit Facility***" and, the credit documentation in respect thereof, the "***Second Lien Credit Agreement***").[1] |
| *Amount* | An initial aggregate principal amount not to exceed the sum of (i) $64 million (which amount shall correspond with the aggregate original principal amount of loans funded under the DIP Facility on the closing date of the Second Lien Exit Facility (the "***Closing Date***")) *plus* (ii) any interest in respect of the DIP Facility that has been paid in kind and capitalized or accrued prior to the Closing Date *plus* (iii) the gross amount of any loans borrowed on the Closing Date to fund original issue discount.[2] |
| *Lenders* | On Closing Date, the DIP Lenders, *pro rata* in accordance with their holdings of the DIP Loans as of the Closing Date; *provided*, that the Convertible Noteholders that are not Initial Consenting Noteholders may request to become lenders in respect of the Second Lien Exit Facility after the Closing Date on a *pro rata* basis. |
| *Borrower* | 2U, Inc. |
| *Guarantors* | Same guarantors as set forth in the Amended and Restated Credit Agreement; *provided*, that if any subsidiary of the Borrower that is not a guarantor in respect of the Amended and Restated Credit Agreement on the Closing Date becomes a guarantor in respect of the Amended and Restated Credit Agreement after the Closing Date, such subsidiary shall become a guarantor in respect of the Second Lien Exit Facility; *provided*, *further* that no entity shall provide a guarantee with respect to the Second Lien Exit Facility unless such entity provides a guarantee with respect to the Amended and Restated Credit Agreement. |
| *Security* | Second priority liens on all assets of the Borrower and its subsidiaries that secure the obligations under the Amended and Restated Credit Agreement, junior in right of security only to (x) the liens securing the obligations under the Amended and Restated Credit Agreement and (y) liens expressly permitted under the Second Lien Credit Agreement to be senior to the liens securing the Second Lien Exit Facility; *provided*, that if any assets of the Borrower or any of its subsidiaries that do not |

---

[1] This term sheet is subject in all respects to the Second Lien Credit Agreement.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable.

3

| | |
|---|---|
| | constitute collateral securing the obligations under the Amended and Restated Credit Agreement are granted as collateral to secure the obligations under the Amended and Restated Credit Agreement after the Closing Date, such assets shall be granted as collateral to secure the obligations under the Second Lien Exit Facility. Notwithstanding the foregoing, in no event shall the collateral securing the Second Lien Exit Facility include collateral that does not secure the Amended and Restated Credit Agreement. |
| *Intercreditor Agreement* | A first lien/second lien intercreditor agreement in form and substance satisfactory to the Required Lenders[3], but in any event to include usual and customary "silent second lien" provisions to be mutually agreed (which shall include, without limitation, (x) limitations on voting on any restructuring plan that does not have either (i) first lien lender consent or (ii) otherwise provides for payment in full, in cash, of all first lien obligations, (y) a prohibition on providing debtor-in-possession financing to the extent first lien lenders elect to provide such financing and (z) a no new liens provision (which shall include a liens "most-favored-nations" clause in favor of the first lien lenders). |
| *Maturity* | The date that is six (6) months after the latest maturity date under the Amended and Restated Credit Agreement (as in effect on the Closing Date). |
| *Rate* | S+9.5% *per annum*, payable in kind. |
| *SOFR Floor* | 0.75% |
| *OID/Fees* | 2%, payable in kind. |
| *Amortization* | None. |
| *Incremental Term Loans* | The Borrower shall be permitted to request incremental term loans under the Second Lien Exit Facility in an aggregate principal amount to be agreed ("***Incremental Second Lien Loans***"), subject to substantially the same terms and conditions set forth in the Second Lien Credit Agreement (with such modifications to be agreed by the Borrower and the Second Lien Lenders as may be necessary to take into account the nature of the Incremental Second Lien Loans as incremental indebtedness); *provided*, that (i) the Borrower shall seek such increase from existing Second Lien Lenders (each of which shall be entitled to agree or decline to participate on a *pro rata* basis in its sole and absolute discretion) and (ii) the proceeds of any Incremental |

---

[3] As used in this term sheet, Required Lenders shall has the meaning ascribed to such term in the Second Lien Credit Agreement.

4

| | |
|---|---|
| | Second Lien Loans shall only be used to repay the obligations under the Amended and Restated Credit Agreement. |
| *Conditions Precedent* | Usual and customary for facilities of this type and otherwise acceptable to the Required Lenders. |
| *Representations and Warranties* | Usual and customary representations and warranties to be agreed by the Borrower and Required Lenders, but in any event not more restrictive than the representations and warranties set forth in the Amended and Restated Credit Agreement as in effect on the Closing Date, and otherwise acceptable to the Required Lenders. |
| *Affirmative and Negative Covenants* | Usual and customary affirmative and negative covenants to be agreed by the Borrower and Required Lenders, but in any event not more restrictive than the affirmative and negative covenants set forth in the Amended and Restated Credit Agreement as in effect on the Closing Date (in each case, with at least a 20% cushion set outside of the levels set forth therein), and otherwise acceptable to the Required Lenders. |
| *Events of Default* | To be based on the "Events of Default" in the Amended and Restated Credit Agreement (as in effect on the Closing Date) and otherwise acceptable to the Required Lenders; *provided*, that the Second Lien Credit Agreement shall contain a cross default provision that, in respect of the Amended and Restated Credit Agreement, shall be limited to cross payment default (beyond the applicable grace period, if any, set forth in the Amended and Restated Credit Agreement (as in effect on the Closing Date)) and cross acceleration. |
| *Other* | Other provisions to be consistent with those set forth in the Amended and Restated Credit Agreement and as otherwise acceptable to the Required Lenders and the Borrower. |

5

**<u>Exhibit B</u>**

**Joinder**

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This joinder agreement to the Restructuring Support Agreement, dated as of [_____], 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), between the Debtors, and the Consenting Creditors, each as defined in the Agreement, is executed and delivered by _____ (the "**Joining Party**") as of _____, 2024.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.  <u>Effectiveness</u>.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Debtors, the Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representation and warranties of the Consenting Creditors, as set forth in <u>Article 10</u> of the Agreement to each other Party to the Agreement.

4.  <u>Governing Law</u>.  This joinder agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By:_____
Name:
Title:


| Claims (principal amount) | |
|---|---|
| -    First Lien Claims | US$ |
| -    Unsecured Notes Claims | |
| -    Other (please describe) | |


Notice Address:


_____
_____
_____
Fax: _____
Attention: _____
Email: _____


Acknowledged:

**2U, INC.**
**(on behalf of the Debtors)**


By:_____
Name:
Title:

## Exhibit C

### Milestones

The following milestones shall apply to the Chapter 11 Cases (the "**Milestones**"), unless the applicable Milestone is extended or waived with the prior written consent of the Required Consenting Noteholders (email from the Consenting Noteholder Group Counsel being sufficient) and, with respect to the "Outside Date", with the prior written consent of the Required First Lien Lenders (email from the First Lien Ad Hoc Group Counsel being sufficient):

1. Solicitation.  The Debtors shall commence Solicitation by not later than 11:59 p.m. prevailing Eastern Time on July 24, 2024.

2. Commencement of the Chapter 11 Cases.  The Debtors shall commence the Chapter 11 Cases for each of the Debtors by not later than 11:59 p.m. prevailing Eastern Time on July 25, 2024.

3. Filing of Lease Rejection Motion.  The Debtors shall file the Lease Rejection Motion by not later than 11:59 p.m. on the Petition Date.

4. Filing of the Plan and Disclosure Statement.  The Debtors shall file the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and Solicitation Materials by not later than one (1) Business Day following the Petition Date.

5. Entry of the Interim DIP Order.  The Bankruptcy Court shall have entered the Interim DIP Order by not later than five (5) calendar days following the Petition Date.

6. Entry of the Solicitation Procedures Order.  The Bankruptcy Court shall have entered the Solicitation Procedures Order by not later than five (5) calendar days following the Petition Date.

7. Interim Notification Procedures and Restrictions on Transfers Order.  The Bankruptcy Court shall have entered an interim order (in form and substance acceptable the Required Consenting Noteholders), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors, not later than five (5) calendar days following the Petition Date.

8. Final Notification Procedures and Restrictions on Transfers Order.  The Bankruptcy Court shall have entered a Final Order (in form and substance acceptable the Required Consenting Noteholders), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors, on or prior to the date of entry of the Combined Order.

9. Entry of the Final DIP Order.  The Bankruptcy Court shall have entered the Final DIP Order on or prior to the date of entry of the Combined Order.

10.    <u>Rights Offering Order</u>.  The Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order on or prior to the date of entry of the Combined Order.

11.    <u>Lease Rejection Order.</u>  The Bankruptcy Court shall have entered the Lease Rejection Order on or prior to date of entry of the Combined Order.

12.    <u>Combined Order.</u>  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days following the Petition Date, the Combined Order shall have been entered.

13.    <u>Occurrence of the Effective Date ("Outside Date").</u>  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is fifty (50) days after the Petition Date, the Effective Date shall have occurred.

**<u>Exhibit D</u>**

**Proposed Interim DIP Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-[ ● ] ([ ● ]) |
| Debtors.[1] | (Joint Administration Requested) |

### INTERIM ORDER
### (A) AUTHORIZING THE DEBTORS TO
### (I) OBTAIN JUNIOR LIEN POSTPETITION FINANCING AND
### (II) USE CASH COLLATERAL; (B) GRANTING LIENS
### AND SUPERPRIORITY CLAIMS; (C) GRANTING ADEQUATE
### PROTECTION TO CERTAIN PARTIES; AND (D) GRANTING RELATED RELIEF

Upon the motion, dated [Docket No. [●]] (the "**Motion**"), of 2U, Inc. (the "**Borrower**") and the other debtors in possession (collectively, with the Borrower, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") seeking, pursuant to sections 105, 361, 362, 363, 364, 503, 506(c), 507, 546, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), entry of interim and final orders (respectively, the "**Interim Order**" and "**Final Order**") authorizing, among other things, the Debtors to obtain junior secured postpetition financing in the form of a term loan facility in the aggregate principal amount of up to $64 million (the "**DIP Facility**"), of which up to $60 million will be available immediately upon entry of this Interim Order (the "**Interim Borrowing**"), with the remaining up to $4 million to be available subject to and upon entry of the Final Order (the "**Final Borrowing**"), in accordance with and subject to the terms and conditions set forth in the DIP Credit Agreement (as defined

---

1    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

below), the other Credit Documents (as defined in the DIP Credit Agreement and, together with the DIP Credit Agreement, the "**DIP Credit Documents**"), this Interim Order, the Final Order (as it relates to any Final Borrowing) and the Approved Budget (as defined in the DIP Credit Agreement) then in effect; and upon this Court's consideration of that certain *Debtor-in-Possession Credit and Guaranty Agreement*, dated as of July 24, 2024, by and among the Borrower, certain subsidiaries of the Borrower party thereto, as guarantors (together with any subsidiaries of the Borrower that become guarantors subsequent to the Closing Date (as defined in the DIP Credit Agreement), the "**DIP Guarantors**" and, together with the Borrower, the "**DIP Credit Parties**"), Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent (collectively, in such capacities, the "**DIP Agent**"), and the lenders from time to time party thereto (the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), substantially in the form filed with this Court as <u>**Exhibit A**</u> hereto (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**"),[2] and the other DIP Credit Documents; and the Court having considered the interim relief requested in the Motion; and upon the record made by (a)  the Motion and the exhibits attached thereto, the *Declaration of Cullen Murphy in Support of Motion of Debtors for Interim and Final DIP Orders (A) Authorizing the Debtors to (I) Obtain Junior Lien Postpetition Financing and (II) Use Cash Collateral; (B) Granting Liens and Superpriority Claims; (C) Granting Adequate Protection to Certain Parties; and (D) Granting Related Relief* (the "**Murphy Declaration**"), and the *Declaration of William Kocovski, Restructuring Consultant to the Debtors, in Support of First Day Motions* (the "**First**

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement, or the other DIP Credit Documents, as applicable.

2

**Day Declaration**") filed with the Court in support of the relief requested in the Motion, and (b) the testimony and evidence at the interim hearing, held on July [●], 2024, on the Motion (the "**Interim Hearing**"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the hearing to consider the Motion on a final basis (the "**Final Hearing**"), is otherwise fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration of all objections or responses to the Motion, and for good and sufficient cause therefor:

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. <u>**Commencement of Chapter 11 Cases**</u>. On July 25, 2024 (the "**Petition Date**"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No official committee or chapter 11 trustee has been appointed in the Chapter 11 Cases.

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

US-DOCS\152248865.13

B.    **Jurisdiction and Venue**.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Rules provide the bases for the relief sought in the Motion and granted in this Interim Order.

C.    **Notice**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, in accordance with and compliance with Bankruptcy Rules 2002, 4001, and 9014, as well as the Local Rules, and is due, sufficient, and appropriate notice, and complies with section 102(1) of the Bankruptcy Code.  Without limiting the foregoing, due notice was afforded, whether by email, overnight courier and/or hand delivery to the Notice Parties.  No other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

D.    **Prepetition Credit Agreement**.

(i)    As of the Petition Date, pursuant to that certain Credit and Guaranty Agreement, dated as of June 28, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**" and, collectively with the Collateral Documents (as defined in the Prepetition Credit Agreement) and any other agreements and documents executed or delivered in connection with the Prepetition Credit Agreement or Collateral Documents, each as may be amended, restated,

amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition Loan Documents**"), by and among the Borrower (in such capacity, the "**Prepetition Borrower**"), certain subsidiaries of the Prepetition Borrower party thereto, as guarantors (the "**Prepetition Guarantors**" and, together with the Prepetition Borrower, the "**Prepetition Credit Parties**"), Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Agent**"), and the lenders from time to time party thereto (the "**Prepetition Lenders**" and, together with the Prepetition Agent, the **"Prepetition Secured Parties"**), the Prepetition Credit Parties incurred "Obligations" (as defined in the Prepetition Credit Agreement, the "**Prepetition Secured Obligations**") to the Prepetition Secured Parties on a joint and several basis;

(ii)    As of the Petition Date, the Prepetition Credit Parties were justly and lawfully indebted and liable to the Prepetition Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Loans (as defined in the Prepetition Credit Agreement) in the aggregate principal amount of not less than $414,300,000.00, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other Prepetition Secured Obligations incurred under the Prepetition Loan Documents;

(iii)    The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Credit Parties, enforceable in accordance with the terms of the Prepetition Loan Documents, and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack,

rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(iv)    As of the Petition Date, pursuant to the Prepetition Loan Documents, the Prepetition Credit Parties granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, a security interest in and continuing lien on (the "**Prepetition Liens**") substantially all of their respective assets and property, including (but, for the avoidance of doubt, not including any Excluded Assets (as defined in the Prepetition Loan Documents)), a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Collateral (as defined in the Prepetition Credit Agreement), which, for the avoidance of doubt, includes Cash Collateral (as defined below), and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition Collateral**");

(v)    None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(vi)    None of the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or

6

insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents; and

(vii)    No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties or their Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

E.    **Prepetition Convertible Notes**.

(i)    As of the Petition Date, pursuant to that certain Indenture, dated as of April 23, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**2025 Notes Indenture**"), by and between 2U Inc., as issuer (the "**Issuer**"), and Wilmington Trust, National Association, as trustee (the "**Indenture Trustee**"), governing the Issuer's $380 million aggregate principal amount of 2.25% Convertible Senior Notes due 2025 (the "**2025 Notes**"), and that certain Indenture, dated as of January 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**2030 Notes Indenture**" and, collectively with the 2025 Notes Indenture and any other agreements and documents executed or delivered in connection with the 2025 Notes Indenture or the 2030 Notes Indenture, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Indentures**"), by and between the Issuer and the Indenture Trustee, as trustee, governing the Issuer's $147 million aggregate principal amount of 4.50% Senior Unsecured Convertible Notes due 2030 (the "**2030 Notes**" and, together with the 2025 Notes, the "**Convertible Notes**" and, all the holders of the Convertible Notes, whether or not party to this Agreement, the "**Convertible Noteholders**"), the Debtors were justly and lawfully unconditionally indebted and liable to the Convertible Noteholders without defense, challenge,

7

objection, claim, counterclaim, or offset of any kind (a) in the amount of not less than $381.9 million in aggregate principal and accrued interest outstanding under the 2025 Notes (together with all other debts, liabilities and obligations under the 2025 Indenture, the "**2025 Notes Obligations**") and (b) in the amount of not less than $150.1 million in aggregate principal and accrued interest outstanding under the 2030 Notes (together with all other debts, liabilities and obligations under the 2030 Indenture, the "**2030 Notes Obligations**" and, the 2030 Notes Obligations together with the 2025 Notes Obligations, the "**Notes Obligations**").

(ii)    The Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the Indentures, and no portion of the Notes Obligations or any payment made to the Convertible Noteholders or applied to or paid on account of the Notes Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(iii)    None of the Convertible Noteholders control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Indenture; and

(iv)    No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Convertible Noteholders or their Representatives, in each case, in

US-DOCS\152248865.13

their capacity as such, under or relating to any agreements by and among the Debtors and any Convertible Noteholder that is in existence as of the Petition Date.

F.    **Cash Collateral**.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G.    **No Control**.  None of the DIP Agent or the other DIP Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, or the DIP Credit Documents.

H.    **No Claims or Causes of Action**.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the DIP Agent or the other DIP Secured Parties under, with respect to, in connection with, related to, or arising from any agreements by and among the Debtors and any of the DIP Agent or the other DIP Secured Parties, including, without limitation, this Interim Order, the other DIP Credit Documents, or otherwise that is in existence as of the Petition Date.

I.    **No Credit Available on More Favorable Terms**.  As set forth in the Motion and on the record before this Court, the Debtors are unable to obtain:  (i) financing on more favorable terms and conditions from sources other than the DIP Lenders under the DIP Credit Documents; (ii) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; or (iii) credit for money borrowed with priority over any or all

9

administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and have only been able to obtain credit for money borrowed that is secured by a junior lien on property of the DIP Credit Parties.  The Debtors have also been unable to obtain credit for borrowed money without (i) granting the DIP Liens (as defined below), (ii) the DIP Superpriority Claims (as defined below) to (or for the benefit of) the DIP Secured Parties, and (iii) incurring the Adequate Protection Obligations (as defined below).  Accordingly, the DIP Facility is the best source of debtor-in-possession financing available to the Debtors.

J.    **Extension of Financing**.  The DIP Lenders have indicated a willingness to provide the DIP Facility (and the Loans (as defined in the DIP Credit Agreement) thereunder (the "**DIP Loans**")) to the Borrower in accordance with this Interim Order, the other DIP Credit Documents, and the Approved Budget then in effect, and subject to (i) the entry of this Interim Order, (ii) the entry of the Final Order by no later than the applicable DIP Milestone (as defined and set forth in the DIP Credit Agreement), (iii) approval and ratification of the Debtors' entry into the DIP Credit Agreement, the other DIP Credit Documents, and each of their respective terms, and (iv) findings by this Court that (x) such financing is essential to the Debtors' estates, the continued operation of the Debtors' businesses, and the preservation of the value of the Debtors' assets, (y) the DIP Secured Parties are good-faith lenders, and (z) the DIP Secured Parties' claims, junior lien claims, security interests and liens, rights, and other protections granted pursuant to and in connection with this Interim Order and the DIP Facility (including the DIP Superpriority Claims and the DIP Liens), will not be affected by any subsequent reversal, modification, vacatur, stay or amendment, as the case may be, of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

US-DOCS\152248865.13

K.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)    The DIP Facility and the DIP Credit Documents result from a competitive process that the Debtors, along with their advisors, conducted to select the best available terms of postpetition financing available to the Debtors under the circumstances.  The DIP Facility and the DIP Credit Documents were negotiated in good faith and at arm's length between the DIP Credit Parties, on the one hand, and each DIP Secured Party, on the other hand.  The terms and conditions of the DIP Facility and the DIP Credit Documents, and the fees paid and to be paid thereunder and/or in respect thereof, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration;

(ii)    all obligations incurred, payments made (or to be made), and transfers or grants of security set forth in this Interim Order, the DIP Facility, and the DIP Credit Documents by any DIP Credit Party are granted to or for the benefit of the DIP Secured Parties for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the DIP Loans and the Commitments (as defined in the DIP Credit Agreement) (such commitments, the "**DIP Commitments**") and the other financial accommodations secured thereby; and

(iii)    the use of proceeds from the DIP Loans made under the DIP Facility that may be extended under this Interim Order and the other DIP Credit Documents are deemed to be extended by the DIP Lenders in good faith and for valid business purposes and uses, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns of each) are entitled to the full protection and

11

benefits of section 364(e) of the Bankruptcy Code whether or not this Interim Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

(iv)    Based on the Motion, the First Day Declaration, the Murphy Declaration and the record and argument presented to the Court at the Interim Hearing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in Section 13 of this Interim Order (collectively, the "**Adequate Protection**"), and the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Credit Documents are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties under the circumstances.

(v)    The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order and the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens (as defined below), any challenges or objections to the use of Cash Collateral, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan Documents or the DIP Credit Documents, as applicable.

(vi)    The Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed

US-DOCS\152248865.13

Adequate Protection are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral, including Cash Collateral.

L.    **Section 506(c)**.  The DIP Secured Parties and the Prepetition Secured Parties are entitled to the benefits of a waiver of section 506(c) of the Bankruptcy Code.

M.    **Section 552(b)**.  Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

N.    **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and property.  Good and sufficient cause has been shown for the entry of this Interim Order and for the authorization of the Debtors to obtain financing pursuant to the DIP Credit Documents.  The Debtors have an immediate and critical need to obtain the relief set out herein, and will suffer immediate and irreparable harm if the interim relief is not granted.  It is in the best interests of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility and the DIP Credit Documents (and entry into such documents is ratified), to incur the Obligations (as defined in the DIP Credit Agreement) (the "**DIP Obligations**") and to grant the liens, claims, rights, and other protections contemplated by this Interim Order, the DIP Facility, and the DIP Credit Documents to the DIP Secured Parties.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

US-DOCS\152248865.13

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    **Motion Granted**.  The relief sought in the Motion is hereby granted on an interim basis, and the Interim Borrowing under the DIP Facility is hereby authorized, upon the terms and conditions set forth in this Interim Order and the DIP Credit Documents.  Any objections to the relief set forth in this Interim Order that have not been withdrawn, waived, or settled are hereby denied and overruled in their entirety.  The Interim Order shall become effective and enforceable immediately upon its entry.

2.    **DIP Facility**.

(a)    **DIP Obligations**.  The Debtors are expressly and immediately authorized and empowered (i) to enter into the DIP Credit Documents, and their entry into such agreements is hereby ratified and approved, (ii) to incur the DIP Obligations in accordance with and subject to this Interim Order and the other DIP Credit Documents, (iii) to enter into, execute and/or deliver all the DIP Credit Documents and all other instruments, certificates, agreements and documents contemplated thereby or hereby, and (iv) to take all actions, which may be required or otherwise necessary for the performance by the DIP Credit Parties under the DIP Credit Documents and the creation and perfection of the DIP Liens described and provided for herein and therein.  The DIP Credit Parties are hereby authorized and directed to pay, without further court order, all principal, interest, fees, costs and expenses, indemnities and other amounts described herein and in the DIP Credit Documents (including the DIP Obligations) as such shall accrue and become due hereunder or thereunder, and all such payments of principal, interest, fees, costs and expenses, indemnities and other amounts shall not be subject to disgorgement once made.  The DIP Credit Documents and all DIP Obligations represent, constitute and evidence, as the case may be, valid and binding, joint and several, obligations of the DIP Credit Parties, enforceable against each of the DIP Credit

14

Parties, each of their estates and any successors thereto in accordance with their terms. All obligations incurred, payments made, rights granted, and transfers or grants of security set forth in this Interim Order or the other DIP Credit Documents by any DIP Credit Party are for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby. The obligations and guarantees incurred or made, payments made, transfers or grants of security as set forth in the DIP Credit Documents, by any DIP Credit Party as approved under this Interim Order shall not be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any challenge, rejection, reduction, subordination, defense, recharacterization, avoidance, reduction, setoff, recoupment or counterclaim or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.

(b)    **Authorization to Borrow**. To prevent immediate and irreparable harm to the Debtors' estates, the Borrower is hereby authorized to borrow under the DIP Facility, and the DIP Guarantors are authorized to guarantee, on a joint and several basis, repayment of such DIP Obligations up to the Interim Borrowing under the DIP Facility (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Credit Agreement) in accordance with this Interim Order, the Approved Budget then in effect, and the DIP Credit Documents.

(c)    **DIP Account**. The Debtors shall maintain a deposit account at Flagstar Bank, N.A. in the name of the Debtor 2U, Inc. but subject to a deposit account control agreement solely in favor of the DIP Agent, with the account number ending in ******1233, which account (x) shall constitute DIP Collateral and (y) shall be subject solely to the DIP Liens and the DIP Superpriority Claims (the "**DIP Account**"). The proceeds of the DIP Facility (including the

15

Interim Borrowing and the Final Borrowing) shall be funded into the DIP Account and the Debtors

shall be permitted to make Withdrawals from the DIP Account for disbursements to be made on

such day or the immediately succeeding day, subject to the terms and conditions of the DIP Credit

Agreement (including Section 5.19 thereof), including, without limitation, the prior or concurrent

submission of a Withdrawal Notice to the DIP Agent (for distribution to the DIP Lenders), with a

concurrent copy (which shall not constitute notice) to the Lender Advisors, that certifies, among

other things, that the Withdrawal complies with the Withdrawal Conditions.[4]  Notwithstanding

anything to the contrary herein, proceeds of the DIP Facility (including all amounts in the DIP

Account) shall constitute DIP Collateral and be subject solely to the DIP Liens and the DIP

Superpriority Claims.

      3.    **DIP Liens**.

      (a)    Effective as of the date of entry of this Interim Order, in each case subject

only to the Carve-Out (as defined below) and the priorities set forth in Section 3 hereof, the DIP

Agent, for the benefit of the DIP Secured Parties and to secure the DIP Obligations, is granted,

without the necessity of the execution or recordation of filings by the DIP Credit Parties of

mortgages, security agreements, control agreements, pledge agreements, financing statements, or

other similar documents or instruments, or the possession or control by the DIP Agent or any DIP

Lender of, or over, any collateral, the following security interests and liens (all such security

---

[4]    "Withdrawal Conditions" shall mean "(a) no Default or Event of Default shall have occurred and be continuing on the date of the Withdrawal or after giving effect to the use of the Withdrawal, (b) an Authorized Officer of the Borrower shall have delivered to the Collateral Agent and the Lenders a Withdrawal Notice with respect to the applicable Withdrawal, (c) the Interim DIP Order or Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay without the prior written consent of the Required Lenders, and (d) the Withdrawal Liquidity Condition shall have been satisfied."

"Withdrawal Liquidity Condition" shall mean "with respect to any Withdrawal on any date, the amount of the requested Withdrawal does not exceed the positive difference of (a) the amount of disbursements to be made on such day or the immediately succeeding day, which disbursements are to be made in accordance with the Approved Budget (subject to Permitted Variances), *minus* (b) the aggregate amount of cash in the Credit Parties' bank accounts as of the end of the day immediately prior to such withdrawal date in excess of $5,000,000."

US-DOCS\152248865.13

interests and liens granted to the DIP Agent, for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the other DIP Credit Documents, collectively, the "**DIP Liens**" and, the property subject to the DIP Liens, the "**DIP Collateral**"):

(i)       Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, non-avoidable, continuing and automatically and fully-perfected security interest in and lien on all prepetition and postpetition property of each DIP Credit Party (whether existing on the Petition Date or thereafter acquired) that is not, on or as of the Petition Date, subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (collectively, the "**Unencumbered Property**"), including, without limitation, any unencumbered cash of each DIP Credit Party (whether maintained with the DIP Agent, in the DIP Account or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, securities accounts, commodity accounts, commercial tort claims, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock or other equity or ownership interests held by each DIP Credit Party, including equity interests in subsidiaries and non-wholly-owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including the proceeds of avoidance actions) and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or

US-DOCS\152248865.13

thereafter created, acquired or arising and wherever located, which security interest and liens in favor of the DIP Agent and the DIP Lenders are with respect to (x) proceeds of the DIP Facility, the DIP Account, and any and all amounts from time to time therein, are subject only to the Carve-Out and (y) all DIP Collateral other than proceeds of the DIP Facility, the DIP Account, and any and all amounts from time to time therein, are subject to the Carve-Out and junior only to the Adequate Protection Liens; *provided* that, so long as there are any Prepetition Secured Obligations outstanding, to the extent that any DIP Secured Party receives any proceeds of Unencumbered Property (other than proceeds of the DIP Facility, the DIP Account, and any and all amounts from time to time therein), such DIP Secured Party shall promptly turn over any such proceeds to the Prepetition Agent for the benefit of the Prepetition Lenders until the payment in full in cash of the Prepetition Secured Obligations.

(ii)     Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien on all prepetition and postpetition property of each DIP Credit Party (whether now existing or hereafter acquired) that is subject to valid, perfected and non-avoidable liens (including the Prepetition Liens) in existence immediately prior to the Petition Date, or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Permitted Liens**"), which security interests and liens in favor of the DIP Agent, for the benefit of the DIP Secured Parties, are subject to the Carve-Out and junior only to such Permitted Liens and the Adequate Protection Liens; *provided* that, for the avoidance of doubt, the DIP Facility, the DIP Account, and any and all amounts from time to time therein, are not subject to Permitted Liens of any non-DIP Secured Party.

18

(b)    The DIP Liens shall not be subject to challenge including, without limitation, under sections 510, 546, 549, or 550 of the Bankruptcy Code.  The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other successor or other proceedings related to any of the foregoing (such successor cases or proceedings, "**Successor Cases**"), or upon the dismissal of any of the Chapter 11 Cases.

(c)    Notwithstanding anything herein to the contrary, the DIP Liens shall not be (i) subject or subordinated to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Credit Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Credit Parties, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code; *provided*, for the avoidance of doubt, that the DIP Liens granted pursuant to (x) section 364(c)(2) of the Bankruptcy Code shall have the priority set forth in Section 3(a)(i) hereof and (y) section 364(c)(3) of the Bankruptcy Code shall have the priority set forth in Section 3(a)(ii) hereof.

4.    **DIP Superpriority Claims**.  Effective as of the date of entry of this Interim Order, in each case subject to the Carve-Out and subject and junior to the Adequate Protection Claims, in accordance with the DIP Credit Documents, the DIP Agent, for the benefit of the DIP Secured Parties, is granted, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**").  The DIP Secured

Parties shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including as set forth in Section 17(a) hereof, with respect to the DIP Superpriority Claims.

5.    **Budget**.  The Initial Approved Budget, a summary form of which is annexed as **Exhibit B** hereto (as it may be updated periodically in accordance with the DIP Credit Documents) is hereby approved.  Proceeds of all DIP Loans made to or for the benefit of any of the Debtors on or after the Petition Date in accordance with the DIP Credit Documents and Cash Collateral shall be used by the Debtors in accordance with the DIP Credit Documents and this Interim Order, and subject to and in accordance with the Approved Budget[5] then in effect.

6.    **Authorization and Approval to Use Proceeds of DIP Loans**.  Subject to the terms and conditions and in compliance with this Interim Order, the Approved Budget then in effect, and the DIP Credit Documents, each DIP Credit Party is authorized to use proceeds of the DIP Loans.

7.    **Automatic DIP Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the respective DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein and the other DIP Credit Documents.  Notwithstanding the foregoing, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) (the "**Required DIP Lenders**") are each authorized (without obligation) to, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens and other similar documents or instruments, and the automatic stay set forth in section 362 of the Bankruptcy Code does not apply

---

[5]    As used in this Interim Order, the Approved Budget shall refer to the "Approved Budget" as defined in the DIP Credit Agreement, which budget, including, for the avoidance of doubt, the Initial Approved Budget, shall be reasonably acceptable to the Required Lenders (as defined in the Prepetition Credit Agreement, the "**Prepetition Required Lenders**")) with such consent not to be unreasonably withheld.

US-DOCS\152248865.13

or prohibit any of the actions set forth in this Section 7, and all such financing statements, deeds of trust, mortgages, security agreements, notices and other agreements or documents or instruments shall be deemed to have been filed or recorded at the time and on the Petition Date. Subject in all instances to the terms of the DIP Credit Documents, upon request of the Required DIP Lenders, the DIP Credit Parties shall execute and deliver to the DIP Agent and the Required DIP Lenders all such financing statements, mortgages, security agreements, notices and other documents or instruments, and otherwise cooperate and assist in any such filings, as the Required DIP Lenders may request to evidence, confirm, validate or perfect, or to ensure the contemplated priority of, the DIP Liens. The DIP Agent and the Required DIP Lenders are each authorized (without obligation) to file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any DIP Credit Party has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. In the event that the Prepetition Agent requires any subsidiary of the Borrower that is not a Prepetition Guarantor to become a Prepetition Guarantor and/or to grant liens or security interests in favor of, or for the benefit of, the Prepetition Secured Parties, the DIP Agent (at the direction of the Required DIP Lenders) may require the Borrower to cause any of such subsidiaries that are not DIP Credit Parties to also become DIP Credit Parties and grant liens and security interests in favor and for the benefit of the DIP Secured Parties.

8.      Any provision of any lease or other license, contract or other agreement that requires (a) the consent or approval of one or more landlords or other parties or (b) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold or contractual interest, or the proceeds thereof, or

other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force and effect with respect to the grant of postpetition liens in such leasehold or contractual interest or the proceeds of any assignment and/or sale thereof by the Debtors, in favor of the DIP Secured Parties in accordance with the terms of this Interim Order or the other DIP Credit Documents.

9. **Validity of Prepetition Secured Obligations and Prepetition Liens**. As of the Petition Date, (a) the Prepetition Secured Obligations shall constitute (i) legal, valid, binding, nonavoidable and enforceable obligations and (ii) allowed claims in the Chapter 11 Cases; (b) no offsets, rights of recoupment, defenses or counterclaims to the Prepetition Secured Obligations shall exist; (c) no portion of the Prepetition Secured Obligations, the Prepetition Loan Documents and the transactions contemplated thereby, or any amounts paid to the Prepetition Secured Parties or applied to the Prepetition Secured Obligations shall be subject to contest, attack, objection, recoupment, defense, avoidance, recharacterization, disallowance, reduction, reclassification, attachment, recovery, offset, action, counterclaim, cross-claims, surcharge, subordination (whether equitable, contractual or otherwise), impairment, challenge, reduction, disgorgement, cause of action, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature pursuant to the Bankruptcy Code or applicable non-bankruptcy law or otherwise; (d) the Prepetition Loan Documents shall be valid, binding and enforceable by the Prepetition Lenders and/or the Prepetition Agent, as applicable, in accordance with their terms; and (e) the Debtors shall not have any claim, challenge, counterclaim, defense, setoff right, recoupment right, or cause of action against the Prepetition Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys, and advisors (or any of them or their agents, each in such capacity), and none of the foregoing in favor of the

22

Debtors or the Debtors' estates exists, whether arising under applicable state or federal law (including, without limitation, any "lender liability" causes of action or recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder) or the Prepetition Secured Obligations, including without limitation, any right to assert any claim for disgorgement or recovery.  As of the Petition Date, pursuant to the Prepetition Loan Documents, the Prepetition Credit Parties granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, the Prepetition Liens on substantially all of their respective assets and property, including (but, for the avoidance of doubt, not including any Excluded Assets (as defined in the Prepetition Loan Documents)), a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Prepetition Collateral.  None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.  Notwithstanding anything to the contrary in the Prepetition Loan Documents or otherwise, the proceeds of the DIP Facility, the DIP Account, and any and all amounts from time to time therein shall not be Prepetition Collateral and shall not be subject to the Prepetition Liens.

10.    **Validity of Notes Obligations**.  As of the Petition Date, (a) the Notes Obligations shall constitute (i) legal, valid, binding, nonavoidable and enforceable obligations and (ii) allowed claims in the Chapter 11 Cases; (b) no offsets, rights of recoupment, defenses or counterclaims to the Notes Obligations shall exist; (c) no portion of the Notes Obligations, the

US-DOCS\152248865.13

Indentures and the transactions contemplated thereby, or any amounts paid to the Convertible Noteholders or applied to the Notes Obligations shall be subject to contest, attack, objection, recoupment, defense, avoidance, recharacterization, disallowance, reduction, reclassification, attachment, recovery, offset, action, counterclaim, cross-claims, surcharge, subordination (whether equitable, contractual or otherwise), impairment, challenge, reduction, disgorgement, cause of action, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature pursuant to the Bankruptcy Code or applicable non-bankruptcy law or otherwise; (d) the Indentures shall be valid, binding and enforceable by the Convertible Noteholders and/or the Indenture Trustee, as applicable, in accordance with their terms; and (e) the Debtors shall not have any claim, challenge, counterclaim, defense, setoff right, recoupment right, or cause of action against the Convertible Noteholders and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys, and advisors (or any of them or their agents, each in such capacity), and none of the foregoing in favor of the Debtors or the Debtors' estates exists, whether arising under applicable state or federal law (including, without limitation, any "lender liability" causes of action or recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Indentures (or the transactions contemplated thereunder) or the Notes Obligations, including without limitation, any right to assert any claim for disgorgement or recovery.

11.    **Carve-Out**.

(a)    **Carve-Out Components**.  As used in this Interim Order and the DIP Credit Documents, the "**Carve-Out**" shall be comprised of the following components:

24

(i)     **Clerk and U.S. Trustee Fees**.  All fees required to be paid to the

Clerk of this Court and U.S. Trustee under section 1930(a) of title 28 of the United States Code

and section 3717 of title 31 of the United States Code (collectively, "**Clerk and UST Fees**").

(ii)    **Chapter 7 Trustee Fees**.  All reasonable fees and expenses up to

$50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7**

**Trustee Fee Cap**").

(iii)   **Allowed Professional Fees**.  To the extent allowed at any time,

whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid fees

and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained or proposed

to be retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the

"**Professional Persons**"), (a) at any time before, on, or the first business day following, the

delivery of the Carve-Out Trigger Notice (as defined below), and without regard to whether such

fees and expenses are provided for in the Approved Budget then in effect and whether allowed by

the Bankruptcy Court prior to or after delivery of the Carve-Out Trigger Notice, and (b) incurred

after the first business day following the delivery of the Carve-Out Trigger Notice in an aggregate

amount not exceeding $5 million (the amount set forth in clause (b), the "**Post-Trigger-Notice**

**Carve-Out Fee Cap**").  The Post-Trigger-Notice Carve-Out Fee Cap shall not be reduced or

increased by the amount of any compensation or reimbursement of expenses paid prior to the

occurrence of an Event of Default in respect of which the Carve-Out is invoked.  Notwithstanding

anything to the contrary herein, for purposes of the Carve-Out, Allowed Professional Fees shall

exclude any transaction, completion, restructuring, sale, consummation, success, or similar fees of

any Professional Person to the extent incurred or payable after the first business day following the

delivery of the Carve-Out Trigger Notice.  Any payment or reimbursement made in respect of any

Allowed Professional Fees incurred on or after the first business day following delivery of the Carve-Out Trigger Notice shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the other DIP Credit Documents, the Bankruptcy Code, and applicable law.

        (b)    **Carve Out Reserve**.  On a weekly basis, the Debtors shall fund from cash on hand into a segregated account (the "**Carve Out Reserves**") held in trust by Epiq Corporate Restructuring, LLC for the benefit of the Professional Persons and, solely for purposes of U.S. Trustee fees held therein, the U.S. Trustee, an amount equal to the estimated amounts included in the Approved Budget and for (i) the U.S. Trustee fees and (ii) fees and expenses of Professional Persons (the "**Estimated Professional Fees**"); *provided* that, until a Final Order has been entered, the Debtors shall fund, on a weekly basis, the Carve Out Reserve in an amount equal to the lesser of (i) the estimated amounts included in the Approved Budget and (ii) the estimated accrual amounts for such week as reported by the Professional Persons to the DIP Lender Advisors for the Estimated Professional Fees.  The Debtors shall use funds held in the Carve Out Reserve to pay the Clerk and UST Fees as they become due and payable, and shall otherwise use funds held in the Carve Out Reserve exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of this Court and any amounts paid from the Carve Out Reserves shall reduce the amount in the Carve Out Reserves on a dollar-for-dollar basis; *provided* that when all obligations included within the Carve Out Reserves have been paid in full (regardless of when such obligations are due and/or allowed by this Court), any funds remaining in the Carve Out Reserve shall revert to the DIP Agent, for the benefit of the DIP

US-DOCS\152248865.13

Secured Parties, and the Prepetition Agent, for the benefit of the Prepetition Secured Parties (to the extent the Prepetition Secured Obligations are outstanding at such time), in each case, subject to and in accordance with the priorities set forth in this Interim Order. Funds transferred to the Carve Out Reserve shall be subject to the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Claims granted hereunder solely to the extent of such reversionary interest; *provided* further that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out. For the avoidance of doubt, after the first business day following the delivery of the Carve-Out Trigger Notice, funding of the Carve Out Reserves, taking into account amounts already funded into the Carve Out Reserves *minus* Allowed Professional Fees incurred on, or prior to the first business day following, the delivery of the Carve-Out Trigger Notice, shall in no event exceed Post-Trigger-Notice Carve-Out Fee Cap.

(c)    **Carve-Out Trigger Notice**. For purposes of this Interim Order, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent at the direction of the Required DIP Lenders, on behalf of the DIP Lenders, to the Debtors, the Debtors' lead restructuring counsel (Latham & Watkins LLP), and the U.S. Trustee, which notice (i) may be delivered upon the occurrence and during the continuation of an Event of Default (as defined below and subject to any applicable grace periods, waivers, or forbearances) and acceleration of the DIP Obligations under the DIP Credit Documents, and (ii) shall state that the Carve-Out is triggered and the Post-Trigger-Notice Carve-Out Fee Cap has been invoked.

US-DOCS\152248865.13

(d)    **Priority of Carve-Out**.  The Carve-Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral (including Cash Collateral), as set forth in this Interim Order.

(e)    None of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Chapter 11 Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

12.    **Cash Collateral.**  The Prepetition Secured Parties have consented or are deemed to have consented to the use of Cash Collateral that constitutes Prepetition Collateral; *provided* that nothing in this Interim Order shall (a) be construed as the affirmative consent by the Prepetition Secured Parties for the use of Cash Collateral that constitutes Prepetition Collateral other than on the terms set forth in this Interim Order, in compliance with the Approved Budget then in effect, and in the context of the DIP Facility authorized by this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (c) prejudice, limit or otherwise impair the rights of any Prepetition Secured Party (solely in such capacity) to seek new, different or additional adequate protection or assert any other right, and the rights of any other party in interest, including the DIP Secured Parties, to object to such relief are hereby preserved.

28

13.    **Adequate Protection.**  Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral that constitutes Prepetition Collateral) for any diminution in value of their interests in the Prepetition Collateral (including Cash Collateral that constitutes Prepetition Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "**Diminution in Value**"), and as an inducement to the Prepetition Secured Parties to consent to the use of their Cash Collateral that constitutes Prepetition Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "**Adequate Protection Obligations**"):

(a)    *Adequate Protection Liens*.  The Prepetition Secured Parties are hereby granted, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid and perfected replacement security interest in and lien upon all of the DIP Collateral (other than the DIP Account (and all amounts from time to time therein) and any proceeds of the DIP Facility) on account of the Diminution in Value (the "**Adequate Protection Liens**"), subject only to the Carve-Out.

(b)    *Adequate Protection Claims*.  The Prepetition Secured Parties are hereby granted an allowed superpriority administrative expense claim against the DIP Credit Parties on a joint and several basis (without the need to file any proof of claim) on account of the Diminution in Value under section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), which Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time therein), subject only to the Carve-Out.

(c)    *Prepetition Secured Parties Fees and Expenses*.  As further adequate protection, the DIP Credit Parties shall currently pay, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses (collectively, the "**Adequate Protection Fees and Expenses**") of (i) the advisors to the *ad hoc* group of Prepetition Lenders represented by Milbank LLP (in such capacity, the "**First Lien Ad Hoc Group Counsel**", and the Prepetition Lenders in the *ad hoc* group represented by such First Lien Ad Hoc Group Counsel, the "**First Lien Ad Hoc Group Members**"), including, without limitation, those of the First Lien Ad Hoc Group Counsel and FTI Consulting, Inc., (ii) the Prepetition Agent, (iii) Holland & Knight LLP, as counsel to the Prepetition Agent, and (iv) Allen Overy Shearman Sterling US LLP ("**AOS**"), as counsel to the Revolving Credit Lenders (as defined in the Prepetition Credit Agreement but subject to the last sentence of this Section 13(c)), in each case subject to the review procedures set forth in this Section 13(c) (with respect to any advisor), whether or not incurred prepetition or postpetition, including, without limitation, agency fees.  Payment of such fees and expenses shall not be subject to allowance or review by this Court or subject to the U.S. Trustee fee guidelines.  At any time that any of the professionals referenced in this Section 13(c) seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each such professional shall provide summary copies of its invoices (which shall not be required to contain time entries, but shall include a general brief description of the nature of the matters for which services were performed, and which may be redacted or modified to delete any privileged information or any other confidential information, and the provision of a professional's invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors and the U.S. Trustee (collectively, the "**Review Parties**").  Any objections raised by any Review Party with respect to such invoices must be in writing and

state with particularity the grounds therefor and must be submitted to the applicable professional within five (5) calendar days after the receipt by the Review Parties (the "**Review Period**").  If no written objection is received by 12:00 p.m. (prevailing Eastern Time) at the end date of the Review Period, the Debtors shall promptly pay such invoices as soon as practicable but not later than three (3) business days after the end date of the Review Period.  If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly (and in no event later than three (3) business days after receipt of the applicable professional's invoice) pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Payments of any amounts set forth in this Section 13(c) are not subject to recharacterization, avoidance, subordination or disgorgement.  Notwithstanding anything to the contrary in this Interim Order, nothing in this Interim Order shall authorize the payment or reimbursement of any fees and expense of any of the Revolving Credit Lenders (including any fees and expenses of AOS) incurred in connection with filing, prosecuting or pursuing any objection, or litigation related to the DIP Facility, the DIP Credit Documents, the use of DIP Collateral (including Cash Collateral), the Restructuring Support Agreement and any of the transactions contemplated under any of the foregoing, including the confirmation and consummation of the Approved Chapter 11 Plan.

(d)    *Payment of Interest to Prepetition Secured Parties*.  The Debtors shall pay to the Prepetition Secured Parties current interest in respect of the Prepetition Secured Obligations at the rates and times and in the form provided for in the Prepetition Credit Agreement.

(e)    *Maintenance of Collateral*.  The DIP Credit Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral (including, in each case, Cash

31

Collateral) in amounts and for the risks, and by the entities, as required under the Prepetition Loan Documents and the DIP Credit Documents, as applicable.

(f)    *Perfection of Adequate Protection Liens*. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of the Adequate Protection Liens granted and created hereunder, and, such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities set forth herein, effective as of the date of this Interim Order, without the necessity of executing deposit account control agreements or creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens granted to the applicable Prepetition Secured Parties hereunder. Without in any way limiting the validity of the automatic perfection of the Adequate Protection Liens under the terms of this Interim Order, the Prepetition Secured Parties are hereby authorized, but not required, to execute in the name of the Prepetition Credit Parties, as their true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, or take possession of certificated securities, or take any other similar action in a manner not inconsistent herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "***Perfection Actions***"). All such Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order. The automatic stay shall be modified to the extent necessary to permit the Prepetition Secured Parties to take any Perfection Action. For the avoidance of doubt, the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-

avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order, whether or not the Prepetition Secured Parties take such Perfection Actions. A certified copy of this Interim Order may, in the discretion of the Prepetition Agent, be filed or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing and recording offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable.

(g)      *Reporting*.  The Debtors shall provide to (i) the Prepetition Agent at the same time as such reporting (including any reporting with respect to the Approved Budget and the Permitted Variances (as defined in the DIP Credit Agreement) in connection therewith) is provided to any DIP Secured Party, all reporting required to be provided to the DIP Secured Parties under the DIP Credit Documents and (ii) the Prepetition Secured Parties the reports, documents, and other information required to be delivered to the Prepetition Secured Parties under the Prepetition Credit Agreement in accordance with the relevant timelines and requirements set forth therein, which reports, documents, and other information shall also be provided to the DIP Secured Parties at the same time.

14.      **Indemnity**. The DIP Agent, the DIP Lenders, the First Lien Ad Hoc Group Members, the Revolving Credit Lenders, and the Prepetition Agent have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of DIP Collateral (including Cash Collateral), including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of DIP Collateral (including Cash Collateral), and all documents related to any

and all transactions contemplated by the foregoing. The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, the DIP Lenders, the First Lien Ad Hoc Group Members, the Revolving Credit Lenders, the Prepetition Agent, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns ("**Representatives**"), in accordance with the DIP Credit Documents and the Prepetition Loan Documents, which indemnification is hereby authorized and approved; *provided* that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.

15.     **Releases**.  Effective as of the Petition Date, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the First Lien Ad Hoc Group Members, the Revolving Credit Lenders, the Prepetition Agent, the DIP Secured Parties, and each of their respective successors and assigns (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising

US-DOCS\152248865.13

in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively,

the "**Released Claims**"), in each case arising out of or related to (as applicable) the Prepetition

Loan Documents, the DIP Credit Documents, the obligations owing and the financial obligations

made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby,

and the obligations and financial obligations made thereunder, in each case that the Debtors at any

time had, now have or may have, or that their predecessors, successors or assigns at any time had

or hereafter can or may have against any of the Released Parties for or by reason of any act,

omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this

Interim Order; *provided* that the releases set forth in this Section shall not release any claims

against a Released Party or liabilities that a court of competent jurisdiction determines results from

the bad faith, fraud, gross negligence or willful misconduct of such Released Party.  For the

avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of

their obligations under the DIP Credit Documents.

16.    **Events of Default; Rights and Remedies Upon Event of Default; Termination
of Use of Cash Collateral**.

(a)    Any material violation of this Interim Order or any occurrence of an "Event

of Default" under (and as defined in) the DIP Credit Agreement or any other DIP Credit Document

(including, without limitation, a breach of any DIP Milestone) shall constitute a "DIP Termination

Event" under this Interim Order unless waived or otherwise agreed in writing by the Required DIP

Lenders.   Notwithstanding anything to the contrary set forth herein or in the DIP Credit

Documents, unless waived or extended in writing by the Required DIP Lenders, any failure to

meet or satisfy any of the DIP Milestones in accordance with the DIP Credit Agreement shall

US-DOCS\152248865.13

constitute an immediate Event of Default and DIP Termination Event, and any remedies with respect thereto shall not be subject to any notice requirements or periods.

(b)    Upon the expiration of five (5) business days (unless extended with the written consent of the Required DIP Lenders in their sole discretion) following the delivery of a written notice (which may be the Carve-Out Trigger Notice) by the DIP Agent (at the direction of the Required DIP Lenders), on behalf of the DIP Lenders, to the Borrower and the U.S. Trustee of the occurrence, and during the continuance, of a DIP Termination Event (the "**DIP Remedies Notice Period**"), the DIP Agent (acting at the direction of the Required DIP Lenders) shall be entitled to take any act or exercise any remedy as provided in this Interim Order or any of the DIP Credit Documents, including, without limitation, (i) immediately terminate and/or revoke the Debtors' right under this Interim Order and the DIP Credit Documents to use the proceeds of the DIP Facility and any funds in the DIP Account, and/or access or make withdrawals from the DIP Account, (ii) declare all DIP Obligations owing under the DIP Credit Documents to be immediately due and payable, (iii) terminate, reduce or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains, (iv) terminate the DIP Facility and any DIP Credit Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations, (v) invoke the right to charge interest at the default rate under the DIP Credit Documents, and/or (vi) stop lending (collectively, the "**DIP Termination Remedies**").  For the avoidance of doubt, notwithstanding the foregoing, during the DIP Remedies Notice Period, the Debtors (x) may not borrow under the DIP Facility or make any Withdrawal from or access the DIP Account, or use the proceeds therein, and (y) may use Cash Collateral solely in amounts necessary to avoid immediate and irreparable harm to the Debtors' estates (including funding

payroll and other administrative expenses) all in accordance with this Interim Order and the Approved Budget then in effect, or that have otherwise been approved in advance in writing by the Required DIP Lenders.  During the DIP Remedies Notice Period, the Debtors and any party in interest shall be entitled to seek an emergency hearing within the DIP Remedies Notice Period with the Court for the sole purposes of (1) contesting whether an Event of Default has occurred or is continuing or (2) seeking authorization for the Debtors' use of Cash Collateral.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the DIP Secured Parties to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Credit Agreement, or the other DIP Credit Documents, as applicable, including, without limitation, to (i) implement the postpetition financing arrangements authorized by this Interim Order, (ii) permit the DIP Secured Parties to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iii) permit the DIP Secured Parties to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Credit Documents and apply such payments to the DIP Obligations, and (iv) subject to the DIP Remedies Notice Period, permit the DIP Secured Parties to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Credit Documents, or applicable law.  Notwithstanding anything to the contrary in this Interim Order or any DIP Credit Document, so long as there are any Prepetition Secured Obligations outstanding and except with respect to the proceeds of the DIP Facility, the DIP Account and/or any amounts from time to time therein, the DIP Secured Parties shall have no right and shall take

37

no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the

DIP Credit Documents or this Interim Order on the DIP Collateral (other than proceeds of the DIP

Facility, the DIP Account, and all amounts from time to time therein), or otherwise seek to exercise

or enforce any rights or remedies against the DIP Collateral (other than proceeds of the DIP

Facility, the DIP Account, and all amounts from time to time therein).

(d)     So long as there are any Prepetition Secured Obligations outstanding, all

proceeds realized in connection with the exercise of rights and remedies of the DIP Secured Parties

(other than proceeds of the DIP Facility, the DIP Account, and all amounts from time to time

therein) shall be promptly turned over to the Prepetition Agent for the benefit of the Prepetition

Lenders and applied in accordance with the terms of the Prepetition Loan Documents.  After the

payment of all Prepetition Secured Obligations in full in cash, any and all proceeds realized in

connection with the exercise of rights and remedies of the Prepetition Secured Parties shall be

promptly turned over to the DIP Agent for the benefit of the DIP Secured Parties and applied in

accordance with the terms of the DIP Credit Documents.

(e)     To the extent that the Prepetition Secured Obligations are outstanding at

such time, upon the occurrence and during the continuance of a Prepetition Secured Party

Termination Event (as defined below), and after delivery by the Prepetition Agent, on behalf of

the Prepetition Required Lenders, to the Debtors of a written notice of the occurrence of a

Prepetition Secured Party Termination Event (with copy to counsel to the DIP Lenders and the

DIP Agent) following five (5) business days (the "**Prepetition Remedies Notice Period**"), unless

such Prepetition Secured Party Termination Event is cured (to the extent curable) by the Debtors

or waived by the Prepetition Required Lenders, at the end of the Prepetition Remedies Notice

Period, the Prepetition Agent (on behalf of the Prepetition Required Lenders) may terminate or

US-DOCS\152248865.13

revoke the Prepetition Secured Parties' consent to the Debtors' right to use Cash Collateral

constituting Prepetition Collateral (but not the proceeds of the DIP Facility, the DIP Account or

any amounts therein, the right to which shall only be terminated or revoked by the Required DIP

Lenders) and shall be entitled to exercise all rights and remedies available under the Prepetition

Loan Documents (subject to the terms of this Interim Order), including, for the avoidance of doubt,

foreclosure upon, or recovery in connection with, the liens granted to the Prepetition Secured

Parties pursuant to the Prepetition Loan Documents and this Interim Order on the Prepetition

Collateral and the DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and

any amounts from time to time therein), or the exercise or enforcement of any rights or remedies

against the Prepetition Collateral or the DIP Collateral (other than proceeds of the DIP Facility,

the DIP Account, and any amounts from time to time therein).  For purposes of this Section 16(e),

"Prepetition Secured Party Termination Event" shall mean any of the following events: (i) the

breach by the Debtors or failure to satisfy any requirement under this Interim Order in any manner

materially adverse to the Prepetition Secured Parties; (ii) an Event of Default under the DIP Credit

Agreement or any other DIP Credit Document (including, without limitation, a breach of any DIP

Milestone) unless waived or otherwise agreed in writing by the Required DIP Lenders; (iii) unless

waived or extended in writing by the Required DIP Lenders, any failure to meet or satisfy any of

the DIP Milestones in accordance with the DIP Credit Agreement; (iv) the dismissal of any of the

Chapter 11 Cases or conversion of any Chapter 11 Case to a chapter 7 case; (v) the appointment

or election of a chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner)

under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in

sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of

any Debtor in the Chapter 11 Cases; (vi) any Debtor challenging or contesting the nature, extent,

amount, enforceability, validity, priority or perfection of any of the Prepetition Secured

Obligations or Prepetition Liens; (vii) the entry of an order in the Chapter 11 Cases granting relief

from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third

party to execute upon or enforce a lien against any assets of the Debtors that constitute Prepetition

Collateral or DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, or amounts

from time to time therein) without the prior written consent of the Prepetition Required Lenders if

such assets have an aggregate value in excess of $2,500,000; (viii) subject to the Carve-Out, the

entry of an order in the Chapter 11 Cases granting liens that are senior to the liens of the Prepetition

Secured Parties under the Prepetition Loan Documents or the Adequate Protection Liens without

the prior written consent of the Prepetition Required Lenders; (ix) the failure of the Debtors to

make any payment required pursuant to Sections 13(c) or (d) hereof when due that is not cured

within two (2) business days of receipt by the Debtors of written notice (which may be by email)

from the Prepetition Agent (acting at the direction of the Prepetition Required Lenders) or an

advisor to the First Lien Ad Hoc Group of such default, violation or breach; (x) the failure by the

Debtors to deliver to the Prepetition Agent any Budget or Variance Report required to be delivered

to the Prepetition Agent when due pursuant to this Interim Order that is not cured within three (3)

business days after the applicable delivery deadline; or (xi) the failure by the Debtors to provide

the Debtors' balance sheet and monthly profits and losses statement as required by the DIP Credit

Agreement, within the timeframe set forth therein, that is not cured within three (3) business days

of receipt by the Debtors of written notice (which may be by email) from the Prepetition Agent

(acting at the direction of the Prepetition Required Lenders) or an advisor to the First Lien Ad Hoc

Group of such failure.  For the avoidance of doubt, notwithstanding the foregoing, during the

Prepetition Remedies Notice Period, the Debtors may use Cash Collateral solely in amounts

US-DOCS\152248865.13

necessary to avoid immediate and irreparable harm to the Debtors' estates (including funding payroll and other administrative expenses) all in accordance with this Interim Order and the Approved Budget then in effect, or that have otherwise been approved in advance in writing by the Required Prepetition Lenders.  During the Prepetition Remedies Notice Period, the Debtors and any party in interest shall be entitled to seek an emergency hearing within the Prepetition Remedies Notice Period with the Court for the sole purposes of (1) contesting whether a Prepetition Secured Party Termination Event has occurred or is continuing or (2) seeking authorization for the Debtors' use of Cash Collateral.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the Prepetition Secured Parties to perform any act authorized or permitted under or by virtue of this Interim Order.

17.    **Proofs of Claim**.  None of the DIP Secured Parties, the Indenture Trustee, or the Prepetition Agent shall be required to file proofs of claim in any of these Chapter 11 Cases or any Successor Cases for any claim allowed herein or with respect to any of the DIP Obligations, the Notes Obligations, or the Prepetition Secured Obligations (as applicable).  The statements of claim in respect of the DIP Obligations, the Notes Obligations, and the Prepetition Secured Obligations set forth in this Interim Order are deemed sufficient to and do constitute proofs of claim in respect of such obligations and, with respect to the DIP Obligations and the Prepetition Secured Obligations, their secured status.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of the DIP Secured Parties, the Indenture Trustee, on behalf of itself and the Convertible Noteholders under the 2025 Notes and the 2030 Notes, and the

US-DOCS\152248865.13

Prepetition Agent, on behalf of the Prepetition Secured Parties are each hereby authorized and entitled, in their sole and absolute discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim (or a master proof of claim) with respect to, respectively, each of the 2025 Notes, the 2030 Notes and the Prepetition Secured Obligations in the Borrower's Chapter 11 Case, which shall be deemed filed in each of the Chapter 11 Cases or any Successor Cases for any claim allowed herein or with respect to any of the DIP Obligations, Notes Obligations, or Prepetition Secured Obligations.  Any such proof of claim and/or aggregate proof of claim (or master proof of claim) may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Agent, Indenture Trustee, or Prepetition Agent, as applicable, shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Secured Parties, the Convertible Noteholders, or the Prepetition Secured Parties, as applicable.

18.    **Other Rights and Obligations.**

(a)    **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties are deemed to have acted in good faith and are hereby entitled to all the protections and benefits provided by section 364(e) of the Bankruptcy Code.

(b)    **Expenses**.  The Debtors are authorized and directed, without further Court order, to promptly pay, in cash, all reasonable and documented fees and expenses of (1) the DIP

Secured Parties as provided in the applicable DIP Credit Documents, whether or not the transactions contemplated thereby or hereby are consummated, whether or not incurred prepetition or postpetition, including, without limitation, agency fees and the fees and expenses of (x) (i) counsel to DIP Lenders, Schulte Roth & Zabel LLP ("**SRZ**") and Weil, Gotshal & Manges LLP ("**Weil**"), (ii) financial advisor to DIP Lenders, Houlihan Lokey Capital, Inc. ("**Houlihan**" and together with SRZ and Weil, the "**DIP Lender Advisors**") and (iii) any other counsel, advisors or consultants retained by DIP Lenders (with the consent of the Required DIP Lenders), and (y) (i) the DIP Agent, Wilmington Savings Fund Society, FSB and (ii) counsel to the DIP Agent, Seward & Kissel LLP and, solely to the extent necessary to enforce rights and remedies under the DIP Credit Documents, one counsel in each local jurisdiction and (2) the Indenture Trustee under each of the 2025 Note and the 2030 Notes and its counsel, whether or not incurred prepetition or postpetition, including, without limitation, agency fees.  Payment of such fees and expenses shall not be subject to allowance or review by this Court or subject to the U.S. Trustee fee guidelines. At any time that any of the professionals hereunder seek payment from the Debtors of fees and expenses that are incurred on or after the Petition Date but prior to confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices (which shall not be required to contain time entries, but shall include a general brief description of the nature of the matters for which services were performed, and which may be redacted or modified to delete any privileged information or any other confidential information, and the provision of a professional's invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Review Parties.  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within the Review Period.  If no written objection

US-DOCS\152248865.13

is received by 12:00 p.m. (prevailing Eastern Time) at the end date of the Review Period, the Debtors shall promptly pay such invoices as soon as practicable but not later than three (3) business days after the end date of the Review Period.  If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly (and in no event later than three (3) business days after receipt of the applicable professional's invoice) pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Payments of any amounts set forth in this Section 18(b), whether prior to, on or after the Petition Date, are not subject to recharacterization, avoidance, subordination or disgorgement.

(c)    **No Waiver**.  The failure or delay of the DIP Secured Parties or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order or any other DIP Credit Document, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Secured Parties or Prepetition Secured Parties, unless any such waiver is pursuant to a written instrument executed by, with respect to the DIP Secured Parties, the DIP Agent (acting at the direction of the Required DIP Lenders) or by the Required DIP Lenders, in each case on behalf of the DIP Lenders, and, with respect to the Prepetition Secured Parties, the Prepetition Agent (acting at the direction of the Prepetition Required Lenders) or the Prepetition Required Lenders, in each case on behalf of the Prepetition Lenders.

(d)    **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

US-DOCS\152248865.13

(e)     **No Limitation of Rights**.  No rights, protections or remedies of the DIP Secured Parties and/or the Prepetition Secured Parties granted by this Interim Order and/or the DIP Credit Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order (other than the Final Order) or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

(f)     **Consent**.  Nothing in this Interim Order shall be construed to convey on any individual DIP Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Credit Documents.

(g)     **No Marshaling**.  The DIP Secured Parties and Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of this Interim Order, the other DIP Credit Documents, and the Prepetition Loan Documents, as applicable, and, subject to entry of the Final Order, none of the DIP Secured Parties or Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(h)     **Amendment**.  As provided in and consistent with their respective rights under the DIP Credit Documents, the Borrower and the applicable DIP Credit Party, as the case may be, with the consent of the Required DIP Lenders, may make any non-material amendment, modification, or supplement to the DIP Credit Documents, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver, without further notice to or approval of this Court, and shall provide copies of any such amendments to the U.S. Trustee and the Prepetition Secured Parties.  Except as otherwise provided herein, no waiver, modification, or

US-DOCS\152248865.13

amendment of any of the provisions hereof or of any other DIP Credit Document (including any material amendment, modification, supplement or waiver thereof) shall be effective unless (i) set forth in writing, (ii) signed by, or on behalf of, the Borrower, the other applicable DIP Credit Party, and the Required DIP Lenders (except as otherwise provided in the DIP Credit Agreement), and (iii) approved by this Court after notice to the U.S. Trustee and the Prepetition Secured Parties; *provided*, *however*, that any forbearance from, or waiver of, a Default or an Event of Default (each as defined in the DIP Credit Agreement), including a breach of any DIP Milestone, in each case, under the DIP Credit Documents shall not require an order of this Court but shall require the consent of the Required DIP Lenders in their sole discretion and written notice to the First Lien Ad Hoc Group Counsel within one (1) business day of such forbearance or waiver.  For the avoidance of doubt, a material amendment, modification, supplement or waiver of the DIP Credit Documents shall include, without limitation, any change to a DIP Credit Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the commitments of the DIP Lenders under the DIP Facility, to increase the rate of interest or fees or provide for additional fees, premiums, or other amounts for the benefit of the DIP Secured Parties, in each case, except as currently provided in or contemplated by such DIP Credit Document, to add specific Events of Default, or to enlarge the nature or extent of remedies available to the DIP Agent following the occurrence of an Event of Default. Notwithstanding anything to the contrary herein, any amendment, modification, supplement or waiver of this Interim Order that would materially affect the rights of any Prepetition Secured Parties or affect the DIP Collateral (other than proceeds of the DIP Facility, the DIP Account, and any and all amounts from time to time therein) in any way shall require the prior written consent of the Prepetition Required Lenders.

US-DOCS\152248865.13

(i)      **Priority of Terms**.  To the extent of any conflict between or among (i) the

express terms or provisions of any of the DIP Credit Documents, the Motion, any other order of

this Court (including, without limitation, the Cash Management Order), or any other agreements,

on the one hand, and (ii) the terms and provisions of this Interim Order, on the other hand, unless

such term or provision herein is phrased in terms of "defined in" or "as set forth in" any of the

other DIP Credit Documents, the terms and provisions of this Interim Order shall govern.  This

Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date

immediately upon entry hereof, notwithstanding the possible application of Bankruptcy Rules

6004(h), 7062, 9014 or otherwise.

(j)      **Binding Nature of Order**.  The provisions of this Interim Order shall be

binding upon the Debtors and their respective successors and assigns (including, without

limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any

Debtor's estate or with respect to its property).

(k)      **Survival of this Interim Order**.  The provisions of this Interim Order and

any actions taken pursuant thereto shall survive entry of any order which may be entered

(i) confirming any plan of reorganization in these Chapter 11 Cases, (ii) converting any of these

Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized

by applicable law, dismissing any of these Chapter 11 Cases, (iv) withdrawing of the reference of

any of these Chapter 11 Cases from this Court, or (v) providing for abstention from handling or

retaining of jurisdiction of any of these Chapter 11 Cases in this Court.  The terms and provisions

of this Interim Order, including the DIP Liens, DIP Superpriority Claims, Adequate Protection

Liens, and Adequate Protection Claims granted pursuant to this Interim Order, shall continue in

full  force  and  effect  notwithstanding  the  entry  of  such  order,  and  such  DIP Liens,  DIP

US-DOCS\152248865.13

Superpriority Claims, Adequate Protection Liens, and Adequate Protection Claims shall maintain

their respective priorities as provided by this Interim Order, the DIP Facility, and the other DIP

Credit Documents (as the case may be) until, with respect to the DIP Liens and DIP Superpriority

Claims, all of the DIP Obligations have been indefeasibly paid in full, in cash (other than

contingent indemnification obligations for which no claim has been asserted), and, with respect to

the Adequate Protection Liens and Adequate Protection Claims, all of the Prepetition Secured

Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Credit

Documents, including upon the effective date of an Approved Chapter 11 Plan.

(l)      **No Discharge**.  The DIP Obligations, the Prepetition Secured Obligations,

and the Adequate Protection Obligations shall not be discharged by the entry of an order

confirming any plan of reorganization in any of these Chapter 11 Cases, notwithstanding the

provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been paid in

full, in cash (other than contingent indemnification obligations for which no claim has been

asserted), on or before the effective date of such plan of reorganization, or such plan is otherwise

an Approved Chapter 11 Plan.

(m)      **Credit Bid Rights**.  In connection with any sale process authorized by this

Court of any DIP Credit Party's assets, whether effectuated through section 363 or section 1129

of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or

otherwise, and subject in all respects to the DIP Credit Documents and the Prepetition Loan

Documents, as applicable, (i) the DIP Secured Parties (including the DIP Agent (directly or via

one or more acquisition vehicles) acting at the direction of the Required DIP Lenders) shall have

the unqualified right to credit bid up to the full amount of the then outstanding DIP Obligations in

connection with any such sale and (ii) the Prepetition Secured Parties shall have the unqualified

48

right to credit bid up to the full amount of the then outstanding Prepetition Secured Obligations in connection with any such sale, subject to the terms of this Interim Order.  None of the Debtors or the Prepetition Secured Parties shall object to any DIP Secured Party's credit bidding up to the full amount of the applicable outstanding DIP Obligations in any sale of any DIP Collateral.  None of the Debtors or the DIP Secured Parties shall object to any Prepetition Secured Party's credit bidding up to the full amount of the applicable Prepetition Secured Obligation in any sale of any Prepetition Collateral (which shall not constitute the DIP Facility proceeds, the DIP Account or any amounts therein from time to time).  The DIP Agent (at the direction of the Required DIP Lenders), on behalf of the DIP Lenders, shall have the right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Secured Parties to any acquisition entity or joint venture formed in connection with such bid.  The Prepetition Agent (at the direction of the Prepetition Required Lenders), on behalf of the Prepetition Lenders, shall have the right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the Prepetition Secured Parties to any acquisition entity or joint venture formed in connection with such bid.

(n)    **Rights Cumulative**.  The rights and obligations, including any consent rights, as provided under this Interim Order shall be cumulative, and not alternative, to, and not otherwise derogate from, the rights and obligations as provided under the DIP Credit Documents and Prepetition Loan Documents.

19.    **Limitation of Liability**.  In determining to make any DIP Loan or DIP Commitment under the DIP Credit Agreement pursuant to this Interim Order or the other DIP Credit Documents or consent to the Debtors' use of Cash Collateral, as applicable, the DIP Secured Parties and Prepetition Secured Parties in their capacity as such shall not be deemed to be in control of the

US-DOCS\152248865.13

operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors. Furthermore, nothing in this Interim Order or the other DIP Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors. None of the DIP Secured Parties or Prepetition Secured Parties in their capacity as such or any of their affiliates are successors to the Debtors and/or their estates by reason of any theory of law or equity, and none of the DIP Secured Parties, Prepetition Secured Parties, or any of their respective affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates.

20.      **Section 506(c) Claims**.  No costs or expenses of administration which have been or may be incurred by any Debtor or their estate in these Chapter 11 Cases at any time (excluding, for the avoidance of doubt, the Carve-Out) shall be charged against the DIP Secured Parties or the DIP Collateral or the Prepetition Secured Parties or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise.  Nothing contained in this Interim Order shall be deemed a consent by the DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment, or claim against, or in respect of, the DIP Collateral or Prepetition Collateral, under sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise.

21.      **Section 552(b)**.  Subject to the entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties in any respect.

22.    **Restrictions on the Use of DIP Collateral with Respect to Foreign and Non-Debtor Affiliates**.  The Debtors shall not transfer or use any DIP Collateral or Prepetition Collateral, including any Cash Collateral, to or for the benefit of any direct or indirect foreign or non-debtor affiliate or subsidiary of the Debtors that is not a DIP Credit Party; *provided* that the Debtors shall be permitted to make payments for the benefit of its foreign and non-debtor affiliates or subsidiaries that are not DIP Credit Parties (i) in compliance in all respects with the Approved Budget (subject to Permitted Variances) or (ii) with the prior written consent of the Required DIP Lenders and the Prepetition Required Lenders ("**Permitted Non-Debtor Affiliate Payments**"). All intercompany investments in the form of a loan or advance owed to a DIP Credit Party shall be evidenced by a subordinated intercompany note, which shall be pledged to the Prepetition Secured Parties and the DIP Secured Parties, subject to the priorities set forth in this Interim Order.

23.    **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

24.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the DIP Facility, the DIP Credit Documents, and/or this Interim Order.

25.    **Final Order and Hearing.**  The Final Hearing to consider the relief requested in the Motion will be held on [●], 2024 at a time to be determined.  The Debtors will file with the Court the proposed form of Final Order at a later date.

SO ORDERED by this Court [●], 2024.

 

 

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

US-DOCS\152248865.13

**<u>Exhibit A</u>**

**DIP Credit Agreement**

PROPOSED AGREED FORM

---

DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

dated as of July [26], 2024

among

2U, INC.,

as Borrower,

CERTAIN SUBSIDIARIES OF THE BORROWER PARTY HERETO,
as Guarantors

THE LENDERS PARTY HERETO

and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent and Collateral Agent

---

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| SECTION 1 | DEFINITIONS AND INTERPRETATION | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Accounting Terms | 32 |
| 1.3 | Interpretation, Etc | 32 |
| 1.4 | Timing of Performance | 33 |
| 1.5 | Currency Generally | 33 |
| 1.6 | Divisions | 33 |
| 1.7 | Negative Covenant Compliance | 33 |
| 1.8 | Rates | 33 |
| SECTION 2 | LOANS | 34 |
| 2.1 | Loans | 34 |
| 2.2 | Pro Rata Shares | 35 |
| 2.3 | Use of Proceeds | 35 |
| 2.4 | Evidence of Debt; Notes | 35 |
| 2.5 | Interest on Loans | 36 |
| 2.6 | Conversion and Continuation | 37 |
| 2.7 | Default Interest | 37 |
| 2.8 | Fees | 37 |
| 2.9 | Maturity | 37 |
| 2.10 | Voluntary Prepayments | 38 |
| 2.11 | Mandatory Prepayments | 38 |
| 2.12 | Application of Prepayments | 40 |
| 2.13 | General Provisions Regarding Payments | 40 |
| 2.14 | Ratable Sharing | 41 |
| 2.15 | Making or Maintaining Term SOFR Loans | 42 |
| 2.16 | Increased Costs; Capital Adequacy | 43 |
| 2.17 | Taxes; Withholding, Etc | 44 |
| 2.18 | Obligation to Mitigate | 48 |
| 2.19 | Replacement of Lenders | 48 |
| 2.20 | Defaulting Lenders | 49 |
| 2.21 | Benchmark Replacement Setting | 50 |
| SECTION 3 | CONDITIONS PRECEDENT | 51 |
| 3.1 | Closing Date | 51 |
| 3.2 | Conditions to Each Extension of Credit | 52 |
| SECTION 4 | REPRESENTATIONS AND WARRANTIES | 53 |
| 4.1 | Organization; Required Power and Authority; Qualification | 53 |
| 4.2 | Equity Interests and Ownership | 53 |
| 4.3 | Due Authorization | 54 |
| 4.4 | No Conflict | 54 |
| 4.5 | Governmental Consents | 54 |
| 4.6 | Binding Obligation | 54 |
| 4.7 | Historical Financial Statements | 55 |
| 4.8 | No Material Adverse Change | 55 |
| 4.9 | Adverse Proceedings | 55 |

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

4.10  Payment of Taxes.................................................................................... 55
4.11  Title.......................................................................................................... 55
4.12  Real Estate Assets ................................................................................... 55
4.13  Environmental Matters ............................................................................ 55
4.14  Investment Company Regulation ............................................................ 56
4.15  Margin Stock............................................................................................ 56
4.16  Employee Matters .................................................................................... 56
4.17  Employee Benefit Plans ........................................................................... 56
4.18  [Reserved]................................................................................................ 57
4.19  Compliance with Laws; Use of Proceeds ............................................... 57
4.20  Collateral.................................................................................................. 58
4.21  DIP Order................................................................................................. 58
4.22  Intellectual Property ................................................................................ 58
4.23  Education Law Matters ............................................................................ 58

SECTION 5      AFFIRMATIVE COVENANTS ........................................................ 58

5.1   Financial Statements and Other Reports and Notices ............................ 59
5.2   Existence .................................................................................................. 62
5.3   Payment of Taxes and Claims................................................................. 62
5.4   Maintenance of Properties ...................................................................... 62
5.5   Insurance .................................................................................................. 62
5.6   Books and Records .................................................................................. 63
5.7   Inspections ............................................................................................... 63
5.8   Lenders Meetings..................................................................................... 63
5.9   Compliance with Laws ............................................................................ 63
5.10  Environmental.......................................................................................... 64
5.11  Subsidiaries.............................................................................................. 64
5.12  Compliance with Milestones................................................................... 64
5.13  Use of Proceeds ....................................................................................... 65
5.14  Further Assurances................................................................................... 66
5.15  Post-Closing Obligations ........................................................................ 66
5.16  Compliance with Education Law ............................................................. 66
5.17  Bankruptcy Matters.................................................................................. 66
5.18  Operating Covenant ................................................................................. 67
5.19  DIP Account ............................................................................................. 67

SECTION 6      NEGATIVE COVENANTS ............................................................... 67

6.1   Indebtedness............................................................................................. 67
6.2   Liens ......................................................................................................... 69
6.3   Payments and Prepayments of Junior Financing or Convertible Bond
      Indebtedness; Payments and Prepayments of Certain Indebtedness; Amendments
      to Certain Documents .............................................................................. 72
6.4   Restricted Payments................................................................................. 72
6.5   Burdensome Agreements ......................................................................... 74
6.6   Investments .............................................................................................. 75
6.7   Fundamental Changes .............................................................................. 77
6.8   Asset Sales................................................................................................ 77
6.9   Sales and Lease-Backs ............................................................................ 78
6.10  Transactions with Affiliates.................................................................... 79
6.11  Fiscal Year ............................................................................................... 80
6.12  Lines of Business ..................................................................................... 80

ii

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

| | | |
|---|---|---|
| 6.13 | [Reserved] | 80 |
| 6.14 | [Reserved] | 80 |
| 6.15 | Budget Variance Covenant | 80 |
| 6.16 | Prohibited Conduct | 80 |
| 6.17 | Employee Incentive/Retention Plans | 81 |
| SECTION 7 | GUARANTY | 81 |
| 7.1 | Guaranty of the Obligations | 81 |
| 7.2 | Contribution by Guarantors | 81 |
| 7.3 | Payment by Guarantors | 82 |
| 7.4 | Liability of Guarantors Absolute | 82 |
| 7.5 | Waivers by Guarantors | 84 |
| 7.6 | Guarantors' Rights of Subrogation, Contribution, Etc | 84 |
| 7.7 | Subordination of Other Obligations | 85 |
| 7.8 | Continuing Guaranty | 85 |
| 7.9 | Authority of Guarantors or the Borrower | 85 |
| 7.10 | Financial Condition of the Borrower | 85 |
| 7.11 | Bankruptcy, Etc | 85 |
| 7.12 | Discharge of Guaranty Upon Sale of Guarantor | 86 |
| 7.13 | Maximum Liability | 86 |
| SECTION 8 | EVENTS OF DEFAULT | 86 |
| 8.1 | Events of Default | 86 |
| 8.2 | Acceleration | 92 |
| 8.3 | Application of Payments and Proceeds | 92 |
| SECTION 9 | AGENTS | 93 |
| 9.1 | Appointment and Authority | 93 |
| 9.2 | Rights as a Lender | 93 |
| 9.3 | Exculpatory Provisions | 93 |
| 9.4 | Reliance by Agents | 95 |
| 9.5 | Delegation of Duties | 96 |
| 9.6 | Resignation of the Administrative Agent | 96 |
| 9.7 | Non-Reliance on Agents and Other Lenders | 97 |
| 9.8 | Administrative Agent May File Proofs of Claim | 97 |
| 9.9 | Collateral Documents and Guaranty | 98 |
| 9.10 | Withholding Taxes | 99 |
| 9.11 | Agent Discretion | 99 |
| 9.12 | Indemnification by Lenders | 100 |
| 9.13 | Survival | 100 |
| 9.14 | Erroneous Payment | 101 |
| SECTION 10 | MISCELLANEOUS | 102 |
| 10.1 | Notices | 102 |
| 10.2 | Expenses | 105 |
| 10.3 | Indemnity; Certain Waivers | 105 |
| 10.4 | Set-Off | 107 |
| 10.5 | Amendments and Waivers | 107 |
| 10.6 | Successors and Assigns; Participations | 109 |
| 10.7 | Independence of Covenants | 113 |
| 10.8 | Survival of Representations, Warranties and Agreements | 113 |

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

10.9    No Waiver; Remedies Cumulative ........................................................................ 113
10.10   Marshalling; Payments Set Aside ...................................................................... 114
10.11   Severability .......................................................................................................... 114
10.12   Obligations Several; Independent Nature of the Lenders' Rights ................................. 114
10.13   Headings ............................................................................................................... 114
10.14   Governing Law .................................................................................................... 114
10.15   Consent to Jurisdiction........................................................................................ 114
10.16   WAIVER OF JURY TRIAL................................................................................ 115
10.17   Confidentiality ..................................................................................................... 115
10.18   Usury Savings Clause .......................................................................................... 116
10.19   No Strict Construction ......................................................................................... 117
10.20   Counterparts; Effectiveness ................................................................................. 117
10.21   Integration............................................................................................................. 117
10.22   No Fiduciary Duty ............................................................................................... 117
10.23   PATRIOT Act...................................................................................................... 118
10.24   Judgment Currency .............................................................................................. 118
10.25   Acknowledgement and Consent to Bail-In of Affected Financial Institutions ............... 118
10.26   Acknowledgement Regarding Any Supported QFC........................................... 118
10.27   Certain ERISA Matters ........................................................................................ 119

US-DOCS\152200537.3WEIL:\99823095\22\10159.0003

<u>APPENDICES</u>:

Appendix A          –    Commitments and Percentages
Appendix B          –    Notice Addresses

<u>SCHEDULES</u>:

Schedule 4.1        –    Organization
Schedule 4.2        –    Equity Interests and Ownership
Schedule 4.10       –    Taxes
Schedule 4.12       –    Real Estate Assets
Schedule 6.1(a)(ii) –    Indebtedness
Schedule 6.2(a)(ii) –    Liens
Schedule 6.5        –    Burdensome Agreements
Schedule 6.6(e)     –    Investments
Schedule 6.10(f)    –    Transactions with Affiliates

<u>EXHIBITS</u>:

Exhibit A-1    –    Form of Funding Notice
Exhibit A-2    –    Form of Conversion/Continuation Notice
Exhibit A-3    –    Form of Withdrawal Notice
Exhibit B      –    Form of Note
Exhibit C      –    Form of Compliance Certificate
Exhibit D-1    –    Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-2    –    Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-3    –    Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit D-4    –    Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit E      –    Form of Assignment and Assumption
Exhibit F      –    Form of Counterpart Agreement
Exhibit G      –    Form of Collateral Agreement
Exhibit H      –    Form of Interim DIP Order

US-DOCS\152200537.3WEIL:\99823095\22\10159.0003

**DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**

This **DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of July [26], 2024 (this "**Agreement**"), is entered into by and among 2U, INC., a Delaware corporation (the "**Borrower**"), CERTAIN SUBSIDIARIES OF THE BORROWER PARTY HERETO, as Guarantors, THE LENDERS PARTY HERETO, and Wilmington Savings Fund Society, FSB ("**WSFS**"), as administrative agent (together with its permitted successors in such capacity, the "**Administrative Agent**"), and as collateral agent (together with its permitted successors in such capacity, the "**Collateral Agent**").

**RECITALS:**

**WHEREAS**, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, on July 25, 2024 (the "**Petition Date**"), the Borrower and certain of the Borrower's Subsidiaries (collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of each of the Borrower and each other Debtor, each a "**Chapter 11 Case**", and collectively the "**Chapter 11 Cases**") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested that the Lenders provide a junior lien debtor-in-possession term loan facility denominated in Dollars in an aggregate principal amount not to exceed $64,000,000 (the "**DIP Facility**"), with all of the Borrower's obligations under the DIP Facility to be guaranteed by each Guarantor, and the Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein;

**WHEREAS**, the priority of the DIP Facility with respect to the Collateral shall be as set forth in the Interim DIP Order and the Final DIP Order, in each case upon entry thereof by the Bankruptcy Court, and in the Collateral Documents;

**WHEREAS**, all of the claims and the Liens granted under the DIP Orders and the Credit Documents to the Administrative Agent and the Lenders in respect of the DIP Facility shall be subject to the Carve-Out;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**SECTION 1    DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**.  The following terms used herein, including in the preamble, recitals, appendices, schedules and exhibits hereto, shall have the following meanings:

"**2025 Convertible Notes**" mean the Borrower's 2.25% senior unsecured convertible notes due 2025 issued pursuant to the 2025 Notes Indenture and which have a maturity date of May 1, 2025.

"**2025 Notes Indenture**" means that certain indenture governing the 2025 Convertible Notes, dated as of April 23, 2020, between the Borrower, as issuer, and Wilmington Trust, National Association, as trustee, as in effect on the Closing Date.

"**2030 Convertible Notes**" mean the Borrower's 4.50% senior unsecured convertible notes due 2030 issued pursuant to the 2030 Notes Indenture and which have a maturity date of February 1, 2030.

"**2030 Notes Indenture**" means that certain indenture governing the 2030 Convertible Notes, dated as of January 11, 2023, between the Borrower, as the issuer, and Wilmington Trust, National Association, as trustee, as in effect on the Closing Date.

"**Accrediting Body**" means any non-governmental entity, including institutional and specialized accrediting agencies, which engages in the granting or withholding of accreditation of educational institutions, programs or courses in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions, programs or courses.

"**Administrative Agent**" has the meaning assigned to such term in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Borrower or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the knowledge of the Borrower or any of its Restricted Subsidiaries, threatened in writing against the Borrower or any of its Restricted Subsidiaries or any property of the Borrower or any of its Restricted Subsidiaries.

"**Affected Financial Institution**" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding the foregoing, neither any Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Credit Documents.

"**Agency Fee Letter**" means an agency fee letter to be entered into by and between the Borrower and the Administrative Agent on or prior to the Closing Date.

"**Agent**" means each of the Administrative Agent, the Collateral Agent and any sub-agent or supplemental agent appointed by the Administrative Agent or the Collateral Agent from time to time.

"**Agent Parties**" has the meaning assigned to such term in Section 10.1(d)(ii).

"**Aggregate Payments**" has the meaning assigned to such term in Section 7.2.

"**Agreement**" has the meaning assigned to such term in the preamble hereto.

"**AML Laws**" means all Laws of any jurisdiction applicable to any Lender, the Borrower or any of its Restricted Subsidiaries from time to time concerning or relating to anti-money laundering.

"**Anti-Corruption Laws**" means all Laws of any jurisdiction applicable to the Borrower or any of its Restricted Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Anti-Terrorism Laws**" means any of the Laws relating to terrorism or money laundering, including Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering

Pg 402 of 568

Control Act of 1986 (i.e., 18 USC. §§ 1956 and 1957), the Laws administered by OFAC, and all Laws comprising or implementing these Laws.

"**Applicable Margin**" means (i) for Loans that are Base Rate Loans, 7.50% *per annum* and (ii) for Loans that are Term SOFR Loans, 8.50% *per annum*.

"**Approved Budget**" has the meaning assigned to such term in Section 5.1(j).

"**Approved Chapter 11 Plan**" means a plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (a "**Plan of Reorganization**") that (a) (i) provides for the termination of any unused Commitments and the payment in full in cash and full discharge of the Obligations on the effective date thereof and provides for treatment of the Obligations in a manner consistent with the Restructuring Support Agreement, or (ii) the Required Lenders have informed the Borrower in writing is an "Approved Chapter 11 Plan", (b) contains releases and other exculpatory provisions for the Administrative Agent and the Lenders in form and substance satisfactory to the Administrative Agent and the Required Lenders, and (c) is otherwise in form and substance satisfactory to the Agents and the Required Lenders.

"**Approved Fund**" means any Fund that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" has the meaning assigned to such term in Section 6.8.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.6(b)(iii)), and reasonably accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form reasonably approved by the Administrative Agent; <u>provided</u> that the assigning Lender shall not be required to execute the assignment and assumption to the extent such Lender is replaced in accordance with Section 2.19.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), chief compliance officer, a director, general counsel, company secretary or assistant company secretary, and such Person's chief financial officer or treasurer; <u>provided</u>, no individual shall be deemed to be an "Authorized Officer" of any Person unless and until an officer of such Person shall have delivered to the Administrative Agent an incumbency certificate as to the office of such individual with respect to such Person.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or

3

rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"**Base Rate**" means, for any day, a rate per annum equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the sum of (a) the Federal Funds Effective Rate in effect on such day, plus (b) 1/2 of 1.00%, and (iii) the sum of (a) Term SOFR for an Interest Period of one month at approximately 11:00 a.m. London time on such day (or if such day is not a Business Day, the immediately preceding Business Day), plus (b) 1.00%. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or Term SOFR, as the case may be, shall be effective on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or Term SOFR, as applicable. Notwithstanding anything set forth herein, the Base Rate shall in no event be less than 1.75%.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Benchmark**" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.21(a).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, either of the following to the extent selected by the Required Lenders in their reasonable discretion for the applicable Benchmark Replacement Date (and notified in writing by the Required Lenders to the Administrative Agent),

        (a)      the sum of (i) Daily Simple SOFR and (ii) the spread adjustment selected or recommended by the applicable Governmental Authority for the replacement of the tenor of Term SOFR, or

        (b)      the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the applicable Governmental Authority or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents; provided that, in each case, such rate, or the underlying rates component thereof, is or are displayed on a screen or other information service that publishes such rate or rates from time to time as selected by the Required Lenders (and is administratively feasible for the Administrative

4

Agent) in their reasonable discretion; and provided further that any such Benchmark Replacement shall be administratively feasible for the Administrative Agent.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the applicable Governmental Authority or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time; provided that such Benchmark Replacement Adjustment shall be administratively feasible for the Administrative Agent.

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar

5

insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark, (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark(or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.21 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.21.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"**Bi-Weekly Disbursement Period**" has the meaning assigned to such term in Section 6.15.

"**Board of Directors**" means, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers or managing member of such Person, (iii) in the case of any partnership, the general partners of such partnership (or the board of directors of the general partner of such Person, if any) and (iv) in any other case, the functional equivalent of the foregoing.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System.

"**Borrower**" has the meaning assigned to such term in the introductory paragraph.

"**Borrowing**" means any Loans of the same type and class made, converted or continued on the same date and, in the case of Term SOFR Loans, as to which a single Interest Period is in effect.

"**Borrowing Date**" means any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"**Brooklyn Lease**" means the Agreement of Lease, dated February 13, 2017, by and between Brooklyn Lessor and 2U NYC, LLC (as may be amended, supplemented or modified from time to time).

"**Brooklyn Lessor**" means 55 Prospect Owner LLC.

"**Budget**" means, in form acceptable to the Required Lenders in their sole discretion, a rolling 13-week cash flow budget depicting on a weekly basis, cash balances, cash inflows and cash outflows, payroll and other information for the applicable 13-week period, including a line item for cash movements between any Credit Party and any affiliate (other than another Credit Party).

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by Law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with any Term SOFR Loans, the term "Business Day" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease**" means, as applied to any Person, all leases that are required to be, in accordance with GAAP as in effect on December 31, 2018, recorded as capitalized leases; provided that the adoption or issuance of any accounting standards after such date will not cause any lease that was not or would not have been a Capital Lease prior to such adoption or issuance to be deemed a Capital Lease.

"**Carve-Out**" has the meaning assigned to such term in the DIP Order.

"**Cash Collateralize**" means in respect of an obligation, provide and pledge cash collateral in Dollars, pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A 1 from S&P or at least P 1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A 1 from S&P or at least P 1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any Lender or by any commercial bank organized under the Laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (iv) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's and (vi) other cash management arrangements made in accordance with policy therefor approved by the Board of Directors of the Borrower. In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (x) Investments of the type and maturity described in clauses (i) through (v) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term investments utilized

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments.

"**Casualty Event**" means any event that gives rise to the receipt by Borrower or any Restricted Subsidiary of any casualty insurance proceeds (other than proceeds of business interruption insurance) or condemnation awards or that gives rise to a taking by a Governmental Authority in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace, restore or repair, or compensate for the loss of, such equipment, fixed assets or real property.

"**Change in Law**" means (a) the adoption of any rule, regulation, treaty or other law after the Closing Date, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that, notwithstanding anything herein to the contrary, (i) any requests, rules, guidelines or directives under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 or issued in connection therewith and (ii) any requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, in each case shall be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the Closing Date, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Restricted Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including, without limitation, for purposes of Section 2.16.

"**Change of Control**" means any of the following:

(i)       any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such Person or its Subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of thirty-five percent (35%) or more of the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or

(ii)       a "change of control" or similar provision as set forth in any indenture or other instrument evidencing any Material Indebtedness of the Borrower or any Restricted Subsidiary has occurred obligating the Borrower or any Restricted Subsidiary to repurchase, redeem or repay all or any part of the Indebtedness provided for therein (excluding, for the avoidance of doubt, any conversion obligations related thereto).

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) a Person acquiring voting interests in the Equity Interests shall not be deemed to have beneficial ownership of such voting interests subject to a stock purchase agreement, merger agreement or similar agreement, so long as such agreement contains a condition to the closing of the transactions

8

contemplated thereunder that the Obligations (other than Remaining Obligations) shall be paid in full and the Commitments hereunder terminated prior to (or contemporaneously with) the consummation of such transactions.

"**Chapter 11 Case**" and "**Chapter 11 Cases**" have the meanings given to such terms in the recitals hereto.

"**Closing Date**" means the first date on which the conditions set forth in Section 3.1 have been satisfied.

"**Code**" means the Internal Revenue Code of 1986, as amended, together with the regulations promulgated thereunder from time to time.

"**Collateral**" has the meaning assigned to "DIP Collateral" in the DIP Order.

"**Collateral Agent**" has the meaning assigned to such term in the preamble hereto.

"**Collateral Agreement**" means the Collateral Agreement substantially in the form of Exhibit G.

"**Collateral Documents**" means the DIP Order, the Collateral Agreement, the Intellectual Property Security Agreements, if any, and all other instruments, documents and agreements delivered by or on behalf or at the request of any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Combined Hearing**" means the combined hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (i) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code and (ii) confirmation of the Approved Chapter 11 Plan, as such hearing may be adjourned or continued from time to time.

"**Combined Order**" means the order of the Bankruptcy Court confirming the Approved Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Required Lenders and the Credit Parties.

"**Commitment**" means the First Draw Commitment and the Second Draw Commitment of a Lender, as applicable, and "Commitments" means such commitments of all of the Lenders in the aggregate. The aggregate amount of the Commitments as of the Closing Date is $64,000,000.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time and any successor statute.

"**Communications**" has the meaning assigned to such term in Section 10.1(d)(ii).

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and

9

frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.15(c) and other technical, administrative or operational matters) that the Required Lenders decide may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Required Lenders and the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents); *provided*, that any such changes shall be administratively feasible for the Administrative Agent.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument (other than a Credit Document) to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" has the meaning assigned to such term in Section 7.2.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. Any Person holding more than ten percent (10 %) of the voting Equity Interests in another Person shall be deemed to be in Control of such Person. "Controlling" and "Controlled" have meanings correlative thereto.

"**Controlled Foreign Corporation**" means a "controlled foreign corporation" (within the meaning of Section 957 of the Code) of which the Borrower or any of its Subsidiaries is a "United States shareholder" (within the meaning of Section 951 of the Code) and with respect to which the Borrower shall have made a determination, in its reasonable judgment, that a guaranty by, grant of a Lien by, or pledge of two-thirds or more of the voting Equity Interests of, such Subsidiary would result in incremental income tax liability as a result of the application of Section 956 of the Code, taking into account actual anticipated repatriation of funds, foreign tax credits and other relevant factors.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a written Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Convertible Bond Indebtedness**" means unsecured Indebtedness having a feature which entitles the holder thereof to convert or exchange all or a portion of such Indebtedness into or by reference to Equity Interests of the Borrower (or other securities or property following a merger event or other change of the Equity Interests of the Borrower). For the avoidance of doubt, the 2025 Convertible Notes and 2030 Convertible Notes shall constitute Convertible Bond Indebtedness.

"**Counterpart Agreement**" means a joinder to this Agreement substantially in the form of Exhibit F.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

"**Credit Document**" means any of this Agreement, the Notes, if any, each Notice, each Counterpart Agreement, if any, the Collateral Documents, the Agency Fee Letter and each other document jointly identified by the Borrower and the Administrative Agent from time to time.

"**Credit Extension**" means the making of a Loan.

"**Credit Party**" means the Borrower and each Guarantor.

"**Credit Support**" means, with respect to any Person and any Indebtedness or other obligations, (i) such Person's guarantee of, or becoming a direct or indirect obligor with respect to, such Indebtedness or other obligations, (ii) such Person's pledge or other hypothecation of its assets to directly or indirectly secure or provide recourse with respect to such Indebtedness or other obligations, (iii) such Person becoming directly or indirectly liable for such Indebtedness or other Obligations or (iv) such Person providing any other form of direct or indirect credit support for such Indebtedness or other obligations (including by means of a "keepwell" or other similar commitment).

"**Daily Simple SOFR**" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Required Lenders (in consultation with the Administrative Agent) in accordance with the conventions for this rate recommended by the applicable Governmental Authority for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Required Lenders may establish another convention in their reasonable discretion that is administratively feasible for the Administrative Agent.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Declined Proceeds**" has the meaning assigned to such term in Section 2.11(b).

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Defaulting Lender**" means any Lender that has (a) failed to fund any portion of its Loans within one Business Day of the date on which such funding is required hereunder, (b) notified the Borrower, the Administrative Agent or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement or provided any written notification to any Person to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by the Administrative Agent (whether acting on its own behalf or at the reasonable written request of the Borrower (it being understood that the Administrative Agent shall comply with any such reasonable request)) to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute or subsequently cured, or (e)(i) become or is insolvent or has a parent company that has become or is insolvent, (ii) become the subject of a bankruptcy or insolvency proceeding or any action or proceeding of the type described in Section 8.1(f) or (h), or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged

with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) become the subject of a Bail-In Action or has a parent company that has become the subject of a Bail-In Action; provided that a Lender shall not be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any capital stock in such Lender or its direct or indirect parent by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  The Administrative Agent shall not be deemed to have knowledge or notice of designation of any Lender as a "Defaulting Lender" hereunder unless the Administrative Agent has received written notice as set forth above from such Lender, the Required Lenders or from the Borrower referring to this Agreement and notifying the Administrative Agent of the identity and designation of such Lender as a "Defaulting Lender" which the Administrative Agent may conclusively rely upon without incurring liability therefor, and absent receipt of such notice from such Lender, the Required Lenders or the Borrower, the Administrative Agent may conclusively assume that no Lender under this Agreement has been designated as a "Defaulting Lender".

"**DIP Account**" has the meaning assigned to such term in Section 5.19.

"**DIP Facility**" has the meaning assigned to such term in the recitals hereto.

"**DIP Milestone**" has the meaning assigned to such term in Section 5.12.

"**DIP Order**" means (a) the Interim DIP Order at all times from and after the entry of the Interim DIP Order and until (but excluding) the entry of the Final DIP Order and (b) the Final DIP Order at all times from and after the entry of the Final DIP Order.

"**Disclosure Statement**" shall mean the disclosure statement (in form and substance acceptable to the Required Lenders and the Credit Parties) for an Approved Chapter 11 Plan.

"**Disqualified Equity Interest**" means any Equity Interest which is not Qualified Equity Interests.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means a Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**Earn-Out Obligations**" those certain obligations of the Borrower or any Restricted Subsidiary arising in connection with any acquisition of assets or businesses permitted under Section 6.6 to the seller of such assets or businesses and the payment of which is dependent on the future earnings or performance

12

of such assets or businesses and contained in the agreement relating to such acquisition or in an employment agreement delivered in connection therewith.

"**ED**" means the United States Department of Education and any successor agency administering student financial assistance under Title IV, HEA Programs.

"**Educational Agency**" means any entity or organization, whether governmental or non-governmental, that engages in granting or withholding educational approvals, administers student financial assistance to or for students of, or otherwise regulates educational institutions, programs or courses, in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such institutions, programs or courses, including (i) ED, any Accrediting Body, any State Educational Agency, and (ii) any Governmental Authority with jurisdiction to enforce laws or regulations concerning misrepresentation, unfair, deceptive or abusive acts and practices, consumer fraud, or other consumer protection laws and regulations as such laws and regulations apply to educational institutions, programs and courses; provided, that the term Educational Agency does not include the data protection authority of any European Union member nation.

"**Educational Law**" means any federal, state, local or similar statute, law, regulation, ordinance, order, rule, official ED guidance or standard issued or administered by any Educational Agency.

"**Educational Services Agreement**" means an agreement between any Credit Party and any educational institution for the provision of any services supporting the operation of such institution or its educational programs or courses in any respect, including but not limited to, as applicable: marketing; student recruiting or admissions; enrollment management; course support for online delivery of courses; the provision of technology; faculty recruiting or development, placement services for student internships, externships or clinical experiences; and student counseling.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.6(b)(iii), 10.6(b)(v) and 10.6(b)(vi) (subject to such consents, if any, as may be required under Section 10.6(b)(iii)).

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (regardless of whether such plan is subject to ERISA, but other than any Multiemployer Plan or Foreign Pension Plan) which is sponsored, maintained or contributed to by, or required to be contributed by, the Borrower or any of its Restricted Subsidiaries or, solely with respect to such a plan subject to Title IV of ERISA, any of their respective ERISA Affiliates, or with respect to which the Borrower or any of its Restricted Subsidiaries has any material liability.

"**Environmental Claim**" means any notice of violation, claim, action, suit, proceeding, demand, abatement order or other written notice or order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury,

13

threat or harm to health or safety (with respect to exposure to Hazardous Materials), natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them) Laws, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) pollution or the protection of the environment, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health (with respect to exposure to Hazardous Materials), industrial hygiene, land use or the protection of human, plant or animal health or welfare (in each case with respect to exposure to Hazardous Materials), in any manner applicable to the Borrower or any of its Restricted Subsidiaries or any real property thereof.

"**Equity Interests**" means all shares of capital stock, partnership interests (whether general or limited), limited liability company membership interests, beneficial interests in a trust and any other interest or participation that confers on a Person the right to receive a share of profits or losses, or distributions of assets, of an issuing Person, including any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding any debt Securities convertible into or exchangeable for such Equity Interests (including, for the avoidance of doubt, any Convertible Bond Indebtedness).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which that Person is a member; and (iii) solely for purposes of Section 412 of the Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Person is a member.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (ii) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430(j) of the Code or, with respect to any Multiemployer Plan, the failure to make any required contribution in accordance with Section 515 of ERISA except where such failure to make a required contribution does not result and could not reasonably be expected to result in a Material Adverse Effect or the application for a waiver of the minimum funding standard or an extension of any amortization period, within the meaning of Sections 412(c) or 431(d) of the Code with respect to any Pension Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Borrower or any of its Restricted Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower or any of its Restricted Subsidiaries pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan or Multiemployer Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on any ERISA Party pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) with respect to a Multiemployer Plan, the withdrawal of any ERISA Party in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

ERISA) if there is any potential liability to the ERISA Parties therefor, or the receipt by any ERISA Party of notice that such plan is in insolvency pursuant to Section 4245 of ERISA, or that such plan is to terminate or has terminated under Section 4041A of ERISA (to the extent such termination will or is likely to result in a liability to the ERISA Parties) or under 4042 of ERISA; (viii) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on the ERISA Parties of fines, penalties, taxes or related charges under Chapter 43 of Title 26 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan to the extent that such fines, penalties, taxes or related charges result in or could reasonably be expected to result in a Material Adverse Effect; (ix) the assertion of a material claim (other than routine claims for benefits), suit, action, proceeding, hearing, audit or, to the knowledge of the Borrower, investigation against any Foreign Pension Plan or the assets thereof, Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against an ERISA Party in connection with any Employee Benefit Plan or Foreign Pension Plan that results in or could reasonably be expected to result in a Material Adverse Effect; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code, or the receipt of notice of the failure of a Foreign Pension Plan to qualify for any applicable tax-favored status or to be registered and maintained in good standing with the applicable Governmental Authority; or (xi) the imposition of a lien on the assets of the Borrower or any of its Restricted Subsidiaries pursuant to Section 430(k) of the Code or Section 303(k) or Section 4068 of ERISA.

"**Erroneous Payment**" has the meaning assigned to such term in Section 9.14(a).

"**ERISA Party**" means the Borrower, any of its Restricted Subsidiaries or any ERISA Affiliate of either of the foregoing.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning assigned to such term in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, and any successor statute.

"**Excluded Assets**" has the meaning assigned to such term in the Collateral Agreement.

"**Excluded Earnout**" means any obligations of Borrower or any Subsidiary to pay additional consideration in connection with an acquisition if such additional consideration is payable (i) in capital stock or Equity Interests, (ii) in cash or (iii) any combination of the foregoing.

"**Excluded Subsidiary**" means (a) Immaterial Subsidiaries, (b) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or by any contractual obligation existing on the Closing Date or at the time of acquisition thereof after the Closing Date, in each case, from guaranteeing or granting a Lien on its assets to secure the Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a bank guarantee unless such consent, approval, license or authorization has been received, (c) not-for-profit Subsidiaries, (d) (i) any direct or indirect Foreign Subsidiary that is a controlled foreign corporation within the meaning of Section 957 of the Code (a "CFC"), (ii) any direct or indirect subsidiary of a CFC, (iii) any Foreign Subsidiary Holding Company and (iv) any direct or indirect Subsidiary of a Foreign Subsidiary Holding Company, (e) special purpose entities (including any securitization vehicle (or similar entity)), (f) any Subsidiary acquired pursuant to an acquisition permitted under this Agreement financed with secured Indebtedness permitted to be incurred under Section 6.1(q) and any Subsidiary thereof that guarantees such Indebtedness (in each case to the

15

extent such secured Indebtedness prohibits such Subsidiary from becoming a Guarantor), (g) any other Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost or other consequences of guaranteeing the Obligations would be excessive in view of the benefits to be obtained by the Lenders therefrom, (h) any captive insurance Subsidiary and (i) any other Subsidiary of the Borrower, for so long as such Subsidiary would not be able to execute a guaranty or pledge, as applicable, without giving rise to material adverse tax consequences (including as a result of any law or regulation in any non-U.S. jurisdiction similar to Section 956 of the Code).

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Commitment or, if such Lender did not fund the applicable Loan pursuant to a prior Commitment, on the date such Lender acquires the applicable interest in such Loan (in each case, other than pursuant to an assignment request by the Borrower under Section 2.18 or Section 2.19) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(g) or (i) and (d) any withholding Taxes imposed under FATCA.

"**Executive Order No. 13224**" means that certain Executive Order No. 13224, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"**Exposure**" means, as of any date of determination, the outstanding principal amount of the Loans owing to a Lender under the DIP Facility; provided, at any time prior to the making of such Loans under the DIP Facility, the Exposure of any Lender shall be equal to such Lender's Commitment under the DIP Facility.

"**Fair Share**" has the meaning assigned to such term in Section 7.2.

"**Fair Share Contribution Amount**" has the meaning assigned to such term in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) (or any amended or successor version described above) of the Code, and any fiscal or regulatory legislation, rules, or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

Business Day, the Federal Funds Rate for such day shall be the rate charged to a financial institution selected by the Required Lenders on such day on such transactions as determined by the Administrative Agent, which rate must be administratively feasible for the Administrative Agent.

"**FEMA**" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the NFIP.

"**Final DIP Order**" means an order from the Bankruptcy Court in the Chapter 11 Cases in form and substance acceptable to the Required Lenders and the Credit Parties approving, on a final basis, among other things, in each case, on terms acceptable to the Required Lenders and the Credit Parties, (i) the junior lien debtor-in-possession post-petition financing on the terms and subject to the conditions set forth in this Agreement and (ii) the incurrence of the Obligations and the Loans hereunder, which order shall be in full force and effect, and shall not, be reversed, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required Lenders and the Credit Parties.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer or chief restructuring officer (or comparable officer) of the Borrower that such financial statements fairly present, in all material respects, the financial condition of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

"**First Draw**" has the meaning assigned to such term in Section 2.01(a)(i).

"**First Draw Commitment**" the commitment of a Lender to make or otherwise fund Loans on the Closing Date and "First Draw Commitments" means such commitments of all of the Lenders in the aggregate. The amount of each Lender's First Draw Commitment, if any, is set forth on Appendix A or in the applicable Assignment and Assumption, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the First Draw Commitments as of the Closing Date is $60,000,000.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower and its Restricted Subsidiaries ending on December 31 of each calendar year, as may be adjusted pursuant to this Agreement.

"**Floor**" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to Term SOFR. For the avoidance of doubt, as of the Closing Date, the initial Floor for Term SOFR shall be 0.75%.

"**Foreign Lender**" means (i) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (ii) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"**Foreign Pension Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside of the United States by the Borrower or any of its Restricted Subsidiaries primarily for the benefit of employees of the Borrower or any of its Restricted Subsidiaries residing outside of the United States that provides, or results in, retirement income,

17

a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Foreign Subsidiary**" means a Subsidiary that is not a Domestic Subsidiary.

"**Foreign Subsidiary Holding Company**" means any Domestic Subsidiary of the Borrower substantially all of the assets of which consist of the Equity Interests (or Equity Interests and other Securities) of one or more Controlled Foreign Corporations or other Foreign Subsidiary Holding Companies.

"**Fund**" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Funding Date**" means each of (i) the Closing Date and (ii) the Second Draw Funding Date.

"**Funding Guarantor**" has the meaning assigned to such term in Section 7.2.

"**Funding Notice**" means a written notice substantially in the form of Exhibit A-1 or any other form reasonably approved by the Administrative Agent.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to such term in Section 10.6(e)(ii).

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 7.1.

"**Guarantor**" means each Restricted Subsidiary of the Borrower that is a signatory hereto or that executes a Counterpart Agreement until such time as such Restricted Subsidiary is released in accordance with Section 7.12.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any hazardous or toxic chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any facility or to the environment, in each case due to its dangerous and deleterious properties or characteristics.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation,

18

transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the Laws applicable to any Lender which are presently in effect or, to the extent allowed by Law, under such applicable Laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable Laws now allow.

"**Historical Financial Statements**" means (i) the audited consolidated balance sheet of the Borrower and its subsidiaries as of December 31, 2023 and the related consolidated statements of operations, and stockholders' deficit and cash flows for such Fiscal Year and (ii) the unaudited consolidated balance of the Borrower and its subsidiaries as of March 31, 2024 and the related consolidated statements of operations, and stockholders' deficit and cash flows for such Fiscal Quarter.

"**HQ Premises Lease**" means the Office Lease, dated December 23, 2015, by and between HQ Premises Lessor and 2U Harkins Road LLC (as may be amended, supplemented or modified from time to time).

"**HQ Premises Lessor**" means Lanham Office 2015 LLC.

"**Immaterial Subsidiary**" means, as of any date of determination, any Restricted Subsidiary of the Borrower (a) whose total assets as of the most recent available quarterly or year-end financial statements after giving Pro Forma Effect to any acquisitions or dispositions of companies, divisions or lines of business since the start of such four quarter period and on or prior to the date of acquisition of such Restricted Subsidiary do not exceed 5.00% of the consolidated total assets (excluding intercompany amounts and balances) of the Borrower and its Restricted Subsidiaries at such date and (b) whose revenues for the most recently ended four quarter period for which financial statements are available do not exceed 5.00% of the consolidated revenues (excluding intercompany amounts and balances) of the Borrower and its Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; provided that (i) the total assets of all such Restricted Subsidiaries as of the most recent available quarterly or year-end financial statements shall not exceed 7.50% of the consolidated total assets (excluding intercompany amounts and balances) of the Borrower and its Restricted Subsidiaries at such date and (ii) the revenues of all such Restricted Subsidiaries for the most recently ended four-quarter period for which financial statements are available after giving Pro Forma Effect to any acquisitions or dispositions of companies, divisions or lines of business since the start of such four quarter period and on or prior to the date of acquisition of such Restricted Subsidiary shall not exceed 7.50% of the consolidated revenues (excluding intercompany amounts and balances) of the Borrower and its Restricted Subsidiaries for such period, in each case determined in accordance with GAAP. The Borrower may change the designation of any Restricted Subsidiary as an Immaterial Subsidiary by providing written notice to the Administrative Agent; provided that any Restricted Subsidiary of the Borrower formed or acquired after the Closing Date, as applicable, that meets the requirements of an "Immaterial Subsidiary" set forth herein shall be deemed designated as an "Immaterial Subsidiary" unless the Borrower otherwise notifies the Administrative Agent in writing.

"**Indebtedness**" as applied to any Person, means, without duplication, (i) indebtedness for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP (excluding, for the avoidance of doubt, lease payments under operating leases); (iii) any obligation owed for all or any part of the deferred purchase price of property or services, including earn-outs earned but past due (excluding trade or similar payables, accrued income taxes, VAT, deferred taxes, sales taxes, equity taxes and accrued liabilities incurred in the

19

ordinary course of such Person's business and excluding Excluded Earnouts); (iv) the undrawn face amount of any letter of credit, bankers' acceptances, bank guarantees, surety bonds, performance bonds, and similar instruments issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (v) Disqualified Equity Interests; (vi) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Indebtedness of another; (vii) any obligation of such Person in respect of the Indebtedness described in clauses (i) through (vi) hereof the primary purpose or intent of which is to provide assurance to an obligee that the Indebtedness of the primary obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (viii) any liability of such Person for the Indebtedness of another in respect of the Indebtedness described in clauses (i) through (vi) hereof through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (viii), the primary purpose or intent thereof is as described in clause (vii) above; (ix) net obligations of such Person under any Swap Contract; and (x) Indebtedness of the type referred to in clauses (i) through (ix) above secured by a Lien on any property or asset owned or held by that Person regardless of whether the Indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; <u>provided</u>, the amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date; <u>provided</u>, <u>further</u> that the following shall not constitute Indebtedness: (i) any right of use liabilities recorded in accordance with Accounting Standards Update ("***ASU***") No. 2016-02, Leases (Topic 842), (ii) liabilities recorded under GAAP related to lease accounting (ASC 840) (other than in respect of capital leases), (iii) any liabilities resulting from equity awards accounted for as a liability, (iv) prepaid or deferred revenue arising in the ordinary course of business and purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset, (v) [reserved], (vi) purchase price adjustments and Earn-Out obligations (until such obligations or adjustments become a liability on the balance sheet of such Person in accordance with GAAP and solely if not paid after becoming due and payable), (vii) royalty payments made in the ordinary course of business in respect of licenses (to the extent such licenses are permitted hereby), (viii) any accruals for payroll and other non-interest bearing liabilities accrued in the ordinary course of business, including tax accruals, (ix) deferred rent obligations, taxes and compensation, (x) customary payables with respect to money orders or wire transfers, (xi) customary obligations under employment arrangements, (xii) obligations in respect of any license, permit or other approval arising in the ordinary course of business, and (xiii) any obligations attributable to the exercise of appraisal rights and the settlement or resolution of any claims or actions (whether actual, contingent or potential) with respect thereto.

"**Indemnified Taxes**" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (ii) to the extent not otherwise described in (i), Other Taxes.

"**Indemnitee**" has the meaning assigned to such term in Section 10.3(a).

"**Initial Approved Budget**" means the Budget in form and substance acceptable to the Required Lenders in their sole discretion and delivered to the Required Lenders and Lender Advisors prior to the Petition Date.

"**Intellectual Property**" has the meaning assigned to such term in the Collateral Agreement (as defined in the Prepetition Credit Agreement (as in effect on the date hereof)).

"**Intellectual Property Security Agreement**" has the meaning assigned to such term in the Collateral Agreement.

"**Interest Payment Date**" means with respect to (i) any Base Rate Loan (other than any Swingline Loan), the last Business Day of each calendar quarter, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; and (ii) any Term SOFR Loan, the last day of each Interest Period applicable to such Loan.

"**Interest Period**" means, in connection with a Term SOFR Loan, an interest period of one month, (i) initially, commencing on the applicable Funding Date of such Term SOFR Loan and ending on the last Business Day of such period, and (ii) thereafter commencing on the day on which the immediately preceding Interest Period expires and ending on the last Business Day of the next succeeding one-month period; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect any Loan shall extend beyond the Maturity Date.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim DIP Order**" means an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit H and in form and substance satisfactory to the Required Lenders; it being agreed that the form attached as Exhibit H is satisfactory.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by the Borrower or any of its Restricted Subsidiaries of, or of a beneficial interest in, any of the Securities, Equity Interests or any other assets constituting a business line or unit of, or a division of, or make any other investment in, any other Person; and (ii) any direct or indirect loan, advance or capital contribution by the Borrower or any of its Restricted Subsidiaries to any other Person. For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment less any returns to the Borrower or any of its Restricted Subsidiaries in respect of such Investment made in cash or Cash Equivalent; provided that, the aggregate amount of such returns shall not exceed the original amount of such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**Junior Financing**" means Junior Indebtedness or any other Indebtedness of the Borrower or any Restricted Subsidiary, in each case, that is unsecured or is required to be subordinated in payment, lien priority or any other manner to the Obligations.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Junior Indebtedness**" means Indebtedness of any Person so long as (a) such Indebtedness is either unsecured or Subordinated Indebtedness; and (b) if such Indebtedness is Subordinated Indebtedness, the other terms and conditions contained in the relevant definitions thereof shall be satisfied. For the avoidance of doubt, the 2025 Convertible Notes, 2030 Convertible Notes and any permitted refinancing (but not a conversion thereof into Equity Interests) thereof shall be Junior Indebtedness.

"**Junior Restricted Financing**" has the meaning assigned to such term in Section 6.3.

"**Laws**" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, guidances, guidelines, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions, whether now or hereafter in effect.

"**Lease Rejection Motion**" means a motion, which shall be in form and substance acceptable to the Required Lenders and the Credit Parties, which seeks orders providing for the rejection of certain of the Debtor's unexpired leases (including the HQ Premises Lease and the Brooklyn Lease unless such leases are to be assumed pursuant to a settlement with the applicable landlords) pursuant to section 365 of the Bankruptcy Code; *provided* that the claims arising from any rejection of unexpired leases shall be capped pursuant to section 502(b)(6) of the Bankruptcy Code.

"**Lease Rejection Order**" means any order of the Bankruptcy Court granting the Lease Rejection Motion and related relief, which shall be in form and substance acceptable to the Required Lenders and the Credit Parties.

"**Lender**" means, at any time, any Lender that holds Loans or Commitments at such time.

"**Lender Advisors**" means Schulte Roth & Zabel LLP, Weil, Gotshal & Manges LLP and Houlihan Lokey Capital, Inc.

"**Lender Affiliated Parties**" has the meaning assigned to such term in Section 10.22.

"**Lender Group Obligations**" has the meaning assigned to such term in Section 5.13.

"**Lender Party**" has the meaning assigned to such term in Section 10.17.

"**Lender Related Party**" has the meaning assigned to such term in Section 5.13.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease. For the avoidance of doubt, Convertible Bond Indebtedness shall not constitute Liens.

"**Loan**" means any loans, advances and any extension of credit by a Lender to the Borrower pursuant to this Agreement.

"**Margin Stock**" has the meaning assigned thereto in Regulation U of the Board of Governors.

"**Master Agreement**" has the meaning set forth in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, change or condition that, individually or in the aggregate, has had, or could reasonably be expected to have (i) a material adverse effect on the business, assets, results of operations or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, other than as a result of the Chapter 11 Cases or any event, circumstance or condition leading up to, related to or resulting from the Chapter 11 Cases, or (ii) a material adverse effect on the rights and remedies of Agent and any other Secured Party under the Credit Documents, taken as a whole, including

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

the legality, validity, binding effect or enforceability of the Credit Documents; provided, that any change in law, regulation, sub-regulatory guidance or condition generally that impacts the educational industry in which any of the Credit Parties operate shall not in and of itself constitute a "Material Adverse Effect".

"**Material Indebtedness**" means (i) any Indebtedness (other than the Obligations) of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate outstanding principal amount of at least $10,000,000, (ii) any Indebtedness (other than the Obligations) of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate outstanding principal amount of at least any "material indebtedness", "threshold amount" or similar threshold amount under any Indebtedness that constitutes "Material Indebtedness" pursuant to clause (i) of this definition, (iii) Indebtedness under the Prepetition Credit Agreement, (iv) the 2025 Convertible Notes and (v) the 2030 Convertible Notes.

"**Material Real Estate**" means any wholly-owned, fee-owned Real Estate Asset having a fair market value in excess of $1,000,000.

"**Maturity Date**" means January 24, 2025.

"**MD&A Report**" means, with respect to the financial statements for which such report is required, a "Management's Discussion and Analysis of Financial Condition and Results of Operations" report.

"**Moody's**" means Moody's Ratings and any successor thereto.

"**Multiemployer Plan**" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any of its Restricted Subsidiaries or any of their respective ERISA Affiliates, or with respect to which the Borrower or any of its Restricted Subsidiaries has any material liability.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**NFIP**" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"**Non-Public Information**" shall mean information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD promulgated by the SEC under the Securities Act and the Exchange Act.

"**Note**" means a promissory note in the form of Exhibit B.

"**Notice**" means a Funding Notice or a Conversion/Continuation Notice.

"**Notice Office**" means the office of the Administrative Agent set forth on Appendix B hereto, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**Obligations**" means all obligations of every nature of each Credit Party from time to time owed to any Agent (including any former Agent), any Lender, whether for principal, interest (including interest which, but for the filing of a petition in any proceeding under any Debtor Relief Law with respect to such

Credit Party, would have accrued on the Obligations, whether or not a claim is allowed against such Credit Party for such interest in such proceeding), fees, expenses, indemnification or otherwise.

"**Obligee Guarantor**" has the meaning assigned to such term in Section 7.7.

"**OFAC**" means the US Department of Treasury Office of Foreign Assets Control, or any successor thereto.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation, memorandum and articles of association, constitution or organization and its by-laws (or other formative documents however described peculiar to the jurisdiction of the corporation in question); (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement; (iii) with respect to any general partnership, its partnership agreement; (iv) with respect to any limited liability company, its articles of organization and its operating agreement; and (v) relative to any Person that is any other type of entity, such documents as shall be comparable to the foregoing. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a Governmental Authority, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such Governmental Authority.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.18 or Section 2.19).

"**Outstanding Amount**" means with respect to the Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of the Loans occurring on such date.

"**Owned IP**" means all of the Intellectual Property owned, or purported to be owned, by the Borrower or any Credit Party or any Restricted Subsidiary of a Credit Party.

"**Participant**" has the meaning assigned to such term in Section 10.6(d).

"**Participant Register**" has the meaning assigned to such term in Section 10.6(d).

"**PATRIOT Act**" means USA PATRIOT Improvement and Reauthorization Act, Title III of Pub. L. 109-177.

"**Payment Office**" means the account of the Administrative Agent as provided to the Borrower and the Lenders in writing or such other account as the Administrative Agent may hereafter designate in writing as such to the Borrower and Lenders.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Code or Section 302 of ERISA.

"**Permitted Encumbrance**" has the meaning assigned to such term in Section 6.2(b).

"**Permitted Lien**" means each Lien permitted pursuant to Section 6.2.

"**Permitted Variances**" has the meaning assigned to such term in Section 6.15.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" has the meaning assigned to such term in the recitals hereto.

"**Plan of Reorganization**" has the meaning assigned to such term in the definition of "Approved Chapter 11 Plan" set forth in this Section 1.1.

"**Pledged Equity Interests**" has the meaning assigned to such term in the Collateral Agreement.

"**Platform**" has the meaning assigned to such term in Section 10.1(d)(i).

"**Prepetition Credit Agreement**" means that certain Credit and Guaranty Agreement, dated as of June 28, 2021, by and among the Borrower, the subsidiaries of the Borrower from time to time party thereto as guarantors, the lenders from time to time party thereto and Alter Domus (US) LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date.

"**Prime Rate**" means a variable per annum rate, as of any date of determination, equal to the rate as of such date published in the "Money Rates" section of *The Wall Street Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as of the date of publication in *The Wall Street Journal* of a Prime Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the Prime Rate, Required Lenders shall choose a reasonably comparable index or source to use as the basis for the Prime Rate, which shall be administratively feasible for the Administrative Agent.

"**Privacy, Data Security and Consumer Protection Laws**" means all applicable laws, regulations, and legally binding guidelines concerning the collection, receiving, processing, handling, disposal, privacy, protection, accessing, using, disclosing, electronically transmitting, securing, sharing, transferring and storing of Protected Information.

"**Pro Rata Share**" means, with respect to any Lender, with respect to all payments, computations and other matters relating to the DIP Facility, the percentage obtained by dividing (a) the Exposure of such Lender under the DIP Facility by (b) the aggregate Exposure of all of the Lenders under the DIP Facility.

"**Protected Information**" means any information that: (i) identifies (or in combination with other information may identify), relates to, describes, is capable of being associated with, or can be reasonably linked, directly or indirectly, to a natural person, including an individual's name, address, telephone number, e-mail address, date of birth, photograph, social security number or tax identification number,

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

credit card number, bank account number, biometric identifiers, persistent identifiers including IP address; as well as medical, health or insurance information; or (ii) is "personal information", "personal data" or similar defined term protected by one or more of the applicable Privacy, Security and Consumer Protection Laws.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" shall mean any Lender that does not wish to receive Non-Public Information with respect to the Borrower or its Subsidiaries or their respective securities.

"**Qualified Equity Interests**" means any Equity Interests (other than warrants, rights or options referenced in the definition thereof) that (a) does not have a maturity and is not mandatorily redeemable; (b) by its terms (or by the terms of any employee stock option, incentive stock or other equity-based plan or arrangement under which it is issued or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (x) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (excluding any mandatory redemption resulting from an asset sale or change in control so long as no payments in respect thereof are due or owing, or otherwise required to be made, until all Obligations have been paid in full), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case, at any time on or after the ninety-first (91st) day following Maturity Date, or (y) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (A) debt securities or (B) any Equity Interests referred to in clause (x) above, in each case, at any time on or after the ninety-first (91st) day following the Maturity Date; or (c) is preferred stock, so long as (x) no holder thereof can require the issuer to redeem any such stock for cash prior to the Maturity Date and (y) any redemption feature of such stock is available only if permitted under this Agreement.

"**Real Estate Asset**" means an interest in any real property.

"**Recipient**" means (i) any Agent or (ii) any Lender, as applicable.

"**Recovery Event**" means any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Restricted Subsidiary.

"**Register**" has the meaning assigned to such term in Section 10.6(c).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time.

"**Regulation FD**" means Regulation FD as promulgated by the US Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, or leaching of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material).

"**Remaining Obligations**" means, as of any date of determination, the Obligations that as of such date of determination are Obligations under the Credit Documents that survive termination of the Credit Documents, but as of such date of determination are not due and payable and for which no claims have been made.

"**Removal Effective Date**" has the meaning assigned to such term in Section 9.6(b).

"**Required Lenders**" means, as of any date of determination, Lenders having at least 66.67% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments; provided that the unused Commitments of, and the portion of the Total Outstandings held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Requirement of Law**" as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Resignation Effective Date**" has the meaning assigned to such term in Section 9.6(a).

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Restricted Subsidiary**" means any Subsidiary of the Borrower.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of July 24, 2024 (as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof) among the Credit Parties, the Required Lenders, and the holders of a majority of the obligations under the Prepetition Credit Agreement and any party that executes a joinder thereto, in form and substance acceptable to the Credit Parties and the Required Lenders.

"**S&P**" means S&P Global Ratings, and any successor to its rating agency business.

"**Second Draw**" has the meaning assigned to such term in Section 2.01(a)(ii).

"**Second Draw Commitment**" means the commitment of a Lender to make or otherwise fund Loans on the Second Draw Funding Date and "Second Draw Commitments" means such commitments of all of the Lenders in the aggregate. The amount of each Lender's Second Draw Commitment, if any, is set forth on Appendix A or in the applicable Assignment and Assumption, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Second Draw Commitments as of the Closing Date is $4,000,000.

"**Second Draw Funding Date**" has the meaning assigned to such term in Section 2.01(a)(ii).

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government.

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, His Majesty's Treasury, Switzerland or any other relevant authority, (ii) any Person located, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (iii) any Person 50% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (i) or (ii) hereof.

"**Sanctions**" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (ii) the United Nations Security Council; (iii) the European Union or any of its member states; (iv) Her Majesty's Treasury; or (v) Switzerland.

"**Secured Parties**" has the meaning assigned to such term in the Collateral Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, and any successor statute.

"**Securities and Exchange Commission**" means the US Securities and Exchange Commission, or any successor thereto.

"**SOFR**" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"**Solicitation**" means the solicitation of votes on the Approved Chapter 11 Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Solicitation Procedures Order**" the order of the Bankruptcy Court approving the Solicitation procedures and scheduling the Combined Hearing, which order shall be in form and substance acceptable to the Required Lenders and the Credit Parties.

"**SPC**" has the meaning assigned to such term in Section 10.6(e)(ii).

"**Special Flood Hazard Area**" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"**Specified Indebtedness**" has the meaning assigned to such term in Section 8.1(b).

"**Specified Transaction**" means any incurrence or repayment of Indebtedness (excluding Indebtedness incurred for working capital purposes other than pursuant to this Agreement) or Investment (including any proposed Investment or acquisition) that results in a Person becoming a Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary, any acquisition or any Asset Sale that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or any Asset Sale of a business unit, line of business or division of any Credit Party, in each case whether by merger, consolidation, amalgamation or otherwise or any material restructuring of the Borrower or implementation of any initiative not in the ordinary course of business.

"**State Educational Agency**" means any state or local educational licensing body that provides a license, permit, authorization or other approval necessary for an educational institution or other entity to operate or to provide educational programs or courses in that state.

"**Subordinated Indebtedness**" means any unsecured Junior Indebtedness of the Borrower the payment of principal and interest of which and other obligations of the Borrower in respect thereof are subordinated to the prior payment in full of the Obligations on terms and conditions reasonably satisfactory to the Required Lenders and the Administrative Agent.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity deemed to constitute a subsidiary of such Person under GAAP. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a direct or indirect Subsidiary or direct or indirect Subsidiaries of the Borrower, unless the context otherwise requires.

"**Swap Contract**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (ii) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Contract.

"**Swap Obligation**" means, with respect to any Person, any obligation to pay or perform under any Swap Contract.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (i) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in clause (i), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term SOFR**" means, for any Interest Period for a Term SOFR Loan, the greater of (a) the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (the "**Term SOFR Determination Day**") that is two U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator and (b) the Floor; provided, however, that if as of 5:00 p.m. (Chicago time) on any Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Required Lenders (in consultation with the Administrative Agent) in their reasonable discretion).

"**Term SOFR Determination Day**" has the meaning assigned to it under the definition of Term SOFR.

"**Term SOFR Loan**" means a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (iii) of the definition of "Base Rate".

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Total Disbursements**" means all disbursements of the Credit Parties, but excluding payment for fees for professional services.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Tranche**" means the respective facility and commitments utilized in making (or, where applicable, conversion of) Loans hereunder, with there being one Tranche on the Closing Date.

"**Type**" means a Base Rate Loan or a Term SOFR Loan.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the Collateral Agent in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, the term "UCC" shall

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in paragraph (g) of Section 2.17.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**Variance Report**" has the meaning assigned to such term in Section 5.1(k).

"**Variance Report Certificate**" has the meaning assigned to such term in Section 5.1(l).

"**Withdrawal**" means a withdrawal from the DIP Account made subject to and in accordance with the Withdrawal Conditions.

"**Withdrawal Conditions**" means (a) no Default or Event of Default shall have occurred and be continuing on the date of the Withdrawal or after giving effect to the use of the Withdrawal, (b) an Authorized Officer of the Borrower shall have delivered to the Collateral Agent and the Lenders a Withdrawal Notice with respect to the applicable Withdrawal, (c) the Interim DIP Order or Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay without the prior written consent of the Required Lenders, and (d) the Withdrawal Liquidity Condition shall have been satisfied.

"**Withdrawal Liquidity Condition**" shall mean, with respect to any Withdrawal on any date, the amount of the requested Withdrawal does not exceed the positive difference of (a) the amount of disbursements to be made on such day or the immediately succeeding day, which disbursements are to be made in accordance with the Approved Budget (subject to Permitted Variances), _minus_ (b)the aggregate amount of cash in the Credit Parties' bank accounts as of the end of the day immediately prior to such withdrawal date in excess of $5,000,000.

"**Withdrawal Notice**" means a written Withdrawal Notice substantially in the form of Exhibit A-3.

31

"**Withholding Agent**" means the Borrower, the Administrative Agent and any other applicable withholding agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    **Accounting Terms**.

(a)    Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by the Borrower to the Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable) (except for the lack of footnotes and being subject to year-end adjustments). If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Credit Document, and either the Borrower or the Required Lenders shall so request, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent (for distribution to the Lenders) financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements except for any calculations otherwise permitted to be made in accordance with this Agreement to the extent not addressed in the preparation of the Historical Financial Statements. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect, including Accounting Standards Codification "ASC" 820, ASC 825) to value any Indebtedness or other liabilities of the Borrower or any of its Subsidiaries at "fair value," as defined therein.

1.3    **Interpretation, Etc**.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in any Credit Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and

32

words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Appendices, Exhibits and Schedules shall be construed to refer to Sections of, and Appendices, Exhibits and Schedules to, this Agreement, (e) any reference to any Law herein shall, unless otherwise specified, refer to such Law as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Securities, accounts and contract rights. The term "enforceability" and its derivatives when used to describe the enforceability of an agreement shall mean that such agreement is enforceable except as enforceability may be limited by any Debtor Relief Law and by general equitable principles (whether enforcement is sought by proceedings in equity or at law). Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

       1.4    **Timing of Performance**.  Subject to Section 2.16(d), when the performance of any covenant, duty or obligation under any Credit Document is required to be performed on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day.

       1.5    **Currency Generally**.  For purposes of determining compliance with Section 6.1, Section 6.2 and Section 6.6 with respect to any amount of Indebtedness, Lien or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness, Lien or Investment is incurred or granted (so long as such Indebtedness, Lien or Investment, at the time incurred or granted, made or acquired, was permitted hereunder).

       1.6    **Divisions**.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

       1.7    **Negative Covenant Compliance**.  For purposes of determining whether the Borrower and its Restricted Subsidiaries comply with any exception to Section 6 where compliance with any such exception is based on a financial ratio or metric being satisfied as of a particular point in time, it is understood that (a) compliance shall be measured at the time when the relevant event is undertaken, as such financial ratios and metrics are intended to be "incurrence" tests and not "maintenance" tests, (b) correspondingly, any such ratio and metric shall only prohibit the Borrower and its Restricted Subsidiaries from creating, incurring, assuming, suffering to exist or making, as the case may be, any new, for example, Liens, Indebtedness or Investments, but shall not result in any previously permitted, for example, Liens, Indebtedness or Investments ceasing to be permitted hereunder.

       1.8    **Rates**.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to Base Rate, the Term SOFR Reference Rate or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes (including, but not limited to, determining whether any Conforming Changes, if any, are necessary or advisable). The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of Base Rate, the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Required Lenders may select information sources or services (that shall be accessible by the Administrative Agent) in their reasonable discretion to ascertain Base Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and the Administrative Agent shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## SECTION 2    LOANS

2.1    **Loans**.

(a)    Commitments. Subject to the terms and conditions set forth in Section 3, each Lender severally agrees to make to the Borrower:

(i)    a single loan denominated in Dollars in a principal amount equal to its First Draw Commitment (the "**First Draw**") on Closing Date; and

(ii)    a single loan denominated in Dollars in a principal amount equal to its Second Draw Commitment (the "**Second Draw**") on or after the date the Final DIP Order shall have been entered by the Bankruptcy Court (such date, the "**Second Draw Funding Date**");

provided, that (x) Loans may be Term SOFR Loans or Base Rate Loans, as further provided herein, (y) the Borrower may make only one borrowing under each Commitment and (z) each Lender's applicable Commitment shall terminate immediately and without further action on the applicable Funding Date after giving effect to the funding of such Lender's applicable Commitment on such date.

(b)    Repayments and Prepayments. Any amount of the Loans that is subsequently repaid or prepaid may not be reborrowed.

(c)    [Reserved].

(d)    Maturity. To the extent not previously paid, all amounts owed hereunder shall be paid in full no later than the Maturity Date.

(e)    Funding Notice. The Borrower shall deliver to the Administrative Agent a fully executed Funding Notice for the Loans no later than 10:00 a.m. (New York City time) at least one Business Day in advance of each Funding Date (or such later time as the Administrative Agent may agree) and, promptly upon receipt thereof, the Administrative Agent shall notify each Lender of the proposed borrowing.

(f)    Funding of Loans. Each Lender shall make each Loan to be made by it hereunder on the proposed Funding Date thereof by wire transfer of immediately available funds by 12:00 p.m. (New York City time) to the Payment Office. Upon satisfaction or waiver of the conditions precedent specified in Section 3 and receipt of all requested funds, the Administrative Agent shall make the proceeds of the

34

Loans available to the Borrower on each Funding Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Administrative Agent from the Lenders to be wired to the DIP Account.

2.2    **Pro Rata Shares**.  All Loans shall be made, and all participations purchased, by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that (i) the failure of any Lender to fund any such Loan shall not relieve any other Lender of its obligation hereunder and (ii) no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

2.3    **Use of Proceeds**.

(a)    Margin Regulations. The Borrower and its Restricted Subsidiaries shall not use any portion of the proceeds of any Credit Extension in any manner that causes such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof applicable to Margin Stock.

(b)    Anti-Corruption Laws, AML Laws and Sanctions. The Borrower shall not request any Credit Extension, nor use, and shall not permit that its Restricted Subsidiaries and its or their respective directors, officers and employees (in such individual's capacity as such) to use, directly or indirectly, the proceeds of any Credit Extension, or lend, contribute or otherwise make available such proceeds to any Restricted Subsidiary, other Affiliate, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or AML Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions by any Person (including any Person participating in the transactions contemplated hereunder, whether as underwriter, advisor lender, investor or otherwise).

2.4    **Evidence of Debt; Notes**.

(a)    Evidence of Debt. Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any applicable Loans; and provided; further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    Notes. If so requested by any Lender by written notice to the Borrower at least two Business Days prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's applicable Loan.

2.5    **Interest on Loans**.

(a)    Interest. Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made to repayment thereof (whether by acceleration or otherwise) at an interest rate equal to the Base Rate or Term SOFR, as applicable, plus the Applicable Margin for such Type of Loan.

(b)    Interest Rate Election. The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Term SOFR Loan, shall be selected by the Borrower and notified to the Administrative Agent pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to the Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c)    Interest Periods. In connection with Term SOFR Loans there shall be no more than ten Interest Periods outstanding at any time. In the event the Borrower fails to specify between a Base Rate Loan or a Term SOFR Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Term SOFR Loan) will be automatically converted into a Base Rate Loan on the last day of then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event the Borrower fails to specify an Interest Period for any Term SOFR Loan in the applicable Funding Notice or Conversion/Continuation Notice, the Borrower shall be deemed to have selected an Interest Period of one month. Promptly on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Term SOFR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

(d)    Computation of Interest. Interest payable pursuant to Section 2.5(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Term SOFR Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Term SOFR Loan, the date of conversion of such Term SOFR Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Term SOFR Loan, the date of conversion of such Base Rate Loan to such Term SOFR Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)    Interest Payable. Except as otherwise set forth herein, interest on each Loan shall accrue on a daily basis and be payable in arrears in kind and capitalized (i) on each Interest Payment Date applicable to that Loan; (ii) concurrently with any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) on the Maturity Date. The amounts so capitalized and added to the principal in accordance with the immediately preceding sentence shall be treated as principal for all purposes of this Agreement and bear interest in accordance with the terms hereof from (and including) the applicable Interest Payment Date or such other date of payment, in each case on which such interest was paid "in kind" and capitalized. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Laws. Notwithstanding anything to the contrary herein, all accrued

36

and unpaid interest required to be paid at maturity (whether by acceleration or otherwise) of the Loans shall be paid in cash in Dollars.

    2.6    **Conversion and Continuation**.

    (a)    <u>Conversion</u>. Subject to Section 2.15 and so long as no Event of Default under any of Section 8.1(a), 8.1(f) or 8.1(g) shall have occurred and then be continuing and the Administrative Agent (acting upon the instructions of the Required Lenders) shall not have delivered a notice revoking such conversion rights hereunder, the Borrower shall have the option to convert at any time all or any part of any Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from one Type of Loan to another Type of Loan; <u>provided</u>, a Term SOFR Loan may not be converted on a date other than the expiration date of the Interest Period applicable to such Term SOFR Loan unless the Borrower shall pay all amounts due under Section 2.15 in connection with any such conversion.

    (b)    <u>Continuation</u>. Subject to Section 2.15 and so long as no Event of Default under any of Section 8.1(a), 8.1(f) or 8.1(g) shall have occurred and then be continuing and the Administrative Agent (acting upon the instructions of the Required Lenders) shall not have delivered a notice revoking such conversion rights hereunder, the Borrower shall also have the option, upon the expiration of any Interest Period applicable to any Term SOFR Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Term SOFR Loan.

    (c)    <u>Conversion/Continuation Notice</u>. The Borrower shall deliver a Conversion/ Continuation Notice to the Administrative Agent at the Notice Office no later than 12:00 noon (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed Conversion/Continuation Date (in the case of a conversion to, or a continuation of, a Term SOFR Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Term SOFR Loans shall be irrevocable on and after the date of receipt thereof by the Administrative Agent, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

    2.7    **Default Interest**. Upon the occurrence and during the continuance of an Event of Default, the overdue portion of any principal amount of all Loans and, to the extent permitted by applicable Law, any overdue interest payments on the Loans or any overdue premium, fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall bear interest (including post-petition interest in any proceeding under any Debtor Relief Law) from the date of such Event of Default, payable in kind and capitalized at a rate that is 2.00% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such overdue interest, overdue premium, fees and other amounts, at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for Loans outstanding as Base Rate Loans). Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

    2.8    **Fees**.

    (a)    The Borrower agrees to pay to the Administrative Agent and the Collateral Agent such other fees in the amounts and at the times separately agreed upon under the Agency Fee Letter.

    2.9    **Maturity**. The outstanding Loans, together with all other amounts owed hereunder with respect thereto, shall be paid in full no later than the Maturity Date.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

24-11279-mew   Doc 20   Filed 07/25/24   Entered 07/25/24 04:51:59   Main Document
Pg 437 of 568

2.10   **Voluntary Prepayments**.

(a)       Any time and from time to time, with respect to any Type of Loan, the Borrower may prepay, <u>without</u> premium or penalty (but subject to Section 2.15(c)), any Loan on any Business Day in whole or in part, in an aggregate minimum amount of and integral multiples in excess of that amount, and upon delivery of the prepayment notice as set forth in the following table:

| Type of Loan | Minimum Amount | Integral Multiple | Prior Notice |
|---|---|---|---|
| Base Rate Loans | $1,000,000 | $1,000,000 | One Business Day |
| Term SOFR Loans | $1,000,000 | $1,000,000 | Three Business Days |

in each case given to the Administrative Agent, as the case may be, by 2:00 p.m. (New York City time) on the date required and the Administrative Agent will promptly notify each applicable Lender of such prepayment. Upon delivery of the prepayment notice, the principal amount of the Loans specified in such written notice shall become due and payable on the prepayment date specified therein; <u>provided</u>, such prepayment obligation may be conditioned on the occurrence of any subsequent event (including a Change of Control or refinancing transaction). Each prepayment of outstanding Tranches pursuant to this Section 2.10(a) shall be applied to the Tranche or Tranches designated on such notice on a pro rata basis within such Tranche. Subject to Section 2.20, each prepayment of an outstanding Tranche pursuant to this Section 2.10(a) shall be applied to the remaining amortization payments of such Tranche as directed by the Borrower (or, if the Borrower has not made such designation, in direct order of maturity), but, in any event, on a pro rata basis to the Lenders within such Tranche.

2.11   **Mandatory Prepayments**.

(a)       <u>Issuance of Debt</u>. No later than the fifth Business Day following the date of receipt of the proceeds of the incurrence of any Indebtedness by the Borrower or any of its Restricted Subsidiaries (unless such Indebtedness is permitted to be incurred pursuant to Section 6.1), the Borrower shall prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to 100% of the net cash proceeds from such incurrence, net of any underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses and the amount of any reserves established by the Borrower and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, in each case, in respect of such event, <u>provided</u> that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of net cash proceeds in the amount of such reduction.

(b)       <u>Asset Sales; Casualty and Condemnation</u>. In the event and on each occasion that any net cash proceeds are received by or on behalf of the Borrower or any of its Restricted Subsidiaries in respect of (1) any Asset Sale in reliance on Section 6.8(n) or (2) any Casualty Event, in an aggregate amount greater than $1,000,000 per Fiscal Year, the Borrower shall, within ten Business Days (or, if later, within ten Business Days after the later of the date the threshold referred to above is first exceeded and the date the relevant net cash proceeds are received) after such net cash proceeds are received, prepay the Loans as set forth in Section 2.12(b) in an aggregate amount equal to 100% of the net cash proceeds net of the principal amount of any Indebtedness that is secured by a Lien on the asset subject to such Asset Sale or Casualty Event and that is required to be repaid in connection with such Asset Sale or Casualty Event (other than Indebtedness under this Agreement), together with any applicable premiums, penalties, interest or breakage costs, any underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses and the amount of any reserves established by the Borrower and the Restricted Subsidiaries to fund contingent liabilities or remedy any underlying concern reasonably estimated to be payable, in each case, in respect of such event, <u>provided</u> that

38

any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of net cash proceeds in the amount of such reduction; provided, further, that, in the case of any Asset Sale in reliance on Section 6.8(n), so long as no Event of Default has occurred and is continuing and if permitted under the Approved Budget, if the Borrower and the Restricted Subsidiaries invest (or commit to invest) the net cash proceeds from such event (or a portion thereof) within 12 months after receipt of such net cash proceeds in assets that are used or useful in the business of the Borrower and its Restricted Subsidiaries (including acquisitions or other Investments permitted under Section 6.6 (other than cash and Cash Equivalents)), then no prepayment shall be required pursuant to this paragraph in respect of such net cash proceeds in respect of such event (or the applicable portion of such net cash proceeds, if applicable) except to the extent of any such net cash proceeds therefrom that have not been so invested (or committed to be invested) by the end of such 12 month period (or if committed to be so invested within such 12 month period, have not been so invested within 18 months after receipt thereof), at which time a prepayment shall be required in an amount equal to such net cash proceeds that have not been so invested (or committed to be invested).

(c)      [Reserved].

(d)      Notice to the Administrative Agent. The Borrower shall deliver a prepayment notice to the Administrative Agent of any mandatory prepayment required to be made pursuant to clauses (a) and (b) of this Section 2.11 at least three Business Days (or such shorter period as the Administrative Agent may agree in its reasonable discretion) prior to the date of such prepayment provided, such prepayment obligation may be conditioned on the occurrence of such event (including a Change of Control or refinancing transaction). Each such prepayment notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice. Any Lender may elect, by written notice to the Administrative Agent by 12:00 p.m. (New York City time) at least one Business Day prior to the prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to Section 2.11(b) (such amounts, "**Declined Proceeds**"). Any Lender that fails to provide written notice to the Administrative Agent in the time frame set forth above shall be deemed to have accepted the prepayment. Any Declined Proceeds shall be retained by the Borrower and added to the "Available Amount" in accordance with the terms of such definition.

(e)      Notwithstanding any other provisions of this Section 2.11, (i) to the extent that any or all of the net cash proceeds of any Asset Sale by a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) (a "**Foreign Disposition**") or the net cash proceeds of any Casualty Event from a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) (a "**Foreign Casualty Event**"), in each case giving rise to a prepayment event pursuant to Section 2.11(b) is prohibited, restricted or delayed by applicable local law, rule or regulation (including, without limitation, financial assistance and corporate benefit restrictions and fiduciary and statutory duties of any director or officer of such Subsidiaries) from being repatriated to the Borrower or so prepaid or such repatriation or prepayment would present a material risk of liability for the applicable Restricted Subsidiary or its directors or officers (or gives rise to a material risk of breach of fiduciary or statutory duties by any director or officer), in each case, as determined by the Borrower in good faith, then the portion of such net cash proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.11 but may be retained by the applicable Foreign Subsidiary and (ii) to the extent that the Borrower has determined in good faith that repatriation of any or all of the net cash proceeds of any Foreign Disposition or any Foreign Casualty Event, in each case giving rise to a prepayment event pursuant to Section 2.11(b), would result in adverse tax or regulatory consequences (as determined by the Borrower in good faith), the net cash proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.11 but may be retained by the applicable Foreign Subsidiary.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(f)     Notwithstanding anything in this Section 2.11 to the contrary, no mandatory prepayment of outstanding Loans that would otherwise be required to be made under Section 2.11(a) or (b) shall be required to be made unless and until all commitments under the Prepetition Credit Agreement shall have been terminated and the principal of and interest on all Indebtedness under the Prepetition Credit Agreement and all fees, expenses and other amounts payable (other than contingent amounts not yet due and payable) in respect thereof shall have been paid in full.

2.12    **Application of Prepayments**.

(a)     Application of Voluntary Prepayments. Any prepayment of any Loan pursuant to Section 2.10 shall be applied to the principal repayment installments thereof as specified by the Borrower in the applicable notice of prepayment (and absent such direction in direct order of maturity); provided, any such prepayment of the Loans shall be applied to prepay the Loans of each of the Lenders on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b)     Application of Mandatory Prepayments. Any prepayment of any Loan required to be made pursuant to Section 2.11(a) or (b) shall be applied to the principal repayment installments thereof as specified by the Borrower in the applicable notice of prepayment (and absent such direction in direct order of maturity); provided, any such prepayment of the Loans shall be applied to prepay the Loans of each of the Lenders on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(c)     Application of Prepayments to Types of Loans. Any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Term SOFR Loans, in each case in a manner which minimizes the amount of any payment required to be made by the Borrower pursuant to Section 2.15(c).

(d)     Notwithstanding anything herein to the contrary set forth in this Section 2.12 or any other provision of this Agreement, any and all repayments and prepayments of the Loans pursuant to Section 2.11 shall be applied in accordance with the DIP Order.

2.13    **General Provisions Regarding Payments**.

(a)     Payments Due. All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 2:00 p.m. (New York City time) on the date due at the Payment Office for the account of the Lenders, or in any other manner expressly provided for in this Agreement; for purposes of computing interest and fees, funds received by the Administrative Agent after that time on such due date may in the discretion of the Administrative Agent be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)     Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption, distribute to the Lenders, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a

40

rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(c)     Payments to Include Interest. All payments in respect of the principal amount of any Loan shall include payment of accrued interest on the principal being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(d)     Distribution of Payments. The Administrative Agent shall promptly distribute to each Lender at such account as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by the Administrative Agent.

(e)     Affected Lender. Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Lender affected by circumstances contemplated under Section 2.15(b) or if any such Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Term SOFR Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(f)     Payment Due on Non-Business Day. Subject to the provisos set forth in the definition of "Interest Period", whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

(g)     [Reserved].

(h)     Non-Conforming Payment. In the event any payment by or on behalf of the Borrower hereunder required to be paid in cash pursuant to the terms of this Agreement is not made in same day funds prior to 2:00 p.m. (New York City time), the Administrative Agent may deem such payment to be a non-conforming payment and if so, shall give prompt written notice thereof to the Borrower and each applicable Lender. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.7 from the date such amount was due and payable until the date such amount is paid in full.

2.14    **Ratable Sharing**. Subject to Section 10.6(b)(v) and (ix), if any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent in writing of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided: (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.14 shall not be construed

41

to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any of its Restricted Subsidiaries (other than pursuant to Section 10.6(d)), as to which the provisions of this Section shall apply. Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Credit Party in the amount of such participation.

2.15    **Making or Maintaining Term SOFR Loans**.

(a)    Inability to Determine Rates. Subject to Section 2.21, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(i)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error), that "Term SOFR" cannot be determined pursuant to the definition thereof, or

(ii)    the Required Lenders determine that for any reason in connection with any request for a Term SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

the Administrative Agent will promptly so notify the Borrower and each Lender.

Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make Term SOFR Loans, and any right of the Borrower to continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans, shall be suspended (to the extent of the affected Term SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the direction of the Required Lenders) revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein and (ii) any outstanding affected Term SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.15(c). Subject to Section 2.21, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by the Administrative Agent without reference to clause (iii) of the definition of "Base Rate" until the Administrative Agent revokes such determination.

(b)    Illegality or Impracticability of Term SOFR Loans. If, after the Closing Date, any Lender determines that the introduction of, or any change in, any applicable law or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any of the Lenders (or any of their respective lending offices) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, shall make it unlawful or impossible for a Lender to honor its obligations to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate or Term SOFR, or to determine or charge interest based

42

upon SOFR, the Term SOFR Reference Rate or Term SOFR, then, upon notice thereof by such Lender to the Borrower (with a copy to the Administrative Agent) (an "**Illegality Notice**"), (a) any obligation of the Lenders to make Term SOFR Loans, and any right of the Borrower to continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans, shall be suspended, and (b) the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (iii) of the definition of "Base Rate", in each case until each affected Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of an Illegality Notice, the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans to Base Rate Loans (the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (iii) of the definition of "Base Rate"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such Term SOFR Loans to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.15(c).

(c)    Compensation for Losses. The Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all actual and reasonable losses, expenses and liabilities (including any interest paid or payable by such Lender to Lenders of funds borrowed by it to make or carry its Term SOFR Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Term SOFR Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Term SOFR Loan does not occur on a date specified therefor in a Conversion/Continuation Notice; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Term SOFR Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Term SOFR Loans is not made on any date specified in a written notice of prepayment given by the Borrower.

(d)    Booking of Term SOFR Loans. Any Lender may make, carry or transfer Term SOFR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

2.16    **Increased Costs; Capital Adequacy**.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement);

(ii)    subject any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Excluded Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, Commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Term SOFR Loans made (or deemed made) by such Lender;

43

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Term SOFR Loan or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon written request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; provided that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III after the Closing Date, then such Lender shall be compensated pursuant to this Section 2.16(a) only to the extent such Lender certified that it is imposing such charges on similarly situated borrowers under the other syndicated credit facilities that such Lender is a lender under.

(b)    Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.16(a) or 2.16(b) and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 Business Days after receipt thereof.

(d)    Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

2.17    **Taxes; Withholding, Etc**.

(a)    Defined Terms. For purposes of this Section 2.17, the term "applicable law" includes FATCA.

(b)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums

44

payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Borrower. The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Borrower. The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within 10 Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    Evidence of Payments. As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 2.17, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such

45

documentation (other than such documentation set forth in Section 2.17(g)(ii)(A), 2.17(g)(ii)(B) and 2.17(g)(ii)(D)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)       Without limiting the generality of the foregoing:

(A)       any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)       any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i)       in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed originals of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)       executed originals of IRS Form W-8ECI;

(iii)       in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payment in connection with any Credit Document is effectively connected with the conduct of a U.S. trade or business by such Foreign Lender (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN or W-8BEN-E; or

(iv)       to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax

46

Compliance Certificate substantially in the form of Exhibit D-4 on behalf of such direct and indirect partner(s);

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of originals as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Closing Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

(h)    Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(i)  <u>Status of Administrative Agent</u>. On or before the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent shall provide to the Borrower two duly-executed copies of IRS Form W-9. The Administrative Agent agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal ineligibility to do so.

(j)  <u>Survival</u>. Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

2.18  **Obligation to Mitigate**. If any Lender requests compensation under Section 2.16, or requires the Borrower to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate or reduce amounts payable pursuant to Section 2.16 or 2.17, as the case may be, in the future, and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

2.19  **Replacement of Lenders**. (i) If any Lender requests compensation under Section 2.16, or if the Borrower is required to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or (ii) if any Lender is a Defaulting Lender or (iii) if any Lender declines to approve any waiver, amendment or modification of this Agreement or any Credit Document that requires approval of all Lenders (directly affected or otherwise) pursuant to Section 10.5 and to which the Required Lenders have consented (or a majority of the Lenders directly affected) or (iv) if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon written notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.6), all of its interests, rights and obligations under this Agreement and the related Credit Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u>:

(a)  the Administrative Agent shall have received the assignment fee (if any) specified in Section 10.6(b)(iv) and if such assignee Lender is not an existing Lender, it shall provide the Administrative Agent and, in the case of an IRS Form W-9, Borrower, with all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form and an administrative questionnaire;

(b)  such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents (including any amounts under Section 2.19(c) from or on behalf of the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts));

(c)  in the case of any such assignment resulting from a claim for compensation under Section 2.16 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments thereafter; and

48

(d)       such assignment does not conflict with applicable Law.

2.20   **Defaulting Lenders**.

(a)       General. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)       Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.5.

(ii)      Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 10.4), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to any Credit Party as a result of any judgment of a court of competent jurisdiction obtained by any Credit Party against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of the relevant non-Defaulting Lenders on a pro rata basis prior to being applied pursuant to this Section 2.20(a)(ii).

(b)       Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Commitments, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

49

2.21    **Benchmark Replacement Setting**.

(a)    Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)    Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Required Lenders will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.20(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.21, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.21.

(d)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Required Lenders (and accessible to the Administrative Agent) in their reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Required Lenders may modify the definition of "Interest Period" (or

any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

## SECTION 3    CONDITIONS PRECEDENT

3.1    **Closing Date**.  The obligations of each Lender to make Loans on the initial Funding Date are effective upon the satisfaction, or waiver by such Lender, of the following conditions (in addition to the conditions precedent set forth in Section 3.2) on or before the Closing Date, each to the satisfaction of the Administrative Agent and the Required Lenders:

(a)      Credit Agreement and Collateral Documents. The Agents shall have received fully executed copies of (i) this Agreement (together with the schedules and exhibits thereto) and (ii) the other Collateral Documents, including the Collateral Agreement (together with the schedules and exhibits thereto).

(b)      Funding Notice. The Administrative Agent shall have received a fully executed and delivered Funding Notice, no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the Closing Date (or such later time as the Administrative Agent may agree), together with a flow of funds memorandum attached thereto with respect to the initial funding of Loans on the Funding Date.

(c)      Interim DIP Order. The Interim DIP Order (i) shall have been entered within five days of the Petition Date (or such longer period as the Required Lenders may agree ) and shall be in full force and effect and (ii) shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified, without the prior written consent of the Required Lenders.

(d)      First Day Orders. The "first day" orders (including a cash management order), which shall be in form and substance satisfactory to the Required Lenders, shall have been entered upon an application or motion of the Credit Parties in form and substance satisfactory to the Required Lenders.

(e)      Approved Budget. The Required Lenders shall have received and approved, in their sole discretion, the Initial Approved Budget.

(f)      Restructuring Support Agreement. The Support Effective Date (as defined in the Restructuring Support Agreement) shall have occurred.

(g)      Fees. The Borrower shall have paid to the Administrative Agent and the Collateral Agent the fees payable to each such Person on the Closing Date referred to in Section 2.8(a), in each case, to the extent due and payable on the Closing Date.

(h)      Secretary's Certificate and Attachments. The Administrative Agent shall have received an executed officer's certificate of each Credit Party, together with all applicable attachments, certifying as to the following:

(i)      *Organizational Documents*. Attached thereto is a copy of each Organizational Document of such Credit Party, to the extent applicable and customary in the relevant jurisdiction of such Credit Party, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto.

(ii)      *Signature and Incumbency*. Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Credit Party executing the Credit Documents to which it is a party.

(iii)      *Resolutions*. Attached thereto are copies of resolutions of the Board of Directors of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)      *Good Standing Certificates*. Attached thereto is a good standing certificate (if applicable) from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation dated as of a recent date prior to the Closing Date.

(i)      "Know-Your-Customer", Etc. The Administrative Agent and each applicable Lender shall have received all documentation and other information required under Anti-Terrorism Laws and applicable "know-your-customer" and anti-money laundering Laws, including certificates required under the Beneficial Ownership Regulation, including, without limitation, a duly executed W-9 (or such other applicable tax form) of the Borrower.

(j)      Promissory Notes. Delivery of each Note requested by a Lender in accordance with Section 2.4(b), if any.

(k)      Expenses. The Administrative Agent and each Lender shall have received, or substantially simultaneously with the initial funding of the Loans on the Funding Date shall receive, (i) to the extent invoiced at least two Business Days prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment in full, in cash, of all reasonable and documented out-of-pocket expenses (including fees, charges and disbursements of Schulte Roth & Zabel LLP, Weil, Gotshal & Manges LLP, Seward & Kissel LLP and Houlihan Lokey Capital, Inc.) required to be reimbursed or paid by any Credit Party under any Credit Document and (ii) reimbursement or payment in full, in cash, of all reasonable and documented out-of-pocket fees and expenses of the Consenting Noteholder Advisors (as defined in the Restructuring Support Agreement); *provided*, that, in each case, each of Schulte Roth & Zabel LLP, Weil, Gotshal & Manges LLP, Seward & Kissel LLP and Houlihan Lokey Capital, Inc. may provide summary copies of its invoices (which shall not be required to contain time entries, if any, and which may be redacted or modified to delete any privileged information or any other confidential information but shall include a general brief description of the nature of the matters for which services were performed), and it is understood and agreed that such summary copies shall constitute sufficient documentation in accordance with this paragraph (k).

3.2      **Conditions to Each Extension of Credit**.  The agreement of each Lender to make any extension of credit requested to be made by it on any Funding Date is subject to the satisfaction of the following conditions precedent:

52

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties made by any Credit Party in or pursuant to the Credit Documents shall be true and correct in all material respects (unless qualified by materiality, in which case they shall be true and correct in all respects) on and as of such date as if made on and as of such date (except to the extent made as of a specific date, in which case such representation and warranty shall be true and correct in all material respects (unless qualified by materiality, in which case they shall be true and correct in all respects) on and as of such specific date).

(b)    <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c)    <u>Notices</u>. The Borrower shall have delivered to the Administrative Agent the notice of borrowing or Application, as the case may be, for such extension of credit in accordance with this Agreement.

(d)    <u>MAE</u>. Since the Petition Date, no Material Adverse Effect shall have occurred.

(e)    <u>Second Draw Funding</u>. Solely in respect of the Second Draw, (x) the Bankruptcy Court shall have entered the Final DIP Order within 45 days following the Petition Date (or such later date as the Required Lenders may agree) (and, in any event, prior to the Second Draw Funding Date) and (y) the Required Lenders shall have consented (in their sole discretion) to funding such Second Draw.

(f)    <u>DIP Order</u>. The DIP Order (or, in the case of the First Draw, only the Interim DIP Order) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay without the prior written consent of the Required Lenders.

Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 3.2 have been satisfied.

## SECTION 4    REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders and each Agent to enter into this Agreement, and the Lenders to make each Credit Extension, each Credit Party represents and warrant to the Lenders and the Agents on the Closing Date that the following statements are true and correct:

4.1    **Organization; Required Power and Authority; Qualification**.  Except as permitted under Section 6.7, each Credit Party (a) is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization or incorporation as identified in Schedule 4.1, (b) subject to the entry of the DIP Order and subject to the terms thereof and any restrictions arising on account of such Credit Party's status as a "debtor" under the Bankruptcy Code, has all requisite corporate (or equivalent) power and authority to own and operate its properties, to lease the property it operates as lessee, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) except as a result of the commencement of the Chapter 11 Cases, is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except, in each case, in jurisdictions where the failure to be so qualified or in good standing could not be reasonably expected to have a Material Adverse Effect.

4.2    **Equity Interests and Ownership**.  The Equity Interests constituting Pledged Equity Interests have been duly authorized and validly issued and are fully paid and non-assessable. Except as set forth on Schedule 4.2, there is no existing option, warrant, call, right, commitment or other agreement

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(including preemptive rights) to which Borrower or any of its Restricted Subsidiaries is a party requiring, and there is no Equity Interest constituting Pledged Equity Interests outstanding which upon conversion or exchange would require, the issuance by Borrower or any of its Restricted Subsidiaries of any additional Equity Interests constituting Pledged Equity Interests of Borrower or any of its Restricted Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, Equity Interests constituting Pledged Equity Interests of Borrower or any of its Restricted Subsidiaries. Schedule 4.2 correctly sets forth the ownership interest of the Borrower and its Restricted Subsidiaries in their respective Restricted Subsidiaries in which Equity Interests constituting Pledged Equity Interests are held as of the Closing Date.

4.3    **Due Authorization**.  Subject to the entry of the DIP Order and subject to the terms thereof, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary corporate or limited liability or other entity action, as applicable, on the part of each Credit Party that is a party thereto.

4.4    **No Conflict**.  Subject to the entry of the DIP Order and subject to the terms thereof, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any of the Organizational Documents of the Borrower or any Guarantor or otherwise require any approval of any stockholder, member or partner of the Borrower or any Guarantor, except for such approvals or consents which will be obtained on or before the Closing Date; (b) violate any provision of any Law applicable to or otherwise binding on the Borrower or any Guarantor, except to the extent such violation could not be reasonably expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Borrower or any Guarantor (other than any Liens created under any of the Credit Documents in favor of the Collateral Agent on behalf of the Secured Parties or any other Permitted Lien); or (d) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, or otherwise require any approval or consent of any Person under, any material Contractual Obligation relating to any Indebtedness of the Borrower or any Guarantor (other than the Prepetition Credit Agreement, the 2030 Convertible Notes and the 2025 Convertible Notes), except to the extent such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect, and except for such approvals or consents (i) which will be obtained on or before the Closing Date and have been disclosed in writing to the Lenders or (ii) the failure of which to obtain could not reasonably be expected to have a Material Adverse Effect.

4.5    **Governmental Consents**.  Subject to the entry of the DIP Order and subject to the terms thereof, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except (a) such as have been obtained and are in full force and effect, (b) for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Required Lenders for filing and/or recordation, as of the Closing Date, subject to the DIP Order, or (c) those which, if not obtained or made, would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6    **Binding Obligation**.  Subject to the entry of the DIP Order and subject to the terms thereof, each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

4.7    **Historical Financial Statements**.  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.

4.8    **No Material Adverse Change**.  Since the Petition Date, no event or change has occurred that has caused or could reasonably be expected to cause, either in any case or in the aggregate, a Material Adverse Effect.

4.9    **Adverse Proceedings**.  Except for the Chapter 11 Cases, there are no Adverse Proceedings that are not stayed as a result of the commencement of the Chapter 11 Cases, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Restricted Subsidiaries is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, domestic or foreign, that are not stayed as a result of the commencement of the Chapter 11 Cases that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.10    **Payment of Taxes**.  Subject to applicable bankruptcy law, the terms of the DIP Order and any required approval or order by the Bankruptcy Court and except for any Taxes disclosed on Schedule 4.10, as of the Closing Date, the Borrower and its Restricted Subsidiaries have paid all Taxes that were due and payable (including in the capacity as a withholding agent), other than any Tax being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) reserves or other appropriate provisions, as shall be required in conformity with GAAP shall have been made therefor, (b) the failure to so pay would not reasonably be expected, individually or in the aggregate, to constitute a Material Adverse Effect, or (c) such payment has been stayed by the commencement of the Chapter 11 Cases.

4.11    **Title**.  Except as a result of the commencement of the Chapter 11 Cases, each of the Borrower and its Restricted Subsidiaries has (a) good, sufficient and legal title to (in the case of fee interests in real property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), (c) to each of the Borrower's and its Restricted Subsidiaries' knowledge, valid license rights in (in the case of license interests in Intellectual Property), and (d) good title to or right to use (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for (x) assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.8 or (y) except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except for Permitted Encumbrances and as otherwise permitted by this Agreement including by Section 6.2, all such properties and assets are free and clear of Liens.

4.12    **Real Estate Assets**.  As of the Closing Date, Schedule 4.12 is a complete and correct list of (a) all Real Estate Assets, and (b) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.

4.13    **Environmental Matters**.  Neither the Borrower nor any of its Restricted Subsidiaries nor any of their respective properties or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

any Hazardous Materials Activity, in each case which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect. Neither the Borrower nor any of its Restricted Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 USC. § 9604) or any comparable state Law that individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect. To each of the Borrower's and its Restricted Subsidiaries' knowledge, there are and have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Restricted Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Except as could not reasonably be expected to have a Material Adverse Effect, neither the Borrower nor any of its Restricted Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any facility, and none of the Borrower's or any of its Restricted Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent that individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect. No event or condition has occurred or is occurring with respect to the Borrower or any of its Restricted Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect. The representations and warranties in this Section 4.13 are the sole representations and warranties of Borrower with respect to environmental matters, including matters arising under Environmental Law or involving Environmental Claims, Hazardous Materials, or Hazardous Materials Activities.

4.14    **Investment Company Regulation**.  Neither the Borrower nor any of the Guarantors is, or is required to be, registered under the Investment Company Act of 1940.

4.15    **Margin Stock**.  Neither the Borrower nor any of its Restricted Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of any Credit Extension made to or for the benefit of any Credit Party will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

4.16    **Employee Matters**.  Neither the Borrower nor any of its Restricted Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to result in a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Restricted Subsidiaries, (c) to the knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Restricted Subsidiaries and (d) to the knowledge of the Borrower, no union organization activity that is taking place, except, with respect to any matter specified in clause (a), (b), (c) or (d) above, either individually or in the aggregate, that could not reasonably be likely to give rise to a Material Adverse Effect.

4.17    **Employee Benefit Plans**.  Except to the extent excused by the Bankruptcy Court, as a result of the filing of the Chapter 11 Cases or as would not result in a Material Adverse Effect: (i) with respect to each Employee Benefit Plan and Foreign Pension Plan, the Borrower and its Restricted Subsidiaries are in material compliance with all applicable Laws, including the provisions and requirements of ERISA and the Code, and have performed all their obligations under each Employee Benefit Plan; (ii) each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code has received a

56

favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would reasonably be expected to cause such Employee Benefit Plan to lose its qualified status; (iii) no liability to the PBGC (other than required premium payments) has been or is expected to be incurred by any ERISA Party; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) no ERISA Party is in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan; and (vi) neither the Borrower nor any of its Restricted Subsidiaries has incurred any material obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan.

4.18     **[Reserved]**.

4.19     <u>**Compliance with Laws; Use of Proceeds**</u>.

(a)     <u>Generally</u>. Subject to the entry of the DIP Order and the terms thereof, each of the Borrower and its Restricted Subsidiaries is in compliance with all applicable Laws in respect of the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     <u>Anti-Terrorism Laws</u>. None of the Borrower or any of its Restricted Subsidiaries (and, to the knowledge of each such Person, no joint venture or subsidiary thereof) is in violation in any material respect of any Anti-Terrorism Law. As of the Closing Date, to the knowledge of the Borrower, the information included in the Beneficial Ownership Certification is true and correct.

(c)     <u>AML Laws; Anti-Corruption Laws and Sanctions</u>. None of (i) the Borrower, any of its Restricted Subsidiaries or any of their respective directors or officers, or, to the knowledge of the Borrower, any of their respective employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower, any of its Restricted Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan, use of proceeds or other transaction contemplated by this Agreement will cause a violation of AML Laws, Anti-Corruption Laws or applicable Sanctions by any Person participating in the transactions contemplated by this Agreement, whether as lender, borrower, guarantor, agent, or otherwise.

(d)     <u>Use of Proceeds</u>. The proceeds of the Loans shall be used in accordance with the terms of the DIP Order, the Credit Documents and the Approved Budget.

(e)     <u>Disclosure</u>.  No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to any Agent or the Lenders by or on behalf of the Borrower or any of its Restricted Subsidiaries for use in connection with the transactions contemplated hereby, taken as a whole, contains any untrue statement of a material fact or omits to state a material fact (known to the Borrower, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein, taken as a whole, not materially misleading in light of the circumstances in which the same were made (after giving effect to all supplements thereto). Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events are not to be viewed as facts or a guarantee of performance and are subject to significant uncertainties and contingencies many of which are beyond the control of the Borrower and its Restricted Subsidiaries and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

4.20    **Collateral**.  Subject to Section 5.15 of this Agreement and the entry of the DIP Order, the security interest of the Collateral Agent in the Collateral constitutes a valid, perfected second priority security interest in and continuing Lien on all of each Credit Party's right, title and interest in, to and under the Collateral (subject to Permitted Encumbrances and other Permitted Liens).

4.21    **DIP Order**.  The DIP Order is valid, genuine, legal and enforceable against the Credit Parties and the other parties subject thereto, and has not been reversed, stayed (whether by statutory stay or otherwise), modified, waived or amended without the consent of the Required Lenders.

4.22    **Intellectual Property**.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Borrower or the other Credit Parties own all software that was developed by, for, or on behalf of Borrower or any of its Restricted Subsidiaries for use in the business, (ii) each Credit Party owns and possesses all right, title and interest in and to the Owned IP free and clear of all Liens, other than Permitted Liens, and (iii) each Credit Party has sufficient rights pursuant to a license or other valid and enforceable rights to all other Intellectual Property used in, or held for use in, the operation of each Credit Party's business as currently conducted. To the knowledge of any Credit Party, all material Owned IP is subsisting, valid, and enforceable.

4.23    **Education Law Matters**.

(a)    Educational Authorizations. Each Credit Party complies, and during the past three (3) years has complied, in all material respects with all applicable Educational Laws regarding any licenses, permits, authorizations or other approvals required to be obtained from any Educational Agency to conduct its business.

(b)    Incentive Compensation. Each Credit Party complies, and during the past three (3) years has complied, in all material respects with all applicable Educational Laws concerning the compensation of persons or entities engaged in student recruiting, admissions or financial aid activities, including but not limited to 20 U.S.C. § 1094(a)(20) and ED regulations at 34 C.F.R. § 668.14(b)(22).

(c)    Misrepresentation. Each Credit Party complies, and for the past three (3) years has complied, in all material respects with all applicable Educational Laws regarding consumer marketing and student recruiting, has not committed any misrepresentation (either affirmatively or by omission) about the Credit Party or about any educational institution with which the Credit Party has an Educational Services Agreement, or about any educational program or course offered by a Credit Party or supported by an Educational Services Agreement. With respect to educational institutions, programs and courses supported by any Credit Party pursuant to an Educational Services Agreement, the Credit Party uses only marketing materials approved by the pertinent educational institution.

(d)    Educational Records. Each Credit Party and each Educational Services Agreement complies, and for the past three (3) years has complied, in all material respects with all Privacy, Data Security and Consumer Protection Laws that are (i) applicable to any Protected Information created, obtained or maintained pursuant to any Educational Services Agreement, and (ii) subject to enforcement by any Educational Agency.

(e)    Accessibility. Each Credit Party and each Educational Services Agreement complies, and for the past three (3) years has complied, in all material respects with all applicable Laws concerning the accessibility of educational programs and courses to persons with disabilities.

**SECTION 5    AFFIRMATIVE COVENANTS**

58

On and after the Closing Date, so long as any Commitment is in effect, and until payment in full of all Obligations (other than Remaining Obligations), each Credit Party shall, and shall cause each of its Restricted Subsidiaries to:

5.1    **Financial Statements and Other Reports and Notices**.  Deliver to (x) the Administrative Agent (for further distribution to the Lenders) and (y) solely in the case of Sections 5.1(k), 5.1(l), 5.1(m), 5.1(n) and 5.1(o), the Lender Advisors (for further distribution the Lenders, as applicable):

(a)    Quarterly Financial Statements. 45 days (or such longer period as permitted by the SEC) after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Borrower, beginning with the Fiscal Quarter ending June 30, 2024, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such Fiscal Quarter and the related unaudited consolidated statements of income or operations, stockholders' equity (to the extent required on Form 10-Q) and cash flows for such Fiscal Quarter and the portion of the Fiscal Year through the end of such Fiscal Quarter, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and an MD&A Report with respect thereto; provided, the filing by the Borrower of a Form 10-Q (or any successor or comparable form) with the Securities and Exchange Commission as at the end of and for any applicable Fiscal Quarter shall be deemed to satisfy the obligations under this Section 5.1(a) to deliver financial statements with respect to such Fiscal Quarter.

(b)    Annual Financial Statements. 90 days (or such longer period as permitted by the SEC) after the end of each Fiscal Year, beginning with the Fiscal Year ending December 31, 2024, (i) the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year, all in reasonable detail, together with an MD&A Report with respect thereto; and (ii) with respect to such consolidated financial statements a report thereon by KPMG LLP or other independent certified public accountant of recognized national standing selected by the Borrower and reasonably satisfactory to the Required Lenders, which report shall not contain any going concern, scope of audit or similar qualification (other than resulting from (1) the maturity of the Loans at the Maturity Date or any other Indebtedness maturing within one year from the time such report is delivered or (2) any prospective or actual default as a result of a breach of any financial covenant in documentation governing any Indebtedness permitted hereunder), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements); provided, the filing by the Borrower of a Form 10-K (or any successor or comparable form) with the Securities and Exchange Commission as at the end of and for any applicable Fiscal Year shall be deemed to satisfy the obligations under this Section 5.1(b) to deliver financial statements with respect to such Fiscal Year.

(c)    Monthly Income Statement. 30 days after the end of each fiscal month of the Borrower, beginning with the fiscal month ending July 31, 2024, the consolidated balance sheets of the Borrower and its Subsidiaries as at the end of such fiscal month and for the portion of the Fiscal Year ended and the related consolidated statement of income of the Borrower and its Subsidiaries for such fiscal month and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the corresponding figures for the corresponding month of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year (including a calculation to "Consolidated EBITDA" under and as defined in the Prepetition Credit Agreement (as in effect on the date hereof)), all in reasonable detail.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(d)    Compliance Certificate. (i) Together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to Sections 5.1(a) and 5.1(b), a duly executed and completed Compliance Certificate.

(e)    Statements of Reconciliation after Change in Accounting Principles. If, as a result of any change in the accounting policies of the Borrower from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of the Borrower and its Subsidiaries delivered pursuant to Section 5.1(a), 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Required Lenders.

(f)    Projections. No later than ninety (90) days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year shown on a quarterly basis (including a projected consolidated balance sheet of the Borrower and its Restricted Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow, projected changes in financial position and projected income and a description of the underlying assumptions applicable thereto and projected covenant compliance levels) (collectively, the "**Projections**").

(g)    Notices. Promptly upon any officer of any Credit Party obtaining knowledge of any of the following, a certificate of its Authorized Officer specifying the nature and period of existence thereof, and what action the Borrower has taken, is taking and proposes to take with respect thereto:

(i)    any Default or Event of Default (other than as a result of the commencement of the Chapter 11 Cases);

(ii)    the institution of, or non-frivolous threat by, any Adverse Proceeding that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(iii)    the occurrence of or forthcoming occurrence of any ERISA Event that would result in a Material Adverse Effect;

(iv)    (A) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and (B) any remedial action taken by the Borrower or any of its Restricted Subsidiaries in response to (1) any Hazardous Materials Activities the existence of which could reasonably be expected to result in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; and

(v)    following the Petition Date, any event or change that, individually or in the aggregate, could reasonably be expected to have Material Adverse Effect.

(h)    [reserved].

(i)    Other Information. (A) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Restricted Subsidiary with the SEC, or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, as the case may be, in each case that is not

60

otherwise required to be delivered to the Administrative Agent pursuant hereto; provided that such information shall be deemed to have been delivered on the date on which such information has been posted on the Borrower's website on the Internet on any investor relations page at http://www.2u.com (or any successor page) or at http://www.sec.gov and (B) promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation (which information and documentation shall be delivered directly to the requesting Persons and no other Persons).

(j)      Approved Budget.  No later than 5:00 p.m., New York City time, every other Thursday (commencing on August 8, 2024), a Budget. For the purposes of this Agreement, the "**Approved Budget**" shall refer, initially, to the Initial Approved Budget and, upon the delivery of an updated Budget to the Required Lenders, such updated Budget shall become the "Approved Budget" upon the date on which the Required Lenders, in their sole discretion, shall have approved such Budget (which approval may be by e-mail from the Lender Advisors). The then-existing Approved Budget shall remain the Approved Budget for the projection period, without giving effect to any update, modification or supplement (with appropriate adjustments for the timing of monthly or semi-monthly disbursements), until such time as another Budget is approved by the Required Lenders in their sole discretion. Notwithstanding anything to the contrary, the Required Lenders may approve, in their sole discretion, all, none or only a portion of such update, modification or supplement to the Budget for any period covered by such update, modification or supplement as determined by the Required Lenders in their sole discretion; provided, however, once any period or any portion of a Budget has been approved it may not later be rejected, modified or supplemented by the Required Lenders.

(k)      Variance Report.  No later than 5:00 p.m., New York City time, every other Thursday (commencing on August 8, 2024), (x) an aggregate variance report (a "**Variance Report**"), which shall be substantially consistent in form, scope and detail as the Approved Budget, and which will contain columns with the prior two weeks' actuals and budget figures in a form that matches the Approved Budget (with individual variance figures for each line item in the Approved Budget) *plus* a cumulative forecast compared against cumulative actual figures, (y) written commentary from management of the Borrower explaining all variances in excess or $1,000,000 on a line item by line item basis and (z) a description of cash movements and other transactions between any Credit Party and any affiliate (other than another Credit Party) during the prior two week period.

(l)      Variance Report Certificate.  Concurrently with the delivery of each Variance Report pursuant to Section 5.01(l) above, a certificate prepared in respect of such Variance Report certifying compliance by the Credit Parties with the Permitted Variances and confirming that no Default or Event of Default shall exist or be continuing as of such time, or shall be reasonably expected to occur or arise (provided, that, if such certification and confirmation cannot be provided for any reason, such certificate shall specifically identify and describe the instance of any non-compliance or default, and the facts, circumstances, extent/amount of, reason for, and other information relevant to, such non-compliance or default; provided, however, that, the compliance with the foregoing shall in any event not be deemed to cure or negate any non-compliance with the Permitted Variances or any Default or Event of Default) (a certificate that complies with the foregoing requirements, a "**Variance Report Certificate**").

(m)      [Reserved].

(n)      Bankruptcy Documents.  As promptly as practicable prior to such filing (and in no event later than two business days prior to such filing), drafts of all pleadings, motions, applications, responses, oppositions, judicial information, financial information, notices, reports, orders and other documents intended to be filed by or on behalf of any Credit Party with the Bankruptcy Court in the Chapter

61

11 Cases, and consult in good faith with the Required Lenders regarding the form and substance of any of the foregoing documents in advance of such proposed filing, execution, distribution or use (as applicable); *provided* that each such document shall be consistent in all respects with the Restructuring Support Agreement and such other terms and conditions as are acceptable to Required Lenders; *provided*, *further*, that the foregoing shall not apply to any retention applications, fee applications or related declarations filed by the Debtors' Advisors (as defined in the Restructuring Support Agreement).

(o)    Additional Reporting.  All written reports provided by the Credit Parties to any statutory committee, the U.S. Trustee (as defined in the DIP Order), or any other party in interest in the Chapter 11 Cases. In addition, the Credit Parties shall provide, any reporting that any Credit Party agrees or is obligated, under the Prepetition Credit Agreement or otherwise, to provide to the lenders under the Prepetition Credit Agreement, as and when required thereunder. Upon written request by the Required Lenders, promptly provide the Administrative Agent and the Required Lenders with updates on any material developments in connection with the Credit Parties' reorganization efforts under the Chapter 11 Cases, and documents related thereto, or otherwise.

Notwithstanding the foregoing, the information required to be delivered pursuant to Section 5.1(a), (b) or (i)(A) shall be (x) deemed to have been delivered on the date (A) on which such information has been posted on the Internet at www.sec.gov or such other website previously notified by the Borrower to the Administrative Agent to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (B) on which the Borrower files its Form 10-K or 10-Q, as applicable, with the SEC.

5.2    **Existence**.  Except as otherwise permitted under Sections 6.8 and 6.9 and with respect to Immaterial Subsidiaries, at all times preserve and keep in full force and effect its existence and, subject to any restriction on account of any Credit Party's status as a "debtor" under the Bankruptcy Code, all rights and franchises, licenses and permits material to its business; <u>provided</u>, any Restricted Subsidiary of the Borrower shall not be required to preserve any such existence, right or franchise, licenses and permits if the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and that the loss thereof could not reasonably be expected to have a Material Adverse Effect.

5.3    **Payment of Taxes and Claims**.  Subject to the DIP Order, applicable bankruptcy law and any required approval by the Bankruptcy Court, pay all applicable Taxes imposed upon it or any of its properties or assets for sums that have become due and payable with respect thereto except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves in conformity with GAAP are being maintained, (b) the failure to make a payment could not reasonably be expected, individually or in the aggregate, to constitute a Material Adverse Effect, or (c) the requirement to so pay applicable Taxes has been stayed by virtue of the Chapter 11 Cases.

5.4    **Maintenance of Properties**.  Maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all material properties useful and necessary in the business of the Borrower and its Restricted Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.5    **Insurance**.  Use commercially reasonable efforts to maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance (including customary flood insurance

with respect to any Material Real Estate located in a Special Flood Hazard Area) with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, the Borrower and its Restricted Subsidiaries will maintain or cause to be maintained actual cash value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.

5.6    **Books and Records**.  Keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall have been made.

5.7    **Inspections**.  Permit each of the Administrative Agent and any authorized representatives designated by the Administrative Agent (and, solely during the existence of an Event of Default, any Lender or such Lender's authorized representatives designated by such Lender, and any such visits shall be coordinated by the Administrative Agent) to visit and inspect any of the properties of the Borrower and its Restricted Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (and the Borrower will be given the opportunity to participate in any such discussion with such independent public accountants), all upon reasonable prior notice and at such reasonable times during normal business hours and as often as may reasonably be requested and at the Credit Parties' expense; provided, so long as no Event of Default has occurred and is continuing, the Credit Parties shall only be obligated to reimburse the Administrative Agent and any such authorized representative for the expenses of one such visit and inspection per calendar year and only one such visit shall occur per calendar year. Notwithstanding anything to the contrary in this Section 5.7, none of the Borrower or any of its Restricted Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable Law or any third party contract legally binding on Borrower or such Restricted Subsidiary, or (iii) is subject to attorney, client or similar privilege or constitutes attorney work-product.

5.8    **Lenders Meetings**.  Participate in a telephone meeting of the Required Lenders every other Friday (commencing on August 9, 2024) (at a time mutually agreed upon by the Borrower and the Required Lenders) with all Lenders who choose to attend such conference call and management of the Borrower, and other advisors to the Company requested to join by the Required Lenders, at which conference call shall be discussed any matters material to the business of the Borrower and its Subsidiaries, including, but not limited to, those items covered in the MD&A Reports, the Approved Budget and/or the reports delivered pursuant to sections 5.1(l), 5.1(n) and 5.1(o) and any asset sale, preparation for strategic processes and/or any issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Credit Parties and their Subsidiaries, including such matters as may be requested by the Required Lenders; provided, that the requirements set forth in this Section 5.8 may be waived in the sole and absolute discretion of the Required Lenders in writing (including via e-mail of the Lender Advisors).

5.9    **Compliance with Laws**.

(a)    Generally. Comply with the requirements of all applicable Laws (including all Environmental Laws), except for any noncompliance which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      Anti-Terrorism Laws. Comply in all material respects with all Anti-Terrorism Laws applicable thereto.

(c)      Anti-Corruption Laws. Maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Restricted Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, applicable AML Laws and applicable Sanctions in all material respects.

5.10    **Environmental**.  Promptly take any and all actions necessary and required under Environmental Laws to (a) cure any violation of applicable Environmental Laws by the Borrower or its Restricted Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (b) make an appropriate response to any Environmental Claim against the Borrower or any of its Restricted Subsidiaries and discharge any legally binding obligations it may have to any Person thereunder, in each case, where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.11    **Subsidiaries**.  Within 45 days (or such longer period as acceptable to the Required Lenders) after the date any Person becomes a Restricted Subsidiary of the Borrower, other than an Immaterial Subsidiary, or ceases to be an Excluded Subsidiary, shall (provided that during the pendency of the Chapter 11 Cases, the foregoing 45-day period shall be shortened to 10 days, or such longer period as acceptable to the Required Lenders):

(a)      Notice to Administrative Agent. Promptly send to the Administrative Agent written notice setting forth with respect to such Person, if applicable, (x) the date on which such Person became a Restricted Subsidiary of the Borrower or ceased to be an Excluded Subsidiary, and (y) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Restricted Subsidiaries of the Borrower, and such written notice shall be deemed to supplement Schedules 4.1 and 4.2 for all purposes hereof;

(b)      Counterpart Agreement. Other than with respect to an Excluded Subsidiary, promptly cause such Restricted Subsidiary to become a Guarantor hereunder by executing and delivering to the Administrative Agent and the Collateral Agent a Counterpart Agreement, upon which time such Restricted Subsidiary (i) shall automatically become a Guarantor and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Credit Documents and (ii) will grant Liens to the Collateral Agent, for the benefit of the Administrative Agent and the Lenders in any property of such Restricted Subsidiary which constitutes Collateral;

(c)      Corporate Documents. Other than with respect to an Excluded Subsidiary, take all such corporate or limited liability company or other entity organizational actions, as applicable, and execute and deliver, or cause to be executed and delivered, all such applicable documents, instruments, agreements, and certificates as are similar to those described in Section 3.1(j); and

(d)      Collateral Documents. Other than with respect to an Excluded Subsidiary, deliver all such applicable documents, instruments, agreements, and certificates consistent with those delivered on the Closing Date and take all of the actions necessary to grant and to perfect a second priority Lien (subject to Permitted Liens) in favor of the Collateral Agent, for the benefit of the Secured Parties (subject to any limitations sets forth in the DIP Order) in the Equity Interests of such Restricted Subsidiary and in substantially all of the personal property of such Restricted Subsidiary (other than Excluded Assets).

5.12    **Compliance with Milestones**.  Each Credit Party shall, and shall cause each of its Subsidiaries to, satisfy and comply with the requirements of each of the milestones set forth below (each,

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

a "**DIP Milestone**") by the deadlines stated below (as such deadlines may be extended in the sole and absolute discretion of the Required Lenders in writing (including via e-mail of the Lender Advisors)):

(a)    on or prior to 11:59 p.m. prevailing Eastern Time on July 24, 2024, the Debtors shall have commenced Solicitation (as defined in the Restructuring Support Agreement);

(b)    on or prior to 11:59 p.m. prevailing Eastern Time on July 25, 2024, the Debtors shall have commenced the Chapter 11 Cases;

(c)    on or prior to 11:59 p.m. prevailing Eastern Time on July 25, 2024, the Debtors shall have filed the Lease Rejection Motion;

(d)    on or prior to 11:59 p.m. prevailing Eastern Time on July 26, 2024, the Debtors shall have filed the Approved Chapter 11 Plan, Disclosure Statement, and a motion for approval of the Disclosure Statement and Solicitation Materials (as defined in the Restructuring Support Agreement);

(e)    on or prior to 11:59 p.m. prevailing Eastern Time on July 30, 2024, the Bankruptcy Court shall have entered the Interim DIP Order;

(f)    on or prior to 11:59 p.m. prevailing Eastern Time on July 30, 2024, the Bankruptcy Court shall have entered the Solicitation Procedures Order;

(g)    on or prior to 11:59 p.m. prevailing Eastern Time on July 30, 2024, the Bankruptcy Court shall have entered an interim order (in form and substance acceptable to the Required Lenders) (the "**Interim NOL Order**"), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors;

(h)    on or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered a final order (in form and substance acceptable the Required Lenders) (the "**Final NOL Order**"), establishing notification procedures and approving restrictions on certain transfers of interest in, and claims against the Debtors;

(i)    on or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Final DIP Order;

(j)    on or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Equity Rights Offering Backstop Order (as defined in the Restructuring Support Agreement);

(k)    on or prior to 11:59 p.m. prevailing Eastern Time on the date the Combined Order is entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Lease Rejection Order;

(l)    on or prior to 11:59 p.m. prevailing Eastern Time on September 8, 2024, the Bankruptcy Court shall have entered the Combined Order; and

(m)    on or prior to 11:59 p.m. prevailing Eastern Time on September 13, 2024, the effective date of the Approved Chapter 11 Plan shall have occurred.

5.13    **Use of Proceeds**. Use the proceeds of any Credit Extension in accordance with the terms of the DIP Order, the Credit Documents and the Approved Budget, including, without limitation: (i) to pay amounts due to Lenders and the Agents hereunder and professional fees and expenses (including legal,

financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby and (ii) to provide working capital and for other general corporate purposes of the Credit Parties, in each case, in accordance with the DIP Order and the Approved Budget.

5.14    **Further Assurances**.  Subject to the express limitations set forth herein and in the Collateral Documents, at any time or from time to time upon the request of the Administrative Agent or the Required Lenders, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents. In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of the Borrower, and its Restricted Subsidiaries that are Guarantors and all of the outstanding Equity Interests of the Restricted Subsidiaries of the Borrower (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries and any Excluded Subsidiaries), in each case, in accordance with the DIP Order.

5.15    **Post-Closing Obligations**. Execute and deliver the documents and complete the tasks set forth on Schedule 5.15, in each case within the time limits specified on such schedule (which may be extended by the Required Lenders which extension may be granted by electronic e-mail).

5.16    **Compliance with Education Law**.

(a)    Comply in all material respects with all Educational Laws applicable to its operations, including the maintenance of all licenses, permits, approvals and authorizations necessary from any Educational Agency to conduct its business.

(b)    Cause all Educational Services Agreements to comply in all material respects with Educational Laws applicable to the Credit Parties; and

(c)    Comply in all material respects with all Privacy, Data Security and Consumer Protection Laws that are (i) applicable to any Protected Information created, obtained or maintained pursuant to any Educational Services Agreement, and (ii) subject to enforcement by any Educational Agency.

5.17    **Bankruptcy Matters**.  Each Credit Party shall:

(a)    cause all proposed (i) orders related to the Loans and other Obligations and the Credit Documents, seeking approval of any other financing or use of cash collateral, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto and (ii) orders seeking relief under section 363 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, in each case, proposed by the Credit Parties to be in accordance with and permitted by the terms of this Agreement and acceptable to the Agents and the Required Lenders, in each case, in their discretion in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules, the DIP Order and any other order of the Bankruptcy Court; and

66

(c)      provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Credit Party's or any Subsidiary's contracts or real property leases pursuant to section 365 of the Bankruptcy Code.

5.18      **Operating Covenant**.  Each Credit Party shall operate its business and that of its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement and the Restructuring Support Agreement, the most current business plan provided to the Lenders, past practices, and, except as expressly contemplated or provided in this Agreement and the Restructuring Support Agreement, use commercially reasonable efforts to preserve intact such Credit Party's and each of its direct and indirect subsidiaries' business organization and relationship with third parties (including lessors, licensors, suppliers, distributors and customers) and employees, and (ii) subject to any applicable restrictions and limitations set forth in any confidentiality agreements then in effect, provide the Lender Advisors reasonable access (A) during normal business hours, to the Borrower's books, records and facilities and (B) to the management and advisors of the Credit Parties.

5.19      **DIP Account**.  The Borrower shall establish and maintain a deposit account at Flagstar Bank, N.A. in the name of the Borrower but subject to a deposit account control agreement solely in favor of the Collateral Agent, with the account number ending in ******1233 (the "**DIP Account**").  The Credit Parties shall not create, incur, assume or permit to exist any Lien on the DIP Account or any amounts held therein, other than described in Section 6.2(a)(i) and (b)(vii)(B). The proceeds of the Loans (including Loans made in respect of the First Draw Commitment and the Second Draw Commitment) shall be funded into the DIP Account and, subject to the Withdrawal Conditions, the Borrower shall be permitted to make Withdrawals from the DIP Account for disbursements to be made on such day or the immediately succeeding day, subject to the prior or concurrent submission of a Withdrawal Notice to the Collateral Agent (for distribution to the Lenders), with a concurrent copy (which shall not constitute notice) to the Lender Advisors, that certifies, among other things, that the Withdrawal complies with the Withdrawal Conditions. For avoidance of doubt, in no event shall the Collateral Agent or any Lender Advisor have any obligation to confirm any of the certifications or calculations set forth in the Withdrawal Notice, and the Collateral Agent is entitled to conclusively rely on such certifications and shall incur no liability for acting in reliance thereon.

## SECTION 6     NEGATIVE COVENANTS

On and after the Closing Date, so long as any Commitment is in effect and until payment in full of all Obligations (other than Remaining Obligations), no Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly:

6.1      **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      (i) the Obligations, (ii) Indebtedness existing on the Closing Date (other than the 2025 Convertible Notes, the 2025 Notes Indenture, the 2030 Convertible Notes and the 2030 Notes Indenture) and set forth in Schedule 6.1(a)(ii), (iii) the 2025 Convertible Notes and the 2025 Notes Indenture outstanding on the Closing Date, (iv) [reserved], (v) Indebtedness under the Prepetition Credit Agreement outstanding on the Closing Date and (vi) the 2030 Convertible Notes and the 2030 Notes Indenture outstanding on the Closing Date;

(b)      Indebtedness that may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations (but not with respect to letters of credit) incurred in the ordinary course of business or in respect of workers' compensation claims, health, disability or other employee benefits or property, banker's acceptances, customs, Taxes and other similar tax guarantees,

67

casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(c)    Indebtedness of the Borrower or any of its Restricted Subsidiaries in respect of cash pooling, customary cash management, setting off, netting services, overdraft protections and otherwise in connection with deposit and securities accounts arising in the ordinary course of business;

(d)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, such Indebtedness is extinguished within 30 days after its incurrence;

(e)    Indebtedness consisting of (i) unpaid insurance premiums (not in excess of eighteen months' premiums) owing to insurance companies and insurance brokers incurred in connection with the financing of insurance premiums in the ordinary course of business, (ii) take-or-pay obligations contained in supply arrangements, in the case of the foregoing clauses (i) and (ii) in the ordinary course of business and (iii) Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in respect of bank guarantees, warehouse receipts, letters of credit, or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date the thereof;

(f)    guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrower and its Restricted Subsidiaries;

(g)    (i) endorsements for collection, deposit or negotiation and warranties of products or services, in each case incurred in the ordinary course of business and (ii) treasury and cash management obligations, including depository, credit or debit card, purchasing cards, electronic funds transfer and other cash management arrangements;

(h)    Indebtedness and guaranties of the Borrower or any of its Restricted Subsidiaries owing to (or made by) the Borrower or any of its Restricted Subsidiaries to the extent the Investment made by the person extending such credit or making such guaranty is permitted under Section 6.6(e);

(i)    [reserved];

(j)    [reserved];

(k)    [reserved];

(l)    other Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate principal amount at any time outstanding (for the Borrower and all Restricted Subsidiaries) not in excess of $2,000,000;

(m)    Indebtedness of the Borrower or any of its Restricted Subsidiaries under Swap Contracts entered into for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person or foreign exchange risk and in each case, not for speculative purposes;

68

(n)        guarantees of the Borrower or any Restricted Subsidiary in respect of Indebtedness otherwise permitted hereunder of the Borrower or any Restricted Subsidiary, so long as, in the case of a guarantee provided by a Credit Party in respect of Indebtedness of a Restricted Subsidiary that is not a Credit Party, such guarantee is in the ordinary course of business and made in accordance with the Approved Budget;

(o)        subject to the Approved Budget, Indebtedness (other than for borrowed money) in respect of bid bonds, performance bonds, surety bonds, appeal bonds, completion guaranties and similar obligations, in each case, incurred by Borrower or any of its Restricted Subsidiaries in the ordinary course of business, including guaranties or obligations with respect to letters of credit supporting such bid bonds, performance bonds, surety bonds, appeal bonds, completion guaranties and similar obligations;

(p)        Indebtedness representing deferred compensation to employees of the Borrower or any of its Restricted Subsidiaries; and

(q)        Indebtedness arising from judgments or decrees not constituting an Event of Default under Section 8.1(h).

6.2        **Liens**.  Create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind of the Borrower or any of its Restricted Subsidiaries, whether now owned or hereafter acquired, except:

(a)        (i) Liens in favor of the Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document, (ii) Liens existing on the Closing Date and set forth on Schedule 6.2(a)(ii), (iii) [reserved] and (iv) Liens on Collateral securing Indebtedness under Section 6.1(a)(v);

(b)        each of the following Liens (each, a "**Permitted Encumbrance**"), excluding any such Lien imposed by any section of ERISA:

(i)        Liens for Taxes, assessments, charges or other governmental levies if the applicable Person is in compliance with Section 5.3 with respect thereto;

(ii)        statutory or common law (or restatements of such laws in underlying contracts) Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business;

(iii)        (A) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (B) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries;

(iv)        pledges or deposits to secure the performance of bids, trade contracts, utilities, governmental contracts and leases (other than Indebtedness for borrowed money), statutory or regulatory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(v)        covenants, conditions, easements, rights-of-way, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions and other similar

69

encumbrances and minor title defects or survey matters, in each case affecting Real Estate Assets and that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(vi)    Liens (A) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (B) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(vii)    Liens (A) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institutions general terms and conditions;

(viii)    (A) any interest or title of a lessor, sub-lessor, licensor or sub-licensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business or not otherwise materially interfering with the Borrower's or any of its Restricted Subsidiaries' business taken as a whole and (B) non-exclusive licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons or the Borrower or a Restricted Subsidiary in the ordinary course of business or not otherwise materially interfering with the Borrower's or any of its Restricted Subsidiaries' business taken as a whole;

(ix)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

(x)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xi)    Liens that are contractual, statutory or common law provision relating to banker's liens, rights of set-off, rights of pledge or similar rights and remedies (A) relating to the establishment of depository relations with banks or other deposit-taking financial institutions or investment or securities accounts, (B) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xii)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement in connection with any Investment, Asset Sale, letter of intent or other transaction permitted hereunder;

(xiii)    ground leases in respect of Real Estate Assets on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

70

(xiv)   (A) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (B) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(xv)   Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(xvi)   Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xvii)   Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(xviii)   deposits of cash with the owner or lessor of premises leased and operated by the Borrower or its Restricted Subsidiaries to secure the performance of the Borrower's or such Restricted Subsidiary's obligations under the terms of the lease for such premises;

(xix)   in the case of any non-wholly owned Restricted Subsidiary, any put and call arrangements or restrictions on disposition related to its Equity Interests set forth in its organizational documents or any related joint venture or similar agreement;

(xx)   Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(xxi)   [reserved];

(xxii)   Liens deemed to exist in connection with repurchase agreements, reverse repurchase agreements, securities lending and borrowing agreements and similar transactions;

(xxiii)   Liens on amounts deposited as "security deposits" (or their equivalent) and other Liens relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business in the ordinary course of business in connection with actions or transactions not prohibited by this Agreement;

(xxiv)   Liens on cash and Cash Equivalents securing obligations under master netting agreements and other Swap Contracts permitted hereunder;

(xxv)   Liens encumbering property or assets under construction (and proceeds or products thereof) arising from progress or partial payments by a customer of the Borrower or its Restricted Subsidiaries relating to such property or assets;

(xxvi)   Liens on cash, Cash Equivalents or other property arising in connection with any defeasance, discharge or redemption of Indebtedness;

(xxvii)   Liens deemed to exist in connection with Investments in repurchase agreements under Section 6.6;

71

(c)    Liens securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.1(h);

(d)    Liens on Margin Stock owned by the Borrower and Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes; and

(e)    Liens (i) in favor of the Borrower or a Restricted Subsidiary on assets of a Restricted Subsidiary that is not a Credit Party securing permitted intercompany Indebtedness and (ii) in favor of the Borrower or any Guarantor; provided that any Lien made in favor of the Borrower or any Guarantor shall constitute Collateral.

6.3    **Payments and Prepayments of Junior Financing or Convertible Bond Indebtedness; Payments and Prepayments of Certain Indebtedness; Amendments to Certain Documents**.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Junior Financing or Convertible Bond Indebtedness (collectively, the **"Junior Restricted Financing"**), other than (i) payments made in compliance in all respects with the Approved Budget (subject to Permitted Variances), (ii) payments agreed to in writing by the Required Lenders, or (iii) pursuant to the DIP Orders.

(b)    Make any payment of principal or interest or otherwise on account of any Indebtedness under the Prepetition Credit Agreement, the 2030 Convertible Notes or the 2025 Convertible Notes other than (i) payments made in compliance in all respects with the Approved Budget (subject to Permitted Variances), (ii) payments agreed to in writing by the Required Lenders or (iii) pursuant to the DIP Orders.

(c)    Amend, modify or change any term or condition of any Junior Financing Documentation in violation of the applicable definition or criteria thereof of the applicable subordination terms or intercreditor agreement, or in any manner that is materially adverse to the interests of the Lenders.

(d)    Amend, modify, or change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any Organizational Document of any Credit Party or any Pledged Equity Interests if such amendment, modification, waiver or change is materially adverse to the interests of the Lenders.

6.4    **Restricted Payments**.    Declare, order, pay or make any Restricted Payment (other than dividends payable solely in common stock of the Person making such dividend) except that, without duplication:

(a)    each Restricted Subsidiary may make Restricted Payments to the Borrower and other Restricted Subsidiaries of the Borrower (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower, any other Restricted Subsidiary and to each other owner of Equity Interests of such Restricted Subsidiary based on its relative ownership interests of the relevant class of Equity Interests);

(b)    subject to compliance with the Approved Budget, the Borrower may make Restricted Payments:

72

(i)    to (1) purchase its Equity Interests from present or former officers, directors, employees or consultants of the Borrower or Subsidiary upon the death, disability or termination of employment or services of such individual, (2) purchase, redeem or otherwise acquire any Equity Interests from employees, officers, directors and consultants of the Borrower or any Subsidiary by net exercise, net settlement, net withholding or otherwise, pursuant to the terms of any employee stock option, incentive stock or other equity-based plan or arrangement, and (3) consummate ordinary course net settlements made pursuant to its equity incentive program as in effect on the Closing Date;

(ii)    the proceeds of which shall be used by a parent entity to pay its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business in any fiscal year plus any reasonable and customary indemnification claims made by directors or officers of the Borrower attributable to the ownership or operations of its Restricted Subsidiaries;

(iii)    the proceeds of which shall be used by the Borrower to pay franchise or similar taxes and other fees and expenses required to maintain its corporate existence;

(iv)    the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of the Borrower to the extent such salaries, bonuses and other benefits are attributable to the ownership or operations of its Restricted Subsidiaries; and

(v)    to allow any parent entity of the Borrower to pay fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering by any parent entity of the Borrower that is directly attributable to the ownership or operations of the Borrower and its Subsidiaries.

(c)    [reserved];

(d)    for any taxable period for which the Borrower or any Subsidiaries of the Borrower are members of a consolidated, combined, unitary, or similar income tax group for federal and/or applicable state or local income tax purposes or are entities treated as disregarded from any such members for U.S. federal income Tax purposes (a "**Tax Group**") of which the Borrower, any direct or indirect parent company of the Borrower or any Subsidiary is the common parent, the Borrower and the Borrower's Subsidiaries may make dividends or other distributions, directly or indirectly, to the Borrower or any Subsidiary (and the Borrower may make such dividends or other distributions to any direct or indirect parent company of the Borrower) to permit the parent of the Tax Group to pay any consolidated, combined or similar income Taxes of such Tax Group that are due and payable by the parent of such Tax Group for such taxable period, but only to the extent attributable to the Borrower and/or Subsidiaries of the Borrower; provided that (x) the amount of dividends permitted to be made under this Section 6.4(d) for any taxable period shall not exceed the lesser of (A) the amount of such Taxes that would have been due and payable by the Borrower and/or the applicable Subsidiaries of the Borrower had the Borrower and/or such Subsidiaries of the Borrower, as applicable, been a stand-alone corporate taxpayer (or a stand-alone corporate Tax Group) and (B) the actual Tax liability of the Borrower for such taxable period, (y) to the extent that such Taxes are attributable to Subsidiaries of the Borrower that are not Credit Parties, such Taxes must be funded by such Subsidiaries and (z) if the Borrower receives a refund from a Governmental Authority in respect of any amounts paid pursuant to this Section 6.4(d), any subsequent distributions pursuant to this Section 6.4(d) shall be reduced by the amount of such refund;

73

(e)    [reserved];

(f)    [reserved]; and

(g)    subject to the prior written consent of the Required Lenders, the Borrower may make Restricted Payments consisting of the cashless exercise of options and warrants of the Equity Interests of the Borrower or any of its Subsidiaries.

6.5    **Burdensome Agreements**.    Create or otherwise cause or suffer to exist or become effective any Contractual Obligation that encumbers or restricts the ability of the Borrower or any of its Restricted Subsidiaries to:

(a)    pay dividends or make any other distributions on any of such Restricted Subsidiary's Equity Interests owned by the Borrower or any other Restricted Subsidiary of the Borrower; or

(b)    create, incur, assume or suffer to exist any Lien upon any of its property or revenues;

provided, notwithstanding anything herein to the contrary, this Section 6.5 shall not apply to Contractual Obligations that:

(i)    are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary (and any amendments or modifications thereof that do not materially expand the scope of any such prohibition restriction or condition);

(ii)    represent Indebtedness of a Restricted Subsidiary that is not a Credit Party which is permitted by Section 6.1 and which does not apply to any Credit Party;

(iii)    are customary restrictions that arise in connection with (x) any Permitted Lien and relate to the property subject to such Lien or (y) arise in connection with any disposition permitted by Section 6.8 or 6.9 and relate solely to the assets or Person subject to such disposition;

(iv)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 6.6;

(v)    are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 6.1 but solely to the extent any negative pledge relates to the property financed by such Indebtedness and the proceeds, accessions and products thereof;

(vi)    are customary restrictions on leases, subleases, licenses or contemplated by asset sale, merger, purchase or other similar agreements not prohibited hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(vii)    are customary provisions restricting subletting, transfer or assignment of any lease governing a leasehold interest of the Borrower or any of its Restricted Subsidiaries;

(viii)    are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business;

74

(ix)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(x)    arise in connection with cash or other deposits permitted under Sections 6.2 and 6.6 and limited to such cash or deposit;

(xi)    are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xii)    are restrictions regarding licensing or sublicensing by the Borrower and its Restricted Subsidiaries of intellectual property in the ordinary course of business;

(xiii)    are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder;

(xiv)    are customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person;

(xv)    are in existence on the Closing Date and set forth on Schedule 6.5 or any amendment thereto;

(xvi)    are restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the disposition of all or substantially all of the Equity Interests or assets of such Restricted Subsidiary;

(xvii)    are customary restrictions or conditions imposed by any agreement relating to Liens permitted by this Agreement but solely to the extent that such restrictions or conditions apply only to the property or assets subject to such permitted Lien;

(xviii)    are customary restrictions pursuant to applicable Law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(xix)    are set forth in any agreement governing Indebtedness not prohibited by Section 6.1; provided that such restrictions and conditions are customary for such Indebtedness.

6.6    **Investments**.  Make or own any Investment in any Person except Investments in or constituting:

(a)    cash and Cash Equivalents;

(b)    Investments made in compliance with the Approved Budget;

(c)    Investments existing as of the Closing Date of Borrower or a Subsidiary in another Subsidiary;

(d)    [reserved];

(e)    (i) intercompany Investments by the Borrower or any Restricted Subsidiary in any Credit Party; provided, that all such intercompany Investments to the extent such Investment is a loan or advance owed to a Credit Party, are evidenced by a subordinated intercompany note, (ii) intercompany

75

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

Investments by any Restricted Subsidiary that is not a Credit Party to any other Restricted Subsidiary that is not a Credit Party, (iii) intercompany Investments by any Credit Party in any Restricted Subsidiary in the ordinary course of business made in compliance with the Approved Budget, (iv) [reserved], (v) investments in connection with ordinary course of business cash management, cash pooling and other similar arrangements, or and (vi) investments held by the Borrower or any Restricted Subsidiary on the Closing Date and set forth on Schedule 6.6(e);

(f)    accounts receivable arising and trade credit granted in the ordinary course of business;

(g)    (i) Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors, (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of the Borrower and its Restricted Subsidiaries and (iii) Securities of trade creditors or customers that are received in settlement of bona fide disputes;

(h)    Investments made in the ordinary course of business consisting of negotiable instruments held for collection in the ordinary course of business and lease, utility and other similar deposits in the ordinary course of business and deposits with suppliers in the ordinary course of business and customary trade arrangements with customers consistent with past practice;

(i)    to the extent constituting Investments, deposit and securities accounts maintained in the ordinary course of business and in compliance with the provisions of the Credit Documents;

(j)    Investments consisting of Indebtedness, Liens, fundamental changes, Asset Sales and Restricted Payments permitted under Sections 6.1, 6.2, 6.7, 6.8 and 6.4, respectively (other than by reference to this Section 6.6(j)); provided that no Investment can be made solely pursuant to this Section 6.6(j);

(k)    Investments in Swap Contracts permitted under Section 6.1;

(l)    Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(m)    advances of payroll payments to employees in the ordinary course of business and in compliance with the Approved Budget;

(n)    guarantees permitted by Section 6.1 and guarantees of obligations that do not constitute Indebtedness; and

(o)    the non-exclusive licensing, cross-licensing, sublicensing or contribution of Intellectual Property rights pursuant to joint research development or marketing arrangements with Persons other than the Borrower and its Restricted Subsidiaries which does not interfere in any material respect with the business of the Borrower or any of its Restricted Subsidiaries.

Notwithstanding anything in this Section 6.6 to the contrary, (x) in no event will any Credit Party (directly or indirectly through one or a series of transactions) sell, transfer, assign or grant an exclusive license with respect to or contribute any material Intellectual Property to any non-Credit Party and (y) no Investment made after the Closing Date by the Credit Parties in any Restricted Subsidiary that is not a Credit Party shall be made except in accordance with the Approved Budget.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

6.7    **Fundamental Changes**.  Other than as permitted under the DIP Order or with the consent of the Required Lenders, merge, dissolve, liquidate, consolidate with or into another Person, or dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

Notwithstanding anything in this Section 6.7 to the contrary, in no event will any Credit Party, (directly or indirectly through one or a series of transactions) sell, transfer, assign or grant an exclusive license with respect to or contribute any material Intellectual Property to any non-Credit Party.

6.8    **Asset Sales**.  Sell, lease or sub-lease (as lessor or sublessor), sell and leaseback, assign, convey, license (as licensor or sublicensor), transfer or otherwise dispose to (any of the foregoing, an "**Asset Sale**"), any Person, in one transaction or a series of transactions, of all or any part of the Borrower's or any of its Restricted Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of the Restricted Subsidiaries of the Borrower, except:

(a)    the liquidation or other disposition of cash and Cash Equivalents;

(b)    the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of inventory or other assets, in each case, in the ordinary course of business;

(c)    the sale or discount, in each case without recourse and in the ordinary course of business, by the Borrower or its Restricted Subsidiaries of accounts receivable or notes receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof or in connection with the bankruptcy or reorganization of the applicable account debtors and dispositions of any securities received in any such bankruptcy or reorganization and the any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims in the ordinary course of business;

(d)    the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of used, worn out, obsolete or surplus property by the Borrower or its Restricted Subsidiaries, including the abandonment or other disposition of intellectual property, in each case, which, in the reasonable judgment of the Borrower, is no longer economically practicable to maintain or necessary for or useful in the conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(e)    the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of equipment or Real Estate Assets to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such disposition are reasonably promptly applied to the purchase price of such replacement property, or (iii) such transaction is part of a sale lease-back of such property permitted by Section 6.9;

(f)    any conveyance, transfer, exchange or disposition of assets which would constitute a Restricted Payment permitted under Section 6.4 or an Investment permitted under Section 6.6 (other than, in each case, by reference to this Section 6.8(f));

(g)    the sale, lease, assignment, conveyance, transfer, license, exchange or disposition of assets resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset, or consisting of or subsequent to a total loss or constructive total loss of property;

77

(h)      Asset Sales constituting (i) Investments made in accordance with Section 6.6, (ii) sale and leaseback transactions permitted under Section 6.9 or (iii) Liens permitted under Section 6.1 (other than, in each case, by reference to this Section 6.8(h));

(i)      the Borrower and its Restricted Subsidiaries may lease or sublease (as lessee or sublessee) or license or sublicense (as licensee or sublicensee) real or personal property so long as any such lease, license, sublease or sublicense does not create a Capital Lease except to the extent permitted by Section 6.1;

(j)      assignments, licenses, cross-licenses, or sublicenses with respect to Intellectual Property granted to third parties in the ordinary course of business which, in the aggregate, do not materially detract from the value of the Collateral taken as a whole or materially interfere with the business of the Credit Parties and their Restricted Subsidiaries;

(k)      Asset Sales to, between or among the Borrower and any Guarantor;

(l)      Asset Sales (x) between or among any Restricted Subsidiary that is not a Guarantor and any other Restricted Subsidiary that is not a Guarantor or joint venture, (y) by a Restricted Subsidiary that is not a Guarantor to Borrower or any other Guarantor or (z) by any Credit Party to a Restricted Subsidiary and/or joint venture that is not a Credit Party to the extent constituting an Investment permitted under Section 6.6(e);

(m)      the unwinding or settling of any Swap Contracts (including, for the avoidance of doubt, the termination of those certain base capped call transactions, dated as of April 20, 2020, and those certain additional capped call transactions, dated as of April 29, 2020, each between the Borrower and each of Citibank, N.A., Morgan Stanley & Co. LLC and Credit Suisse Capital LLC, in each case pursuant to their respective terms);

(n)      Asset Sales made in compliance with the Approved Budget;

(o)      (i) the issuance or sale of shares of any Restricted Subsidiary's Equity Interests to (1) the Borrower or any Guarantor, or (2) if such Restricted Subsidiary is not a Credit Party, to another Restricted Subsidiary, and (ii) compensatory issuances or grants of Equity Interests of the Borrower approved by the Borrower's board of directors, any committee thereof or any designee of either to employees, officer, directors or consultants made pursuant to equity-based compensation plans or arrangements that have been approved by the shareholders of the Borrower;

(p)      dispositions of leases entered into in the ordinary course of business, to the extent that they do not materially interfere with the business of the Borrower or any Restricted Subsidiary, taken as a whole; and

(q)      to the extent constituting Asset Sales, transactions contemplated by Sections 6.2, 6.4, 6.6 and 6.7.

Notwithstanding anything in this Section 6.8 to the contrary, in no event will any Credit Party (directly or indirectly through one or a series of transactions) sell, transfer, assign or grant an exclusive license with respect to or contribute any material Intellectual Property to any non-Credit Party.

6.9      **Sales and Lease-Backs**.  Become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Person (a) has sold or transferred or is to sell or to transfer to any other

78

Person (other than the Borrower or any Guarantor), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Person to any Person (other than the Borrower or any Guarantor) in connection with such lease, in each case other than as permitted by Section 6.1.

6.10    **Transactions with Affiliates**.  Enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of the Borrower (other than between or among the Borrower and its Restricted Subsidiaries), on terms that are materially less favorable to the Borrower or any of its Restricted Subsidiaries (taken as a whole), as the case may be, than those that might be obtained at the time from a Person who is not such an Affiliate; provided, the foregoing restriction shall not apply to:

(a)    any transaction between or among the Borrower and any of its Restricted Subsidiaries not otherwise restricted hereunder; provided that any transaction between or among any Credit Party and any non-Credit Party in reliance of this clause (a) shall be made in accordance with the Approved Budget;

(b)    any transaction between or among non-Credit Party Restricted Subsidiaries not otherwise restricted hereunder;

(c)    subject to the Approved Budget, reasonable and customary indemnities (including the provision of directors and officers insurance) provided to, and reasonable and customary fees and out-of-pocket expense reimbursement paid to, members of the Board of Directors, officers and other employees of the Borrower and its Restricted Subsidiaries;

(d)    subject to the Approved Budget, reasonable and customary employment, compensation (including bonus) and severance arrangements for members of the Board of Directors, officers and other employees of the Borrower and its Restricted Subsidiaries and other employee benefit arrangements paid to or provided for the benefit of, directors, officers or employees thereof;

(e)    Restricted Payments to the extent permitted under Section 6.4, Investments to the extent permitted under Section 6.6 and other transactions permitted by Section 6;

(f)    any transaction existing on the Closing Date and set forth on Schedule 6.10(f) or any amendment thereto to the extent such amendment is not adverse to the Lenders;

(g)    transactions approved by a majority of the disinterested directors of the Borrower's Board of Directors;

(h)    employment arrangements entered into in the ordinary course of business between the Borrower or any Restricted Subsidiary and any employee thereof;

(i)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services or providers of employees or other labor, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower or the Restricted Subsidiaries, in the reasonable determination of the members of the Board of Directors of the Borrower or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated Person; and

(j)    [reserved].

79

6.11 **Fiscal Year**. Change its Fiscal Year-end from December 31; provided, that Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Required Lenders will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

6.12 **Lines of Business**. Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the Closing Date or that are similar, corollary, reasonably related, incidental, ancillary or complementary thereto; provided, that during the pendency of the Chapter 11 Case, no Credit Party shall enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the Closing Date or with the prior written consent of the Required Lenders.

6.13 **[Reserved]**.

6.14 **[Reserved]**.

6.15 **Budget Variance Covenant**. Pay any expenses or other disbursements other than in accordance with the Approved Budget, subject to the Permitted Variance. Every other Thursday, commencing on August 8, 2024, the Permitted Variances (as defined below) shall be tested on a bi-weekly basis for the prior cumulative two-weekly period for Total Disbursements (the "**Bi-Weekly Disbursement Period**") against the Approved Budget, and Total Disbursements shall not be more than 120% of the Total Disbursements in the Approved Budget for such Bi-Weekly Disbursement Period (the "**Permitted Variances**").

6.16 **Prohibited Conduct**. Without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders), no Credit Party shall, nor shall it permit any of its Subsidiaries to, do any of the following:

(a) object to or contest the validity or enforceability of the DIP Order, any Liens granted to the Collateral Agent and Lenders therein, or any terms of the Credit Documents or cooperate with any party with respect to such an objection or contest;

(b) seek to modify any of the rights granted under the DIP Order to any of the Administrative Agent, the Collateral Agent or the Lenders in any manner;

(c) [reserved]; or

(d) use any portion of proceeds of the Loans, directly or indirectly, (i) to object to, seek subordination of, prevent, hinder, delay or contest the validity, extent, perfection, priority or enforceability of any of the Secured Parties' rights, remedies, claims, liens, security interests, defenses, or realization upon any of the Collateral or enforcement or assertion of any of their respective rights thereto; (ii) for any purpose that is prohibited under the DIP Order, the Credit Documents or the Bankruptcy Code; (iii) to initiate, assert, prosecute or finance in any way any claim, defense, demand, cause of action, adversary action, suit, arbitration, proceeding, application, motion, or other litigation of any type adverse to the interests of any or all of the Secured Parties, any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, partners, managers, employees, agents, representatives, subsidiaries, security-holders or equity-holders, or their respective rights and remedies under Credit Documents or the DIP Order, or under or relating to any other loan or extensions of credit or other agreement provided to any of the Borrower or its predecessors or affiliates, in each case, including, without

80

limitation, any action, suit or other proceeding for breach of contract, tort, recharacterization, any actions under section 105 or chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or any other applicable law (state, federal, or foreign) or otherwise; (iv) except as permitted by the Approved Budget (including Permitted Variances), to make any payment in settlement of any claim, action, or proceeding in excess of $200,000 in the aggregate without the prior written consent of the Required Lenders; (v) to incur Indebtedness, except to the extent permitted hereunder; (vi) to seek to amend or modify any of the rights granted to the Secured Parties under the DIP Order or the Credit Documents; (vii) to seek to subordinate, recharacterize, disallow, or avoid the Obligations; (viii) to object to or challenge in any way the claims, liens, or interests held by or on behalf of the Secured Parties; (ix) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of, or seek equitable relief from, any of the Obligations, the Liens of the Collateral Agent or any other rights or interests of the Secured Parties; or (x) to file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Credit Parties without the prior written consent of the Required Lenders.

6.17    **Employee Incentive/Retention Plans**.  Modify or enter into any employee incentive or retention plans (or any similar types of retention or incentive programs) without the prior written consent of the Required Lenders.

## SECTION 7    GUARANTY

7.1    **Guaranty of the Obligations**.  Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent for the ratable benefit of the Secured Parties the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under section 362(a) of the Bankruptcy Code following an Event of Default, collectively, the "**Guaranteed Obligations**").

7.2    **Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (x) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (y) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors <u>times</u> (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state Law; <u>provided</u>, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in

81

respect of this Guaranty (including in respect of this Section 7.2), minus (ii) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

7.3    **Payment by Guarantors**.  Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due following an Event of Default but for the operation of the automatic stay in connection with the Chapter 11 Cases or otherwise under section 362(a) of the Bankruptcy Code), Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a proceeding under any Debtor Relief Law, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in such proceeding) and all other Guaranteed Obligations then owed to Secured Parties as aforesaid.

7.4    **Liability of Guarantors Absolute**.  Except as otherwise provided in any order of the Bankruptcy Court, each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations (other than Remaining Obligations). In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability;

(b)    this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(c)    the Administrative Agent may enforce this Guaranty upon the occurrence and during the continuance of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Secured Party with respect to the existence of such Event of Default;

(d)    the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor to enforce this Guaranty whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(e)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid when due. Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and

82

such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(f)    any Secured Party, upon such terms as it deems appropriate, without notice or demand (except to the extent notice is required to be provided hereunder, in any other Credit Document or under applicable Law) and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its reasonable discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (but so long as such sale is in accordance with applicable Law), and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(g)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than Remaining Obligations) or unless the obligations of the Guarantors are reduced or terminated by the Agent and applicable Secured Parties in accordance with the terms of this Agreement), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Secured Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (iv) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; and (v) any defenses, set-offs or counterclaims which the Borrower may allege or assert against any Secured Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations,

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

accord and satisfaction and usury; and (vi) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5   **Waivers by Guarantors**.  Each Guarantor hereby waives, to the extent permitted by applicable Law, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations (other than Remaining Obligations); (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of Law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof (other than the default of payment), (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (f) any defenses or benefits that may be derived from or afforded by Law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof (other than the defense of payment).

7.6   **Guarantors' Rights of Subrogation, Contribution, Etc**.  Until the Guaranteed Obligations (other than Remaining Obligations) shall have been paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Secured Party. In addition, until the Guaranteed Obligations (other than Remaining Obligations) shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than Remaining Obligations) shall not have been finally and paid in full, such amount shall be held in trust for the Administrative Agent on behalf of Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of Secured Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof and of the other Credit Documents.

7.7    **Subordination of Other Obligations**.  Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default under Section 8.1(a), 8.1(f) or 8.1(g) has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of Secured Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.8    **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.9    **Authority of Guarantors or the Borrower**.  It is not necessary for any Secured Party to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, members of the Board of Directors or any agents acting or purporting to act on behalf of any of them.

7.10    **Financial Condition of the Borrower**.  Any Credit Extension may be made to the Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation, as the case may be. No Secured Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower. Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Secured Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Secured Party.

7.11    **Bankruptcy, Etc.**

(a)    The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by the Chapter 11 Cases or any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation

of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Secured Parties that the Guaranteed Obligations pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

7.12    **Discharge of Guaranty Upon Sale of Guarantor**.  If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof to a Person that is not the Borrower or a Subsidiary of the Borrower, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Secured Party or any other Person effective as of the time of such sale or disposition. In addition, a Guarantor shall automatically be discharged and released of its Guaranty (i) upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Subsidiary or (ii) upon the request of the Borrower, upon any Guarantor becoming an Excluded Subsidiary (other than as a result of becoming a non-wholly-owned Subsidiary).

7.13    **Maximum Liability**.  It is the desire and intent of the Guarantors and the Secured Parties that this Guaranty shall be enforced against the Guarantor to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. The provisions of this Guaranty are severable, and in any action or proceeding in the Chapter 11 Cases or otherwise under the Bankruptcy Code or involving any state corporate law, or any state, Federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Secured Parties, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "**Maximum Liability**"). Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Secured Parties hereunder; provided, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

## SECTION 8    EVENTS OF DEFAULT

8.1    **Events of Default**.  The occurrence and continuance of any one or more of the following conditions or events shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due. Failure by any Credit Party to pay (i) when due any principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary

prepayment, by mandatory prepayment or otherwise or (ii) any interest on any Loan or any fee, expenses or any other amount due hereunder, under the DIP Order or under any other Credit Document within two Business Days after the date due; or

(b)     <u>Default in Other Agreements</u>. (i) Failure of the Borrower or any of its Restricted Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Material Indebtedness (other than Indebtedness under Swap Contracts and the Loans) (such Material Indebtedness, the "**Specified Indebtedness**") beyond the grace period, if any, provided therefor, in each case, to the extent the holders thereof are not stayed from exercising remedies as a result of the Chapter 11 Cases; (ii) breach or default by the Borrower or any of its Restricted Subsidiaries with respect to any other term of (A) one or more items of Specified Indebtedness or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Specified Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Specified Indebtedness (or a trustee on behalf of such holder or holders), to cause, such Specified Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be (it being understood, for the avoidance of doubt, that the satisfaction of any customary "conversion conditions" set forth in the instruments governing any Convertible Bond Indebtedness will not be deemed to constitute a default under this clause (b) on account of such satisfaction giving any holder of such Convertible Bond Indebtedness the right to convert the same); or (iii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Borrower or any Restricted Subsidiary is the Defaulting Party (as defined in such Swap Contract) and the Swap Termination Value owed by the Borrower or such Restricted Subsidiary as a result thereof is greater than $10,000,000, or (B) any Termination Event (as so defined, but which shall not under any circumstances include any "Additional Termination Event" (however described)) under such Swap Contract as to which the Borrower or any Restricted Subsidiary is an Affected Party (as so defined) and (x) the Borrower or such Restricted Subsidiary is required to make a payment in connection with such Termination Event, (y) the Swap Termination Value owed by the Borrower or such Restricted Subsidiary as a result thereof is greater than $10,000,000, and (z) the Borrower or such Restricted Subsidiary shall fail to make such payment within the later to occur of five Business Days after the due date thereof and the expiration of any grace periods in such Swap Contract applicable to such payment obligation; or

(c)     <u>Breach of Certain Covenants</u>. Failure of the Borrower or any Restricted Subsidiary of the Borrower to perform or comply with any term or condition contained in any of (i) Section 5.8, which failure continues for two consecutive Business Days, or (ii) Sections 5.1(a), 5.1(b), 5.1(c), 5.1(d), 5.1(g)(i), 5.1(j), 5.1(k), 5.1(l), 5.1(n) or 5.1(o), 5.2 (as it relates to the existence of the Borrower in its jurisdiction of organization), 5.9, 5.12, 5.13, 5.17, 5.19 or 6; or

(d)     <u>Breach of Representations, Etc</u>. Any representation, warranty or certification made or deemed made by any Credit Party in any Credit Document or in any statement, instrument, report or certificate at any time given by such Credit Party in writing pursuant hereto or thereto or in connection herewith or therewith shall be incorrect or misleading in any material respect (or, in the case of any representation or warranty qualified by materiality, in all respects) as of the date made or deemed made; or

(e)     <u>Other Defaults Under Credit Documents</u>. The Borrower or any Restricted Subsidiary of the Borrower shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other subsection of this Section 8.1, and such default shall not have been remedied or waived within five consecutive Business Days after receipt by the Borrower of notice from the Administrative Agent or any Lender of such default; or

87

(f)    Involuntary Bankruptcy; Appointment of Receiver, Etc. Other than the Chapter 11 Cases, (i) a court of competent jurisdiction shall enter a decree or order for relief in respect of the Borrower or any of its Restricted Subsidiaries in an involuntary case under any Debtor Relief Law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state Law; or (ii) an involuntary case shall be commenced against the Borrower or any of its Restricted Subsidiaries under any Debtor Relief Law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over the Borrower or any of its Restricted Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of the Borrower or any of its Restricted Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of the Borrower or any of its Restricted Subsidiaries, and any such event described in this clause (i) and (ii) shall continue for sixty (60) days without having been dismissed, vacated, bonded or discharged; or

(g)    Voluntary Bankruptcy; Appointment of Receiver, Etc. Other than the Chapter 11 Cases, (i) the Borrower or any of its Restricted Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under any Debtor Relief Law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such Law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or the Borrower or any of its Restricted Subsidiaries shall make any assignment for the benefit of creditors; or (ii) the Borrower or any of its Restricted Subsidiaries hall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or (iii) the Board of Directors of the Borrower or any of its Restricted Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); *provided* that this clause (g) shall not apply to the extent that, with respect to the case of any Credit Party, within five Business Days after the commencement thereof, such case becomes jointly administered with the Chapter 11 Cases with the reasonable consent of the Required Lenders; or

(h)    Judgments and Attachments. Other than as may be stayed as a result of the Chapter 11 Cases or being determined in the Chapter 11 Cases, any final, non-appealable money judgment, writ or warrant of attachment or similar process involving in any individual or aggregate proceeding at any time an amount in excess of $10,000,000 (in each case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company does not deny coverage or a third party indemnity and taking into account any deductibles) shall be entered or filed against the Borrower or any of its Restricted Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); or

(i)    Employee Benefit Plans. (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or could reasonably be expected to result in a Material Adverse Effect; or (ii) there exists any fact or circumstance that results in the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) or 4068 of ERISA on the assets of the Borrower or its Restricted Subsidiaries that primes the Liens that secure the Obligations; or

(j)    Change of Control. A Change of Control shall occur; or

(k)    Guaranties, Collateral Documents and other Credit Documents. At any time after the execution and delivery thereof, except as permitted under the DIP Order, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations (other than Remaining Obligations), shall cease to be in

88

full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, or (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations (other than Remaining Obligations) in accordance with the terms hereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in a material portion of the Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document or the Lien securing the Obligations shall cease to constitute first priority security interests (subject to Permitted Liens, including, without limitation, Liens securing Indebtedness incurred under the Prepetition Credit Agreement), or (iii) the Borrower or any of its Restricted Subsidiaries shall contest in writing the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, or (iv) the Borrower or any of its Restricted Subsidiaries shall contest in writing the validity or perfection of any Lien in a material portion of Collateral purported to be covered by the Collateral Documents; or

(l)      Bankruptcy Matters. Any of the following shall have occurred in the Chapter 11 Cases:

(i)      the DIP Order (A) at any time ceases to be in full force and effect or (B) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(ii)      the entry of an order of the Bankruptcy Court in any of the Chapter 11 Cases finding that the Debtors have breached or failed to satisfy any requirement under the DIP Order or the Credit Documents;

(iii)      except with the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent), the entry of an order in any of Chapter 11 Cases (A) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Credit Documents, or (B) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Credit Documents or under the DIP Order to the Secured Parties;

(iv)      the dismissal of any of the Chapter 11 Cases or conversion of any Chapter 11 Case to a Chapter 7 case or any Debtor shall have filed (or failed to object to) a motion or other pleading seeking such dismissal without the prior written consent of the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors);

(v)      the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Chapter 11 Cases;

(vi)      the entry of an order in any of the Chapter 11 Cases authorizing the Debtors (A) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full, in cash, of all Obligations under the Credit Documents or (B) to grant any Lien, other than Liens expressly permitted under this Agreement and the DIP Order, upon or affecting any Collateral;

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(vii)    (A) the consensual use of prepetition cash collateral by any of the Debtors is terminated or modified or (B) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the DIP Order, without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(viii)    subject to the DIP Order and the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any claim against any Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is pari passu with or senior to the claims of the Secured Parties or any 507(b) claim, without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(ix)    except as provided in the DIP Order or any other order of the Bankruptcy Court, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(x)    the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated for any reason;

(xi)    the payment of any prepetition debt or other prepetition claim other than (A) as provided in any of the orders (in form and substance acceptable to the Required Lenders) approving the "first day" motions filed in the Chapter 11 Cases, (B) to the extent such payment is expressly permitted pursuant to this Agreement or otherwise expressly provided in the Approved Budget (including any Permitted Variances), (C) pursuant to an order (in form and substance acceptable to the Required Lenders) of the Bankruptcy Court, or (D) with the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent);

(xii)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Credit Parties having an aggregate fair market value in excess of $300,000 and such order materially and adversely affects the Credit Parties' ability to operate their business in the ordinary course or to consummate the Restructuring (as defined in the Restructuring Support Agreement);

(xiii)    [reserved];

(xiv)    (x) any Debtor shall (A) challenge or contest the validity or enforceability of the DIP Order or any Credit Document or deny that it has further liability thereunder, (B) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Obligations, Liens securing the Obligations, Credit Documents, Adequate Protection Liens (as defined in the DIP Order) or Adequate Protection Claims (as defined in the DIP Order), (C) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate, disgorge, disallow, impair or offset all or any portion of the Obligations, Liens securing the Obligations, Credit Documents, Adequate Protection Liens or Adequate Protection Claims, or (D) join or file

90

any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (A) or (B) above; or (y) the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges or other relief contemplated in clauses (A) or (B) above);

(xv)    the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations owing under the DIP Order, this Agreement, and the other Credit Documents;

(xvi)    the entry of any order in any of the Chapter 11 Cases charging any of the Collateral with respect to the Secured Parties, whether under section 506(c) of the Bankruptcy Code or otherwise;

(xvii)    any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of all or substantially all of the Collateral pursuant to section 363 of the Bankruptcy Code or otherwise (other than in the ordinary course of business that is expressly permitted by the Approved Budget and this Agreement), unless on terms acceptable to the Required Lenders;

(xviii)    any Debtor shall seek to withdraw or modify the Approved Chapter 11 Plan or the Disclosure Statement in respect thereof or file any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement, the Restructuring Support Agreement or the Approved Chapter 11 Plan and entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(xix)    (x) the entry of an order approving a disclosure statement with respect to a Plan of Reorganization or (b) the entry of an order confirming a Plan of Reorganization, in each case, unless such Plan of Reorganization is acceptable to the Agents and the Required Lenders;

(xx)    [reserved];

(xxi)    termination of the Restructuring Support Agreement;

(xxii)    any Debtor uses or seeks to use any proceeds of any Credit Extension in any manner inconsistent with the terms of the DIP Order, the Credit Documents or the Approved Budget;

(xxiii)    [reserved];

(xxiv)    any of the Interim NOL Order, the Final NOL Order, the Disclosure Statement Order, the Combined Order, the Equity Rights Offering Backstop Order (as defined in the Restructuring Support Agreement) or the Lease Rejection Order, after the date of entry thereof, (A) at any time ceases to be in full force and effect or (B) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Administrative Agent and the Required Lenders (which, for the avoidance of doubt, can be communicated via e-mail, including e-mail of the Lender Advisors and counsel to the Administrative Agent) or if any of the Debtors seek to withdraw, waive, amend or modify any of the foregoing orders in any manner not acceptable to the Required Lenders;

91

(xxv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), of any ruling or order denying any requisite approval of, delaying, impeding or enjoining the consummation of the transactions contemplated under the Restructuring Support Agreement in accordance with the terms thereof;

(xxvi)    any of the Debtors shall use, or seek to use, Collateral, including Cash Collateral in any manner inconsistent with the terms of the DIP Order; or

(xxvii)    if any Debtor or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Debtors and their Subsidiaries.

8.2    **Acceleration**.  Subject to the DIP Order and the terms thereof, (a) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (b) upon the occurrence of any other Event of Default, at the direction of the Required Lenders:

(i)    upon notice to the Borrower by the Administrative Agent, the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other Obligations under this Agreement and the other Credit Documents, shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Credit Party; and

(ii)    the Collateral Agent shall exercise any and all of its other rights and remedies under applicable Law (including the UCC) or at equity, hereunder and under the other Credit Documents.

8.3    **Application of Payments and Proceeds**.  After the acceleration of the principal amount of any of the Loans in accordance with Section 8.2, all payments and proceeds in respect of any of the Obligations received by any Agent or any Lender under any Credit Document, including any proceeds of any sale of, or other realization upon, all or any part of the Collateral, shall be applied as follows:

(i)    *first*, to all fees, costs, indemnities, liabilities, obligations and expenses (including the fees and expenses of counsel) incurred by or owing to the Administrative Agent or the Collateral Agent with respect to this Agreement, the other Credit Documents or the Collateral;

(ii)    *second*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any Lender with respect to this Agreement, the other Credit Documents or the Collateral;

(iii)    *third*, to the principal amount of the Obligations constituting unpaid principal of the Loans, ratably among the applicable Secured Parties in proportion to the respective amounts described in this clause third held by them;

(iv)    *fourth*, to any other Indebtedness or obligations of any Credit Party owing to the Administrative Agent, the Collateral Agent or any Lender under the Credit Documents; and

(v)    *fifth*, to the Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct to the Borrower.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (b) each of the Persons entitled to

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category. Each Credit Party irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Administrative Agent or the Collateral Agent from or on behalf of any Credit Party, and, as between each Credit Party on the one hand and the Administrative Agent, the Collateral Agent and the other Secured Parties on the other, the Administrative Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as the Administrative Agent may deem advisable notwithstanding any previous application by the Administrative Agent.

## SECTION 9    AGENTS

9.1    **Appointment and Authority**.  Each of the Lenders hereby irrevocably appoints WSFS to act on its behalf as the Administrative Agent hereunder and under the other Credit Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each of the Lenders hereby irrevocably appoints WSFS to act on its behalf as the Collateral Agent hereunder and under the other Credit Documents and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Except as expressly set forth in Sections 9.6(a), 9.6(b), 9.14(c) and 9.14(e), the provisions of this Section are solely for the benefit of the Agents, the Lenders, and neither the Borrower or any of its Subsidiaries shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent", "administrative agent" and "collateral agent" herein or in any other Credit Document (or any other similar term) with reference to an Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

9.2    **Rights as a Lender**.  The Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity, if applicable. Such Person and its Affiliates may accept deposits from, lend money to, own Securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any of its Subsidiaries or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

9.3    **Exculpatory Provisions**.

(a)    No Agent shall have any duties or obligations except those expressly set forth herein and in the other Credit Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); provided, no Agent shall be required to take any

action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

(iii)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(b)    No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.5 and Sections 8.1, 8.2 and 8.3), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. As to any matters not expressly provided for by this Agreement or any other Credit Document, each Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with written instructions given by the Required Lenders (or, where expressly required by the terms of any Credit Document, a greater proportion of the Lenders), and such instructions, and any action taken or failure to act pursuant thereto, shall be binding on all Lenders. No Agent shall have any liability for any failure or delay in taking any actions contemplated herein as a result of the failure or delay on the part of the Required Lenders to provide such instructions. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice conspicuously labeled as a "notice of default" and describing such Default is given to such Agent in writing by the Borrower or a Lender.

(c)    No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document, (v) the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Credit Document or (vi) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(d)    For the avoidance of doubt, each Agent's rights, protections, indemnities and immunities provided herein shall apply to each Agent for any actions taken or omitted to be taken under this Agreement or any other Credit Documents and any other related agreements in any of their respective capacities and Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the other Credit Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such other Credit Document.

(e)    No Agent shall have any liability for any interest rate published on any publicly available source (including but not limited to the Federal Reserve Bank of New York's website), by any publication or other source for determining any interest rates applicable to any Loan, including, without limitation, any inaccuracy or error relating to the publication of any such interest rates. No Agent shall be liable for any delay or failure in performing its duties under this Agreement directly or indirectly as a result of the unavailability of Base Rate, the Term SOFR Reference Rate, Term SOFR, or any benchmark or the absence of a designated Benchmark Replacement, including as a result of any delay or error on the part of any other party, or whether as a result of any other party providing or failing to provide any Agent with any

94

information or direction pursuant to the terms of this Agreement or any other Credit Document. No Agent shall be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement as a result of the unavailability of Base Rate, the Term SOFR Reference Rate, Term SOFR, or other applicable benchmark, and absence of a designated Benchmark Replacement, including as a result of any inability, delay, error or inaccuracy on the part of any other transaction party, including without limitation the Required Lenders and Borrowers, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. No Agent shall have any liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, or for any rates compiled by the ICE Benchmark Administration or any successor thereto, or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's website, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment.

(f)     No Agent shall be required to risk or expand its own funds in performing its obligations hereunder or under any other Credit Document or to take any action which in its reasonable judgment may cause it to incur any expense or financial or other liability for which it is not indemnified to its satisfaction.

(g)     No Agent shall be responsible or liable for delays or failures in performance resulting from acts beyond its control (such acts shall include, but are not limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters, the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility) nor shall Agent have any liability for losses arising from (i) any cause beyond its control, (ii) any delay, error, omission or default of any mail, telegraph, cable or wireless agency or operator or (iii) the acts or edicts of any government or governmental agency or other group or entity exercise governmental powers.

(h)     No Agent shall be liable for any indirect, special, punitive or consequential damages (including but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(i)     No Agent shall have any liability for any failure, inability or unwillingness on the part of any Lender or Credit Party to provide accurate and complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on such Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

9.4     **Reliance by Agents**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received written notice to the contrary from such Lender prior to the making of such

Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5    **Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more trustees, agents, co-agents, sub-agents, supplemental agents, employees, attorneys-in-fact or any other Person (including any Secured Party) appointed by such Agent, including any Affiliate of any Agent. Each Agent and any such trustee, agent, co-agent, sub-agent, supplemental agent or other Person may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article IX shall apply to any such sub agent or supplemental agent and to the Related Parties of each Agent and any such sub-agent or supplemental agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents or supplemental agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents or supplemental agents. In connection with the designation of any such sub-agent or supplemental agent, this Agreement and the other Credit Documents may be amended solely to implement mechanical provisions customarily requested by such sub-agent or supplemental agent so long as such amendment is reasonably satisfactory to the Borrower and the Administrative Agent.

9.6    **Resignation of the Administrative Agent**.

(a)    Each Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor with the consent of the Borrower; provided, (x) no such consent of the Borrower shall be required while an Event of Default exists and (y) such consent shall not be unreasonably withheld, delayed or conditioned, and shall be deemed to have been given unless the Borrower shall have objected to such appointment by written notice to the Required Lenders and such Agent within ten Business Days after having received notice thereof. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    Solely to the extent that the Administrative Agent is a Lender, (i) if the Administrative Agent (x) becomes a Defaulting Lender and is not performing its role hereunder as Administrative Agent or (y) declines to approve any waiver, amendment or modification of this Agreement or any Credit Document that requires approval of all Lenders pursuant to Section 10.5 or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, the Administrative Agent may be removed as the Administrative Agent hereunder at the request of the Borrower and the Required Lenders and (ii) the Required Lenders may, by notice in writing to the Borrower and the applicable Agent remove such Person as an Agent and, with the consent of the Borrower (provided, (x) no such consent of the Borrower shall be required while under this clause (b) if an Event of Default under Section 8.1(a), (f) or (g) exists and (y) such consent shall not be unreasonably withheld, delayed or conditioned, and shall be deemed to have been given unless the Borrower shall have objected to such appointment by written notice to the Administrative Agent within ten Business Days after having received notice thereof), appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents, (except that in the case of any Collateral held by the Collateral Agent on behalf of the Secured Parties, the retiring or removed Collateral Agent shall continue to hold such Collateral until such time as a successor Collateral Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent, and the retiring or removed Agent (to the extent not already discharged as provided above) shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Credit Documents, the provisions of this Section and Sections 10.2 and 10.3 shall continue in effect for the benefit of such retiring or removed Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as an Agent.

(d)     Any entity into which an Agent may be merged or converted or with which it may be consolidated, or any corporation or association resulting from any merger, conversion or consolidations which an Agent may be party, or any corporation or association to which all or substantially all of the corporate trust or agency business and assets as a whole or substantially as a whole of an Agent may be transferred or sold, shall be the successor Agent under this Agreement and each Credit Document and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or any further action.

9.7     **Non-Reliance on Agents and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon either Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder. Without limiting the foregoing, each Lender acknowledges and agrees that neither such Lender, nor any of its respective Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the PATRIOT Act or the regulations thereunder, including the regulations contained in 31 C.F.R. 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any recordkeeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other Laws.

9.8     **Administrative Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.8, 10.2 and 10.3) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.8, 10.2 and 10.3.

9.9      **Collateral Documents and Guaranty**.

(a)      The Secured Parties irrevocably authorize the Collateral Agent,

(i)      to release any Lien on any property granted to or held by the Collateral Agent under any Credit Document (x) upon termination of all Commitments and payment in full of all Obligations (other than Remaining Obligations), (y) that is sold or otherwise disposed of or to be sold or otherwise disposed of to a Person that is not a Credit Party as part of or in connection with any sale or other disposition permitted under the Credit Documents, or (z) subject to Section 10.5, if approved, authorized or ratified in writing by the Required Lenders;

(ii)      to subordinate any Lien on any property granted to or held by the Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by Section 6.2(d); and

(iii)      to release any Guarantor from its Guaranty upon consummation of any transaction not prohibited hereunder resulting in such Guarantor ceasing to constitute a Guarantor or otherwise becoming an Excluded Subsidiary (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry); provided that in no event shall any Guarantor cease to constitute a Guarantor solely as a result of (i) such Guarantor ceasing to constitute a wholly owned Subsidiary of the Borrower after the Closing Date (unless such Person otherwise constitutes an Excluded Subsidiary (other than solely on account or constituting a non-wholly owned Subsidiary of the Borrower)).

Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.9(a). Notwithstanding anything contained herein or in any other Credit Document to the contrary, in no event shall any Agent be obligated to execute or deliver any document evidencing or authorizing any release, subordination or re-conveyance without receipt of a certificate executed by an Authorized Officer of the Borrower certifying that such release, subordination or re-conveyance, as applicable, complies with this Agreement and the other Credit Documents, and that all conditions precedent to such release, subordination or re-conveyance have been complied with.

98

(b)    Anything contained in any of the Credit Documents to the contrary notwithstanding, each Credit Party, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including pursuant to section 363(k), section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to section 363(k), section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may, directly or through one or more acquisition vehicles, be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon the direction of Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any or all of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

(c)    Neither the Administrative Agent nor the Collateral Agent shall be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, and neither the Administrative Agent nor the Collateral Agent shall be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

9.10    **Withholding Taxes**.  To the extent required by any applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered, was not properly executed or was invalid or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out of pocket expenses) incurred, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due the Administrative Agent under this Section 9.10.

9.11    **Agent Discretion**.  Notwithstanding anything set forth herein or in the other Credit Documents to the contrary, to the extent any such Credit Document grants any Agent discretion to act or refrain from acting without the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.5 and Sections 8.1, 8.2 and 8.3), such Agent shall nonetheless be entitled to request direction from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.5 and Sections 8.1, 8.2 and 8.3) as to the matter over which such

99

Agent has been granted discretion, and no Agent shall be required to exercise or be liable for failure to exercise such discretion until such time as it has obtained the requested direction from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.5 and Sections 8.1, 8.2 and 8.3). For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to any Agent hereunder (including without limitation this Article IX), phrases such as "satisfactory to the Administrative Agent", "approved by the Administrative Agent", "acceptable to the Administrative Agent", "as determined by the Administrative Agent", "in the Administrative Agent's discretion", "selected by the Administrative Agent", "elected by the Administrative Agent", "requested by the Administrative Agent", "satisfactory to the Collateral Agent", "approved by the Collateral Agent", "acceptable to the Collateral Agent", "as determined by the Collateral Agent", "in the Collateral Agent's discretion", "selected by the Collateral Agent", "elected by the Collateral Agent", "requested by the Collateral Agent", "satisfactory to the Agent", "approved by the Agent", "acceptable to the Agent", "as determined by the Agent", "in the Agent's discretion", "selected by the Agent", "elected by the Agent", "requested by the Agent", and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or, where expressly required by the terms of any Credit Document, a greater proportion of the Lenders), as applicable, to take such action or to exercise such rights. Nothing contained in this Agreement shall require any Agent to exercise any discretionary acts and any permissive grant of power to any Agent hereunder shall not be construed to be a duty to act.

9.12    **Indemnification by Lenders**.    Each Lender severally agrees to indemnify and hold harmless each Agent and each of its Related Parties, to the extent that such Agent shall not have been timely reimbursed by the Borrower, based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed indemnity payment is sought) from, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent or Related Parties in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of or in connection with this Agreement or the other Credit Documents; provided no Lender shall be liable to any Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.5 and Sections 8.1, 8.2 and 8.3) shall constitute gross negligence or willful misconduct). If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the outstanding Loans at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

9.13    **Survival**.    The agreements in this Section 9 and Sections 10.2 and 10.3 shall survive the resignation of any Agent, the termination of the Credit Documents and payment of the obligations hereunder.

9.14    **Erroneous Payment**.

(a)      Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of the Administrative Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives a payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)      The Borrower and each other Credit Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this Section 9.14), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, (i) comprised of funds received by the Administrative Agent from the Borrower or any other Credit

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

Party or (ii) the proceeds of realization from the enforcement of one or more of the Credit Documents against or in respect of the Borrower or one or more of the Credit Parties in each case for the purpose of making such Erroneous Payment.

(d)    In addition to any rights and remedies of the Administrative Agent provided by law, the Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 9.14 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Administrative Agent or any of its Affiliate, branch or agency thereof to or for the credit or the account of such Lender. The Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)    Each party's obligations under this Section 9.14 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

## SECTION 10    MISCELLANEOUS

10.1    **Notices**.

(a)    <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.1(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, addressed (a) in the case of the Credit Parties, as follows, (b) in the case of an Agent, to it at its address (or facsimile number) as set forth on Appendix B, (c) in the case of the Lenders, at their primary address set forth below their name on Appendix B or otherwise indicated to Administrative Agent in writing or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Assumption, in such Assignment and Assumption or (d) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications, to the extent provided in Section 10.1(b), shall be effective as provided in Section 10.1(b).

the Credit Parties:

2U, Inc.
2345 Crystal Drive, Suite 1100
Arlington VA 22202
Attention: Paul S. Lalljie; Lillian Brownstein, Matthew Norden;
E-mail Address: plalljie@2u.com; lbrownstein@2u.com; mnorden@2u.com

102

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
555 Eleventh Street NW
Suite 1000
Washington, D.C. 20004
Attention: Katherine Putnam; Melissa Fabian
E-mail Address: Katherine.Putnam@lw.com; Melissa.Fabian@lw.com

(b)    Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided, the foregoing shall not apply to Notices to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving Notices by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefore; provided, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    Change of Address, Etc. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)    Platform.

(i)    Each Credit Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, IntraLinks, Syndtrak or a substantially similar electronic transmission system (the "**Platform**").

(ii)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third- party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Credit Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any Credit Party's or the Administrative Agent's transmission of communications through the Platform. Each party hereto agrees that no Agent has any responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Communication or otherwise required for the Platform. In no event shall any Agent or any of its Related Parties have any liability to any

103

Credit Party, any Lender or any other Person or entity for damages of any kind, whether or not based on strict liability and including, without limitation, direct damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of communications through the Platform, except to the extent the same resulted primarily from the gross negligence or willful misconduct of such Agent or its Related Parties, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment. In no event shall any Agent or any of its Related Parties have any liability for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems. Each Credit Party, each Lender and each Agent agrees that the Administrative Agent may, but shall not be obligated to, store any Communications on the Platform in accordance with the Administrative Agent's customary document retention procedures and policies. All uses of the Platform shall be governed by and subject to, in addition to this Section 10.1(d), separate terms and conditions posted or referenced in such Platform and related agreements executed by the Lenders and their Affiliates in connection with the use of such Platform. Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the Administrative Agent, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment. "**Communications**" means, collectively, any notice, demand, communication, information, document or other material that any Credit Party provides to the Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

(iii)    The Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to Section 5.1 or otherwise are being distributed through the Platform, any document or notice that the Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for Public Lenders. The Borrower agrees to clearly designate all information provided to the Administrative Agent by or on behalf of the Credit Parties which is suitable to make available to Public Lenders. If the Borrower has not indicated whether a document or notice delivered pursuant to Section 5.1 or otherwise contains Non-Public Information, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to the Borrower, its Subsidiaries and their respective securities. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable requirements of Law, including the U.S. Federal and state securities Laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of the U.S. Federal or state securities Laws. In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Credit Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

10.2    **Expenses**.

(a)    Borrower Expenses. The Borrower shall pay, promptly following receipt of a written demand with a summary statement, (a) all reasonable, documented, out of pocket expenses incurred by (x) the Agents (including the reasonable fees, out of pocket charges and disbursements of one outside legal counsel for the Agents, and, if necessary or appropriate, one local outside counsel in each reasonably necessary and materially relevant jurisdiction and in the case of other consultants and advisers, to the extent such persons are approved by the Borrower) and (y) the Lenders (including the reasonable fees, out of pocket charges and disbursements of the Lender Advisors and, if necessary and appropriate, one local counsel in each reasonably necessary and materially relevant jurisdiction and in the case of other consultants and advisers, to the extent such persons are approved by the Borrower), in connection with the Commitments, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Credit Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (b) all reasonable, documented out of pocket expenses incurred by any Agent or any Lender (including the reasonable, documented out-of-pocket fees, charges and disbursements of the Lender Advisors and one outside counsel for the Agents (and, in the case of a conflict of interest, additional counsels, as appropriate) and if necessary or appropriate, of any special counsel and one local counsel in each reasonably necessary and materially relevant jurisdiction (and in the case of a conflict of interest, additional counsels as appropriate and in the case of other consultants and advisers, to the extent such persons are approved by the Borrower) (in each case, except allocated costs of in-house counsel)) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Credit Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    Lender Expenses. Each Lender shall promptly following written demand therefor, pay or reimburse each Agent based on and to the extent of such lender's pro rata share of all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Credit Documents, including all such out-of-pocket costs and expenses incurred during any legal proceeding (including any proceeding under any Debtor Relief Law) and all respective fees, charges and disbursements of a primary counsel and local counsel for the Agent Indemnitees, to the extent that the Agent Indemnitees are not timely reimbursed for such expenses by or on behalf of the Borrower (solely to the extent, that the Borrower for any reason fails to pay any amount required under Section 10.2 or Section 10.3(a) to be paid by it to any Agent (or any sub-agent thereof), or any Related Party of any of the foregoing). For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the outstanding Loans at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full). The obligations of the Lenders under this Section 10.3(b) are subject to the provisions of Section 10.12.

10.3    **Indemnity; Certain Waivers**.    (a) Indemnification by Borrower. The Borrower shall indemnify each Agent (and any sub-agent or Related Party thereof) (each such Person being called an "**Agent Indemnitee**"), each Lender (and any Related Party thereof) (each Person called a "**Lender Indemnitee**"; together with the Agent Indemnitee, each an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable, documented out-of-pocket fees, charges and disbursements of one primary outside counsel for Agent Indemnitees and a primary firm of counsel for the Lender Indemnitees (in each case, except allocated costs of in-house counsel and if reasonably necessary (as determined by the Agent Indemnitees or the Lender Indemnitees, as applicable), a single regulatory counsel and a single local counsel in each appropriate jurisdiction for the Agent Indemnitees and a single regulatory counsel and a single local counsel

in each appropriate jurisdiction for the Lender Indemnitees (plus additional counsel desirable due to actual or reasonably perceived conflict of interest among such parties)), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower or any of its Subsidiaries) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or its Subsidiaries, or any environmental liability related in any way to the Borrower or its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, any of its Subsidiaries, its Affiliates, its equity holders or creditors, and regardless of whether any Indemnitee is a party thereto; provided, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses: (v) solely with respect to the Lender Indemnitees (and specifically excluding the Agent Indemnitees), arising from any settlement effected without the Borrower's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned), (w) are determined by a court of competent jurisdiction in a final and nonappealable judgment to have resulted from the gross negligence, or willful misconduct of such Indemnitee (or any of its Affiliates or their respective officers, directors, employees, advisors and agents), (x) solely with respect to the Lender Indemnitees (and specifically excluding the Agent Indemnitees), a material breach of the Credit Documents by, any Lender Indemnitee (or any of its Affiliates or their respective officers, directors, employees, advisors and agents), (y) relate to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim or (z) arise out of, or in connection with, any proceeding that does not involve an act or omission by the Borrower or its Subsidiaries or any of their respective affiliates or that is brought by an Indemnitee against any other Indemnitee (other than disputes involving claims by or against any Agent in its capacity as such or in a similar agency or arranger role, but not any other person or entity party to any such proceeding).

(a)    [reserved].

(b)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnitee or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof; provided that the foregoing shall not limit any Credit Party's indemnity obligations to the extent special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is entitled to receive indemnification hereunder. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

(c)    Payments. All amounts due under Section 10.3 shall be payable within ten Business Days after written demand therefor, together with supporting documentation in reasonable detail.

(d)    Survival. Each party's obligations under Sections 10.2 and 10.3 shall survive the resignation or removal of any Agent, the termination of the Credit Documents and payment of the obligations hereunder.

10.4    **Set-Off**.  If an Event of Default shall have occurred and be continuing, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency, but in any event, excluding Excluded Assets) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, or any such Affiliate, to or for the credit or the account of the Borrower or any other Credit Party against any and all of the obligations of the Borrower or such Credit Party now or hereafter existing under this Agreement or any other Credit Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender, or Affiliate shall have made any demand under this Agreement or any other Credit Document and although such obligations of the Borrower or such Credit Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.20 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided, the failure to give such notice shall not affect the validity of such setoff and application.

10.5    **Amendments and Waivers**.  (a) Required Lenders' Consent. Subject to Section 2.21, Sections 10.5(b), 10.5(c) and 10.5(d), no amendment, modification, termination or waiver of any term or condition of any Credit Document, or consent to any departure by any Credit Party therefrom, shall be effective without the written consent of the Required Lenders.

(a)    Affected Lenders' Consent. No amendment, modification, termination or waiver of any term or condition of any Credit Document, or consent to any departure by any Credit Party therefrom, shall:

(i)    increase or extend the Commitment of any Lender or extend the scheduled final maturity of any Loan without the written consent of the Lender holding such Commitment or Loan;

(ii)    reduce the principal amount of any Loan without the written consent of the Lender holding such Loan;

(iii)    waive, reduce or postpone any scheduled repayment of principal of any Loan or elect to make any payment due under any Credit Document not in immediately available funds in US dollars without the written consent of the Lender holding such Loan; provided, that, mandatory prepayments may be waived with the consent of the Required Lenders only;

(iv)    reduce the rate of interest on any Loan without the written consent of the Lender holding such Loan; provided, that, the imposition of default interest may be waived with the consent of the Required Lenders only;

(v)    reduce any fee or premium payable under any Credit Document without the written consent of the Lender that is entitled to receive such fee or premium;

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

(vi)    extend the time for payment of any interest on any Loan without the written consent of the Lender holding such Loan; <u>provided</u>, that, default interest may be extended or waived with the consent of the Required Lenders only; or

(vii)    extend the time for payment of any fee or premium payable under any Credit Document without the written consent of the Lender that is entitled to receive such fee or premium;

(b)    <u>Consent of all Lenders</u>. Without the written consent of all Lenders (other than, in the case of the clauses (iv) and (v), a Defaulting Lender), no amendment, modification, termination or waiver of any term or condition of any Credit Document, or consent to any departure by any Credit Party therefrom, shall:

(i)    amend, modify, terminate or waive any term or condition of Sections 10.5 or 10.6(b)(v);

(ii)    amend, modify, terminate or waive any term or condition of this Agreement or any other Credit Document that expressly provides that the consent of all Lenders is required;

(iii)    subordinate in right of payment the Obligations to any other Indebtedness;

(iv)    amend, modify, terminate or waive any provision of Section 2.14, Section 8.3, or of the definition of "Required Lenders" or "Pro Rata Share";

(v)    release the Liens of the Secured Parties in all or substantially all of the Collateral, or release all or substantially all of the value of the guarantees;

(vi)    subordinate the Liens of the Secured Parties in any Collateral; and

(vii)    consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document (except as expressly provided in the Credit Documents).

Notwithstanding the foregoing, no agreement shall amend, modify or otherwise affect the rights or duties of any Agent hereunder or under any other Credit Document without the prior written consent of such Agent.

Notwithstanding the foregoing, this Agreement and the other Credit Documents may be amended (or amended and restated), modified or supplemented with the written consent of the Administrative Agent and the Borrower (or the Administrative Agent and the Borrower may enter into additional Credit Documents as the Administrative Agent reasonably deems appropriate) (a) to cure any ambiguity, error, omission or inconsistency of a technical nature, defect or inconsistency, so long as such amendment, modification or supplement does not adversely affect the rights of any Lender (as certified by the Borrower), (b) [reserved], (c) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders, (d) [reserved] and (e) to implement changes contemplated by Section 6.11 with respect to a change in the Borrower's fiscal year. In addition, notwithstanding the foregoing, the Agency Fee Letter may be amended, modified, supplemented or restated with the written consent solely of the Borrower and the Agents.

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments and waivers hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Required Lenders or all of the Lenders, as required, have approved any such amendment or waiver (and the definitions of "Required Lenders") will automatically be deemed modified accordingly for the duration of such period; provided that, subject to the limitations set forth in the first paragraph of this Section 10.1, any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to such Defaulting Lender hereunder, reduce any percentage specified in the definition of Required Lender, disproportionately affect such Defaulting Lender as compared to other Lenders holding the same class of Loans, or alter the terms of this proviso, will require the consent of such Defaulting Lender.

Notwithstanding anything in this Agreement or the other Credit Documents, any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Credit Documents and shall be excluded in determining whether all or all affected Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 10.5); provided that (i) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender and (ii) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(c)     Execution of Amendments, Etc. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.

10.6    **Successors and Assigns; Participations**.  (a) Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.6(b), (ii) by way of participation in accordance with Section 10.6(d), or (iii) by way of pledge or assignment of a security interest subject to Section 10.6(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.6(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(a)     Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, each such assignment shall be subject to the following conditions:

(i)    *Minimum Amounts*.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in Section 10.6(b)(i)(B) in the aggregate, or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in Section 10.6(b)(i)(A), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 in the case of any assignment in respect of any Loan, unless the Administrative Agent otherwise consents (each such consent not to be unreasonably withheld or delayed), or, in each case, if less, all of such assigning Lender's remaining Loans or Commitments hereunder.

(ii)    *Proportionate Amounts*. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)    *Reserved*.

(iv)    *Assignment and Assumption*. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with all forms, certificates or other evidence each assignee is required to provide pursuant to Section 2.17(c) and a processing and recordation fee of $3,500; provided, the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(v)    *No Assignment to Certain Persons*. No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(vi)    *No Assignment to Natural Persons*. No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vii)    *Defaulting Lenders*. No such assignment shall be made to any Defaulting Lender.

(viii)    *[Reserved]*.

(ix)    *Debt Repurchases*. Assignments of Loans to the Borrower or any of its Subsidiaries shall not be permitted.

(x)    *Administrative Questionnaire and Regulatory Matters*. If the assignee is not an existing Lender hereunder, the Administrative Agent shall have received (a) an administrative questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Related Parties or their respective securities) will be made available and who may

110

receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws and (b) all documentation and other information reasonably determined by the Administrative Agent to be required by applicable regulatory authorities required under applicable "know your customer" and AML Laws, including the PATRIOT Act.

Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed administrative questionnaire (unless the assignee shall already be a Lender hereunder), any "know your customer" information requested by the Administrative Agent, the processing and recordation fee referred to in Section 10.6(b)(iv) and any written consent to such assignment required by Section 10.6(b)(iii), the Administrative Agent shall accept such Assignment and Assumption and record the same in the Register. No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this Section 10.6(b).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.6(c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.16, 2.17, 10.2 and 10.3 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.6(d).

(b)    Register. The Administrative Agent, acting solely for this purpose as an non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior written notice.

(c)    Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries; provided that such restriction shall not apply to any Lender on the Closing Date or an Affiliate or Approved Fund of such Lender to the extent such Person becomes an Affiliate of the Borrower or its Subsidiaries after the Closing Date) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided, (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt,

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

each Lender shall be responsible for the indemnity under Section 10.3(b) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 10.5(b) that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.16 and 2.17 (subject to the requirements and limitations of such sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section (it being understood that the documentation required under Section 2.17(g) shall be delivered solely to the participating Lender); provided, such Participant shall be subject to the provisions of Section 2.18 and Section 2.19 as if it were an assignee under Section 10.6(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender; provided, such Participant shall be subject to Section 2.17 as though it were a Lender. Each Lender that sells a participation pursuant to this Section shall maintain a register on which it records the name and address of each Participant and the principal amounts of each Participant's participation interest with respect to the Loans and the Commitments (each, a "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to such Loans or Commitments for all purposes under this Agreement, notwithstanding any notice to the contrary. In maintaining the Participant Register, such Lender shall be acting as the agent of the Borrower solely for this purpose and undertakes no duty, responsibility or obligation to the Borrower (without limitation, in no event shall such Lender be a fiduciary of the Borrower for any purpose, except that such Lender shall maintain the Participant Register); provided, no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, or its other obligations under this Agreement) except to the extent that such disclosure is necessary to establish in connection with a Tax audit that such Commitment, Loan, or other obligation is in registered form under Section 5f.103(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations or, if different, under Sections 871(h) or 881(c) of the Code (and, in each case, any amended or successor versions). A Participant shall not be entitled to receive any greater payment under Sections 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant (except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation) unless the sale of the participation to such Participant is made with the Borrower's prior written consent. For the avoidance of doubt, Administrative Agent shall have no duty to maintain any Participant Register.

(d)    Certain Pledges; SPCs.

(i)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations of such Lender; provided, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto, unless such pledgee exercises its remedies under the applicable pledge and either becomes the owner of such rights or causes another Person to become the owner of such rights.

(ii)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC")

the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided, (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (A) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 2.16 and 2.17), (B) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and (C) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Credit Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the applicable Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (1) with notice to, but without prior consent of the Borrower and the Administrative Agent, and with the payment of a processing fee of $3,500 to the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (2) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.

(e)     Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

10.7    **Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.8    **Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.15(c), 2.16, 2.17, 9.14, 10.2, 10.3 and 10.4 and the agreements of the Lenders set forth in Sections 2.17, 9.3(b), 9.7 and 9.10 shall survive the payment of the Loans and the termination hereof.

10.9    **No Waiver; Remedies Cumulative**.  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights,

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.10    **Marshalling; Payments Set Aside**.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to the Administrative Agent or any Lender (or to the Administrative Agent, on behalf of the Lenders), or any Agent or any Lender enforces any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

10.11    **Severability**.  In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.12    **Obligations Several; Independent Nature of the Lenders' Rights**.  The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

10.13    **Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.14    **Governing Law**.  This Agreement and the other Credit Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Credit Document (except, as to any other Credit Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York and, to the extent applicable, the Bankruptcy Code.

10.15    **Consent to Jurisdiction**.  The Borrower and each other Credit Party irrevocably and unconditionally agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Credit Parties, Agents, Lenders and Related Parties pertaining to this Agreement or any other Credit Document or the transactions relating hereto or thereto or to any matter arising out of or relating to this Agreement or any other Credit Document or the transactions relating hereto or thereto; provided, that the Agents, Lenders and the Credit Parties acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court, provided, further, that nothing in this Agreement shall be deemed or operate to preclude any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the

114

Obligations, or to enforce a judgment or other court order in favor of such Agent. Each Credit Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Credit Party hereby waives any objection that such Credit Party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.1. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

10.16  **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.17  **Confidentiality**.  Each of the Agents, each of the Lenders (each, a "**Lender Party**") shall hold all information received from the Borrower or any of its Subsidiaries regarding any of their respective businesses (including the existence of this Credit Agreement, the transactions contemplated herein or the terms or conditions hereof or thereof) other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary (it being understood and agreed that all information received after the Closing Date from the Borrower or any of its Subsidiaries shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential), it being understood and agreed by the Borrower that, in any event, each Lender Party may make disclosures of such non-public information (i) to its Affiliates (other than portfolio companies) and to such Lender Party's and its Affiliates' respective employees, actual and prospective limited partners and investors, directors, officers, managers, legal counsel, independent auditors and other experts or agents and advisors or to such Lender Party's current or prospective funding sources in connection with disclosures otherwise made in accordance with this Section 10.17 (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential, and in the case of any Lender agrees that it will be held liable for such breach of this Section 10.17); (ii) to any actual or potential assignee, transferee or Participant of any rights, benefits, interests and/or obligations under this Agreement or to any direct or indirect contractual counterparties (or the professional advisors thereto) in swap or derivative transactions related to the Borrower and its Obligations (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential, and in the case of any Lender agrees that it will be held liable for such breach of this Section 10.17); (iii) to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans and/or the Commitments or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; (iv) as required or requested by any regulatory authority purporting to have jurisdiction over such Lender Party or its Affiliates (including any self-regulatory authority, such as the NAIC); provided, unless prohibited by applicable Law or court order, each Lender Party shall make reasonable efforts to notify the Borrower of any request by such regulatory authority (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender Party by such regulatory authority) for disclosure of any such non-public information prior to the actual disclosure thereof; (v) to the extent required by order

of any court, governmental agency or representative thereof or in any pending legal or administrative proceeding, or otherwise as required by applicable Law or judicial process; provided, unless prohibited by applicable Law or court order, each Lender Party shall make reasonable efforts to notify the Borrower of such required disclosure prior to the actual disclosure of such non-public information; (vi) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (vii) for purposes of establishing a "due diligence" defense, (viii) with the consent of the Borrower, or (ix) to the extent such information (A) becomes publicly available other than as a result of a breach of this Section 10.17, (B) becomes available to such Lender Party or any of its Affiliates on a non-confidential basis from a source other than a Credit Party that does not have a duty of confidentiality to the Borrower, or (C) is independently developed by such Lender Party.

Each of the Administrative Agent, the Collateral Agent and the Lenders acknowledges that (a) the information provided by the Borrower or its Subsidiaries may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

All information, including requests for waivers and amendments furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement, will be syndicate-level information, which may contain material non-public information about the Borrower, the Credit Parties and their Related Parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.

Notwithstanding anything herein to the contrary, the Administrative Agent, the Lenders and their respective Affiliates shall not, directly or indirectly, use the name of the Borrower or its Affiliates in any publicity, advertising or other media and may not issue a press release or otherwise publicize to any person, directly or indirectly, orally or in writing, any information related to the existence of this Credit Agreement, the transactions contemplated herein or the terms or conditions hereof or thereof; provided that such party may repeat information about the transactions contemplated hereby that has been publicly announced by the Borrower and no additional information can be publicized.

10.18    **Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable Law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury Laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if

116

previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

10.19  **No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.20  **Counterparts; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement or any Credit Document shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other state laws based on the Uniform Electronic Transactions Act, and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

10.21  **Integration**.  This Agreement and the other Credit Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof; underlined that, for the avoidance of doubt, nothing set forth in the Credit Documents shall impair in any manner the rights of the Agents and the Lenders in their other capacities under any other documents with the Borrower or any Subsidiary of the Borrower, including as holders in respect of any warrant issued by such Person.

10.22  **No Fiduciary Duty**.  Each Agent, each Lender, and their Affiliates (collectively, the "**Lender Affiliated Parties**"), may have economic interests that conflict with those of the Credit Parties, and each Credit Party acknowledges and agrees (a) nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Affiliated Parties and each Credit Party, its stockholders or its Affiliates; (b) the transactions contemplated by the Credit Documents are arm's-length commercial transactions between the Lender Affiliated Parties, on the one hand, and each Credit Party, on the other; (c) in connection therewith and with the process leading to such transaction each of the Lender Affiliated Parties is acting solely as a principal and not the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person; (d) none of the Lender Affiliated Parties has assumed an advisory or fiduciary responsibility in favor of any Credit Party with respect to the transactions contemplated hereby or the process leading thereto (regardless of whether any of the Lender Affiliated Parties or any of their respective Affiliates has advised or is currently advising any Credit Party on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents; (e) each Credit Party has consulted its own legal and financial advisors to the extent it deemed appropriate; (f) each Credit Party is responsible for making its own independent judgment with respect to such transactions and the process leading thereto; and (g) no Credit Party will claim that any of the Lender Affiliated Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Credit Party, in connection with such transaction or the process leading thereto.

117

10.23    **PATRIOT Act**. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of each Credit Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Credit Parties in accordance with the PATRIOT Act.

10.24    **Judgment Currency**. In respect of any judgment or order given or made for any amount due under this Agreement or any other Credit Document that is expressed and paid in a currency (the "judgment currency") other than the currency in which it is expressed to be payable under this Agreement or other Credit Document, the party hereto owing such amount due will indemnify the party due such amount against any loss incurred by them as a result of any variation as between (a) the rate of exchange at which the United States dollar amount is converted into the judgment currency for the purpose of such judgment or order and (b) the rate of exchange, as quoted by the Administrative Agent or by a known dealer in the judgment currency that is designated by the Administrative Agent, at which such Lender is able to purchase Dollars with the amount of the judgment currency actually received by the Administrative Agent or such Lender. The foregoing indemnity shall constitute a separate and independent obligation of the applicable party and shall survive any termination of this Agreement and the other Credit Documents, and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of or conversion into Dollars.

10.25    **Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Solely to the extent an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

10.26    **Acknowledgement Regarding Any Supported QFC**. To the extent that the Credit Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**," and each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 10.26, the following terms have the following meanings:

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Covered Entity**" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

10.27    **Certain ERISA Matters**.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) of one

US-DOCS\152200537.3WEIL:\99823095\22\10159.0003

or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement;

(ii)      the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from prohibitions of Section 406 of ERISA and Section 4975 of the Code such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

In addition, unless either (I) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (II) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that the Administrative Agent or any of its Affiliates is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

[remainder of page intentionally left blank]

US-DOCS\152200537.3WEIL\99823095\22\10159.0003

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.[1]

**2U, INC.**, as Borrower

By: _____
Name:
Title:


**EDX LLC**,
as Guarantor

By: _____
Name:
Title:

**EDX BOOT CAMPS LLC**,
as Guarantor

By: _____
Name:
Title:

**CRITIQUEIT, INC.**, as Guarantor

By: _____
Name:
Title:


**2U HARKINS ROAD LLC**, as Guarantor
By:        2U, INC., its sole member

By: _____
Name:
Title:

---

[1] NTD: To include all filing Debtors (other than 2U, Inc.) as guarantors.

[Signature Page to DIP Credit and Guaranty Agreement]

**2U NYC, LLC**, as Guarantor

By: _____
Name:
Title:

[Signature Page to DIP Credit and Guaranty Agreement]

**2U GET SMARTER, LLC,** as Guarantor

By: _____
Name:
Title:

**2U GETSMARTER (US), LLC**, as Guarantor

By: _____
Name:
Title:

**2U KEIH HOLDCO, LLC**, as Guarantor

By: _____
Name:
Title:

[Signature Page to DIP Credit and Guaranty Agreement]

**WILMINGTON SAVINGS FUND SOCIETY, FSB**,
as Administrative Agent and Collateral Agent


By: _____
Name:
Title:

[__],
as a Lender


By: _____
Name:
Title:

[Signature Page to DIP Credit and Guaranty Agreement]

## Exhibit B

### Initial Approved Budget

# Disclaimer



**Forward-Looking Statements**

The information included herein contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements in the information included herein are not historical are forward-looking statements, including statements regarding the timing and implementation of the restructuring pursuant to the Restructuring Support Agreement (the "RSA"), the chapter 11 cases (the "Chapter 11 Cases"), the prepackaged joint plan of reorganization (the "Plan"), the Company's ability to continue operating in the ordinary course while the Chapter 11 Cases are pending, and the potential benefits of the transactions contemplated by the RSA and the Plan, including the timetable for completing such transactions, if at all, and the effects of such transactions on the Company's financial position and long-term stability and growth. Forward-looking statements contain words such as "expect," "anticipate," "could," "should," "intend," "plan," "believe," "seek," "see," "may," "will," "would," or "target." Forward-looking statements are based on the Company's current expectations, beliefs, assumptions, and estimates concerning the future and are subject to significant business, economic, and competitive risks, uncertainties, and contingencies. These risks, uncertainties, and contingencies are difficult to predict, and could cause the Company's actual results to differ materially from those expressed or implied in such forward-looking statements.

These risks include, among others, those related to the effects of the Chapter 11 Cases on the Company and the Company's relationship with its various constituents, including colleges and universities, faculty, students, regulatory authorities, including the Department of Education, employees and other third parties; the Company's ability to develop and implement the Plan and whether that Plan will be approved by the bankruptcy court and the ultimate outcome of the Chapter 11 Cases in general; the length of time the Company will operate under the Chapter 11 Cases; the potential adverse effects of the Chapter 11 Cases on the Company's liquidity and results of operations, including failure to receive proceeds under the debtor-in-possession financing facility (the "DIP Facility"); the Company's ability to operate within the restrictions and the liquidity limitations of the DIP Facility and any other credit facility that the Company may enter into in connection with the Chapter 11 Cases and restrictions imposed by the applicable courts; the timing or amount of any recovery, if any, to the Company's stakeholders; the potential cancellation of the Company's common stock in the Chapter 11 Cases; the delisting and deregistration of the Company's common stock and becoming a private company; the potential material adverse effect of claims that are not discharged in the Chapter 11 Cases; uncertainty regarding the Company's ability to retain key personnel; increased administrative and legal costs related to the Chapter 11 process; changes in the Company's ability to meet its financial obligations during the Chapter 11 process and to maintain contracts that are critical to its operations; the effectiveness of the overall restructuring activities pursuant to the Chapter 11 Cases and any additional strategies that the Company may employ to address its liquidity and capital resources, achieve its stated goals, and continue as a going concern; the actions and decisions of equityholders, creditors, regulators, and other third parties that have an interest in the Chapter 11 Cases, which may interfere with the ability to confirm and consummate the Plan; and those risks described under the heading "Risk Factors" in 2U's Annual Report on Form 10-K for the year ended December 31, 2023, 2U's Quarterly Report on Form 10-Q for the quarter ended March 31, 2024, and 2U's other filings with the U.S. Securities and Exchange Commission. We refer you to such documents for a discussion of these and other risks and uncertainties. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, actual results may vary materially and adversely from those indicated or anticipated, whether express or implied, by such forward-looking statements. These forward-looking statements speak only as of the date they are made. The Company undertakes no duty or obligation to update any forward-looking statement after the date of the information included herein, whether as a result of new information, future events, changes in assumptions, or otherwise.

1

# DIP Budget for the 13 Weeks Ended 10/18



*$ in millions*

| | Week 1 07/26/24 Forecast | Week 2 08/02/24 Forecast | Week 3 08/09/24 Forecast | Week 4 08/16/24 Forecast | Week 5 08/23/24 Forecast | Week 6 08/30/24 Forecast | Week 7 09/06/24 Forecast | Week 8 09/13/24 Forecast | Week 9 09/20/24 Forecast | Week 10 09/27/24 Forecast | Week 11 10/04/24 Forecast | Week 12 10/11/24 Forecast | Week 13 10/18/24 Forecast | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Degree | 9.0 | 2.0 | 0.8 | 9.5 | 16.5 | 2.7 | 5.9 | 8.1 | 12.2 | 11.2 | 1.7 | 1.1 | 7.7 | 88.4 |
| Boot Camp | 1.2 | 2.0 | 1.5 | 2.4 | 4.5 | 2.4 | 1.7 | 2.6 | 4.6 | 2.6 | 1.1 | 1.9 | 4.0 | 32.4 |
| edX | 0.9 | 1.2 | 1.4 | 1.4 | 1.4 | 1.4 | 1.2 | 1.2 | 1.2 | 0.9 | 1.0 | 1.0 | 1.0 | 15.3 |
| Exec Ed | 2.2 | 2.2 | 3.5 | 3.5 | 3.5 | 3.5 | 3.6 | 3.6 | 3.6 | 3.6 | 3.3 | 3.3 | 3.3 | 42.7 |
| All Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.0 |
| **Total Receipts** | **13.3** | **7.3** | **7.3** | **16.9** | **26.0** | **10.0** | **12.4** | **15.5** | **21.5** | **18.3** | **7.1** | **7.3** | **16.0** | **178.8** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, benefits & severance | (12.0) | (1.7) | (8.9) | (2.1) | (9.1) | (1.6) | (12.9) | (2.1) | (9.0) | (1.8) | (11.4) | (3.6) | (7.9) | (83.9) |
| Marketing | (5.9) | (4.5) | (4.0) | (5.4) | (3.4) | (3.2) | (2.1) | (2.4) | (2.3) | (2.1) | (2.2) | (2.1) | (1.9) | (41.4) |
| University Payments | (2.9) | (3.0) | (2.4) | (7.4) | (2.7) | (2.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.5) | (1.1) | (1.1) | (29.0) |
| All Other Disbursements | (8.8) | (3.7) | (3.5) | (4.9) | (1.9) | (1.9) | (3.7) | (2.2) | (2.2) | (2.2) | (3.3) | (2.7) | (2.7) | (43.6) |
| **Total Operating Disbursements** | **(29.5)** | **(12.9)** | **(18.7)** | **(19.8)** | **(17.1)** | **(9.5)** | **(19.8)** | **(7.7)** | **(14.5)** | **(7.1)** | **(18.3)** | **(9.4)** | **(13.5)** | **(197.9)** |
| **Operating Cash Flow** | **(16.2)** | **(5.6)** | **(11.5)** | **(2.9)** | **8.9** | **0.5** | **(7.4)** | **7.8** | **7.0** | **11.2** | **(11.2)** | **(2.1)** | **2.5** | **(19.0)** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Debt service payments | (0.5) | (11.5) | - | - | - | - | (0.0) | (37.2) | - | - | (1.1) | - | - | (50.4) |
| Restructuring professional fees | (5.1) | - | - | - | (0.6) | - | - | (22.3) | - | - | - | - | (0.9) | (29.0) |
| Other restructuring costs | - | - | - | - | - | - | - | (3.8) | - | - | - | - | - | (3.8) |
| **Total Non-Operating Disbursements** | **(5.7)** | **(11.5)** | **-** | **-** | **(0.6)** | **-** | **(0.0)** | **(63.3)** | **-** | **-** | **(1.1)** | **-** | **(0.9)** | **(83.2)** |
| **Net Cash Flow** | **(21.9)** | **(17.0)** | **(11.5)** | **(2.9)** | **8.3** | **0.5** | **(7.4)** | **(55.5)** | **7.0** | **11.2** | **(12.3)** | **(2.1)** | **1.5** | **(102.2)** |
| **Beginning Cash Balance** | 27.1 | 65.2 | 48.1 | 36.7 | 33.8 | 42.1 | 42.5 | 39.1 | 30.1 | 37.1 | 48.3 | 36.0 | 33.8 | 27.1 |
| Net Cash Flow | (21.9) | (17.0) | (11.5) | (2.9) | 8.3 | 0.5 | (7.4) | (55.5) | 7.0 | 11.2 | (12.3) | (2.1) | 1.5 | (102.2) |
| DIP / Exit Funding | 60.0 | - | - | - | - | - | 4.0 | 46.5 | - | - | - | - | - | 110.5 |
| **Ending Unrestricted Cash Balance** | **65.2** | **48.1** | **36.7** | **33.8** | **42.1** | **42.5** | **39.1** | **30.1** | **37.1** | **48.3** | **36.0** | **33.8** | **35.4** | **35.4** |
| ***Memo:*** | | | | | | | | | | | | | | |
| Transfer of Exec Ed receipts from Debtor to Non-Debtor included in amounts above | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 31.5 |

*Note: Liquidity based on unrestricted cash. Unrestricted cash balance excludes certain cash in transit, deposit related to credit card as well as restricted cash*

2

## **Exhibit E**

**Plan**

[**Omitted.**]

**<u>EXHIBIT C</u>**

Financial Projections

## 2U, Inc.
## FINANCIAL PROJECTIONS

**INTRODUCTION**

The following financial projections for the consolidated Debtors, as well as their Non-Debtor Affiliates (the "***Consolidated Financial Projections***"), are based on forecasts of operating results for calendar year 2024 through calendar year 2028 (the "***Projected Period***").  For 2024, the Consolidated Financial Projections include five (5) months of the Debtors' actual financial results (January through May), and seven (7) months of the Debtors' projected financial results (June through December).  Also attached are the notes and assumptions to the Consolidated Financial Projections (in each case, the "***Notes***").  The Consolidated Financial Projections and the Notes should be read in conjunction with the *Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "***Plan***") and the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "***Disclosure Statement***").[1]

The Debtors, with the assistance of their advisors, have prepared the Consolidated Financial Projections to assist the Bankruptcy Court in determining whether the Plan meets the "feasibility" test of section 1129(a)(11) of the Bankruptcy Code.  The Debtors believe that the Plan meets this test.  In connection with the negotiation and development of the Plan, and for the purpose of determining whether the Plan meets the feasibility test outlined in the Bankruptcy Code, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources during the Projected Period.  Certain financial information was used in connection with the preparation of the Consolidated Financial Projections.

The Debtors generally do not publish their projections or their anticipated financial position or results of operations.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to Holders of Claims or Interests after the date of this Disclosure Statement, or to include such information in documents required to be filed with the Bankruptcy Court, the Securities and Exchange Commission, or any other governmental or regulatory entity.

THE CONSOLIDATED FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND IN CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS, MOELIS & COMPANY AND ALIXPARTNERS, LLP.  THE CONSOLIDATED FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE INTERNATIONAL ACCOUNTING STANDARDS BOARD OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

ACCEPTED IN THE UNITED STATES OF AMERICA ("GAAP"). THEREFORE, THE BASIS OF THESE PROJECTIONS MAY DIFFER FROM WHAT HAS BEEN PREVIOUSLY REPORTED BY THE COMPANY.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING CONSOLIDATED FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE CONSOLIDATED FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE CONSOLIDATED FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE CONSOLIDATED FINANCIAL PROJECTIONS.

THE CONSOLIDATED FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING BASED ON THE GAAP PROVISIONS OF ACCOUNTING STANDARDS CODIFICATION ("ASC") 852, REORGANIZATIONS. THE IMPACT OF FRESH START ACCOUNTING, WHEN REFLECTED AT THE EFFECTIVE DATE, IS EXPECTED TO HAVE A MATERIAL IMPACT ON THE DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS. FRESH START ADJUSTMENTS ARE NOT EXPECTED TO HAVE A MATERIAL IMPACT ON THE PROJECTED RECOVERIES FOR CREDITORS.

THE CONSOLIDATED FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES AS FURTHER DETAILED IN THE DISCLOSURE STATEMENT IN THE SECTION ENTITLED "RISKS FACTORS," MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE CONFIRMATION OF THE PLAN ON THE PRESUMED EFFECTIVE DATE, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, COVENANTS IN NEW CREDIT FACILITIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE CONSOLIDATED FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY,

MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE CONSOLIDATED FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE CONSOLIDATED FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE CONSOLIDATED FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE CONSOLIDATED FINANCIAL PROJECTIONS ARE INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE CONSOLIDATED FINANCIAL PROJECTIONS.

THE CONSOLIDATED FINANCIAL PROJECTIONS WERE DEVELOPED FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

## GENERAL ASSUMPTIONS IN THE CONSOLIDATED FINANCIAL PROJECTIONS AND THE NOTES

The Consolidated Financial Projections have been prepared on the assumption that the Effective Date will occur approximately on or around September 12, 2024. The Consolidated Financial Projections for the Debtors and Non-Debtor subsidiaries, are based on, and assume, among other things, the successful reorganization of the Debtors and implementation of the emergence business plan. Although the Debtors presently intend to cause the Effective Date to occur as soon as practical following Confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur. If the Effective Date is delayed, the Debtors will continue to incur restructuring costs, which may be significant. The consolidated Financial Projections include the estimated impacts of the transactions contemplated in the Plan. The Consolidated Financial Projections and the Notes do not include any assumptions about employee equity awards or any equity capital beyond the issuance of equity in exchange for certain of the Debtors' outstanding debt securities and the equity rights offering contemplated in the Restructuring, as set forth in the Plan.

## CONSOLIDATED FINANCIAL PROJECTIONS

### Projected Consolidated Income Statement

(unaudited); (in millions); (years ending December 31)[2]

| $ in millions | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Degree | 393.6 | 385.5 | 449.6 | 512.3 | 555.9 |
| Boot Camp - Consumer | 127.7 | 96.9 | 99.7 | 105.9 | 108.9 |
| Exec Ed - Consumer | 123.7 | 153.6 | 167.7 | 188.5 | 204.6 |
| edX - Consumer | 18.7 | 30.5 | 36.9 | 40.6 | 43.1 |
| Enterprise | 69.3 | 92.8 | 102.9 | 109.6 | 114.5 |
| **Total Revenue** | **733.1** | **759.3** | **856.9** | **956.9** | **1,027.0** |
| **Expenses** | | | | | |
| Total Marketing & Sales | (184.6) | (206.1) | (222.6) | (245.9) | (262.0) |
| Total Labor | (240.4) | (230.5) | (249.9) | (276.1) | (293.1) |
| Other Expenses | | | | | |
| Curriculum and Teaching | (86.9) | (84.5) | (92.3) | (102.0) | (109.0) |
| Hosting & Licensing | (45.6) | (43.5) | (46.9) | (50.5) | (54.1) |
| Tech Expenses | (8.2) | (9.1) | (9.8) | (10.4) | (11.1) |
| Rent & Office | (7.3) | (7.9) | (9.7) | (9.7) | (10.1) |
| Professional Fees | (21.6) | (20.9) | (27.6) | (29.7) | (31.9) |
| All Other Expenses | (37.5) | (35.7) | (39.7) | (42.7) | (45.3) |
| Total Other Expenses | (207.2) | (201.6) | (226.0) | (244.9) | (261.4) |
| **Total Opex** | **(632.2)** | **(638.2)** | **(698.5)** | **(766.9)** | **(816.5)** |
| **Adjusted EBITDA** | **100.9** | **121.1** | **158.3** | **190.1** | **210.5** |
| Depreciation & Amortization | (95.7) | (83.3) | (74.2) | (69.1) | (72.7) |
| Net Interest Income (Expense) | (77.8) | (64.3) | (65.8) | (60.0) | (62.0) |
| Restructuring Costs | (132.9) | (13.5) | - | - | - |
| Other Expense | (8.8) | - | - | (6.0) | (6.0) |
| Income Tax Expense | - | - | (4.6) | (13.7) | (17.4) |
| **Net Income** | **(214.3)** | **(40.1)** | **13.8** | **41.2** | **52.3** |

---

[2]    2024 forecast includes the Debtors' actual results for January through May. In addition to excluding the effects of fresh start accounting adjustments on the reorganized Debtors' depreciation and amortization, the 2024 forecast excludes ASC 842 lease accounting adjustments associated with contract modifications.

**Projected Consolidated Income Statement Assumptions**

**1.       Operating Revenues**

2U has two reportable segments: the Degree Program Segment and the Alternative Credential Segment.

2U's Degree Program Segment provides the technology and services to nonprofit colleges and universities to enable the online delivery of degree programs. Students enrolled in these programs are generally seeking an undergraduate or graduate degree of the same quality they would receive on campus.

2U's Alternative Credential Segment provides premium online open courses, executive education programs, technical, and skills-based boot camps through relationships with nonprofit colleges and universities and other leading organizations. Students enrolled in these offerings are generally seeking to reskill or upskill for career advancement or personal development through shorter duration, lower-priced offerings. In addition to selling these offerings directly to individuals, the Company also sells to organizations and institutions, including employers, non-profits, governments and governmental entities to enable upskilling and reskilling of their workforces.

**a.       Degree Program Segment Revenue**

Degree Program Segment revenue is composed of payments from university partners related to 2U's share of tuition from students enrolled in administered online programs.

Degree Program Segment revenue for 2024 is primarily driven by expectations for existing enrollments in current programs, new enrollments in current programs, and enrollments from new launches.  Revenue is forecasted to decline in 2025 by $8.1 million year-over-year due to $16 million of one-time revenue recognized in 2024 related to exiting a certain program and $10 million relating to programs that are ending in 2024, which is partially offset by expected growth from new programs expected to be launched in 2024 and 2025.  Revenue is forecasted to return to growth in 2026.

The forecast results in a compound annual growth rate of 9% (from 2024) and revenue of $556 million in 2028, driven by new program launches and improvements in marketing efficiency that drives increased enrollments for existing programs.

**b.       Alternative Credential Segment Revenue**

**i.  Boot Camp Consumer Revenue**

2U's Boot Camp Consumer Programs ("**Boot Camps**") are technical and skills-based boot camps made up of 12 to 24-week full-time, synchronous, e-learning formats designed as a launching point to new career paths.  Boot Camp revenue includes payments made by enrolled students for boot camp courses and is recognized over the length of the course.

Boot Camp revenue for 2024 is based on management's outlook when considering the demand environment, course offerings and planned marketing spend. Management is also rationalizing the program portfolio and cost structure in 2024 to focus on programs that provide a positive contribution margin. 2025 revenue declines by $31 million as a result of these 2024 actions. From 2025 through 2028, Boot Camp revenue is forecasted to grow at a compound annual growth rate of 4%.

### ii. Executive Education Consumer Revenue

2U's Executive Education Consumer Programs ("**Exec Ed**") are cohort-based asynchronous learning courses designed to enhance and build career-critical skills for executives over 2-16 weeks of intensive learning. Exec Ed revenue includes payments made by enrolled students for courses and is recognized over the length of the course.

Exec Ed revenue is based on management's outlook when considering the demand environment, course offerings and planned marketing spend. The 2024 forecast assumes continued momentum from late 2023 with increased demand for Exec Ed products as well as an improvement in marketing efficiency. Projected revenue and enrollment growth is supported by organic lead growth, higher conversions and an increase in prospect generation spend. Beyond 2024, new courses are expected to drive the growth in the product. The forecast results in a compound annual growth rate of 13% from 2024 through 2028.

### iii. edX Consumer Revenue

The Company offers high-quality online learning opportunities through edX ("**Open Courses**"), its education consumer marketplace. In addition to generating revenue for the edX product line, the platform also drives leads and revenue for the other product lines.

The forecast assumes that 2024 Open Course revenue is similar to 2023 Open Course revenue. Revenue growth through the forecast period is driven by improving the marketing technology underlying the edX platform, resulting in an increase in paid course enrollments.

From 2025 through 2028, Open Course revenue is forecasted to grow at a compound annual growth rate of 12%.

### iv. Enterprise Revenue

The enterprise sales channel targets corporate and government institutions that seek to upskill and reskill employees at any level of their organizations in job-relevant subject areas by offering relevant Boot Camp, Exec Ed and Open Course products.

The forecast assumes revenue growth is driven by a revamped go-to-market sales strategy with new product innovations, optimized pricing and a refocused salesforce to meet corporate clients' specific needs. New product innovations include premium bundled Exec Ed courses that specialize in one discipline, translated content offerings from high-demand courses to serve clients seeking localized content, curated catalogs targeted toward a particular area or skillset to serve

customer demand, and a subscription model. From 2025 through 2028, enterprise revenue is forecasted to grow at a compound annual growth rate of 7%.

## 2.    Expenses

### a.    Inflation assumptions and fixed cost escalation

Labor costs inflation is assumed to be 4% in 2025 and 2% thereafter. Non-labor costs, with the exception of marketing prospect generation, are also generally assumed to increase by 2% per year. To the extent actual inflation exceeds 2%, the projections assume any incremental increase would be offset by productivity improvements.

Prospect generation unit cost per lead is forecasted to increase by 3% per year.

Additionally, fixed costs are forecasted to escalate by approximately $16 million to $19 million per year beginning in 2026 to support business growth.

### b.    Marketing and Sales

Marketing and sales costs include search engine optimization, paid marketing and social media optimization.

Paid marketing spend is used to generate interest and enrollment in 2U's products to drive future revenue. Cost per paid lead is a variable cost that is forecasted in line with expected future demand specific to each product line and the forecasted paid leads needed to generate enrollments and, ultimately, revenue. Marketing cost is built up from leads, forecasted conversion rates and, along with assumptions for organic leads, builds up to forecasted enrollments and revenue.

### c.    Labor

Labor forecast includes payroll wages, instructor and teaching assistant costs, bonus, taxes and benefit expense.

Projected labor costs are projected to decrease from 2024 to 2025 as the business optimizes its cost structure for long-term sustainability. Wages are projected by function and product line. The variable portion of wages increase with business growth from 2025 and beyond based on applicable drivers. Instructor and teaching assistant costs are variable costs that are forecasted based on Boot Camp and Exec Ed revenue and enrollments.

The forecast does not include any employee bonus expense in 2024 Adjusted EBITDA. Bonus expense resumes in 2025 and beyond and is projected as a percentage of wages. For 2024, the forecast includes a retention plan that is excluded from Adjusted EBITDA, but reflected in Net Income and Unlevered Free Cash Flow.

Taxes and benefits expenses are also projected as a percentage of wages.

> d.    **Curriculum and Teaching**

Curriculum and teaching expense consists primarily of amounts due to universities for licenses to use their brand names and other trademarks in connection with Exec Ed and Boot Camp offerings. The payments are based on contractually specified percentages of the tuition and fees 2U receives from students in those offerings.  Curriculum and teaching costs are variable and projected as a percentage of Exec Ed and Boot Camp product line revenue.

> e.    **Hosting and Licensing**

Hosting and licensing expense reflects software license and technology costs that support 2U's digital infrastructure. Hosting and licensing expenses are projected as 75% fixed and 25% variable.

> f.    **Technology Expense**

Technology expense includes technical development costs associated with course content, external cloud implementation, and video production, among other development costs.  These costs are assumed to be 100% fixed.

> g.    **Rent and Office**

Rent and office expense reflects operating lease costs for in-use lease locations.  Office expenses reflect CAM, taxes, janitorial services, utilities, building security and other building related expenses.

> h.    **Professional Fees**

Professional fees include ordinary course consulting, legal, compliance, and accounting fees. These costs are assumed to be 100% fixed.

**3.    Adjusted EBITDA**

Adjusted EBITDA (loss) is defined as net income or net loss, as applicable, before net interest income (expense), other income (expense), net, taxes, depreciation and amortization expense, transaction costs, integration costs, restructuring-related costs, stockholder activism costs, certain litigation-related costs, consisting of fees for certain non-ordinary course litigation and other proceedings, impairment charges, losses on debt modification and extinguishment, and stock-based compensation expense. Some of these items may not be applicable in any given reporting period and they may vary from period to period.

Adjusted EBITDA (loss) is a key measure used by management and the board of directors to understand and evaluate operating performance and trends, to develop short- and long-term operational plans and to compare performance against that of other peer companies using similar measures. In particular, the exclusion of certain expenses that are not reflective of our ongoing operating results in calculating adjusted EBITDA (loss) can provide a useful measure for period-to-period comparisons of the business. Accordingly, management believes that adjusted EBITDA (loss) provides useful information to investors and others in understanding and evaluating operating results in the same manner as our management and board of directors.

Adjusted EBITDA (loss) is not a measure calculated in accordance with U.S. GAAP, and should not be considered as an alternative to any measure of financial performance calculated and presented in accordance with U.S. GAAP. The use of adjusted EBITDA (loss) has limitations as an analytical tool, and should not be considered in isolation or as a substitute for analysis of financial results as reported under U.S. GAAP.

### a.    Depreciation and Amortization

The projections include depreciation and amortization using the straight-line method over the estimated useful life of the property & equipment and intangible assets. The Debtors' property & equipment consists of computers, furniture and equipment and leasehold improvements. Intangible assets include technology, curriculum content and university and enterprise client relationships, trade names and domain names.

Projected depreciation and amortization does not reflect fresh start accounting valuation adjustments to the Debtors' assets, nor has the useful lives of depreciable and amortizable assets been reassessed.

### b.    Net Interest Income (Expense)

Net Interest Income (Expense) consists primarily of interest expense from long-term debt and interest income from cash and cash equivalents. Interest expense also includes debt issuance costs.

### c.    Restructuring Costs

Restructuring costs include restructuring advisor professional fees, severance and severance-related costs, retention payments, real estate costs for unoccupied facilities, payment of rejection damage claims, public company costs that will not be ongoing and other one-time items related to the Chapter 11 Cases. Restructuring costs are forecasted based on when the expense is expected to occur.

### d.    Other Expense

Other expenses include other miscellaneous costs. The forecast does not reflect potential income, expense or loss associated with fresh start accounting, asset impairments, asset dispositions, amortization of new debt issuance costs, and other non-cash items.

### e.    Income Taxes

The projections assume an income tax rate of 25% throughout the forecast period. As of December 31, 2023, the Company had approximately $830 million of net operating losses ("*NOLs*"). Tax analysis related to the ability to utilize NOLs and other tax attributes post-emergence remains ongoing. Therefore, the projections do not include any benefit related to utilizing NOLs or other tax attributes.

## Projected Consolidated Adjusted EBITDA to Cash Statement

(unaudited); (in millions); (years ending December 31)

| $ in millions | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| **Adjusted EBITDA** | **100.9** | **121.1** | **158.3** | **190.1** | **210.5** |
| | | | | | |
| Portfolio Management Receipts, Net | 69.9 | 0.5 | - | - | - |
| Bonus Payment Timing | (0.4) | 22.6 | 2.2 | 2.7 | 1.8 |
| Capital Expenditures | (38.3) | (39.5) | (49.6) | (51.8) | (54.8) |
| Income Tax Payments | - | - | (4.6) | (13.7) | (17.4) |
| Changes in Working Capital | (10.0) | 1.5 | 4.5 | (8.1) | (15.1) |
| **Unlevered Free Cash Flow from Operations** | **122.1** | **106.1** | **110.9** | **119.2** | **124.9** |
| | | | | | |
| Restructuring Professional Fees | (64.6) | - | - | - | - |
| Severance | (25.3) | (7.5) | - | - | - |
| Retention | (16.4) | (2.4) | - | - | - |
| Unoccupied Real Estate | (18.7) | - | - | - | - |
| Other | (10.5) | - | - | - | - |
| **Unlevered Free Cash Flow** | **(13.4)** | **96.3** | **110.9** | **119.2** | **124.9** |
| | | | | | |
| Debt Service | (62.9) | (50.4) | (49.3) | (48.8) | (48.3) |
| Equity Rights Offering | 46.5 | - | - | - | - |
| DIP / Second Lien Exit Term Loan Facility | 64.0 | - | - | - | - |
| Exit Facility Paydown | (30.0) | - | - | - | - |
| **Net Cash Flow** | **4.2** | **45.9** | **61.6** | **70.4** | **76.5** |
| | | | | | |
| Beginning Unrestricted Cash Balance | 60.7 | 64.9 | 110.7 | 172.3 | 242.7 |
| **Ending Unrestricted Cash Balance** | **64.9** | **110.7** | **172.3** | **242.7** | **319.2** |

## Projected Adjusted EBITDA to Cash Assumptions

1. **Portfolio Management Receipts, Net**

Portfolio management receipts include one-time termination payments received in 2024 related to certain Degree programs exited during 2023. The 2024 amount is net of $16 million of Portfolio Management revenue included in Adjusted EBITDA.

2. **Bonus Payment Timing**

Reflects the cash payment versus the accrual timing difference for normal course bonus and enterprise commissions accrued during the year.  Bonuses are assumed to be paid the year after they are earned.  As mentioned above, 2024 Adjusted EBITDA does not include any bonus expense that would be paid in 2025, which is why there is a significant bonus payment timing adjustment in 2025.  Normal bonus payments resume in 2026 and beyond.

**3.  Capital Expenditures**

Projected capital expenditure payments include investments in curriculum & learning, technology, computers, furniture & equipment, and leasehold improvements.

As the business grows, the Capex forecast is aligned to support new launches and/or new verticals, as well as maintain current infrastructure.  Projections reflect approximately $20 million of internal labor that is capitalized annually.  The remaining balance is external spend.

**4.  Income Tax Payments**

Reflects forecasted cash payments for statutory income tax during the Projected Period.

**5.  Changes in Working Capital**

Reflects normal course working capital changes related to business operations.

**6.  Restructuring Professional Fees**

Reflects professional fees related to the Company Advisors, certain creditor advisors as well as United States Trustee fees related to the Chapter 11 Cases, certain litigation and associated transactions.

**7.  Severance**

Reflects projected cash payments for severance and severance-related costs related to optimizing the cost structure.

**8.  Retention**

Reflects retention payments paid to employees as part of a retention plan implemented in 2024.

**9.  Unoccupied Real Estate**

Includes all cash payments related to unoccupied facilities, including payment of allowed claims for rejected leases.

**10. Other**

D&O tail policy and public company costs that will not be required for the post-emergence, go-forward business.

### 11. Debt service

Debt service reflects cash payments required for principal and interest on outstanding debt obligations.

### 12. DIP Loan and Equity Rights Offering

2024 includes $64 million of proceeds from the DIP Facility and $46.5 million of proceeds from a subsequent Equity Rights Offering in connection with the Restructuring, as described in the Disclosure Statement. Among other things, the proceeds of the Equity Rights Offering, including, to the extent applicable, the proceeds of the sale of equity pursuant to the equity rights backstop commitment provided by certain holders of the Unsecured Notes, will be used to fund certain obligations under the Plan in cash upon emergence, including, reducing the aggregate principal amount of the Amended and Restated Loans on the Effective Date and paying the Equity Rights Offering Backstop Commitment Premium. Fees associated with the DIP Facility will be paid as paid-in-kind ("*PIK*") interest, and therefore do not impact forecasted cash flows.

## Net Debt Summary

(unaudited); (in millions); (years ending December 31)

| $ in millions | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
| First Lien Term Loan Facilities | 376.2 | - | - | - | - | - |
| First Lien Revolving Facility | 40.0 | - | - | - | - | - |
| Amended and Restated Credit Facility | - | 386.2 | 382.4 | 378.5 | 374.6 | 370.7 |
| Second Lien Exit Term Loan Facility | - | 69.7 | 80.9 | 93.9 | 109.0 | 126.6 |
| Convertible Senior Notes | 527.0 | - | - | - | - | - |
| Deferred Government Grant Obligations | 3.5 | - | - | - | - | - |
| Other Borrowings | 1.7 | 0.8 | 0.1 | - | - | - |
| **Total Debt (Face Value)** [(1)] | **948.4** | **456.7** | **463.4** | **472.4** | **483.6** | **497.3** |
| Less: Unrestricted cash and restricted cash collateral for Debt (excl. minimum liquidity requirement) [(2)] | (34.4) | (34.9) | (80.7) | (142.3) | (212.7) | (289.2) |
| **Total Net Debt** | **914.0** | **421.9** | **382.7** | **330.1** | **271.0** | **208.1** |

Notes:
1. Excludes certain contractual obligations and commitments, including non-cancelable operating lease obligations, commitments to certain university clients and purchase obligations.
2. Minimum liquidity requirement estimated to be $30 million

Amended and Restated Credit Facility principal balance reflects the face value of the debt. The balance is comprised of the face value of the converted prepetition First Lien Revolving Loan Claims ($40.0 million), face value of the prepetition First Lien Term Loan Claims ($374.3 million), and 1% upfront PIK fees in accordance with the exit transaction on the forecasted Effective Date.

The projections reflect Amended and Restated Credit Facility annual principal amortization of 1% and annual interest of SOFR+6.5%. The forecast assumes SOFR is 5.4%. The interest and

principal amortization are assumed to be paid quarterly.  Additionally, the Amended and Restated Credit Facility also requires the following principal paydowns: (i) $30 million at Closing, (ii) $20 million at the 15-month anniversary of Closing, and (iii) $20 million at the 21-month anniversary of Closing. The facility matures 27 months after emergence and is assumed to be refinanced under existing terms prior to the 15-month anniversary of Closing.

Second Lien Exit Term Loan Facility assumes borrowings and PIK interest accrued under the DIP Facility would become the Second Lien Exit Term Loan facility in accordance with the exit transaction on the forecasted Effective Date. Interest and fees associated with this facility will be PIK (2% fee paid in kind plus SOFR+9.5% per annum interest payable in kind).

The Unsecured Notes are assumed to convert to New Common Interests in the Reorganized Debtors upon consummation of the Restructuring Transactions on the Effective Date. 2024 debt service includes interest payments made prior to the Petition Date.

As of the Petition Date, the Company has two outstanding conditional loan agreements (the "***Deferred Government Grant Obligations***") for an aggregate amount of $3.5 million (face value). The Company maintains restricted cash as collateral for standby letters of credit in connection with the Deferred Government Grant Obligations.  The forecast assumes these obligations are settled by utilizing the existing cash collateralized standby letters of credit in 2024.

Other borrowings reflect miscellaneous equipment borrowings.

## **EXHIBIT D**

Liquidation Analysis

# LIQUIDATION ANALYSIS[1]

## Introduction

Under the "best interests of creditors" test (the "**Best Interests Test**") set forth in section 1129(a)(7) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as may be amended from time to time, the "**Bankruptcy Code**"), the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an impaired claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7).

To demonstrate that the *Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Plan**") satisfies the Best Interests Test, the Debtors' management, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared this hypothetical liquidation analysis (this "**Liquidation Analysis**"), presenting recoveries that may be obtained by Holders of Claims and Interests upon a disposition of assets in a hypothetical chapter 7 liquidation as an alternative to recoveries provided under the Plan.

This Liquidation Analysis sets forth an estimated range of recovery values that may be realized by each Class of Claims and Interests upon disposition of the Debtors' assets pursuant to a hypothetical chapter 7 liquidation, as an alternative to the Plan. As illustrated by this Liquidation Analysis, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical chapter 7 liquidation than they will under the Plan. Critically, this Liquidation Analysis indicates that no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the Best Interests Test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors' management based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Some assumptions in this Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**").

ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated, and the recoveries that would result, if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code after conversion of the Chapter 11 Cases.  The Liquidation Analysis is not intended and should not be used for any purpose other than determining the Plan's compliance with the Best Interests Test.  The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of a chapter 7 case.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Debtors' estimates of Allowed Claims and Interests contained in this Liquidation Analysis reference specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the Plan to holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests.  Thus, the Claims amounts in the Chapter 11 Cases may differ.  This Liquidation Analysis assumes that, in a chapter 7 liquidation, the business of the Debtors would cease upon or shortly after conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  The cessation of business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not be asserted in cases under chapter 11 where the Debtors would continue to operate their business as debtors-in-possession.  These additional Claims could be significant, and some may be entitled to administrative expense status or otherwise entitled to priority in payment over General Unsecured Claims.

This Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon a liquidation and sale of the Debtors' assets, (ii) potential employee Claims (for such items as severance and potential U.S. WARN Act liabilities), (iii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, (iv) certain Claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code, (v) environmental or other governmental claims arising from the shut-down or sale of the Debtors' assets, or (vi) additional unsecured and contract and lease rejection claims likely to arise in a chapter 7 liquidation.  The likely result of such assumptions in this Liquidation Analysis would be to diminish potential recoveries of Allowed Claims against the Debtors, especially of Allowed General Unsecured Claims.  More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS, THEIR MANAGEMENT NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED

HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

This Liquidation Analysis is based on, among other information, the Debtors' books and records and good faith estimates regarding asset recoveries and Claims resulting from a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which may be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative claims, and additional administrative claims incurred as in cases under chapter 7 of the Bankruptcy Code, such as wind down costs and chapter 7 trustee fees and expenses (collectively, the "***Wind-Down Expenses***").  As of the date hereof, the total amount of Claims and Interests Allowed against the Debtors has not been estimated or otherwise fixed by the Court.  Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any purpose other than for determining the Plan's compliance with the Best Interests Test, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.

**<u>Basis of Presentation</u>**

This Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases convert to cases under chapter 7 of the Bankruptcy Code and that the Debtors' Non-Debtor Affiliates similarly enter chapter 7 proceedings (or similar liquidation proceedings in applicable foreign jurisdictions) on or about September 6, 2024 (the "***Liquidation Date***").  Among other things, the assumption that all Debtors and Non-Debtor Affiliates would enter into court-supervised liquidation proceedings results in (i) a significant reduction or complete elimination of any recovery on account of intercompany claims and (ii) increased expenses and difficulty in monetizing the Debtors' assets due to significant complexity associated with parallel liquidation proceedings of the Non-Debtor Affiliates in various foreign jurisdictions.

Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of March 31, 2024, which are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.  The Debtors' management team believes that the March 31, 2024 book value of their assets and certain liabilities are a reliable proxy for such book values as of the Liquidation Date.  This Liquidation Analysis assumes that, on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "***Trustee***") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors

would be sold, either piecemeal or in whole, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of Wind-Down Expenses and other chapter 7 administrative claims; (ii) *second,* to pay the secured portions of all Allowed First Lien Claims from the collateral securing such Claims; and (iii) *third*, to pay Allowed DIP Claims. Any remaining cash would be distributed to creditors holding General Unsecured Claims, including deficiency claims of the Holders of First Lien Claims and DIP Claims, to the extent the value of the amount of such Claims exceeds the value of the collateral securing such Claims. Certain factors, such as an inability of the Debtors or the Trustee to maintain the Debtors' operations during the Liquidation Process (as defined below), a seizure of collateral by secured creditors, significant employee attrition, and/or delays in the liquidation process, may materially reduce the proceeds generated in a liquidation of the Debtors' assets and yield significantly lower recoveries than those estimated in this Liquidation Analysis.

This Liquidation Analysis has been prepared assuming that the Debtors' current Chapter 11 Cases convert to chapter 7 on the Liquidation Date. This Liquidation Analysis assumes certain of the Non-Debtor Affiliates (the "***Going Concern Entities***") will be sold as a going concern (namely, the Non-Debtor Affiliates involved in the Exec Ed Programs business, as discussed in Note H below) while the majority of the Debtors and Non-Debtor Affiliates (collectively with the Going-Concern Entities, the "***Liquidating Entities***") will cease operations and their individual assets will be sold piece-meal during a three-month liquidation process (the "***Liquidation Process***") under the direction of the Trustee, utilizing certain of the Debtors' employees, resources and third-party advisors, to allow for the orderly wind down of the Debtors' estates. There can be no assurance that the liquidation would be completed in this limited time frame or in this manner, nor is there any assurance that the recoveries assigned in this Liquidation Analysis to the Liquidating Entities' assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest. *See* 11 U.S.C. § 704. This Liquidation Analysis is also based on the assumptions that: (i) the Debtors have continued access to cash collateral during the course of the Liquidation Process to fund Wind-Down Expenses, and (ii) operations, accounting, treasury, IT, and other management services needed to wind down the estates continue. The Liquidation Analysis was prepared on an entity-by-entity basis for all Debtors and Non-Debtor Affiliates and is displayed below on a consolidated basis for convenience. Asset recoveries accrue first to satisfy creditor claims at the legal entity against which such liabilities have been incurred. To the extent any remaining value exists, it is assumed to flow to each individual entity's parent organization or appropriate shareholder. In addition, this Liquidation Analysis includes an analysis of the recovery of Intercompany Claims.

### DETAILED LIQUIDATION ANALYSIS

This Liquidation Analysis for the Liquidating Entities was analyzed on an entity-by-entity basis. For ease of presentation, the following table provides a summary Liquidation Analysis for the Debtors in total, but the results of the Best Interests Test discussed herein reflect the analysis

performed on an entity-by-entity basis.  This Summary Liquidation Analysis should be reviewed in conjunction with the associated notes.

| Liquidation Analysis - Summary of Recoveries from Debtors | | | | | | |
|---|---|---|---|---|---|---|
| *In $Thousands* | Note: | Book Value | Recovery % Low | High | Recovery $ Low | Recovery $ High |
| Cash and Cash Equivalents | [A] | $ 19,585 | 100.0% | 100.0% | $ 19,585 | $ 19,585 |
| Restricted Cash | [B] | 3,675 | 0.0% | 0.0% | - | - |
| Accounts Receivable | [C] | 65,129 | 50.0% | 75.0% | 32,548 | 48,825 |
| Prepaid Expenses and Other Current Assets | [D] | 62,561 | 3.7% | 27.8% | 2,339 | 17,420 |
| Physical and Leasehold Assets, Net | [E] | 34,776 | 2.1% | 6.4% | 737 | 2,212 |
| Other Non-Current Assets | [F] | 1,034,031 | 1.4% | 2.7% | 14,046 | 27,703 |
| Intercompany Receivables from Non-Debtors | [G] | na | na | na | 6,342 | 6,686 |
| Equity from Non-Debtor Subsidiaries | [H] | na | na | na | 16,329 | 22,795 |
| **Total Assets** | | **$ 1,219,756** | **7.5%** | **11.9%** | **$ 91,925** | **$ 145,226** |
| | | | | | | |
| **Wind-Down Expenses** | [I] | | | | | |
| Wind-Down Expenses | | | | | $ 35,677 | $ 38,466 |
| Wind-Down Expenses Recovery | | | | | 35,677 | 38,466 |
| *Wind-Down Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **Net Proceeds from Liquidation** | | | | | **$ 56,248** | **$ 106,760** |
| | | | | | | |
| **First Lien Claims** | [J] | | | | $ 415,300 | $ 415,300 |
| First Lien Recovery | | | | | 56,248 | 106,759 |
| **First Lien Deficiency Claims** | | | | | **$ 359,052** | **$ 308,541** |
| *First Lien Recovery %* | | | | | *13.5%* | *25.7%* |
| | | | | | | |
| **DIP Claims** | [K] | | | | $ 60,000 | $ 60,000 |
| DIP Recovery | | | | | - | - |
| *DIP Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **General Unsecured Claims** | [L] | | | | $ 1,368,028 | $ 1,317,517 |
| General Unsecured Recovery | | | | | - | - |
| *General Unsecured Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Total Creditor Recovery** | | | | | **$ 56,248** | **$ 106,759** |

**Notes to the Liquidation Analysis**

[A] <u>Cash and Cash Equivalents</u>: This cash balance represents the estimated balance as of the Liquidation Date. A 100% recovery on cash and equivalents has been estimated for the low and high scenarios.

[B] <u>Restricted Cash</u>: The Restricted Cash balance represents the estimated balance as of the Liquidation Date. Restricted Cash is held as collateral and is expected to be unrecoverable in the event of a chapter 7 liquidation. A 0% recovery has been estimated for the low and high scenarios.

[C] <u>Accounts Receivable</u>: The Debtors' accounts receivable was evaluated by category. A 50.0% to 75.0% recovery, on a blended basis, has been estimated for the Debtors' receivables based on the likelihood of recoverability.

[D] <u>Prepaid Expenses and Other Current Assets</u>: Prepaid Expenses and Other Current Assets consist largely of advances to universities, prepaid insurance premiums, as well as software licenses and subscriptions. These assets have been evaluated on an individual basis for recoverability based on the high likelihood of recoverability of unused insurance premiums and the more limited recoverability of other assets. On a blended basis, a 3.7% to 27.8% recovery has been estimated on the Debtors' Prepaid Expenses and Other Current Assets.

[E] <u>Physical and Leasehold Assets, Net</u>: Physical and Leasehold Assets consists of tangible assets such as furniture and equipment, computers, and leasehold improvements. The recoveries have been evaluated by asset type. On a blended basis, a 2.1% to 6.4% recovery has been estimated on the Debtors' Physical and Leasehold Assets.

[F] <u>Other Non-Current Assets</u>: Other Non-Current Assets consist of various assets such as intangibles and deferred rent receivable that will likely be largely unrecoverable in the event of a chapter 7 liquidation. These assets have been evaluated on an individual basis for recoverability. The intellectual property licensed to edX related to university course curriculums was separately valued and assigned an estimated recovery value assuming that, subject to any restrictions in the relevant license agreement, the licenses can be assigned to an interested buyer. On a blended basis, a 1.4% to 2.7% recovery has been estimated on the Debtors' Other Non-Current Assets.

[G] <u>Intercompany Receivables from Non-Debtors</u>: Intercompany Receivables from Non-Debtors represents intercompany claims at Debtor entities from Non-Debtor entities. Intercompany Receivables from Non-Debtors is expected to yield a $6.3 million to $6.7 million recovery on the low and high scenarios, respectively, based on an analysis of the recovery at the respective Non-Debtors.

[H] <u>Equity in Non-debtor Subsidiaries</u>: Equity in Non-Debtor Subsidiaries represents residual equity value of certain Non-Debtor entities after debt and other claims have been paid at the respective Non-Debtor entities. Equity in Non-Debtor Subsidiaries consists of the remaining

equity value (after satisfaction of intercompany payables) of the estimated proceeds from the Non-Debtor Affiliates involved in the Exec Ed Programs business unit that was assumed to be sold on a distressed going concern basis and was separately valued and assigned an estimated recovery value.  The value was estimated based on trading multiples, while accounting for the distressed nature of the sale transaction.

[I] <u>Wind-Down Expenses</u>: Wind-Down Expenses represent administrative expenses prior to conversion to chapter 7 and the expenses associated with administering the chapter 7 liquidation.  A combined 6% trustee and related legal/professional expense has been applied to the total non-cash, non-residual equity asset value.  Legal/professional fees of the Trustee are estimated to be approximately $3.0 million in the low scenario and $5.8 million in the high scenario.  Chapter 7 wind down and operation expenses total approximately $10.9 million.  Additionally, certain pre-conversion balance sheet priority liabilities (e.g., taxes payable) have been included in the estimated Wind-Down Expenses and total approximately $21.8 million.  A full recovery is estimated for Wind-Down Expenses.

[J] <u>First Lien Claims:</u> A recovery of 13.5% to 25.7% has been estimated for the First Lien Claims.

[K] <u>DIP Claims</u>: The amount of estimated DIP Claims assumes that the Debtors only receive the initial draw.  The liens securing the obligations under the DIP Facility are junior to the liens securing the obligations under the First Lien Credit Agreement, and therefore, Allowed DIP Claims are assumed only to obtain a recovery after the First Lien Claims are paid in full.  Recovery on the DIP Claims is estimated to be $0.

[L] <u>General Unsecured Claims</u>: The General Unsecured Claims includes estimated deficiency claims and Unsecured Note Claims, scheduled at the applicable Debtors.  Recovery on the General Unsecured Claims is estimated to be $0.

# **EXHIBIT E**

Organizational Structure

# 2U CORPORATE STRUCTURE



**Legend:**

- Borrower under First Lien Credit Agreement
- Guarantor under First Lien Credit Agreement
- Issuer of Unsecured Notes
- 100% Pledged Subsidiary under First Lien Credit Agreement
- 65% Pledged Subsidiary under First Lien Credit Agreement

# **EXHIBIT E**

Equity Rights Offering Procedures

## 2U, INC. (THE "COMPANY")
## EQUITY RIGHTS OFFERING PROCEDURES[1]

- **You may participate in this Equity Rights Offering (as defined below) only if you hold at least $1,000 in principal amount of Convertible Notes as of the Equity Rights Offering Termination Time (as defined below)**.

- **Each holder of Convertible Notes (the "Convertible Noteholders") are _not_ required to exercise any of their Subscription Rights, but they may if they wish to do so and they follow the required procedures.**

- **If you are a Convertible Noteholder and you exercise your Subscription Rights, you will have to PAY the Purchase Price (as defined below) for such exercise, as described further below.**

- **If the Equity Rights Offering is consummated, Convertible Noteholders who have timely, duly and validly exercised their applicable Subscription Rights, including payments therefor, will receive the corresponding number of Equity Rights Offering Shares (as defined below) that were purchased.**

- **Notwithstanding whether Convertible Noteholders have exercised any of their Subscription Rights, consummation of the Equity Rights Offering is subject to, among other things, the consent of the Required Consenting Noteholders and the confirmation of the Plan (as defined below).**

- **Additional information is provided in this document and in the Subscription Form enclosed herewith.**

**The Subscription Rights and the Equity Rights Offering Shares (other than the Equity Rights Offering Shares issued to the Equity Rights Offering Backstop Parties) are being distributed and issued by the Company without registration under the Securities Act of 1933, as amended (the "Securities Act"), as a result of Section 1145 of the Bankruptcy Code to the maximum extent available by law or, if Section 1145 is not available, then otherwise pursuant to another exemption from registration under the Securities Act and any other applicable securities laws. The Equity Rights Offering Shares issued to the Equity Rights Offering Backstop Parties are being distributed and issued by the Company without registration pursuant to Section 4(a)(2) of the Securities Act and/or the safe harbor of Regulation D promulgated thereunder or such other exemption as may be available from any applicable registration requirements. None of the Subscription Rights or the Equity Rights Offering Shares have been, nor is it anticipated that they will be, registered**

---

[1] Capitalized terms used and not defined herein shall have the meaning assigned to them in the *Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**"). In the event of any conflict, inconsistency or discrepancy between statements contained herein and any statements in the Plan, the Plan  will govern and control for all purposes.

under the Securities Act or any state or local law requiring registration for offer and sale of a security.

The Subscription Rights are not detachable or transferable. Any purported transfer shall be void and without effect, and neither the transferor nor the purported transferee will receive any Equity Rights Offering Shares otherwise purchasable on account of such transferred Subscription Rights.

Only Convertible Noteholders (including the Equity Rights Offering Backstop Parties) that hold Convertible Notes as of the Equity Rights Offering Termination Time are permitted to participate in this Equity Rights Offering.

Each Equity Rights Offering Share issued upon exercise of a Subscription Right (other than the Equity Rights Offering Shares issued to the Equity Rights Offering Backstop Parties) may, unless issued to an entity that is an "underwriter" as that term is defined for purposes of Section 1145 of the Bankruptcy Code, be resold in reliance on Section 1145 of the Bankruptcy Code and pursuant to Section 4(a)(1) of the Securities Act and shall not be restricted securities under the Securities Act.

Equity Rights Offering Shares issued to the Equity Rights Offering Backstop Parties in reliance upon the exemption provided by Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder shall be imprinted or otherwise associated with a legend in substantially the following form:

"THE SECURITIES REPRESENTED HEREBY WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Disclosure Statement (as defined below) has previously been distributed in connection with the Debtors' solicitation of votes to accept or reject the Plan and that document sets forth important information, including risk factors, that should be carefully read and considered by each Convertible Noteholder prior to making a decision to participate in the Equity Rights Offering. Epiq Corporate Restructuring, LLC is the subscription agent for the Equity Rights Offering (the "Subscription Agent"). You may request copies of the Disclosure Statement and Plan by (i) calling the Subscription Agent at 877-525-5725 (Toll Free U.S.) or +1 360-803-4441 (International) or (ii) emailing tabulation@epiqglobal.com (with reference to "2U Disclosure Statement" in the subject line). You may also obtain copies of the Disclosure Statement, the Plan, and any pleadings filed in these chapter 11 cases at no charge at https://dm.epiq11.com/2U. The Equity Rights Offering is being conducted by the Company in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the

**Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

Convertible Noteholders should note the following times relating to the Equity Rights Offering:

| Date | Calendar Date | Event / Notes |
|------|---------------|---------------|
| Subscription Commencement Date | [ ● ], 2024 | Commencement of the Equity Rights Offering and the first date on which Convertible Noteholders are eligible to exercise Subscription Rights. |
| Equity Rights Offering Termination Time | 5:00 p.m. prevailing Eastern Time on [ ● ], 2024 | The deadline for Convertible Noteholders (including Equity Rights Offering Backstop Parties) to submit their Convertible Notes via ATOP in order to exercise Subscription Rights.[2] |
| Registration Deadline | By one Business Day after the Equity Rights Offering Termination Time | The deadline for Convertible Noteholders (including Equity Rights Offering Backstop Parties) to submit registration details and IRS Forms via the Registration Portal. |
| Non-Backstop Funding Deadline | By one Business Day after the Equity Rights Offering Termination Time | The deadline for Convertible Noteholders (other than Equity Rights Offering Backstop Parties) to deliver the payment of the aggregate Purchase Price. |
| Backstop Funding Deadline | 5:00 p.m. prevailing Eastern Time on [ ● ], 2024 | The deadline for Equity Rights Offering Backstop Parties to deliver their aggregate Purchase Price pursuant to the Equity Rights Offering Backstop Commitment Letter. |
| Settlement Date | Effective Date of Plan | The date by which the Equity Rights Offering is settled. |
| * The Equity Rights Offering Termination Time and any applicable funding deadline may be extended by the Company, in its sole distraction, with the prior written approval of the Required Consenting Noteholders, or as required by law. | | |

To Convertible Noteholders:

On July [ ● ], 2024, the Debtors filed the Plan with the United States Bankruptcy Court for the Southern District of New York, and the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy*

---

[2] Use of the ATOP system is subject to the DTC's agreement. If the ATOP system is not used, a Nominee (as defined below) will be required to arrange for the DWAC withdrawal of the corresponding Convertible Note upon instruction by the Subscription Agent.

*Code* (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Disclosure Statement**").

Subject to the terms and conditions set forth in the Plan and these Equity Rights Offering Procedures, each Convertible Noteholder as of the Equity Rights Offering Termination Time is entitled to subscribe for its *pro rata* share of an aggregate amount of not less than $46.5 million of New Common Interests to be issued as of the Effective Date at the Purchase Price (defined below) (the "**Equity Rights Offering**" and the New Common Interests issued pursuant to the Equity Rights Offering, the "**Equity Rights Offering Shares**"). Convertible Noteholders who timely and validly elect to participate in the Equity Rights Offering by electing to exercise their Subscription Rights for their corresponding share of the Equity Rights Offering Shares shall purchase such shares at a price per share of $7.00 (the "**Purchase Price**"), which represents a 30% discount to the Stipulated Equity Value.

No Convertible Noteholder shall be entitled to participate in the Equity Rights Offering unless the aggregate Purchase Price for the Equity Rights Offering Shares it subscribes for is received by the Subscription Agent (i) in the case of a Convertible Noteholder that is not an Equity Rights Offering Backstop Party, by the Non-Backstop Funding Deadline, and (ii) in the case of the Equity Rights Offering Backstop Parties, by the Backstop Funding Deadline. Each Convertible Noteholder must deliver the payment of the aggregate Purchase Price by the relevant deadline. Any Convertible Noteholder that exercises its Subscription Rights must enter into a joinder to the Restructuring Support Agreement (the "**Joinder**") pursuant to which, among other things, such Convertible Noteholders must vote to accept the Plan (if such Convertible Notes were held as of the Voting Record Date) and must neither object to the confirmation of the Plan nor opt out of the releases contained therein.

No interest is payable on any advanced funding of the Purchase Price. If the Equity Rights Offering is terminated for any reason, then the applicable Purchase Price previously received by the Subscription Agent will be returned promptly to the Convertible Noteholders as provided in Section 6 hereof. No interest will be paid on any returned Purchase Price.

**The rights and obligations of the Equity Rights Offering Backstop Parties in the Equity Rights Offering shall be governed by the Equity Rights Offering Backstop Commitment Letter, including to the extent the rights or obligations set forth therein differ from the rights and obligations set forth in these Equity Rights Offering Procedures.**

**To participate in the Equity Rights Offering, a Convertible Noteholder must complete all of the steps outlined below. If a Convertible Noteholder does not complete all of the steps outlined below by the applicable deadline, such Convertible Noteholder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Equity Rights Offering.**

## 1.    Equity Rights Offering

Convertible Noteholders as of the Equity Rights Offering Termination Time have the right, but not the obligation, to participate in the Equity Rights Offering.

5

During the period beginning on the Subscription Commencement Date and ending on the Equity Rights Offering Termination Time (the "**Rights Exercise Period**"), Convertible Noteholders are eligible to subscribe for up to their *pro rata* portion of the Equity Rights Offering Shares.

Subject to the terms and conditions set forth in the Plan, these Equity Rights Offering Procedures, and the Subscription Form, each Convertible Noteholder may timely and validly elect to participate in the Equity Rights Offering and to subscribe for up to its *pro rata* share of the Equity Rights Offering Shares. Convertible Noteholders who timely and validly elect to participate in the Equity Rights Offering by electing to exercise their Subscription Rights for their corresponding Equity Rights Offering Shares shall pay the aggregate Purchase Price for such shares. **For the avoidance of doubt, holders should use the principal amount of their Convertible Notes when calculating their allotted number of Equity Rights Offering Shares on their Subscription Form.**

**To the extent the aggregate amount subscribed for by the Convertible Noteholders that are not Equity Rights Offering Backstop Parties through the Equity Rights Offering is less than the Equity Rights Offering Backstop Commitment, the Equity Rights Offering Backstop Parties have agreed to purchase any unsubscribed Equity Rights Offering Shares up to the Equity Rights Offering Backstop Commitment amount, as set forth in the Equity Rights Offering Backstop Commitment Letter.**

The Subscription Rights and the corresponding Equity Rights Offering Shares issued in the Equity Rights Offering (other than the Equity Rights Offering Shares issued to the Equity Rights Offering Backstop Parties) will be issued in reliance on Section 1145 of the Bankruptcy Code and, unless such Convertible Noteholder is an "underwriter," as that term is defined for purposes of Section 1145 of the Bankruptcy Code, may be resold in reliance on Section 1145 of the Bankruptcy Code and pursuant to Section 4(a)(1) of the Securities Act and shall not be restricted securities under the Securities Act.

The Equity Rights Offering Shares issued to the Equity Rights Offering Backstop Parties are being distributed and issued by the Company without registration pursuant to Section 4(a)(2) under the Securities Act and/or Regulation D promulgated thereunder. Any Convertible Noteholder who receives such Equity Rights Offering Shares pursuant to Section 4(a)(2) of the Securities Act shall be subject to restriction under the Securities Act on its ability to resell those securities.

Resale restrictions are discussed in more detail in Article IX of the Disclosure Statement, entitled "EXEMPTIONS FROM SECURITIES ACT REGISTRATION."

**SUBJECT TO THE TERMS AND CONDITIONS OF THESE EQUITY RIGHTS OFFERING PROCEDURES, AND THE EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT LETTER IN THE CASE OF THE EQUITY RIGHTS OFFERING BACKSTOP PARTIES, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION FORM ARE IRREVOCABLE.**

    2.    **Rights Exercise Period**

The Equity Rights Offering shall commence, and the Subscription Rights will be deemed to be delivered, on the Subscription Commencement Date and shall expire at the Equity Rights Offering Termination Time. Each Convertible Noteholder intending to purchase Equity Rights Offering Shares in the Equity Rights Offering must (a) affirmatively elect to exercise its Subscription Rights in the manner set forth in the applicable Subscription Form by the Equity Rights Offering Termination Time and (b) pay the applicable Purchase Price, by, in the case of this clause (b), (i) in the case of a Convertible Noteholder that is not an Equity Rights Offering Backstop Party, the Non-Backstop Funding Deadline, or (ii) in the case of the Equity Rights Offering Backstop Parties, the Backstop Funding Deadline.

Any exercise of the Subscription Rights to purchase the Equity Rights Offering Shares by a Convertible Noteholder after the Equity Rights Offering Termination Time or payment after the applicable funding deadline will not be allowed and any purported exercise or payment received by the Subscription Agent after such applicable deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

The Equity Rights Offering Termination Time and any applicable funding deadline may be extended by the Company with the prior written approval of the Required Consenting Noteholders, or as required by law.

### 3.    Delivery of Subscription Documents

In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Form and these Equity Rights Offering Procedures will be sent to each eligible Convertible Noteholder at that time, together with appropriate instructions for the proper completion, due execution and timely delivery of the required steps and the payment of the applicable aggregate Purchase Price for its Equity Rights Offering Shares.

Copies of the Subscription Form and these Equity Rights Offering Procedures may also be obtained by contacting the Subscription Agent or visiting the Debtors' restructuring website at https://dm.epiq11.com/2U.

### 4.    Exercise of Subscription Rights

For any Convertible Noteholder holding through its broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, as applicable (each a, "**Nominee**"): In order to exercise any Subscription Rights, such Convertible Noteholder's Nominee must submit its Convertible Notes into the ATOP system to the account established by the Subscription Agent with DTC.

(a)    In order to validly exercise its Subscription Rights, each Convertible Noteholder must:

i.    have instructed its Nominee to electronically deliver the Convertible Notes through DTC's ATOP, such that the Nominee's delivery of the Convertible Notes through DTC's ATOP is completed prior to the Equity Rights Offering Termination Time;

7

ii.  by the Registration Deadline, provide registration details for the Equity Rights Offering Shares via the Subscription Agent's Registration Portal (https://epiqworkflow.com/cases/2URightsOffer) and an IRS Form W-9 or appropriate IRS Form W-8, as applicable and for Convertible Noteholders who are not Equity Rights Offering Backstop Parties, provide an executed signature page to the Joinder; and

iii.  pay the applicable Purchase Price in accordance with the following:

a.  if the Convertible Noteholder is not an Equity Rights Offering Backstop Party, by the Non-Backstop Funding Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Subscription Form; and

b.  if the Convertible Noteholder is an Equity Rights Offering Backstop Party, no later than the Backstop Funding Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Subscription Form.

(b)  With respect to Section 4(a)(ii) above, each subscribing Convertible Noteholder may coordinate with its Nominee(s) to deliver the payment of the applicable Purchase Price payable for the Equity Rights Offering Shares elected to be purchased by such Convertible Noteholder, by the applicable deadline.

(c)  In the event that the funds received by the Subscription Agent from any Convertible Noteholder do not correspond to the Purchase Price payable for the Equity Rights Offering Shares elected to be purchased by such Convertible Noteholder, the number of the Equity Rights Offering Shares deemed to be purchased by such Convertible Noteholder will be the lesser of (1) the number of the Equity Rights Offering Shares elected to be purchased by such Convertible Noteholder as evidenced by the relevant DTC ATOP submission(s) and (2) a number of the Equity Rights Offering Shares determined by dividing the amount of the funds received by the Purchase Price, in each case up to such Convertible Noteholder's *pro rata* portion of Equity Rights Offering Shares. In the event any excess funds remain following the adjustment described in the foregoing sentence, such amounts will be returned, without interest, to the applicable Convertible Noteholder as soon as reasonably practicable.

(d)  The cash paid to the Subscription Agent in accordance with these Equity Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated account until released to the Debtors in connection with the settlement of the Equity Rights Offering on the Effective Date or in accordance with the Plan.

The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

(e)     Each Convertible Noteholder that participates in the Equity Rights Offering is deemed to have made the following representations and acknowledgments:

    i.     Each Convertible Noteholder recognizes and understands that the Subscription Rights are not transferrable and that the benefits of the Subscription Rights are not separable from the claim or securities with respect to which the Subscription Rights have been granted.

    ii.    Each Convertible Noteholder represents and warrants that it will not accept a distribution of Equity Rights Offering Shares if at such time it does not hold all of the Convertible Notes associated with its Subscription Rights and, by accepting a distribution of Equity Rights Offering Shares, such Convertible Noteholder will be deemed to be the owner thereof.

    iii.   Each Convertible Noteholder represents and warrants that it is the beneficial owner of, or the authorized signatory of such beneficial owner of, the Convertible Notes as of the date such Convertible Noteholder exercises its Subscription Rights.

## 5.     Transfer Restriction

(a)     Once a Convertible Noteholder has tendered its Convertible Note(s) through DTC's ATOP, such Convertible Note(s) shall be frozen from trading unless and until the Equity Rights Offering is terminated.

(b)     The Subscription Rights are not detachable or transferable. Any purported transfer of the Subscription Rights shall be void and without effect, and the purported transferee will not receive any Equity Rights Offering Shares otherwise purchasable on account of such purported transfer of Subscription Rights.

(c)     Once a Convertible Noteholder has properly exercised its Subscription Rights, subject to the terms and conditions contained in these Equity Rights Offering Procedures, and the Equity Rights Offering Backstop Commitment Letter in the case of the Equity Rights Offering Backstop Parties, such exercise will be irrevocable.

## 6.     Termination/Return of Payment

Unless the Effective Date has occurred, the Equity Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of (a) termination of the Restructuring Support Agreement in accordance with its terms or (b) the Debtors revoking or withdrawing the Plan. In the event the Equity Rights Offering is terminated, any payments received

pursuant to these Equity Rights Offering Procedures will be returned, without interest, to the applicable Convertible Noteholder as soon as reasonably practicable, which is expected to be no later than the later of the date that is five Business Days after the date on which the Equity Rights Offering is terminated or the date the Subscription Agent receives the applicable refund information.

**7.    Settlement of the Equity Rights Offering and Distribution of the Equity Rights Offering Shares**

The settlement of the Equity Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Equity Rights Offering Procedures, the consent of the Required Consenting Noteholders and the simultaneous occurrence of the Effective Date.

**8.    Fractional Shares**

No fractional Equity Rights Offering Shares will be issued in the Equity Rights Offering. All share allocations (including each Convertible Noteholder's Equity Rights Offering Shares) will be calculated and rounded down to the nearest whole share, at the beneficial holder level. The total amount of Equity Rights Offering Shares that may be purchased pursuant to the Equity Rights Offering shall be adjusted as necessary to account for the rounding described in this <u>Section 8</u>. No compensation shall be paid, whether in cash or otherwise, in respect of any rounded-down amounts.

**9.    Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined in good faith by the Company, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Company may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscriptions will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Company determines in good faith. In addition, the Subscription Agent shall have no obligation to notify parties of or cure any defects to the forms returned in exercising the Subscription Rights.

*Before exercising any Subscription Rights, Convertible Noteholders should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

All calculations shall be made in good faith by the Debtors and in accordance with any Allowed Unsecured Notes Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

### 10.    Modification of Procedures

With the prior written consent of the Required Consenting Noteholders, the Debtors reserve the right to modify these Equity Rights Offering Procedures, or adopt additional procedures consistent with these Equity Rights Offering Procedures to effectuate the Equity Rights Offering and to issue the Equity Rights Offering Shares, *provided, however*, to the extent that any modification to these Equity Rights Offering Procedures or adoption of additional procedures is made after the Subscription Commencement Date which directly, adversely, and materially impacts the Convertible Noteholders, the Debtors shall provide prompt written notice by posting a notice with respect to such material modification or adoption of additional procedures on the Debtors' case website at https://dm.epiq11.com/2U. In so doing, and with the prior written consent of the Required Consenting Noteholders, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith is necessary and appropriate to effectuate and implement the Equity Rights Offering and the issuance of the Equity Rights Offering Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of the Subscription Form without the reasonable consent of the Convertible Noteholder subject thereto. The Debtors are not obligated to deliver any notice to the Convertible Noteholders in connection with any reduction in the size of the Equity Rights Offering, other than Equity Rights Offering Backstop Parties.

### 11.    Inquiries and Transmittal of Documents; Subscription Agent

The Rights Offering Instructions for the Convertible Noteholders attached hereto should be carefully read and strictly followed by the Convertible Noteholders.

Questions relating to the Equity Rights Offering should be directed to the Subscription Agent via email to: tabulation@epiqglobal.com (please reference "2U Subscription" in the subject line) or at the following phone number: +1-646-362-6336. Please note that the Subscription Agent is only able to respond to procedural questions regarding the Equity Rights Offering, and cannot provide any information beyond that included in these Equity Rights Offering Procedures and the Subscription Form. A Convertible Noteholder must follow the directions included herein with respect to providing instructions in connection with the Equity Rights Offering.

The risk of non-delivery of any instructions, documents, and payments to the Subscription Agent is on the Convertible Noteholder electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

### 12.    Failure to Exercise Subscription Rights

Subscription Rights that are not exercised in accordance with these Equity Rights Offering Procedures by the Equity Rights Offering Termination Time will be relinquished on the Equity Rights Offering Termination Time, and none of the Debtors, the Reorganized Debtors or any of their respective employees, Affiliates, or professionals shall have any liability for any failure to

11

exercise Subscription Rights. Any attempt to exercise Subscription Rights after the Equity Rights Offering Termination Time shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Equity Rights Offering Termination Time regardless of when the documents relating thereto were sent. In all cases, you should allow sufficient time to ensure timely delivery of your Convertible Notes by ATOP by the Equity Rights Offering Termination Time, and you must also provide the relevant registration details and the applicable IRS tax form via the Registration Portal.

### 2U, INC.
### EQUITY RIGHTS OFFERING INSTRUCTIONS FOR CONVERTIBLE NOTEHOLDERS

**Terms used and not defined herein shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Equity Rights Offering, you must follow the instructions set out below:**

- **Review** the worksheet in Item 1 of your Subscription Form, which calculates the maximum number of Equity Rights Offering Shares available for you to purchase. Such total amount should be automatically rounded down to the nearest whole share.

- **Review** Item 2 of your Subscription Form to determine the number of Equity Rights Offering Shares you elect to purchase.

- **Review** Item 3 of your Subscription Form to determine the aggregate Purchase Price for such Equity Rights Offering Shares you have elected to purchase.

- **Review** the payment instructions in Item 4 for such Equity Rights Offering Shares you have elected to purchase.

- **Review** the certification in Item 5 of your Subscription Form. Participation in the Equity Rights Offering shall indicate your acceptance and approval of the terms and conditions set forth in these Equity Rights Offering Procedures.

- **Provide your instructions to your Nominee** to submit the applicable portion of your Convertible Notes via ATOP prior to the Equity Rights Offering Termination Time.

- **Submit required information on the Registration Portal** for the registration of your Equity Rights Offering Shares and provide the applicable IRS Form by the Registration Deadline. To access the Registration Portal, visit https://epiqworkflow.com/cases/2URightsOffer and follow the instructions to submit the needed details.

- **Arrange for full payment** by wire transfer of immediately available funds of the aggregate Purchase Price, calculated in accordance with Item 3 of your Subscription Form by the Non-Backstop Funding Deadline (in the case of Convertible Noteholders that are not Equity Rights Offering Backstop Parties), or the Backstop Funding Deadline (in the case of Convertible Noteholders that are Equity Rights Offering Backstop Parties). You may wish to coordinate with your Nominee(s) to arrange for payment of the Purchase Price to the Subscription Agent by the Non-Backstop Funding Deadline or the Backstop Funding Deadline, as applicable.

- Timely submission of (i) your Convertible Notes via ATOP and (ii) the required information via the Registration Portal is the only valid method to participate in the Equity Rights Offering.

**The Equity Rights Offering Termination Time is 5:00 p.m. prevailing Eastern Time on [ ● ], 2024.**

**The Registration Deadline and the Non-Backstop Funding Deadline are one Business Day after the Equity Rights Offering Termination Time.**