**Hearing Date: January 28, 2025, 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: January 21, 2025, 4:00 p.m. (Prevailing Eastern Time)**

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Counsel to the Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 (MEW) |
| Reorganized Debtors.[1] | (Jointly Administered) |

### NOTICE OF REORGANIZED DEBTORS' OBJECTION TO
### THE CLAIMS FILED BY KCP HARKINS FEE OWNER, LLC
#### (Duplicate Claims | Contingent and Unliquidated Claims)

        **PLEASE TAKE NOTICE** that, on the date hereof, the reorganized debtors

(collectively, the "***Debtors***" or the "***Reorganized Debtors***") in the above-captioned cases (the

"***Chapter 11 Cases***") filed the *Reorganized Debtors' Objection to the Claims Filed by KCP*

*Harkins Fee Owner, LLC* (the "***Objection***").

---

[1]    The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Reorganized Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider entry of an order approving the Objection (the "*Hearing*") will be held on **January 28, 2025, 10:00 a.m. (Prevailing Eastern Time)** before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York, One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE** that unless otherwise ordered by the Bankruptcy Court, the Hearing will be conducted in person at the **United States Bankruptcy Court for the Southern District of New York** (the "*Bankruptcy Court*"), before the **Honorable Michael E. Wiles, United States Bankruptcy Judge, Courtroom 617, One Bowling Green, New York, NY 10004**. If you wish to appear virtually at the hearing via Court Solutions, please email wiles.chambers@nysb.uscourts.gov to request approval prior to the hearing. Parties and members of the public who wish to listen to the hearing by audio feed do not need approval and may do so by registering with Court Solutions. Parties may register with Court Solutions at www.Court-Solutions.com. Information on how to register for, and use, the Court Solutions platform is available at https://help.court-solutions.com/hc/en-us.

**PLEASE TAKE FURTHER NOTICE** that the Objection requests the Bankruptcy Court (a) disallow and expunge from the claims register Claim No. 10051 filed by KCP Harkins Fee Owner, LLC (the "*HQ Landlord*") on the ground that such claim is duplicative of another filed proof of claim, and (b) reduce the amount of Claim No. 10052 filed by the HQ Landlord on the ground that such claim asserts amounts that are currently contingent and unliquidated against the applicable Debtor.

**PLEASE TAKE FURTHER NOTICE** that any responses (the "*Responses*") to the Objection must be made in writing and conform with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules for the Southern District of New York (the

2

"*Local Bankruptcy Rules*"), and be filed with the Clerk of the Court at the address set forth above, with a copy delivered directly to Judge Wiles' chambers at: wiles.chambers@nysb.uscourts.gov, and served upon (a) United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee, 1 Bowling Green, Room 534, New York, New York 10004 (Attn: Rachael E. Siegel (rachael.e.siegel@usdoj.gov) and Daniel Rudewicz (daniel.rudewicz@usdoj.gov)); (b) 2U, LLC, 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202 (Attn: Matthew Norden (mnorden@2u.com) and Lillian Brownstein (lbrownstein@2u.com)); (c) Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George A. Davis (george.davis@lw.com), George Klidonas (george.klidonas@lw.com), Anupama Yerramalli (anu.yerramalli@lw.com), Randall C. Weber-Levine (randall.weber-levine@lw.com) and Scott Yousey (scott.yousey@lw.com)), counsel for the Reorganized Debtors; (d) Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Albert A. Pisa (apisa@milbank.com), Tyson Lomazow (tlomazow@milbank.com), and Abigail Debold (adebold@milbank.com)), counsel for the First Lien Ad Hoc Group; (e) Weil, Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153 (Attn: Matt Barr (matt.barr@weil.com), David Griffiths (david.griffiths@weil.com), and F. Gavin Andrews (f.gavin.andrews@weil.com)), counsel for the Ad Hoc Noteholder Group; and (f) Schulte, Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 (Attn: Kristine Manoukian (kristine.manoukian@srz.com), Kelly Knight (kelly.knight@srz.com), and Reuben E. Dizengoff (reuben.dizengoff@srz.com)), counsel to Greenvale; so as to be filed and actually received by all of them not later than **4:00 p.m. (Prevailing Eastern Time) on January 21, 2025** (the "*Response Deadline*").

**PLEASE TAKE FURTHER NOTICE** that any Response must contain the following: (a) the name of the claimant and description of the basis for the amount of the claim; (b) a concise

3

statement setting forth the reasons why the claim should not be disallowed and expunged from the claims register or reduced for the reasons set forth in the Objection, including the specific factual and legal bases which will be relied upon in opposing the Objection, and (c) all documentation or other evidence of the claim, to the extent not included with the proof of claim previously filed with the Bankruptcy Court, which will be relied upon in opposing the Objection.

**PLEASE TAKE FURTHER NOTICE** that if no Responses are timely filed and served with respect to the Objection by the Response Deadline, the Bankruptcy Court may enter the order granting the relief requested in the Objection without further notice or an opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Objection along with its underlying exhibits can be viewed and/or obtained by: (a) accessing the Bankruptcy Court's website at www.nysb.uscourts.gov; (b) contacting the Office of the Clerk of the Bankruptcy Court at United States Bankruptcy Court, Southern District of New York; or (c) accessing the website of the Reorganized Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC ("***Epiq***"), at https://dm.epiq11.com/2U, or by contacting Epiq directly at (877) 525-5725 (toll free U.S. and Canada) and (360) 803-4441 (International).

**PLEASE TAKE FURTHER NOTICE that any claim that the Bankruptcy Court disallows and expunges will be treated as if it had not been filed and will not be entitled to any distribution on account thereof and any claim that is reduced will be treated as if it had been filed for the reduced amount and will be entitled to a distribution for the reduced amount.**

**PLEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Objection or if you want the Bankruptcy Court to hear your position on the Objection, then you or your attorney must attend the Hearing.  If you or your attorney do not follow the foregoing steps,

the Bankruptcy Court may decide that you do not oppose the relief requested in the Objection and

may enter orders granting the relief requested.

**PLEASE TAKE FURTHER NOTICE** that you need not appear at the hearing if you do

not oppose the relief requested in the Objection.

**LATHAM & WATKINS LLP**

Dated:    December 16, 2024                By:    */s/ George A. Davis*
          New York, New York               George A. Davis
                                           George Klidonas
                                           Anupama Yerramalli
                                           Randall C. Weber-Levine
                                           Scott Yousey
                                           1271 Avenue of the Americas
                                           New York, NY 10020
                                           Telephone: (212) 906-1200
                                           Facsimile: (212) 751-4864
                                           Email:  george.davis@lw.com
                                                   george.klidonas@lw.com
                                                   anu.yerramalli@lw.com
                                                   randall.weber-levine@lw.com
                                                   scott.yousey@lw.com

                                           *Counsel to the Reorganized Debtors*

**Hearing Date: January 28, 2025, 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: January 21, 2025, 4:00 p.m. (Prevailing Eastern Time)**

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
George A. Davis
George Klidonas
Anupama Yerramalli
Randall C. Weber-Levine
Scott Yousey

*Counsel to the Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>2U, Inc., *et al.*,<br><br>              Reorganized Debtors.[2] | Chapter 11<br><br>Case No. 24-11279 (MEW)<br><br>(Jointly Administered) |

**REORGANIZED DEBTORS' OBJECTION TO**
**THE CLAIMS FILED BY KCP HARKINS FEE OWNER, LLC**
**(Duplicate Claims | Contingent and Unliquidated Claims)**

> **THIS OBJECTION SEEKS TO (I) DISALLOW AND EXPUNGE AND/OR REDUCE CLAIM NO. 10051, AND (II) REDUCE CLAIM NO. 10052. YOUR RIGHTS MAY BE AFFECTED BY THIS OBJECTION.**
>
> **CLAIMANTS RECEIVING THIS OBJECTION SHOULD CAREFULLY REVIEW THIS OBJECTION AND LOCATE THEIR NAMES AND CLAIMS IN THE OBJECTION.**

---

[2] The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802). The Reorganized Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

The reorganized debtors (collectively, the "*Debtors*" or the "*Reorganized Debtors*") in the above-captioned cases (the "*Chapter 11 Cases*") hereby file this objection (this "*Objection*") to proof of claim number 10051 (the "*Guarantor Claim*") and proof of claim number 10052 (the "*Primary-Obligor Claim*" and, together with the Guarantor Claim, the "*HQ Landlord Claims*") submitted by KCP Harkins Fee Owner, LLC (the "*HQ Landlord*"). In support of this Objection, the Reorganized Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The HQ Landlord Claims are a blatant attempt to exploit the chapter 11 process for an unwarranted windfall, leading to an absurd result. The Debtors promptly rejected the HQ Lease (as defined below) at the outset of these prepackaged Chapter 11 Cases, which leave unsecured claims unimpaired, and acknowledged the resulting breach. Further, the HQ Lease clearly limits the HQ Landlord's remedy for such a breach, which are strictly limited by the cap under section 502(b)(6) of the Bankruptcy Code (the "*502(b)(6) cap*") and the contractual damage limitations. Yet, the HQ Landlord insists it is entitled to the maximum 502(b)(6) cap as a claim against two separate Debtors—regardless of its duty to mitigate damages by reletting the premises (if possible) for equivalent or even higher rent. Such a position yields an outcome where the HQ Landlord recovers twice the 502(b)(6) cap while retaining the opportunity to profit from reletting, which is plainly absurd and contrary to the law.

2.      Prior to the Petition Date, Debtor 2U Harkins Road LLC (the "*Debtor-Tenant*") and the HQ Landlord were party to that certain Office Lease, dated as of December 23, 2015 (as amended, restated, supplemented, or modified from time to time, the "*HQ Lease*"), a copy of which is attached hereto as **Exhibit B**, for the premises located at 7900 Harkins Road, Lanham, Maryland 20706 (the "*HQ Premises*"). The obligations of the Debtor-Tenant under the HQ Lease

2

were guaranteed by Debtor 2U, Inc. (the "***Debtor-Guarantor***") under that certain Guaranty and Subordination Agreement, dated as of December 23, 2015, between the HQ Landlord and the Debtor-Guarantor.  Additionally, in lieu of a cash security deposit, the Debtor-Tenant provided a letter of credit to the HQ Landlord as security for the HQ Lease (the "***Letter of Credit***").

3.     To preserve value and relieve the Debtors' estates of approximately $78.3 million in burdensome rent obligations for office spaces the Debtors were no longer occupying, the Debtors rejected several non-residential real property leases, including the HQ Lease, at the outset of these Chapter 11 Cases.  However, in rejecting the HQ Lease, the Debtor-Tenant did not leave the HQ Landlord holding the proverbial bag.  To the contrary, the Debtors' confirmed plan provides for payment in full of the HQ Landlord's allowed claim in the ordinary course of business, subject to the 502(b)(6) cap.

4.     It is, therefore, surprising and troubling that the HQ Landlord now asserts that it is entitled to payment of damages in the maximum amount calculated under the 502(b)(6) cap from not only the Debtor-Tenant, but also from the Debtor-Guarantor.  *See* Primary-Obligor Claim, ¶ 13 & Guarantor Claim, ¶ 13 (the Guarantor Claim is "separate and distinct from, and not duplicative of, the amount asserted [in the Primary-Obligor Claim] for Capped Rent Reserve").

5.     This assertion is, unfortunately, part of a common trend of self-serving conduct by the HQ Landlord.  In fact, the Debtors and the HQ Landlord signed an agreement for early termination of the HQ Lease shortly before the Petition Date, on July, 24, 2024 (the "***Lease Amendment***"),[3] with knowledge that a chapter 11 filing was imminent.  The HQ Landlord, however, claimed it lacked authority to enter into such amendment without the consent of its mortgage lender, which was purportedly denied once the Debtors filed these Chapter 11 Cases –

---

[3]     A copy of the Lease Amendment is attached hereto as **Exhibit C**.

all, apparently, in furtherance of this attempt to abuse the bankruptcy process to grab more than double what it is entitled. Despite all this, the Reorganized Debtors still offered a comprehensive settlement to resolve the entirety of the HQ Landlord Claims. However, the HQ Landlord rejected the settlement proposal and filed *KCP Harkins Fee Owner, LLC's Motion to Compel Payment of its Claims Against Debtors 2U, Inc. and 2U Harkins Road LLC, and for Related Relief* [Docket No. 273] (the "**Motion to Compel**").[4]

6.    Permitting the HQ Landlord a double recovery, *i.e.*, the maximum amount calculated under the 502(b)(6) cap from the Debtor-Tenant and then again from the Debtor-Guarantor, would provide the HQ Landlord with a windfall in direct contradiction of section 502(b)(6) of the Bankruptcy Code, which caps "the claim of *a lessor* for damages resulting from the termination of a lease of real property." 11 U.S.C. § 502(b)(6) (emphasis added). For this reason, the Guarantor Claim must be disallowed and expunged.

7.    Additionally, the Reorganized Debtors dispute the HQ Landlord's calculation of amounts that the HQ Landlord asserts it is entitled to recover under the HQ Landlord Claims. In particular, the HQ Landlord presumes it is entitled to accelerate and recover all rent due under the HQ Lease for the remainder of the term, but the HQ Lease provides otherwise. When the provisions of the HQ Lease are appropriately applied in light of the 502(b)(6) cap, the HQ Landlord is only entitled to monthly payments in an aggregate sum of about $8 million, the majority of which is contingent and unliquidated at this time. Further, the HQ Landlord may not have

---

[4]    The Reorganized Debtors will separately file an objection to the Motion to Compel, pursuant to which, the HQ Landlord seeks entry of an order either (a) compelling payment on the HQ Landlord Claims, or (b) fixing a deadline by which an objection to the HQ Landlord Claims must be filed and heard. For the avoidance of doubt, the Reorganized Debtors object to the Motion to Compel and submit that this Objection must be resolved by the Bankruptcy Court before any amount of the HQ Landlord Claims can be allowed or paid. Additionally, the filing of this Objection makes moot the request to set a deadline to object to the HQ Landlord Claims. Accordingly, the Motion to Compel must be denied.

US-DOCS\156006521.7

complied with its obligations under the Lease Amendment, and accordingly, its prior breach may excuse the Debtors' performance entirely.  The existing amount of the Primary-Obligor Claim must be reduced accordingly.

8.    The chapter 11 process is not a vehicle for disproportionate recoveries, and the HQ Landlord's assertions threaten to distort its purpose by a turning statutory safeguard into an avenue for an unjustified windfall.  This Court should reject such an illogical and inequitable result, which undermines substantial efforts and investments made to reorganize this company.

## RELIEF REQUESTED

9.    By this Objection, the Reorganized Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"):  (a) disallowing and expunging the Guarantor Claim; (b) reducing the Primary-Obligor Claim; and (c) granting related relief.

## JURISDICTION AND VENUE

10.    The United States Bankruptcy Court for the Southern District of New York (this "***Court***") has jurisdiction to consider this Objection under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.    The Reorganized Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by this Court in connection with this Objection to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this Objection in this district is proper under 28 U.S.C. §§ 1408 and 1409.

5

12.     The statutory and legal predicates for the relief requested herein are section 502(b)

of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***") and rule

3007 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").[5]

## GENERAL BACKGROUND

13.     On July 25, 2024 (the "***Petition Date***"), the Debtors filed voluntary petitions in this

Court commencing these Chapter 11 Cases.  The Debtors continued to manage and operate their

businesses as debtors in possession under section 1107 and 1108 of the Bankruptcy Code.  No

trustee or examiner was requested, and no committee was appointed in these Chapter 11 Cases.

14.     On the Petition Date, the Debtors filed: (a) the *Joint Prepackaged Plan of*

*Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*

[Docket No. 19]; (b) the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization*

*of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 20];

and (c) the *Motion of Debtors for an Order (A) Authorizing the Debtors to (I) Reject Certain*

*Unexpired Leases and Sublease of Nonresidential Real Property and (II) Abandon any Remaining*

*Personal Property Located at the Leased Premises; and (B) Granting Related Relief* [Docket No.

28] (the "***Lease Rejection Motion***"), by which the Debtors requested approval to reject certain

leases, including the HQ Lease, pursuant to section 365 of the Bankruptcy Code.

15.     On August 2, 2024, and August 23, 2024, respectively, the Debtors filed the *First*

*Amended Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates Under*

*Chapter 11 of the Bankruptcy Code* [Docket No. 55], and the *Second Amended Joint Prepackaged*

---

[5]     Bankruptcy Rule 3007(d)(1) provides that "objections to more than one claim may be joined in a single objection
if all the claims were filed by the same entity."

6

*Plan of Reorganization of 2U, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 90] (as further amended, supplemented, or otherwise modified, the "**Plan**").[6]

16.    On September 5, 2024, the Court entered the *Order (A) Authorizing the Debtors to (I) Reject Certain Unexpired Leases and Sublease of Nonresidential Real Property and (II) Abandon Any Remaining Personal Property Located at the Leased Premises; and (B) Granting Related Relief* [Docket No. 168] (the "**Lease Rejection Order**"), thereby approving the relief sought in the Lease Rejection Motion and authorizing the Debtors to reject the leases, including the HQ Lease, listed on Schedule 1 attached to the Lease Rejection Order. Pursuant to the Lease Rejection Order, the HQ Lease was deemed rejected effective as of August 31, 2024.

17.    On September 9, 2024, the Court entered the *Order (A) Approving (I) the Disclosure Statement and (II) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of 2U, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code, and (B) Granting Related Relief* [Docket No. 176].

18.    The Plan went effective on September 13, 2024 (the "**Effective Date**"), and the Debtors filed the Notice of Effective Date on the same date [Docket No. 178].

19.    Although there was no general bar date established in these Chapter 11 Cases, Article V.C of the Plan requires that any Person or Entity seeking to assert a Rejection Damages Claim must file a Proof of Claim for such Rejection Damages Claim with the Voting and Claims Agent within thirty (30) days of the Effective Date. *See* Plan, Art. V.C. Accordingly, the deadline for each landlord to a rejected lease (each, a "**Landlord**") to file a Proof of Claim asserting a Rejection Damages Claim passed on October 15, 2024 (the "**Proof of Claim Deadline**").

---

[6]    Any capitalized term used, but not otherwise defined, in this Objection shall have the meaning ascribed to such term in the Plan.

7

20.    Additionally, the Plan provides that Allowed General Unsecured Claims (including

Landlord Claims) shall be unimpaired and paid in the ordinary course of business; *provided that*

each Landlord Claim shall be subject to the cap set forth in section 502(b)(6) of the Bankruptcy

Code. *See* Plan, Art. III.B.5.

21.    On October 10, 2024, the HQ Landlord submitted: (a) the HQ Primary-Obligor

Claim, asserting against the Debtor-Tenant an unsecured claim in the amount of $8,436,223.47,

consisting of (i) $10,332,059.70 calculated as the amount allowable under the 502(b)(6) cap, *plus*

(ii) $39,087.27 in unpaid prepetition utilities, *plus* (iii) $65,076.50 in attorneys' fees and costs

incurred prepetition, *minus* (ii) $2 million drawn on the Letter of Credit;[7] and (b) the Guarantor

Claim, asserting against the Debtor-Guarantor an unsecured claim in the amount of

$10,436,223.47, consisting of (i) $10,332,059.70 calculated as the amount allowable under the

502(b)(6) cap, *plus* (ii) $39,087.27 in unpaid prepetition utilities, *plus* (iii) $65,076.50 in attorneys'

fees incurred prepetition.

22.    Since the Proof of Claim Deadline, the Reorganized Debtors, with the assistance of

their advisors, have been diligently reviewing the Proofs of Claim asserting Rejection Damages

Claims and seeking to reconcile or resolve any discrepancies as to any amounts asserted therein.

23.    To assist with this process, on November 1, 2024, the Reorganized Debtors sent a

letter (the "***Information Request Letter***") to each Landlord, including the HQ Landlord, that timely

filed a Proof of Claim.  A copy of the Information Request Letter that was sent to the HQ Landlord

(the "***HQ Information Request Letter***") is attached as **Exhibit D** hereto.  The HQ Information

Request Letter requested, among other information: (a) a breakdown of the amount of damages

---

[7]    Based on correspondence with JPMorgan Chase, N.A., the issuing bank on the Letter of Credit, the HQ Landlord
drew the full $2 million available on the Letter of Credit on September 16, 2024, after the rejection of the HQ
Lease became effective.

due under the HQ Lease calculated in accordance with any liquidated damages provision therein, including evidence relied upon to arrive at such breakdown; (b) a narrative and timeline of the HQ Landlord's efforts to mitigate damages resulting from the rejection of the HQ Lease; and (c) evidence of such mitigation efforts.

24.     The HQ Landlord responded to the Information Request Letter by a letter dated November 8, 2024 (the "***HQ Landlord Response Letter***"), a copy of which is attached hereto as **Exhibit E**.  Among other things, the HQ Landlord asserted its position that all calculations and supporting documents supporting the HQ Landlord Claims are provided in the addenda thereto. *See* HQ Landlord Response Letter, 2.  The HQ Landlord additionally indicated that, while it has yet to relet any part of the HQ Premises as of the date of the HQ Landlord Response Letter, it had conducted three tours for prospective tenants "for individual or several floors," and broadly stated its expectation that "it may take up to three (3) years to fully relet the Property." *Id.*

25.     On December 6, 2024, the Reorganized Debtors, through their counsel, sent a settlement proposal to the HQ Landlord's counsel to resolve the entirety of the HQ Landlord Claims.  The HQ Landlord's counsel responded on December 9 by rejecting the settlement proposal.  On the same day, the HQ Landlord filed the Motion to Compel.

## **OBJECTION**

26.     In the face of a properly filed claim objection, the claimant must prove by a preponderance of evidence that the claim should be allowed under applicable law.  *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 408984, at *4 (Bankr. S.D.N.Y. Feb. 2, 2021); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to

9

meet the usual burden of proof to establish the validity of the claim."). "[T]he ultimate burden of persuasion is always on the claimant." *Ditech*, 2021 WL 408984, at \*4.

27.    The allowance of claims is governed by section 502 of the Bankruptcy Code. Pursuant to section 502(a) of the Bankruptcy Code, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects thereto." 11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after notice and a hearing, shall determine the allowed amount of the claim.  *See* 11 U.S.C. § 502(b).

28.    Section 502(b)(1) of the Bankruptcy Code provides for the disallowance of any claim "to the extent that [it] is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. § 502(b)(1).

29.    Section 502(b)(6) of the Bankruptcy Code also provides for the disallowance of any:

> claim of a lessor for damages resulting from the termination of a lease of real property, to the extent such claim exceeds—(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—(i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed or the lessee surrendered, the leased property; plus (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

30.    The Reorganized Debtors hereby object to: (a) the Guarantor Claim on the basis that it is duplicative of the Primary-Obligor Claim given that the HQ Landlord will receive the full amount allowed by section 502(b)(6) of the Bankruptcy Code; and (b) the amount that the HQ Landlord asserts it is presently entitled to recover under the HQ Landlord Claims given that the HQ Landlord has failed to demonstrate that its alleged damages were calculated in accordance

10

with the liquidated damages provision of the HQ Lease, and the HQ Landlord's only other remedy

under the HQ Lease to recover future damages is on a monthly basis.  As such, the Reorganized

Debtors respectfully request that the Court disallow the Guarantor Claim in its entirety and allow

the Primary-Obligor Claim in monthly installments in an aggregate amount not to exceed

$8,436,223.47 to be paid by the Reorganized Debtors.

**A.   THE HQ GUARANTOR CLAIM IS DUPLICATIVE AND MUST BE DISALLOWED UNDER SECTION 502(B)(6) OF THE BANKRUPTCY CODE**

31.     Under the Plan, the HQ Landlord will be paid the maximum amount allowable

under section 502(b)(6) of the Bankruptcy Code as a result of Debtor-Tenant's rejection of the HQ

Lease, on account of the allowance and non-impairment of the Primary-Obligor Claim.  The

Guarantor Claim, therefore, must be disallowed because, if it is not, the HQ Landlord will receive

an unwarranted duplicative recovery against the estates in direct violation of section 502(b)(6) of

the Bankruptcy Code.

32.     It is well settled that the plain meaning of a statute "should be conclusive, except

in the 'rare case [in which] the literal application of a statute will produce a result demonstrably at

odds with the intentions of the drafters.'"  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235,

242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

33.     Section 502(b)(6) of the Bankruptcy Code applies by its terms to "the ***claim of a***

***lessor*** for damages resulting from the termination of a lease of real property."  11 U.S.C.

§ 502(b)(6) (emphasis added).  Consequently, the language—and the plain meaning—of the

statute clearly limits the ***lessor's*** total claim for damages, irrespective of the number of claims and

whether they are asserted against a primary or secondary obligor.

34.     Applying the plain language of the statute, courts have concluded that section

502(b)(6) of the Bankruptcy Code establishes a cap on a lessor's total claim against the estates

11

arising from the termination of a lease, rather than a cap on the lessor's claim against each debtor.
*See, e.g.*, *In re Cortlandt Liquidating LLC*, 658 B.R. 244, 251 (S.D.N.Y. 2024) (Vyskocil, J.)
(affirming ruling of the United States Bankruptcy Court for the Southern District of New York,
Chapman, J., Ret., and stating that "the statute speaks not to a particular debtor entity, but rather
to the amount of damages recoverable from the estate"); *In re Episode USA*, 202 B.R. 691, 695
(Bankr. S.D.N.Y. 1996) ("[t]he thrust of the § 502(b)(6) cap is not directed toward any particular
debtor entity; rather, it acts to limit the amount of damages the lessor may be allowed from the
bankruptcy estates"); *Arden v. Motel Partners (In re Arden)*, 176 F.3d 1226, 1229 (9th Cir. 1999)
("A plain reading of [section 502(b)(6) of the Bankruptcy Code] underscores that ***it is the claim
of the lessor***, not the status of the lessee or its agent or guarantor, that triggers application of the
cap." (emphasis added)).

35.     This plain reading of section 502(b)(6) of the Bankruptcy Code is supported by the
legislative history of the Bankruptcy Reform Act of 1978, which shows that Congress designed
the 502(b)(6) cap to achieve the twin aims of preventing a windfall to landlords while fairly
compensating them for the rejection of their commercial leases.  S. Rep. 95-989 (1978) (the
502(b)(6) cap is "designed to compensate the landlord for his loss while not permitting a claim so
large (based on a long-term lease) as to prevent other general unsecured creditors from recovering
a dividend from the estate"); *see also In re Andover Togs, Inc.*, 231 B.R. 521, 544-45 (Bankr.
S.D.N.Y. 1999) ("because commercial leases are typically of long-term duration, which could lead
to an astronomical calculation of damages engendered by a lease's premature termination,
Congress capped the maximum amount that a landlord can claim as damages caused by a debtor's
rejection of a lease by means of section 502(b)(6)"); *In re Episode USA, Inc.*, 202 B.R. 691, 693
(Bankr. S.D.N.Y. 1996) ("The legislative history of § 502(b)(6) indicates that the limitation on

12

allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. . . . Second, in a true lease of real property, the lessor retains all the risk and benefits as to the value of the real estate at the termination of the lease. Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor."); *In re Interco, Inc.*, 137 B.R. 1003, 1005-06 (Bankr. E.D. Mo. 1992) ("It is apparent from the legislative history and case law that the purpose of Section 502(b)(6) is to compensate the landlord fairly while protecting other creditors in a bankruptcy case. This rationale is applicable whether the debtor is the tenant or the guarantor of the lease. Although the dynamics of the economic relationship between lessors and lessees have changed considerably since Congress enacted this limitation in 1978, absent an expression of Congressional intent to the contrary, the Court must find and conclude that the literal application of Section 502(b)(6) limits the damages recoverable by the lessors here.").

36.    Consequently, when a landlord files separate claims against both a debtor-tenant and a debtor-guarantor for damages stemming from a single lease rejection, section 502(b)(6) of the Bankruptcy Code determines the maximum, aggregate amount of damages allowable to the landlord for both claims. And where, as here, the landlord will already recover the full amount of the 502(b)(6) cap from the debtor-tenant, the claim against the debtor-guarantor impermissibly exceeds the 502(b)(6) cap and must be disallowed.

37.    The Reorganized Debtors are not asking this Court to create new law. To the contrary, the Reorganized Debtors' position is founded on decades of precedent. *Fisher v. Lee Bros. Value World, Inc.*, a case decided under section 353 of the Bankruptcy Act of 1898 (the precursor to section 502(b)(6) of the Bankruptcy Code), is instructive. 486 F.2d 1037 (9th Cir. 1973). In that case, the landlord filed two separate proofs of claim: one for breach of a lease and

13

one for breach of a related guaranty. *Id.* at 1038. The Ninth Circuit found that the statutory cap established the maximum amount the landlord could recover as a result of the termination of a single lease and, since general unsecured claims were being paid in full, the court limited the landlord's recovery to an aggregate amount equal to the applicable statutory cap. *Id*. at 1038. The court noted that "***even should the appellants have two claims***, Section 353 [of the Bankruptcy Act] ***limits their allowability to an aggregate amount*** not exceeding the rent, without acceleration, reserved by such lease for the three years next succeeding the date of surrender of the premises." *Id.* (emphasis added). *See also* Hr'g. Tr. 16:14-18, *In re Stock Bldg. Supply, LLC*, No. 09-11554 (MFW) (Bankr. D. Del. Nov. 5, 2009) [Docket No. 444] (adopting the Ninth Circuit's reasoning in *Fisher* and noting that "the majority of courts are following that [same reasoning]"); *Rhedom Realty Corp. v. Mammoth Mart Inc.*, 397 F. Supp. 381, 384 (D. Mass. 1975) (affirming bankruptcy court order denying landlord's assertion of separate proofs of claim against debtor-tenant and debtor-guarantor, and stating "***[r]egardless of the number of claims Rhedom is allowed to make, its damages must be limited by Section 353 of the Act*** which restricts a landlord's recovery on a rejected executory lease contract . . . to an amount not to exceed the rent, without acceleration, reserved by such lease for the three years next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after the filing of the petition, plus unpaid accrued rent, without acceleration, up to the date of surrender or reentry").

38.    In the analogous context in which a landlord draws on a letter of credit issued as security for a lease, multiple courts (including this Court) have reduced the landlord's allowed claim by the amount recovered on the letter of credit because, otherwise, the landlord would impermissibly circumvent section 502(b)(6) of the Bankruptcy Code by collecting payment of the

14

full amount of the 502(b)(6) cap from the debtor in addition to the amount drawn on the letter of credit while also burdening the debtor with the resulting reimbursement claim of the issuing bank. *See In re Cortlandt Liquidating LLC*, 658 B.R. 244, 255-56 (S.D.N.Y. 2024) (holding that "failing to apply the Letter of Credit posted as security for a lease would [] result in an 'end run' around the Section 502(b)(6) damages cap" and that, to hold otherwise "would lead to duplicate claims against the Debtors from [the landlord] and [the issuing bank]"); *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 209 (3d Cir. 2003); *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 921 (2d Cir.1944) (collecting cases applying precursor to section 502(b)(6) under the Bankruptcy Act and indicating that the difference between a security deposit provided by a debtor-tenant and a credit enhancement provided by a third-party, such as a guarantor, is "'purely technical'" and "insufficient to justify divergent rules as to the respective allowable claims.").

39.    This case is no different.  The HQ Landlord is impermissibly seeking a double recovery by pursuing both the Primary-Obligor Claim and the Guarantor Claim with full knowledge that the Plan provides for payment in full of the maximum amount allowed under section 502(b)(6) of the Bankruptcy Code.  But accepting the HQ Landlord's disregard of the plain meaning of section 502(b)(6) of the Bankruptcy Code would create absurd results "demonstrably at odds with the intentions of [Congress].'"  *Ron Pair Enters.,* 489 U.S. at 242.  Indeed, if the Guarantor Claim is allowed separately from the Primary-Obligor Claim, the HQ Landlord would receive a windfall of over $10 million on top of the $10 million it seeks to receive from the Primary-Obligor Claim, and all of that on top of the rents it will likely receive from replacement tenants (as discussed further below).  That windfall would come at the expense of other creditors—most notably, the Holders of First Lien Claims and the Holders of Unsecured Notes Claims who did not bargain for a compromise in the value of the debt and equity that they accepted under the

15

Plan while giving the HQ Landlord a double recovery on its already **unimpaired** claim.  Such a result is clearly at odds with the intentions of Congress in enacting section 502(b)(6) of the Bankruptcy Code.

40.    For these reasons, section 502(b)(6) of the Bankruptcy Code requires the Guarantor Claim to be disallowed as duplicative of the Primary-Obligor Claim.

**B.    THE HQ LANDLORD CLAIMS MUST BE REDUCED IN ACCORDANCE WITH THE APPLICABLE PROVISIONS OF THE LEASE**

41.    It is well settled that the 502(b)(6) cap is applied to determine the maximum allowable amount of a lessor's claim **only after** damages have been calculated pursuant to the terms of the underlying lease and applicable state law.  *In re Ancona*, Case No. 14-10532 (CGM), 2016 WL 828099, at *10 (Bankr. S.D.N.Y. Mar. 2, 2016) ("Section 502(b)(6)(A) is not a formula for calculating damages; it is simply a method to cap damages calculated under the terms of the lease and state law.") (quoting *In re Usinternetworking, Inc.*, 291 B.R. 378, 380 (Bankr. D. Md. 2006)).  As a result, "[t]he claim, independent of the allowance process under § 502(b)(6), must be determined first under applicable non-bankruptcy law and then compared with and, if necessary, reduced to the statutory maximum provided in § 502(b)(6)."  *In re MDC Systems, Inc.*, 488 B.R. 74, 82 (Bankr. E.D. Pa. 2013) (emphasis added).  The HQ Lease is governed under Maryland law, and, therefore, Maryland state law applies to enforcement of the HQ Lease.  *See* HQ Lease, Section 25.13.

42.    The Reorganized Debtors object to the HQ Landlord Claims because the HQ Landlord has not properly calculated the amount of damages it is entitled to under the HQ Lease before applying the 502(b)(6) cap.  In particular, while the HQ Landlord contends it is entitled to at least $41 million of damages under the HQ Lease, the vast majority of the damages the HQ Landlord asserts have not, and may never, come due under the terms of the HQ Lease.  *See*

16

*Smelkinson Sysco v. Harrell*, 162 Md. App. 437, 447 (2005) (stating that "[p]arties are held to the

express terms of their contract" with respect to damages); 100 *Inv. Ltd. P'ship v. Columbia Town

Ctr. Title Co.*, 430 MD 197, 234 (2013) ("When the clear language of a contract is unambiguous,

the court will give effect to its plain, ordinary, and usual meaning."); *Owens-Illinois, Inc. v. Cook*,

386 Md. 468, 496 (2005) ("[W]hen the language of the contract is plain and unambiguous there is

no room for construction, and a court must presume that the parties meant what they expressed.").

43.    Under section 19.2 of the HQ Lease, after default and/or termination of the HQ

Lease, the HQ Landlord can recover either:

   a. ***monthly installments*** equal to the rent for the remainder of the term less the
      amount of rent that the HQ Landlord receives during such period from others
      to whom the Premises may be rented; or

   b. as liquidated damages, ***the present value*** of (a) all rent and other sums due under
      the Lease through the end of the term, plus (b) ***all expenses and value*** of ***all
      vacancy periods projected by the HQ Landlord*** to be incurred in connection
      with reletting, *minus* (c) any rent and other sums which Tenant proves by a
      preponderance of the evidence would be received by the HQ Landlord upon
      reletting the Premises ***from the end of the vacancy period projected by the HQ
      Landlord*** through expiration of the term.

*See* HQ Lease, Section 19.2.

44.    Given that the HQ Landlord has failed to (a) provide evidence of the projected

vacancy periods, much less the rents, expenses and other values associated thereby, and

(b) discount its alleged damages to present value, the HQ Landlord is not entitled to recover

liquidated damages under section 19.2 of the HQ Lease; its recovery is thus limited to monthly

installments under section 19.2(a) of the HQ Lease.  In fact, the HQ Landlord admits in the HQ

Information Request Letter that (a) it "may take up to three years to fully relet the property,"

*i.e.*, that it is likely to do so in less than three years and that (b) the HQ Premises may be relet in

parts or as a whole.  *See* HQ Landlord Response Letter, 2.  Thus, without evidence of projected

17

vacancies on an apportioned basis, monthly installments are required given that the HQ Premises

could be relet at any time (and that the HQ Landlord is required to attempt to do so).  Such a result

is also consistent with the terms of the Plan, which provides that Landlord Claims, like all other

General Unsecured Claims, will be paid in the ordinary course of business.[8]

45.    Because the HQ Landlord has not satisfied the requirements of the section 19.2(b)

liquidated damages provision, there is no basis for the Reorganized Debtors to immediately pay

future rent under the HQ Landlord Claims when the HQ Landlord has not yet suffered any actual

damages.[9]  And given that the HQ Lease requires monthly reductions for any amounts the HQ

Landlord receives from reletting the HQ Premises, it cannot be determined what damages, if any,

the HQ Landlord will ultimately suffer.  This is crucial considering the fact that the HQ Landlord

is duty-bound under Maryland law to "make all reasonable efforts to minimize the loss sustained

from the breach and can charge the defaulting party only with such damages as, 'with reasonable

endeavors and expense and without risk of additional substantial loss or injury, he could not

prevent.'"  *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship*, 376 Md. 331

(2003); *see also*, *Saul Holdings L.P. v. Raquel Sales, Inc.*, Case No. 293777-V, 2009 Md. Cir. Ct.

---

[8]    The HQ Landlord's attempt to circumvent the plain language of the Plan by reference to the Restructuring Support Agreement does not change the result.  *See* Motion to Compel ¶ 19-20.  Setting aside the fact that the HQ Landlord was not a party to the Restructuring Support Agreement, and therefore has no entitlements thereunder, nothing in the Restructuring Support Agreement contradicts the clear language of the Plan which provides for payment of **Allowed** Landlord Claims (subject to the 502(b)(6) cap) **in the ordinary course of business**.  *See* Plan, Art. III.B.5. Nor can anything in the Restructuring Support Agreement or the Plan be interpreted to mean that the Debtors would pay any amount asserted by the HQ Landlord as long as it is purportedly calculated in accordance with the 502(b)(6) Cap, or to waive any objections the Debtors or Reorganized Debtors may have to the HQ Landlord Claims.

[9]    Notably, the HQ Landlord's asserted damages amount includes rent through the remaining term of the HQ Lease which has not yet accrued.  However, nothing in the HQ Lease permits the HQ Landlord to accelerate and recover all future rent and other charges under the HQ Lease through the remainder of the term.  *See, e.g.*, *In re East Penn Children's Learning Academy, LLC*, 635 B.R. 243, 250-51 (Bankr. E.D. Pa, 2021) (reducing the allowed claim of a lessor after rejection of a lease because "[i]f a lease does not contain an acceleration clause, a landlord 'may recover future rents on the property only as they become due'").

18

LEXIS 10, at *16 (Md. Cir. Ct. 2009) (holding an acceleration provision in a commercial lease to be unenforceable as contrary to the landlord's duty to mitigate damages under Maryland law); *In re W.T. Grant Co.*, 13 B.R. 198, 202 (Bankr. S.D.N.Y. 1981) (finding that lessor sustained no actual damages where minimum aggregate rent from subsequent re-letting of premises to new tenant exceeded the aggregate amount of rent reserved in the debtor's lease), *aff'd*, 36 B.R. 939 (S.D.N.Y. 1984).

46.    When the terms of the HQ Lease are appropriately applied and the HQ Landlord's $2 million draw on the Letter of Credit is taken into account, the amount due to the HQ Landlord at most as of the date hereof, whether recovered from the Debtor-Tenant or Guarantor, is no greater than $1,482,995.20, as detailed in **Exhibit F** hereto.  Any other amounts that the HQ Landlord claims at this time are contingent and unliquidated and must be paid in the ordinary course of business, subject to the 502(b)(6) cap.  As a result, any additional amounts of rent that may come due under the HQ Lease after the date hereof may only be allowed on a monthly basis (subject to a reduction by any amounts the HQ Landlord receives from reletting the HQ Premises during the applicable period, in accordance with section 19.2 of the HQ Lease) in the amounts set forth below[10]:

| Month | Amount |
|---|---|
| January 2025 | $869,153.53 |
| February 2025 | $869,153.53 |
| March 2025 | $869,153.53 |
| April 2025 | $869,153.53 |
| June 2025 | $869,153.53 |
| July 2025 | $869,153.53 |
| August 2025 | $869,153.53 |

---

[10]    The HQ Landlord's own calculations indicate that the rent reserved under the HQ Lease from December 1, 2024 through August 31, 2025 amounts to $7,822,381.80.  *See* Primary-Obligor Claim, Exh. 2 & Guarantor Claim, Exh. 2.  When divided into monthly installments during that period, the monthly payment amount is $869,153.53.

19

47.    In addition, even these amounts are subject to the HQ Landlord proving that it has taken all reasonable steps to attempt to relet the HQ Premises during these months and was unable to obtain any offers to do so.

48.    Further, as the HQ Landlord concedes, the aggregate allowed amount of all its claims cannot exceed $8,436,223.47.    *See* Primary-Obligor Claim, ¶ 8.    Accordingly, any additional amounts that may come due under the HQ Lease after the date hereof must be disallowed to the extent such claims exceed such amount.

## C.    THE HQ LANDLORD MAY HAVE BREACHED ITS OBLIGATIONS IN CONNECTION WITH THE LEASE AMENDMENT, EXCUSING THE REORGANIZED DEBTORS' PERFORMANCE

49.    The Reorganized Debtors further object to the HQ Landlord Claims because the HQ Landlord may have breached its obligations in connection with the Lease Amendment. Pursuant to the Lease Amendment, the HQ Landlord agreed to the early termination of the HQ Lease on September 30, 2024 in exchange for (a) payment of a "Lease Amendment Fee" in the amount of $3 million, and (b) the HQ Landlord's draw from the remaining $2 million on the Letter of Credit.    *See* Lease Amendment, Sections 2, 6 and 7.    Additionally, the HQ Landlord agreed it would not be entitled to receive attorneys' fees incurred in connection with the Lease Amendment or any Event of Default (as defined in the HQ Lease) that may have occurred up to the date of the Lease Amendment.    *See* Lease Amendment, Section 10.

50.    The HQ Landlord represented that it had authority to enter the Lease Amendment, subject only to approval of its mortgage lender.    The HQ Landlord agreed it was obligated to "use commercially reasonable and diligent efforts to promptly obtain" that approval.    *See* Lease Amendment, Section 13.    After the Debtors filed these Chapter 11 Cases, however, the HQ Landlord claimed that the amendment was not effective because the lender did not provide

20

approval.  If the HQ Landlord breached its obligation to provide commercially reasonable and diligent efforts to obtain lender approval, then this prior breach would excuse the Reorganized Debtors' performance.

51.    The evidence regarding whether the HQ Landlord used commercially reasonable and diligent efforts to obtain lender approval and whether lender approval was granted or denied is solely within the possession of the HQ Landlord and its lender.  Accordingly, discovery will be needed to determine whether the HQ Landlord can satisfy its burden to demonstrate its performance under the Lease Amendment.

## **RESERVATION OF RIGHTS**

52.    Nothing in this Objection shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Reorganized Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Reorganized Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection; (e) a concession by the Reorganized Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Reorganized Debtors' estates; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If this Court enters any order granting the relief sought herein, any

US-DOCS\156006521.7

payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Reorganized Debtors' rights to subsequently dispute such claim.

## NOTICE

53.     Notice of this Objection will be given to:  (a) the United States Trustee for Region 2; (b) Milbank LLP as counsel to the First Lien Ad Hoc Group; (c) the administrative agent and collateral agent under the first lien credit agreement; (d) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Noteholder Group; (e) Schulte Roth & Zabel LLP as counsel to Greenvale; (f) the indenture trustees for the Notes; (g) the HQ Landlord; (h) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) the United States Attorney's Office for the Southern District of New York; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; and (l) all parties entitled to notice pursuant to Local Rule 9013-1(b).  The Reorganized Debtors submit that, under the circumstances, no other or further notice is required.

54.     A copy of this Objection is available from (a) this Court's website, www.nysb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/2U.

## NO PRIOR OBJECTION

55.     The Reorganized Debtors have not made any prior Objection for the relief sought in this Objection to this Court or any other court.

**WHEREFORE**, the Reorganized Debtors respectfully request that this Court enter the Proposed Order granting the relief requested in this Objection and such other and further relief as may be just and proper.

**LATHAM & WATKINS LLP**

Dated:    December 16, 2024          By:    */s/ George A. Davis*
          New York, New York                 George A. Davis
                                             George Klidonas
                                             Anupama Yerramalli
                                             Randall C. Weber-Levine
                                             Scott Yousey
                                             1271 Avenue of the Americas
                                             New York, NY 10020
                                             Telephone: (212) 906-1200
                                             Facsimile: (212) 751-4864
                                             Email:  george.davis@lw.com
                                                     george.klidonas@lw.com
                                                     anu.yerramalli@lw.com
                                                     randall.weber-levine@lw.com
                                                     scott.yousey@lw.com

                                             *Counsel to the Reorganized Debtors*

# EXHIBIT A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 2U, Inc., *et al.*, | Case No. 24-11279 (MEW) |
| Reorganized Debtors.[1] | (Jointly Administered) |

## ORDER GRANTING REORGANIZED DEBTORS' OBJECTION
## TO THE CLAIMS FILED BY KCP HARKINS FEE OWNER, LLC

Upon consideration of the objection (the "***Objection***")[2] of the Reorganized Debtors to proof claim number 10051 and proof of claim number 10052; and this Court having reviewed the Objection and the First Day Declarations; and this Court having jurisdiction to consider the Objection and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and consideration of the Objection and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and this Court having authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Objection has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

---

[1]  The Reorganized Debtors in these cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: 2U, Inc. (5939); edX LLC (8554); 2U GetSmarter, LLC (9643); 2U Harkins Road LLC (N/A); 2U NYC, LLC (N/A); 2U KEIH Holdco, LLC (3837); CritiqueIt, Inc. (5532); edX Boot Camps LLC (8904); and 2U GetSmarter (US), LLC (9802).  The Reorganized Debtors' mailing address is 2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Objection is GRANTED, as set forth herein.

2.      Any response to the Objection, to the extent not withdrawn or settled, is hereby overruled on its merits.

3.      The Guarantor Claim is disallowed and expunged in its entirety.

4.      The Primary-Obligor Claim is allowed in the amount of $[1,482,995.20][3] (the "***Allowed Claim***").

5.      [Any additional amounts of rent that may come due under the HQ Lease after the date hereof will be allowed on a monthly basis (subject to a reduction by any amounts the HQ Landlord receives from reletting the HQ Premises during the applicable period) in the amounts set forth below (each a "***Monthly Claim***"):

| Month | Amount |
|---|---|
| January 2025 | $869,153.53 |
| February 2025 | $869,153.53 |
| March 2025 | $869,153.53 |
| April 2025 | $869,153.53 |
| June 2025 | $869,153.53 |
| July 2025 | $869,153.53 |
| August 2025 | $869,153.53 |

6.      To the extent the aggregate amount of the Allowed Claim, all Monthly Claims, and any additional amounts that may come due under the HQ Lease after the date hereof exceeds $8,436,223.47, such amounts are disallowed and expunged.]

---

[3]   As described in the Objection, discovery will be required for a determination of any claims or counterclaims the Reorganized Debtors have in connection with the Lease Amendment.  To the extent discovery reveals additional objections, the Reorganized Debtors will file a revised Proposed Order consistent with such objections.

2

7.      The HQ Landlord shall given prompt written notice of any agreement to re-let all or any portion of the HQ Premises, which notice shall provide a summary of the monthly amounts of rent and other costs to be received thereunder.

8.      Nothing in the Objection or this Order or the relief granted herein is to be construed as (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors, other than the Guarantor Claim or the Primary-Obligor Claim, under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) a concession by the Debtors that any lien (contractual, common, statutory or otherwise) is valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved); (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver of the obligation of any party in interest to file a Proof of Claim; or (h) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

9.      The Reorganized Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

10.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

3

New York, New York
Dated:_____,
2024

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

US-DOCS\156006521.7

# **EXHIBIT B**

**HQ Lease**

US-DOCS\156006521.7

**OFFICE LEASE**

**BY AND BETWEEN**

**LANHAM OFFICE 2015 LLC**
**(as landlord)**

**AND**

**2U HARKINS ROAD LLC**
**(as tenant)**

**7900 HARKINS ROAD**
**LANHAM, MARYLAND**

# TABLE OF CONTENTS

Page

Article I DEFINITIONS ................................................................................................1

Article II PREMISES.................................................................................................16

Article III TERM .......................................................................................................22

Article IV BASE RENT.............................................................................................25

Article V OPERATING EXPENSES AND REAL ESTATE TAXES ........................................27

Article VI USE OF PREMISES ....................................................................................35

Article VII ASSIGNMENT AND SUBLETTING.............................................................37

Article VIII MAINTENANCE AND REPAIRS ..............................................................43

Article IX ALTERATIONS...........................................................................................44

Article X SIGNS .......................................................................................................48

Article XI SECURITY DEPOSIT ...............................................................................50

Article XII INSPECTION............................................................................................52

Article XIII INSURANCE...........................................................................................53

Article XIV SERVICES AND UTILITIES ....................................................................56

Article XV LIABILITY OF LANDLORD....................................................................61

Article XVI RULES....................................................................................................65

Article XVII DAMAGE OR DESTRUCTION .............................................................65

Article XVIII CONDEMNATION ...............................................................................69

Article XIX DEFAULT ..............................................................................................69

Article XX BANKRUPTCY........................................................................................74

Article XXI SUBORDINATION .................................................................................76

Article XXII HOLDING OVER ..................................................................................77

Article XXIII COVENANTS OF LANDLORD ...........................................................78

i

Article XXIV PARKING AND ACCESS EASEMENTS ...........................................................79

Article XXV GENERAL PROVISIONS.................................................................................81

Article XXVI RENEWAL ....................................................................................................88

Article XXVII ROOF RIGHTS AND ROOF TERRACE .........................................................90

Article XXVIII AMENITY SPACE .......................................................................................91

Article XXIX EXPANSION RIGHTS ...................................................................................92

Article XXX METROPLEX II ASSUMPTION........................................................................94

Article XXXI NON-COMPETITION .....................................................................................95

| EXHIBIT A | Plan Showing Premises |
|---|---|
| EXHIBIT B | Work Agreement |
| EXHIBIT C | Rules and Regulations |
| EXHIBIT D | Certificate Affirming the Must Take Commencement Date |
| EXHIBIT E | Measurement Schedule |
| EXHIBIT F | Location of Building Fitness Center |
| EXHIBIT G | Subordination, Nondisturbance and Attornment Agreement |
| EXHIBIT H | Roof Access Agreement |
| EXHIBIT I | Guaranty |
| EXHIBIT J | Parking Easement |
| EXHIBIT K | Description of the Land |
| EXHIBIT L | Competitor List |
| EXHIBIT M | Metroplex Rental Obligations |
| EXHIBIT N | Operating Expenses Exclusions |
| EXHIBIT O | Construction Insurance Requirements |
| EXHIBIT P | Takeover Sublease Form |

1098066.03A-NYCSR04A - MSW

# OFFICE LEASE

THIS OFFICE LEASE (this "**Lease**") is dated as of the 23rd day of December, 2015 (the "**Effective Date**"), by and between LANHAM OFFICE 2015 LLC, a Delaware limited liability company ("**Landlord**"), and 2U HARKINS ROAD LLC, a Delaware limited liability company ("**Tenant**").

## ARTICLE I

## DEFINITIONS

"**2nd Floor Amenities**" has the meaning set forth in <u>Section 2.5(a)</u>.

"**2nd Floor Build-Out Work**" has the meaning set forth in the Work Agreement.

"**2nd Floor Build-Out Allowance**" has the meaning set forth in <u>Section 2.5(b)</u>.

"**2nd Floor Premises**" has the meaning set forth in <u>Section 2.5(a)</u>.

"**2U Building Hours**" means 8:00 a.m. to 8:00 p.m. on Monday through Friday and 8 a.m. to 1 p.m. on Saturday (excluding Holidays), and such additional hours, if any, as Landlord from time to time determine.

"**Abated Costs**" has the meaning set forth in <u>Section 4.2(c)</u>.

"**Abated Initial Premises Costs**" has the meaning set forth in <u>Section 4.2(c)</u>.

"**Abated Must Take Expansion Premises Costs**" has the meaning set forth in <u>Section 4.2(c)</u>.

"**Abatement Commencement Date**" has the meaning set forth in <u>Section 15.3(a)</u>.

"**Abatement Period**" has the meaning set forth in <u>Section 4.2(c)</u>.

"**Acceleration Notice**" has the meaning set forth in <u>Section 2.6(a)</u>

"**Access Easement**" has the meaning set forth in <u>Section 24.1</u>.

"**ADA**" has the meaning set forth in the definition of Requirements.

"**Additional Back-Up Generator**" has the meaning set forth in <u>Section 14.4</u>.

"**Additional Back-Up Power**" has the meaning set forth in <u>Section 14.4</u>.

"**Affiliate**" or "**affiliate**" means (i) any Person which directly or indirectly controls, is under common control with or is controlled by any other Person or (ii) any ownership (direct or indirect) by one Person of ten percent (10%) or more of the ownership interests of another Person. For purposes of this definition, "controls," "under common control with," and

"controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or otherwise.

"**Affiliate Assignment**" has the meaning set forth in Section 7.2(a).

"**Affiliate Sublease**" has the meaning set forth in Section 7.2(a).

"**Affiliate Successor**" has the meaning set forth in Section 7.2(a).

"**Affiliate Transaction**" has the meaning set forth in Section 7.2(a).

"**Affiliate User**" has the meaning set forth in Section 7.2(f).

"**Alteration**" means an alteration, decoration, installation, improvement, repair, addition or other physical change in, to or about any portion of the Building.

"**Alteration Threshold**" has the meaning set forth in the definition of Permitted Nonstructural Alteration.

"**Amenity Build-Out Allowance**" has the meaning set forth in Section 2.3(b).

"**Amenity Space**" means part of the first (1st) floor of the Building, as more particularly described in Section 28.1 herein below.

"**Amenity Space Plan**" has the meaning set forth in the Work Agreement.

"**Amenity Space Renovations Work**" has the meaning set forth in the Work Agreement.

"**Ancillary Permitted Use**" means the following uses, to the extent permitted under applicable laws and ordinances and/or permits and approvals, that are ancillary to Office Use in connection with business being conducted by Tenant in the Premises: one or more pantries, one or more employee kitchens and cafeterias, employee fitness centers (and related locker rooms and showers), executive bathrooms with showers, one or more employee bar or lounge areas (including, a themed employee lounge area), presentation areas, conferences, lounge areas, corporate or corporate sponsored events connected to Tenant's ordinary business, meeting and gathering areas, one or more screening rooms, one or more performance rooms, board rooms, a day care center for Tenant's employees, exhibition areas, classrooms for Tenant's employees and training purposes, data room/center directly related to Tenant's business, an auditorium, sound rooms, storage areas, conference rooms, libraries, messenger and mail room facilities, reproduction and copying facilities, mechanical rooms for the supplemental HVAC Units, file rooms, and other lawful ancillary uses customarily found in office buildings where the major tenant is a technology company; provided that such uses shall not include any activities not related to corporate activities of Tenant; and further provided, in all cases, Tenant obtains (at its cost and expense but with Landlord's reasonable cooperation, if needed, provided that Landlord has no obligation to incur any costs or liabilities in connection with such cooperation) any and all required permits, licenses and certificates for such Ancillary Permitted Uses (including, without

2

limitation, any changes to the certificate of occupancy for the Building necessitated by such Ancillary Permitted Uses).

"**Ancillary Terrace Permitted Uses**" means the following uses of the Roof Terrace by Tenant and its Invitees (which, in all cases, are not open to the general public): lounge areas, running track, meeting and gathering areas, and any ancillary purposes reasonably related to any of the foregoing; provided, in all cases, Tenant obtains (at its cost and expense but with Landlord's reasonable cooperation, if needed, provided that Landlord has no obligation to incur any costs or liabilities in connection with such cooperation) any and all required permits, licenses and certificates for such Ancillary Terrace Permitted Uses (including, without limitation, any changes to the certificate of occupancy for the Building necessitated by such Ancillary Terrace Permitted Uses).

"**Annual Expense Statement**" has the meaning set forth in Section 5.2(d).

"**Annual Tax Statement**" has the meaning set forth in Section 5.4.

"**Approved Transferee**" has the meaning set forth in Section 7.3.

"**assign**" has the meaning set forth in Section 7.1(a)(1).

"**Architect's Statement**" has the meaning set forth in Section 17.3(b)(i).

"**Auditorium**" has the meaning set forth in Section 28.1(a).

"**Back Up Costs**" has the meaning set forth in Section 14.4.

"**Bankruptcy Code**" has the meaning set forth in Section **Error! Reference source not found.**.

"**Base Building Cap**" has the meaning set forth in the Work Agreement.

"**Base Building Condition Cap Work**" has the meaning set forth in the Work Agreement.

"**Base Building Condition Work**" has the meaning set forth in the Work Agreement.

"**Base Building Condition Delivery Date**" has the meaning set forth in the Work Agreement.

"**Base Building Condition Target Delivery Date**" has the meaning set forth in the Work Agreement.

"**Base Capacity**" has the meaning set forth in Section 14.3(a).

"**Base Rent**" means, collectively, the Initial Premises Base Rent and each of the Must Take Expansion Premises Base Rents.

3

"**Base Rent Annual Escalation Percentage**" means Three and Three Tenths percent (3.3%).

"**BOMA Measurement Standard**" means the 2010 BOMA Standard Method of Measurement ANSI-Z 65.1 2010.

"**Brokers**" means Serten Advisors, LLC, which is sometimes referred to herein as "**Tenant's Broker**."

"**Building**" means the twelve (12) story building containing approximately Three Hundred Nine Thousand Three Hundred Three (309,303.18) total RSF as of the date hereof and located at 7900 Harkins Road, Lanham, Maryland 20706.

"**Building Common Areas**" means all of the common facilities in or around the Land that are owned or controlled by Landlord and which are designed and intended, from time to time, to be used on a non-exclusive use, without the express permission of Landlord, by the tenants and other occupants of the Building in common with Landlord and each other, including the Lobby (which is to be used by Tenant and all other Tenant Invitees as access to and from the Premises by individuals), the Amenity Space, the fire stairs (which are to be used by Tenant and all other Invitees solely for emergency egress in an emergency, except as provided in Section 25.5), outdoor walkways and plazas (if any), parking areas and exterior entrances to the Building.

"**Building Fitness Center**" has the meaning set forth in Section 2.4(e).

"**Building Hours**" 8:00 a.m. to 6:00 p.m. on Monday through Friday (excluding Holidays), and such additional hours, if any, as Landlord from time to time determine.

"**Building Structure and Systems**" has the meaning set forth in Section 8.2.

"**Building Systems**" has the meaning set forth in Section 8.2.

"**Business Days**" means Mondays through Fridays excluding Holidays.

"**Capital Improvement**" means any alteration, addition, repair or replacement (whether structural or nonstructural) made by Landlord to the Building (including the Building Common Areas) or equipment or systems thereof that, under GAAP, is properly classified as a capital expenditure.

"**Capital Transaction**" has the meaning set forth in Section 25.4(b).

"**Case**" has the meaning set forth in Section 20.2.

"**CGL Insurance**" has the meaning set forth in Section 13.2(a).

"**Change in Control**" means, with respect to Tenant or Guarantor, (i) a merger, consolidation or transfer of the direct or indirect ownership interest of Tenant or Guarantor in which the stockholders of Tenant or Guarantor immediately prior to such transaction would own,

1098066.03A-NYCSR04A - MSW

in the aggregate, less than fifty percent (50%) of the total combined voting power of all classes of capital stock of the surviving Person normally entitled to vote for the election of directors of the surviving or acquiring Person or (ii) the sale by Tenant or Guarantor of all or substantially all such Tenant or Guarantor's assets in one transaction or in a series of related transactions.

"**Claimant**" has the meaning set forth in Section 25.25.

"**Claimant Act**" has the meaning set forth in Section 25.25.

"**Competitor**" has the meaning set forth in Section 31.1(a).

"**Competitor Covenants**" has the meaning set forth in Section 31.1(a).

"**Competitor Restrictions**" has the meaning set forth in Section 31.1(a).

"**Consent Needed Transaction**" has the meaning set forth in Section 7.3.

"**Consumable Expenses**" has the meaning set forth in Section 5.2(b).

"**Decorative Alteration**" means a Nonstructural Alteration consisting of painting (and/or other wall covering), window treatments, carpeting, flooring, installation of doors and internal windows within the Premises, installation of Tenant's furniture, trade fixtures and a manner that is not attached to the Premises (other than the anchoring of customary cabinetry, furniture, fixtures and equipment).

"**Default Rate**" has the meaning set forth in Section 19.7(a).

"**Delivery Block**" is defined in the Work Agreement.

"**Demolition Work Delivery Date**" has the meaning set forth in the Work Agreement.

"**Demolition Work Target Delivery Date**" has the meaning set forth in the Work Agreement.

"**Demolition Plan**" has the meaning set forth in the Work Agreement.

"**Demolition Work**" has the meaning set forth in the Work Agreement.

"**Early Must Take Instance**" has the meaning set forth in Section 2.6(a).

"**Early Must Take Possession Date**" has the meaning set forth in Section 2.6(a).

"**Effective Date**" has the meaning set forth in the Preamble.

"**Electric Cost**" means the product of (i) Usage multiplied by (ii) the Landlord's Rate, for the period that corresponds to the period during which Usage was measured.

"**Electrical Dispute Notice**" has the meaning set forth in Section 14.3(a).

"**Elevator Abatement Date**" has the meaning set forth in <u>Section 15.3(b)</u>.

"**Elevator Interruption**" has the meaning set forth in <u>Section 15.3(b)</u>.

"**Elevator Untenantability Notice**" has the meaning set forth in <u>Section 15.3(b)</u>.

"**Emergency Generator System**" has the meaning set forth in <u>Section 14.4</u>.

"**Environmental Default**" has the meaning set forth in <u>Section 6.3(b)</u>.

"**Environmental Law**" has the meaning set forth in <u>Section 6.3(a)</u>.

"**Event of Bankruptcy**" has the meaning set forth in <u>Section **Error! Reference source not found.**</u>.

"**Event of Default**" has the meaning set forth in <u>Section 19.1</u>.

"**Excess First Floor Costs**" has the meaning set forth in <u>Section 2.7(a)</u>.

"**Excluded Expenses**" has the meaning set forth in <u>Section 5.2(b)</u>.

"**Excluded RSF**" has the meaning set forth in the definition of Initial Premises Base Rent.

"**Executive Order**" has the meaning set forth in <u>Section 25.23</u>.

"**Expansion Premises**" has the meaning set forth in <u>Section 29.1(a)</u>.

"**Expense Statement**" has the meaning set forth in <u>Section 5.2(e)</u>.

"**Expiration Date**" has the meaning set forth in <u>Section 3.1</u>.

"**Extra Rent**" has the meaning set forth in <u>Section 19.2</u>.

"**Factors**" has the meaning set forth in <u>Section 26.2</u>.

"**Fair Market Rent**" has the meaning set forth in <u>Section 26.2(a)</u>.

"**Final Delivery Block**" is defined in the Work Agreement.

"**First  Delivery Block**" is defined in the Work Agreement.

"**Final Target Delivery Day**" means April 1, 2017.

"**First Renewal Term**" has the meaning set forth in <u>Section 26.1</u>.

"**Fitness Center**" has the meaning set forth in <u>Section 2.5(a)</u>.

"**Food Hall/Deli**" has the meaning set forth in <u>Section 28.1(a)</u>.

6

"**Food Service Area**" has the meaning set forth in Section 28.1(a).

"**Food Trucks**" has the meaning set forth in Section 28.1(b).

"**Force Majeure Event**" or "**Force Majeure Events**" has the meaning set forth in Section 25.25.

"**Guarantor**" means 2U, Inc., a Delaware corporation.

"**Guaranty**" means that certain Guaranty and Subordination Agreement executed by Guarantor in the form of **Exhibit I** attached hereto.

"**Hazardous Materials**" has the meaning set forth in Section 6.3(a).

"**Holidays**" means New Year's Day, President's Day, Memorial Day, Martin Luther King, Jr.'s Birthday, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day.

"**Independent Engineer**" means a reputable, independent, licensed engineer or other reputable, independent licensed professional consultant, in either case selected by Landlord and having expertise in the area at issue, and who has not been hired by Landlord or any affiliate of Landlord within the prior five (5) years.

"**Initial Build-Out Allowance**" has the meaning set forth in Section 2.2(d).

"**Initial Build-Out Work**" has the meaning set forth in the Work Agreement.

"**Initial Premises**" means (i) floors 2, 8, 9, 10, 11 and 12 containing an aggregate 168,422.64 RSF, and (ii) the Roof Terrace which shall have no allocable RSF.

"**Initial Premises Base Rent**" means, for the first Lease Year, an amount equal to Twenty and 50/100 Dollars ($20.50) multiplied by the RSF of the Initial Premises, less 15,545.44 RSF on the 2nd Floor Premises (the "**Excluded RSF**"), and subject to escalation as provided in Section 4.3. For the absence of doubt, Tenant is not required to pay Base Rent on 15,545.44 RSF on the 2nd Floor Premises but shall be responsible for paying additional rent for the entire 2nd Floor Premises.

"**Initial Term**" means eleven (11) years and nine (9) months, commencing on the Lease Commencement Date.

"**Insolvency Requirements**" has the meaning set forth in Section 20.1.

"**Intended Must Take Delivery Date**" has the meaning set forth in Section 2.6(a).

"**Invitee**" means any invitee, employee, subtenant, assignee, contractor, client, licensee, customer or guest of Tenant or any Permitted Occupant; provided that "Invitee" shall not include Landlord or any other tenant of the Building, any contractor engaged by or behalf of Landlord or any other tenant of the Building, or any invitee, employee, customer, vendor or guest of Landlord or any other tenant of the Building.

"**Issuer Requirement**" has the meaning set forth in <u>Section 11.3</u>.

"**Janitorial Services**" has the meaning set forth in <u>Section 14.2(a)</u>.

"**KW**" means kilowatts.

"**KWHR**" means kilowatt hours.

"**Land**" has the meaning set forth in <u>Section 5.1</u>.

"**Landlord**" has the meaning set forth in the Preamble.

"**Landlord Delay**" or "**Landlord's Delay**" has the meaning set forth in the Work Agreement.

"**Landlord Indemnitees**" has the meaning set forth in <u>Section 15.1(a)</u>.

"**Landlord Notice Address**" c/o Cohen Equities, 675 Third Avenue, Suite 2400, New York, NY 10017, Attention: Meir Cohen.

"**Landlord Party**" means any of Landlord, any Affiliate of Landlord, and Landlord's then managing and leasing agents for the Building, the employees, principals, invitees, guests, agents and contractors of the foregoing.

"**Landlord Payment Address**" c/o Cohen Equities, 675 Third Avenue, Suite 2400, New York, NY 10017, Attention: Meir Cohen.

"**Landlord's FMV**" has the meaning set forth in <u>Section 26.2(a)</u>.

"**Landlord's Initial Work**" as defined in Section 1.3(a)(i) of the Work Agreement.

"**Landlord's Lien**" has the meaning set forth in <u>Section 19.6</u>.

"**Landlord's Rate**" means the actual amount at which Landlord from time to time purchases each KW and KWHR of electricity for the same period from the utility company inclusive of any taxes or other charges in connection therewith and appearing on the utility company invoice for such period, taking into account all applicable abatements, time of day discounts, deductions and rebates.

"**Landlord's Restoration Condition**" has the meaning set forth in <u>Section 17.2</u>.

"**Landlord's Review Period**" has the meaning set forth in <u>Section 7.3</u>.

"**Landlord's Work**" has the meaning set forth in the Work Agreement.

"**Landlord's Work Target Delivery Date**" has the meaning set forth in the Work Agreement.

"**Late Charge**" has the meaning set forth in <u>Section 19.7(b)</u>.

"**Lease**" has the meaning set forth in the Preamble.

"**Lease Assumption**" has the meaning set forth in Section 11.2.

"**Lease Commencement Date**" has the meaning set forth in Section 3.2.

"**Lease Term**" means the Initial Term and shall also include any properly exercised Renewal Options described in Article XXVI.

"**Lease Year**" shall mean a period of twelve (12) consecutive months commencing on the Lease Commencement Date, and each successive twelve (12) month period thereafter; provided, however, that if the Lease Commencement Date is not the first day of a month, then the second Lease Year shall commence on the first day of the month in which the first anniversary of the Lease Commencement Date occurs.

"**Letter of Credit**" has the meaning set forth in Section 11.3.

"**Lobby**" has the meaning set forth in Section 2.4(a)

"**Lobby Renovations Allowance**" has the meaning set forth in Section 2.4(a).

"**Lobby Renovations Plan**" has the meaning set forth in the Work Agreement.

"**Lobby Renovations Work**" has the meaning set forth in the Work Agreement.

"**Material Event of Default**" means an Event of Default pursuant to Section 19.1(a)(1), Section 19.1(a)(2), Section 19.1(b), Section 19.1(d), Section 19.1(g) or Section 19.1(h).

"**Measurement Schedule**" has the meaning set forth in the definition of RSF.

"**Metered Costs**" has the meaning set forth in Section 5.2(c).

"**Metroplex Cap**" has the meaning set forth in Section 30.1(a).

"**Metroplex Landlord**" has the meaning set forth in Section 30.2(a).

"**Metroplex Lease**" has the meaning set forth in Section 30.1(a).

"**Metroplex Premises**" has the meaning set forth in Section 30.1(a).

"**Metroplex Rent**" has the meaning set forth in Section 30.1(a).

"**Minimum Parking Amount**" has the meaning set forth in Section 24.3.

"**Mock Up Space**" has the meaning set forth in Section 3.4.

"**Monthly Operating Expense Payment**" has the meaning set forth in Section 5.2(d).

"**Monthly Real Estate Tax Payment**" has the meaning set forth in Section 5.2(d).

"**Mortgage**" has the meaning set forth in Section 7.1(d).

"**Must Take Allowance**" has the meaning set forth in Section 2.6(c).

"**Must Take Commencement Date**" has the meaning set forth in Section 3.5.

"**Must Take Expansion Premises**" means individually and collectively, each of floors 5, 6 and 7 of the Building more particularly designated on **Exhibit A**, each containing the RSF set forth on the Measurement Schedule attached hereto as **Exhibit E**.

"**Must Take Expansion Premises Base Rent**" means, with respect to the Initial Term an amount equal to the RSF contained in the applicable Must Take Expansion Premises, multiplied by the Per RSF Base Rent then in effect, and with respect to the Renewal Term, the Per RSF Base Rent as determined as set forth in Article XXVI.

"**Named Tenant**" means 2U Harkins Road LLC, a Delaware limited liability company.

"**Negotiating Period**" has the meaning set forth in Section 26.2.

"**Net Worth**" has the meaning set forth in Section 7.2(a).

"**Net Worth Parties**" has the meaning set forth in Section 7.2(a).

"**Net Worth Supplemental Security Deposit Amount**" has the meaning set forth in Section 7.2(b).

"**Net Worth Threshold**" has the meaning set forth in Section 7.2(a).

"**New Subtenant**" has the meaning set forth in Section 30.2(b).

"**Nonstructural Alteration**" means an Alteration in and to the interior of the Premises only, which, in Landlord's reasonable determination, shall be any Alterations that (i) will not necessitate any changes, replacements or additions to columns or floors or other structural elements of the Building, (ii) are not readily visible to the exterior of the Building, or the Building Common Areas (including the Lobby), (iii) will not adversely affect the Building Systems or the roof, or (iv) would not have a negative impact on any building warranty (but excluding any warranty exclusively covering Tenant's Property). For the absence of doubt, the installation of cabling within the Premises within the walls, risers and conduits is deemed to be a Nonstructural Alteration.

"**Offer**" has the meaning set forth in Section 29.1(b)(1).

"**Office Sharing**" has the meaning set forth in Section 7.2(c).

"**Office Use**" means standard office use in accordance with similar Class A office buildings in the Prince George's County, Maryland submarket of comparable age and condition, without regard to the Plans, Tenant's Ancillary Permitted Use or Ancillary Terrace Permitted Uses.

10

"**officer**" has the meaning set forth in Section 15.1(d).

"**Operating Expenses**" has the meaning set forth in Section 5.2(b).

"**Parking Easement**" has the meaning set forth in Section 24.1.

"**Parking Lot**" has the meaning set forth in Section 24.1.

"**Parking Structure**" has the meaning set forth in the Parking Easement.

"**Per RSF Base Rent**" means (i) for the Initial Term, Twenty and 50/100 Dollars ($20.50), provided that on the first day of the second Lease Year and on each anniversary thereof during the Lease Term, the Per RSF Base Rent in effect shall be increased by an amount equal to the product of (a) the Base Rent Annual Escalation Percentage, multiplied by (b) the Per RSF Base Rent in effect immediately before the increase and (ii) for each Renewal Term, the Per RSF Base Rent shall be determined as set forth in Article XXVI and shall escalate annually in accordance with Section 4.3 below.

"**Permitted Nonstructural Alteration**" means a Nonstructural Alteration the cost of which, together with the cost of all other such Nonstructural Alterations undertaken in any twelve (12) month period (exclusive of the initial fit out of any portion of the Premises), is not more than $200,000.00 (the "**Alteration Threshold**") (increased each Lease Year by five percent (5%)) for each floor in which such Nonstructural Alteration is undertaken. With respect to Nonstructural Alterations undertaken on a partial floor, the Alteration Threshold shall be decreased in proportion to the percentage of the RSF of such floor not included in the Premises.

"**Permitted Occupants**" shall mean, collectively, Tenant, its permitted successors, assigns and subtenants, Permitted Users and Affiliate Users.

"**Permitted Structural Alteration**" means any Structural Alteration that is an item to be completed pursuant to the Work Agreement.

"**Permitted Successor**" has the meaning set forth in Section 7.2(a).

"**Permitted Users**" has the meaning set forth in Section 7.2(c).

"**Permitted Uses**" means, (1) with respect to all floors of the Premises, Office Use and the Ancillary Permitted Uses, and (2) with respect to the Roof Terrace, any Ancillary Terrace Permitted Uses.

"**Permitees**" has the meaning set forth in Section 24.2.

"**Person**" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, governmental authority or any other form of entity.

"**Plan Review Period**" has the meaning set forth in Section 9.4(b)(i).

"**Plan Revision Review Period**" has the meaning set forth in Section 9.4(b)(i).

11

"**Premises**" means

      (a)    as of the Lease Commencement Date, the Initial Premises; plus

      (b)    as of each Must Take Commencement Date, the applicable Must Take Expansion Premises, plus

      (c)    such additional space as Tenant may hereafter lease at the Building pursuant to Article XXVI (ROFR).

"**Premises Consumable Services**" has the meaning set forth in Section 5.2(b).

"**Projected Savings**" has the meaning set forth in Section 5.2(b).

"**Proposed Transfer Commencement Date**" has the meaning set forth in Section 7.3.

"**Proposed Transfer Space**" has the meaning set forth in Section 7.3.

"**Prospect**" has the meaning set forth in Section 29.1(b)(1).

"**Public Transaction**" has the meaning set forth in Section 7.2(a).

"**Publicly Traded Entity**" means a Person whose securities are listed on a national securities exchange or quoted on an automated quotation system. Landlord acknowledges that as of the date hereof, Guarantor is a Publicly Traded Entity.

"**Real Estate Taxes**" has the meaning set forth in Section 5.3(b).

"**Reasonable Parking Alternative**" has the meaning set forth in Section **Error! Reference source not found.**3.

"**Removal Cost**" has the meaning set forth in Section 9.2(b).

"**Renewal Notice**" has the meaning set forth in Section 26.1(a).

"**Renewal Options**" means two (2) options for five (5) years each, as more particularly described in Article XXVI below.

"**Renewal Terms**" has the meaning set forth in Section 26.1.

"**Renewal Term Base Rent**" has the meaning set forth in Section 26.1(b).

"**Renewed Premises**" has the meaning set forth in Section 26.1(a).

"**Rent Credit Amount**" has the meaning set forth in Section 4.6.

"**Required Condition**" has the meaning set forth in Section 8.2.

"**Required Delivery Condition**" has the meaning set forth in Work Agreement.

"**Required Removables**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Required SNDA Form**" has the meaning set forth in <u>Section 21.4</u>.

"**Requirements**" means all present and future laws, ordinances (including without limitation, zoning ordinances and land use requirements), requirements, orders, directives, rules, resolutions, codes, and regulations of all governmental authorities, and the direction or order of any public officer pursuant to law, then having jurisdiction over the Building, Landlord and/or Tenant, (including, without limitation, the Americans with Disabilities Act (the "**ADA**") and the regulations promulgated thereunder, as the same may be amended from time to time) and Environmental Laws.

"**Restoration Period**" has the meaning set forth in <u>Section 17.3(b)(ii)</u>.

"**ROFR Premises**" has the meaning set forth in <u>Section 29.1(b)(1)</u>.

"**ROFR Procedure**" has the meaning set forth in <u>Section 29.1(b)</u>.

"**Roof Terrace**" has the meaning set forth in <u>Section 27.2</u>.

"**RSF**" means the rentable square footage of the Building and other applicable square footages of the Premises are set forth in the chart attached as **Exhibit E** hereto (the "**Measurement Schedule**"). Landlord and Tenant agree that the areas listed on the Measurement Schedule have been ratified and agreed to by Landlord and Tenant for all purposes under this Lease. Landlord and Tenant further acknowledge and agree that the Measurement Schedule shall be used in connection with any measurement of the Premises and all other space in the Building for any purpose under this Lease, subject to Landlord's right to re-measure the Premises or any portion thereof and to adjust the Measurement Schedule in connection with, and solely due to, (i) any alteration or improvement that physically expands the Building, or (ii) a measurement of a partial floor added to the Premises; provided that the entire floor in which such partial floor is located shall not exceed the RSF for such floor set forth on the Measurement Schedule. Any adjustment to the Measurement Schedule pursuant to the foregoing shall be performed by an architect, licensed in Prince George's County, Maryland, selected by Landlord and subject to verification by Tenant's architect, in both cases upon application of the BOMA Measurement Standard to such re-measurement, physical expansion or partial floor, as applicable.

"**Second Article IX Request**" has the meaning set forth in <u>Section 9.4(b)(i)</u>.

"**Second Renewal Term**" has the meaning set forth in <u>Section 26.1</u>.

"**Second Request**" has the meaning set forth in <u>Section 7.3</u>.

"**Security Deposit Amount**" means, subject to the reduction set forth in <u>Section 11.1</u> herein below, Six Million and No/100 Dollars ($6,000,000.00).

"**Services Abatement Event**" has the meaning set forth in <u>Section 15.3(a)</u>.

"**Services Abatement Period**" has the meaning set forth in <u>Section 15.3(a)</u>.

13

"**SNDA**" has the meaning set forth in <u>Section 21.4</u>.

"**Specialty Alterations**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Stated Must Take Commencement Date**" has the meaning set forth in <u>Section 3.5</u>.

"**Structural Alteration**" means any Alteration that is not a Nonstructural Alteration or Decorative Alteration.

"**sublet**" has the meaning set forth in <u>Section 7.1(a)(1)</u>.

"**Submetered Costs**" has the meaning set forth in <u>Section 5.2(c)</u>.

"**Subsequent Build-Out Work**" has the meaning set forth in <u>Section 2.6(a)</u>.

"**Substantial Casualty**" has the meaning set forth in <u>Section 15.3(a)</u>

"**successor landlord**" has the meaning set forth in <u>Section 21.3(a)</u>.

"**Successor Transaction**" has the meaning set forth in <u>Section 7.2(a)</u>.

"**Takeover Sublease**" has the meaning set forth in <u>Section 30.2(a).</u>

"**Tax Benefits**" has the meaning set forth in <u>Section 5.6</u>.

"**Tax Statement**" has the meaning set forth in <u>Section 5.4</u>.

"**Temporary Usage Charge**" has the meaning set forth in <u>Section 5.3(g)</u>

"**Tenant**" has the meaning set forth in the Preamble.

"**Tenant Delay**" or "**Tenant's Delay**" has the meaning set forth in the Work Agreement.

"**Tenant Expense Dispute Notice**" has the meaning set forth in <u>Section 5.2(e)</u>.

"**Tenant Improvement Allowance**" means, as applicable (and individually and collectively), the Initial Build-Out Allowance; the Amenity Build-Out Allowance; the Lobby Renovations Allowance; the 2nd Floor Build-Out Allowance; and the Must Take Allowance, as subject to the reallocations by Tenant permitted by the Work Agreement.

"**Tenant Indemnitees**" has the meaning set forth in <u>Section 15.2(b)</u>.

"**Tenant Invitee**" means an Invitee of Tenant.

"**Tenant Notice Address**" means 8201 Corporate Drive, Suite 900, Landover, MD 20785, Attention: Chief Financial Officer, until Tenant has commenced full business operations at the Premises, and thereafter, the Premises, Attention: Chief Financial Officer, after Tenant has commenced full business operations at the Premises. With a copy to: General Counsel.

14

"**Tenant Tax Statement Dispute Notice**" has the meaning set forth in Section 5.4.

"**Tenant's 2nd Floor Completion Date**" has the meaning set forth in Section 2.2(d).

"**Tenant's Broker**" has the meaning set forth in the definition of Brokers.

"**Tenant's Completion Date**" has the meaning set forth in Section 2.2(d).

"**Tenant's FMV**" has the meaning set forth in Section 26.2(a).

"**Tenant's Initial Premises Completion Date**" has the meaning set forth in Section 2.2(d).

"**Tenant's Plans**" has the meaning set forth in Section 9.4(a).

"**Tenant's Property**" means all paneling, workstations, trade fixtures, machinery and equipment, signage, supplemental HVAC units, UPS, server racks, fitness equipment, audio-visual equipment, kitchen equipment (excluding any equipment in the Food Hall/Deli), communications equipment and office furniture, whether or not attached to or built into the Premises, which are installed in the Premises by or for the account of Tenant or Permitted User and paid for by Tenant or such Permitted User, and all furniture, furnishings and other articles of movable personal property owned by Tenant or any other Tenant Invitee and located in the Premises.

"**Tenant's Proportionate Share**" means the percentage set forth on the Measurement Schedule opposite the applicable floor of the Building. With respect to partial floors, if any, Tenant's Proportionate Share shall be a percentage determined by dividing RSF of the partial floor by Three Hundred Nine Thousand Three Hundred Three (309,303.18) total RSF.

"**Tenant's Request Notice**" has the meaning set forth in Section 7.3.

"**Tenant's Restoration Work**" has the meaning set forth in Section 17.1(c).

"**Tenant's Work**" has the meaning set forth in the Work Agreement.

"**Third Appraiser**" has the meaning set forth in Section 26.2(a).

"**Threshold Successors**" has the meaning set forth in Section 10.1.

"**Trustee**" has the meaning set forth in Section **Error! Reference source not found.**.

"**Unavoidable Delay**" has the meaning set forth in the Work Agreement.

"**Untenantability Notice**" has the meaning set forth in Section 15.3(a).

"**Usage**" means actual usage of electricity for each calendar month or such other period as Landlord shall determine and shall include the quantity and peak demand KWHR and KW.

"**Utilities**" has the meaning set forth in Section 5.2(c).

15

"**Work Agreement**" means the agreement set forth as **Exhibit B** annexed hereto and incorporated herein, as such may be amended and modified by mutual written agreement between Landlord and Tenant.

## ARTICLE II

## PREMISES

2.1    **Lease of Premises**. Tenant leases the Premises from Landlord for the Lease Term upon the conditions and covenants set forth in this Lease, together with the exclusive right to use the Roof Terrace and the non-exclusive right to use the Amenity Space as provided in Section 27.2 and Article XXVIII herein below. Tenant will have the non-exclusive right to use and access the following: (i) common and public areas of the Building as shown on **Exhibit E**, (ii) subject to Article XXIV, the Parking Lot (or, when constructed, the Parking Structure), and (iii) the other Building Common Areas. Except as may otherwise be expressly provided in this Lease (including, without limitation, as provided in Article XXVII (Roof Rights and Roof Terrace) herein below and **Exhibit H** (Roof Access Agreement) attached hereto), the lease of the Premises does not include the right to use the roof, mechanical rooms, electrical closets, janitorial closets, telephone rooms or other non-common or non-public areas of the Building. It is expressly understood and agreed that no Building shaftways and risers shall be deemed part of the Premises but that Tenant shall have reasonable access to and use of such shaftways and risers that are part of Building Common Areas serving the Premises for its cables, wiring, conduits, vents, tubes and piping as contemplated by this Lease without charge.

2.2    **Delivery of Initial Premises**.

(a)    Landlord represents that, to the best of its knowledge, the use of the Premises by Tenant for Office Use is permitted by all Requirements and insurance requirements applicable to the Building.

(b)    Landlord, at its sole cost and expense (but with respect to the Base Building Condition Cap Work, subject to the Base Building Cap), shall promptly undertake and complete Landlord's Initial Work at the Initial Premises and the Must Take Expansion Premises in accordance with terms and conditions of hereof and the Work Agreement. Landlord shall use all commercially reasonable efforts to commence and to complete (i) the Demolition Work in substantial conformity with the Demolition Plan in the Required Delivery Condition by the applicable Demolition Work Target Delivery Date, (ii) the Base Building Condition Work (exclusive of the Base Building Condition Cap Work) in the Required Delivery Condition on or before the applicable Base Building Condition Target Delivery Date (with respect to the Initial Premises) and on or before the applicable Must Take Base Building Condition Target Delivery Date (with respect to each Must Take Expansion Premises), (iii) the Base Building Condition Cap Work in the Required Delivery Condition on or before the expiration of the Initial Post-Delivery Work Period (with respect to the Initial Premises) and (iv) any Base Building Post-Delivery Work relating solely with respect each floor of the Must Take Expansion Premises in the Required Delivery Condition on or before the expiration of the Must Take Expansion Premises Post-Delivery Work Period, in each case, subject to extension attributable to Tenant Delay and Unavoidable Delay (as limited by Section 3.3(f)).    Notwithstanding that the Tenant

16

has the right to delay accepting delivery of the Final Delivery Block in accordance with Section 1.13(b)(ii) of the Work Agreement, the Lease Commencement Date for the entire Initial Premises shall remain December 1, 2016, subject to the extensions set forth in this Lease and the Work Agreement.

(c)    Landlord acknowledges that Tenant cannot commence Tenant's Work at the Initial Premises until Landlord's Initial Work for the Initial Premises is in the Required Delivery Condition nor can Tenant commence Tenant's Work on any floor of the Must Take Expansion Premises until Must Take Expansion Premises is in the Required Delivery Condition.

(d)    Subject to the terms hereof, upon acceptance of the applicable Delivery Block, Tenant shall undertake and substantially complete the construction of the Initial Build Out Work of the Initial Premises (exclusive of the 2nd Floor Premises Work) in substantial conformity with the Initial Build-Out Plan by April 1, 2017, subject to extension attributable for Landlord Delay and Unavoidable Delay ("**Tenant's Initial Premises Completion Date**"). Subject to the terms hereof, Tenant shall undertake and substantially complete the construction the 2nd Floor Build-Out Work in substantial conformity with the 2nd Floor Plan by April 1, 2018, subject to extension attributable for Landlord Delay and Unavoidable Delay ("**Tenant's 2nd Floor Completion Date**", and together with "**Tenant's Initial Premises Completion Date**", "**Tenant's Completion Date**"). Landlord shall pay Tenant an allowance equal to the product of (a) Forty-Eight and 00/100 Dollars ($48.00) multiplied by (b) the number of RSF for the Initial Premises (excluding the RSF of the 2nd Floor Premises) (the "**Initial Build-Out Allowance**") for the Initial Build-Out Work. Tenant shall pay all costs and expenses with respect to the Initial Build-Out Work, to the extent such costs and expenses for the Initial Build-Out Work (together with reallocations of the Tenant Improvement Allowance permitted by the Work Agreement to the Initial Build-Out Allowance) exceed the Initial Build-Out Allowance.

2.3    **Amenity Space Build-Out**.

(a)    Landlord represents that it has no knowledge that (i) the Food Service Area portion of the Amenity Space intended to be used for food service/deli cannot be used for such intended use nor (ii) the Auditorium portion of the Amenity Space cannot be used as an auditorium and assembly space.

(b)    Subject to the terms hereof and the Work Agreement, Landlord shall undertake and complete the Amenity Space Renovations Work, and shall use all commercially reasonable efforts to complete the Amenity Space Renovations Work in substantial conformity with Amenity Space Plan by the Final Target Delivery Day, subject to extension attributable to Tenant Delay and Unavoidable Delay (as limited by Section 3.3(f)). The Amenity Space Renovations Work shall be undertaken, to the extent reasonably possible, in such a manner as a minimize noise, dust and any disruption to Tenant's business, Tenant's Work or access to the Premises. Notwithstanding the foregoing, Landlord shall not be required to spend more than Five Hundred Thousand and No/100 Dollars ($500,000.00) for the Amenity Space Renovations Work (the "**Amenity Build-Out Allowance**"), which shall allocated to the Food Service Area and Auditorium as Tenant shall reasonably determine, subject to reallocations of the Tenant Improvement Allowance permitted by the Work Agreement to and from the Amenity Build-Out Allowance and any limitations set forth herein or in the Work Agreement. Tenant shall pay all

17

costs and expenses (including a construction supervision fee to Landlord equal to one percent (1%) of all hard construction costs with respect to the development and/or renovation of the Amenity Space) for the Amenity Space Renovations Work, to the extent such costs and expenses for the Amenity Space Renovations Work  exceed the Amenity Build-Out Allowance (subject to reallocation as permitted by the Work Agreement).

(c)    Landlord shall endeavor to keep Tenant informed of the Amenity Space Renovations Work costs and the timing of the completion of each component of the Amenity Space Renovations Work. Except as for the reallocation permitted in the Work Agreement, Tenant shall not receive any credit, cash or otherwise, for any unused portion of the Amenity Build-Out Allowance.

(d)    Notwithstanding anything to the contrary contained herein, Landlord acknowledges that, subject to reallocations by Tenant to and from the Amenity Build-Out Allowance permitted pursuant to the Work Agreement, the Amenity Build-Out Allowance is intended to be allocated to renovations and installations of and to the Amenity Space required by Tenant as set forth in the Amenity Space Plan and no portion of the Amenity Build-Out Allowance (or any amounts paid by Tenant in excess thereof) shall be utilized for renovations and installations not set forth the Amenity Space Plan (including renovations required to cause the Amenity Space to comply with the Amenity Space Use, unless caused by Tenant's modifications to the Amenity Space or the Lobby).  The Amenity Space Plan shall include, among other things, the interior finishes (i.e., floor, ceiling and wall finishes, to the extent Tenant elects to modify such interior finishes) for the Amenity Space.

2.4    **Lobby Renovations**.

(a)    Subject to the terms hereof, Landlord shall undertake and complete the Lobby Renovations Work of the lobby of the Building (such space, the "**Lobby**"), and shall reasonably endeavor to complete the Lobby Renovations Work in substantial conformity with the Lobby Renovation Plan by the Final Target Delivery Day, subject to extension attributable to Tenant Delay or Unavoidable Delay (subject to the 30 day limit as provided in Section 3.3(f)). The Lobby Renovations Work shall be undertaken, to the extent reasonably possible, in such a manner as a minimize noise, dust and any disruption to Tenant's business. During the Lobby Renovations Work, Tenant and its Invitees shall have reasonable access to and through the lobby via (at a minimum) an unobstructed, temporarily demised path with secure access with an area within the lobby available as a reception and security area with access to the elevator bank and the Premises. Notwithstanding the foregoing, Landlord shall not be required to spend more than Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Lobby Renovations Allowance**") on the Lobby Renovations Work. Tenant shall pay all costs and expenses (including a construction supervision fee to Landlord equal to one percent (1%) of all hard construction costs with respect to the Lobby Renovations Work), to the extent such costs and expenses for the Lobby Renovations Work exceed the Lobby Renovations Allowance (subject to the reallocations to and from the Lobby Renovation Allowance by Tenant permitted by the Work Agreement). Landlord shall endeavor to keep Tenant informed of the Lobby Renovations Work costs and the timing of the completion of each component thereof.

1098066.03A-NYCSR04A - MSW

(b)        Notwithstanding anything to the contrary contained herein, Landlord acknowledges that, subject to reallocations by Tenant permitted pursuant to the Work Agreement, the Lobby Renovations Allowance is intended to be allocated to renovations and installations of and to the Lobby required by Tenant as set forth in the Lobby Renovations Plan and no portion of the Lobby Renovations Allowance (or any amounts paid by Tenant in excess thereof) shall be utilized for renovations and installations not set forth in the Lobby Renovation Plan. The Lobby Renovations Plan shall include, among other things, the interior finishes (i.e., floor, ceiling and wall finishes to the extent Tenant elects to modify such interior finishes) for the Lobby.

(c)        Tenant shall have the right, at its sole cost and expense, to install a security desk, security system and turnstiles in the Lobby at any time during the Lease Term.

(d)        So long as Tenant (or an Affiliate User and/or Permitted Successor) continues to occupy any portion of the Premises, all installations and renovations made to the Lobby (and the Amenity Space) as part of the Lobby Renovations Plan and the Amenity Space Plan, respectively, shall not be removed or altered by Landlord (unless required to comply with a legal or insurance requirement) without Tenant's consent and Landlord shall consult with Tenant as part of any comprehensive modifications to the Lobby or the Amenity Space.

(e)        Landlord shall have the right, at its sole cost and expense at Landlord's sole option, to use the portion of the Lobby described in cross-hatching on **Exhibit F** for a fitness center for use by other tenants of the Building (the "**Building Fitness Center**"). The Building Fitness Center is not part of the Lobby Renovations Work .

2.5        **2nd Floor Premises**.

(a)        Tenant shall lease the 2nd floor (the "**2nd Floor Premises**") to be used as a fitness center and/or employee lounge (the "**Fitness Center**") for the exclusive use of Tenant and Tenant's Invitees ("**2nd Floor Amenities**") and Office Use. The 2nd Floor Premises shall be part of the Initial Premises; provided however, for the purposes of calculating Base Rent for the Lease Term (including for any Renewal Term), Base Rent for the 2nd Floor Premises shall be calculated as if the 2nd Floor comprised only 12,000 RSF (and shall be included as such in the Initial Premises Base Rent) however, Tenant's Proportionate Share shall include the full RSF for the 2nd Floor Premises. Tenant shall pay Base Rent and additional rent with respect to the 2nd Floor Premises in accordance with the terms for the other portions of the Initial Premises and shall be entitled to the abatement of Base Rent and additional rent for the 2nd Floor Premises in accordance with Section 4.2.

(b)        Subject to the terms hereof, Tenant shall undertake and complete the 2nd Floor Build-Out Work. Except for Landlord's Initial Work, Landlord shall pay Tenant an allowance equal to Six Hundred Thousand and No/100 Dollars ($600,000.00) (the "**2nd Floor Build-Out Allowance**") on the 2nd Floor Build-Out Work to be distributed to Tenant pursuant to the Work Agreement and subject to the reallocations to and from the 2nd Floor Build-Out Allowance by Tenant permitted by the Work Agreement. Tenant shall pay all costs and expenses with respect to the 2nd Floor Build-Out Work, to the extent such costs and expenses for the 2nd Floor Build-Out Work exceed the 2nd Floor Build-Out Allowance. For clarity, the 2nd Floor

19

Build-Out Allowance is the only Tenant Improvement Allowance Landlord is required to provide with respect to the 2nd Floor Premises (subject to Tenant's right to reallocate the Tenant Improvement Allowance pursuant to the Work Agreement).

(c)    For so long as Tenant uses any portion on the 2nd Floor Premises as a Fitness Center, Tenant shall be responsible, at Tenant's sole cost and expense, to furnish, operate, maintain and staff the Fitness Center and to install, repair, replace and maintain any equipment therein. Notwithstanding the foregoing, Tenant shall be permitted to convert all or any portion of the 2nd Floor Premises to any other Permitted Use.

2.6    **Must Take Expansion Premises**.

(a)    Subject to the terms hereof, Landlord will make each Must Take Expansion Premises with Landlord's Initial Work complete and each applicable Must Take Allowance available to Tenant up to three hundred sixty (360) days prior to each applicable Stated Must Take Commencement Date for Tenant's construction of the space (each a "**Subsequent Build-Out Work**"), subject to extension attributable to Tenant Delay and Unavoidable Delay (as limited by Section 3.3(f)).  If Tenant desires to accelerate the delivery of any Must Take Expansion Premises and the corresponding Must Take Allowance, Tenant shall give Landlord at least at least one hundred twenty (120) days' advance notice (an "**Acceleration Notice**") prior to the date Tenant intends to access such Must Take Expansion Premises specified in such Acceleration Notice to commence the Subsequent Build-Out Work therein (the "**Intended Must Take Delivery Date**"). As used herein, the "**Early Must Take Possession Date**," in each case, shall mean the date that Tenant and/or its vendors/contractors physically access a Must Take Expansion Premises to commence work with building permits (vs. accessing the space for planning or inspection purposes) after Landlord has delivered possession of such Must Take Expansion Premises to Tenant in the Required Delivery Condition (provided that in no event shall such date extend beyond the applicable Stated Must Take Commencement Date for such Must Take Expansion Premises, unless due to Landlord Delay or Unavoidable Delay, as limited by Section 3.3(f)). If Tenant accelerates the Stated Must Take Commencement Date for any Must Take Expansion Premises pursuant to this Section 2.6, the Abatement Period for each Must Take Expansion Premises will commence on the Early Must Take Possession Date (an "**Early Must Take Instance**").   If Tenant does not accelerate the Stated Must Take Commencement Date pursuant to this Section 2.6, the Abatement Period for each such Must Take Expansion Premises will commence on the Stated Must Take Commencement Date. If requested by Landlord, within a reasonable time after the Stated Must Take Commencement Date or Early Must Take Possession Date, as applicable, Tenant shall execute and deliver to Landlord a certificate confirming that Landlord's Initial Work with respect to such Must Take Expansion Premises is substantially completed.

(b)    In the event of an Early Must Take Instance, Tenant shall pay all additional rent applicable to the RSF of such Must Take Expansion Premises (including, without limitation, by increasing Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes in accordance with Sections 5.2(a) and 5.3(a)) from the Early Must Take Possession Date and all other terms and conditions of this Lease shall be applicable thereto.

20

(c)    Tenant shall pay all costs and expenses incurred in connection with each Subsequent Build-Out Work, to the extent such costs and expenses exceed an allowance provided by Landlord equal to the product of (a) Forty-Six and 50/100 Dollars ($46.50) multiplied by (b) the number of RSF of rentable area in each applicable Must Take Expansion Premises, multiplied by (c) a ratio, the numerator of which shall be equal to the number of days between the applicable Must Take Commencement Date and the date which is 4,289 days after the Lease Commencement Date (i.e. 11 years and 9 months, assuming a 365 day year), and the denominator of which shall be equal to 4,289 the (each such allowance, a "**Must Take Allowance**").  By way of example only, assuming the 7th floor consists of 28,175 RSF and the Must Take Commencement Date for the 7th floor is the first anniversary of the Lease Commencement Date, then the Must Take Allowance for the 7th floor would be $1,198,611.65 calculated as follows:

$46.50 x 28,175.44 RSF = $1,310,157.96 (0.9149) [i.e. 3,924/4289] = $1,198,611.65

Except as provided below, Tenant shall not receive any credit, cash or otherwise, for any unused portion of any Must Take Allowance; provided however that upon written notice to Landlord no later than sixty (60) days after each applicable scheduled Must Take Commencement Date (time being of the essence), Tenant may convert any Must Take Allowance to be used for Tenant's purchase of other leasehold improvements to be made in accordance with the terms and provisions hereof to any other portion of the Premises (including any future Must Take Expansion Premises) leased by Tenant as the time of the applicable Must Take Commencement Date; provided that Tenant shall not be permitted to convert any future Must Take Allowance for any Must Take Expansion Premises for which a Must Take Commencement Date has not occurred.

(d)    Prior to a Must Take Commencement Date and provided the applicable Must Take Expansion Premises has not been leased or otherwise utilized, and further provided that such temporary use will not interfere with any of Landlord's construction or build-out obligations, upon thirty (30) days prior written notice to Landlord, Tenant may have temporary or periodic use (not to exceed three (3) consecutive days at once, nor ten (10) days in the aggregate) of the Must Take Expansion Premises, for a nominal charge, for Tenant functions. In connection therewith, at Landlord's election, Landlord and Tenant shall enter into a revocable license agreement in form and substance satisfactory to Landlord.

(e)    For avoidance of doubt, Landlord shall perform and complete the Demolition Work with respect to each Must Take Expansion Premises at the same time as Landlord performs the Demolition Work with respect to the Initial Premises. Landlord will complete the Base Building Condition Work with respect to each Must Take Expansion Premises on the earlier of the Intended Early Must Take Possession Date (if accelerated) or the Stated Must Take Commencement Date (as applicable).

2.7    **Tenant's Construction Payments**.

(a)    If the Amenity Space Renovations Work (pursuant to the Amenity Space Plans) or Lobby Renovations Work (pursuant to the Lobby Plans) costs more than the amount of the Amenity Build-Out Allowance or Lobby Renovations Allowance (as such may be increased

21

or decreased by Tenant using the reallocations permitted in the Work Agreement) ("**Excess First Floor Costs**"), then Tenant shall pay such Excess First Floor Costs directly to any contractors completing such work as and when due to such contractors (provided Landlord has timely provided the invoices and payment information to Tenant). Tenant's failure to timely make any payments of Excess First Floor Costs hereunder, regardless if Tenant has a good faith basis for withholding or delaying such payment, shall not relieve Tenant from its obligation to discharge (or bond) any lien resulting from Tenant's failure to timely pay the same. Tenant agrees to defend, indemnify and hold Landlord harmless from any claim, cost or liability incurred in connection with Tenant's failure to pay such Excess First Floor Costs, including reasonable attorneys' fees and expenses.

(b)    For the Initial Build-Out Work, the 2nd Floor Build-Out Work, the Amenity Space Renovations Work , the Lobby Renovation Work and the Subsequent Build-Out Work, Landlord shall in no event be required to advance any funds, spend any funds or incur any costs or expense in excess of the aggregate Tenant Improvement Allowances for such work (including, as the result of any reallocation of any portion of such Tenant Improvement Allowance as may be permitted under this Lease or the Work Agreement).

## ARTICLE III

## TERM

3.1    **Term**. All of the provisions of this Lease shall be in full force and effect from and after the date first above written. The Lease Term shall commence on the Lease Commencement Date. If the Lease Commencement Date is not the first day of a month, then the Lease Term shall be the period set forth in the definition of "Lease Term" in Article I, plus the partial month in which the Lease Commencement Date occurs, and the last day of the Lease Term shall be the "**Expiration Date**". For purposes of clarity, the Lease Term includes any properly exercised renewal or extension of the term of this Lease.

3.2    **Lease Commencement Date**.  Subject to the extensions set forth in this Lease and the Work Agreement, the "**Lease Commencement Date**" shall be December 1, 2016.

3.3    **Failure to Deliver.**

(a)    Subject to Section 3.3(f) of this Lease, if Landlord does not make the Initial Premises in its entirety available for delivery to Tenant in the Required Delivery Condition by the Base Building Condition Target Delivery Date, then the Abatement Period applicable to the Initial Premises pursuant to Section 4.2(a) below shall be extended as follows: (i) one (1) day for each day after the Base Building Condition Target Delivery Date that the entire Initial Premises is not available to be delivered to Tenant in the Required Delivery Condition up to forty-five (45) days; (ii) one and one half (1 ½) days for each day after forty-five (45) days after the Base Building Condition Target Delivery Date that the entire Initial Premises is not available to be delivered to Tenant in the Required Delivery Condition up to ninety (90) days, and (iii) thereafter two (2) days for each day after ninety (90) days after the Base Building Condition Target Delivery Date that the entire Initial Premises is not available to be delivered to Tenant in the Required Delivery Condition.  (As an example to the above, if the Base Building

Delivery Date was 100 days after the Base Building Target Delivery Date, the Abatement Period would be extended for 142½ days (45 days for the first 45 days plus 77½ days for the second 45 days plus 20 days for the last 10 days)). As used in this Section 3.3(a), the phrase "not available to be delivered" or similar phrases mean that Landlord has not tendered possession and delivery of the Initial Premises in the Required Delivery Condition, subject to Tenant's rights to delay acceptance of delivery and possession of the Final Delivery Block as set forth in Section 1.13(b)(ii) of the Work Agreement.

(b)    Landlord shall be required to complete Landlord's Initial Work (exclusive of the Base Building Condition Cap Work) for the Premises in its entirety in order to satisfy the Required Delivery Condition for the applicable portion of the Premises.  In regards to the Initial Premises, Tenant shall not be required to take possession or accept delivery of less than a full Delivery Block in the Required Delivery Condition. Tenant shall not be required to take possession or accept delivery of the Initial Premises until the Base Building Condition Target Delivery Date (and may delay possession and acceptance of delivery for the Final Delivery Block as provided in Section 1.13(b)(ii) of the Work Agreement) regardless of whether the entire Initial Premises is in the Required Delivery Condition before such date such that the applicable Base Building Condition Delivery Date would have occurred but for Section 3.3(a) (provided that Tenant, in its sole and absolute discretion, may elect accept such early possession and delivery by Landlord but only upon Tenant's delivery of a written notice to Landlord specifically agreeing to accept such possession and delivery prior to the Base Building Condition Target Delivery Date).

(c)    Tenant will give Landlord no less than one hundred twenty (120) days' prior notice of when it reasonably expects in good faith to commence the installation of its furniture and work stations within the Initial Premises (such one hundred twenty (120) day time period, the "**Initial Premises Post-Delivery Work Period**"), and with respect to the Must Take Expansion Premises, within such space (such one hundred twenty (120) day time period, the "**Must Take Expansion Premises Post-Delivery Work Period**", and together with the Initial Premises Post-Delivery Work Period, the "**Post-Delivery Work Period**")), and Landlord will coordinate and complete its applicable Base Building Condition Cap Work during the applicable Post-Delivery Work Period. If Landlord does not deliver the Base Building Condition Cap Work Substantially Complete on or before the expiration of the applicable Post-Delivery Work Period, Tenant shall be entitled to a rent credit of $200.00 per day until the Base Building Condition Cap Work is Substantially Complete.

(d)    If Landlord does not deliver any Must Take Expansion Premises in the Required Delivery Condition by the earlier of the applicable Stated Must Take Commencement Date applicable to such floor or Intended Must Take Delivery Date set forth in the applicable Acceleration Notice (a "**Deemed Early Must Take Possession Date**"), then the Abatement Period applicable to such floor's Base Rent pursuant to Section 4.2(a) below (as may be modified by Section 2.6 above) shall be extended as follows: one (1) day for each day after the earlier of the Stated Must Take Commencement Date or the Deemed Early Must Take Possession Date that the applicable Must Take Expansion Premises has not been delivered to Tenant in the Required Delivery Condition up to thirty (30) days; two (2) days for each day after thirty (30) days after the earlier of the Stated Must Take Commencement Date or the Deemed Early Must Take Possession Date that the applicable Must Take Expansion Premises has not

23

been delivered to Tenant in the Required Delivery Condition up to forty-five (45) days, and thereafter two and one-half (2-1/2 ) days for each day after forty five (45) days after the earlier of the Stated Must Take Commencement Date or Deemed Early Must Take Possession Date that the applicable Must Take Expansion Premises has not been delivered to Tenant in the Required Delivery Condition.  (As an example to the above, if the Delivery Date of the applicable Must Take Expansion Premises was  60 days after the earlier of the Stated Must Take Commencement Date or the Deemed Early Must Take Possession, the Abatement Period for such Must Take Expansion Premises would be extended for  days (30 days for the first 30 days plus 30 days for the second 15 days plus 37½ days for the last 15 days))

(e)    Notwithstanding anything to the contrary contained in the Lease or the Work Agreement, in no event shall Tenant be responsible for any Premises Consumable Expenses or Tenant's Proportionate Share of Operating Expenses or Real Estate Taxes for a Must Take Expansion Premises until the applicable Must Take Commencement Date.

(f)    Notwithstanding anything to the contrary contained in the Lease or the Work Agreement, in connection with the performance and completion of Landlord's Work, Landlord is entitled to extensions for Tenant Delays (subject to the requirements of Section 1.11 of the Work Agreement) and Landlord is entitled to up to (but not in excess of) thirty (30) days of extensions in the aggregate for Unavoidable Delays. If a Tenant Delay and an Unavoidable Delay occur at the same time, they shall run concurrently and not consecutively.  Provided Landlord has complied with the notice provisions of Article XXV, during the continuation of  an Unavoidable Delay, Landlord's obligation to complete any item of Landlord's Work or deliver any portion of the Premises shall be extended for up to such thirty (30) day period without penalty to Landlord (including, the Abatement Period, the Lease Commencement Date and/or the Must Take Commencement Date, as applicable, shall not change or be extended); provided that the applicable Tenant's Completion Date shall be extended one day for each day of such Unavoidable Delay. Upon Landlord's utilization of 30 days of Unavoidable Delay extensions, any further Unavoidable Delay affecting the performance and completion of Landlord's Work shall be a Landlord Delay without the necessity of Tenant delivering additional notices to Landlord, and subject to the penalties contained in this Section 3.3.

3.4    **Mock Up Space**. As soon as reasonably practicable, Landlord shall make available to Tenant a portion of an upper floor of the Building (other than the 3rd or the 4th floor) which may or may not be the Initial Premises or Must Take Expansion Premises, but shall be reasonably acceptable to both Landlord and Tenant (containing no more than 2,000 contiguous RSF) following the completion of Demolition Work and Base Building Condition Work on such floor (the "**Mock Up Space**"), in either case on a date reasonably determined by Landlord and reasonably acceptable to Tenant for the purpose of constructing on-site mockups therein; provided that (i) Tenant's use of the Mock-Up Space does not interfere with any of Landlord's Demolition Work or Base Building Condition Work on such floor, (ii) use of the Mock-Up Space shall be at Tenant's sole cost and expense (including any utilities), and (iii) all terms of this Lease shall apply to such use except those regarding the payment of Base Rent and additional rent.

3.5    **Stated Must Take Commencement Date**.  Subject to the terms and provisions hereof and provided Tenant has not accelerated the Stated Must Take Commencement Date as

permitted by Section 2.6, provided that Landlord shall have delivered the applicable Must Take Expansion Premises to Tenant in the Required Delivery Condition, Tenant shall take possession of the applicable floor of each Must Take Expansion Premises no later than as follows (each, a "**Stated Must Take Commencement Date**"):

(a)    7th floor, on or before the first (1st) anniversary of the Lease Commencement Date;

(b)    6th floor, on or before the second (2nd) anniversary of the Lease Commencement Date;

(c)    5th floor, on or before the third (3rd) anniversary of the Lease Commencement Date.

As used herein the "**Must Take Commencement Date**" with respect to a Must Take Expansion Premises shall mean the earlier to occur of (i) the Early Must Take Possession Date (or the Deemed Early Must Take Commencement Date) plus any penalty period with respect to the applicable Must Take Expansion Premises as provided in Section 3.3(d), and (ii) the Stated Must Take Commencement Date for the applicable Must Take Expansion Premises plus any penalty period with respect to the applicable Must Take Expansion Premises as provided in Section 3.3(d). Promptly after each Must Take Commencement Date and applicable Abatement Period for the applicable Must Take Expansion Premises is mutually ascertained, Landlord and Tenant shall execute a certificate confirming the applicable Must Take Commencement Date in a form substantially similar to the form attached to this Lease as **Exhibit D** subject to Landlord's delivery of such Must Take Expansion Premises in the Required Delivery Condition.

## ARTICLE IV

## BASE RENT

4.1    **Base Rent**.

(a)    From and after the Lease Commencement Date, but subject to the applicable Abatement Period set forth in Section 4.2(a), the Rent Credit Amount and any other rent abatement Tenant may be expressly entitled to pursuant to this Lease, Tenant shall pay the Initial Premises Base Rent in equal monthly installments in advance on the first day of each month during a Lease Year. If the Lease Commencement Date is not the first day of a month, then the Initial Premises Base Rent from the Lease Commencement Date until the first day of the following month shall be prorated on a per diem basis at the rate of one-thirtieth (1/30th) of the monthly installment of the Initial Premises Base Rent payable during the first Lease Year, and Tenant shall pay such prorated installment of the Initial Premises Base Rent on the Lease Commencement Date.

(b)    Commencing on each applicable Must Take Commencement Date but subject to the applicable Abatement Period set forth in Section 4.2(b), the Rent Credit Amount and any other rent abatement Tenant may be expressly entitled to pursuant to this Lease, hereof, Tenant shall pay, and Base Rent shall include, the Must Take Expansion Premises Base Rent for such Must Take Expansion Premises. If any Must Take Commencement Date is not the first day

25

of a month, then the applicable Must Take Expansion Premises Base Rent from the Must Take Commencement Date until the first day of the following month shall be prorated on a per diem basis at the rate of one-thirtieth (1/30th) of the monthly installment of the applicable Must Take Expansion Premises Base Rent payable during the applicable Lease Year, and Tenant shall pay such prorated installment of the Must Take Expansion Premises Base Rent on the Must Take Commencement Date.

4.2    **Abatement Period**.

(a)    Provided that no Event of Default has occurred and is continuing, commencing on the Lease Commencement Date, subject to the provisions of Section 3.3, Landlord agrees to waive the total amount of the following costs for the Initial Premises only for a six (6) month period: (1) all Base Rent due for such period, to be applied in monthly installments for each of the six (6) full months following the Lease Commencement Date, (2) Tenant's additional rent for Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes due for such six (6) month period (including any Metered Costs), (3) all Consumable Expenses, (4) any Temporary Usage Charges and (5) all Submetered Costs for such six (6) month period.

(b)    Provided that no Event of Default has occurred and is continuing, commencing on each Must Take Commencement Date, Landlord agrees to waive the total amount of Must Take Expansion Premises Base Rent only (i.e., such abatement shall not include any additional rent for Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes, Consumable Expenses or Submetered Costs for such floor and Tenant shall remain liable for the same) due for a nine (9) month period for such Must Take Expansion Premises, to be applied in monthly installments for each of the nine (9) full months following the applicable Must Take Commencement Date (or earlier, pursuant to Section 2.6(a) of this Lease).

(c)    The total amount of Base Rent, Operating Expenses, Real Estate Taxes, Consumable Expenses and Submetered Costs abated pursuant to Section 4.2(a) shall be the "**Abated Initial Premises Costs**" and the total amount of Base Rent abated pursuant to Section 4.2(a) shall be the "**Abated Must Take Expansion Premises Costs**", and together with the Abated Initial Premises Costs, the "**Abated Costs**".  The six (6) or nine (9) month abatement period pursuant to Section 4.2(a) and (b), respectively, plus any extensions provided by Section 3.3 or elsewhere in this Lease or Work Agreement shall be the "**Abatement Period.**"  For the avoidance of doubt, any cost or expense not expressly included in the Abated Costs, shall be due and payable by Tenant in accordance with this Lease. The escalation of Base Rent calculated pursuant to Section 4.3 shall be calculated without giving effect to any waiver of rent or rent credit provided to Tenant.  For clarity, all references to the Abatement Period shall include any extensions thereof provided in Section 3.3.

4.3    **Base Rent Annual Escalation Percentage**. On the first day of the second Lease Year and each succeeding Lease Year during the Lease Term, the Per RSF Base Rent in effect shall be increased by an amount equal to the product of (a) the Base Rent Annual Escalation Percentage, and (b) the Per RSF Base Rent in effect immediately before the increase.

4.4    **Payment Requirements**. All sums payable by Tenant under this Lease, whether or not stated to be Base Rent, additional rent or otherwise, shall be paid to Landlord in legal tender of the United States, without setoff, deduction or demand (except as otherwise expressly provided in this Lease or the Work Agreement), at the Landlord Payment Address, or to such other party or such other address as Landlord may designate in writing. Landlord's acceptance of rent after it shall have become due and payable shall not excuse a delay upon any subsequent occasion or constitute a waiver of any of Landlord's rights hereunder. If any sum payable by Tenant under this Lease is paid by check which is returned due to insufficient funds, stop payment order, or otherwise, then: (a) such event shall be treated as a failure to pay such sum when due; and (b) in addition to all other rights and remedies of Landlord hereunder, Landlord shall be entitled (i) to impose, as additional rent, a returned check charge of One Hundred Dollars ($100.00) to cover Landlord's administrative expenses and overhead for processing, and (ii) to require that all future payments be remitted by wire transfer, money order, or cashier's or certified check. Tenant shall have the right to pay any sum due hereunder by wire transfer or ACH.

4.5    **Other Sums Due**. Any additional rent or other sum owed by Tenant to Landlord (other than Base Rent), and any cost, expense, damage or liability incurred by Landlord for which Tenant is liable, shall be considered additional rent payable pursuant to this Lease, and unless expressly provided otherwise pursuant to a different provision of this Lease, such amount shall be paid by Tenant no later than thirty (30) days after the date Landlord notifies Tenant of the amount thereof or makes demand therefor.

4.6    **Additional Rent Credit**. Provided and for so long as no Event of Default shall have occurred and be continuing, commencing on February 1, 2028, Landlord shall apply the Rent Credit Amount (as hereinafter defined) to the next installment(s) of Base Rent payable hereunder until the Rent Credit Amount has been fully applied. The "**Rent Credit Amount**" means $450,000.00. Landlord shall have the right, at its option, to pay the Rent Credit Amount (or any portion thereof then remaining) in a lump sum to Tenant upon the occurrence of sale, financing or refinancing of the Building, and Tenant shall confirm receipt of the same in writing. Upon payment in full of the Rent Credit Amount (whether by application to Base Rent as provided herein or by lump sum payment), the provisions of this Section 4.6 shall be deemed satisfied.

## ARTICLE V

## OPERATING EXPENSES AND REAL ESTATE TAXES

5.1    **Definitions**. For the purposes of this Article V, the term "**Building**" shall be deemed to include the site upon which the Building is constructed as described in **Exhibit K** (which site is sometimes referred to herein as the "**Land**").

5.2    **Operating Expenses; Consumable Expenses and Base Building Expenses.**

(a)    Operating Expenses. Subject to the limitations set forth in this Section 5.2, the Abatement Periods as set forth in Section 4.2 and any other rent abatement Tenant may be expressly entitled to pursuant to this Lease, from and after the Lease Commencement Date,

Tenant shall pay as additional rent Tenant's Proportionate Share (as such share may increase from time to time as provided in this Lease) of the Operating Expenses for each calendar year falling entirely or partly within the Lease Term. Following each Must Take Commencement Date (subject to the extension of the Abatement Period as set forth in Section 3.3), Tenant's Proportionate Share with respect to Operating Expenses shall be increased by the Tenant's Proportionate Share set forth opposite such Must Take Expansion Premises in the Measurement Schedule (or with respect to any partial floor subsequently demised by Landlord to Tenant hereunder, as determined in the definition of "**Tenant's Proportionate Share**").

(b)     Consumable Expenses.  Subject to the limitations set forth in this Section 5.2, the applicable Abatement Periods as set forth in Section 4.2 and any other rent abatement Tenant may be expressly entitled to pursuant this Lease, from and after the Lease Commencement Date (with respect to the Initial Premises and the Roof Terrace) and from and after the applicable Must Take Commencement Date (with respect to each Must Take Expansion Premises), Tenant shall pay 100% of the costs and expenses of (i) the cleaning and janitorial services with respect to the interior of the applicable portion of the Premises and the Roof Terrace only (including full floor elevator lobbies and core bathroom areas within the applicable portion of the Premises) and (ii) to the extent not capable of being separately submetered,  gas (when such is provided to the Premises) and sewer charges (provided the sewer charges are not included in the water submeters) that are attributable solely to the applicable portion of the Premises     (collectively, "**Premises Consumable Services**" and the cost thereof, the "**Consumable Expenses**").  For clarity:

(i)     in the case of water, gas and sewer costs properly attributable to the Premises that are not possible or feasible to measure by way of submetering, such costs shall be measured by way of overall/general metering and Landlord shall provide reasonable explanation/information together with invoicing to substantiate that such costs are so attributable to the Premises (subject to Tenant's dispute and other rights contained throughout this Agreement);

(ii)     in the case of cleaning/janitorial costs, Landlord shall arrange cleaning/janitorial contracts with applicable vendors that specifically identify which portions of the cleaning/janitorial services for the Building are attributable to the Premises or alternatively, arrange for a separate contract for the Premises. Tenant shall have the option (but not the obligation) to arrange its own cleaning/janitorial contract for the Premises directly with applicable vendor(s) if it so wishes to at any time, provided that it first give Landlord with sufficient advance notice so that existing contracts can be terminated or amended to exclude the Premises from their scope of work;

(iii)     "Premises Consumable Services" shall not include Building System HVAC (which are either Operating Expenses, subject to Section 5.2(g) or will be separately metered pursuant to Section 14.3) and electricity serving the Premises (Section 14.3 applies to such electrical charges) or any other Building Systems servicing the Building Common Areas or tenants of the Building generally (which are either Operating Expenses, charged directly to the applicable tenant, or with respect to Tenant, charged to Tenant pursuant to Article XIV);

28

(iv)    Landlord will invoice Tenant for Premises Consumable Services monthly and separately from Operating Expenses and amounts separately determined by meters;

(v)    Landlord may not arbitrarily allocate expenses to Premises Consumable Services as opposed to other tenants or the Building Common Areas;

(vi)    In no event will Consumables Expenses include Submetered Costs or Excluded Expenses and no cost in connection with Premises Consumable Services will be payable by Tenant until the applicable Abatement Period has expired (with respect to the Initial Premises) or the applicable Must Take Commencement Date (with respect to each floor of the Must Take Expansion Premises); and

(vii)    Tenant shall have the right to audit on a semi-annual basis, invoices for Consumable Expenses utilizing the same mechanism set forth in clause 5.2(f) below with respect to Annual Expense Statements.

(c)    Landlord to Install Submeters. As part of the Base Building Condition Cap Work, Landlord shall install, at Landlord's sole expense (subject to the Base Building Cap), submeters to ascertain Tenant's actual electrical Usage (including, without limitation, in connection with any Specialty Installations installed by Landlord at Tenant's request, as part of the Lobby Renovations Work and/or Amenity Space Renovations Work). Any such submeter shall exclusively meter such Specialty Alteration, the Usage of the two Building System HVAC units on each floor of the Premises and the airhandlers and condenser water towers on the roof. In addition to the foregoing, also as part of Landlord's Base Building Condition Cap Work, Landlord will install separate meters or submeters to determine (A) electrical Usage within the Food Service Area, (B) electric Usage by other tenants on floors 3 and 4, (C) water usage by Tenant within the Premises, (D) water usage by other tenants, (E) water usage within the rooftop uses and (F) water usage with the Food Service Area. Landlord shall also install submeters for both generators serving the Building. All the costs of all electricity, gas, water, HVAC, sewer and other utility charges of every type and nature (collectively "**Utilities**") serving the Building (but not exclusive to any tenant space, the Food Service Area, the Premises or the Roof Terrace) where the usage of such utilities is capable of being determined by meters or submeters (and shall be so determined) are collectively or individually referred to herein as "**Metered Costs**" and the costs of all Utilities exclusively serving the Premises or any Specialty Alterations installed by Tenant outside of the Premises are collectively or individually referred to herein as "**Submetered Costs**."

(d)    Definition of Operating Expenses. As used herein, the term "**Operating Expenses**" shall mean the sum of all expenses incurred by Landlord in the ownership, operation, maintenance, repair and cleaning of the Building and Building improvements, the operation, maintenance repair, operating (including but not limited to the Amenity Space and Parking Lot and any other parking facilities serving the Building, and if and when the Parking Structure is completed and conveyed to Landlord in accordance with the Parking Easement, in the ownership, operation, maintenance, repair and cleaning of the Parking Structure), including, but not limited to, the following (but subject to the limitations and provisos set forth in this Section 5.2): (1) Metered Costs (excluding Submetered Costs and to the extent separately metered or

29

submetered, costs for Utilities with respect to Operator's usage or specific tenants' premises or a tenant's Specialty Alterations located outside of such tenant's premises which shall be paid directly by such tenant); (2) costs of Utilities for the Building and Building Common Areas, to the extent such Utilities are not included in Metered Costs or are not separate Submetered Costs or are not recovered by Landlord under Section 5.2(g), without duplication, (3) premiums and other charges for insurance and deductibles under such insurance policies; (4) management fees and personnel costs of the Building (provided that the management fee percentage charged shall not exceed three percent (3%) of gross revenues from the Building (adjusted for abatements) collected from tenants or other Permitted Occupants of the Building during such calendar year), (5) costs of service and maintenance contracts relating to the Building or Parking Lot (or any Parking Structure constructed as a replacement to the Parking Lot) as a whole (including, without limitation, elevator, generator and HVAC maintenance); (6) operation, maintenance, repair and replacement expenses and supplies; (7) depreciation for Capital Improvements (and any financing costs thereof) (A) required to comply with Requirements (or changes thereto) applicable to the Building or the Parking Lot (or replacement Parking Structure) enacted after the date hereof (amortized over the longest depreciable period required by GAAP, with an interest factor equal to two percent (2%) above the Prime Rate at the time of Landlord's having incurred said expenditure) or (B) which are designed to result in a saving in the amount of Operating Expenses provided that the amount of the cost of any such Capital Improvements under the this clause (7)(B) attributable to any calendar year that may be included in Operating Expenses for such calendar year shall not exceed the estimated savings for such Lease Year as a result of such expenditures by Landlord (the "**Projected Savings**"), which Projected Savings shall be reasonably determined (at the time of or prior to the making of such expenditure by Landlord) by an Independent Engineer, who shall be retained by Landlord (in all such cases the cost thereof shall be included in "Operating Expenses" for the calendar year in which the costs are incurred and subsequent calendar years, amortized over such period of time as the Projected Savings will equal Landlord's cost of such capital improvement, with an interest factor equal to two percent (2%) above the Prime Rate at the time of Landlord having incurred said expenditure); (8) charges for security, janitorial, trash removal, window cleaning and all other cleaning services and supplies furnished to the Building or Parking Lot (or the Parking Structure, as applicable), provided that charges for cleaning services and janitorial services within the Premises are not included by Operating Expenses but will treated as a Consumable Services Expense ; (9) any business, professional and occupational license tax payable by Landlord with respect to the Building or Parking Lot (or the Parking Structure, as applicable); (10) without duplication, reasonable reserves for non-capital replacements, repairs and contingencies; (11) costs of snow removal; (12) any other expense incurred by Landlord in maintaining, repairing, operating or cleaning the Building or Parking Lot, including the Amenity Space and Lobby; (13) costs of maintaining, operating and repairing the Emergency Generator System, and  (14) all other costs which are to be included as Operating Expenses as provided in this Lease but without duplication of any other Operating Expenses. Landlord shall reasonably allocate the premiums of any blanket insurance coverages carried by Landlord among the properties covered by such blanket policies and shall provide an explanation of such allocation to Tenant if requested. Notwithstanding anything to the contrary contained in this Lease, Operating Expenses shall not include the cost and items set forth in **Exhibit N** ("**Excluded Expenses**") and shall be paid without duplication of amounts paid elsewhere in this Lease by Tenant for Premises Consumable

Expenses, Submetered Costs for Tenant's Premises specific Usage or usage, Temporary Usage Charges or Real Estate Taxes (and the same shall apply with respect to those charges also).

(e)     Operating Expense Statements. Subject to the Abatement Period, Tenant shall make estimated monthly payments to Landlord on account of the amount of Operating Expenses that are expected to be incurred during each calendar year (or portion thereof). At the beginning of the Lease Term and at the beginning of each calendar year thereafter, Landlord shall submit a statement setting forth Landlord's reasonable estimate of such Operating Expenses and Tenant's Proportionate Share thereof ("**Expense Statement**"). Tenant shall pay to Landlord on the first day of each month following receipt of such Expenses Statement, until Tenant's receipt of the succeeding Annual Expense Statement, an amount equal to one-twelfth (1/12) of each such share (estimated on an annual basis without proration pursuant to Section 5.4) (such monthly installment payment of Tenant's Proportionate Share of Operating Expenses being referred to a "**Monthly Operating Expense Payment**"). From time to time during any calendar year, Landlord may revise Landlord's estimate and adjust Tenant's monthly payments to reflect Landlord's revised estimate and/or the commencement of any Must Take Expansion Premises; provided that in each case Landlord sends a revised Expense Statement to Tenant. Within approximately ninety (90) days after the end of each calendar year, or as soon thereafter as is feasible, Landlord shall submit a statement (each an "**Annual Expense Statement**") showing (1) a reasonably detailed line item statement of Operating Expenses incurred during the preceding calendar year, (2) Tenant's Proportionate Share of Operating Expenses, and (3) the aggregate amount of Tenant's estimated payments made on account of Operating Expenses during such calendar year. If such Annual Expense Statement indicates that the aggregate amount of such estimated payments exceeds Tenant's actual liability, then Landlord shall credit the net overpayment toward Tenant's next estimated payment(s) pursuant to this Section 5.2 (if applicable) or remit such net overpayment to Tenant within thirty (30) days. If such Annual Expense Statement indicates that Tenant's actual liability exceeds the aggregate amount of such estimated payments, then within thirty (30) days after Landlord's submission thereof, Tenant shall pay the amount of such excess as additional rent.

(f)     Tenant Right to Audit. For a period of twelve (12) months after Tenant's receipt of such Annual Expense Statement (or if a supplemental or amended statement is provided, after the delivery of such supplemental or amended statement), Landlord shall upon Tenant's written request therefor, provide such additional information at Tenant's sole reasonable cost as reasonably necessary for Tenant to verify the amount of Operating Expenses incurred during the preceding calendar year. For a period of twelve (12) months after Tenant's receipt of such Annual Expense Statement (or subsequent supplemental or amended statement), Tenant, or an independent, certified public accountant who is hired by Tenant on a non-contingent fee basis and who offers a full range of accounting services and is reasonably acceptable to Landlord, shall have the right, during regular business hours and after giving at least ten (10) days' advance written notice to Landlord, to inspect and complete an audit of Landlord's books and records relating to Operating Expenses for the immediately preceding calendar year. Tenant shall (and shall cause its employees, agents and consultants to) keep the results of any such audit or audited statement strictly confidential. Within such twelve (12) month period, if Tenant disagrees with the Annual Expense Statement, Tenant shall notify Landlord that it disputes the correctness of the Annual Expense Statement (such notice a "**Tenant Expense Dispute Notice**"), specifying the particular respects in which the Annual

31

Expense Statement is claimed to be incorrect. Pending the determination of any such dispute by agreement or litigation as aforesaid, Tenant shall pay to Landlord the amount due under the disputed Annual Expense Statement, within thirty (30) days after Landlord gives same to Tenant, and such payment to be without prejudice to Tenant's position. If upon resolution of such dispute (whether by mutual agreement between Landlord and Tenant or by judicial determination), the amounts paid by Tenant to Landlord for Operating Expenses exceed the amounts to which Landlord is entitled hereunder, Landlord shall, at Landlord's option, either credit the amount of such excess toward the next monthly payments of Operating Expenses due hereunder or remit such net overpayment to Tenant within thirty (30) days, or if the amounts paid by Tenant to Landlord for Operating Expenses is less than the amounts to which Landlord is entitled hereunder, Tenant shall pay such deficiency to Landlord within (30) days. All of Tenant's costs and expenses of any such audit shall be paid by Tenant unless such audit or audited statement shows that the amounts paid by Tenant to Landlord on account of Operating Expenses for such calendar year exceed the amounts to which Landlord is entitled by more than four percent (4%) in which case Landlord shall pay all costs and expenses of any such audit or audited statement (provided such costs and expenses shall not exceed Five Thousand Dollars ($5,000) in the aggregate) and if such amount exceeds seven percent (7%), Landlord shall pay to Tenant interest at the Default Rate on all overpayments of Operating Expenses for such calendar year accruing from the date of overpayment until paid to Tenant. If Tenant does not notify Landlord in writing of any objection to any Annual Expense Statement within twelve (12) months after receipt thereof (or six (6) months, in the case of Tenant's audit of Consumable Expenses in accordance with Section 5(b)(vii)), then Tenant shall be deemed to have waived such objection for such Annual Expense Statement. Notwithstanding anything to the contrary contained herein, Tenant may not conduct an audit of an Annual Expense Statement more than once each calendar year.

(g)  <u>Building System Charges</u>.  Notwithstanding anything to the contrary contained in this Lease, so long as Tenant is the sole tenant of the Building, in addition to paying Tenant's Proportionate Share of the cost (as an Operating Expense) Metered Costs (each as set forth in the applicable meter) for the Building System HVAC units and condenser water towers located on the rooftop (Landlord shall install separate meters with respect to such rooftop equipment as part of the Base Building Condition Work) connected to the interior Building System HVAC units, upon the end of the applicable Abatement Period, Tenant will pay an additional amount equal to 50% of such electrical Usage and water usage for the for the Building System HVAC units and condenser water towers located on the rooftop connected to the interior Building System HVAC units in addition to Tenant's Proportionate Share as of such date (the "**Temporary Usage Charge**") (as an example, if Tenant's Proportionate Share is 55%, so long as there are no other tenants in the Building, in addition to Tenant's Proportionate Share of the cost of the Metered Costs for electricity and water usage for such rooftop units, Tenant will pay half of the remaining cost, i.e., 22.5%,  of such electrical Usage and water usage). Upon the commencement of any tenant build out work on any portion of the 3rd or 4th floors comprising in the aggregate, no less than 28,175 RSF, Tenant shall no longer be required to pay the Temporary Usage Charge notwithstanding if, at some later date, Tenant is then again the sole tenant of the Building (but Tenant will still be required to pay Tenant's Proportionate Share of such Metered Costs included in Operating Expenses). In addition, if tenants (including Tenant) are allowed to tap their separate supplemental units into the Building System HVAC units and/or condenser water towers, Landlord will reallocate the respective proportionate shares of all tenants with

respect to electrical Usage and water usage charges for the Building System HVAC roof top units to reflect such additional users.

(h)     Calendar Year.  Landlord shall have the one time right, upon twelve (12) months prior notice to Tenant, to change the calculation of Operating Expenses from a calendar year basis to a Lease Year basis (and thereafter all references to "calendar year" in this Section 5.2 shall refer instead to "Lease Year") provided that no such change shall increase Tenant's costs under this Section 5.2 beyond that would Tenant would have incurred if Landlord has retained the calendar calculation.

5.3     **Real Estate Taxes**.

(a)     From and after the Lease Commencement Date but subject to the Abatement Period and any other abatement Tenant is expressly entitled to pursuant to this Lease, Tenant shall pay as additional rent Tenant's Proportionate Share of the Real Estate Taxes for each fiscal year falling entirely or partly within the Lease Term, respectively. Tenant's Proportionate Share with respect to Real Estate Taxes shall be that percentage which is equal to a fraction, the numerator of which is the number of RSF of rentable area in the Initial Premises, and the denominator of which is 309,303.18. Following each Must Take Commencement Date, Tenant's Proportionate Share with respect to Real Estate Taxes shall be increased in accordance with the foregoing formula.

(b)     "**Real Estate Taxes**" shall mean (1) all real estate taxes, vault and/or public space rentals, business district or arena taxes, special user fees, rates, and assessments (including general and special assessments, if any), ordinary and extraordinary, foreseen and unforeseen, which are imposed upon Landlord or assessed against the Building, the Land, the outparcels constituting the Parking Lot (or when the Parking Lot is replaced with the Parking Structure, the parcel underlying the Parking Structure) or Landlord's personal property used in connection therewith, (2) any other present or future taxes or governmental charges that are imposed upon Landlord or assessed against the Building or the Land which are in the nature of or in substitution for real estate taxes, including any tax levied on or measured by the rents payable by tenants of the Building, and (3) expenses (including, without limitation, reasonable attorneys' and consultants' fees and court costs) incurred in reviewing, protesting or seeking a reduction of real estate taxes, whether or not such protest or reduction is ultimately successful. Subject to the foregoing, Real Estate Taxes shall not include any inheritance, estate, gift, franchise, corporation, net income or net profits tax assessed against Landlord from the operation of the Building or any late charges caused by Landlord not timely paying any Real Estate Taxes provided that Tenant has timely paid Monthly Real Estate Tax Payments.

5.4     **Estimated Real Estate Tax Payments.** Tenant shall make estimated monthly payments to Landlord on account of the Real Estate Taxes Landlord reasonably estimates to be incurred during each calendar year. At the beginning of the Lease Term and at the beginning of each fiscal tax year thereafter, Landlord shall submit a statement setting forth Landlord's reasonable estimate of such amount and Tenant's Proportionate Share thereof ("**Tax Statement**"). Tenant shall pay to Landlord on the first day of each month following receipt of such statement, until Tenant's receipt of the succeeding annual statement, an amount equal to one-twelfth (1/12) of such share (estimated on an annual basis without proration pursuant to this

33

Section 5.4, such monthly installment payments required of Tenant under this Section 5.4 being collectively referred to as "**Monthly Real Estate Tax Payments**"). From time to time during any calendar year, Landlord may revise Landlord's estimate and adjust Tenant's monthly payments to reflect Landlord's revised estimate and/or the commencement of any Must Take Expansion Premises. Within approximately ninety (90) days after the end of each calendar year, or as soon thereafter as is feasible, Landlord shall submit a statement (each a "**Annual Tax Statement**") showing (1) a reasonably detailed line item statement of Real Estate Taxes incurred during the preceding calendar year, (2) Tenant's Proportionate Share of the Real Estate Taxes incurred during the preceding calendar year, and (3) the aggregate amount of Tenant's estimated payments made on account of Real Estate Taxes during such year. If such Annual Tax Statement indicates that the aggregate amount of such estimated payments exceeds Tenant's actual liability, then Landlord, at Landlord's option, shall either credit the net overpayment toward Tenant's next estimated payment(s) pursuant to this Section (if applicable) or remit such net overpayment to Tenant within thirty (30) days. If such Annual Tax Statement indicates that Tenant's actual liability exceeds the aggregate amount of such estimated payments, then within thirty (30) days after Landlord's submission thereof, Tenant shall pay the amount of such excess as additional rent. Every Annual Tax Statement (including revised Tax Statements) given to Tenant shall be conclusive and binding upon Tenant, unless Tenant shall notify Landlord within twelve (12) months after an Annual Tax Statement is given to Tenant that Tenant disputes the correctness of the computations made thereon (such notice, a "**Tenant Tax Statement Dispute Notice**"), specifying the particular respects in which such computations are claimed to be incorrect. Pending the resolution of such dispute (by agreement or judicial determination), Tenant shall, within thirty (30) days after it is given such disputed Annual Tax Statement, pay any additional rent due in accordance therewith, but such payment shall be without prejudice to Tenant's position. If Tenant does not notify Landlord in writing of any objection to any Annual Tax Statement within twelve (12) months after receipt thereof, then Tenant shall be deemed to have waived such objection.

5.5    **Real Estate Tax Contests**. Landlord may, from time to time, and Tenant may request that Landlord, from time to time, to initiate and prosecute any proceedings permitted by law for the purpose of obtaining an abatement of, or otherwise contesting the validity or amount of Real Estate Taxes. If requested by Tenant, Landlord shall, at no cost to Landlord, keep Tenant reasonably apprised of such proceedings and provide copies of any relevant documents filed in connection therewith. Landlord's reasonable costs and expenses of pursuing any such contest shall be included in Real Estate Taxes. Landlord shall apply Tenant's Proportionate Share of any recovery as a result of any such contest (net of the reasonable cost and expenses therefor), toward Tenant's next estimated payment(s) pursuant to this Section 5.5.

5.6    **Tax Benefits**. Tenant may seek tax benefits or other incentives from local or state governmental authorities on account of Tenant's occupancy or location in the Building or otherwise but not incentives that result in an abatement, credit or other reduction of Real Estate Taxes (collectively, "**Tax Benefits**") and Landlord agrees, at Tenant's cost and expense, to reasonably cooperate with Tenant in seeking such Tax Benefits. Tenant shall be entitled to receive 100% of any such Tax Benefits. Tenant agrees to defend, indemnify and hold Landlord harmless from any claim, cost or liability incurred in connection with Landlord's cooperation hereunder or the recapture of any Tax Benefits, including, without limitation, reasonable attorneys' fees and expenses.

34

5.7    **Apportionment**. If the Lease Term commences or expires on a day other than the first day or the last day of a calendar year, respectively, then Tenant's liabilities pursuant to this Article for such calendar year shall be apportioned by multiplying the respective amount of Tenant's Proportionate Share thereof for the full calendar year by a fraction, the numerator of which is the number of days during such calendar year falling within the Lease Term, and the denominator of which is three hundred sixty-five (365).

**ARTICLE VI**

**USE OF PREMISES**

6.1    **Permitted Use**. Landlord represents that, to the best of its knowledge, the Initial Premises and each Must Take Expansion Premises can legally be used for Office Use. Tenant shall use and occupy the Premises for the Permitted Use. Tenant shall not use or occupy the Premises for any unlawful purpose, or in any manner that will violate the certificate of occupancy for the Premises. Tenant shall not use or occupy the Premises for any unlawful purpose, or in any manner that will violate the certificate of occupancy for the Premises or the Building (provided Landlord acknowledges that Tenant, at its sole costs and expense, may apply and obtain an amendment to the certificate of occupancy to permit any Permitted Use not otherwise permitted by the current certificate of occupancy and Landlord, at no expense to Landlord, shall reasonably cooperate with such application upon Tenant's request) or that will constitute waste or public nuisance or unreasonably interfere with Landlord or any other tenant of the Building (provided that Landlord acknowledges that Tenant's typical operations often include a large, collaborative, informal and occasionally vocal group discussions and activities which may take place in the Lobby, Amenity Space, the proposed lounge on the 2nd Floor or the outside Building Common Areas and that such activities do not, per se, unreasonably interfere with Landlord or other tenants). Subject to Section 25.26, Tenant shall comply with all present Requirements concerning the Tenant's use, occupancy and condition of the Premises and all machinery, equipment, furnishings, fixtures and improvements therein, all of which shall be complied with in a timely manner at Tenant's sole expense. If any such Requirement requires an occupancy or use permit or license for the Premises or the operation of the business conducted therein, then Tenant shall obtain and keep current such permit or license at Tenant's expense and shall promptly deliver a copy thereof to Landlord. Use of the Premises is subject to all covenants, conditions and restrictions of record; Tenant shall not use any space in the Building for the sale of goods to the public at large or for the sale at auction of goods or property of any kind.

6.2    **Occupancy Fees**. Tenant shall pay before delinquency any business, rent or other taxes or fees that are now or hereafter levied, assessed or imposed upon Tenant's use or occupancy of the Premises, the conduct of Tenant's business at the Premises, or Tenant's equipment, fixtures, furnishings, inventory or personal property. If any such tax or fee is enacted or altered so that such tax or fee is levied against Landlord or so that Landlord is responsible for collection or payment thereof, then Tenant shall pay as additional rent the amount of such tax or fee.

6.3    **Hazardous Materials**.

35

(a)    Tenant shall not cause or permit any Hazardous Materials to be generated, used, released, stored or disposed of in or about the Building, provided that Tenant may use and store (x) substances reasonably necessary in the ordinary operation and maintenance of office equipment or Permitted Uses in the Premises (such as food service, gyms, and screening rooms pursuant to the Permitted Uses), (y) construction materials used in connection with any alterations, and (z) fuel oil in one above ground storage tank serving Tenant's emergency generator, if any, provided in each case that such substances are handled, stored and disposed of in accordance with all Requirements. At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord free of Hazardous Materials and in compliance with all Environmental Law. "**Hazardous Materials**" means (a) asbestos and any asbestos containing material and any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Law or any other applicable Law as a "hazardous substance," "hazardous material," "hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or Toxicity Characteristic Leaching Procedure (TCLP) toxicity, (b) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, and (c) any petroleum product, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), medical waste, chlorofluorocarbon, lead or lead-based product, and any other substance whose presence could be detrimental to the Building or the Land or hazardous to health or the environment. "**Environmental Law**" means any present and future Law and any amendments (whether common law, statute, rule, order, regulation or otherwise), permits and other requirements or guidelines of governmental authorities applicable to the Building or the Land and relating to the environment and environmental conditions or to any Hazardous Material (including, without limitation, CERCLA, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §1801 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., the Clean Air Act, 33 U.S.C. §7401 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Safe Drinking Water Act, 42 U.S.C. §300f et seq., the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. §1101 et seq., the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., and any so-called "Super Fund" or "Super Lien" law, any Law requiring the filing of reports and notices relating to hazardous substances, environmental laws administered by the Environmental Protection Agency, and any similar state and local Requirements, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder concerning the environment, industrial hygiene or public health or safety).

(b)    Notwithstanding any termination of this Lease, Tenant shall indemnify and hold Landlord, its employees and agents harmless from and against any damage, injury, loss, liability, charge, demand or claim based on or arising out of the presence or removal of, or failure to remove, Hazardous Materials generated, used, released, stored or disposed of by Tenant or any Invitee in or about the Building after Lease Commencement Date. In addition, Tenant shall give Landlord immediate verbal and follow-up written notice of any actual or threatened Environmental Default, which Environmental Default Tenant shall cure in accordance with all Environmental Law and to the satisfaction of Landlord and only after Tenant has obtained Landlord's prior written reasonable consent, which shall not be unreasonably withheld.

36

An "**Environmental Default**" means any of the following caused by the acts of Tenant or any Invitee but only if such Hazardous Materials were generated or brought into the Building by Tenant or any Invitee: a violation of an Environmental Law; a release, spill or discharge of a Hazardous Material on or from the Premises, the Land or the Building; an environmental condition requiring responsive action; or an emergency environmental condition. Upon any Environmental Default, in addition to all other rights available to Landlord under this Lease, at law or in equity, Landlord shall have the right but not the obligation to immediately enter the Premises, to supervise and approve any actions taken by Tenant to address the Environmental Default, and, if Tenant fails to immediately address same to Landlord's reasonable satisfaction, to perform, at Tenant's sole cost and expense, any lawful action necessary to address same. If any lender or governmental agency shall require testing to ascertain whether an Environmental Default is pending or threatened, then Tenant shall pay the reasonable costs therefor as additional rent. Promptly upon request, Tenant shall execute from time to time affidavits, representations and similar documents concerning Tenant's knowledge and belief regarding the presence of Hazardous Materials at or in the Building, the Land or the Premises.

      6.4    **ADA**. Landlord at its expense shall take steps reasonably necessary to comply with Title III of the ADA to the extent same applies directly to the Building Common Areas, but excluding any Specialty Alterations installed by or on behalf of Tenant in the Lobby or Amenity Space, any full floors included in the Premises or any ADA compliance necessitated by Tenant's Plans. Tenant at its sole cost and expense shall be solely responsible for taking any and all measures which are required to comply with the ADA concerning the Premises (including the 2nd Floor Premises) and Rooftop Terrace (including means of ingress and egress thereto) and the business conducted therein or necessitated by Tenant's Plans. Any Alterations made or constructed by Tenant for the purpose of complying with the ADA or which otherwise require compliance with the ADA shall be done in accordance with this Lease; provided, that Landlord's consent to such Alterations shall not constitute either Landlord's assumption, in whole or in part, of Tenant's responsibility for compliance with the ADA, or representation or confirmation by Landlord that such Alterations comply with the provisions of the ADA.

## ARTICLE VII

## ASSIGNMENT AND SUBLETTING

      7.1    **General Requirements**.

      (a)    Except as permitted pursuant to Section 7.2 hereof,

      1.    Tenant shall not, whether directly, indirectly, voluntarily, involuntarily, or by operation of law or otherwise, assign or transfer (collectively, "**assign**") this Lease or all or any of Tenant's rights hereunder or interest herein, or sublet or permit anyone to use or occupy (collectively, "**sublet**") the Premises or any part thereof, without in each instance obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed. If an Event of Default has occurred and is then continuing under this Lease, such Event of Default shall be deemed to a "reasonable" reason for Landlord withholding its consent to any proposed subletting or assignment. Notwithstanding the foregoing, Landlord may withhold its

consent to any proposed assignment or subletting of the Premises if such proposed assignment or subletting does not satisfy the following criteria in Landlord's sole determination: (i) the use of the Premises pursuant to such assignment or sublease is in compliance with Article VI hereof; (ii) the proposed assignee or subtenant is of a type and quality consistent and compatible with a Class A office building located in the Prince George's County, Maryland submarket of similar age and condition, and with the Building and its tenants (in Landlord's discretion, acting reasonably); (iii) the financial condition of the assignee under any such assignment or the sublessee under any such sublease, together with an guarantor of its obligations is reasonably acceptable to Landlord (taking into consideration initial Tenant's and Guarantor's continued liability hereunder and any security continued to be held by Landlord under Article XI) and not detrimental to the valuation of the property, in Landlord's opinion, acting reasonably; and (iv) the initial Tenant and the Guarantor each remain fully liable as a primary obligor for the payment of all rent and other charges hereunder and for the performance of all its other obligations hereunder and agree to reaffirm their respective obligations in writing.

2.        except as permitted by this Article VII, no assignment or sublet hereunder may be effectuated by operation of law or otherwise without the prior written consent of Landlord (not to be unreasonably withheld, conditioned or delayed);

3.        any attempted assignment, transfer or other voluntary encumbrance of this Lease or all or any of Tenant's rights hereunder or interest herein, and any sublet or permission to use or occupy the Premises or any part thereof not in accordance with this Article VII shall be void and of no force or effect.

(b)        Any assignment or subletting, Landlord's consent thereto, or Landlord's collection or acceptance of rent from any assignee or subtenant shall not be construed either as waiving or releasing Tenant from any of its liabilities or obligations under this Lease as a principal and not as a guarantor or surety or releasing Guarantor from its liabilities under the Guaranty, or, except as permitted by Section 7.2, as relieving Tenant or any assignee or subtenant from the obligation of obtaining Landlord's prior written consent to any subsequent assignment or subletting. Notwithstanding the foregoing, if Landlord and any assignee of Tenant's interest in this Lease modify or amend this Lease without Tenant's consent so as to increase the obligations of the assignee as the new Tenant under this Lease, Named Tenant's liability shall not be increased, but shall continue as it existed prior to the modification or amendment; provided that such limitation shall only apply to an assignee under Section 7.1 and shall not apply to any Permitted Successor or Affiliate Successor under Section 7.2.

(c)        As security for this Lease, Tenant hereby assigns to Landlord the rent due from any assignee or subtenant of Tenant. For any period during which an Event of Default is continuing, Tenant hereby authorizes each such assignee or subtenant to pay said rent directly to Landlord upon receipt of notice from Landlord specifying same. Landlord's collection of such rent shall not be construed as an acceptance of such assignee or subtenant as a tenant.

(d)        Tenant shall not grant any leasehold mortgage with respect to its interest in this Lease ("**Mortgage**") without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole and absolute discretion (provided this prohibition shall

not prohibit any so-called "all assets" or "blanket" UCC liens or individual lease and equipment financing evidencing by pledges and UCC filings which are permitted without Landlord's consent).

(e)    Tenant shall pay to Landlord an administrative fee equal to One Thousand Five Hundred and No/100 Dollars ($1,500.00) in connection with Tenant's request for Landlord to give its consent to any assignment, subletting, or Mortgage, provided that if Landlord's actual reasonable costs and expenses for such review exceed One Thousand Five Hundred and No/100 Dollars ($1,500.00), Tenant shall promptly reimburse Landlord for its actual reasonable costs and expenses (including attorneys' fees and accounting costs) in lieu of a fixed review fee. Such fee or costs shall be deemed additional rent under this Lease.

(f)    Any sublease, assignment or Mortgage requiring Landlord's consent shall, at Landlord's option, be effected on forms reasonably approved by Landlord. Regardless of whether Landlord's consent is required, Tenant shall deliver to Landlord a fully-executed copy of each agreement evidencing a sublease, assignment or Mortgage within twenty (20) days after Tenant's execution thereof.

(g)    Except as provided in Section 7.2 below, a Change in Control shall constitute an assignment of this Lease and, except as provided in Section 7.2 below, requires Landlord's prior written consent (not to be unreasonably withheld, conditioned or delayed).

7.2    **Permitted Transfers**.

(a)    Notwithstanding anything to the contrary in this Article VII the following transactions shall be permitted without Landlord's prior written consent: (A) (i) the offering, sale or transfer of shares, equity or other ownership interests of Tenant or Guarantor (or any beneficial owner of Tenant or Guarantor) over a national or recognized exchange, foreign or domestic to public holders or (ii) the transfer, conveyance or pledge of any interest in Tenant or Guarantor to the extent that such entity is a Publicly Traded Entity (including a transfer, conveyance or other transaction that results in the delisting of a Publicly Traded Entity), whether by operation of law or otherwise (any transaction described in clause (A)(i) or clause (A)(ii) being a "**Public Transaction**"); a Public Transaction shall be deemed not to be an assignment of this Lease within the meaning of this Article VII regardless of whether a Change in Control is effectuated as the result thereof; (B) provided that no Material Event of Default has occurred and is continuing, transactions (each, a "**Successor Transaction**") with Tenant or Guarantor (the resulting entity being a "**Permitted Successor**") that are not effectuated by way of a Public Transaction (i) into or with which Tenant or Guarantor (or any beneficial owner of Tenant or Guarantor) is merged or consolidated (including a reorganization or recapitalization of or with Tenant or Guarantor or such beneficial owner), (ii) in which all or substantially all of Tenant or Guarantor's assets are transferred (provided such Person also assumes substantially all of such specific party's respective liabilities and obligations, including, without limitation, all of Tenant's obligations under this Lease and all of Guarantor's obligations under the Guaranty) as a going concern, or (iii) involving the transfer of shares or ownership interests of Tenant or Guarantor, regardless of whether such transfer results in a Change in Control of a Tenant or Guarantor or any beneficial owner thereof, provided that (1) the Successor Transaction is not solely for the purpose of transferring the leasehold estate created hereby; (2) Tenant or

Guarantor, as applicable, to extent Tenant and Guarantor continue to exist, together with any such Permitted Successor, shall remain fully liable for all obligations of Tenant under this Lease, and Guarantor (to the extent it continues to exist) or its Permitted Successor shall remain fully liable for all obligations of Guarantor under the Guaranty (provided that if as a result of such Successor Transaction Tenant and/or Guarantor cease to exist, the obligations of Tenant under this Lease and the obligations of Guarantor under the Guaranty, as applicable, are assumed by such Permitted Successor and/or a replacement guarantor that satisfy the credit and financial requirements set forth in subclause (5) below); (3) Tenant and Guarantor shall reaffirm their respective obligations under this Lease or the Guaranty in writing, as applicable and to the extent each continues to exist (provided that if as a result of such Successor Transaction Tenant and/or Guarantor cease to exist, the obligations of Tenant under this Lease and the obligations of Guarantor under the Guaranty, as applicable, are assumed by such Permitted Successor and/or a replacement guarantor that satisfy the credit and financial requirements set forth in subclause (5) below); (4) Tenant and Guarantor shall not be released from any of its respective obligations or liabilities under this Lease or Guaranty; (5) immediately after giving effect to such assignment, the aggregate net worth (as determined in accordance with generally accepted accounting principles, consistently applied, "**Net Worth**") of the Permitted Successor, Tenant (if Tenant continues in existence), Guarantor (if Guarantor continues in existence) and any replacement guarantors of this Lease (collectively, the "**Net Worth Parties**") is equal to or greater than Fifty Million and No/100 Dollars ($50,000,000.00) (the "**Net Worth Threshold**") and (6) Tenant delivers to Landlord fully-executed copies of the reaffirmation documents and Successor Transaction documents, within twenty (20) days following the effective date of such Successor Transaction; and (C) provided that no Event of Default has occurred and is continuing, an assignment of Tenant's interest in this Lease (an "**Affiliate Assignment**") to an Affiliate, or a sublease of or a license to use all or any portion of the Premises (an "**Affiliate Sublease**" and, alternatively, with any Affiliate Assignment, an "**Affiliate Transaction**") to an Affiliate (in either such case, an "**Affiliate Successor**"); provided that (1) the Affiliate Transaction is not solely for the purpose of transferring the leasehold estate created hereby; (2) Tenant, together with any such Affiliate Successor, shall remain fully liable for all obligations of Tenant under this Lease, Guarantor shall remain fully liable for all obligations of Guarantor under the Guaranty, Tenant and Guarantor shall reaffirm their respective obligations thereunder in writing, and Tenant and Guarantor shall not be released from any of its respective obligations or liabilities under this Lease or Guaranty; (3) at least twenty (20) days prior to such effectuating the proposed Affiliate Transaction, Tenant provides to Landlord such documentation as may be required by Landlord to confirm that any assignee or subtenant claimed by Tenant to be an Affiliate is in fact an Affiliate; (4) with respect to an Affiliate Sublease, such Affiliate Sublease contains confirms that (a) the term under such Sublease shall not exceed the Lease Term hereunder, (b) such Sublease shall be subordinate in all respects to this Lease and any Mortgages, but subject to the provisions of any subordination, non-disturbance and attornment agreement which may be in effect at such time, (c) such Affiliate Successor subtenant shall have no privity with Landlord; (5) if at any time prior to the expiration or earlier termination of the term of such sublease, this Lease shall expire or be sooner terminated for any reason, then the term of such sublease shall simultaneously terminate; and (6)Tenant shall deliver to Landlord fully-executed copies of the reaffirmation documents and Affiliate Transaction documents within twenty (20) days following the effective date of such Affiliate Transaction.

40

(b)    Notwithstanding anything to the contrary in clause (B) (5) of subsection (a) above, (A) if the aggregate Net Worth of the Net Worth Parties is less than the Net Worth Threshold, Tenant shall be obligated to deliver to Landlord (and shall be deemed to have satisfied the Net Worth Threshold if it delivers to Landlord) concurrently with the effective date of the Successor Transaction, an additional Letter of Credit (or supplement or replacement to the Letter of Credit then required by Article XI), such that the aggregate Security Deposit Amount of the Letter(s) of Credit then held by Landlord pursuant to this clause and Article XI equals Six Million Dollars ($6,000,000) (the "**Net Worth Supplemental Security Deposit Amount**") and (B) if after delivery of a Letter of Credit(s) in the Net Worth Supplemental Security Deposit Amount as required by this Section 7.2(b), the Net Worth Parties provide Landlord with financial statements that demonstrate to Landlord's reasonable satisfaction that, the Net Worth of the Net Worth Parties then equal or exceed the Net Worth Threshold and Tenant requests in writing that Landlord reduce the Letter of Credit to the amount then required by Article XI, provided no Event of Default has occurred and is then continuing, Landlord shall promptly permit Tenant to replace the Letter of Credit with a Letter of Credit in the amount then required by Article XI.

(c)    Notwithstanding anything to the contrary in this Article VII, without obtaining Landlord's consent, Tenant may share, from time to time, portions of the Premises ("**Office Sharing**") with one or more Persons with whom Tenant has a bona fide business relationship (and not for the purpose of providing short term office space such as We Work or similar companies) (each a "**Permitted User**") while any such Person is working on a project with Tenant at the Premises, provided with respect to any Office Sharing that is for a period of more than six (6) months, Tenant delivers prior written notice thereof to Landlord, (ii) Tenant does not physically subdivide the space so shared to provide separate access for such space to the elevator lobby, and (iii) the percentage of the Premises subject to Office Sharing shall not exceed 7,500 of RSF of the Premises at any one time (not including the lounge within the 2nd Floor Premises). The foregoing Office Sharing arrangement shall not be considered an assignment of this Lease or a sublet of the Premises (by operation of law or otherwise).

(d)    Provided that Tenant gives Landlord at least thirty (30) days prior written notice of the same, a mere change or conversion of Tenant's corporate form (as an example and without limitation, a conversion from a corporation to a limited liability company or a change of Tenant's state of formation), at any time or from time to time during the Lease Term, shall be deemed not to be an assignment of this Lease and Landlord shall have no right to consent to any such change or conversion.

(e)    Any default of any provision hereunder caused by any such Permitted User or an Affiliate User shall be deemed a default of such provision by Tenant. Nothing contained in this Lease (including the provisions of this Article VII) or otherwise (including the provision of any services to the Premises) shall be deemed to (a) create any landlord-tenant or other relationship between Landlord and any Permitted User or Affiliate User, or (b) create any contractual liability or duty on the part of Landlord to any Permitted User or Affiliate User.

(f)    As of the date hereof, Tenant does not have any employees and Guarantor substantially employs the personnel who will occupy the Premises. Notwithstanding anything to the contrary contained in this Lease, it is understood and agreed that any employees of Affiliates of the Named Tenant shall be permitted to occupy the Premises and use Building amenities as if

41

such employees were direct employees of Tenant (each an "**Affiliate User**") and no such occupancy by any Affiliate User shall be considered an assignment of the Lease or a sublet of the Premises (by operation of law or otherwise). The provisions of this Section 7.2(f) are personal to the Named Tenant and shall be void and of no force or effect upon any assignment or sublease, except with respect to an Affiliate Transaction.

7.3    **Request for Consent**. If at any time during the Lease Term, Tenant desires to assign, sublet or Mortgage all or part of this Lease or the Premises to any Person for which Landlord's consent is required by this Article VII (a "**Consent Needed Transaction**"), then in connection with Tenant's request to Landlord for Landlord's consent thereto, Tenant shall give notice to Landlord in writing ("**Tenant's Request Notice**") containing: the identity of the proposed assignee, subtenant or other party and a description of its business; the terms of the proposed assignment, subletting or other transaction; the commencement date of the proposed assignment, subletting or other transaction (the "**Proposed Transfer Commencement Date**"); the area proposed to be assigned, sublet or otherwise encumbered (the "**Proposed Transfer Space**"); the most recent and previous three (3) consecutive years' financial statements (if available) or other evidence of financial responsibility of such proposed assignee, subtenant or other party reasonably satisfactory to Landlord. Landlord shall approve or deny such request for consent as soon as practicable but no later than twenty one (21) Business Days after receipt of Tenant's Request Notice and any other documents requested by Landlord to evaluate such Consent Needed Transaction (such review period, "**Landlord's Review Period**" and any Person so approved or deemed approved, being an "**Approved Transferee**"). If by the eleventh (11th) Business Day of Landlord's Review Period, Landlord has not responded to Tenant's request for Landlord's consent to the proposed assignment or subletting, Tenant shall have the right to provide Landlord with a second written request for consent (a "**Second Request**") that specifically identifies the proposed transaction and contains the following statement in at least 14 pt. bold and capital letters: "**THIS IS A SECOND REQUEST FOR LANDLORD'S CONSENT TO THE PROPOSED TRANSACTION DESCRIBED HEREIN PURSUANT TO THE PROVISIONS OF ARTICLE VII OF THE LEASE. IF LANDLORD FAILS TO RESPOND WITHIN TEN (10) BUSINESS DAYS AFTER ITS RECEIPT OF THIS NOTICE, THEN LANDLORD SHALL BE DEEMED TO HAVE CONSENTED TO THE PROPOSED TRANSACTION DESCRIBED HEREIN**." Notwithstanding the notice provisions contained in Section 25.7 of this Lease, in order to be effective each Second Request shall be sent to both (1) Meir Cohen, and (2) C. Vincent Leon-Guerrero, Esq. in the manner set forth in Section 25.7 for notices. If Landlord fails to respond to such Second Request within ten (10) Business Days after receipt by Landlord of the Second Request (time being of the essence), Landlord shall be deemed to have consented to the proposed transaction only. In the event Landlord timely notifies Tenant that Landlord refuses to grant its consent to the proposed assignment or subletting which is a Consent Needed Transaction, Landlord agrees to simultaneously provide Tenant with reasons for so refusing its consent in writing.

7.4    **Transferees Bound**. All restrictions and obligations imposed pursuant to this Lease on Tenant shall be deemed to extend to any subtenant, assignee, licensee, concessionaire or other occupant or transferee, and Tenant shall cause such person to comply with such restrictions and obligations. Any assignee shall be deemed to have assumed obligations as if such assignee had originally executed this Lease and at Landlord's request shall execute promptly a document confirming such assumption. Each sublease is subject to the condition that if the Lease

42

Term is terminated or Landlord succeeds to Tenant's interest in the Premises by voluntary surrender or otherwise, at Landlord's option the subtenant shall be bound to Landlord for the balance of the term of such sublease and shall attorn to and recognize Landlord as its landlord under the then executory terms of such sublease or, at Landlord's sole option, the subtenant shall execute a direct lease with Landlord on Landlord's then-current standard form.

7.5    **REIT Limitations**. Notwithstanding anything contained in this lease to the contrary, neither Tenant nor any other Person having an interest in the possession, use, occupancy or utilization of the Premises shall enter into any lease, sublease, license, concession, assignment or other agreement for use, occupancy or utilization for space in the Premises which provides for rental or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the party leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and Tenant agrees that any such proposed lease, sublease, license, concession, assignment or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

## ARTICLE VIII

## MAINTENANCE AND REPAIRS

8.1    **Tenant's Repair Obligations**. During the Lease Term, Tenant shall promptly make all repairs, perform all maintenance, and make all replacements in and to the Premises (provided however, that with respect to the Roof Terrace, Tenant shall only be required to make such maintenance or repairs (i) required to be made to any Alterations to the Roof Terrace or Tenant's Property on the Roof Terrace made or installed by Tenant, (ii) required by reason of any such Alterations or Tenant's Property, and (iii) required by reason of Tenant's or any of its Invitees damage, regardless if caused by such party's negligence or intentional misconduct) that are necessary or desirable to keep the Premises in good condition and repair, in a clean, safe and tenantable condition, and otherwise in accordance with all Requirements and the requirements of this Lease applicable to Tenant. Tenant shall maintain all fixtures, furnishings and equipment and lighting fixtures and bulbs located in, or exclusively serving, the Premises in clean, safe and sanitary condition, shall take good care thereof and make all required repairs and replacements thereto. Tenant shall give Landlord prompt written notice upon Tenant obtaining actual knowledge of any defects or damage to the structure of, or equipment or fixtures in, the Building or any part thereof. Tenant shall suffer no waste or injury to any part of the Premises and shall, at the expiration or earlier termination of the Lease Term, surrender the Premises broom clean in an order and condition at least equal to the order and condition on applicable date that each such portion of the Premises was delivered to Tenant (and with respect to any Must Take Expansion Premises, as of the date Tenant first commences business operating within such Must Take Expansion Premises), subject to subsequent Alterations, ordinary wear and tear and as otherwise provided in Article XVII (Damage or Destruction). Except as otherwise provided in Article XVII (Damage or Destruction), all injury, breakage and damage to the Premises and to any other part of the Building or the Land caused by any act or omission of any Invitees or Tenant, shall be repaired by and at Tenant's expense, except that Landlord shall have the right at Landlord's option to make any such repair and to charge Tenant for all costs and expenses incurred in connection therewith.

8.2     **Landlord's Repair Obligations**. Subject to Tenant's obligations in <u>Section 8.1</u> and elsewhere in this Lease, Landlord shall keep the exterior and demising walls, exterior windows, load bearing elements, foundations, facade, roof (including the Roof Terrace), the Amenity Space (and the components thereof) and Building Common Areas that form a part of the Building, and the building mechanical, vertical lift, turnstiles, parking access controls, security systems, telecommunication systems, back up generators, sprinkler and life safety systems, elevators, electrical, HVAC and plumbing systems, pipes and conduits that are provided by Landlord in the operation of the Building (collectively, the "**Building Structure and Systems**" and such building mechanical, vertical lift, turnstiles, parking access controls, security systems, telecommunication systems, back up generators, sprinkler and life safety systems, elevators, electrical, HVAC and plumbing systems, pipes and conduits only, the "**Building Systems**"), clean and in good working order and condition in the standard appearance, operation and repair of similar Class A office buildings in the Prince George's County, Maryland submarket of comparable age and condition (the "**Required Condition**") and in compliance with applicable Requirements in all material respects. Promptly after becoming aware of any item needing repair or replacements (structural and non-structural) or of any item not meeting the Required Condition, subject to Tenant's obligations in Section 8.1 and elsewhere in this Lease, Landlord will make such repairs and replacements thereto. Notwithstanding any of the foregoing to the contrary: (a) maintenance and repair of special tenant areas within the Premises, facilities, finishes and equipment (including, but not limited to, any special fire protection equipment, telecommunications and computer equipment, kitchen/galley equipment within the Premises, supplemental air-conditioning equipment serving the Premises only and all other furniture, furnishings and equipment of Tenant and all Alterations) shall be the sole responsibility of Tenant and shall be deemed not to be a part of the Building Structure and Systems.

## ARTICLE IX

## <u>ALTERATIONS</u>

9.1     <u>**Alterations**</u>.

(a)     Tenant shall perform any Alterations within the Building only in accordance with, and subject to, this Article and the other applicable provisions of this Lease.

(b)     No Alterations of any nature, including Structural Alteration or any Alterations outside the Premises or to the exterior of the Premises, shall be made by Tenant without Landlord's prior written consent in each instance, except as otherwise expressly permitted in this Article.

(c)     With Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld, conditioned or delayed, Tenant may, from time to time during the Lease Term, at its sole expense, make Structural Alterations, Nonstructural Alterations and any non-Permitted Structural Alterations.

(d)     Landlord's consent shall not be required for any Decorative Alterations and Permitted Nonstructural Alterations, provided that (i) same are performed in accordance with, and subject to, this Article and all other applicable provisions of this Lease, and (ii) prior to

commencing any such Decorative Alteration or Permitted Nonstructural Alteration, Tenant gives to Landlord a notice of Tenant's intention to perform such Decorative Alteration(s) or Permitted Nonstructural Alteration(s), which notice, to be effective, shall be accompanied by a reasonably detailed description of the Decorative Alteration(s) or Permitted Nonstructural Alteration(s) that Tenant intends to perform, the estimated commencement date and completion date of such Decorative Alterations(s) or Permitted Nonstructural Alteration(s), and the estimated cost thereof.

(e)    Any Alterations made by Tenant shall be made (a) in a good, workmanlike, first-class and prompt manner; (b) using new materials only; (c) to the extent Landlord's consent is required under this Article IX, by a contractor, on days, at times and under the supervision of an architect (if applicable) approved in writing by Landlord (in each case, not reasonably withheld, conditioned or delayed); (d) to the extent Landlord's consent is required under this Article IX, in accordance with plans and specifications (if applicable) prepared by an engineer or architect reasonably acceptable to Landlord (if an engineer, architect and/or plans and specifications are applicable to such Alterations), which plans and specifications shall be approved in writing by Landlord at Landlord's standard reasonable charge, (e) in accordance with all Requirements, (f) after obtaining builder's risk insurance set forth in Section 13.2(b), and (g) in the case of any Alteration exceeding the Alteration Threshold, after Tenant has delivered to Landlord documentation reasonably satisfactory to Landlord evidencing Tenant's financial ability to complete the Alteration in accordance with the provisions of this Lease. Alterations that require Landlord's consent shall be made by Tenant in accordance with plans and specifications prepared by an engineer or architect reasonably acceptable to Landlord (as applicable), which plans and specifications shall be approved in writing by Landlord in accordance with the standard for approval for such Alterations provided above in this Section 9.1. Notwithstanding the foregoing, for any Alterations involving tie-ins to the Building fire and life safety equipment or systems, Tenant may only use contractors and subcontractors approved by Landlord in Landlord's sole discretion or designated by Landlord.

(f)    If any lien (or a petition to establish such lien) is filed in connection with any Alteration performed by or on behalf of Tenant or in connection with any work to be paid for by Tenant under Section 2.7, such lien (or petition) shall be discharged by Tenant within twenty (20) days after Tenant receives actual knowledge thereof, at Tenant's sole cost and expense, by the payment thereof or by the filing of a bond reasonably acceptable to Landlord. If Landlord gives its consent to Tenant making of any Alteration, such consent shall not be deemed to be an agreement or consent by Landlord to subject its interest in the Premises or the Building to any liens which may be filed in connection therewith.

(g)    Promptly after the completion of an Alteration (other than a Decorative Alteration), Tenant at its expense shall deliver to Landlord three (3) sets of accurate as-built drawings showing such Alteration in place.

(h)    If any Alterations that require Landlord's prior consent are performed by Tenant without the prior written consent of Landlord, Landlord shall have the right at Tenant's expense to cause Tenant to either correct such Alterations to comply with plans and specifications that Landlord would approve, or to remove the same.

1098066.03A-NYCSR04A - MSW

(i)     Notwithstanding anything to the contrary contained herein, Landlord shall have the option (to be exercised by notice delivered to Tenant within ten (10) days after Tenant submits the Plans therefore) to make any Structural Alterations requested by Tenant, at Tenant's cost. Any Structural Alterations made by Landlord shall be undertaken and completed by Landlord (a) in a good, workmanlike, first-class and prompt manner; (b) using new materials only; (c) by a contractor, on days, at times and under the supervision of an architect (if applicable) approved in writing by Tenant (in each case, not reasonably withheld, conditioned or delayed); (d) substantially in accordance with Tenant's Plans (subject to such modifications that Landlord shall reasonably require and Tenant shall reasonably approve in writing) which plans and specifications shall be approved in writing by Tenant, (e) at market rates (subject to close bids from no less than three contractors per trade, to be selected by Tenant) and (e) in accordance with all Requirements.

9.2     **End of Term Removal; Tenant's Property**.

(a)     All Tenant's Property shall be and shall remain the property of Tenant and may be removed by it at any time during the Lease Term; provided that if any of Tenant's Property is removed, Tenant or any party or person entitled to remove same shall repair or pay the actual cost of repairing any damage to the Premises or to the Building resulting from such removal.

(b)     All Alterations to the Premises or the Building that are not Tenant's Property made by either party shall immediately become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of the Lease Term; provided that Landlord's election, Tenant shall be required to remove any Required Removables (defined below) installed by Tenant and restore any damage to the Premises caused or occasioned by such removal. Within twenty (20) days of Landlord's receipt of Tenant's written request for Landlord's consent to any Alterations requiring Landlord's consent or any Specialty Alterations (defined below) located entirely within the Premises (including any Specialty Alterations installed as part of the Initial Build-Out Work), Landlord shall advise Tenant if removal of said Alterations will be required at the end of the Lease Term (collectively, the "**Required Removables**"), provided that any specialty amenities built by or on behalf of Tenant within the lobby or on the Rooftop Terrace shall be deemed Required Removables. "Required Removables" shall not include existing slab cuts or internal staircases. As used herein, "**Specialty Alterations**" shall mean improvements which are not standard office installations, such as kitchens (other than a pantry or break area installed for the use of Tenant's employees only and of the type normally found in the space of similarly sized office tenants in comparable buildings), executive bathrooms, raised computer floors, computer room installations, supplemental HVAC equipment and components, safe deposit boxes, vaults, reinforcement of floors, Structural Alterations (including slab cuts and internal staircases, if any created after Effective Date) provided that cabling, conduits and lighting shall be deemed not to be Required Removables and Tenant shall have no obligation to remove the same. Landlord shall have the right at Tenant's expense to repair all damage and injury to the Premises or the Building caused by such removal or to require Tenant to do the same. If any Tenant's Property is not removed by Tenant prior to the expiration or earlier termination of the Lease Term, the same shall at Landlord's option become the property of Landlord and shall be surrendered with the Premises as a part thereof; provided, however, that Landlord shall have the right at Tenant's

46

expense to remove from the Premises such Tenant's Property and any Required Removables. If Tenant fails to return the Premises to Landlord as required by this Section 9.2, then Tenant shall pay to Landlord, as additional rent, all actual costs incurred by Landlord in effecting such removal (the "**Removal Cost**"). Pending the determination of such dispute by agreement or judicial determination as aforesaid Tenant may either (x) pay the amounts in dispute pending the results of such hearing or deposit the disputed amounts with the court in escrow, which deposit shall satisfy Tenant's payment obligations hereunder while the dispute is pending or (y) submit such dispute to a court of competent jurisdiction for a judicial determination and pay the amount in dispute pending the results of such determination, which amounts shall be applied by Landlord towards the Removal Cost.

9.3    **Landlord Work**. Landlord is under no obligation to make any Alterations in or to the Premises or the Building except as set forth herein and in the Work Agreement or as otherwise expressly provided in this Lease.

9.4    **Plans, etc**.

(a)    With respect to any Alteration (except for, subject to the provisions of Section 9.1(d) above, Decorative Alterations), Tenant shall advise Landlord thereof and, at Tenant's sole cost and expense (including the reasonable costs of any third party engineer or consultant retained by Landlord in connection herewith), shall have prepared by a licensed architect or engineer approved by Landlord (which approval shall not be unreasonably withheld or delayed), and deliver to Landlord for Landlord's reasonable approval, completed, fully coordinated and reasonably detailed architectural, mechanical and electrical working drawings, plans and specifications therefor, including construction drawings and documents and plans and specifications for the sprinkler, fire and life safety systems, and any amendments or modifications to the foregoing (such complete and reasonably detailed working drawings, plans and specifications being herein referred to as "**Tenant's Plans**"), which approval shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing provisions of this Section 9.4(a) and Section 9.4(b) below (which Section 9.4(b) shall not apply to Permitted Non-Structural Alterations), Landlord's approval shall not be required for Tenant's Plans for Permitted Nonstructural Alterations, provided, however, Tenant shall deliver the same to Landlord as provided herein for informational purposes only. Tenant may submit Tenant's Plans in interim plan phases or stages (such as schematic drawings or design development drawings) to Landlord for approval provided that (a) such interim plan phases or stages are reasonably complete such that approval in phase or stage is appropriate and the nature of the work shown on such plans is ascertainable, and (b) Landlord's approval of any such interim plan phase or stage shall not be deemed to be the approval of Tenant's Plans to the extent inconsistent with such interim plan phases or stages or not reasonably inferable therefrom. Landlord shall review and approve any such interim plan phases or stages subject to the same conditions applicable to Landlord's review and approval of Tenant's Plans.

(b)    (i) For the purposes of this subsection (b), "**Plan Review Period**" means twenty (20) Business Days for Tenant's Plans in respect of Alterations, and "**Plan Revision Review Period**" means fifteen (15) Business Days for revised Tenant's Plans in respect of Alterations.

(i)    Provided Tenant has delivered the Tenant's Plans to Landlord as required above, Landlord shall respond to Tenant's request to approve Tenant's Plans by the last day of the Plan Review Period after Landlord receives a complete set of Tenant's Plans (which may be delivered for approval in stages as same are developed; e.g., including schematic and design development phases), and Landlord shall respond to Tenant's request to approve revisions to Tenant's Plans (or phase or stage thereof) by the last day of the Plan Revision Review Period after Landlord receives such revisions. Landlord's approval of any Tenant's Plans (or phase or stage thereof or revisions thereto) shall not be effective unless same is in writing. If Landlord fails to approve or disapprove the Tenant's Plans (or phase or stage thereof or any revisions thereto) so submitted by Tenant by the tenth (10th) Business Day of the applicable Plan Review Period or fifth (5th) Business Date of the applicable Plan Revision Review Period, as the case may be, at any time after such tenth (10th) Business Day (with respect to a Plan Review Period) or fifth (5th) Business Day (with respect to a Plan Revision Review Period) until Landlord approves or disapproves the Tenant's Plans (or phase or stage thereof or revisions thereto) so submitted by Tenant, Tenant shall have the right to provide Landlord with a second written request for approval (a "**Second Article IX Request**") that specifically identifies the applicable Tenant's Plans (or phase or stage thereof or revisions thereto) and contains the following statement in bold and capital letters: "THIS IS A SECOND ARTICLE IX REQUEST FOR APPROVAL OF TENANT'S PLANS AND/OR REVISIONS THERETO PURSUANT TO THE PROVISIONS OF SECTION 9.4 OF THE LEASE. IF LANDLORD FAILS TO RESPOND WITHIN [FIVE (5)][TEN(10] BUSINESS DAYS AFTER ITS RECEIPT OF THIS NOTICE, THEN LANDLORD SHALL BE DEEMED TO HAVE APPROVED THE TENANT'S PLANS (AND REVISIONS THERETO, IF ANY) DESCRIBED HEREIN." If Landlord fails to respond to such Second Article IX Request within five (5) Business Days (with respect to a Plan Revision Review Period) or ten (10) Business Days (with respect to a Plan Review Period), as applicable, after receipt by Landlord of the Second Article IX Request, the Tenant's Plans (or phase or stage thereof or revisions thereto) in question shall be deemed approved by Landlord, but only to the Tenant's Plans (or phase or stage thereof or revisions thereto) so submitted and identified in such Second Article IX Request. Notwithstanding the notice provisions contained in Section 25.7 of this Lease, in order to be effective each Second Article IX Request shall be sent to both (1) Meir Cohen, and (2) C. Vincent Leon-Guerrero, Esq. in the manner set forth in Section 25.7 for notices. If Landlord fails to respond to such Second Request within five (5) Business Days (with respect to a Plan Revision Review Period) or ten (10) Business Days (with respect to a Plan Review Period), as applicable, after receipt by Landlord of the Second Request (time being of the essence), Landlord shall be deemed to have approved the Tenant's Plans described therein only.

## ARTICLE X

## SIGNS

10.1    **Facade Signage**. Subject to approval by Landlord, Prince George's County and all other governing authorities with jurisdiction thereof, and subject to Tenant obtaining at its sole cost and expense any and all required government and zoning approvals, Tenant shall have

48

the exclusive right to signage on the exterior façade and roof of the Building, which signage may consist of two (2) exterior Building signs, stating Tenant's name and logo provided that Tenant continues to occupy at least seventy percent (70%) of the RSF in the Building, such requirement to consider and include the Must Take Expansion Premises as occupied floors prior to their respective Must Take Commencement Dates. Tenant's right to signage on the exterior façade of the Building shall be personal to 2U, Inc. and any Permitted Successor or Affiliate assignee that continues to occupy at least seventy percent (70%) of the RSF in the Building (collectively, the "**Threshold Successors**"). Subject to any Requirements, Tenant shall have the right to illuminate the Façade signage provided that Tenant obtains, at its sole cost and expense, any approvals required under any applicable Requirements.

10.2    **Monument Signage**. Subject to approval by Prince George's County and all other governing authorities with jurisdiction thereof, Landlord, at Landlord's expense, shall provide a non-exclusive monument sign in front of the Building with Tenant's name and logo, which shall be the largest, highest and most prominent sign on any such monument, provided that Tenant continues to occupy more than fifty percent (50%) of the RSF in the Building, such requirement to consider and include the Must-Take Floors as occupied floors prior to their respective Must Take Commencement Dates. Notwithstanding the foregoing, Tenant, at tenant's sole cost and expense, shall obtain any required approvals for Tenant's monument signage. The exact location of said monument signage shall be determined by Landlord in Landlord's sole discretion upon consultation with Tenant. Tenant's right to signage on the monument sign shall be personal to 2U, Inc. and its Threshold Successors.

10.3    **Entrance Signage**. Subject to approval by Prince George's County and all other governing authorities with jurisdiction thereof, at Tenant's expense, Tenant shall have the non-exclusive right to place signage stating Tenant's name and logo at the main entrance the Building in a location, type and size reasonably approved by Landlord. Tenant shall also have the right to place signage stating Tenant's name and logo at the main entrance to the Premises and within the Premises.

10.4    **Installation**. Tenant shall maintain, insure and operate all signage, and except as otherwise expressly provided herein, shall pay all costs incurred in installing, maintaining, insuring, operating (including connecting, providing and consuming utilities therefor) and removing such signage. Tenant will coordinate installation of said signage, which installation shall be performed by a contractor selected by Tenant and reasonably approved by Landlord and shall be at Tenant's expense. Landlord shall have the right to approve the materials, color, design, weight, lettering, location and other aspects of such signage; provided however that with respect to all signage under this Article X, Landlord hereby pre-approves Tenant's logo and colors. Upon the termination of Tenant's signage rights (or the expiration or termination of the Lease), Tenant shall, at its expense, remove said signage from the Building and repair any damage so as to return the same to its condition prior to the installation of said signage.

10.5    **Interior Signage**. Tenant may, at its sole cost and expense, install, "entry suite" signage that depicts the name and logo of Tenant, any Permitted Occupant that is then occupying the floor of the Building in question, and any clients of Tenant or any Permitted Occupant in the elevator lobbies on the floors (other than the ground floor) in which the Premises are situated and/or adjacent to the doors to the Premises (other than on the ground floor), provided Tenant, at

49

its sole cost and expense clean and maintain such signage in good order and condition. Landlord's approval for the aesthetics of such signage (e.g., the lettering, content, size, medium, design and colors, as opposed to the method of attachment and other physical aspects of such signage) shall not be required for the installation of any such signage in any elevator lobby of any floor the Building occupied by Tenant (it being agreed that Landlord shall have no approval rights of signage, artwork, media and the like within the Premises). Landlord will list Tenant's name and name of any Tenant Affiliates occupying the Premises in the Building electronic directory.

## ARTICLE XI

## SECURITY DEPOSIT

11.1    **Security Deposit Amount; Reduction**. On or before January 15, 2016, Tenant shall deposit with Landlord the Security Deposit Amount as a security deposit which shall be security for the performance by Tenant of all of Tenant's obligations, covenants, conditions and agreements under this Lease. Landlord shall not be required to maintain such security deposit in a separate non-commingled, interest bearing account. Except as may be required by law, Tenant shall not be entitled to interest on the security deposit. If there shall be any uncured Event of Default under this Lease by Tenant, then Landlord shall have the right, but shall not be obligated, to use, apply or retain all or any portion of the security deposit for the payment of any (a) Base Rent, additional rent or any other sum as to which Tenant is in default beyond applicable notice and cure period, or (b) amount Landlord may spend or become obligated to spend, or for the compensation of Landlord for any losses incurred, by reason of Tenant's default (including, but not limited to, any damage or deficiency arising in connection with the reletting of the Premises). If any portion of the security deposit is so used or applied, then within three (3) Business Days after Landlord gives written notice to Tenant of such use or application, Tenant shall deposit with Landlord cash in an amount sufficient to restore the security deposit to the original Security Deposit Amount, and Tenant's failure to do so shall constitute an Event of Default under this Lease. Provided no Event of Default has occurred and is then continuing (as of each of the following dates), the Security Deposit Amount shall be reduced to:

1.      Five Million and No/100 Dollars ($5,000,000.00) on the Lease Commencement Date (provided that (w) Tenant is continuously occupying the Initial Premises, (x) all lien waivers for the Initial Build Out have been provided to Landlord from both the Approved General Contractor (as defined in the Work Agreement) and each contractor, subcontractor, materialman and supplier or any other party entitled to claim a mechanics or other lien on account of Tenant's Work to the extent of the amount paid to such parties (other than (y) subcontractors, materialman and suppliers performing work or supplying materials, or such other parties performing services, with a value of less than $150,000 under one contract, unless and to the extent Tenant obtains final lien waivers from the same or the time period and (z) those waivers related to claims for which the time period for filing a lien has expired without a filing of a lien));

2.      Four Million and No/100 Dollars ($4,000,000.00) on the first (1st) day of twenty-fifth (25th) month of the Lease Term;

50

3.      Two Million and No/100 Dollars ($2,000,000.00) on the first (1st) day of the forty-ninth (49th) month of the Lease Term; and

4.      One Million and No/100 Dollars ($1,000,000.00) on the first (1st) day of the one hundred and eight (108th) month of the Lease Term; which $1,000,000 Security Deposit Amount shall remain in effect through the expiration of the Lease Term.

11.2    **Transfer of Security Deposit**. If Landlord transfers the security deposit to any purchaser or other transferee of Landlord's interest in the Building, then provided such purchaser or assignee assumes the obligations of "Landlord" under this Lease (a "**Lease Assumption**"), Tenant shall look only to such purchaser or transferee for the return of the security deposit, and Landlord shall be released from all liability to Tenant for the return of such security deposit. Tenant acknowledges that the holder of any Mortgage shall not be liable for the return of any security deposit made by Tenant hereunder unless such holder actually receives such security deposit. Tenant shall not pledge, mortgage, assign or transfer the security deposit or any interest therein.

11.3    **Letter of Credit**. Tenant shall have the right to deliver to Landlord an unconditional, irrevocable letter of credit (the "**Letter of Credit**") in substitution for the cash security deposit, subject to the following terms and conditions. Such Letter of Credit shall be (a) in form and substance reasonably satisfactory to Landlord; (b) at all times in the amount of the then Security Deposit Amount, and shall permit multiple draws; (c) issued by a commercial bank reasonably acceptable to Landlord from time to time and either located in the Washington, D.C. metropolitan area or the continental United States from which draws can be made via facsimile meeting the Issuer Requirement below (provided that subject to the terms and conditions hereof, as of the Effective Date, Landlord pre-approves Comerica as the issuer of the Letter of Credit); (d) made payable to, and expressly transferable and assignable at no charge by, Landlord or the holder of any Mortgage secured by the Building (which transfer/assignment shall be conditioned only upon the execution of a written assumption document in connection therewith); provided, however, that in the event the issuing bank of the Letter of Credit charges a fee for a transfer and/or assignment, any and all fees shall be payable by Tenant; (e) payable at sight to a local branch of the issuer of a simple sight draft or via facsimile; (f) of a term not less than one year; and (g) at least thirty (30) days prior to the then-current expiration date of such Letter of Credit, either (1) renewed (or automatically and unconditionally extended) from time to time through the sixtieth (60th) day after the expiration of the Lease Term, or (2) replaced with cash in the amount of the Security Deposit Amount. Notwithstanding anything in this Lease to the contrary, any cure or grace periods set forth in this Lease shall not apply to any of the foregoing, and, specifically, if Tenant fails to timely comply with the requirements of subsection (g) above, then Landlord or its assignee shall have the right to immediately draw upon the Letter of Credit without notice to Tenant and apply the proceeds to the security deposit. Each Letter of Credit shall be issued by a commercial bank that has a credit rating with respect to certificates of deposit, short term deposits or commercial paper of at least P-2 (or equivalent) by Moody's Investor Service, Inc., or at least A-2 (or equivalent) by Standard & Poor's Corporation (the "**Issuer Requirement**"), and shall be otherwise acceptable to Landlord in its sole and absolute discretion. If the issuer's credit rating is reduced below P-2 (or equivalent) by Moody's Investors Service, Inc. or below A-2 (or equivalent) by Standard & Poor's Corporation, then Landlord shall have the right to require that

51

Tenant obtain from a different issuer a substitute Letter of Credit that complies in all respects with the requirements of this <u>Section</u>; provided however that if Comerica's credit rating falls below the Issuer Requirement, then Tenant shall not be required to replace such Letter of Credit unless Comerica's credit rating falls below P-3 (or equivalent) by Moody's Investor Service, Inc., or below A-3 (or equivalent) by Standard & Poor's Corporation. Tenant's failure to obtain such substitute Letter of Credit within thirty (30) day following Landlord's written demand therefor (with no other notice or cure or grace period being applicable thereto, notwithstanding anything in this Lease to the contrary) shall entitle Landlord to immediately draw upon the then existing Letter of Credit in whole or in part, without notice to Tenant. In the event the issuer (including Comerica) of any Letter of Credit held by Landlord is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation or any successor or similar entity, then, effective as of the date such receivership or conservatorship occurs, said Letter of Credit shall be deemed to not meet the requirements of this <u>Section</u>, and within ten (10) days thereof, Tenant shall replace such Letter of Credit with either a replacement Letter of Credit or cash. If Tenant fails to deliver to Landlord such substitute Letter of Credit or cash within such ten (10) day period (with no other notice or cure or grace period being applicable thereto, notwithstanding anything in this Lease to the contrary), then Landlord shall be entitled to immediately draw upon the then existing Letter of Credit; provided further that if Landlord is prevented from drawing upon such Letter of Credit for any reason, then notwithstanding anything in this Lease to the contrary, Tenant's failure to deliver such substitute Letter of Credit or cash within such original ten (10) day period shall constitute an Event of Default for which there shall be no notice or grace or cure periods being applicable thereto. Any failure or refusal of the issuer to honor the Letter of Credit shall be at Tenant's sole risk and shall not relieve Tenant of its obligations hereunder with respect to the security deposit.

## ARTICLE XII

## INSPECTION

12.1    **Inspection**. At reasonable times upon reasonable advance notice (except in an emergency), which notice may be oral if practical under the circumstances (except that no oral or written notice shall be required in an emergency),Tenant shall permit Landlord, its agents and representatives, and the holder of any Mortgage secured by the Building, to enter the Premises without charge therefor and without diminution of the rent payable by Tenant in order to examine, inspect or protect the Premises and the Building, to make such alterations and/or repairs as may be provided for by this Lease, as may be mutually agreed upon by the parties, as Landlord may be required or permitted to make under this Lease or by Requirements, or in order to repair and maintain the Building or other parts of the real property, or as Landlord may deem necessary or reasonably desirable or to exhibit the same to brokers, prospective tenants, lenders, purchasers and others. Landlord shall repair any damage to the Premises or any property of Tenant or Invitees caused by Landlord's negligent acts or omissions in connection with such access. Landlord may not store any supplies or tools in the Premises. Except in the event of an emergency, Landlord shall endeavor to minimize disruption to Tenant's normal business operations in the Premises in connection with any such entry. Except in cases of emergency, at Tenant's option, Tenant may require Landlord to be accompanied by an employee or representative of Tenant.

## ARTICLE XIII

## INSURANCE

13.1    **Rate Increase**. If any increase in the rate of fire insurance or other insurance is due to any activity, equipment or other item of Tenant, then (whether or not Landlord has consented to such activity, equipment or other item) Tenant shall pay as additional rent due hereunder the amount of such increase. The statement of any applicable insurance company or insurance rating organization (or other organization exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions) that an increase is due to any such activity, equipment or other item shall be conclusive evidence thereof.

13.2    **Tenant's Insurance**.

(a)    Commencing as of the Lease Commencement Date and continuing throughout the Lease Term, Tenant shall obtain and maintain (1) commercial general liability insurance (written on an occurrence basis) including contractual liability coverage, premises and operations coverage, broad form property damage coverage and independent contractors coverage, and containing an endorsement for personal injury ("**CGL Insurance**"), (2) business interruption insurance, (3) all-risk (Special Form, Replacement Cost) property insurance, (4) comprehensive automobile liability insurance (covering automobiles owned by Tenant, if any), (5) worker's compensation insurance, (6) employer's liability insurance, and (7) excess/umbrella insurance (written on an occurrence basis). Such commercial general liability insurance shall be in minimum amounts typically carried by prudent tenants engaged in similar operations, but in no event shall be in an amount less than Two Million Dollars ($2,000,000) combined single limit per occurrence with a Four Million Dollar ($4,000,000) annual aggregate. Such business interruption insurance shall be in minimum amounts typically carried by prudent tenants engaged in similar operations, but in no event shall be in an amount less than the Base Rent then in effect during any Lease Year. Such property insurance shall be in an amount not less than that required to replace all of the original tenant improvements installed in the Premises pursuant to the Work Agreement, any Alterations to any Must Take Expansion Premises, all other Alterations and all other contents of the Premises (including, without limitation, Tenant's trade fixtures, decorations, furnishings, equipment and personal property). Such automobile liability insurance shall be in an amount not less than One Million Dollars ($1,000,000) for each accident. Such worker's compensation insurance shall carry minimum limits as defined by the law of the jurisdiction in which the Building is located (as the same may be amended from time to time). Such employer's liability insurance shall be in an amount not less than One Million Dollars ($1,000,000) for each accident, One Million Dollars ($1,000,000) disease-policy limit, and One Million Dollars ($1,000,000) disease-each employee. Such excess/umbrella liability insurance shall be in minimum amounts typically carried by prudent tenants engaged in similar operations, but in no event shall be in an amount less than Five Million Dollars ($5,000,000.00) annual aggregate.

(b)    In addition to the foregoing, at any time Tenant is performing any Alterations or other work in the Premises, including without limitation any build-out work in any Must Take Expansion Premises, Tenant shall maintain the additional insurance described on **Exhibit O** hereto.

53

(c)    All such insurance shall: (1) be issued by a company that is licensed to do business in the jurisdiction in which the Building is located, that has been approved in advance by Landlord and that has a rating equal to or exceeding A:XI from Best's Insurance Guide; (2) name Landlord, the managing agent of the Building and the holder of any Mortgage secured by the Building as additional insureds and/or loss payees (as applicable); (3) intentionally deleted; (4) provide that the insurer thereunder waives all right of recovery by way of subrogation against Landlord, its partners, agents, employees, and representatives, in connection with any loss or damage covered by such policy; (5) be acceptable in form and content to Landlord; (6) with respect to CGL Insurance only, be primary and non-contributory; (7) contains an endorsement for cross liability and severability of interests; and (8) contain an endorsement prohibiting cancellation or failure to renew without the insurer first giving Landlord thirty (30) days' prior written notice (by regular mail) of such proposed action. No such policy shall contain any deductible provision except as otherwise approved in writing by Landlord, which approval shall not be unreasonably withheld. Landlord reserves the right from time to time to require Tenant to obtain higher minimum amounts or different types of insurance if it becomes customary for other landlords of first-class office buildings in the Washington, D.C., metropolitan area to require similar sized tenants in similar industries to carry insurance of such higher minimum amounts or of such different types of insurance. Tenant shall deliver a certificate (on Acord Form 27) of all such insurance and receipts evidencing payment therefor (and, upon request, copies of all required insurance policies, including endorsements and declarations) to Landlord concurrently with Tenant's execution of this Lease and at least annually thereafter. Tenant shall give Landlord immediate notice in case of fire, theft or accident in the Premises, and in the case of fire, theft or accident in the Building if involving Tenant, its agents, employees or Invitees. Neither the issuance of any insurance policy required under this Lease nor the minimum limits specified herein shall be deemed to limit or restrict in any way Tenant's liability arising under or out of this Lease.

13.3    **Waiver of Subrogation**.

(a)    Landlord agrees that it will include in its all-risk property insurance policies appropriate clauses pursuant to which the insurance companies (i) waive all right of subrogation against Tenant with respect to losses payable under such policies and/or (ii) agree that such policy or policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policy or policies.

(b)    Tenant agrees to include, in its all-risk property insurance policy or policies on Tenant's Property, appropriate clauses pursuant to which the insurance company or companies (i) waive the right of subrogation against Landlord with respect to losses payable under such policy or policies and/or (ii) agree that such policy or policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policy or policies.

(c)    To the extent of the waiver included in Landlord's all-risk property insurance policy pursuant to subsection (a) above or, if Landlord fails to comply with its obligations under such subsection (a), to the extent of the waiver which would have been included if Landlord had procured the same, Landlord hereby waives any and all right of recovery which it might otherwise have against Tenant, its affiliates, successors, assigns,

54

subtenants, and their respective servants, agents and employees, for loss or damage occurring to the Building and the fixtures, appurtenances and equipment therein, to the extent the same is covered by Landlord's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Tenant, its servants, agents or employees. To the extent of the waiver included in Tenant's all-risk property insurance policy pursuant to subsection (b) above or, if Tenant fails to comply with its obligations under such subsection (b), to the extent of the waiver which would have been included if Tenant had procured the same, Tenant hereby waives any and all right of recovery which it might otherwise have against Landlord, its affiliates, successors, assigns, tenants, and their respective servants, agents, and employees for loss or damage to Tenant's furniture, furnishing, fixtures and other property removable by Tenant under the provisions hereof to the extent the same is covered by Tenant's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Landlord, its servants, agents or employees, or such other tenant and the servants, agents or employees thereof.

(d)     Each of Landlord and Tenant hereby agrees to advise each other promptly if the clauses to be included in their respective insurance policies pursuant to subsections (a) and (b) above cannot be obtained, and thereafter to furnish the other with a certificate of insurance showing the naming of the other as an additional insured, as aforesaid. Each of Landlord and Tenant hereby also agrees to notify the other promptly, but no later than thirty (30) days after such party becomes aware, of any cancellation or change of the terms of any such policy which would affect such clauses or naming. All such policies which name both Landlord and Tenant as additional insureds shall, to the extent obtainable without material charge (unless the additional insured agrees to pay the same), contain agreements by the insurers to the effect that no act or omission of any additional insured will invalidate the policy as to the other additional insureds.

13.4    **Landlord's Insurance**. Landlord shall maintain in respect of the Building at all times during the term of this Lease:

(a)     standard "All-Risk" (or its then equivalent) property insurance, covering the Building in amounts equal to the full replacement cost of the Building at the time in question;

(b)     Commercial General Liability Insurance (including contractual liability) in an amount not less than less than One Million Dollars ($1,000,000) combined single limit per occurrence with a Two Million Dollar ($2,000,000) annual aggregate (with commercially reasonable deductibles for similar Class A office buildings in the Prince George's County, Maryland submarket of comparable age and condition);

(c)     Employer's Liability Insurance in an amount not less than One Million Dollars ($1,000,000), with a waiver of subrogation endorsement;

(d)     Umbrella excess liability insurance over the insurance required by subsections (ii) and (iii) of this Section with combined, minimum coverage of Twenty Million Dollars ($25,000,000.00);

(e)     boiler and machinery coverage on a replacement cost basis; and

(f)     Workers' Compensation Insurance, as applicable, in statutory limits.

(g)     Landlord covenants to maintain the foregoing insurance subject to such commercially reasonable deductibles for similar Class A office buildings in the Prince George's County, Maryland submarket of comparable age and condition.

**ARTICLE XIV**

**SERVICES AND UTILITIES**

14.1    **Building System HVAC**.

(a)     Landlord represents that the current Building System HVAC is adequate to maintain an indoor temperature for Office Use.  Landlord will supply heating and cooling (i) to the Premises during 2U Building Hours, and (ii) to the Lobby and the Amenity Space during Building Hours suitable for Office Use.  Tenant shall be solely responsible for costs of installing supplemental HVAC as Tenant may require in the Premises.

(b)     Landlord shall not be liable for any failure to maintain comfortable atmosphere conditions in all or any portion of the Premises due to excessive heat generated by any equipment or machinery installed by Tenant (with or without Landlord's consent), due to any impact that Tenant's furniture, equipment, machinery, millwork or layout of the Premises may have upon the delivery of HVAC to the Premises or during time periods where occupant density is in excess of design standards of the existing Building System HVAC.

(c)     If Tenant requires Building System HVAC beyond the hours specified in this Section 14.1 above (including in the Auditorium), Landlord will furnish the same, provided Tenant gives Landlord sufficient advance notice of such requirement but in any event no later than 3:00 p.m. on the date of the requested service (provided if the date(s) of requested service fall on any Holiday, then such notice shall be provided by 3:00 p.m. on the last Business Day prior to such Holiday). Subject to the provisions of Section 5.2(b), Tenant shall pay for such extra service in accordance with Landlord's then-current schedule, which shall reflect Landlord's actual cost of providing such service, including labor and cost of electricity and wear and tear on equipment and shall remit payment for the same to Landlord within thirty (30) days of receipt of an invoice therefor. If the same after-hours service is also requested by other tenants on the same floor as Tenant, the charge therefor to each tenant requesting such after-hours service shall be a pro-rated amount based upon the square footage of the leased premises of all tenants requesting such after-hours services.

14.2    **Janitorial Services; Landscaping and Snow Removal**.

(a)     Subject to the provisions of Section 5.2(b), Landlord will provide cleaning, janitorial services and garbage removal (the "**Janitorial Services**") to the Premises during the Lease Term on Monday through Friday (or at Landlord's option, Sunday through Thursday) only (excluding Holidays) after 6:00 p.m. on Monday through Friday and after 9:00 a.m. on weekends, as applicable. If Tenant requires or requests any supplemental Janitorial Services (to the extent Tenant has not separately contracted for such services as provided in Section 5.2(b)), such supplemental services shall be billed to Tenant at reflect Landlord's actual

56

cost of providing such service and Tenant shall remit payment for the same to Landlord within thirty (30) days of receipt of an invoice therefor.

(b)     Landlord will provide Tenant with the Building's cleaning specifications upon Landlord's selection of a cleaning contractor for the performance of the Janitorial Services. In the event the Janitorial Services being provided by any cleaning contractor are poor or inadequate in Tenant's reasonable judgment, Tenant shall deliver written notice thereof to Landlord (describing the problems in reasonable detail); following receipt of such written notice, Landlord will exercise commercially reasonable efforts for a period of sixty (60) days to correct such problems with the cleaning contractor. After such 60-day period, if the problems identified in Tenant's notice persist, and provided the RSF of the Premises does not fall below the RSF of the Initial Premises as of the Effective Date, at Tenant's election, Landlord will terminate the current cleaning contractor and hire a new cleaning contractor to provide the Janitorial Services, which new cleaning contractor shall be selected by Landlord and reasonably acceptable to Tenant.

(c)     In the event Tenant uses the Lobby or the Amenity Space for any Tenant event after 2U Business Hours, to the extent Tenant uses the services of the Building's cleaning contractor to clean up after such event, Tenant shall pay Landlord's actual cost of providing such service and Tenant shall remit payment for the same to Landlord within thirty (30) days of receipt of an invoice therefor.

(d)     Landlord will maintain the landscaping in the Building Common Areas, and shall provide snow removal service for the Building Common Areas (but excluding any portions of the roof) and Parking Lot, and shall provide exterior window washing service in accordance with similar Class A office buildings in the Prince George's County, Maryland submarket of comparable age and condition.

14.3   **Electricity**.

(a)     Base Capacity. It is Tenant's responsibility to confirm prior to Effective Date that the Building is equipped with electrical service of an average demand load of not less than six (6) watts per usable square foot of the Premises and exclusive of the operation of the Building Structure and Systems (including Building System HVAC units) that serve the Premises (the "**Base Capacity**"). Tenant, at its sole cost and expense, shall distribute the electricity within the Premises from the electrical panel(s) and shall have the right to re-distribute such capacity to various portions of the Premises in such amounts as Tenant elects.

(b)     Payment of Submetered Cost for Tenant's Electric Cost; Disputes. Landlord, from time to time but not more often than monthly, shall give to Tenant an invoice indicating the period during which Tenant's Usage for the Premises or any of Tenant's Specialty Installations (as determined by the submeters which exclusively meter the Premises or such Specialty Installations) was measured and the amount of Tenant's Electric Cost payable by Tenant to Landlord for such period. Tenant shall pay to Landlord the amount of Tenant's Electric Cost  for the Premises and Tenant's Specialty Installations (as a Submetered Cost) set forth on such invoices, as additional rent, within thirty (30) days after Tenant is given such invoices. In addition, if any tax is imposed upon Landlord by any governmental authority with respect to the

purchase, sale or resale of electrical energy supplied to Tenant hereunder, then, to the extent permitted by law, such taxes shall be paid by Tenant to Landlord, as additional rent (to the extent not already included in Landlord's Rate). Notwithstanding the foregoing, Landlord agrees to use commercially reasonable efforts to maintain a valid resale certificate at any time during the Lease Term that Landlord is supplying electricity hereunder and further agrees that Tenant shall only be required to pay sales tax in respect of additional rent related to Tenant's Usage the one time as a pass-through (as a separate line item on Landlord's bill to Tenant); it being agreed by the parties that Tenant will not be obligated or liable to double pay any particular sales taxes in respect of additional rent for Tenant's Usage. Every invoice for electricity given by Landlord pursuant to this Section 14.3(a) shall be conclusive and binding upon Tenant unless  within one hundred twenty (120) days after the receipt of such statement Tenant shall notify Landlord that it disputes the correctness of the statement, specifying the particular respects in which the statement is claimed to be incorrect based on the provisions of this Section 14.3(a) (an "**Electrical Dispute Notice**"). If Tenant delivers the Electrical Dispute Notice, Landlord agrees, at no cost or expense to Landlord, to grant Tenant's representatives (who shall be either Tenant's regular employees or a CPA from a qualified and reputable audit firm of Tenant's selection which regularly performs such inspections), reasonable access to those books and records of Landlord relevant to such dispute (other than privileged materials) for the purpose of verifying electricity charges calculated pursuant to this Section 14.3(a) and to have and make copies of any and all bills and vouchers relating to such dispute on the terms and conditions otherwise applicable to Tenant's review of Expense Statements and Annual Statements. Pending the determination of such dispute by agreement or judicial determination, Tenant shall pay to Landlord the amounts in accordance with the disputed statement, within thirty (30) days after Landlord gives same to Tenant, and such payment to be without prejudice to Tenant's position. If the dispute shall be determined in Tenant's favor, Landlord shall either pay or credit (at Landlord's option) to Tenant the amount of Tenant's overpayment without interest unless such dispute reveals an overcharge to Tenant in excess of seven percent (7%) of the amount due with respect to the applicable calendar year, in which case the payment or credit of such overpayment shall include interest at the Default Rate from the date(s) of such overpayment relates to the date such overpayment is refunded or credited.

        (c)    Repair of Submeters. Tenant may, from time to time (but in no event more than once every twelve (12) months), check the accuracy of the electric submeter(s) serving the Premises, at Tenant's expense, using the services of a testing agency/lab designated by Landlord and reasonably acceptable to Tenant. If the results shall disclose that the electric submeter(s) (or any of them) shall be inaccurate (other than to a *di minimus* extent), then such submeter(s) shall be repaired or replaced by Landlord, and Landlord and Tenant shall make a retroactive adjustment of the electric payments which have been made based on such inaccurate electric meter(s) or submeter(s); provided that only electricity charges made during the twelve (12) month period prior to receipt of the testing results shall be subject to retroactive adjustments.

        (d)    Additional Capacity. If at any time during the Lease Term Tenant determines that Tenant requires the electrical service being furnished to any portion of the Premises to be greater than Base Capacity, Tenant may request that Landlord, at Tenant's sole cost and expense, provide (i) up to four (4) watts per usable square foot, on a demand load basis, of additional power to each floor of the Premises. Landlord will not unreasonably withhold, condition or delay its consent to such a request should Tenant demonstrate the need for such

power to Landlord's reasonable satisfaction and should the Building have sufficient available capacity for the provision of such additional power taking into account the needs of current and future tenants of the Building as reasonably determined by Landlord and Landlord reasonably determines that the delivery of such additional power to Tenant will not adversely affect electricity service to the Building or other tenants. Tenant shall be responsible for all actual out-of-pocket costs Landlord incurs associated with providing additional power to the Premises and shall the same within thirty (30) days of receipt of an invoice therefor. For clarity, the Electric Costs for any such additional capacity shall be billed to Tenant in accordance with <u>Section 14.3(c)</u>.

14.4    <u>**Generator**</u>. Landlord shall maintain in good working order and condition and adequately fueled fuel oil generator emergency generator system for the Building (such emergency generator system being referred to herein collectively as the "**Emergency Generator System**"). Tenant may, at Tenant's sole cost and expense, non-exclusively connect to the second 1500kW generator (the "**Additional Back-Up Generator**") solely for the purpose of Tenant's back-up emergency power needs in the Premises in an amount not to exceed Tenant's Proportionate Share of 1500kW of the capacity of such Additional Back-Up Generator, such additional capacity being referred to herein as "**Additional Back-Up Power**" (provided that, so long as Tenant is the sole tenant of the Building, Tenant can utilize 100% of the Additional Back Up Power, and pay 100% of the Back Up Costs or if Tenant is not the sole tenant of the Building but less than all other tenants elect to connect to the Additional Back-Up, Tenant shall be entitled to utilize more than Tenant's Proportionate Share of such Additional Back Up Power as grossed up to reflect the use of less than all the other tenants (calculated to provide that other using tenant's applicable proportionate shares shall be similarly grossed up to equal 100% of use) and pay such grossed up Tenant's Proportionate Share of Back Up Costs). Landlord shall bill Tenant for Tenant's actual amounts of any costs or expenses for use of the Additional Back-Up Generator, including without limitation, fuel (as indicated on the fuel submeter(s)), maintenance, repairs, and replacement costs (collectively, "**Back Up Costs**") and Tenant shall pay the same within thirty (30) days of receipt of an invoice therefor. In no event shall Tenant be entitled to connect to the Emergency Generator System.

14.5    <u>**Elevator**</u>. Landlord shall provide elevator service from the Lobby to the Premises by having no less than four (4) passenger elevators (i.e. not elevators primarily intended as freight elevators) (A) in active service at all times during 2U Building Hours and (B) in service and subject to call twenty-four (24) hours per day seven (7) days per week; provided that temporary loss of any elevators for routine inspection or repair and maintenance shall permitted notwithstanding the foregoing or the provisions of <u>Section 15.3</u> to the contrary. With respect to the other two elevators (that is, the elevators beyond the four (4) aforementioned passenger elevators), Landlord shall not allow for such elevators to be out of service for any period of time beyond the period of time reasonably necessary to effectuate maintenance/repairs/replacements to same or to use such elevators for freight or other necessary purposes to operate the Building, it being recognized that Tenant expects the shared use of all elevators in the Building rather than just the four (4) aforementioned passenger elevators. Notwithstanding anything to the contrary contained herein, in no event shall any tenant of the Building be given exclusive use of an elevator except for limited times during such tenant's initial build out or subsequent renovation of its space (not to exceed 180 days with respect to such work for each tenant) or for times which

are not 2U Building Hours (other than Saturday) in which such tenants are moving in, out or about the Building.

14.6   **Security**. Landlord, at Landlord's expense (but subject to reimbursement as an Operating Expense), will provide a monitored card or key access system to the Building, the Premises, amenity areas, fitness area, roof and elevators. Landlord, at Landlord's expense, shall supply the initial cards and/or keys for the above in a quantity as reasonably required by Tenant. In addition, provided Tenant's RSF footage does not fall below that of the Initial Premises, Landlord shall have a security guard policing the parking lot and grounds from 5:00 p.m. to 10:00 p.m. Monday through Friday. Tenant may, at Tenant's expense, install its own security system in the Premises, provided that such security system shall not impair Landlord's right to access to the Premises as provided in this Lease.

14.7   **Access**. Commencing on the Base Building Work Delivery Date, Tenant shall have access to the Building, the Amenity Space and the Premises twenty-four (24) hours per day each day of the year (except in the event of an emergency) (for clarity, Tenant's access to the Amenity Space after Business Hours shall not require Landlord or Operator to keep the food service operations in the Food Service Area open).

14.8   **Water**. Landlord shall furnish domestic hot and cold water to the Premises for drinking, food service, cleaning, lavatory purposes and shower use. If water is used for any other purpose (including cafeteria and/or private or executive lavatory purposes that include showers), Landlord, as part of Landlord's Base Building Condition Work, at Landlord's sole cost and expense, shall install submeters to exclusively measure the consumption of such portions of the Premises  thereof where water is being used for any other purpose, in which event Tenant shall pay for 100% of the Submetered Costs for the quantities of water furnished to such portions as shown on such submeters exclusively measuring the Premises at Landlord's actual cost thereof, within thirty (30) days after Landlord's submission of an invoice therefor from time to time.

14.9   **Submetered Costs**.  Tenant shall pay any other Submetered Costs not specifically included in Section 14.3 (Electricity) and Section 14.8 (Water) above, based upon the quantities of Utilities used by Tenant as shown on such submeters installed within the Premises (and exclusively serving the Premises) based upon Landlord's actual cost of such Utility, within thirty (30) days after Landlord's submission of an invoice therefor from time to time.

1098066.03A-NYCSR04A - MSW

**ARTICLE XV**

**LIABILITY OF LANDLORD**

15.1    **Landlord Liability**.

(a)    Neither Landlord, nor the lessors under any superior lease, nor the holders of any superior mortgages, nor any of their respective its agents, officers, directors, shareholders, partners or principals (disclosed or undisclosed) (collectively, "**Landlord Indemnitees**") shall be liable to Tenant, any Invitee or any other person or entity for any damage (including indirect and consequential damage), injury, loss or claim (including claims for the interruption of or loss to business) based on or arising out of any cause whatsoever (except as otherwise provided in Section 15.3 below), including without limitation the following: repair to any portion of the Premises or the Building; interruption in the use of the Premises or any equipment therein; any accident or damage resulting from any use or operation (by Landlord, Tenant or any other person or entity) of elevators or heating, cooling, electrical, sewerage or plumbing equipment or apparatus; termination of this Lease by reason of damage to the Premises or the Building; any fire, robbery, theft, vandalism, mysterious disappearance or any other casualty; actions of any other tenant of the Building or of any other person or entity; failure or inability to furnish any service specified in this Lease; and leakage in any part of the Premises or the Building from water, rain, ice or snow that may leak into, or flow from, any part of the Premises or the Building, or from drains, pipes or plumbing fixtures in the Premises or the Building. If any condition exists which may be the basis of a claim of constructive eviction, then Tenant shall give Landlord written notice thereof and a reasonable opportunity to correct such condition in accordance with Section 15.3 below, and in the interim Tenant shall not claim that it has been constructively evicted or is entitled to a rent abatement. Any property placed by Tenant or any Invitee in or about the Premises or the Building shall be at the sole risk of Tenant, and Landlord shall not in any manner be held responsible therefor. Any person receiving an article delivered for Tenant shall be acting as Tenant's agent for such purpose and not as Landlord's agent. For purposes of this Article, the term "**Building**" shall be deemed to include the Land and the Parking Lot. Notwithstanding the foregoing provisions of this Section, Landlord shall not be released from liability to Tenant for any physical injury to any natural person caused by Landlord's willful misconduct or gross negligence to the extent such injury is not covered by insurance (a) carried by Tenant or such person, or (b) required by this Lease to be carried by Tenant; provided, however, that Landlord shall not under any circumstances be liable for any consequential or indirect damages.

(b)    Wherever in this Lease an indemnification is for the benefit of Landlord, such indemnification shall also be for the benefit of all Landlord Indemnitees, regardless of whether or not expressly so provided.

(c)    Tenant shall not have the right to set off or deduct any amount allegedly owed to Tenant pursuant to any claim against Landlord from any rent or other sum payable to Landlord. Tenant's sole remedy for recovering upon such claim shall be to institute an independent action against Landlord, which action shall not be consolidated with any action of Landlord.

61

(d)    If Tenant or any Invitee is awarded a money judgment against Landlord, then recourse for satisfaction of such judgment shall be limited to execution against Landlord's estate and interest in the Building. No other asset of Landlord, any partner, director, member, officer or trustee of Landlord (each, an "**officer**") or any other person or entity shall be available to satisfy or be subject to such judgment, nor shall any officer or other person or entity be held to have personal liability for satisfaction of any claim or judgment against Landlord or any officer.

15.2    **Indemnification**.

(a)    To the fullest extent permitted by law, but subject to the requirements and limitations set forth in Section 13.3(c),Tenant shall (i) defend, indemnify and save harmless Landlord and all Landlord Indemnitees against and from any and all claims (x) based on or arising from, in whole or in part (A) the manner of use of or occupancy of the Premises, the management of the Premises by Tenant or any Tenant Invitees or the conduct of any business therein, (B) any act or omission of Tenant or Tenant's Invitees, (C) any default under any of the terms, covenants or conditions of this Lease on Tenant's part to observe, perform or comply with, or (D) any work done, or any condition created (other than by, or on behalf of, Landlord or any Landlord Indemnitees for Landlord's or Tenant's account) in or about the Premises, by Tenant or any Tenant Invitee, during the Lease Term or during the period of time, if any, prior to the Lease Commencement Date or applicable Must Take Commencement Date that Tenant may have been given access to the Premises or during the period of time after the expiration of the Lease Term that Tenant or any Tenant Invitee remains in possession or occupancy of the Premises or any portion thereof, or (y) arising from any negligent act or omission or otherwise intentional misconduct of Tenant or any of its subtenants or licensees or its or their employees, agents or contractors even if the claims described in (x) or (y) above arise out of the concurrent negligence (but not gross negligence) of Landlord or any the Landlord Indemnitees, and (ii) reimburse to Landlord and the Landlord Indemnitees all reasonable costs and expenses (including reasonable attorneys' fees) paid or incurred by Landlord or any of the Landlord Indemnitees in connection with each such claim or action or proceeding brought thereon. In case any action or proceeding be brought against Landlord or any of the Landlord Indemnitees by reason of any such claim, Tenant, upon notice from Landlord, shall resist and defend such action or proceeding by attorneys reasonably acceptable to Landlord, Landlord agreeing that the attorneys for the insurance company providing Tenant's insurance are acceptable.

(b)    To the fullest extent permitted by law, but subject to the requirements and limitations set forth in Section 13.3(c), Landlord shall (i) indemnify and save harmless Tenant and all agents, officers, directors, shareholders, partners or principals (disclosed or undisclosed) of Tenant (the "**Tenant Indemnitees**") against and from any and all claims, losses, costs and expenses arising from any property damage or physical injury caused by Landlord's gross negligence or willful misconduct, (ii) reimburse to Tenant and the Tenant Indemnitees all reasonable costs and expenses (including reasonable attorneys' fees) paid or incurred by Tenant or any of the Tenant Indemnitees in connection with each such claim or action or proceeding brought thereon. In case any action or proceeding be brought against Tenant or any of the Tenant Indemnitees by reason of any such claim, Landlord, upon notice from Tenant, shall resist and defend such action or proceeding by attorneys reasonably acceptable to Tenant, Tenant agreeing that the attorneys for the insurance company providing Landlord's insurance are acceptable.

(c)      Except as set forth in Section 22.1 with respect to Tenant holding over in the Premises after the expiration of the Term, neither Landlord nor Tenant shall be liable to the other for any indirect or consequential damages to the other.

15.3    **Interruption of Essential Services**.

(a)      Anything herein contained to the contrary notwithstanding, if (i) for any reason, including, without limitation, Landlord's acts or omissions or a Force Majeure Event (but specifically excluding for the purposes of this Section 15.3, an event arising under Article XVII, the remedy for which are addressed in such Article), there is a material loss of HVAC, electricity, or water to any portion of the Premises (such event being hereinafter referred to as a "**Services Abatement Event**"), and such Services Abatement Event renders untenantable (which shall include inaccessible) at least a full floor of the Premises (or, solely with respect to a Services Abatement Event affecting the 2nd Floor Premises, at least thirty-three percent (33%) of the 2nd Floor Premises), and (ii) Landlord receives notice from Tenant of the Services Abatement Event and of the fact that Tenant is prevented from, and (other than with respect to an Elevator Interruption) has actually ceased using one or more full floors of the Premises (or, solely with respect to a Services Abatement Event affecting the 2nd Floor Premises, at least thirty-three percent (33%) of such premises) and of the specific portions of the Premises that Tenant is prevented from, and has actually ceased using (such notice being hereinafter referred to as the "**Untenantability Notice**"), (iii) for at least (A) five (5) consecutive Business Days after Landlord's receipt of the Untenantability Notice (or ten (10) consecutive Business Days in the event such untenantability results solely from a Force Majeure Event) (for the purposes of this Section 15.3, Friday and Monday are consecutive Business Days), or (B) at least seven (7) Business Days (whether or not consecutive) in any forty-five (45) day period (or at least fifteen (15) Business Days (whether or not consecutive) in any sixty (60) day period in the event such untenantability results solely from Force Majeure Event) after Landlord's receipt of the Untenantability Notice, in any case arising out of the same Services Abatement Event (the Business Day following the last Business Day of the foregoing periods, as the case may be, being hereinafter called the "**Abatement Commencement Date**"), and, except with respect to an Elevator Interruption, as a result of the Services Abatement Event, Tenant actually ceases using, and continues not to use, such specific portions of the Premises (provided that the entry by representatives of Tenant to the affected area that is the subject of an Untenantability Notice on a limited basis solely to retrieve files and documents or to maintain equipment in such affected portion or any unaffected portion of Premises shall not by itself be deemed to be reoccupying for the ordinary conduct of its business), (iv) the Services Abatement Event is not the result of any act or (where Tenant has a duty to act) omission of Tenant, and (v) no Event of Default then exists (other than an Event of Default substantially caused by such Services Abatement Event), then, in addition to Tenant's other rights and remedies at law or equity, Base Rent and all additional rent relating to Operating Expenses, Consumable Expenses, Real Estate Taxes and Submetered Costs (including Temporary Usage Costs) then payable by Tenant under this Lease with respect to the floors(s) rendered untenantable as contemplated in this Section 15.3(a) shall be reduced as provided in subsection (c) below.

(b)      In addition, if for any reason, including, without limitation, Landlord's acts or omissions or a Force Majeure Event (but specifically excluding for the purposes of this Section 15.3, an event arising under Article XVII, the remedy for which are addressed in such

63

Article) (i) Landlord receives notice from Tenant of an Elevator Interruption (such notice being hereinafter referred to as the "**Elevator Untenantability Notice**") (A) that two (2) elevator cars (or more) out of six (6) are unavailable for Tenant's use for a significant portion of a 2U Business Day for (x) at least thirty (30) consecutive Business Days (for the purposes of this Section 15.3, Friday and Monday are consecutive Business Days) or (y) thirty (30) non-consecutive Business Days in any ninety (90) day period, in each case following the delivery of an Elevator Untenantability Notice, one half (½) of a full upper floor of the Premises shall be deemed untenantable as of the applicable Elevator Abatement Date notwithstanding that Tenant is still conducting business in the Premises, (B) that three (3) elevator cars (out of six (6) elevators) are unavailable for Tenant's use for a significant portion of a 2U Business Day for (x) at least seven (7) consecutive Business Days or for a significant portion of the day or (y) at least ten (10) non-consecutive Business Days in any thirty (30) day period, in each case following the delivery of an Elevator Untenantability Notice, two and one half (2 ½) full upper floors of the Premises shall be deemed untenantable as of the applicable Elevator Abatement Date notwithstanding that Tenant is still conducting business in the Premises; (C) that there are more than three (3) elevators but not all elevators are unavailable for Tenant's use during a significant portion of the day for (x) three (3) consecutive Business Days, or (y) at least seven (7) non-consecutive Business Days in any thirty (30) day period, in each case following the delivery of an Elevator Untenantability Notice, three and a half (3 ½) full upper floors of the Premises shall be deemed untenantable as of the applicable Elevator Abatement Date regardless of whether Tenant is still conducting business in the Premises or (D) that there are no elevators in service (out of six (6) elevators) during a significant portion of a 2U Business Day for (x) any three (3) consecutive Business Days or (y) for four (4) non-consecutive Business Days in a fourteen (14) day period, in each case following the delivery of an Elevator Untenantability Notice, then four (4) full upper floors of the Premises shall be deemed untenantable as of the applicable Elevator Abatement Date regardless of whether Tenant is still conducting business in the Premises (each event in this clause (b) being hereinafter referred to as a "**Elevator Interruption**" and the day following the last day of the foregoing 30 consecutive Business Day, 30 non-consecutive Business Day, 7 consecutive Business Days, 10 non-consecutive Business Day, 3 consecutive Business Days, 7 non-consecutive Business Days, 3 consecutive Business Days, or 4 non-consecutive Business Days, as the case may be, being hereinafter called the "**Elevator Abatement Date**"), (ii) the Elevator Interruption is not the result of any act or (where Tenant has a duty to act) omission of Tenant, and (iii) no Event of Default then exists (other than an Event of Default substantially caused by such Elevator Interruption) then, in addition to Tenant's other rights and remedies at law or equity, the rents payable by Tenant under this Lease shall be reduced as provided in subsection (c) below.

(c)    Provided that the conditions described in clauses (i) through (v) of subsection (a) above or in clauses (i) through (iii) of subsection (b) above have been satisfied during the period (the "**Services Abatement Period**") commencing on the applicable Abatement Commencement Date (with respect to a Services Abatement Event) or the applicable Elevator Abatement Date (with respect to an Elevator Interruption) and ending on the last day that the Premises (or the applicable portions thereof) is untenantable (or deemed untenantable) as result of the Services Abatement Event or Elevator Interruption, the rents payable by Tenant under this Lease that are attributable to the Services Abatement Period shall be reduced by an amount equal to (i) the annual Base Rent, Tenant's Proportionate Share of Operating Expenses and Real Estate Taxes per RSF, payable during, or attributable to, the applicable Services Abatement Period,

64

divided by (ii) 365, and multiplied by (iii) the number of days during the Services Abatement Period, and multiplied further by (iv) the RSF of the portion of the Premises that is so untenantable or deemed untenantable (such area may change from time to time).

(d)     The rights and remedies of Tenant set forth in this Section shall not be deemed a waiver by Tenant of Landlord's continued obligation to make the repair or to provide the service in question nor cure Landlord's default of its obligations under the Lease with respect to Landlord's failure to make such repair or provide such service.

## ARTICLE XVI

## RULES

16.1    **Rules and Regulations**. Tenant and Invitees shall at all times abide by and observe the rules specified in **Exhibit C**. Tenant and Invitees shall also abide by and observe any other reasonable rule that Landlord may promulgate from time to time for the operation and maintenance of the Building, provided that notice thereof is given and such rule is not inconsistent with the provisions of this Lease. Tenant may, within thirty (30) days following notice of any changes to the rules and regulations, dispute the reasonableness of any rules Tenant believes (i) are unreasonable to Tenant taking into consideration Tenant's rights and obligations under the Lease or (ii) have an adverse impact on Tenant or (iii) are unusual for similar Class A Buildings located in the Prince George's County, Maryland submarket by written notice to Landlord, in which case the parties shall meet to resolve such dispute within 30 days after the delivery of Tenant's notice and, if they are unable for any reason to resolve such dispute within such 30 day period, either party may submit such dispute to a court of competent jurisdiction and during the pendency of such lawsuit, Tenant shall comply with such disputed change to the rules and regulations. Notwithstanding the foregoing, Tenant shall have no obligation to comply with such amendments to the rules and regulations (and any amendments shall be deemed not to be reasonable) if the same (w) limit Tenant's use of the Premises, the Lobby and the Amenity Space for the Permitted Uses, (x) increase costs payable by Tenant to Landlord under this Lease unless required under applicable Requirements or to a de minimis extent, (y) increase Tenant's obligations beyond a de minimis extent subject to the terms of this Lease or (z) limit Tenant's access to the Lobby, Amenity Space or the Premises. All rules shall be binding upon Tenant and enforceable by Landlord as if they were contained herein. Nothing contained in this Lease shall be construed as imposing upon Landlord any duty or obligation to enforce such rules, or the terms, conditions or covenants contained in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for the violation of such rules by any other tenant or its employees, agents, assignees, subtenants, invitees or licensees. Landlord shall use reasonable efforts not to enforce any rule or regulation in a manner which unreasonably discriminates against Tenant.

## ARTICLE XVII

## DAMAGE OR DESTRUCTION

17.1    **Damage or Destruction**.

1098066.03A-NYCSR04A - MSW

(a)      If the Building or the Premises shall be partially damaged or partially destroyed by fire or other casualty and as a result thereof a portion of the Premises becomes untenantable or inaccessible, the Base Rent and additional rent payable under this Lease shall be abated on a per rentable square foot basis based on the RSF of that portion of the Premises as shall have been rendered untenantable as a result of such damage or destruction for the period, commencing on the date such portion of the Premises becomes untenantable or inaccessible and ending on the date next preceding the earlier of (i) the date on which the Landlord's Restoration Condition is substantially complete or on which that portion of the Premises otherwise becomes tenantable and accessible for Tenant to commence Tenant's Restoration Work, plus an additional period of up to six (6) months for Tenant to complete restoration of Tenant's Restoration Work, and (ii) the date on which Tenant or any Permitted User occupies such portion of the Premises for the conduct of its business. For purposes of this Section 17.1, the term "untenantable" shall mean, with respect to any portion of the Premises, that Tenant is not reasonably able to conduct its business in that portion of the Premises affected in substantially the same manner as was conducted in such space immediately prior to such fire or other casualty. If this Lease is terminated pursuant to this Article, then Base Rent and any additional rent payable under this Lease shall be payable only to the date of the casualty that caused the termination of the Lease.

(b)      If the Building, the Lobby, the Amenity Space or the Premises shall be totally (which shall be deemed to include substantially all) damaged or destroyed by fire or other casualty and as a result thereof all (or substantially all) of the Premises becomes untenantable or inaccessible, the Base Rent and any additional rent payable under this Lease shall be abated for the period commencing on the date such portion of the Premises became untenantable or inaccessible and ending on the date next preceding the earlier of (i) the date the Required Landlord Restoration is substantially complete or on which the Premises otherwise becomes tenantable and accessible (exclusive of any Tenant's Work or other Alterations) plus an additional of up to six (6) months for Tenant to complete restoration of Tenant's Work or other Alterations, and (ii) the date on which Tenant occupies the Premises for the conduct of its business; provided, however, that Landlord and Tenant shall use reasonable efforts to cooperate in connection with such restoration to provide the parties with shortest possible restoration period through the coordination of their respective work.

(c)      Promptly after the date on which the Landlord Restoration Condition is substantially complete, Tenant shall commence, and thereafter diligently proceed with, the repair, restoration and replacement of all Alterations (including Tenant's Work) and Tenant's Property ("**Tenant's Restoration Work**")**.**

17.2    **Restoration**. If any damage or destruction described in Section 17.1 above occurs, then, provided this Lease shall not have been terminated as in Section 17.3 below provided, Landlord shall repair or restore such damage or destruction with reasonable dispatch after notice to it of the damage or destruction (including repair and restoration of any Landlord's Work), the Lobby and the Amenity Space; provided, however, that Landlord shall not be required to make any repairs or restoration that are the obligation of Tenant or any other tenant in the Building to make; and provided further that Landlord shall not be required to repair, replace or move any of Tenant's Property nor to repair or restore any Tenant's Work or other Alterations (such damage or destruction that Landlord is expressly obligated to repair or restore pursuant to this Section 17.2 being herein referred to as the "**Landlord's Restoration Condition**").

66

Notwithstanding the foregoing Landlord can complete restoration of the Lobby and Amenity Space after the end of the Restoration Period and concurrently with Tenant's Work, provided the Premises floors have been turned over to Tenant for Tenant's Work and provided further that Tenant has an appropriate path to access the elevators and Premises to perform its work and that the Lobby and Amenity Space restoration is completed no later than the date Tenant takes occupancy of the Premises for normal business operations.

17.3    **Termination Rights**.

(a)    If more than fifty percent (50%) the Building or the Premises shall be totally or substantially damaged or destroyed by fire or other casualty, or if the Building shall be so damaged or destroyed by fire or other casualty (whether or not the Premises are damaged or destroyed) as to require a reasonably estimated expenditure of more than fifty percent (50%) of the full replacement cost of the Building immediately prior to the casualty (either, a "**Substantial Casualty**"), then in either such case Landlord may terminate this Lease by giving Tenant notice to such effect within ninety (90) days after the date of the casualty. In addition, and notwithstanding anything herein to the contrary, Landlord shall also have the right to terminate this Lease if (1) in connection with a Substantial Casualty, notwithstanding the Landlord has maintained the insurance coverage required to be maintained hereby, the actual insurance proceeds are insufficient to pay the full cost of such  restoration, (2) the holder of any Mortgage secured by the Building fails or refuses to make such insurance proceeds available for such repair and restoration (provided that Landlord agrees to use commercially reasonable efforts to cause the applicable loan documents to provide that such holder will make insurance proceeds available for restoration so long as there is at least three years left in the Lease Term, including by way of an early exercise by Tenant of a renewal term, and to use best efforts to cause such holder to make such insurance proceeds available for restoration,) or (3) after a Substantial Casualty, as the result of the changes to zoning Requirements, the  Building cannot be rebuilt to at least 75% of its current FAR or cannot be used for Office Use after restoration.

(b)    Upon a Substantial Casualty:

(i)    Unless Landlord elects to terminate this Lease as provided in Section 17.3(a) hereof, within ninety (90) days after the date of such casualty, Landlord shall give to Tenant a statement (the "**Architect's Statement**") from a reputable, independent architect, licensed as an architect in Prince George's County, reasonably selected by Landlord, that sets forth such architect's good faith estimate and assumptions as to when the repairs to the Building and Premises will be substantially complete.

(ii)    If (A) such architect estimates in the Architect's Statement that the repairs to the Building and the Premises will be substantially complete more than twelve (12) months after the date of such casualty or (B) the repairs or restoration that Landlord is obligated to make are not substantially completed within the greater of (x) the aforementioned twelve (12) month period, as applicable, after the date of such casualty or (y) the lesser period of time originally estimated by such architect (which period, in either subclause (x) or (y), shall be extended for up to 120 days if Landlord is delayed in making such repairs by reason of a noticed Force Majeure Event (such period, as same may be so extended, the "**Restoration Period**")), then, Tenant may elect to terminate this

67

Lease by giving notice of such termination to Landlord. For Tenant's notice of termination to be effective, it must be given, in the case of clause "(A)" within sixty (60) days after the date Landlord gives to Tenant the Architect's Statement, or, in the case of clause "(B)," within thirty (30) days after the last day of the Restoration Period as originally noticed by Landlord, time being of the essence in both cases. If a Substantial Casualty occurs in the last eighteen (18) months of the Lease Term and the Restoration Period is more than one-third (1/3) of the then-remaining Lease Term then either Landlord or Tenant may elect to terminate this Lease by giving notice of such termination to the other party (provided that Landlord's termination election shall be revoked in the event Tenant elects to renew the Lease as permitted by <u>Article XXVI</u>). For Landlord or Tenant's notice of termination pursuant to the preceding sentence to be effective, it must be given within sixty (60) days after the receipt of the Architect's Statement, time being of the essence. Notwithstanding the foregoing, if Tenant fails to give Landlord such notice of termination in the manner and in the time period set forth above, then Tenant's right to terminate this Lease shall be null and void, and of no further force or effect, and this Lease shall continue in full force and effect, subject to the other provisions of this Lease**.**

       (iii)    In the event Landlord shall fail to deliver an Architect's Statement as required above (time being of the essence), Tenant may obtain an Architect's Statement and such Architect's Statement shall be deemed substituted for the one that Landlord would be required to deliver.

       (c)    If, in accordance with, and subject to, the provisions of this <u>Section 17</u>, either Landlord or Tenant give the other such notice of termination (and Landlord's notice is not revoked as provided above) the Lease Term shall expire as fully and completely on the date which is thirty (30) days after the date on which Landlord or Tenant gives the other such notice of termination, as if such termination effective date were the Expiration Date, and on or prior to such termination effective date (provided that Tenant shall not have any obligation to remove any Tenant's Property or Specialty Alterations), Tenant shall quit, surrender and vacate the Premises in accordance with the applicable provisions of this Lease, without prejudice, however, to Landlord's rights and remedies against Tenant under the provisions of this Lease in effect prior to such termination effective date, and any Base Rent or additional rent owing prior to the date of casualty shall be paid up to such date, and any payments of Base Rent or additional rent made by Tenant which were on account of any period subsequent to the date of the casualty (less any amounts of other rents then owing to Landlord) shall be returned to Tenant.

     17.4    <u>**Cooperation**</u>. Each of Landlord and Tenant shall cooperate with each other as is reasonably required to enable each to collect all of the insurance proceeds (including rent insurance proceeds) from their respective insurance companies applicable to damage or destruction of the Premises or the Building by fire or other casualty.

     17.5    <u>**Compensation**</u>. No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or reasonable annoyance arising from any repair or restoration of any portion of the Premises or of the Building pursuant to this Article.

68

## ARTICLE XVIII

## <u>CONDEMNATION</u>

18.1     If one-third or more of the Premises, or the use or occupancy thereof, shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose or sold under threat of such a taking or condemnation (collectively, "**condemned**"), then, this Lease shall terminate on the day prior to the date title thereto vests in such authority and rent shall be apportioned as of such date. If less than one-third of the Premises or occupancy thereof is condemned, then this Lease shall continue in full force and effect as to the part of the Premises not so condemned, except that as of the date title vests in such authority Tenant shall not be required to pay rent with respect to the part of the Premises so condemned. Notwithstanding anything herein to the contrary, if twenty-five percent (25%) or more of the Land or the Building is condemned, then whether or not any portion of the Premises is condemned, either Landlord or Tenant shall have the right to terminate this Lease as of the date title vests in such authority. Notwithstanding the foregoing, it shall not be considered a condemnation if Tenant's use of parking at the Building is diminished in a way that does not materially detrimentally interfere with Tenant's use of the Premises.

18.2     All awards, damages and other compensation paid on account of such condemnation shall belong to Landlord, and Tenant assigns to Landlord all rights to such awards, damages and compensation. Tenant shall not make any claim against Landlord or such authority for any portion of such award, damages or compensation attributable to damage to the Premises, value of the unexpired portion of the Lease Term, loss of profits or goodwill, leasehold improvements or severance damages. Nothing contained herein, however, shall prevent Tenant from pursuing a separate claim against the authority for relocation expenses and for the value of Tenant's Property and any Alterations paid by Tenant.

18.3     Any elimination or shutting off of light, air, or view by any structure which may be erected on lands adjacent to the Land shall in no way effect this Lease or impose any liability on Landlord provided not caused by Landlord or any affiliate of Landlord.

18.4     In the event of any taking of less than the whole of the Building which does not result in a termination of this Lease, or in the event of a taking for a temporary use or occupancy of all or any part of the Premises which does not extend beyond the Expiration Date, Landlord, at its expense, and to the extent any award or awards shall be sufficient for the purpose, shall proceed with reasonable diligence to repair, alter and restore (a) the remaining parts of the Building to substantially the condition such portion existed prior to the taking to the extent that the same may be feasible and so as to constitute a complete and tenantable Building and (b) the Premises to substantially the condition existing prior to the taking.

## ARTICLE XIX

## <u>DEFAULT</u>

19.1     **<u>Events of Default</u>**. In addition to those events or circumstances described in this Lease as an Event of Default, each of the following shall constitute an "**Event of Default**":

(a)    Tenant's failure to make when due any payment of (1) the Base Rent, (2) subject to Section 19.1(b), any Monthly Operating Expense Payment or Monthly Real Estate Tax Payment or (3) any other additional rent or other sum payable hereunder when due and the payment in question is not paid in full within five (5) Business Days after Tenant is given a notice specifying such default for any Base Rent or Monthly Operating Expense Payment or Monthly Real Estate Tax Payment and ten (10) Business Days after Tenant is given notice specifying such default for any other additional rent or other payment;

(b)    Tenant's failure to pay any monthly installment of Monthly Operating Expense Payment or Monthly Real Estate Tax Payment after reset or change in the monthly amount by Landlord and such non-payment continues for more than ten (10) Business Days after Tenant is given notice specifying such default for any other additional rent or other payment;

(c)    Tenant's failure to perform or observe any covenant or condition of this Lease not otherwise specifically described in this Section 19.1; provided, however, no Event of Default shall be deemed to have occurred unless such failure continues for thirty (30) days after Landlord delivers written notice thereof to Tenant, unless such failure is of such nature that it cannot be cured within such thirty (30) day period, in which case no Event of Default shall occur so long as Tenant shall commence the curing of the failure within such thirty (30) day period and shall thereafter diligently prosecute the curing of same but in no event later than ninety (90) days after the date notice is given by Landlord to Tenant, or such shorter period as is appropriate if such failure can be cured in a shorter period;

(d)    an Event of Bankruptcy as specified in Article XX;

(e)    any voluntary subletting, assignment, transfer, Mortgage of the Premises or this Lease not permitted by Article VII;

(f)    any default by Guarantor under the Guaranty beyond any notice and cure period;

(g)    failure of Tenant to maintain the security deposit in accordance with Article XI above; or

(h)    any failure to maintain the insurance required pursuant to Article XIII above.

19.2    **Remedies**. During the continuation of an Event of Default (even if prior to the Lease Commencement Date), then the provisions of this Section shall apply. Landlord shall have the right, at its sole option, to terminate this Lease in accordance with applicable law; provided that prior to exercising such termination right, Landlord shall give Tenant ten (10) Business Days' notice of Landlord's intention to exercise such termination right (it being expressly agreed that such notice, to the extent permitted by applicable law, shall run concurrent with any notice required to be delivered under applicable law, and not in addition thereto). In addition, with or without terminating this Lease, Upon the delivery of ten (10) Business Days' notice to Tenant, Landlord may re-enter (including, without limitation, changing the locks to the Premises), terminate Tenant's right of possession and take possession of the Premises. The provisions of this Article shall operate as a notice to quit, and except as required in this Section 19.2, Tenant

70

hereby waives any other notice to quit or notice of Landlord's intention to re-enter the Premises or terminate this Lease. If necessary, Landlord may proceed to recover possession of the Premises under applicable laws, or by such other proceedings, including re-entry and possession, as may be applicable. If Landlord elects to terminate this Lease and/or elects to terminate Tenant's right of possession, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, however, to Tenant's liability for all Base Rent, additional rent and other sums specified herein. Whether or not this Lease and/or Tenant's right of possession is terminated, Landlord shall have the right, at its sole option, to terminate any renewal or expansion right contained in this Lease and to grant or withhold any consent or approval pursuant to this Lease in its sole and absolute discretion; provided that if such Event of Default is subsequently cured and this Lease remains in effect, then such options and Landlord's consent standard shall be restored. Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term(s) (which may extend beyond the date on which the Lease Term would have expired but for Tenant's Event of Default) and on such terms and conditions (which may include any concessions or allowances granted by Landlord) as Landlord, in its sole and absolute discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet all or any portion of the Premises or to collect any rent due upon such reletting. Whether or not this Lease and/or Tenant's right of possession is terminated or any suit is instituted, Tenant shall be liable for any Base Rent, additional rent, damages or other sum which may be due or sustained prior to such default, and for all costs, fees and expenses (including, but not limited to, reasonable attorneys' fees and costs, brokerage fees, expenses incurred in enforcing any of Tenant's obligations under the Lease or in placing the Premises in first-class rentable condition, advertising expenses, and any concessions or allowances granted by Landlord) incurred by Landlord in pursuit of its remedies hereunder and/or in recovering possession of the Premises and renting the Premises to others from time to time plus other actual damages suffered or incurred by Landlord on account of Tenant's default. Tenant also shall be liable for additional damages which at Landlord's election shall be either one or a combination of the following: (a) an amount equal to the Base Rent and additional rent due or which would have become due from the date of Tenant's default through the remainder of the Lease Term, less the amount of rental, if any, which Landlord receives during such period from others to whom the Premises may be rented (other than any additional rent received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), which amount shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following Tenant's default and continuing until the date on which the Lease Term would have expired, it being understood that separate suits may be brought from time to time to collect any such damages for any month(s) (and any such separate suit shall not in any manner prejudice the right of Landlord to collect any damages for any subsequent month(s)), or Landlord may defer initiating any such suit until after the expiration of the Lease Term (in which event such deferral shall not be construed as a waiver of Landlord's rights as set forth herein and Landlord's cause of action shall be deemed not to have accrued until the expiration of the Lease Term), and it being further understood that, to the extent permitted by applicable law, if Landlord elects to bring suits from time to time prior to reletting the Premises, Landlord shall be entitled to its full damages through the date of the award of damages without regard to any Base Rent, additional rent or other sums that are or may be projected to be received by Landlord upon reletting of the Premises; or (b) an amount equal to the sum of (i) all Base Rent, additional rent and other sums

71

due or which would be due and payable under this Lease as of the date of Tenant's default through the end of the scheduled Lease Term, plus (ii) all expenses (including broker and attorneys' fees) and value of all vacancy periods projected by Landlord to be incurred in connection with the reletting of the Premises, minus (iii) any Base Rent, additional rent and other sums which Tenant proves by a preponderance of the evidence would be received by Landlord upon reletting of the Premises from the end of the vacancy period projected by Landlord through the expiration of the scheduled Lease Term. Such amount shall be discounted using a discount factor equal to the yield of the Treasury Note or Bill (as published by *The Wall Street Journal* or similar or successor publication at the time), as appropriate, having a maturity period approximately commensurate to the remainder of the Lease Term, and such resulting amount shall be payable to Landlord in a lump sum on demand, it being understood that upon payment of such liquidated and agreed final damages, Tenant (and Guarantor) shall be released from further liability under this Lease with respect to the period after the date of such payment, and that Landlord may bring suit to collect any such damages at any time after an Event of Default shall have occurred. In the event Landlord relets the Premises together with other premises or for a term extending beyond the scheduled expiration of the Lease Term, it is understood that Tenant will not be entitled to apply any base rent, additional rent or other sums generated or projected to be generated by either such other premises or in the period extending beyond the scheduled expiration of the Lease Term (collectively, the "**Extra Rent**") against Landlord's damages. Similarly in proving the amount that would be received by Landlord upon a reletting of the Premises as set forth in clause (iii) above, Tenant shall not take into account the Extra Rent. The provisions contained in this <u>Section</u> shall be in addition to, and shall not prevent the enforcement of, any claim Landlord may have against Tenant for anticipatory breach of this Lease. Nothing herein shall be construed to affect or prejudice Landlord's right to prove, and claim in full, unpaid rent accrued prior to termination of this Lease. If Landlord is entitled, or Tenant is required, pursuant to any provision hereof to take any action upon the termination of the Lease Term, then Landlord shall be entitled, and Tenant shall be required, to take such action also upon the termination of Tenant's right of possession. Notwithstanding anything to the contrary contained in this <u>Section 19.2</u> or applicable law, none of the damages described in this <u>Section 19.2</u> shall be indirect or consequential damages (it is intended that this <u>Section 19.2</u> describes actual damages only and, for the avoidance of doubt and notwithstanding anything to the contrary anywhere in this Lease except for <u>Section 22.1</u> with respect to Tenant holding over in the Premises after the expiration of the Term, Tenant shall not be liable for indirect or consequential damages). Except for claims under Section 22.1, Landlord expressly waives any right or claim to or for indirect or consequential damages from Tenant.

19.3    **<u>Waiver</u>**. Tenant hereby expressly waives, for itself and all persons claiming by, through or under it, any right of redemption, re-entry or restoration of the operation of this Lease under any present or future law, including without limitation any such right which Tenant would otherwise have in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Premises as herein provided.

19.4    **<u>Cumulative Rights</u>**. All rights and remedies of Landlord set forth in this Lease are cumulative and in addition to all other rights and remedies available to Landlord at law or in equity, including those available as a result of any anticipatory breach of this Lease. The exercise by Landlord of any such right or remedy shall not prevent the concurrent or subsequent exercise of any other right or remedy. No delay or failure by Landlord to exercise or enforce any of

Landlord's rights or remedies or Tenant's obligations shall constitute a waiver of any such rights, remedies or obligations. Landlord shall not be deemed to have waived any default by Tenant unless such waiver expressly is set forth in a written instrument signed by Landlord. If Landlord waives in writing any default by Tenant, such waiver shall not be construed as a waiver of any covenant, condition or agreement set forth in this Lease except as to the specific circumstances described in such written waiver.

19.5    **No Waiver**. If Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, then the same shall not constitute a waiver of the same or of any other covenant, condition or agreement set forth herein, nor of any of Landlord's rights hereunder. Neither the payment by Tenant of a lesser amount than the monthly installment of Base Rent, additional rent or of any sums due hereunder nor any endorsement or statement on any check or letter accompanying a check for payment of rent or other sums payable hereunder shall be deemed an accord and satisfaction. Landlord may accept the same without prejudice to Landlord's right to recover the balance of such rent or other sums or to pursue any other remedy. Notwithstanding any request or designation by Tenant, Landlord may apply any payment received from Tenant to any payment then due. No re-entry by Landlord, and no acceptance by Landlord of keys from Tenant, shall be considered an acceptance of a surrender of this Lease.

19.6    **Landlord's Lien**. As security for the performance of Tenant's obligations, Tenant grants to Landlord a lien ("**Landlord Lien**") upon and a security interest in Tenant's existing or hereafter acquired personal property, inventory, furniture, furnishings, fixtures, equipment, licenses, permits and all other tangible and intangible property, assets and accounts, and all additions, modifications, products and proceeds thereof, including, without limitation, such tangible property which has been used at the Premises, purchased for use at the Premises, located at any time in the Premises or used or to be used in connection with the business conducted or to be conducted in the Premises, whether or not the same may thereafter be removed from the Premises, and including, without limitation, all stock and partnership interests now or hereafter owned by Tenant, legally or beneficially, in any entity which manages, owns or operates the business to be conducted in or upon the Premises. The Landlord Lien shall be in addition to all rights of distraint available under applicable law. Notwithstanding the foregoing, Landlord's lien shall automatically be subordinate to any lender who has a blanket lien on Tenant's assets, and Landlord agrees to subordinate the Landlord Lien in favor of any of any future equipment and personal property lenders or lessors of Tenant pursuant to a subordination agreement reasonably acceptable to Landlord. In addition to the foregoing, Landlord agrees to enter into a "collateral access agreement" (or an agreement that gives such lender or lessor the right to enter into the Building and the Premises and remove Tenant's property) reasonably acceptable to Landlord and provided that Tenant is a party to such agreement.

19.7    **Default Rate; Late Charges**.

(a)    If Tenant fails to make any payment to any third party or to do any act herein required to be made or done by Tenant, then Landlord may, but shall not be required to, make such payment or do such act. The taking of such action by Landlord shall not be considered a cure of such default by Tenant or prevent Landlord from pursuing any remedy it is otherwise entitled to in connection with such default. If Landlord elects to make such payment or

do such act, then all expenses incurred by Landlord, plus interest thereon at a rate (the "**Default Rate**") equal to the rate per annum which is five (5) whole percentage points higher than the prime rate published in the Money Rates section of *The Wall Street Journal* (or, if no such rate is published therein for any reason, then the prime rate as published in a comparable publication selected by Landlord), from the date incurred by Landlord to the date of payment thereof by Tenant, shall constitute additional rent due hereunder; provided, however, that nothing contained herein shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate then allowed by law.

(b)    If Tenant fails to make any payment of Base Rent, additional rent or any other sum on or before the date such payment is due and payable (without regard to any grace period specified in <u>Section 19.1</u>), then Tenant shall pay to Landlord a late charge of five percent (5%) of the amount of such payment ("**Late Charge**"); provided however that so long as no Event of Default has occurred and is continuing, Landlord will waive the Late Charge (but not the imposition of the Default Rate thereon) with respect to the first instance of a late payment in a twelve (12) month period. In addition, such payment and such late fee shall bear interest at the Default Rate from the date such payment or late fee, respectively, became due to the date of payment thereof by Tenant; provided, however, that nothing contained herein shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate then allowed by law. Such late charge and interest shall constitute additional rent due hereunder without any notice or demand. Notwithstanding anything to the contrary, Landlord shall waive the late charge once in each Lease year, provided that such payment is made within the five (5) day period after receipt of Landlord's non-payment notice.

(c)    If more than one natural person or entity shall constitute Tenant, then the liability of each such person or entity shall be joint and several. If Tenant is a general partnership or other entity the partners or members of which are subject to personal liability, then the liability of each such partner or member shall be joint and several. No waiver, release or modification of the obligations of any such person or entity shall affect the obligations of any other such person or entity.

## ARTICLE XX

## BANKRUPTCY

20.1    An "**Event of Bankruptcy**" is the occurrence with respect to any of Tenant or Guarantor of any of the following: (a) such person becoming insolvent, as that term is defined in Title 11 of the United States Code (the "**Bankruptcy Code**") or under the insolvency laws of any state (the "**Insolvency Requirements**"); (b) appointment of a receiver or custodian for substantially all of the property of such person; (c) filing by such person of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Requirements; (d) filing of an involuntary petition against such person as the subject debtor under the Bankruptcy Code or Insolvency Requirements, which either (1) is not dismissed within ninety (90) days after filing, or (2) results in the issuance of an order for relief against the debtor; (e) such person making or consenting to an assignment for the benefit of creditors or a composition of creditors; or (f) the dissolution of Tenant or Guarantor not permitted under Section 7.2.

20.2     Upon occurrence of an Event of Bankruptcy, Landlord shall have all rights and remedies available pursuant to Article XIX; provided, however, that while a case (the "**Case**") in which Tenant is the subject debtor under the Bankruptcy Code is pending, Landlord's right to terminate this Lease shall be subject, to the extent required by the Bankruptcy Code, to any rights of Tenant or its trustee in bankruptcy (collectively, "**Trustee**") to assume or assume and assign this Lease pursuant to the Bankruptcy Code. After the commencement of a Case: (i) Trustee shall perform all post-petition obligations of Tenant under this Lease; and (ii) if Landlord is entitled to damages (including, without limitation, unpaid rent) pursuant to the terms of this Lease, then all such damages shall be entitled to administrative expense priority pursuant to the Bankruptcy Code. Any person or entity to which this Lease is assigned pursuant to the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of assignment, and any such assignee shall upon request execute and deliver to Landlord an instrument confirming such assumption. Trustee shall not have the right to assume or assume and assign this Lease unless Trustee promptly (a) cures all defaults under this Lease, (b) compensates Landlord for damages incurred as a result of such defaults, (c) provides adequate assurance of future performance on the part of Trustee as debtor in possession or Trustee's assignee, and (d) complies with all other requirements of the Bankruptcy Code. If Trustee fails to assume or assume and assign this Lease in accordance with the requirements of the Bankruptcy Code within sixty (60) days after the initiation of the Case, then Trustee shall be deemed to have rejected this Lease. If this Lease is rejected or deemed rejected, then Landlord shall have all rights and remedies available to it pursuant to Article XIX. Adequate assurance of future performance shall require, among other things, that the following minimum criteria be met: (1) Tenant's gross receipts in the ordinary course of business during the thirty (30) days preceding the Case must be greater than ten (10) times the next monthly installment of Base Rent and additional rent due; (2) Both the average and median of Tenant's monthly gross receipts in the ordinary course of business during the seven (7) months preceding the Case must be greater than the next monthly installment of Base Rent and additional rent due; (3) Trustee must pay its estimated pro-rata share of the cost of all services performed or provided by Landlord (whether directly or through agents or contractors and whether or not previously included as part of Base Rent) in advance of the performance or provision of such services; (4) Trustee must agree that Tenant's business shall be conducted in a first-class manner, and that no liquidating sale, auction or other non-first-class business operation shall be conducted in the Premises; (5) Trustee must agree that the use of the Premises as stated in this Lease shall remain unchanged and that no prohibited use shall be permitted; (6) Trustee must agree that the assumption or assumption and assignment of this Lease shall not violate or affect the rights of other tenants of the Building; (7) Trustee must pay at the time the next monthly installment of Base Rent is due, in addition to such installment, an amount equal to the monthly installments of Base Rent, and additional rent due for the next six (6) months thereafter, such amount to be held as a security deposit; (8) Trustee must agree to pay, at any time Landlord draws on such security deposit, the amount necessary to restore such security deposit to its original amount; (9) Trustee must comply with all duties and obligations of Tenant under this Lease; and (10) All assurances of future performance specified in the Bankruptcy Code must be provided.

## ARTICLE XXI

## SUBORDINATION

21.1  **Subordination**. Subject to the provisions of <u>Section 21.4</u> (including and expressly conditioned upon Tenant's receipt of an SNDA (as hereinafter defined) from the holder of a superior mortgage and lessor of a superior lease substantially in the Required SNDA Form (as hereinafter defined)), this Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate in all respects to all ground leases, overriding leases and underlying leases of the Land and/or the Building and/or the Premises now or hereafter existing and to all mortgages which may now or hereafter affect the Land, the Parking Lot and/or the Building and/or any of such leases, whether or not such mortgages shall also cover other lands and/or buildings, to each and every advance made or hereafter to be made under such mortgages, and to all renewals, modifications, replacements and extensions of such leases and such mortgages and spreaders and consolidations of such mortgages. Subject to the provisions of <u>Section 21.4</u> (including and expressly conditioned upon Tenant's receipt of an SNDA from the holder of a superior mortgage and lessor of a superior lease substantially in the Required SNDA Form), this <u>Section 21.1</u> shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall execute and deliver any instrument that Landlord, the lessor of any such lease or the holder of any such mortgage or any of their respective successors in interest may reasonably request to evidence such subordination (provided that such holder of a superior mortgage or lessor of a superior lease complies with <u>Section 21.4</u> and provided further that any such instrument is substantially in the form of the Required SNDA Form) within twenty (20) days after such request. The leases to which this Lease is, at the time referred to, subject and subordinate pursuant to this Article are hereinafter sometimes referred to as "superior leases," the mortgages to which this Lease is, at the time referred to, subject and subordinate are hereinafter sometimes referred to as "superior mortgages," and the lessor of a superior lease or its successor in interest at the time referred to is sometimes hereinafter referred to as a "lessor." Landlord represents that, there are no superior leases or "ground leases" in existence with respect to the Property.

21.2  **Notice to Superior Parties**. Subject to the terms of any SNDA in effect (provided the same in the Required SNDA Form), in the event of any act or omission of Landlord that would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, Tenant shall not exercise such termination right (i) until it has given written notice of such act or omission or the accrual of such claim or right, to the holder of each superior mortgage and the lessor of each superior lease in each case whose name and address shall previously have been furnished to Tenant, and (ii) until a reasonable period (not to exceed thirty (30) days beyond the length of the period provided to Landlord hereunder or if no period is so provided, sixty (60) days) for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such holder or lessor shall have become entitled under such superior mortgage or superior lease, as the case may be, to remedy the same, provided such holder or lessor shall with due diligence give Tenant written notice of intention to, and commence and continue to remedy such act or omission, plus such additional time as may reasonably be required to either (a) obtain possession and control of the Building and thereafter cure the breach or default with reasonable diligence and continuity or (b) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure the default. This

76

Section 21.2 shall not apply to Tenant's right to terminate the Lease pursuant to Article XVII (Damage or Destruction) or Article XVIII (Condemnation).

21.3    **Attornment**.

(a)    Subject to the terms of any SNDA in effect if the lessor of a superior lease or the holder of a superior mortgage shall succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease or deed, or if a superior lease shall terminate or be terminated for any reason, then, at the election and upon demand of the party so succeeding to Landlord's rights, as the successor owner of the property of which the Premises is a part, or as the mortgagee in possession thereof, or otherwise (such party, owner or mortgagee being herein sometimes called the "**successor landlord**"), Tenant shall attorn to and recognize such successor landlord as Tenant's landlord under this Lease, and shall promptly execute and deliver any instrument that such successor landlord may reasonably request to evidence such attornment. Subject to the terms of any SNDA in effect, upon such attornment, this Lease shall continue in full force and effect as, or as if it were, a direct lease between the successor landlord and Tenant, upon all of the executory terms, conditions and covenants as are set forth in this Lease and shall be applicable after such attornment.

(b)    The foregoing provisions shall inure to the benefit of any successor landlord, shall apply to the tenancy of Tenant notwithstanding that this Lease may terminate upon the termination of the superior lease, and shall be self-operative upon any such demand, without requiring any further instrument to give effect to said provisions. Subject to Section 4, Tenant, however, upon demand of any successor landlord, agrees to execute, from time to time, an instrument in confirmation of the foregoing provisions, satisfactory to such successor landlord, in which Tenant shall acknowledge such attornment.

21.4    **Non-Disturbance**. Notwithstanding anything contained in this Article to the contrary, Tenant's subordination and attornment to any superior mortgage and superior lease as provided in this Article is expressly conditioned upon (1) simultaneously with the Effective Date, Landlord obtaining from the holder of any existing superior mortgage an executed and acknowledged non disturbance agreement substantially in the form annexed hereto as **Exhibit G** (a "**SNDA**" and the form, the "**Required SNDA Form**") and (2) Landlord obtaining from any future lessor under a ground lease and/or future holder of a mortgagee, an SNDA substantially in the Required SNDA Form (or on such future lender's standard form, provided the terms are substantially consistent with the Required SNDA Form). Provided Landlord delivers such fully executed and acknowledged SNDA substantially in the Required SNDA Form, such agreement shall be executed by Tenant and returned to Landlord within fifteen (15) Business Days of Landlord's request therefor.

## ARTICLE XXII

## HOLDING OVER

22.1    Tenant acknowledges that it is extremely important that Landlord have substantial advance notice of the date on which Tenant will vacate the Premises, because Landlord will require an extensive period to locate a replacement tenant and because Landlord

77

plans its entire leasing and renovation program for the Building in reliance on the Expiration Date. Tenant also acknowledges that if Tenant fails to surrender the Premises or any portion thereof at the expiration or earlier termination of the Lease Term, then it will be conclusively presumed that the value to Tenant of remaining in possession, and the loss that will be suffered by Landlord as a result thereof, far exceed the Base Rent and additional rent that would have been payable had the Lease Term continued during such holdover period. Therefore, if Tenant (or anyone claiming through Tenant) does not immediately surrender the Premises or any portion thereof upon the expiration or earlier termination of the Lease Term, then the rent payable by Tenant hereunder shall be increased to equal: (1) one hundred fifty percent (150%) of the Base Rent that would have been payable pursuant to the provisions of this Lease if the Lease Term and continued during such holdover period for the first three (3) months of the holdover period, and (2) double the Base Rent that would have been payable pursuant to the provisions of this Lease if the Lease Term had continued during such holdover period thereafter. Such rent shall be computed by Landlord and paid by Tenant on a monthly basis and shall be payable on the first day of such holdover period and the first day of each calendar month thereafter during such holdover period until the Premises have been vacated. Notwithstanding any other provision of this Lease, Landlord's acceptance of such rent shall not in any manner adversely affect Landlord's other rights and remedies. Any such holdover shall be deemed to be a tenancy-at-sufferance and not a tenancy-at-will or tenancy from month-to-month. In no event shall any holdover be deemed a permitted extension or renewal of the Lease Term, and nothing contained herein shall be construed to constitute Landlord's consent to any holdover or to give Tenant any right with respect thereto.

## ARTICLE XXIII

## COVENANTS OF LANDLORD

23.1    Landlord covenants that it has the right to enter into this Lease, and that if Tenant shall perform timely all of its obligations hereunder, then, subject to the provisions of this Lease, Tenant shall during the Lease Term peaceably and quietly occupy and enjoy the full possession of the Premises without hindrance by Landlord or any party claiming through or under Landlord.

23.2    Landlord reserves the following rights: (a) to change the street address and name of the Building (provided that so long as Cohen Equities NY LLC (or any Affiliate thereof) controls the Landlord, the Building shall continue to be known a "7900 Harkins Road" (unless the address of the Building is changed, in which event the name may be changed to the new address) and at no time shall the name of the Building be changed to the name of a Competitor); (b) to change the arrangement and location of entrances, passageways, doors, doorways, corridors, stairs, toilets or other public parts of the Building (but not the Amenity Space or the Lobby); (c) to erect, use and maintain pipes, wires, structural supports, ducts and conduits in and through the Premises as may be necessary for Landlord to comply with its obligations under this Lease, to operate the Building and/or to exercise any of its rights hereunder, provided such equipment, pipes, ducts and conduits shall be installed in locations that do not materially adversely affect the layout or reduce the useable area of the Premises by more than a de minimis amount and such equipment, pipes, ducts and conduits shall either be concealed behind, beneath or within partitioning, columns, ceilings or floors located or to be located in the Premises, or completely furred at points immediately adjacent to partitioning, columns or ceilings located or

to be located in the Premises (and Landlord shall use reasonable efforts to the extent practicable to minimize any inconvenience to Tenant in connection with the performance of such work); (d) to resubdivide the Land or to combine the Land with other lands after the construction of the Parking Structure, if and when such Parking Structure is constructed; (g) to construct improvements (including kiosks) on the Land and in the public and Building Common Areas; (h) to prohibit smoking in the entire Building or portions thereof (including the Premises) and on the Land, so long as such prohibitions are in accordance with applicable Requirements; and (i) if any excavation or other substructure work shall be made or authorized to be made upon land adjacent to the Building or the Land, subject to Landlord not unreasonably interfering with the operation of Tenant's business in the Premises, to enter the Premises for the purpose of doing such work as is required to preserve the walls of the Building and to preserve the land from injury or damage and to support such walls and land by proper foundations. Landlord may exercise any or all of the foregoing rights without being deemed to be guilty of an eviction, actual or constructive, or a disturbance of Tenant's business or use or occupancy of the Premises.

**ARTICLE XXIV**

**<u>PARKING AND ACCESS EASEMENTS</u>**

24.1    During the Lease Term, subject to the terms of that certain Easement and Restrictive Covenant Agreement dated November 21, 2007 and recorded in Liber 28935, folio 226 in the Land Records of Prince George's County Maryland (as same may be amended from time to time, collectively, the "**Parking Easement**") and that certain Declaration of Access Easement, dated August 22, 2002, and recorded in the Land Records of Prince George's County in Liber R.E.P. Book 16152, folio 644, as modified a certain Waiver Regarding Access Easement, dated November 21, 2007, and recorded in the Land Records of Prince George's County in Liber R.E.P. Book 28935, folio 247 (the "**Access Easement**"), copies of which is attached hereto as **<u>Exhibit J</u>**, Tenant shall have the non-exclusive use of the parking area under the Parking Easement, as such area may change or be modified under the Parking Easement (or the Parking Structure, if and when completed in accordance with the Parking Easement) serving the Building (either, the "**Parking Lot**") for unreserved parking of standard-sized passenger automobiles for Tenant's Invitees and Permitted Occupants at no charge to Tenant, the Invitees or the Permitted Occupants. Prior to the Lease Commencement Date, Landlord shall install parking controls including automatic arms with un-manned payment and validation systems reasonably acceptable to Tenant. Tenant shall not separately assign, sublet or transfer any parking permits except to Invitees and Permitted Occupants and any attempted assignment, sublet, or transfer of such parking permits in violation of such prohibition shall be void.

24.2    Landlord represents to the best of its knowledge that there are no less than 1,069 striped parking spaces exclusive to the Building currently located in the Parking Lot and that when the Parking Structure is constructed and operational there will be no less than the maximum amount of parking spaces specified in Section 3.1(a) of the Parking Easement. In no event shall Landlord permit parties that are not related to tenants of the Building to use the Parking Lot other than for building management, visitors, vendors, Food Trucks, Permitted Occupants, service providers of the Building or as required by Legal Requirements (collectively, "**Permitees**"). So long as Tenant is the sole tenant in the Building, Tenant shall the right to use all of the Parking Lot (less any reasonable number of spaces reserved by Landlord for

79

Permitees); provided if Tenant is not the sole tenant in the Building, then upon written notice to Tenant, Tenant shall have the right to use Tenant's Proportionate Share of the Parking Lot (and Tenant's Proportionate Share of the Parking Lot, together with any other proportionate shares' of other tenants of the Building shall be grossed up whenever the Building is not 100% occupied).

24.3    In the event the number of parking spaces in the Parking Lot or the Parking Structure at any time falls below 3.30 parking spaces per 1,000 RSF of the Premises (the "**Minimum Parking Amount**"), Landlord shall provide, at Landlord's sole cost and expense (subject to the provisions below should such costs cause a material adverse change to Landlord's financial condition), a reasonable parking alternative (a "**Reasonable Parking Alternative**") to Tenant for the deficiency, reasonably acceptable to Tenant. Tenant will not be unreasonable in not accepting a proposed Reasonable Parking Alternative if:

        (a)    the proposed location is not a secure well lit lot;

        (b)    the proposed location is more than five (5) miles by road to the Building;

        (c)    if the proposed location is more than .3 miles from the Building, Landlord does not provide either a shuttle service or valet service reasonably acceptable to Tenant.

Any shuttle service provided by Landlord must be provided at such time and frequency as is acceptable to Tenant taking into consideration the working hours of its employees so as to not unreasonably inconvenience its employees. In the event that cost to be paid by Landlord to provide such shuttle or valet services (but not the alternative lots), is so excessive as to cause a material adverse change to Landlord's financial condition, Landlord and Tenant will discuss Tenant's sharing a portion of the excessive costs of such services or finding an alternative service (but not location) that is less excessively costly.

24.4    Should the parties be unable to agree on a Reasonable Alternate Parking Solution (after discussing possible alternatives) at least ninety (90) days prior to the loss of parking becoming physically effective then either party may submit such dispute to a court of competent jurisdiction. Notwithstanding anything to the contrary, Landlord shall have the right to re-stripe the Parking Lot if such restriping will yield additional parking spaces and would be in compliance with Requirements; provided that Landlord shall consult with Tenant and consider Tenant's reasonable input prior to performing any restriping. No such restriping shall adversely affect Tenant or reduce the parking spaces from the number that existed immediately prior to such restriping.

24.5    So long as Tenant occupies more than fifty percent (50%) of the Building, Tenant shall have the right, at its sole cost and expense, to offer valet parking service to its employees Invitees and to designate a portion of the Parking Lot (or Parking Structure) for the exclusive use of such valet service, subject to Landlord's reasonable approval as to the size and location of such portion. So long as Tenant occupies more than fifty percent (50%) of the Building, Landlord shall not offer any other tenants in the Building any "reserved" or priority parking spaces in the Parking Lot or Parking Structure.

24.6     Except for the restrictions below in this Section 24.6 and in Section 24.7 below, no other provision of this Lease shall (i) prohibit Landlord from entering into any amendment or modification contemplated by the terms of the Parking Easement, (ii) prohibit Landlord from cooperating with the owner(s) of the Outparcels (as defined in the Parking Easement) with respect to any matter under the Parking Easement, including, without limitation, the construction and conveyance of the Parking Structure, or (iii) be a representation or warranty that the Outparcel Owner(s) are prohibited from entering into any amendments or modifications to the Parking Easement; provided however that Landlord agrees that it shall not waive any provision of the Parking Easement or execute any amendment or modification to the Parking Easement in any manner that would reduce the number of parking spaces available to the Building in the Parking Lot from 1,069 or change the location of the Parking Structure except as currently described in the Parking Easement; nor shall Landlord, as successor to the Parcel C Owner consent to "Permitted Additional Parking" without consulting with Tenant; provided however that such restrictions shall not act to, or require Landlord to default or breach any of its obligations under the Parking Easement. Further, Landlord shall use all commercially reasonable efforts permitted under the Parking Easement to obtain the maximum possible number of parking spaces in the Parking Lot (or in the Parking Structure if it comes into existence) at no additional cost to Landlord for use by the Building, including asserting the right to 1,305 parking spaces under the circumstances where such amount becomes possible. In the event that additional spaces are made available to the Building, Tenant shall be entitled to Tenant's Proportionate Share of any such additional spaces.

24.7     Landlord agrees that is shall not modify, amend or waive any provisions of the Access Easement without Tenant's consent which shall not be unreasonably withheld provided that Tenant shall be not to be deemed to be unreasonable from withholding its consent to any modification of the Access Easement or to any elimination of the Common Access Drives (as defined in the Access Easement) which would reduce the number of access points to Harkins Road and Ellin Road or which otherwise impede or interfere with convenient vehicular and pedestrian access to and from the Building and the Parking Lot or Parking Structure and Harkins Road and Ellin Road or would otherwise adversely impact Tenant.

## ARTICLE XXV

## GENERAL PROVISIONS

25.1     **No Representations.** Tenant acknowledges that neither Landlord nor any broker, agent or employee of Landlord has made any representation or promise with respect to the Premises or the Building except as herein expressly set forth or the Work Agreement, and no right, privilege, easement or license is being acquired by Tenant except as herein expressly set forth.

25.2     **No Joint Venture**. Nothing contained in this Lease shall be construed as creating any relationship between Landlord and Tenant other than that of landlord and tenant. Tenant shall not use the name of the Building for any purpose other than as the address of the business to be conducted by Tenant in the Premises, use the name of the Building as Tenant's business address after Tenant vacates the Premises.

25.3    **Broker.** Landlord and Tenant each warrants to the other that in connection with this Lease it has not employed or dealt with any broker, agent or finder, other than the Broker(s). Landlord acknowledges that Landlord shall pay any commission or fee due to the Broker(s) pursuant to a separate agreement. Pursuant to such separate agreement, a fee will be paid to Tenant's Broker, as more particularly set forth in such agreement (including that Tenant's Broker shall be paid fifty percent (50%) upon full execution of this Lease Agreement (provided that the cash security deposit is first paid or the Letter of Credit is first provided, as applicable) and fifty percent (50%) upon Tenant accepting full possession of each respective portion of the Premises over the course of the Lease Term; that no renewal commission shall be payable; and that any abatements shall be deducted from the rent that the commission payable to Tenant's Broker is based upon). Tenant shall indemnify and hold Landlord harmless from and against any claim for brokerage or other commissions asserted by any broker, agent or finder employed by Tenant, with whom Tenant has dealt, or asserts any claim any claim for brokerage or other commissions by, through or under Tenant, other than the Broker(s).

25.4    **Estoppel**.

(a)    From time to time (but subject to Section 25.4(b) hereof) upon not less than twenty (20) days' prior written notice, time being of the essence, Tenant and each subtenant, assignee, licensee or concessionaire or occupant of Tenant shall execute, acknowledge and deliver to Landlord and/or any other person or entity designated by Landlord, a written statement certifying: (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and stating the modifications); (b) the dates to which the rent and any other charges have been paid; (c) whether or not to Tenant's knowledge after reasonable inquiry, Landlord is in default in the performance of any obligation, and if so, specifying the nature of such default; (d) whether or not, to Tenant's knowledge after reasonable inquiry, if Tenant has any defenses or claims against Landlord and/or any claims of offset against Landlord, and if so, specifying the nature of such defenses or claims; (e) the address to which notices to Tenant are to be sent; (f) that this Lease is subject and subordinate to all mortgages encumbering the Building or the Land; (g) that Tenant has accepted the Premises and that all work thereto has been completed (or if such work has not been completed, specifying the incomplete work); and (h) such other matters as Landlord may reasonably request regarding the Building or this Lease. From time to time (but subject to Section 25.4(b) hereof) upon not less than twenty (20) days' prior written notice, time being of the essence, Guarantor shall (and Tenant shall cause Guarantor) to execute, acknowledge and deliver to Landlord and/or any other person or entity designated by Landlord, a written statement certifying: (a) that the Guaranty is unmodified and in full force and effect; (b) whether or not, to Tenant's knowledge after reasonable inquiry, if Guarantor has any defenses or claims against Landlord and/or any claims of offset against Landlord, and if so, specifying the nature of such defenses or claims; (c) the address to which notices to Tenant are to be sent; and (d) such other matters as Landlord may reasonably request regarding the Building or this Lease. Any such statement may be relied upon by any owner of the Building or the Land, any prospective purchaser of the Building or the Land, any holder or prospective holder of a mortgage or any other person or entity. In the event that Tenant or Guarantor fails to timely delivery an estoppel hereunder, each Tenant and Guarantor appoints Landlord as Tenant's attorney-in-fact (which appointment is coupled with an interest) to execute such estoppel on Tenant's behalf.

(b)    The parties agree that requests for a statement pursuant to <u>Section 25.4(a)</u> shall not be made more frequently than twice in any twelve (12) month period provided that in connection with a financing or sale of the Building or any interest therein (a "**Capital Transaction**") such requests can be made an additional two (2) times in any twelve (12) month period (for a maximum of four (4) times in such twelve month period). Notwithstanding the foregoing, during the continuation of an Event of Default, Landlord may request such statements on a monthly basis.

(c)    From time to time upon not less than twenty (20) days' prior written notice, Landlord shall execute, acknowledge and deliver to Tenant a written statement certifying: (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and stating the modifications); (b) the dates to which the rent and any other charges have been paid; (c) whether or not to Landlord's actual knowledge, Tenant is in default in the performance of any obligation, and if so, specifying the nature of such default; (d) the address to which notices to Tenant are to be sent; and (e) such other matters as Tenant may reasonably request regarding the Building or this Lease. Any such statement may be relied upon by Tenant or any of Tenant's lenders.

25.5    <u>**Fire Stairs**</u>. Subject to the provisions of this Lease and applicable Requirements, Tenant shall have the non-exclusive right to use the Building's fire stairs for walking between its contiguous full floors in order to obtain access to the Premises. In using said stairs, Tenant shall comply with the terms of this Lease as well as any applicable Requirements. Tenant, at its sole cost and expense, shall have the right to upgrade lighting and finishes in the fire stairway subject to Landlord's prior approval, which approval shall not be unreasonably withheld, delayed or conditioned. Landlord shall maintain the fire stair doors and ensure compliance of the fire stairs with applicable Requirements at Landlord's cost and expense (which shall be part of Operating Expenses). Tenant shall have the right, at Tenant's sole cost and expense, to install security access system between the fire stairs and any Tenant-exclusive floors in the Building, provided that Tenant obtains any necessary approvals, and operates and maintains such security system, in accordance with applicable Requirements.

25.6    <u>**WAIVER OF JURY TRIAL; SERVICE OF PROCESS VENUE**</u>. LANDLORD, TENANT, AND ALL GENERAL PARTNERS EACH WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE. TENANT CONSENTS TO SERVICE OF PROCESS AND ANY PLEADING RELATING TO ANY SUCH ACTION AT THE PREMISES; LANDLORD AND TENANT EACH WAIVES ANY OBJECTION TO THE VENUE OF ANY ACTION FILED IN ANY COURT SITUATED IN THE JURISDICTION IN WHICH THE BUILDING IS LOCATED, AND WAIVES ANY RIGHT, CLAIM OR POWER, UNDER THE DOCTRINE OF FORUM NON CONVENIENS OR OTHERWISE, TO TRANSFER ANY SUCH ACTION TO ANY OTHER COURT.

25.7    <u>**Notices**</u>. All notices or other communications required under this Lease shall be in writing and shall be deemed duly given and received when delivered in person (with receipt

therefor), on the next Business Day after deposit with a recognized overnight delivery service, or on the second day after being sent by certified or registered mail, return receipt requested, postage prepaid, to the following addresses: (a) if to Landlord, at each of the Landlord Notice Addresses specified in <u>Article I</u>, with a copy to McCandlish Lillard, 11350 Random Hills Road, Suite 500, Fairfax, Virginia 22030, Attention: C. Vincent Leon-Guerrero, Esq.; (b) if to Tenant, at the Tenant Notice Address specified in <u>Article I</u>. Either party may change its address for the giving of notices by notice given in accordance with this <u>Section</u>. If Landlord or the holder of any mortgage notifies Tenant that a copy of any notice to Landlord shall be sent to such holder at a specified address, then Tenant shall send (in the manner specified in this <u>Section</u> and at the same time such notice is sent to Landlord) a copy of each such notice to such holder, and no such notice shall be considered duly sent unless such copy is so sent to such holder. Any such holder shall have the rights set forth in <u>Section 21.4</u>. Any cure of Landlord's default by such holder shall be treated as performance by Landlord.

25.8    **Severance**. Each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law. If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, then such provision shall be deemed to be replaced by the valid and enforceable provision most substantively similar to such invalid or unenforceable provision, and the remainder of this Lease and the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby. Nothing contained in this Lease shall be construed as permitting Landlord to charge or receive interest in excess of the maximum rate allowed by law.

25.9    **General Rules of Interpretation**. Feminine, masculine or neuter pronouns shall be substituted for those of another form, and the plural or singular shall be substituted for the other number, in any place in which the context may require such substitution.

25.10    **Successors and Assigns**. The provisions of this Lease shall be binding upon and inure to the benefit of the parties and each of their respective representatives, successors and assigns, subject to the provisions herein restricting assignment or subletting.

25.11    **Entire Agreement**. This Lease and the Transfer Agreement contain and embody the entire agreement of the parties hereto and supersede all prior agreements, negotiations, letters of intent, proposals, representations, warranties, understandings, suggestions and discussions, whether written or oral, between the parties hereto. Any representation, inducement, warranty, understanding or agreement that is not expressly set forth in this Lease shall be of no force or effect. This Lease may be modified or changed in any manner only by an instrument signed by both parties. This Lease includes and incorporates all Exhibits attached hereto.

25.12    **Successor Landlord**. Landlord shall have the right to freely assign this Lease (and all of its rights and obligations hereunder) and the Guaranty at any time without notice to or consent of Tenant. In the event of any transfer or transfers of Landlord's interest in the Premises, the transferor and its successors and assigns shall automatically shall be relieved of any and all obligations on the part of Landlord accruing from and after such assignment or transfer. Should Landlord effectuate a transfer of any kind, Tenant shall be required to cooperate in all necessary coordination with such transferee, including providing a replacement Letter of Credit.

25.13  **Jurisdiction**. This Lease shall be governed by the Requirements of the jurisdiction in which the Building is located. There shall be no presumption that this Lease be construed more strictly against the party who itself or through its agent prepared it, it being agreed that all parties hereto have participated in the preparation of this Lease and that each party had the opportunity to consult legal counsel before the execution of this Lease.

25.14  **Headings**. Headings are used for convenience and shall not be considered when construing this Lease.

25.15  **No Offer**. The submission of an unsigned copy of this document to Tenant shall not constitute an offer or option to lease the Premises. This Lease shall become effective and binding only upon execution and delivery by both Landlord and Tenant.

25.16  **Time of Essence**. Time is of the essence with respect to each of Tenant's and Landlord's obligations hereunder.

25.17  **Counterpart**. This Lease may be executed in multiple counterparts, each of which shall be deemed an original and all of which together constitute one and the same document. Faxed signatures shall have the same binding effect as original signatures.

25.18  **Memorandum of Lease**. Neither Landlord nor Tenant shall record this Lease or any memorandum thereof.

25.19  **Survival**. Tenant's liabilities and obligations with respect to the period prior to the expiration or earlier termination of the Lease Term shall survive such expiration or earlier termination.

25.20  **No Representation**. Landlord's review, approval and consent powers (including the right to review plans and specifications) are for its benefit only. Such review, approval or consent (or conditions imposed in connection therewith) shall be deemed not to constitute a representation concerning legality, safety or any other matter.

25.21  **Surrender**. At the expiration or earlier termination of the Lease Term, Tenant shall deliver to Landlord all keys and security cards to the Building and the Premises, whether such keys were furnished by Landlord or otherwise procured by Tenant, and shall inform Landlord of the combination of each lock, safe and vault, if any, in the Premises.

25.22  **Duly Executed**. Each of Landlord and Tenant and the person executing and delivering this Lease on Landlord's or Tenant's behalf represents and warrants that such person is duly authorized to so act; that each of Landlord and Tenant, as applicable, is duly organized, is qualified to do business in the jurisdiction in which the Building is located, is in good standing under the Requirements of the state of its organization and the Requirements of the jurisdiction in which the Building is located, and has the power and authority to enter into this Lease; and that all action required to authorize Landlord and Tenant, as applicable, and such person to enter into this Lease has been duly taken.

25.23  **OFAC**. Each of Landlord and Tenant, each as to itself, hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the

85

USA Patriot Act, and the laws administered by the United States Treasury Department's Office of Foreign Assets Control, including, without limitation, Executive Order 13224 ("**Executive Order**"). Each of Landlord and Tenant further represents (i) that it is not, and it is not owned or controlled directly or indirectly by any person or entity, on the SDN List published by the United States Treasury Department's Office of Foreign Assets Control and (ii) that it is not a person otherwise identified by government or legal authority as a person with whom a U.S. Person is prohibited from transacting business. As of the date hereof, a list of such designations and the text of the Executive Order are published under the internet website address www.ustreas.gov/offices/enforcement/ofac.

25.24    **Guarantor's Financials**.

(a)    Within ten (10) Business Days after Landlord's request Tenant shall deliver to Landlord Guarantor's most recent audited financial statements. Landlord agrees to hold the financial statements and other such additional information subject to customary confidentiality conditions. Tenant warrants that all such financial information heretofore and hereafter submitted is and shall be correct and complete.

(b)    Notwithstanding the foregoing, so long as Guarantor's audited annual financial statements are publically filed, Tenant shall have no obligation to comply with the requirements of Section 25.24(a).

25.25    **Force Majeure Event**. If, by reason of: (i) strikes or other labor troubles, not caused by an act or omission of the party claiming the benefit of such delay (a "**Claimant**") or any affiliate of such Claimant or any contractors hired by such Claimant or an affiliate of such Claimant (a "**Claimant Act**") (ii) governmental prohibitions, preemptions, restrictions or other controls, (iii) any Requirement compliance which is not required because of Claimant Act (but not normal and customary delays of governmental or regulatory authorities in issuing permits and certificates, inspecting work or closing permits), (iv) shortages of fuel, supplies or labor not caused by a Claimant Act, (v) acts of God or the elements (such as tornado, hurricane, flood, snow, etc. and abnormally inclement weather for the season), (vi) civil commotion, acts of war, terrorism or the public enemy, (vii) fire or other casualty or catastrophe, (viii) accidents not caused by a Claimant Act, or (ix) any other cause beyond Claimant's reasonable control but specifically excluding, however, (A) weather conditions that are reasonably foreseeable as to frequency, duration and severity in their season of occurrence, (B) financial inability, or (C) reasonably foreseeable field conditions (each of the events described in the preceding clauses being herein referred to as an "**Force Majeure Event**," and, collectively, "**Force Majeure Events**"), the observance, performance or compliance with, any non-monetary obligation (i.e., any obligation other than the obligation to pay a sum of money) on the part of Claimant to observe, perform or comply with, is prevented or delayed, including the inability to supply, provide or furnish, or a delay in supplying, providing or furnishing, any service expressly or implicitly to be supplied, provided or furnished, or the inability to make, or a delay in making, any alteration, decoration, installation, improvement, repair, addition or other physical change in, to or about the Premises or any other portion of the Building, or the inability to supply, or a delay in supplying, any equipment, fixtures or other materials, then, for so long as the Claimant shall be unable to observe, perform or comply with, or shall be delayed in the observance, performance or compliance with, any such non-monetary obligation, this Lease and Tenant's

86

obligation to pay rent hereunder and Landlord's or Tenant's, as applicable, obligation to observe, perform and comply with all of the other obligations on their respective parts to observe, perform or comply with, shall in no way be affected, impaired or excused, and, except as otherwise expressly provided to the contrary in this Lease, the Claimant's obligation to observe, perform or comply with any such non-monetary obligation shall be excused for the period during which the Force Majeure Event prevents or delays such observance, performance or compliance. For purposes of this Lease, Force Majeure Events shall be deemed to exist only after the date that the applicable Claimant notifies the other party in writing of such delay. After such initial notification, the Claimant shall promptly after request of the other party (made no more often than once every ten (10) days) notify the other party of the status of such delay. Each party shall use all commercially reasonable efforts to mitigate the delay caused by any event of Force Majeure Event to the extent reasonably commercially practicable, but, without the necessity of employing overtime labor unless such party elects to do so within its sole discretion or unless the other party elects to pay for such overtime labor. Each party shall provide the other with notice of any occurrence of Force Majeure Event as soon as reasonably practicable as a condition to such party claiming any extension of time under this Lease (including without limitation under the Work Agreement) due to Force Majeure Event. A Force Majeure Event shall be deemed not to occur until the Claimant delivers the other party notice of the Force Majeure Event. Under no circumstances shall the non-payment of money or a failure attributable to a lack of funds be deemed to be (or to have caused) an event of Force Majeure Event.

25.26   **Contests**.

(a)    Tenant may, at its expense contest, by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to the Premises, of any Requirement with which Tenant is obligated to comply pursuant to the provisions of this Lease, and Landlord shall cooperate with Tenant in such proceedings, provided that:

(i)    Landlord shall not be subject to criminal penalty or to prosecution for a crime nor shall the Premises or any part thereof be subject to being condemned or vacated, by reason of non-compliance or otherwise by reason of such contest;

(ii)    Tenant shall defend, indemnify and hold harmless Landlord from and against any and all actions, proceedings, claims, deficiencies, judgments, suits, losses, obligations, penalties, liabilities, damages, costs and expenses (including court costs and reasonable legal fees and disbursements) which Landlord shall suffer by reason of such non-compliance or contest;

(iii)    such non-compliance or contest shall not constitute or result in any violation of any superior lease or superior mortgage, or if such superior lease and/or superior mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by Landlord, such action shall be taken and such security shall be furnished at the expense of Tenant; and

(iv)    Tenant shall keep Landlord advised as to the status of such proceedings.

87

(b)    Without limiting the application of subsection (a)(i) above thereto, Landlord shall be deemed subject to prosecution for a crime within the meaning of said subsection, if Landlord, or any officer, director, partner, member, principal or employee of Landlord individually, is charged with a crime of any kind or degree whatever, whether by service of a summons or otherwise, unless such charge is withdrawn before Landlord or such officer, director, partner, member, principal or employee (as the case may be) is required to plead or answer thereto.

**ARTICLE XXVI**

**RENEWAL**

26.1    **Renewal Term**. So long as (i) there exists no uncured Event of Default by Tenant, and (ii) this Lease is still in full force and effect, Tenant shall have the right, exercisable at Tenant's option, to renew the term of this Lease for two (2) successive terms of five (5) years for all of the then Premises demised under this Lease as of the exercise of the applicable option or less than all such space provided that Tenant renews at least fifty percent (50%) of the Premises originally demised by this Lease (including any Must Take Expansion Premises). If exercised, and if the conditions applicable thereto have been satisfied, the first renewal term of this Lease (the "**First Renewal Term**") shall commence immediately following the end of the initial Lease Term and the second renewal term of this Lease (the "**Second Renewal Term**") shall commence immediately following the end of the First Renewal Term. (Collectively the First and Second Renewal Terms shall be referred to herein as the "**Renewal Terms**".) The rights of renewal herein granted to Tenant are personal to Named Tenant and any Threshold Successor of Named Tenant (and may not be exercised by any other transferee, assignee or subtenant of original Tenant) and shall be subject to, and shall be exercised in accordance with, the following terms and conditions:

(a)    Tenant shall exercise an option for a Renewal Term by providing Landlord irrevocable written notice no later than eighteen (18) months prior to the expiration of the then-current term of this Lease that it desires to exercise its right of renewal for a Renewal Term (the "**Renewal Notice**") for the portion of the Premises as described in the Renewal Notice (the "**Renewed Premises**").

(b)    All terms and conditions of this Lease shall remain in full force and effect during the Renewal Terms, except that commencing on the first (1st) day of such Renewal Term, the Per RSF Base Rent for Renewed Premises for such Renewal Period shall be equal to the greater of (1) the Per RSF Base Rent in effect for the prior Lease Year, as escalated, and (2) ninety-five percent (95%) of the Fair Market Rent for the RSF of the Renewed Premises, as determined in accordance with the process set forth in <u>Section 26.2</u> below (the "**Renewal Term Base Rent**"); provided however that in no event shall the Per RSF Base Rent for a Renewal Term be less than the Per RSF Base Rent in effect for the prior Lease Year, as escalated and no Per RSF Base Rent shall be allocated to the Excluded RSF.

(c)    The Per RSF Base Rent, as adjusted at the commencement of the Renewal Terms, shall continue to escalate annually on the first day of each Lease Year, in accordance with <u>Section 4.3</u> of this Lease.

88

(d)     If there exists an uncured Event of Default under this Lease on the date Tenant sends a Renewal Notice or at any time thereafter until a Renewal Term is to commence, at Landlord's election, such Renewal Term shall not commence.

(e)     Tenant's right of renewal with respect to a Renewal Term shall lapse and be of no further force or effect if Tenant fails to timely provide a Renewal Notice. If Tenant's right of renewal with respect to a Renewal Term lapses for any reason, then Tenant's right of renewal with respect to any subsequent Renewal Term shall automatically lapse and be of no further force or effect.

(f)     An amendment confirming exercise of each applicable Renewal Term and specifying the Per RSF Base Rent adjustment for such Renewal Term shall be executed by Landlord and Tenant within thirty (30) days after the determination of the Per RSF Base Rent for such Renewal Term, after conclusion of the process set forth in Section 26.2.

26.2    **Fair Market Rent**. Tenant and Landlord agree to negotiate for thirty (30) days after receipt by Landlord of the Renewal Notice for the applicable Renewal Term (the "**Negotiating Period**") to determine Fair Market Rent for purposes of this Section 26.2 based on the following factors: the stated or quoted Per RSF Base Rent (base rent, including renewal free rent/abatement) that would be received by landlords renting space of quality, size and location comparable to the Premises in comparable buildings in the Landover/Lanham submarket for a five (5) year renewal term, adjusted to reflect the additional rent provided herein, and taking into account all other relevant factors (the "**Factors**"). If the parties are unable to agree on Fair Market Rent for purposes of this Section 26.2 during the Negotiating Period, then the Fair Market Rent shall be determined as follows:

(a)     Within ten (10) days of the Negotiating Period, Landlord and Tenant shall each appoint an appraiser (as defined below) to determine the fair market rent. Each appraiser shall deliver to Landlord and Tenant its written report conforming to USPAP (Uniform Standards of Professional Appraisal Practice) setting forth its determination of fair market rent based on the Factors (respectively, "**Landlord's FMV**" and "**Tenant's FMV**"). If the fair market rent of the two (2) appraisers are within five percent (5%) of one another, the "Fair Market Rent" under this Section 26.2 shall be the average of the two (2) appraised values. If the fair market rents are not within five percent (5%) of one another, then the two (2) appraisers shall choose an independent third appraiser within ten (10) days after delivery of their respective reports. If the two (2) appraisers cannot agree on the appointment of the third appraiser within such time, the parties shall thereupon make application to the American Institute of Real Estate Appraisers to appoint a third appraiser. If the American Institute of Real Estate Appraisers does not act within thirty (30) days, the parties shall make application to the Circuit Court for Prince George's County, Maryland to appoint such third appraiser. The third appraiser ("**Third Appraiser**") shall be directed to issue a written appraisal conforming to USPAP the fair market rent of the Premises based on the Factors. The final "Fair Market Rent" under this Section 26.2 shall be the either Landlord's FMV or Tenant's FMV, as selected by the Third Appraiser.

(b)     All appraisers shall be members of the American Institute of Real Estate Appraisers (MAI) who are familiar with appraisal procedures and have at least ten (10) years' experience in the Prince George's County Maryland commercial real estate rental market.

(c)     Each party shall bear the costs of its own appraiser. The cost of the Third Appraiser, if incurred, shall be borne equally by the parties.

(d)     Landlord and Tenant shall each act in a commercially reasonable fashion throughout the process of determining the Fair Market Rent.

(e)     Upon the determination of the Fair Market Rent as provided above, the Fair Market Rent for the applicable Renewal Term shall be adjusted as provided in <u>Section 26.1(a)</u>.

(f)     Upon the determination of the Renewal Term Base Rent for an applicable Renewal Term, Landlord and Tenant will enter into a confirmation certificate setting for the Renewal Term Base Rent for the applicable Renewal Term.

**ARTICLE XXVII**

**<u>ROOF RIGHTS AND ROOF TERRACE</u>**

27.1     **<u>Roof Access</u>**. Subject to the terms and conditions of this Lease and the Roof Access Agreement attached hereto as **<u>Exhibit H</u>**, during the Lease Term Tenant, at Tenant's sole cost and expense, but without any additional rental therefor, shall have continuous access to and use of the Building roof, subject to local governmental codes and other Requirements, for the installation and maintenance of its communication and HVAC equipment.

27.2     **<u>Roof Terrace</u>**. Tenant shall have sole and exclusive use of the roof top "penthouse" and the exterior portions of the roof; provided that Landlord shall have the right to use and access the Roof Terrace to perform or exercise any of its rights under this Lease. Subject to Landlord's reasonable approval (not to be unreasonably withheld, conditioned or delayed), and; provided that both Landlord and Tenant reasonably agree that the same is feasible and will not cause any material damage or degradation of value to the Building or Building Systems, Tenant shall have the right to install a deck on the roof of the Building (the "**Roof Terrace**"), at Tenant's sole cost and expense, in a mutually agreeable location and based on mutually agreeable dimensions for the deck. At Tenant's request, Landlord agrees to contract for the installation and maintenance of the Roof Terrace; provided that Landlord and Tenant mutually agree on the terms and procedures for payment of the same by Tenant. The construction of the Roof Terrace shall be governed by <u>Article IX</u> (Alterations) hereof; provided that at all times all work on the roof shall be controlled and supervised by Landlord, at Tenant's cost and expense. In no event shall Tenant make or cause to be made any penetration through the roof without the prior written reasonable consent of Landlord. Should Landlord consent to Tenant's penetration through the roof, Tenant shall use Landlord's roofing contractor to repair or re-flash Tenant's roofing penetrations. Tenant shall deliver to Landlord a certification letter from such roofing contractor stating that all roof repairs and penetrations have been made in compliance with the roof warranty. Tenant's right to install the Roof Terrace shall be subject to applicable Requirements, as well as Landlord's review and reasonable approval of Tenant's plans and specifications therefor. Following construction of the Roof Terrace, provided the rentable square footage of the Premises does not fall below the rentable square footage of the Initial Premises as of the Effective Date (in which event, at Landlord's election, such right shall be non-exclusive,

90

in common with other tenants of the Building), Tenant shall have the exclusive right to use the Roof Terrace, in accordance with all rules and regulations adopted by Landlord, in its reasonable discretion, in connection therewith. Tenant shall indemnify and hold Landlord harmless from any claims, injury or damage that results from Tenant's installation and use of the Roof Terrace, however, Tenant shall either carry or reimburse Landlord for the appropriate insurance addressing such rooftop installation. Notwithstanding anything to the contrary contained herein, Tenant shall not be required to remove the Roof Terrace at the expiration or earlier termination of the Lease Term, provided such Roof Terrace has been maintained by Tenant and is in good condition, reasonable wear and tear accepted.

## ARTICLE XXVIII

## AMENITY SPACE

28.1    **Amenity Space**.

(a)    Landlord shall allocate a portion of the first floor of the Building as the Amenity Space, which shall be comprised of: (x) the area of the existing kitchen area located in the Amenity Space, together with the existing space adjacent thereto, as an food hall/deli, serving hot and cold food, having a general store style concept (the "**Food Hall/Deli**" and such area, the "**Food Service Area**"), to the extent permitted by applicable Requirements; and (y) the existing auditorium located on the Amenity Space for auditorium use (the "**Auditorium**"). Tenant shall have the right, at Tenant's sole cost and expense, to install audio-visual and/or sound equipment in the Auditorium, provided that Landlord shall have no liability for any damage or loss to any such equipment.

(b)    The costs of operating and maintaining the Food Hall/Deli once it is constructed by Landlord as required in Section 2.3 shall be the sole responsibility of Landlord (or the third party operator(s) that Landlord engages to operate the Food Hall/Deli (the "**Operator**")). Landlord shall be responsible for engaging the Operator to operate the Food Hall/Deli, subject to Tenant's reasonable approval; Tenant shall be responsible for engaging third party operators for all other amenities within the Amenity Space. Landlord acknowledges that the food offerings, quality and experience are important to the Tenant and its employees. Landlord will use commercially reasonable efforts to ensure that the Operator takes Tenant's needs and preferences into account in its culinary offerings and that Tenant has reasonable influence over such culinary offerings. Landlord shall endeavor to have the Operator commence operations within the Food Hall/Deli upon completion of the Food Hall/Deli, subject to extension attributable to Tenant Delay and Unavoidable Delay (as limited by Section 3.3(f)). There shall be no obligation for the Landlord to maintain or subsidize the operation of the Food Hall/Deli if Tenant and its employees/visitors do not generate sufficient demand for such business to be reasonably viable (meaning such operations will not economically "breakeven") in the Building; provided however if Landlord intends to cease operations in the Food Hall/Deli pursuant to the foregoing, Landlord shall give Tenant at least thirty (30) days prior notice and Tenant shall have the right, at its sole cost and expense, to operate, or to engage an operator to operate, the Food Hall/Deli for the benefit of Tenant and any other tenants in the Building. Following development/renovation thereof in accordance with Sections 2.3 and 9.1 herein above, other tenants, Tenant and only its employees who maintain offices in the Building shall be entitled to

use the Amenity Space, on a non-exclusive basis, in accordance with reasonable rules and regulations related thereto as provided by Landlord from time to time, during the 2U Building Hours on Business Days.

Notwithstanding the foregoing, Tenant may arrange for food trucks ("**Food Trucks**") to operate in proximity to the Building, provided that:

> 1.      The Food Trucks do not locate within or otherwise interfere with parking, fire lanes or other areas reasonably designated by Landlord;

> 2.      The Food Trucks be subject to any applicable municipal and other regulatory approvals and shall operate in compliance with all applicable restrictions and rules;

> 3.      The Food Trucks shall be subject to any other reasonable rules and regulations imposed by Landlord; and

> 4.      The Food Trucks shall be subject to compliance with any other applicable third party restrictions.

> (c)      All costs of operating and maintaining the Auditorium (including, any subsequent staffing as necessary to effectively operate the Auditorium) to the extent not attributable to use by a specific tenant, including Tenant, may be included in Operating Expenses to the extent such costs are not excluded from Operating Expenses (in accordance with the terms hereof).

28.2      **Additional Amenities**. In addition to the aforesaid amenities, Landlord shall allow Tenant, at Tenant's expense, to install amenities for Tenant's employees, of a nature and in an area which shall be acceptable by Landlord, within the Premises. Landlord shall have the right to approve (acting reasonably) Tenant's proposed amenities. In addition, notwithstanding anything to the contrary contained herein, Landlord, at Landlord's sole discretion, shall have the right to request that Tenant restore said amenity area(s) to the same condition at the time of delivery of said area(s) at the time of approval of proposed amenities, prior to the expiration or earlier termination of this Lease.

**ARTICLE XXIX**

**EXPANSION RIGHTS**

29.1      **Right of First Refusal**.

> (a)      Tenant shall have the following expansion rights with respect to the full third (3rd) floor, and the full fourth (4th) floor of the Building (each of the third (3rd) floor and the fourth (4th) floor, an "**Expansion Premises**"). Commencing on the Effective Date, Tenant may, at any time and from time to time, lease the ROFR Premises pursuant to the ROFR Procedure (as defined below).

> (b)      The term "**ROFR Procedure**" shall mean:

92

1.　　　Landlord shall notify Tenant once Landlord and a bona fide prospect (the "**Prospect**") have had ongoing substantive discussions (i.e., as evidenced by Landlord's receipt of a bona fide and substantive written counter proposal from the Prospect that is acceptable to Landlord) (the "**Offer**"), to lease all or any portion of any Expansion Premises; provided that the Offer (as described in the Offer, the "**ROFR Premises**") must at a minimum contain the following terms in clear and unambiguous language: base rent, rent concessions, work allowance, condition of the ROFR Premises upon delivery by Landlord, Landlord's work;

2.　　　All other terms and conditions (except for the Lease Term, rent and the additional rent, which shall be as set forth below) with respect to the ROFR Premises shall be equal to the terms set forth in the Offer;

3.　　　For a period of ten (10) Business Days after receipt of any such notice from Landlord, Tenant shall have the right to elect to lease the ROFR Premises from Landlord upon the terms and conditions set forth in the Offer, commencing on the date the ROFR Premises is available as set forth in the terms and conditions set forth in the Offer. In the event Tenant agrees to lease the ROFR Premises within such ten (10) Business Day period, for an additional five (5) Business Day period, Landlord and Tenant shall negotiate and execute an amendment to this Lease indicating the location and configuration of the ROFR Premises. The RSF of full floors and the increase to Tenant's Proportionate Share shall be as set forth in the Measurement Schedule and the RSF of partial floors and the increase to Tenant's Proportionate Share shall be determined in the process described in the definition of "RSF." Landlord shall promptly notify Tenant in writing of the measurement, and verification by Tenant's architect shall be completed within ten (10) days after Landlord's notice. If Tenant rejects the ROFR Premises or the five (5) Business Day period expires, Landlord may lease the ROFR Premises to the Prospect;

4.　　　In no event shall Tenant have the right to lease less than all of the ROFR Premises designated by Landlord;

5.　　　Tenant shall be obligated to pay additional rent with respect to the ROFR Premises in accordance with the provisions of Article V of this Lease;

6.　　　The term of the lease for the ROFR Premises shall be coterminous with the Lease Term;

7.　　　No abatements, allowances or other concessions shall apply with respect to any ROFR Premises except as otherwise set forth in the Offer;

8.　　　The rent for the ROFR Premises shall be the same as the Per RSF Base Rent then in effect for the Premises; and

9.　　　If the Prospect does not enter into a lease for the ROFR Premises within one hundred eighty (180) days of the Offer, if the Offer is modified in any material respect or if a new Offer is tendered to Landlord, then Landlord shall follow the ROFR Procedure with respect to such modified or new Offer.

93

(c)    If an Event of Default by Tenant has occurred and is continuing beyond any applicable notice and cure period, on the date Landlord's notice is given to Tenant by Landlord or at any time thereafter but prior to the commencement of the term any expansion space and if such Event of Default is not cured within the applicable notice and cure period, if any, provided in this Lease, then, at Landlord's option, Tenant's right to lease the ROFR Premises shall lapse and be of no further force or effect.

## ARTICLE XXX

## METROPLEX II ASSUMPTION

30.1    **Metroplex Lease**.

(a)    Guarantor currently leases 65,681 square feet ("**Metroplex Premises**") under a lease for certain premises at 8201 Corporate Drive, Landover, MD that expires July 31, 2018 ("**Metroplex Lease**"). The current rent per square foot under the Metroplex Lease ranges from $24.83 per rentable square foot to $27.46 per rentable square foot. Guarantor represents and warrants to Landlord that as of the date hereof (a) Guarantor has delivered to Landlord a true, correct and complete copy of the Metroplex Lease, including all addenda, amendments or modifications thereto and all such amendments or modifications are listed on **Exhibit M** attached hereto, (b) the Metroplex Lease is in full force and effect and there are no defaults beyond applicable notice and cure periods that have occurred thereunder that remain uncured, (c) the Metroplex Lease has not been modified or amended, except by any amendments referenced above, (d) the Metroplex Lease comprises the entire agreement between Guarantor and Metroplex regarding the Metroplex Premises, (e) the Metroplex Premises contains approximately 65,681 rentable square feet of office space, (f) the Metroplex Lease expires on July 31, 2018, and (g) the base rental obligations due for the remaining term of the Metroplex Lease (as of the date hereof) are set forth on **Exhibit M** attached hereto ("**Metroplex Rent**"). Guarantor shall indemnify, hold harmless and defend Landlord from and against any and all claims arising out of a breach of the representations and warranties set forth in this Article XXX.

(b)    Landlord represents that it has thoroughly reviewed the Metroplex Lease and understands its obligations as a subtenant thereunder.

30.2    **Takeover**

(a)    Simultaneously with the execution of this Lease, Landlord, as subtenant, and Guarantor, as sublandlord, will enter into sublease of the Metroplex Lease substantially in the form of **Exhibit P** (the "**Takeover Sublease**") provided that, as provided in the Takeover Sublease, the effectiveness of the Takeover Sublease shall be subject to the parties obtaining the consent of the landlord under the Metroplex Lease (the "**Metroplex Landlord**") to the Takeover Sublease. Each of Landlord and Guarantor shall use all commercially reasonable efforts to obtain the consent of the Metroplex Landlord to the Takeover Sublease. Landlord shall provide to Metroplex Landlord information and materials (i.e., financial statements) it reasonably requests in connection with its consideration of the Takeover Sublease and Landlord. If requested by the Metroplex Landlord, Landlord shall provide a reasonable cash security to Metroplex Landlord, provided that the Metroplex Cap (as such term is defined below) shall be reduced by the amount

of such cash security until such cash security is either returned to Landlord or Metroplex Landlord draws on such cash security as the result of a default by Landlord under the Metroplex Lease, at which time, such amount shall be added back to the Metroplex Cap.

(b)     This Lease and Tenant's obligations hereunder shall not be contingent on the Metroplex Landlord agreeing to or consenting to the Takeover Sublease. However, if Guarantor and Landlord are not able to obtain the consent of the Metroplex Landlord to the Takeover Sublease for reasons other than Landlord's failure to use commercially reasonable efforts to obtain the consent of the Metroplex Landlord, as provided above, within one hundred twenty (120) days after submission of the Takeover Sublease, together with submission of all additional items pursuant to Section 30.2(a) above, if requested, then (x) the Takeover Sublease shall be void and of no further force and effect (in accordance with its terms), however, pursuant to this Lease, Landlord shall remain obligated to make timely monthly payments of the Metroplex Rent up to a cap of $2,850,000.00 (the "**Metroplex Cap**") directly to Guarantor as set forth in the Takeover Sublease, as and when payable under the Metroplex Lease, which payments shall commence on the Lease Commencement Date, and (y) Guarantor and Landlord shall use commercially reasonable efforts to find a third-party subtenant acceptable to Guarantor and Metroplex Landlord, each in their sole discretion ("**New Subtenant**"). If Guarantor and Landlord are able to find such a New Subtenant, and such New Subtenant enters into a sublease of the Metroplex Lease with Guarantor, the actual payments by New Subtenant under such sublease attributable to Metroplex Rent shall be paid to Guarantor by such New Subtenant, and Landlord's monthly payment of the Metroplex Rent shall be reduced by the monthly payment of Metroplex Rent actually received by Guarantor from such New Subtenant.

(c)     In connection with an sale of the Building by Landlord, (i) if the Takeover Sublease is still in effect having been consented to by Metroplex Landlord, provided that Landlord has not subleased or licensed the Metroplex Premises to another unaffiliated occupant, then the Takeover Sublease shall terminate simultaneously with the sale of the Building and Landlord shall prepay in one lump sum the remaining balance of the Metroplex Rent payable by Landlord up to the Metroplex Cap or (ii) if the Takeover Sublease has been voided because Metroplex Landlord did not consent to the Takeover Sublease, then Landlord shall have the option, upon the sale of the Building, to prepay in one lump sum the remaining balance of the Metroplex Rent payable by Landlord up to the Metroplex Cap.

30.3   **Default**. The parties agree that a default by Landlord or Guarantor under the Takeover Sublease shall not be a default by Landlord or Tenant hereunder and any claims or judgments in favor of either Landlord or Guarantor under the Takeover Sublease shall be pursued separately and neither party shall be entitled to set-off any such claims or judgments against such party's obligations or liabilities under this Lease or the Guaranty.

## ARTICLE XXXI

## NON-COMPETITION

31.1   **Non-Competition**.

(a)        Landlord covenants that during the Lease Term, Landlord shall not lease any space in the Building, or grant any signage rights in or on the Building to any of the companies lists on **Exhibit L** (and any successors or assigns thereto) (each such company, a "**Competitor**" and such restrictions, the "**Competitor Restrictions**"). So long as any of the Competitor Restrictions are in effect, Landlord shall (i) obtain in any lease or occupancy agreement in the Building entered into after the Effective Date a covenant not to assign, sublease, license or otherwise transfer the same to any Competitor in violation of this paragraph, (ii) promptly remove any signage in violation of the Competitor Restriction, and (iii) use its commercially reasonable efforts (including diligently seeking summary dispossess or eviction proceedings or seeking other injunctive relief) to enforce the Competitor Restrictions under any such lease entered into after the Effective Date (collectively, "**Competitor Covenants**").

(b)        If Landlord breaches a Competitive Restriction or fails to enforce a Competitor Covenant or Tenant reasonably believes that Landlord will breach a Competitor Restriction or not enforce a Competitor Covenant, Tenant shall have the right to exercise any and all rights and all remedies at law or in equity, against Landlord, and at Tenant's option, the applicable tenant or proposed tenant (or subtenant or proposed subtenant) to enjoin such breach or anticipated breach. In addition to the foregoing (and not in limitation thereof), Tenant shall have the right to bring an action in Landlord's name, at Landlord's cost and expense, to enforce the Competitor Restrictions against any tenant or occupant of the Building who may be in violation of such Competitor Restrictions as incorporated into its lease or occupancy agreement, provided that Tenant first obtains a final judgment concluding that Landlord failed to act in accordance with its obligations under this Section and thereafter Landlord fails to take and pursue such actions as are necessary to correct Landlord's failure within fifteen (15) days of such determination and continuously prosecute such actions to completion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

96

IN WITNESS WHEREOF, Landlord, Tenant and Guarantor have executed this Lease under seal as of the day and year first above written.

WITNESS/ATTEST:

Name: DAVID BERGMAN

LANDLORD:
**LANHAM OFFICE 2015 LLC,**
a Delaware limited liability company

By: _____ (SEAL)
Name: Meir Cohen
Title: Authorized Signatory

WITNESS/ATTEST:

Name: _____

TENANT:

**2U HARKINS ROAD LLC**, a Delaware limited liability company
By: _____ [SEAL]
Name: Christopher J. Paucek
Title: Chief Executive Officer

WITNESS/ATTEST:

Name: _____
Title: _____

GUARANTOR:

Guarantor is executing this Lease solely for the purpose of agreeing to be bound by the provisions of Article XXX hereof.

**2U, INC.**, a Delaware corporation

By: _____ [SEAL]
Name: Christopher J. Paucek
Title: Chief Executive Officer

*Lease Signature Page*

IN WITNESS WHEREOF, Landlord, Tenant and Guarantor have executed this Lease under seal as of the da   and   ear first above written.

WITNESS/ATTEST:

LANDLORD:

**LANHAM OFFICE 2015 LLC**,
a Delaware limited liabilit   compan

_____

B  : _____ (SEAL)

Name: _____

Name:_____

Title: _____

WITNESS/ATTEST:

TENANT:

**2   HARKINS ROAD LLC**, a Delaware limited liabilit   compan

*Gabrielle Smith Paucek*
Gabrielle Smith Paucek (Dec 21, 2015)

B  : *Christopher J Paucek*    [SEAL]
Christopher J Paucek (Dec 21, 2015)

Name: Gabrielle Smith Paucek

Name: Christopher J. Paucek
Title: Chief Executive Officer

WITNESS/ATTEST:

GUARANTOR:

Guarantor is executing this Lease solel   for the purpose of agreeing to be bound b   the provisions of Article XXX hereof.

**2   , INC.**, a Delaware corporation

*Gabrielle Smith Paucek*
Gabrielle Smith Paucek (Dec 21, 2015)

*Christopher J Paucek*
Christopher J Paucek (Dec 21, 2015)

B  : _____ [SEAL]

Name: Gabrielle Smith Paucek
Title: N/A

Name: Christopher J. Paucek
Title: Chief Executive Officer

*Lease Signature Page*

**Exhibit C**

**Lease Amendment**

*Execution Version*

## FOURTH AMENDMENT TO OFFICE LEASE AGREEMENT

This FOURTH AMENDMENT TO OFFICE LEASE AGREEMENT (this "**Amendment**") is entered into effective as of July 24, 2024 (the "**Fourth Amendment Effective Date**"), between KCP HARKINS FEE OWNER, LLC, a Delaware limited liability company (together with its permitted successors and assigns, "**Landlord**"), 2U HARKINS ROAD LLC, a Delaware limited liability company (together with its permitted successors and assigns, "**Tenant**") and 2U, Inc., a Delaware corporation ("**Guarantor**"). Each of Landlord, Tenant, and Guarantor are hereinafter referred to as a "**Party**" and collectively are referred to as the "**Parties**".

**WHEREAS**, Lanham Office 2015 LLC (as predecessor-in interest to Landlord) and Tenant first entered into that certain Office Lease Agreement (the "**Original Lease**") dated as of December 23, 2015 with respect to certain premises (the "**Original Premises**"; the Original Premises, as expanded by certain expansion premises added to the Original Premises pursuant to the Amendments (as hereinafter defined), collectively, the "**Premises**"), located in the building known as 7900 Harkins Road, Lanham, Maryland;

**WHEREAS**, in connection with the Original Lease, Guarantor entered into that certain Guaranty and Subordination Agreement (the "**Original Guaranty**"; the Original Guaranty, as modified by the Amendments, the "**Guaranty**") dated as of December 23, 2015;

**WHEREAS**, the Original Lease was amended by (i) that certain First Amendment to Office Lease and Reaffirmation of Guaranty (the "**First Amendment**") dated as of May 23, 2016, (ii) that certain Second Amendment to Office Lease and Reaffirmation of Guaranty (the "**Second Amendment**") dated as of October 4, 2017, and (iii) that certain Third Amendment to Office Lease and Reaffirmation of Guaranty (the "**Third Amendment**"; the Third Amendment, together with the First Amendment and the Second Amendment, collectively, the "**Amendments**"; the Amendments, together with the Original Lease, collectively, the "**Lease**") dated as of May 14, 2019;

**WHEREAS**, Tenant and Guarantor (collectively, the "**Debtors**") and certain of their affiliates contemplate filing voluntary proceedings for relief (the "**Bankruptcy Cases**" and each a "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United Stated Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS**, the Parties now desire to enter into this Amendment to terminate the Lease and the Guaranty on the Early Expiration Date (as hereinafter defined), subject to the terms herein, and otherwise amend the Lease and Guaranty as set forth below;

**NOW THEREFORE**, in consideration of the premises, promises, and covenants of the Parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lease and Guaranty are hereby modified and amended, and the Parties mutually agree as follows:

1.    Defined Terms. Unless otherwise specified herein, all capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Lease.

2.    <u>Modification of Expiration Date of Lease</u>. Notwithstanding any provision of the Lease or the Guaranty to the contrary, the Lease Term shall terminate on the later to occur of (a) September 30, 2024 and (b) such other date to be proposed by Tenant for Tenant to vacate the Premises and consented to by Landlord, such consent not to be unreasonably withheld, conditioned, or delayed (the later of such dates, the "**Early Expiration Date**"), with the same force and effect as if the Expiration Date set forth in the Lease were the Early Expiration Date, and the Lease is hereby modified such that the Expiration Date shall, notwithstanding anything to the contrary set forth in the Lease, be the Early Expiration Date. Effective as of the Early Expiration Date, the Lease shall be of no further force or effect, and all rights and obligations of the Parties thereunder shall terminate, except those rights and obligations of the Parties as set forth in this Amendment which are expressly intended to survive the Fourth Amendment Effective Date.

3.    <u>Surrender of Premises</u>. Notwithstanding any provision of the Lease to the contrary, including, but not limited to, Section 8.1 of the Original Lease, Tenant covenants and agrees that it shall surrender and turn over possession of the Premises to the Landlord on the Early Expiration Date in substantially the condition the Premises is in as of the Fourth Amendment Effective Date, broom clean, but subject to ordinary wear and tear, casualty and condemnation, as applicable (the "**Current Condition**") and Landlord agrees to accept the Premises in the Current Condition in lieu of the condition required by the Lease, including, without limitation, Articles 8 and 9 of the Original Lease. For the avoidance of doubt, notwithstanding any provision of the Lease to the contrary, including, without limitation, Articles 8 and 9 of the Original Lease, the Parties acknowledge and agree that Tenant shall have no obligation to remove any Alterations or pay to Landlord any Removal Cost in connection with the foregoing, and any such Alterations shall be surrendered to Landlord on the Early Expiration Date; provided, however that Tenant shall remove all Tenant Property at its own expense prior to the Early Expiration Date.

4.    <u>Rent and Expenses</u>. Notwithstanding any provision of the Lease or the Guaranty to the contrary, Tenant shall pay Base Rent and Tenant's Proportionate Share of Operating Expenses (collectively, the "**Rent**") for the Premises for the portion of the Lease Term relating to the period through and including the Early Expiration Date, in each case, in the manner set forth in the Lease.

5.    <u>Assumption of the Lease and this Amendment</u>. Tenant covenants that it shall assume the Lease, as modified by this Amendment, pursuant to the Debtors' chapter 11 plan(s) of reorganization (the "**Plan**") in the Bankruptcy Cases. Guarantor covenants that it shall assume the Guaranty, as modified by this Amendment, pursuant to the Plan in the Bankruptcy Cases. If the Lease is instead rejected, whether by motion, through a plan, operation of law, or conversion of the Bankruptcy Cases to chapter 7, this Amendment shall be null and void, and Landlord preserves all rights and remedies under the Lease, Guaranty, the Bankruptcy Code and applicable law, including claims for rejection damages under section 502 of the Bankruptcy Code.

6.    <u>Lease Amendment Fee</u>. As partial consideration for Landlord's entry into this Amendment, Tenant and Guarantor covenant that they shall pay to Landlord $3,000,000.00 (the "**Lease Amendment Fee**") upon the earlier of (i) the Plan Effective Date (as hereinafter defined) and (ii) the date that is 150 days after the date of filing of the Bankruptcy Cases.

7.    <u>Letter of Credit</u>.

2

A.    The Parties hereby acknowledge that Landlord is holding a Letter of Credit in the amount of $2,000,000.00 (the "**Letter of Credit**"). The Parties agree that upon the earlier of (i) the effective date of the Plan (the "**Plan Effective Date**") and (ii) September 15, 2024 (such date, the "**L/C Draw Date**"), Landlord may draw upon any undrawn portion of the Letter of Credit in an amount up to $2,000,000.00.

B.    Notwithstanding anything contained in this Amendment or the Lease to the contrary, Landlord may draw on the Letter of Credit prior to the L/C Draw Date upon a breach of this Amendment including, but not limited to, the Debtors' (i) failure to pay Rent, (ii) failure to pay the Lease Amendment Fee, or (iii) rejection of the Lease.

C.    Notwithstanding anything contained in this Amendment or the Lease to the contrary, each of Guarantor and Tenant shall be exempt from any obligations under the Guaranty and/or Lease, including, without limitation, any obligation set forth in Sections 1-2 of the Guaranty and Article XI of the Original Lease, to restore all or any portion of the Security Deposit Amount.

8.    <u>Termination of Guaranty</u>. Notwithstanding any provision of the Lease or the Guaranty to the contrary, but subject to the terms of this Amendment, the Guaranty shall expire, terminate, and be of no further force, effective on the date that the Lease Amendment Fee is paid to Landlord. Landlord acknowledges and agrees that, at such time, all rights and Obligations, as defined in the Guaranty, shall fully terminate. For purposes of clarity, Section 5(a) of the Guaranty shall be of no further force.

9.    <u>Claims for Unpaid Rent and Fees</u>. Notwithstanding anything contained in this Amendment or the Lease to the contrary, Tenant and Guarantor acknowledge that (i) any unpaid Rent due and owing for the period from the Fourth Amendment Effective Date through the date of the filing of the Bankruptcy Cases (the "**Petition Date**") shall be an allowed unsecured prepetition claim of the Landlord in Bankruptcy Cases; and (ii) any (a) unpaid Rent due and owing for the period from the Petition Date through the Early Expiration Date or (b) unpaid portion of the Lease Amendment Fee shall each be an allowed postpetition administrative claim of the Landlord in the Bankruptcy Cases.

10.    <u>Attorneys' Fees</u>. The Parties acknowledge and agree that, notwithstanding anything to the contrary in the Lease or the Guaranty, no Party shall be entitled to receive (or, with respect to Landlord, charge as rent due from Tenant or any Affiliate of Tenant) from any other Party (or any Affiliate of any other Party) any attorneys' fees or disbursements incurred in connection with this Amendment or any default or Event of Default which may have occurred prior to the Fourth Amendment Effective Date.

11.    <u>Mutual Releases and Estoppel</u>.

A.    Landlord hereby represents, warrants, and agrees that as of the date hereof, there exists no breach, default, or Event of Default by Tenant under the Lease, or, to Landlord's knowledge, any event or condition which, with the giving of notice or passage of time or both, would constitute a breach, default or Event of Default by Tenant under the Lease. Landlord further warrants and agrees that, as of the Fourth Amendment Effective Date, the Lease continues to be a

3

legal, valid and binding agreement and obligation of Landlord and Landlord has no current offset or defense to its performance or obligations.

B.      Except as otherwise stated in herein, Landlord hereby waives and releases all demands, charges, claims, accounts, and causes of action of any nature against Tenant, Guarantor, and their Affiliates, stockholders, agents, directors, officers, employees, representatives, successors, heirs, administrators and assigns (each, a "**Tenant Released Party**"), of and from any and all claims, actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages and expenses of any kind or character whatsoever, whether known or unknown, in contract, in law or in equity, which first occurred or arose in any manner whatsoever prior to the Fourth Amendment Effective Date and relate to the Lease or Guaranty, as applicable, and Tenant's occupancy of the Premises.

C.      Tenant and Guarantor each hereby waives and releases all demands, charges, claims, accounts, and causes of action of any nature against Landlord and its Affiliates, stockholders, agents, directors, officers, employees, representatives, successors, heirs, administrators and assigns (each, a "**Landlord Released Party**", and together with the Tenant Released Parties, each a "**Released Party**"), of and from any and all claims, actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages and expenses of any kind or character whatsoever, whether known or unknown, in contract, in law or in equity, which first occurred or arose in any manner whatsoever prior to the Fourth Amendment Effective Date and relate to the Lease or Guaranty, as applicable, and Tenant's occupancy of the Premises.

D.      Notwithstanding the foregoing, the Parties agree that the foregoing releases are not intended to release any Released Party from their respective (i) obligations and/or liabilities under this Amendment or (ii) insurance obligations under the Lease for any accident or event that occurred on or prior to the Early Expiration Date.

12.     <u>Bankruptcy Filing</u>. Notwithstanding anything contained in this Amendment to the contrary, this Amendment shall be null and void if the Debtors do not commence the Bankruptcy Proceedings within one hundred twenty (120) days following the Fourth Amendment Effective Date.

13.     <u>Authority</u>. The Parties hereby represent that they each have the right and authority to enter into this Amendment; provided, however, that Landlord's authority is subject to approval of Midland Loan Services, a PNC Real Estate Business (the "**Lender**"), under that certain Loan Agreement dated as of October 17, 2017 (as amended, restated, replaced, supplemented or otherwise modified from time to time). Landlord warrants that it shall use commercially reasonable and diligent efforts to promptly obtain the approval of its Lender; however, such Lender approval cannot be guaranteed by Landlord.

14.     <u>Interpretation</u>. References to the Guaranty and the Lease in this Amendment, the Guaranty, and the Lease shall, following the Fourth Amendment Effective Date, be deemed to refer to the Guaranty and the Lease as each have been amended by this Amendment.

15.    <u>Miscellaneous</u>. The terms of Sections 25.6 through 25.11, 25.13 through 25.17, and 25.23 of the Original Lease are hereby incorporated by reference, *mutatis mutandis*.

[*Remainder of Page Intentionally Blank; Signature Page Follows*]

5

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment as of the day and year first above written.

**LANDLORD:**

**KCP HARKINS FEE OWNER, LLC,**
a Delaware limited liability company

By:
Name: Jack J.Esav
Title: Member

**TENANT:**

**2U HARKINS ROAD LLC**, a Delaware limited liability company

By: 2U, Inc., its sole member

By:
   Name:
   Title:

**GUARANTOR:**

**2U, Inc.,** a Delaware corporation

By:
   Name:
   Title:

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment as of the day and year first above written.

**LANDLORD:**

**KCP HARKINS FEE OWNER, LLC**,
a Delaware limited liability company

By: _____
    Name:
    Title:

**TENANT:**

**2U HARKINS ROAD LLC**, a Delaware limited liability company

By: 2U, Inc., its sole member

By: _____
    Name: Matthew Norden
    Title: Chief Legal Officer and Chief Financial
        Officer of 2U, Inc.

**GUARANTOR:**

**2U, Inc.,** a Delaware corporation

By: _____
    Name: Matthew Norden
    Title: Chief Legal Officer and Chief Financial
        Officer of 2U, Inc.

**<u>Exhibit D</u>**

**HQ Information Request Letter**



**2U Harkins Road LLC**
2345 Crystal Drive, Suite 1100, Arlington, Virginia 22202

October 31, 2024

KCP Harkins Fee Owner, LLC
1370 Broadway, 7th Floor
New York, NY 10018
Attention: Jack J. Ezon

with a copy to

Foley & Lardner LLP
90 Park Avenue
New York, NY 10016
Attention: Alissa M. Nann, Esq.

      Re: <u>Mitigation of Lease Rejection Damages Claims</u>

Dear Landlord:

      Reference is made to (a) the cases (the "<u>Chapter 11 Cases</u>") commenced under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") being jointly administered under the caption *In re 2U, Inc.,* et al., Case No. 24-11279 (MEW), and (b) the lease (the "<u>Lease</u>") between KCP Harkins Fee Owner, LLC and 2U Harkins Road LLC (collectively with its affiliated debtors in the Chapter 11 Cases, the "<u>Debtors</u>") for the premises located at 7900 Harkins Road, Lanham, MD 20706 (the "<u>Premises</u>").

      As you should be aware, (a) on September 5, 2024, the Bankruptcy Court approved the Debtors' rejection of the Lease pursuant to section 365(a) of the Bankruptcy Code via the *Order (A) Authorizing the Debtors to (I) Reject Certain Unexpired Leases and Sublease of Nonresidential Real Property and (II) Abandon any Remaining Personal Property Located at the Leased Premises; and (B) Granting Related Relief* [Docket No. 168], and (b) in connection with the rejection of the Lease, you are under a state law duty to mitigate any damages that arise as a result of such rejection.

      The Debtors are in the process of reconciling all claims against the Debtors' estates.   As such, the Debtors request that you provide the following information with respect to your estimated damages in accordance with applicable Lease provisions, your efforts to mitigate damages arising from rejection of the Lease and the results thereof no later than November 15, 2024:

- A narrative and timeline of your efforts to mitigate damages resulting from the rejection of the Lease and evidence of these efforts;

- A breakdown of the amount of damages due under the Lease calculated in accordance with any liquidated damages provision in the Lease from the date of

1

rejection, including evidence relied upon to arrive at amounts included in the calculation, including (as applicable): (a) the reasonable rental value of the Premises through the stated term of the Lease, (b) the appropriate discount rate to apply, (c) any projected vacancy period and related expenses, and (d) any other amounts which are required to be estimated for the calculation of damages pursuant to the terms of the Lease;

- If you have entered into a new lease for the Premises or for any portion thereof (a) the date of the new lease for the Premises, (b) the term of the new lease for the Premises, (c) the monthly payments called for under the new lease for the Premises, and (d) the revised amount of your rejection damage claim in light of obtaining a new tenant; and

- If you are currently in negotiations for a new lease for the Premises, please advise us of the expected time frame for the conclusion of these negotiations.

If any mitigation information you provide or have provided becomes inaccurate or otherwise needs to be updated, please send us the revised information as soon as possible.

All requested information and any updates thereto should be sent to:

2U, LLC
2345 Crystal Drive, Suite 1100
Arlington, Virginia 22202
Attn:  Lillian Brownstein
Email: lbrownstein@2u.com

with a copy to

Latham & Watkins LLP
1271 Ave of the Americas
New York, NY 10020
Attn:  George Klidonas, Anu Yerramalli, Randall Weber-Levine & Scott Yousey
Email: george.klidonas@lw.com, anu.yerramalli@lw.com, randall.weber-levine@lw.com, & scott.yousey@lw.com.

If we do not receive the requested information by November 15, 2024, we may object to the entirety of any claim you have asserted for damages arising from the rejection of the Lease.[1] Please contact Lillian Brownstein at lbrownstein@2u.com should you have any questions.

---

[1]  Nothing contained herein is intended or should be construed as: (a) an admission to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; or (d) a waiver of the Debtors' rights under the Bankruptcy Code or other applicable law.

2

Respectfully,

*/s/ Lillian Brownstein*

By:      Lillian Brownstein
Title:   General Counsel

**<u>EXHIBIT E</u>**

**HQ Landlord Response Letter**

KCP HARKINS FEE OWNER, LLC
1370 Broadway, 7th Floor
New York, NY 10018

November 8, 2024

<u>Via E-mail Delivery</u>

Lillian Brownstein
2U, LLC
2345 Crystal Drive, Suite 1100
Arlington, VA 22202
*E-mail: lbrownstein@2u.com*

RE:    **Reply to October 31, 2024 Letter**
**Concerning Mitigation of Lease Rejection Damages Claims**

Dear Ms. Brownstein:

We write in response to your letter dated October 31, 2024 (the "<u>10/31 Letter</u>"), to KCP Harkins Fee Owner, LLC ("<u>Landlord</u>") from 2U Harkins Road LLC ("<u>2U Tenant</u>" and, together with its affiliated debtors in the Chapter 11 Cases (as defined in the 10/31 Letter), including without limitation 2U Inc. ("<u>2U Guarantor</u>"), collectively the "<u>Debtors</u>").  Reference is made to Proofs of Claim Nos. 10051 and 10052 (collectively, the "<u>Proofs of Claim</u>") timely filed by Landlord in the Chapter 11 Cases, concerning the (i) lease (the "<u>Lease</u>") between Landlord and 2U Tenant for that certain real property located at 7900 Harkins Road, Lanham, MD 20706 (the "<u>Property</u>"), and (ii) the guaranty between Landlord and 2U Guarantor.

Notwithstanding Debtors' requests for information regarding Landlord's mitigation efforts in the 10/31 Letter, as Debtors are aware, the Lease expressly provides that "Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet all or any portion of the Premises or to collect any rent due upon such reletting." (Lease, Art. 19.2.)  Nonetheless, without waiving and expressly preserving all of Landlord's claims, rights and remedies, whether under the Bankruptcy Code, the Lease, the Guaranty and/or applicable non-bankruptcy law, the Landlord has made reasonable efforts to mitigate its damages arising as a result of the rejection of the Lease, in full satisfaction of all legal requirements, if any, to do so.

On June 28, 2024, approximately one month prior to the fling of the Chapter 11 Cases, and two months prior to Debtors' vacation of the Property, the Landlord initiated discussions with CBRE, Inc. ("<u>CBRE</u>") regarding the potential retention of their services as a broker to list and market the Property.  On July 22, 2024, CBRE visited the Property and toured the premises. On September 5, 2024, the Landlord retained CBRE and executed a listing agreement for the Property.

Despite the requirement under the Lease that the Debtors leave the Property in "broom swept" condition, extensive clean up and repair work was required by the Landlord in order to ready the Property for prospective tenants. This work has now been completed.  The Landlord has installed banners on the exterior of the Property visible from the street and the nearby train lines advertising its availability and including CBRE contact information.  CBRE has created marketing material for the Property, including a Property brochure, and listed the Property on

November 8, 2024
Page 2

various websites, including CoStar, to facilitate the rental of the Property.  Copies of the Property brochure and photos of the banners are enclosed herewith.

To date, the Landlord and CBRE have conducted three tours for prospective tenants, none of which were for rental of the entire Property but rather for individual or several floors.  The Landlord has not entered into any new leases for space at the Property, and there are no current lease discussions with any prospective tenants.

Based on discussions with CBRE, the market is currently very weak for both full-building leases and individual floor tenants, and it may take up to three (3) years to fully relet the Property.  Further, reletting the Property may require payment of significant broker fees, tenant improvement packages and/or rent concessions by the Landlord (all of which are recoverable by the Landlord under the Lease).  The Landlord will consider any viable tenant.

A detailed breakdown of the amounts asserted in the Proofs of Claim due under the Lease and Guaranty, including the capped rent amount calculated in accordance with section 502(b)(6) of the Bankruptcy Code, and supporting documentation for the same are provided in the addenda to the Proofs of Claim.  The damages to Landlord for rejection of the Lease from the rejection date of August 31, 2024 through the end of the scheduled Lease term of August 31, 2028 are approximately $41 million for outstanding Base Rent, additional rent and real estate taxes.[1]  This amount does not include various additional costs, fees and expenses provided for in the Lease (see Lease, Art. 19.2), which Landlord reserves all rights and waives none to include in amended Proofs of Claim.

---

[1] When estimated at current rates.

We expect that upon consideration of the enclosed information, the Debtors will promptly pay the Proofs of Claim.[2]

Sincerely yours,

KCP HARKINS FEE OWNER, LLC


_____/s/ Jack Ezon_____


By:    Jack Ezon, Authorized Representative


Enclosures


cc:    Latham & Watkins LLP
       1271 Avenue of the Americas
       New York, NY 10020
       Attention:    George Klidonas (George.klidonas@lw.com)
                     Anu Yerramalli (anu.yerramalli@lw.com)
                     Randall Weber-Levine (randall.weber-levine@lw.com)
                     Scott Yousey (scott.yousey@lw.com)

       Alissa M. Nann, Esq. (anann@foley.com)

---

[2] The RSA Term Sheet [Dkt. No. 20] states in part: "In the event the Debtors have not negotiated exits from [the Lease] prior to the Petition Date … any claims for rejection damages (calculated in accordance with section 502(b)(6) of the Bankruptcy Code) *__shall__* be paid in Cash on or after the Effective Date, as determined by the Required Consenting Creditors…."  *See* RSA Term Sheet, p. 7 (emphasis added).



## 7900 HARKINS RD
### LANHAM, MD

# PERFECTLY POSITIONED

**338,000 SF** OF PREMIUM OFFICE SPACE



CBRE

**7900 HARKINS RD, LANHAM, MD**

# Move-in Ready
# Unmatched Access







Step into a fully furnished, modern office designed for productivity from day one. With seamless access to major transit lines, your commute has never been easier. Welcome to a state-of-the-art space built for success.



 **FULL SERVICE COMMERCIAL-GRADE CAFÉ**

 **230 SEAT AUDITORIUM**

**ON-SITE GYM**

**LOCKER ROOMS**

**OPEN FLOORPLANS**

**PLUG AND PLAY**

**EXTERIOR SIGNAGE OPPORTUNITIES**

**EASY ACCESS TO I-95/495**

**STEPS TO THE METRO, AMTRAK, & MARC TRAIN**

**WALKABLE RETAIL AMENITIES**

**OUTDOOR LOUNGE AND GREENSPACE**

**QUALIFIED HUB ZONE**

3



# Your Gateway to Government

1. **IRS**
   INTERNAL REVENUE SERVICE

2. **PRINCE GEORGE'S COUNTY**
   CENTRAL SERVICES

3. **NASA**
   GODDARD SPACE FLIGHT CENTERT

4. **NOAA**
   NATIONAL WEATHER AND CLIMATE
   PROTECTION SERVICE

5. **NEW FBI HQ**
   FUTURE HOME OF THE FBI

6. **USDT**
   CENTER FOR US DEPARTMENT OF TREASURY

7. **NWS**
   NATIONAL WEATHER SERVICE

8. **USDA**
   U.S. DEPARTMENT OF AGRICULTURE

9. **FDA WHITE OAK CAMPUS**
   FOOD AND DRUG ADMINISTRATION

10. **NOAA HEADQUARTERS**
    NATIONAL OCEANIC AND
    ATMOSPHERIC ADMINISTRATION

11. **USCIS**
    U.S. CITIZENSHIP AND IMMIGRATION SERVICES

12. **DHS ST. ELIZABETH'S CAMPUS**
    U.S. DEPARTMENT OF HOMELAND SECURITY

13. **THE PENTAGON**
    U.S. DEPARTMENT OF DEFENSE

14. **NSA/FORT MEADE**
    NATIONAL SECURITY AGENCY

15. **NITAAC**
    NIH INFORMATION TECHNOLOGY ACQUISITION
    AND ASSESSMENT CENTER

16. **NIAID**
    NATIONAL INSTITUTE OF ALLERGY
    AND INFECTIOUS DISEASES



# Steps to Anywhere

**WALKING DISTANCE TO**
Orange Line Metro
The Future Purple Line Metro
Marc Train
Amtrak

**CONVENIENT TO**
Green Line Metro

---

 **METRO STATION**

 **MARC TRAIN STOP**

 **MTA PURPLE LINE STATION**

**▬ MTA PURPLE LINE**

**▬ METRO GREEN LINE**

**▬ METRO ORANGE LINE**

**╫╫╫ MARC TRAIN LINE**

**▬ AMTRAK LINE**

---

# Transit Times

TO DC **25 MIN**

TO BALTIMORE **36 MIN**

TO ANNAPOLIS **106 MIN**

TO DCA **49 MIN**

TO IAD **108 MIN**

TO BWI **42 MIN**



# Drive Times

## Cities

**BALTIMORE**
**44 MINS/30.5 MILES**

**ANNAPOLIS**
**29 MINS/23.3 MILES**

**DC**
**35 MIN/10.9 MILES**

## Airports

**DCA**
**27 MIN/15MILES**

**BWI**
**28 MIN/23.3 MILES**

**IAD**
**51 MINS/39.7 MILES**



# 7900 HARKINS RD

## FLOOR
# 01

**AUDITORIUM SEATING
FOR UP TO 230 PEOPLE**

**MULTIPLE LOUNGE AREAS
AND SEATING OPTIONS**

**COFFEE BAR**

**EXCELLENT STORAGE**

**FULL SERVICE KITCHEN**

**7900 HARKINS RD, LANHAM, MD**





# 7900 HARKINS RD

## TYPICAL FLOOR PLAN

### 36,000 SF

**PLUG AND PLAY**



**7900 HARKINS RD, LANHAM, MD**

7900 HARKINS RD, LANHAM, MD

# Ready
# For You













# 7900 HARKINS RD
## LANHAM, MD

# Contact Us

**Niel Beggy**
Senior Vice President
+1 301 254 4105
niel.beggy@cbre.com

**Brian McCarthy**
Senior Vice President
+1 301 215 4121
brian.mccarthy@cbre.com

**Ned Welbourn**
Senior Vice President
+1 202 585 5640
edward.welbourn@cbre.com

**Tim Connolly**
Vice President
+1 410 294 9913
tim.connolly@cbre.com

© 2024 CBRE, Inc. All rights reserved. This information has been obtained from sources believed reliable, but has not been verified for accuracy or completeness. You should conduct a careful, independent investigation of the property and verify all information. Any reliance on this information is solely at your own risk. CBRE and the CBRE logo are service marks of CBRE, Inc. All other marks displayed on this document are the property of their respective owners, and the use of such logos does not imply any affiliation with or endorsement of CBRE. Photos herein are the property of their respective owners. Use of these images without the express written consent of the owner is prohibited.





**Exhibit F**

**Calculation of Reduced Damages[1]**

| **Description** | **Amount** |
|---|---|
| Rents Due from Sept. 1, 2024 - Nov. 30, 2024 | $  2,509,677.90 |
| Rents Due December 1, 2024[2] | $      869,153.53 |
| Prepetition Utilities | $        39,087.27 |
| Prepetition Attorneys' Fees and Costs | $        65,076.50 |
| **Total Damages Through December 31, 2024** | **$  3,482,995.20** |
| Less Letter of Credit Draw | $ (2,000,000.00) |
| **Total Damages Due** | **$  1,482,995.20** |

1.  All amounts set forth herein are based on the HQ Landlord's own asserted claim amounts.  *See* Primary-Obligor Claim, Exh. 2 & Guarantor Claim, Exh. 2.

2.  The HQ Landlord's own calculations indicate that the rent reserved under the HQ Lease for the period from December 1, 2024 through August 31, 2024 amounts to $7,822,381.80.  *See* Primary-Obligor Claim, Exh. 2 & Guarantor Claim, Exh. 2.  When divided into monthly installments during that period, the monthly payment amount is $869,153.53.